UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X

STUART FORCE individually and as personal
representative of the ESTATE OF TAYLOR FORCE;
ROBBI FORCE; KRISTIN ANN FORCE; RINA ARIEL
individually, as personal representative of the ESTATE
OF H.Y.A. (a minor), and as guardian of S.R.A. and K.A.
(minors); AMICHAI ARIEL individually, as personal
representative of the ESTATE OF H.Y.A. (a minor), and
as the guardian of S.R.A. and K.A. (minors); ELI M.
BOROCHOV; SHARI MAYER BOROCHOV; RONEN
STEVEN BOROCHOV; DEVORA SUE BOROCHOV;
JOSEF S. BOROCHOV; SHIRA NECHAMA
BOROCHOV; AVRAHAM M. BOROCHOV;
ABRAHAM RON FRAENKEL, individually, as personal
representative of the ESTATE OF Y.N.F. (minor), and as
guardian of A.H.H.F., A.L.F., N.E.F., N.S.F., and S.R.F.
(minors); RACHEL DEVORA SPRECHER
FRAENKEL, individually, as personal representative of
the ESTATE OF Y.N.F. (minor), and as guardian of
A.H.H.F., A.L.F., N.E.F., N.S.F., and S.R.F. (minors);
TZVI AMITAY FRAENKEL; YEHUDAH GLICK,
individually and as guardian of S.G. (minor); YAFFA
GLICK individually and as guardian of S.G. (minor);
NERIA DAVID GLICK; SHLOMO GLICK; HALLEL
GLICK; MICAH LAKIN AVNI, individually, as
personal representative of the ESTATE OF RICHARD
LAKIN, and as guardian of Y.L, R.A., and V.A. (minors);
MANYA LAKIN, individually, as personal representative
of the ESTATE OF RICHARD LAKIN, and as guardian
of D.A.B. (minor); RITA AVNI, individually and as
guardian of E.A., R.A., and V.A. (minors); SHACHAR
BOTEACH; SHMUEL ELIMELECH BRAUN
individually and as personal representative of the
ESTATE OF C.Z.B. (minor); CHANA BRAUN
individually and as personal representative of the
ESTATE OF C.Z.B. (minor); SHIMSON SAM
HALPERIN; SARA HALPERIN; MURRAY BRAUN;

Case No. 20-cv-2578

**COMPLAINT**

**Jury trial demanded**

ESTHER BRAUN; MENACHEM MENDEL RIVKIN,
individually and as guardian of S.S.R., M.M.R., R.M.R.,
S.Z.R., and S.R. (minors); BRACHA RIVKIN,
individually and as guardian of S.S.R., M.M.R., R.M.R.,
S.Z.R., and S.R. (minors);
YOAV GOLAN; ROTEM SHOSHANA GOLAN;
YEHUDIT GOLAN; MATAN GOLAN; CICI
JACOBSON; EDDY JACOBSON; RAPHAEL ("RAFI")
LISKER, individually and as guardian of D.Z.L. (minor);
SHOSHANA LISKER, individually and as guardian of
D.Z.L (minor); JONATHAN ISSAC LISKER; AVITAL
KEREM LISKER; TAMAR PENINA LISKER; NOAM
MICHAEL SHAMBA, individually and as guardian of
H.S., T.M.S., O.S., M.S., N.E.S. and N.S. (minors);
YANA SHAMBA, individually and as guardian of H.S.,
T.M.S., O.S., M.S., N.E.S. and N.S. (minors),

Plaintiffs,

-against-

QATAR CHARITY; QATAR NATIONAL BANK and
MASRAF AL RAYAN,

Defendants.

---------------------------------------------------------------- X

**COMPLAINT**

Plaintiffs, by their undersigned counsel, complain of the Defendants, and hereby allege for

their complaint upon information and belief as follows:

**INTRODUCTION**

1.      This is a civil action for wrongful death, personal injury and related torts pursuant

to the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331-2339D, against the members of a terrorism

financing conspiracy spearheaded by the government and Royal Family of Qatar, whose

sponsorship of terrorism killed and maimed Plaintiffs in a series of heinous terrorist attacks in Israel.

2.      For more than a decade, Qatar has openly financed and supported at least two organizations that the U.S. long-ago designated as Specially Designated Terrorists ("SDTs") – the infamous Middle East terrorist organization Hamas and the Palestinian Islamic Jihad ("PIJ").  Both Hamas and PIJ are notorious for their violent terrorist attacks on innocent victims in Israel and elsewhere.

3.      In October 2012, Qatar publicly pledged $400 million to Hamas. That lawless act evoked widespread condemnation in the U.S. Congress. In addition to substantial financial support, Qatar has also provided safe haven to Hamas' senior political leadership since 2012.

4.      To accomplish its goal of spreading acts of terrorism and violence in Israel while evading international sanctions, Qatar coopted several institutions that it dominates and controls to funnel coveted U.S. dollars (the chosen currency of Middle East terrorist networks) to Hamas and PIJ under the false guise of charitable donations.  Three of those institutions are Defendants here - Qatar Charity, Masraf Al Rayan bank and Qatar National Bank (collectively "Defendants").

5.      Qatar Charity is a Qatari organization well-known for its funding of terrorism throughout the Middle East and North Africa.  It is also a member of the Union of Good, a Specially Designated Terrorist Organization ("SDTG") sanctioned for funding Hamas and international terrorism. The chairman of Qatar Charity's board is Hamad bin Nasser al-Thani, a member of the Qatari Royal Family. As part of the conspiracy, Qatar Charity collected and funneled millions of dollars in donations through the U.S. financial system to obtain U.S. dollars which were deposited in two of its branches in the Palestinian Authority-administered territories.

Qatar Charity then transferred a substantial portion of those dollars to Hamas and Hamas-affiliated organizations, as well as to PIJ and PIJ-affiliated charities in order to fund their terrorist activities.

6.     To complete this cycle of terrorist financing, the conspirators used two Qatari banks under the control of Qatar and the Qatar Royal Family – Defendants Masraf Al Rayan bank and Qatar National Bank – both of which were essential to provide access to the U.S. financial system to obtain the U.S. dollars needed to sustain Hamas' and PIJ's terrorist activities.

7.     Defendant Masraf Al Rayan bank is under investigation in the UK for, among other things, the provision of financial services to Qatar Charity in knowing support of that organization's financial support of Hamas and PIJ. Qatar Charity solicited donations in Qatar and around the world and then transferred those funds to its account at Masraf Al Rayan bank in Doha, Qatar.  Masraf Al Rayan bank then transferred those funds denominated in U.S. dollars through a correspondent bank in New York.  Subsequently, those funds were transferred to Qatar Charity's accounts at either the Bank of Palestine, or to the Islamic Bank in Ramallah. Finally, Qatar Charity's local branches would distribute the funds in U.S. dollars from those local accounts to Hamas, PIJ, and their affiliates to finance acts of terrorism in Israel.

8.      Qatar National Bank provided substantial support to the conspiracy by maintaining at least six accounts for Qatar charity, as well as accounts for other infamous terrorists, including a spokesperson and former leader of Hamas' military wing in the West Bank, who was convicted for orchestrating murderous terrorist attacks in Israel, a member of Hamas' politburo who was convicted for his role as a Hamas terror cell operative, and several accounts for the chair of the Union of Good, a U.S.-designated terrorist organization sanctioned for funding Hamas' terrorist activities.  All of those accounts were used to finance Hamas' and PIJ's terrorist activities in Israel.

9.     Pursuant to their unlawful conspiracy, the Defendants and their co-conspirators

provided material support and resources to Hamas and the PIJ that allowed these notorious terrorist organizations to carry out each of the brutal terrorist attacks against the Plaintiffs and/or their family members described below, which left Plaintiffs severely physically and/or psychologically injured. Accordingly, the Defendants are liable pursuant to 18 U.S.C. § 2333 and other claims to the Plaintiffs, who were injured by reason of an act of international terrorism.

<u>**JURISDICTION AND VENUE**</u>

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a) and 2338 as a civil action brought by citizens of the United States who have been injured by reason of acts of international terrorism and their estates, survivors, and heirs.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d).

12.     Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because they have transacted business and committed tortious acts within the United States (and New York) by transferring funds through the United States (and New York) for the benefit of Hamas and PIJ and have purposefully availed themselves of United States jurisdiction in the course of committing the wrongful acts alleged herein.

13.     Specifically, in furtherance of their conspiracy with Defendants, Qatar Charity Qatar National Bank and Masraf Al Rayan bank purposefully and knowingly effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity through banks in New York, including Bank of New York Mellon, and knew or should have known these transfers were made for the ultimate benefit of Hamas and PIJ, both U.S. designated terrorist organizations.

## THE PARTIES

### THE PLAINTIFFS

14.     Plaintiff Stuart Force at all times relevant hereto, is and was a U.S. citizen domiciled in South Carolina and the father, heir and personal representative of the estate of decedent Taylor Force, who was murdered by a Hamas operative on March 8, 2016. At all times relevant hereto, decedent Taylor Force was a U.S. citizen.  Plaintiff Stuart Force brings this action individually and on behalf of the Estate of Taylor Force.

15.     Plaintiff Robbi Force at all times relevant hereto, is and was and was a U.S. citizen domiciled in South Carolina and the mother of decedent Taylor Force.

16.     Plaintiff Kristin Ann Force at all times relevant hereto, is and was and was U.S. citizen and the sister of decedent Taylor Force.

17.     Plaintiff Rina Ariel at all times relevant hereto is and was a U.S. citizen domiciled in Israel and the mother, heir and personal representative of the estate of decedent H.Y.A (a minor). H.Y.A. was murdered in her sleep by a Hamas terrorist on June 30, 2016.  At the time of her death, H.Y.A. was a U.S. citizen domiciled in Israel.   Plaintiff Rina Ariel brings this action individually, as personal representative of the Estate of H.Y.A., and as natural guardian of S.R.A., minor and K.A., minor.

18.     Plaintiff Amichai Ariel at all times relevant hereto, is and was an Israeli citizen domiciled in Israel and the father, heir and personal representative of the Estate of H.Y.A. Plaintiff Amichai Ariel brings this action individually, as personal representative  of the Estate of H.Y.A., and as natural guardian of S.R.A., a minor, and K.A., a minor.

19.     Minors S.R.A. and K.A., at all times relevant hereto, are and were U.S. citizens domiciled in Israel, and the sisters of decedent H.Y.A.

20.     Plaintiff Eli M. Borochov at all times relevant hereto is and was a United States citizen domiciled in the U.S.  On November 6, 2015, Eli was shot by a Hamas terrorist.

21.     Plaintiff Shari Mayer Borochov at all times relevant hereto is and was a United States citizen domiciled in the U.S., and married Eli on August 20, 2019.

22.     Plaintiff Ronen Steven Borochov at all times relevant hereto is and was a U.S. and Israeli citizen domiciled in the U.S., and the father of Eli.

23.     Plaintiff Devora Sue Borochov at all times relevant hereto is and was a U.S. citizen domiciled in the U.S., and the mother of Eli.

24.     Plaintiff Josef S. Borochov at all times relevant hereto is and was a U.S. citizen domiciled in the U.S., and the brother of Eli.

25.     Plaintiff Shira Nechama Borochov at all times relevant hereto is and was a U.S. citizen domiciled in the U.S., and the sister of Eli.

26.     Plaintiff Avraham M. Borochov at all times relevant hereto is and was a U.S. citizen domiciled in the U.S., and the brother of Eli.

27.     Plaintiffs Abraham Ron Fraenkel and Rachel Devora Sprecher Fraenkel at all times relevant hereto are and were the parents, heirs and personal representatives of the estate of their minor son, Y.N.F., who was a citizen of the United States at the time of his kidnapping and murder by Hamas terrorists. Plaintiffs Abraham Ron Fraenkel and Rachel Devora Sprecher Fraenkel are also the parents of minor plaintiffs A.H.H.F., A.L.F., N.E.F., N.S.F., and S.R.F.

28.     Plaintiff Rachel Devora Sprecher Fraenkel at all times relevant hereto is and was a citizen of the United States domiciled in Israel.

29.     Plaintiffs Abraham Ron Fraenkel and Rachel Devora Sprecher Fraenkel each bring this action individually, as joint administrators of the Estate of Y.N.F., and as the natural and legal

guardians on behalf of their minor children, A.H.H.F., A.L.F., N.E.F., N.S.F., and S.R.F.

30.     Plaintiff Abraham Ron Fraenkel at all times relevant hereto is and was a citizen of Israel.

31.     Plaintiff Tzvi Amitay Fraenkel at all times relevant hereto is and was a United States citizen domiciled in Israel, and the brother of decedent Y.N.F.

32.     Minor A.H.H.F. at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Y.N.F.

33.     Minor A.L.F. at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Y.N.F.

34.     Minor N.E.F. at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Y.N.F.

35.     Minor N.S.F. at all times relevant hereto is and was a United States citizen domiciled in Israel, and the sister of decedent Y.N.F.

36.     Minor S.R.F. at all times relevant hereto is and was a United States citizen domiciled in Israel, and the brother of decedent Y.N.F.

37.     Plaintiff Yehudah Glick was a U.S. citizen domiciled in Israel on October 29, 2014 when he was severely wounded in a PIJ terrorist attack. He has since been elected to the Israeli Knesset and was compelled by Israeli law to renounce his U.S. citizenship. Plaintiff Yehuda Glick is the father of Plaintiffs Neria David Glick, Shlomo Glick, Hallel Glick and S.G. (a minor). Plaintiff Yehuda Glick brings this action individually and as natural guardian of his minor child S.G.

38.     Plaintiff Yaffa Glick, who at all times relevant hereto, is and was a U.S. citizen, the wife of Plaintiff Yehuda Glick and the mother of Plaintiffs Neria David Glick, Shlomo Glick,

Hallel Glick and S.G. (a minor).  Plaintiff Yaffa Glick brings this action individually and as natural guardian of her minor child S.G.

39.     Plaintiffs Neria David Glick, Shlomo Glick, and Hallel Glick, at all times relevant hereto, are and were U.S. citizens domiciled in Israel and the children of Plaintiff Yehuda Glick.

40.     Minor S.G., at all times relevant hereto, is and was the child of Plaintiff Yehuda Glick, and was and is a U.S. citizen domiciled in Israel.

41.     Plaintiff Micah Lakin Avni, at all times relevant hereto, is and was a U.S. citizen domiciled in Israel and the son, heir and personal representative of the estate of decedent Richard Lakin, who was murdered by Hamas operatives on October 13, 2015. Plaintiff Micah Avni brings this action individually, as personal representative of the Estate of Richard Lakin, and as parent and natural guardian of Y.L, R.A., and V.A., minors who are the grandchildren of decedent Richard Lakin.  At all times relevant hereto, decedent Richard Lakin was a U.S. citizen.

42.     Plaintiff Manya Lakin, at all times relevant hereto, is and was a U.S. citizen domiciled in Israel and the daughter, heir and personal representative of the Estate of Richard Lakin. Plaintiff Manya Lakin brings this action individually, as personal representative of the Estate of Richard Lakin, and as parent and natural guardian of D.A.B, a minor and grandson of decedent Richard Lakin.

43.     Plaintiff Rita Avni is the wife of plaintiff Micah Lakin Avni and the daughter-in-law of decedent Richard Lakin, and brings this action individually and as parent and natural guardian of E.A., R.A., and V.A., minors.  R.A. and V.A are the grandchildren of decedent Richard Lakin and E.A. is the step-granddaughter of decedent Richard Lakin.  At all times relevant hereto, Plaintiff Rita Avni is and was an Israeli citizen domiciled in Israel.

44.     The minor D.A.B., at all times relevant hereto, is and was a U.S. citizen domiciled

in Israel.

45.   The minor Y.L., at all times relevant hereto, is and was a U.S. citizen domiciled in Israel.

46.   The minors R.A. and V.A., at all times relevant hereto, are and were Israeli citizens.

47.   The minor E.A., at all times relevant hereto, is and was an Israeli citizen domiciled.

48.   Plaintiff Shachar Boteach is the daughter of Plaintiff Manya Lakin, and granddaughter of decedent Richard Lakin.  At all times relevant hereto, Plaintiff Shachar Boteach is and was a U.S. citizen domiciled in Israel.

49.   Plaintiffs Shmuel Elimelech Braun and Chana Braun at all times relevant hereto are and were the parents, heirs and personal representatives of the estate of their minor daughter, C.Z.B., who was also a citizen of the United States on October 22, 2014 when she was killed by a Hamas terrorist.  Plaintiffs Shmuel Elimelech Braun and Chana Braun, at all times relevant hereto, are and were citizens of the United States domiciled in Israel. They each bring claims individually, and as joint administrators of the Estate of C.Z.B.

50.   Plaintiffs Shimson Sam Halperin, Sara Halperin, Murray Braun, and Esther Braun at all times relevant hereto are and were citizens of the United States domiciled in Israel, and the grandparents of decedent C.Z.B.

51.   Plaintiff Menachem Mendel Rivkin at all times relevant hereto is and was a citizen of the United States domiciled in Israel.  Plaintiff Menachem Mendel Rivkin was stabbed by a Hamas terrorist on January 27, 2016.  He brings claims individually, and as the natural and legal guardian of his minor children, S.S.R., M.M.R., R.M.R., S.Z.R., and S.R., who are also citizens of the United States.

52.   Plaintiff Bracha Rivkin at all times relevant hereto is and was the wife of plaintiff

Menachem Mendel Rivkin, and a citizen of the United States domiciled in Israel. Plaintiff Bracha Rivkin brings claims individually, and as the natural and legal guardian of her minor children, S.S.R., M.M.R., R.M.R., S.Z.R., and S.R.

53.    Plaintiffs Yoav Golan and Rotem Shoshana Golan, at all times relevant hereto are and were U.S. citizens domiciled in Israel.  On December 14, 2016, Plaintiffs Yoav Golan and Rotem Shoshana Golan were injured when a Hamas terrorist deliberately drove a car into a crowd of people waiting at a bus station.

54.    Plaintiff Yehudit Golan at all times relevant hereto is and was a U.S. citizen domiciled in Israel, and is the mother of Yoav.

55.    Plaintiff Matan Golan at all times relevant hereto is and was a U.S. citizen domiciled in Israel, and is the brother of Yoav.

56.    Plaintiff Cici Jacobson at all times relevant hereto is and was a U.S. citizen domiciled in Israel and is the grandmother of Yoav.

57.    Plaintiff Eddy Jacobson at all times relevant hereto is and was a U.S. citizen domiciled in Israel, and is the grandfather of Yoav.

58.    Plaintiff Raphael ("Rafi") Lisker at all times relevant hereto is and was a U.S. citizen domiciled in Israel, and brings this action individually and as the natural guardian of D.Z.L., minor.  On December 23, 2106, Plaintiff Rafi Lisker was stabbed in the neck by a Hamas terrorist while walking home from Sabbath services with his wife Shoshana.

59.    Minor D.Z.L. at all times relevant hereto is and was a U.S. citizen domiciled in Israel, and the child of Plaintiff Rafi Lisker.

60.    Plaintiff Shoshana Lisker is the wife of Plaintiff Rafi Lisker, and at all times relevant hereto is and was a U.S. citizen domiciled in Israel. Shoshana Lisker brings this action

individually and as the natural guardian of D.Z.L., minor.

61.     Plaintiff Jonathan Issac Lisker is the son of Plaintiff Rafi Lisker, and at all times relevant hereto is and was a U.S. citizen domiciled in Israel.

62.     Plaintiff Avital Kerem Lisker is the daughter of Plaintiff Rafi Lisker, and at all times relevant hereto is and was a U.S. citizen domiciled in Israel.

63.     Plaintiff Tamar Penina Lisker is the daughter of Plaintiff Rafi Lisker, and at all times relevant hereto is and was a U.S. citizen domiciled in Israel.

64.     Plaintiff Noam Michael Shamba, at all times relevant hereto, is and was a U.S. citizen domiciled in Israel.  On December 14, 2015, Plaintiff Noam Shamba was a victim of a terrorist attack perpetrated by a Hamas operative.  Plaintiff Noam Shamba brings this action individually and as parent and natural guardian of his minor children H.S., T.M.S., O.S., M.S., N.E.S. and N.S., all of whom are and were at all times relevant hereto U.S. citizens domiciled in Israel.

65.     Plaintiff Yana Shamba, at all times relevant hereto, is and was a U.S. citizen domiciled in Israel. Plaintiff Yana Shamba is the wife of Plaintiff Noah Shamba.  She brings this action individually and as parent and natural guardian of her minor children H.S., T.M.S., O.S., M.S., N.E.S. and N.S.

**THE DEFENDANTS**

**Qatar Charity**

66.     Qatar Charity was founded in 2002 as the Qatar Charitable Society. It soon became a key funding source for international terrorists.

67.     The Qatar Charitable Society renamed itself as the Qatar Charity after it became notorious under its prior name for financing international terrorism.

12

68.     In March 2008, the U.S. Interagency Intelligence Committee on Terrorism (IICT)[1] of the U.S. National Counterterrorism Center listed Qatar Charity (then known Qatar Charitable Society) as a "priority III terrorism support entity (TSE)" given its "intent and willingness" to support terrorist organizations that attack the U.S. and its interests.  But, long before then, Qatar Charity engaged in a pattern of support and financing of international terrorist organizations.

69.     In testimony to the 9/11 Commission and Congress, Jamal al-Fadl, Osama bin Laden's former business aide who defected to the United States in 1996, said that Bin Laden told him in 1993 that the Qatar Charitable Society was one of Bin Laden's major sources of funding.

70.     In 2002, in a terrorism-related criminal case in the United States District Court for the Northern District of Illinois the U.S. government confirmed that the Qatar Charitable Society financed Osama Bin Laden, who used the funds to carry out the 1998 East Africa embassy bombings.[2]

71.     According to evidence and testimony before the U.S. House Committee on Financial Services Subcommittee on Oversight and Investigations in 2003, Qatar Charitable Society engaged in the "active financing of Al-Qaida and other designated international terror groups" and "served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian

---

[1] The IICT was established in 1997 pursuant to the National Security Act of 1947 to "advise and assist the Director of Central Intelligence (DCI) in the discharge of his duties and responsibilities with respect to the coordination and publication of national intelligence on terrorism issues and … promote the effective use of Intelligence Community resources for this purpose. The DCI Terrorism Warning Group will prepare coordinated Intelligence Community threat warnings from the DCI to alert senior policy makers of possible foreign terrorist attacks against US and allied personnel, facilities and interests."   https://fas.org/irp/offdocs/dcid3-22.pdf

[2] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." *United States of America v. Enaam M. Arnaout*. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003.

Gulf, providing employment and travel documents to Al-Qaida personnel worldwide, and helping "to move funds to areas where Al-Qaida was carrying out operations."   http://archives-financialservices.house.gov/media/pdf/031103me.pdf

72.     According to that same evidence and testimony, while Qatar Charitable Society touted its humanitarian work, its "charitable mission represented little more than an excuse to provide material support to terrorists."

73.     In addition to its role as a major financial conduit for Al-Qaida, Qatar Charity has also financed and supported other terrorist organizations throughout the Middle East, Africa and elsewhere.

74.     Qatar Charity actively aided radical quasi-official terrorist militias associated with the National Islamic Front (NIF) in Sudan.

75.     In the 1990s, Qatar Charity supported the Eritrean Islamic Jihad Movement, another terrorist organization in Africa.

76.     Outside of Africa, Qatar Charity was extremely active in terrorist activities in the Balkans and the turbulent Muslim republics of the Caucasus.

77.     Qatar Charity has also acted as a financier and agency for terrorist outfits in Chechnya, Mali and elsewhere. Qatar Charity also funded Syria's Ahfad al-Rasul Brigade, among others.

78.     Qatar Charity has provided funding to and partnered with Islamic Relief Worldwide, which was banned in Israel in 2014 for providing funding to Hamas.

79.     In July 2008, Israel's Defense Minister signed an order banning in Israel the entire Qatar Charity organization (then known as the Qatar Charitable Society) and all of its branches operating in the territories administered by the Palestine Authority ("PA") and designating that

organization as a member of the Union of Good, a notorious funder of Hamas terrorism.  At that time, Israel also expressly warned all world banking and financial institutions to "prepare accordingly and act with caution in order to avoid criminal actions and civil lawsuits by victims of terrorism" such as those brought in the United States against Arab Bank.

80.     In November 2008, the U.S. Treasury designated the Union of Good as an SDGT, on the basis that it was "created by Hamas leadership to transfer funds to the terrorist organization."

81.     The U.S. Treasury noted that "[i]n addition to providing cover for Hamas financial transfers, some of the funds transferred by the Union of Good have compensated Hamas terrorists by providing payments to the families of suicide bombers."  The U.S. Treasury had previously designated Hamas as a terrorist organization in October 1997.  U.S. Treasury further found that "Union of Good acts as a broker for Hamas by facilitating financial transfers between a web of charitable organizations . . . and Hamas-controlled organizations in the West Bank and Gaza."

82.     In 2017, to avoid suspicion from international banks after a damning report by the UK Charity Commission noting its connections to Hamas and the Muslim Brotherhood, the UK branch of Qatar Charity renamed itself Nectar Trust.

83.     Saudi Arabia, Bahrain, Egypt, and the United Arab Emirates ("UAE") cut ties with Qatar on June 5, 2017, due to Doha's connections with and support of terrorist organizations.

84.     In June 2019, Saudi Arabia, Bahrain, Egypt and the UAE designated Qatar Charity as a financial supporter of terrorism.

85.     At all times relevant to this complaint chairman of the Qatar Charity board has been Hamad bin Nasser al-Thani, a member of the Qatari royal family.

**Masraf Al Rayan Bank**

86.     Masraf Al Rayan, founded in January 2006, is a publicly held banking company headquartered in Doha, Qatar.  It is regulated by the Qatar Central Bank and is one of the largest Islamic banks in the world with a market capitalization of $7.5 billion.

87.     Masraf Al Rayan bank purports to engage in banking, financing and investing activities in conformity with the principles of Islamic Sharia Laws.

88.     Masraf Al Rayan bank is controlled by the Qatari government and members of the Qatari royal family through their substantial stock ownership of the bank and membership on the Bank's board.  Several members of the Qatari royal family (the House of Thani) are or have been members of the bank's board of directors.

89.     According to Masraf Al Rayan's most recent annual report, the four shareholders with the largest stake in Masraf Al Rayan are all agents or instrumentalities of the Qatar government -- Qatar's General Retirement Authority's Pensions Fund (2.88%); Qatar Investment Authority (4.09%), a Qatar government entity that is responsible for developing, investing and managing the reserve funds of the State of Qatar and other assets assigned to it; Qatar Armed Forces Investment Portfolio (9.31%), another Qatari governmental entity; and Qatar Holding Company (11.65%), the main direct investment subsidiary of Qatar Investment Authority.

90.     Notwithstanding Qatar Charity's long-standing and highly publicized support for Hamas and other international terrorist organizations, Masraf Al Rayan bank has provided throughout the time relevant to Plaintiffs' claims, and presently continues to provide, Qatar Charity with financial services.

91.     Masraf Al Rayan owns 70 percent of Al Rayan (UK) Limited, which owns 98.34% of its subsidiary, Al Rayan Bank PLC.

92.     Al Rayan Bank PLC, formerly known as Islamic Bank of Britain, is a commercial bank in the United Kingdom, established in August 2004 to offer Sharia compliant financial services. The bank has branches in London, Birmingham, Manchester and Leicester, and agencies in Blackburn, Luton, Tooting, Wembley, Ilford, Bradford and Glasgow.

93.     Al Rayan Bank PLC notified its shareholders in late 2019 that it was under investigation by the United Kingdom's Financial Conduct Authority ("FCA").

94.     The FCA investigation is based on Al Rayan Bank PLC's provision of financial services to designated terrorist entities. Among the bank's clients are several Islamic groups linked to Hamas, including Interpal, designated as a terrorist entity by the US Treasury in 2003 due to funding links to Hamas, as well as the Nectar Trust, the U.K. branch of Defendant Qatar Charity. Nectar Trust, previously known as Qatar Charity UK, has received more than £37 million ($44.9 million) from Qatar Charity and is partners with the Emaan Trust, a group whose leaders have close links to the Muslim Brotherhood, in England's northern city of Sheffield.

**Qatar National Bank**

95.     Qatar National Bank, founded in 1964, is Qatar's first domestically owned commercial bank.

96.     The Qatar Investment Authority, Qatar's state-owned sovereign wealth fund, owns a 50% interest in Qatar National Bank. The Qatar Investment Authority was founded in 2005 by then-Emir, Hamad bin Khalifa Al Thani, and was run until 2013 by Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani, the former Prime Minister and Foreign Minister of Qatar. From 2015 to 2018, Sheikh Abdullah bin Mohammed bin Saud Al Thani, another member of the Qatari royal family served as CEO.

97.     Qatar National Bank is controlled by the Qatari government and members of the

Qatari royal family through their substantial stock ownership of the Bank and membership on the Bank's board.  Several members of the Qatari royal family (the House of Thani) are or have been members of the Bank's board of directors, including the current vice chair.

98.     Qatar National Bank markets its "Sharia compliant current accounts in numerous currencies" and associated services throughout the region and in the U.K. According to Qatar National Bank, its "Islamic products and offerings are approved by our Sharia Supervisory Board (SSB)." Yousuf Abdulla Al-Qaradawi sits on the Qatar National Bank SSB, and is also the chair of the Union of Good, a U.S.-designated terrorist organization created by Hamas to collect funding through charitable donations.

## UNDERLYING FACTS

### QATAR AND DEFENDANTS' CONSPIRACY TO FUND HAMAS AND PIJ IN CIRCUMVENTION OF FINANCIAL REGULATIONS

99.     Hamas is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement.  Hamas was founded in December 1987 by Sheikh Ahmed Yassin together with Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar and Abd al-Fatah Dukhan.

100.     Hamas is an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

101.     Hamas is nominally divided into three interconnected wings: (i) a political organization, (ii) the "Da'wa" (Hamas' social service or humanitarian component), and (iii) a military operational wing known as the Izz-al-Din al-Qassam Brigades.   Although these components have separate responsibilities, the Hamas organization operates seamlessly, with each component working together to conduct and support the military operations and achieve the illegal objectives of the terrorist group as a whole.

102.    Hamas' social services are, in large part, administered by local "zakat" committees and charitable societies.  Hamas either established these committees or coopted them by, *inter alia*, installing Hamas members, operatives and activists as members of the zakat committees' governing bodies.  These committees and organizations collect and distribute funds on behalf of Hamas for Hamas' purposes.

103.    The zakat committees played important roles in channeling funds to pay expenses for, and assist the families of, terrorist operatives who were arrested, injured or killed.  These entities also assisted with providing housing subsidies to the families of suicide bombers whose homes were often demolished by the Israeli army after the bombers' identities had been confirmed.  The zakat committees also helped to identify and recruit potential terrorists.

104.    In particular, Hamas routs significant sums that it nominally collects for charitable and humanitarian purposes to terrorist and other operational uses.  Even the funds utilized for charitable purposes free up other funds for specific terrorist acts.  Hamas used (and still uses) funds purportedly collected for charitable purposes to, among other things, provide weapons, explosives, transportation services, safehouses, training and salaries for its terrorist operatives and for terrorist recruiters.  And funds used for Hamas' charitable purposes directly support its military operations, as they support Hamas' image-making machine, which increases its fundraising and attracts foot soldier recruits.

105.    As noted above, Hamas is a Foreign Terrorist Organization dedicated to radical Islamist principles and the destruction of the State of Israel.  It also uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people.

106.    Founded in Gaza in 1981, PIJ is a radical Islamist terrorist organization committed

to the globalization of Islam through violent "jihad," or holy war.

107.    PIJ is formally committed to the destruction of the State of Israel and to achieving its objectives by violent means, including acts of terrorism.

108.    Since its creation, PIJ has carried out dozens of terrorist attacks in Israel. These attacks have killed and injured hundreds of Israeli and U.S. nationals.

109.    As with Hamas, PIJ controls dozens of Non-Government Organizations and religious organizations operating in the Palestinian Territories.

110.    As with Hamas, PIJ routs significant sums that it nominally collects for charitable and humanitarian purposes to terrorist and other operational uses.  Even the funds utilized for charitable purposes free up other funds for specific terrorist acts.  PIJ used (and still uses) funds purportedly collected for charitable purposes to, among other things, provide weapons, explosives, transportation services, safehouses, training and salaries for its terrorist operatives and for terrorist recruiters.  And funds used for PIJ charitable purposes directly support its military operations, as they support PIJ's image-making machine, which increases its fundraising and attracts foot soldier recruits.

111.    From at least 2011 through 2015, Hamas and PIJ knowingly, willfully, and unlawfully combined, conspired, confederated and agreed with Defendants to commit numerous acts of international terrorism, as defined by 18 U.S.C. §§ 2331 and 2332, including acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations.

**HAMAS' AND PIJ'S FORMAL DESIGNATION AS TERRORIST ORGANIZATIONS**

112.    In 1989, the Government of Israel declared Hamas a terrorist organization and designated it an "unlawful organization" because of its terrorist acts.  Notice of the designation

was placed in the official Government of Israel publication, the Announcements and Advertisements Gazette.

113.    On January 23, 1995, President Clinton issued Executive Order No. 12947, which found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

114.    Executive Order No. 12947 designated Hamas and PIJ as Specially Designated Terrorists ("SDTs") and blocked all of their property and interests in property.

115.    On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated Hamas and PIJ as Foreign Terrorist Organizations ("FTOs") pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996.  The designation of Hamas and PIJ as FTOs have been renewed every two years since 1997.

116.    After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

117.    Executive Order No. 13224 designated Hamas and PIJ as Specially Designated Global Terrorists ("SDGTs").  That Executive Order also blocked all property and interests in property of SDGTs, including Hamas and PIJ.

### QATAR'S DIRECT AND DELIBERATE FUNDING OF HAMAS AND PROVISION OF SAFE HAVEN TO ITS LEADERSHIP

118.    Like any enterprise, terrorist organizations need money to operate.  But unlike legitimate organizations, terrorist organizations like Hamas rely on sympathetic nation states and

financial institutions who employ creative fundraising strategies to disguise their operations and evade anti-terrorism laws.  Often terrorist financing is disguised as charitable contributions.

119.    It has long been the official policy of the government of Qatar to provide financial support to the Hamas terrorist organization.  It is thus no surprise that Masraf Al Rayan bank, Qatar Charity, and Qatar National Bank, which are dominated by the Qatari government and royal family, have joined in that effort.

120.    Qatar's support for Hamas started at least as early as 2006, when shortly after the elections that brought Hamas to power in Gaza, Qatar offered $50 million to what was then a Hamas-dominated Palestinian Authority government.

121.    In 2008, Palestinian officials claimed that Qatar provided Hamas with "millions of dollars a month" that was nominally intended for the people of Gaza. [3]

122.    In March 2014, the U.S. Department of the Treasury Under Secretary David Cohen singled out Qatar as an especially "permissive jurisdiction" for terrorist financing. He noted that Qatar "has for many years openly financed Hamas, a group that continues to undermine regional stability."   Qatari oversight is so lax, Cohen noted, that "several major Qatar-based fundraisers act as local representatives for larger terrorist fundraising networks that are based in Kuwait." Cohen noted that Qatar not only supports Hamas, but also extremist groups operating in Syria. https://www.treasury.gov/press-center/press-releases/Pages/jl2308.aspx.

123.    Saudi Arabia, Bahrain, Egypt, and the UAE cut ties with Qatar on June 5, 2017, due to Qatar's long-standing connections with terrorist organizations.

124.    In addition to substantial financial support, Qatar has provided safe haven to

---

[3] "Qatar Seen Bankrolling Hamas," *The Washington Times,* March 5, 2008.
(http://www.washingtontimes.com/news/2008/mar/05/qatar-seen-bankrolling-hamas/?page=all)

Hamas' political leadership since 2012, including for Hamas's leader, Khaled Meshal. In April 2013, Qatar chartered a private flight to transport senior Hamas political leader Ismail Haniyeh, who was at that time a leader of the Palestinian National Authority, to Doha, along with founders of Hamas' military wing, Yehia Sinwar and Rawhi Mushtaha. As of February 2020, Haniyeh was still living in Qatar.

125.    In October 2012, Qatar pledged $400 million to Hamas. In response, 24 U.S. members of Congress wrote to the Qatari ambassador, stating that Qatar's support of "Hamas, a U.S.-designated Foreign Terrorist Organization . . .  legitimizes, and bolsters an organization committed to violence and hatred."

126.    In a 2013 memo to Sheikh Hamad bin Jassem, a Qatari royal family member, Prime Minister and Foreign Minister, marked "secret," Assistant Minister of Foreign Affairs of Qatar Ali Fahad Al- Hajri, noted that at bin Jassem's instruction, $250 million had been paid from the central bank of Qatar directly to Hamas' leader, Khaled Meshal: "I would like to inform Your Excellency that the approved payment was extracted from the emergency fund at the Ministry of Finance by check no. (060622496) dated 27/01/2013 and drawn from Qatar Central Bank on behalf of Mr. Khaled Abdel Rahim Ismail Abdel Kader Misha'al, (Hamas)."

127.    Qatar is Hamas' largest single funder. Between 2012 and 2018, Qatar officially provided Hamas with over $1.1 billion.

### QATAR'S ILLICIT FUNDING OF HAMAS THROUGH MASRAF AL RAYAN AND QATAR CHARITY

128.    Through its control of Masraf Al Rayan bank, Qatar used the bank to funnel money to Hamas and PIJ under the guise of donations to various purported "charitable" organizations. Qatar Charity was principal among them.

129.    According to the U.S. Treasury Under Secretary for Terrorism and Financial

Intelligence David Cohen, "Private fundraising networks in Qatar . . . increasingly rely upon social media to solicit donations for terrorists and to communicate with both donors and recipient radicals on the battlefield. This method has become so lucrative, and Qatar has become such a permissive terrorist financing environment, that several major Qatar-based fundraisers act as local representatives for larger terrorist fundraising networks . . . . There should be no doubt that while we remain committed to working with countries such as . . . Qatar to confront ongoing terrorist financing, the U.S. will not hesitate to act on its own to disrupt these terrorist financing networks."[4]

130.    From March 1, 2015 until September 7, 2015 alone, Defendants conspired to transfer over $28 million in those donations from Qatar Charity to its two branches in PA-administered territories.

131.    Qatar Charity eventually transferred a substantial portion of those funds to Hamas and Hamas-affiliated organizations, as well as to PIJ and PIJ-affiliated charities.

132.    According to the confessions of the Director and Staff of the Qatar Charity Ramallah Branch (located about 10 miles from Jerusalem), as well as that organization's financial books, the conspiracy to fund Hamas operated as follows:

a.    Qatar Charity would solicit donations in Qatar and around the world;

b.    Qatar Charity would transfer those funds to its account at Masraf Al Rayan in Doha; and

c.    Masraf Al Rayan Bank transferred those funds denominated in U.S. dollars through a bank in New York. That bank is believed to be Bank of New York Mellon.

133.    Subsequently, those funds were transferred to Qatar Charity's accounts at either the Bank of Palestine, or to the Islamic Bank in Ramallah.

[4] https://www.treasury.gov/press-center/press-releases/Pages/jl2308.aspx

134.    Finally, Qatar Charity's local branches would distribute the funds from those local accounts to Hamas, PIJ, and their affiliates.

135.    Internal Qatar Charity annual reports for 2013, 2014, and 2015 reflect that Qatar Charity transferred funds to, and carried out joint projects with, various Hamas and PIJ fronts, including the Elehssan Society.

136.    On May 4, 2005, the United States Treasury designated the Elehssan Society "a charitable front for the Palestinian Islamic Jihad."  A Treasury press release announcing the designation stated that "in addition to its use as a financial conduit, Elehssan is used by PIJ to recruit for its operational cadre.  In early 2003, Elehssan planned to open a youth center to support PIJ activity and conduct PIJ-related recruitment and training."

137.    Stuart Levey, then Treasury Under Secretary for the Office of Terrorism and Financial Intelligence, noted that "Elehssan masquerades as a charity, while actually helping to finance Palestinian Islamic Jihad's acts of terror against the Israeli people and other innocents."

138.    Elehssan was named as a recipient of support from three criminal defendants who were part of the notorious PIJ finance ring operated by former University of South Florida professor Sami Al-Arian.

139.    During the entirety of the conspiracy, Qatar Charity was operating illegally in the PA-administered territories, as Israel had designated Qatar Charity as a member of the Union of Good and specifically as a funder of the terrorist organization, Hamas.  Qatar Charity was therefore banned from operating within Israel.  This fact, along with the Qatar government's open support for Hamas, dispels any doubt that Masraf Al Rayan bank was knowingly complicit in financing the Hamas terrorist organization.

140.    Additionally, during the entirety of the conspiracy, Qatar Charity was listed as a

priority III terrorism support entity ("TSE") by the United States Interagency Intelligence Committee on Terrorism ("IICT").

## MASRAF AL RAYAN'S ANTI-TERRORISM POLICIES GAVE IT KNOWLEDGE OF THE UNLAWFUL PURPOSE OF QATAR CHARITY'S ACCOUNTS AND FINANCIAL DEALINGS WITH THE BANK

141.    Qatari banking law and Masraf Al Rayan bank's own anti-terrorism financing policies, know-your-customer rules, and other due diligence requirements would have notified the bank of its customer Qatar Charity's unlawful sponsoring of terrorism.  This is especially true given the world-wide public condemnation of Qatar Charity's role in supporting terrorists generally and in supporting and financing Hamas specifically.

142.    Qatari anti-money laundering laws, like U.S., European Union, and international law, prohibit collecting funds to support terrorism and require banks to implement procedures to combat the financing of terrorism.

143.    At all times relevant to the attacks on Plaintiffs, Masraf Al Rayan bank had anti-terrorism financing policies and procedures in place that would have alerted the bank to Qatar Charity's sponsorship of terrorism.  Those policies and procedures required the bank, among other things, to perform due diligence to assure itself that it knew its customers and the purposes for which those customers use the bank's services.   That due diligence would have revealed Qatar Charity's critical role in financing terrorism.

144.    Indeed, in its annual report, Masraf Al Rayan bank touts its role "in complying with the anti-money laundering and counter-terrorism financing within the local, regional and international system; in addition to its responsibility towards the society and the environment in which it operates."  The bank also had in place a risk management system to keep its Board apprised of the bank's "internal control results, which include . . . Granting and Assessing credit -

Anti-Money Laundering and Counter Terrorism Financing."

145.    According to the bank's annual report, Masraf Al Rayan also employs a "bank transfers monitoring system to ensure that there are no names that appear in the banned lists or those related to anti-money laundering and counter terrorism financing; and integrate[s] this system with the SWIFT system to intercept any suspicious names at the same time when the transactions are taking place."

146.    Despite overwhelming public evidence that Qatar Charity engaged in raising money for and funding Hamas and other global terrorist organizations, Masraf Al Rayan bank knowingly transferred millions of dollars of Qatar Charity funds into local bank branches operating in Hamas territory, on behalf of Qatar Charity which was at the time (1) a known sponsor of Hamas, and was (2) operating illegally in an area governed by Hamas.

### MASRAF AL RAYAN GAVE QATAR CHARITY, HAMAS AND PIJ CRUCIAL ACCESS TO THE U.S. FINANCIAL SYSTEM

147.    In furtherance of the conspiracy to provide the dollars and euros needed by Hamas to conduct its terrorist operations, Masraf Al Rayan bank, in moving Qatar Charity funds, availed itself directly of the U.S. financial system.

148.    Masraf Al Rayan had no U.S. branch or office so it purposefully availed itself of the U.S. financial system by using a correspondent bank to access U.S. dollars.

149.    A correspondent bank is a financial institution that creates and maintains an account for another financial institution to receive deposits from, or to make payments on behalf of, that other financial institution or to engage in other financial transactions related to that other financial institution.

150.    Correspondent banks can act as intermediaries between banks in different countries or as an agent to process local transactions for clients when they are traveling abroad. At the local

level, correspondent banks can accept deposits, process documentation, and serve as transfer agents for funds. The capability to execute these services relieves domestic banks of the need to establish a physical presence in foreign countries. Foreign banks often use correspondent banks in the United States to access the U.S. financial system and to conduct U.S. dollar transactions.

151.    At all times relevant to Plaintiffs' claims, Masraf Al Rayan bank maintained a direct or indirect correspondent banking relationship with at least one New York bank which cleared U.S. dollar transactions for Masraf Al Rayan and its customers.

152.    Masraf Al Rayan's correspondent accounts in New York allowed it access to the U.S. financial system to complete transactions in U.S. dollars and benefit from the stability and reliability of New York's banking laws.

153.    Masraf Al Rayan used its correspondent banking relationships in New York to process U.S. dollar transactions for Qatar Charity which allowed Qatar Charity and Hamas to obtain large volumes of U.S. dollars for distribution to terrorists and their family members in the Palestinian Territories.  Qatar Charity and Hamas could not have obtained those U.S. dollars without Masraf Al Rayan bank's participation in the terrorist funding scheme.

154.    At the time both Qatar Charity and Masraf Al Rayan bank participated in this conspiracy they knew or should have known that Hamas regularly targeted U.S. nationals for assassinations and other forms of terrorist attacks.

155.    At all times relevant to this complaint, both Qatar Charity and Masraf Al Rayan bank were directed, owned, or controlled by the Qatari royal family, who have openly supported Hamas since at least 2012.

156.    Without the support provided through this conspiracy, Hamas would have been unable to carry out the attacks that killed or injured Plaintiffs.

## QATAR NATIONAL BANK'S SUPPORT OF HAMAS AND PIJ
## THROUGH THE PROVISION OF FINANCIAL SERVICES
## TO HAMAS LEADERSHIP, TO QATAR CHARITY, AND TO THE UNION OF GOOD

157.    Qatar National Bank maintains an account for Husam Badran, a Hamas Politburo spokesperson and former leader of Hamas' military wing in the Northern West Bank.

158.    The name associated with the account is "Husam Badran", and the second and third digits of the Qatari national identification number associated with that individual indicate that this "Husam Badran" was born in 1966, the same year as the notorious terrorist of the same name.

159.    The account information lists a Doha, Qatar P.O. box and notes that the account has been open since at least August 2015.

160.    As a Hamas military leader, Badran orchestrated the 2001 Sbarro Pizza bombing in Jerusalem, killing 15 and injuring 130; the 2001 bombing of the Dolphinarium Discotheque in Tel Aviv, killing 21 and wounding 120; the 2002 bombing of the Passover Seder at the Park Hotel in Netanya, killing 30 and injuring 140; and the 2002 bombing of the Matza restaurant in Haifa, killing 14 and injuring 33.

161.    Israeli security forces captured Badran in 2002, and in 2004 he was sentenced to 17 years in prison for his role in the above attacks. In 2011 he was released as part of a prisoner exchange and welcomed by Qatar, where he currently resides with other Hamas leadership and continues to act as a Hamas spokesperson.

162.    As a spokesperson for Hamas, Badran continues to advocate for Palestinian terrorism.

163.    Additionally, according to the Shin Bet (Israeli General Security Service) and the Israeli Defense Forces ("IDF"), Badran continues to give orders to Hamas terror cells and to provide them with funds by smuggling gold and jewelry purchased in Jordan into the West Bank.

164. Qatar National Bank maintains an account for Musa Dudin, a member of Hamas' politburo and convicted Hamas terror cell operative.

165. The name associated with the account is "Musa Dudin", and the second and third digits of the Qatari national identification number associated with that individual indicate that this "Musa Dudin" was born in 1972, the same year as the notorious terrorist of the same name.

166. The account information indicates that Musa Dudin opened his account on the same day the Badran did, and that they both share the same P.O. Box address in Doha.

167. Dudin has Hamas' "prisoner portfolio" meaning that he is responsible for securing the release of Hamas terrorists from prison in Israel in exchange for the release of kidnapped civilians and IDF soldiers, as well as for the remains of killed IDF soldiers.

168. After his arrest in 1992, while Dudin was serving a life sentence in Israel for his role in directing West Bank terror cells, he was released in the same 2011 prisoner exchange as Badran and welcomed by Qatar.

169. Qatar National Bank maintains several accounts for Yousuf Abdulla Al-Qaradawi, chair of the Union of Good, a U.S.-designated terrorist organization, and a spiritual leader of the Muslim Brotherhood, who serves on the Sharia Advisory Board of Qatar National Bank which benefits from his enormous social, political, and religious capital within the Muslim religious community in Qatar. He performed the ribbon cutting at the opening of Qatar National Bank's Islamic Division.

170. In 2008, the United States designated the Union of Good as "an organization created by Hamas leaders to transfer funds to the terrorist organization," noting that "the primary purpose of this activity is to strengthen Hamas' political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support Hamas members and the

families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas," including by making martyr payments to suicide bombers.

171.    Also, in 2008, Israel designated Defendant Qatar Charity as a member of the Union of Good.

172.    The name associated with the Qatar National Bank accounts is "Yousu Abdulla A Al-Qaradawi", and the second and third digits of the Qatari national identification number associated with that individual indicate that this "Al-Qaradawi" was born in 1926, the same year as the Union of Good chair of the same name.

173.    The account information indicates that Qaradawi opened the accounts in September 2006, and lists a P.O. box address in Doha.

174.    As the U.S. Ambassador to Qatar Chase Untermeyer wrote in a 2005 State Department cable, Qaradawi is "the only Islamic thinker in Qatar who matters," who wields tremendous influence in Qatar's religious, media, education, financial and charitable sectors, and who is a friend and confidante of the Qatari royal family. Indeed, at both the 2017 and 2018 Ramadan banquets hosted by Qatar's Emir, Sheikh Tamim bin Hamad Al-Thani, Qaradawi was seated next to the Emir, and was seen chatting cordially with the Emir, who embraced Qaradawi and kissed him on his forehead:







175.    As his leadership position in a designated terrorist organization dedicated to the financial support of Hamas would indicate, Qaradawi espouses certain extremist views. According to Mathew Levitt, Ph.D., a former counterterrorism official at the FBI and Treasury, "Qaradawi is one of the most public figureheads of the radical wing of the Muslim Brotherhood." Likewise, Qaradawi has officially provided his religious imprimatur to terrorist attacks in Israel. In 2017,

Qaradawi stated that he no longer viewed suicide attacks as religiously justified because Hamas could now mount attacks with rockets and other more sophisticated weapons.

176.    Qaradawi remains close with Hamas leadership, as evidenced by the below photograph taken in 2016 in Qatar, in which Qaradawi is seen sitting between and chatting with Khaled Mashal and Ismail Haniyeh while resting his hands on their knees. Khaled Meshal, is the former chair of the Hamas politburo and Ismail Haniyeh is the current head of the Hamas politburo. Both men receive safe haven from Qatar.



177.    Qatar National Bank maintains at least seven accounts for Qatar Charity.

178.    Six of these accounts were opened on March 18, 2012, while another was opened on September 20, 2006.

179.    Qatar National Bank also maintains accounts for Moustafa Mamdouh Mesalm, a senior accountant at Qatar Charity, and an individual named Ibrahim M A Al-Kaabi, both of whom list their address as a Qatar Charity P.O. Box.

180.     Qatar National Bank processed numerous payments to a beneficiary listed as "Qatar Charity" to eleven different accounts.

181.     Moreover, the accounts that Qatar National Bank maintained for the benefit of the above-mentioned terrorists were used to finance Hamas' and PIJ's terrorist activities in Israel.

## THE TERRORIST ATTACKS PERPETRATED BY HAMAS AND PIJ

182.     Pursuant to the unlawful conspiracy set out above, the Defendants and their co-conspirators provided material support and resources to Hamas and the PIJ that allowed these notorious terrorist organizations to carry out brutal terrorist attacks against Plaintiffs and/or their family members, which left Plaintiffs severely physically and/or psychologically injured as described below:

## I.     THE MURDER OF TAYLOR FORCE

183.     In March, 2016, Taylor Force ("Taylor"), a U.S. citizen and business student at Vanderbilt University's Owen Graduate School of Management, joined a school trip to Israel. Taylor was a West Point Graduate and had served with the United States military in Afghanistan and Iraq.

184.     On the evening of March 8, 2016, the young student was walking with classmates on the boardwalk along the seashore in Jaffa, just south of Tel Aviv. What started as an enjoyable night of camaraderie quickly turned into an evening of violence and unspeakable tragedy. At 6:20pm a 22-year-old operative of the terrorist organization Hamas, Bashar Muhammad Abd al-Qader Masalha, from the Palestinian village of Hajjah in the Qalqilya District, had just left the Mahmoudiyah Mosque situated near the Port of Jaffa. Bashar Masalha, who was armed with a knife, began to make his way to Jaffa's seaside Promenade.  He was determined to kill Israelis and others visiting this popular tourist attraction.

185.    A short distance from the Mosque, Bashar Masalha withdrew his knife and began to repeatedly stab a group of Russian tourists he encountered. After stabbing these innocent visitors, he ran in the direction of the seashore.

186.    Upon arriving at the crowded Promenade, the terrorist continued with what would be a brutal, 15-minute stabbing spree along the Tel Aviv coast. As he slashed and stabbed his innocent victims he loudly shouted "Allahu Akbar" ("G_d is Great") at his stunned prey.

187.    Bashar Masalha approached a group of American tourists, one of whom was Taylor. He plunged his knife into the unsuspecting student, leaving him badly bleeding and in critical condition. The terrorist continued running in a frenzy and stabbing many other victims, both Israelis and foreign citizens alike.

188.    Police who arrived on the scene began to pursue Bashar Massalha. He was eventually shot dead after being located near the Jaffa Port Promenade.

189.    In the course of his stabbing spree he had murdered one individual and grievously wounded ten others, including a pregnant woman.

190.    Bleeding heavily and unconscious, Taylor was rushed to the Wolfson Medical Center, but was pronounced dead on arrival.

191.    Israeli security investigators interviewed Bashar Massalha's relatives after the attack. They discovered that the terrorist had just returned the day before from a three-week long religious pilgrimage (Umrah) to Mecca in Saudi Arabia. Instead of attending a family celebration organized for his return, he had disappeared and traveled to Tel Aviv. Before smuggling himself into Israel, Bashar Masalha posted on Facebook messages that implied that he sought to die as a martyr (Shahid) by killing Israelis.

192.    Shortly, after Taylor's murder, the Hamas terrorist organization posted a statement on its Twitter account announcing the death of "our son, the martyr holy warrior Bashar Muhammad Masalha, who carried out the heroic stabbing attack in Jaffa, which led to the death of a Zionist and the injury of ten people."

193.    In addition, Hamas' responsibility was clearly expressed both in media channels known to be affiliated with the terrorist organization and in other Palestinian media: Hours after the attack, photos and messages from Massalha's Facebook account were posted to the PALINFO website (affiliated with Hamas) and on the group's twitter page with the caption: "A photo of the living Shahid hero Bashar Muhammad Massalha, 22, who carried out the stabbing operation in the occupied city of Jaffa."

194.    On March 11, the PALINFO website reported the attack, calling it a "heroic operation" in which Bashar Masalha killed a "settler" and injured 13 additional persons.

195.    The dead terrorist was publicly and proudly identified by the Hamas organization as "a son of the Hamas movement", thus receiving recognition by the group as a rank and file operative sent to carry out the attack upon the urging, and on the behalf of, the organization.

196.    The news website Mashreq News (an Iranian platform, supportive of the Hamas organization) wrote "Masalha's friends say that he was extremely enthusiastic ('Mutahames') prior to the Umrah..." Attached to this news report was an excerpt from the Hamas' announcement concerning Masalha, which was circulated online, saying: "The Hamas movement in Qalqilya District is eulogizing its son, the Shahid holy warrior." The website article continued: "... The Hamas movement announced the death of the Shahid Masalha and described him as its son, a holy warrior Shahid, praising him for his courageous stabbing operation in Jaffa, which led to the death

of an Israeli and to the injury of ten others. The Shahid was known in his village for his virtues and religious commitment..."

197.    At Bashar Masalha's funeral, mourners were seen bearing Hamas flags and shouting enthusiastic cries of support for Ahmad Yassin, the founder of the Hamas organization. Eulogies enthusiastically praising Masalha's murderous attack were delivered to the crowd.

198.    At the time of his murder in 2016, Taylor Force was a 28-year-old military veteran and West Point graduate who was on track to graduate in 2017 with an MBA from Vanderbilt University.  As a result of his murder, Taylor's estate has suffered economic losses in the form of Taylor's lost future income and benefits.  His estate is also entitled to recover damages for Tyler's emotional distress, and pain and suffering, during and in the immediate aftermath of the stabbing attack.

199.    Plaintiffs Stuart Force, Robbi Force and Kristin Ann Force were devastated to learn the tragic news that their son and brother, Taylor, had been so violently killed. Taylor was the center of his parents' lives and they were crushed by the pain and the void they now experience. He had always had an extremely close relationship with his sister, and now Taylor was gone and her life is bitterly impacted. The Force family has never returned to the routine and life they enjoyed before the murder. The Force family suffered severe and on-going psychological and emotional injuries, and mental anguish, as a result of loss of solatium, and loss of Taylor's society and companionship. For his family, the wound of losing Taylor does not heal.

## II.     THE SHOOTING OF ELI M. BOROCHOV

200.    On Friday, November 6, 2015, another U.S. citizen, Eli M. Borochov ("Eli"), who was 20 years old at the time, his father Ronen, and his 6-year old brother, Yosef, were walking

peacefully up the steps to enter the Maharat Hamachpela, the Cave of Patriarchs, a holy site in Hebron, Israel. Chaos soon ensued.

201.    Two Hamas terrorists, who had set up a sniper position nearby, began firing on the crowd at the entrance to the Cave. The terrorists used an SKS sniper carbine with telescopic sights, fitted with an improvised silencer that the terrorists themselves had fashioned. The pair fired from a window, which overlooked the courtyard of the Cave, in a building that belonged to their father. The sniper first shot Eli in his thigh and testicles as he ascended the steps. Moments later the shooter again opened fire and injured another young man, Micha Gedaliah. A bullet lodged in Eli's leg and he fell to the ground screaming in agony. He laid on the ground unable to stand up and was bleeding heavily from his wounds. Shortly afterwards, emergency medical personnel and the army arrived upon the scene. Eli was evacuated from the entrance of the Cave to the Shaare Tzedek Hospital in Jerusalem for emergency surgery. Eli was in severe pain following the removal of the bullet and he continued to suffer for many months afterwards. He still experiences a great deal of psychological trauma over having been shot. He frequently has nightmares about the shooting. The pain, both physical and emotional, accompanies him in all his activities until today.

202.    Eli's father, Ronen Steven Borochov, and his brother, Josef S. Borochov, who were present during the shooting attack and witnessed Eli being injured, suffered extreme mental distress as a result of this traumatic experience.  Ronen and Josef feared for their own lives, as well as Eli's.  They continue to experience mental anguish as a result of the shooting attack and as a result of witnessing Eli's physical and emotional suffering.

203.    Eli's other two siblings, Shira Nechama Borochov and Avraham M. Borochov, suffered mental anguish upon learning of the shooting attack on their father and brothers, and as a result of witnessing Eli's physical and emotional suffering.

204.    Eli's wife, Shari Mayer Borochov, has suffered mental anguish as a result of witnessing the on-going physical and emotional suffering of her husband.

205.    Following the attack, the Hamas organization took responsibility for the shooting and identified the perpetrators as Hamas operatives from its operational terrorist wing, the Izz a-Din al-Qassam Brigades. The Israeli Security Agency ("ISA") identified the two gunmen as members of a Hamas cell, brothers Nasr and Akram Badawi. The cell members were eventually arrested in January 2016. Based upon their subsequent confessions to Israeli authorities, it was confirmed that they were members of Hamas. The cell members were convicted in an Israeli court, on the basis of their statements, of membership in the Hamas organization, of establishing a Hamas terror cell and of perpetrating a large number of shooting attacks (including the attack that grievously injured Eli) with the purpose of killing as many Jews as possible. Two other members of the cell were Nasr and Akram's father, Feisal Badawi who was a partner in planning the cell's operations and agreed to fund the purchase of weapons, and Ata Abu Rumuz who organized the cell and was arrested on September 9, 2016. He was sentenced to 11 years' imprisonment.

206.    The two cell members who wounded Eli were sentenced to life imprisonment, as the court was convinced that only by luck did Eli and the others remain alive, merely wounded by the terrorist shooting, while the cell members had been determined to murder them.

207.    The Hamas organization publicly acknowledged (on websites recognized as official websites of the organization, and on others identified with the terror group) the fact that the members of the terror cell that perpetrated the shooting attacks were operatives of Hamas' Izz a-Din al-Qassam Brigades. Thus, the organization demonstrably took responsibility for the shooting attacks that the cell perpetrated, including the attack that wounded Eli. The names of the cell

members who were captured and later tried appear in the list of prisoners from the Hamas organization who are in Israeli prisons, which is published on the organization's official websites.

208. The ISA also independently determined, according to an official document of its own, that the sniper group was a Hamas cell and that its members were operatives of the terrorist organization.

### III. THE KIDNAPPING AND MURDER OF Y.N.F.

209. On Thursday night, June 12, 2014, two Hamas terrorists drove a stolen vehicle with Israeli license plates to the Gush Etzion area, southwest of Jerusalem, Israel looking for a Jew to kidnap. The mission was part of Hamas' plan at that time to kidnap Jews to use them as bargaining chips in negotiations for the release of Palestinian prisoners held in Israel.

210. At around 10:30 p.m., the Hamas terrorists spotted three boys, 16-year-old U.S. citizen Y.N.F., together with two Israeli teenagers, at a hitchhiking post in Gush Etzion on their way home from school.

211. Y.N.F. was a gifted student who was interested in many different academic and religious subjects. He loved sports and greatly enjoyed the hours he would spend after classes with his brothers and sisters. On the Sabbath he would attend synagogue with his father and family.

212. On the night of June 12, the Hamas terrorists picked up Y.N.F. and his two friends, misleading them to believe they were taking them to their desired destination. After the boys were seated in the back seat of the car, one of the terrorists pulled out a pistol, pointed it at the boys, told them they were kidnapped, and ordered them to keep quiet. During this time, one of the other teenagers managed to place an emergency call and state in a whisper that he had been kidnapped, which ultimately enabled the Israeli police to trace the location of the boys to the Hebron area.

213.    Tragically, shortly after the abduction, the terrorist gunman panicked and decided to murder all three boys. Each boy was brutally shot to death in the back seat of the car at point blank range.

214.    The two Hamas terrorists then continued driving toward Hebron until they reached the outskirts of the village of Duma, where they wrapped the boys' bodies in black plastic bags and moved them to a getaway car that was parked there. They poured gasoline on the kidnapping vehicle and set it on fire with the boys' personal belongings inside. They then drove the new getaway car to Wadi Hasaka, where they threw the boys' bodies in a land plot, and then returned to Hebron.

215.    Later that night, they went back and moved the bodies to a plot of land that Hussam owned, where they buried the bodies and covered them with earth, gravel and uprooted bushes in order to better conceal them. They then buried the boys' clothes nearby, and disposed of the tools and plastic bags that had been used to wrap the bodies. The Israeli government, IDF and security services began a massive two week long search for the abducted teenagers and manhunt for their captors. The operation codenamed, "Brother's Keepers", deployed thousands of individuals who searched the entire West Bank for the missing teenagers. The State of Israel, foreign governments and millions of concerned people around the world maintained a prayer vigil as the desperate search continued for the missing boys.

216.    During the search operation, the Hamas terrorist organization continued to praise the abduction as a heroic military operation. The terrorists posted messages on social media urging Palestinian residents and businesses in the area of the kidnapping to thwart the Israeli efforts by destroying surveillance videos and refusing to cooperate with investigators.

217.    Finally, on June 30, 2014, a search team found the bodies of the three teens, all found to have been murdered by close range gunfire, hidden in the field owned by Hussam.

218.    As a result of the kidnapping and murder, Y.N.F.'s family members have suffered and continue to suffer extreme psychological and emotional harm.

219.    From the evening Y.N.F. did not come on June 12, 2014, until the discovery of his hidden body on June 30, 2014, Y.N.F.'s family members were in agony not fully knowing the fate of their son and brother.

220.    These feelings of mental anguish and emotional distress were only exacerbated once Y.N.F.'s body and the bodies of his two friends were found, brutally murdered and dumped in a makeshift pit.

221.    On August 5, 2014, Israel announced that it had arrested Hussam Kawasma in connection with the kidnapping and murder of Y.N.F. and the two other teenagers. By the time of his arrest, Hussam had shaved his beard and received a fake passport in an attempt to flee to Jordan.

222.    Hussam confessed to planning and preparing for the Hamas kidnapping operation that led to the murder of Y.N.F.

223.    Among other things, Hussam admitted that he obtained funds from Hamas for the operation, procured weapons to be used in the kidnapping, assisted in burying the bodies, destroying evidence, and sheltering the two Hamas kidnappers.

224.    On December 31, 2014, Hussam was convicted by an Israeli court of three counts of accessory to premeditated murder, membership in a group that committed intentional murder, two counts of bringing enemy funds into the country, carrying out the activities for Hamas, arms dealing, two counts of obstruction of justice, and sheltering wanted individuals.

225.    On January 6, 2015, the Israeli court sentenced Hussam to three life sentences for his role in the kidnapping and murder of Y.N.F. and the two other teenagers.

226.    On August 20, 2014, senior Hamas leader Saleh al-Arouri ("al-Arouri"), a member of the Hamas Politburo, gave a public address at a conference of the International Union of Muslim Scholars in Istanbul, Turkey, in which he declared that Hamas had directed the kidnapping operation in which Y.N.F. was abducted and murdered.

227.    Al-Arouri has been identified as the terrorist mastermind behind the operation.

228.    After al-Arouri's speech, Hamas' Felesteen and Safa Press Agency both used Facebook to provide access to the video of Al-Arouri's speech announcing that the kidnapping and murder of the three boys was a Hamas operation.

229.    In September 2014, Israeli investigators learned the hideout location of the two fugitive Hamas kidnappers. In the early morning hours of September 23, 2014, special Israeli police forces surrounded a building in Hebron where Marwan and Amer were hiding. Marwan and Amer both died in a shootout with police.

230.    Senior Hamas officials praised the abduction and called the Hamas kidnappers "martyrs" and "heroes."

231.    Y.N.F. suffered unspeakable terror, pain and anguish during his captivity up to and through his brutal murder.  While he was in the terrorists' custody, knowing that he had been kidnapped and while being threatened with a pistol, the 16-year-old Y.N.F. suffered extreme mental anguish, knowing that his life and the lives of his friends were at risk; that they were in danger of being beaten or otherwise abused by their captors, and that their family members would be distressed to learn that they had been kidnapped.  Y.N.F.'s estate seeks recovery for those damages caused by his kidnapping and murder.

232.     Moreover, the family of Y.N.F. suffered tremendous pain and anguish as a result of his murder by Hamas terrorists. His parents as well as his siblings had a very close personal relationship with the gentle teenager. The loss suffered by the family has never healed and not a day passes without them intensely feeling his absence. The shocking murder and horrific ordeal filled the family with fear, grief and a prolonged sense of depression. Each member of this close-knit family continues to feel the pain in their own personal manner. The family continues to intensely grieve for their murdered son and brother until today.

233.     Y.N.F.'s parents, Abraham Ron Fraenkel and Rachel Devora Sprecher Fraenkel, have suffered, and continue to suffer, severe mental anguish as a result of loss of solatium, and loss of Y.N.F.'s society and companionship.

234.     Y.N.F.'s siblings, Tzvi Amitay Fraenkel, A.H.H.F., A.L.F., N.E.F., N.S.F. and S.R.F., have suffered, and continue to suffer, severe mental anguish as a result of loss of solatium, and loss of Y.N.F.'s society and companionship.

## IV.     THE OCTOBER 29, 2014 SHOOTING OF YEHUDAH GLICK

235.     Yehudah Glick ("Yehudah") is a fifty-four-year-old former American citizen living in Israel. He is an ordained rabbi. Earlier in his career Glick had served in the military as a combat medic. He had also worked as an assistant to an Israeli government minister and was employed by a number of religious organizations in Jerusalem. Yehudah is married with 6 children who depend on him for financial and emotional support.  At the time of his injury in a PIJ terrorist attack, Yehudah was a U.S. citizen.

236.     On the evening of October 29, 2014, at approximately 10 p.m., an operative of Palestinian Islamic Jihad ("PIJ,"), Mu'taz Ibrahim Khalil Hijazi, armed with a gun, and acting on behalf of PIJ, arrived by motorcycle at the Menachem Begin Heritage Center in Jerusalem where

Plaintiff Yehudah Glick was attending a conference. After confirming Yehudah's identity, the terrorist fired four shots at Yehudah from close range and critically wounded him in the chest.

237.    After carrying out the shooting attack Mu'taz Hijazi fled the scene on a scooter. The assassination attempt was caught on surveillance cameras located at the scene of the attack.

238.    Badly bleeding and unconscious Yehudah was evacuated in critical condition to Shaare Zedek Hospital in Jerusalem where he fought for his life for several days.

239.    The shooter, Mu'taz Hijazi, had identified Yehudah as the target he wished to murder. Right before he opened fire he stated: "I am terribly sorry, but I have no option—you are the enemy of Al-Aqsa." Then he began to fire his gun.

240.    The security forces (the Israel Police and the ISA) managed to quickly identify the terrorist shooter as Mu'taz Hijazi. He was known to the security forces in Israel as a PIJ operative. During a prior imprisonment, in 2004, he had joined the ranks of the terrorist group. He had served 11 years in Israeli prisons for terrorist activities.

241.    A few hours after the attack, the security forces arrived at his home to arrest him. Mu'taz Hijazi, however, spotted the police approaching, came out to the roof of his house carrying a gun and opened fire. He was quickly killed by the police, who returned fire, in the exchange.

242.    Following the attack, the PIJ claimed responsibility for the murder attempt. Media outlets, including websites identified with the PIJ and the terrorist groups' senior leaders—all referred to Mu'taz Hijazi as a member of the PIJ's operational arm, known as the Saraya al-Quds (Al-Quds Brigades).

243.    On October 30, 2014, the day Mu'taz Hijazi was killed, a website affiliated with the PIJ published photos from the confrontation between the terrorist and the security forces on the roof of the building he lived in, and wrote the following: "This morning, Thursday, the

Palestinian Islamic Jihad movement announced the death of its martyr, the warrior (mujahid) Mu'taz Hijazi, who was killed in the Al-Thawri neighborhood in Jerusalem, after confrontation with the occupation forces."

244.    After arriving at the hospital Yehudah underwent several emergency surgeries. He remained on a respirator for almost two weeks, and in the hospital for close to one month. The ordeal left him badly weakened. During all that time, both in the hospital and months after his release, he was often in excruciating agony.  He required physical therapy. He suffered nightmares and feelings of trauma and extreme anxiety. Over and over again he replayed the attempted murder in his head. He had trouble walking for months and even sleeping at night was terribly painful. Yehudah was unable to return to work until many months after the attack and is still haunted by the memories of the brutal shooting.

245.    Yehudah's family, which was shocked by the news that their beloved father and husband had been almost killed, grew very fearful after the shooting. His children, Neria David Glick, Shlomo Glick, Hallel Glick, and S.G., suffered mental anguish witnessing Yehudah's suffering and worrying ceaselessly about losing their dear father. Yehudah's wife, Yaffa Glick, was inconsolable and afraid for the future. The family suffered excruciating psychological and emotional harm from the attempted murder ordeal that continues to affect them until today. Yehudah also still experiences pain and suffering, and mental anguish.

## V.    THE OCTOBER 12, 2015 MURDER OF RICHARD LAKIN

246.    Richard Lakin ("Richard") was a U.S. citizen living in Israel in 2015. He was 76 years old at the time, a retired school principal from Connecticut. In his younger years Richard had been in the American civil rights movement and had traveled through the South as a Freedom

Rider. In Israel, Richard had taught many Arab children in the course of his career and was an advocate for peaceful coexistence between all the communities in the Middle East.

247.     On the morning of October 13, 2015, Richard boarded Jerusalem Bus Number 78 on his way to meet with friends. Prior to his boarding the bus, two Hamas operatives, one armed with a gun and the other with a knife, entered the bus. The terrorists, Bahaa' Alyan and Bilal Abu Ghanem, waited until the bus filled up with passengers and then commenced their brutal violence. The assailants signaled to each other to start the attack and Bilal Abu Ghanem drew out his gun, walked toward the back of the bus and started shooting at close range, targeting the heads and upper bodies of the passengers with the intention of murdering them. At the same time, his accomplice, Bahaa' Alyan, drew his knife and targeted the passengers sitting at the front of the bus, stabbing them in all parts of their bodies, especially in their upper bodies, with the intention of murdering them. According to the passengers' statements, the two terrorists shouted "Allahu Akbar", ("G-d is Great"), while perpetrating the murders.

248.     When the bus driver realized it was a terror attack, he stopped the bus and opened the doors to let people flee the terrorists. The driver escaped from the bus but then the terrorists closed the doors to trap the other passengers inside.

249.     Bilal Abu Ghanem used all of the bullets he had and Bahaa' Alyan stabbed as many passengers as he could. According to the surviving passengers' police statements, Bilal Abu Ghanem continued stabbing passengers using the knife Bahaa' Alyan had used before, until the knife broke and remained stuck inside Richard's body.

250.     Two passengers were killed during the course of the massacre. Nine others were injured, three of them seriously, among them Richard, who had been shot in the head and stabbed in the stomach and face. He was taken from the bus to the hospital unconscious and arrived in

critical condition. His shocked family rushed to the hospital and did not leave his side. Two weeks later, on October 27, 2015, after numerous emergency procedures, Richard died of his wounds, raising the death toll in the attack to three.

251.    When the alarm had been sounded, Policemen and Border Police officers quickly arrived at the scene. They boarded the bus, then shot and killed Bahaa' Alyan, and wounded Bilal Abu Ghanem.

252.    After his capture, Bilal Abu Ghanem was interrogated and provided the ISA with a confession. He stated that the two terrorists had planned the attack in advance.

253.    Bilal Abu Ghanem was a known Hamas operative when he executed the terrorist attack. His affiliation in the terrorist group was mentioned both in a court ruling in this matter, and in the verdict handed down in Abu Ghanem's criminal prosecution it states that he was affiliated with Hamas since early 2013.

254.    In a statement given to police investigators in a previous arrest in 2013, Bilal Abu Ghanem revealed the fact that he knew and had connections with his cousin from the Jenin area in the West Bank, whom he described as a Hamas operative. That same cousin was prosecuted by Israel for an attempt to carry out a double suicide attack and was sentenced to 20 years in prison.

255.    Between September 2013 and October 2014, Abu Ghanem was imprisoned on account of his activity within Hamas' Islamic Bloc. In his statements to police in connection with this imprisonment, Abu Ghanem described in great detail his position in the Islamic Bloc and the methods by which the Islamic Bloc recruits students.

256.    Abu Ghanem admitted to his interrogators that the Islamic Bloc is a part of the Hamas organization and that at times it is convenient for Hamas to carry out its activities via the student Bloc.

257.    Photos taken on the day of his release from prison in 2014, depict Abu Ghanem being carried on his friends' shoulders, dressed in Hamas symbols and colors, including a green scarf with the Hamas emblem. Abu Ghanem was closely acquainted with the head of the Islamic Bloc at Al-Quds University, and that he was well aware that the Islamic Bloc's activities were illegal.

258.    A Hamas website refers to Bilal Abu Ghanem as an operative of the terrorist organization and his name appears—publicly and openly—on the Hamas prisoners' website, where he is referred to as a Hamas prisoner.

259.    After the Bus 78 attack, a picture of Bilal Abu Ghanem wearing clothes with Hamas symbols was also circulated on the Internet. The picture contains writings with Hamas characteristics (such as Quranic verses often quoted by operatives and spokesmen of the Izz al-Din al-Qassam Brigades, praising the path of Jihad).

260.    Abu Ghanem's Hamas membership was also made public after the attack in a written declaration published by "The Popular Front for the Liberation of Palestine" terror organization which stated that Abu Ghanem was a commander in the Izz al-Din al-Qassam Brigades.

261.    Hamas praised the attack, stating it is "a message to anyone who harms our holy places," and calling for a continuation of "the intifada." Hamas further created a video reenactment of the Bus 78 attack and published it on the Facebook page of one of its West Bank affiliates.

262.    Richard's children, Plaintiffs Micah Lakin Avni and Manya Lakin, suffered mental anguish as a result of the brutal attack on their father which left him in a coma for two weeks, and as a result of his subsequent untimely death. They dropped everything and remained at the hospital by his side for the entire period. They, and Richard's daughter-in-law Rita Avni, were traumatized

and distraught and continue to suffer loss of solatium, and loss of Richard's companionship, society, and parental guidance.

263.    Richard's grandchildren Shachar Boteach, Y.L., R.A., and V.A.; his step-grandchild E.A.; and his great-grandchild D.A.B., have suffered mental anguish, loss of solatium, and loss of Richard's companionship, society and guidance.  The young children grew very fearful and anxious as a result of the loss of their beloved grandfather and great-grandfather. They all reacted to the stressful period of Richard's hospital procedures and his death very intensely. The entire family suffered severe psychological emotional harm as a result of the attack on Richard that continues until today.

## VI.    THE MURDEROUS CAR RAMMING ATTACK ON THE BRAUN FAMILY

264.    On the afternoon of October 22, 2014, U.S. citizens Shmuel Elimelech Braun, Chana Braun and their infant daughter C.Z.B. were disembarking from the light rail at the Ammunition Hill station in Jerusalem. Chana was pushing baby C.Z.B. in a stroller. As they exited the station, a Hamas terrorist purposefully drove his car at a high speed into the crowd of passengers leaving the train with the intention of causing injury and/or death to as many civilians as possible.

265.    The terrorist, Abd al-Rahman al-Shaludi, from the Jerusalem neighborhood of Silwan had taken his mother's car in order to carry out the attack. He sped past the light rail tracks, where cars are prohibited, and crashed into the platform area, striking many passengers. The terrorist struck three-month old C.Z.B.'s stroller causing the infant to be thrown some ten meters into the air. C.Z.B. landed on her head on the pavement fatally wounded, while her mother Chana screamed in horror. C.Z.B.'s father Shmuel was also knocked over and badly injured by the car.

His entire body was filled with pain and he could not stand up. He laid on the floor writhing in agony and having trouble breathing.

266.    Another nearby victim, a woman was killed and seven other people were badly wounded.

267.    After his car crashed into the platform, Abd al-Rahman al-Shaludi escaped through the window and fled the scene. A number of people started chasing him and called him to stop. As the terrorist attempted to continue his escape, he was shot at by one of the security men who was pursuing him.  The terrorist fell and was badly injured. He was evacuated to a hospital in critical condition and died of his wounds several hours later. When rescue personnel arrived on the scene of the attack, they found baby C.Z.B. with no pulse and serious head injuries. They succeeded in resuscitating C.Z.B. and obtaining a pulse. They then transported her, connected to a ventilator and in critical condition, to the nearby Hadassah Mount Scopus Hospital. Despite these efforts, baby C.Z.B. was pronounced dead some two hours after her arrival at the hospital. Shmuel was also evacuated to the hospital for emergency treatments. Still suffering from his physical injuries, he was horrified to learn that his baby daughter had been killed.

268.    Shmuel was able to survive his injuries, but only after much difficulty. For many months he experienced intense physical and psychological pain and trauma. The memories of the attack haunted him. He had trouble moving about and could not sleep at night. The pain at times was too much to bear. In addition to suffering such serious injuries, Shmuel and his wife Chana underwent the unspeakable anguish of losing their infant daughter C.Z.B. to such a senseless act of terrorism. That loss was especially devastating because C.Z.B. was the long-awaited child for her young parents, who had tried to conceive unsuccessfully for a long time before baby C.Z.B. was born.

269.    Plaintiff Chana Braun suffered psychological and emotional harm watching the unthinkable unfold. One minute she was enjoying a day with her family pushing her darling baby's stroller, the next moment her infant daughter was smashed to the ground, obviously critically wounded as a result of a brutal terrorist attack. She was unable to continue on with her life after the devastating loss of her infant child.

270.    Plaintiff Shmuel Elimelech Braun suffered severe physical injuries as well as psychological and emotional harm as a result of the attack. He witnessed the car strike his wife and infant daughter's stroller and saw his infant daughter being thrown some ten meters into the air and land on her head unconscious. For many months afterwards Shmuel was unable to resume his previous life. He was unable to continue on with any routine after the devastating loss of his infant child.

271.    The couples' mental anguish over C.Z.B.'s death continues to plague them until today, and they continue to suffer loss of solatium, and loss of C.Z.B.'s companionship and society.

272.    C.Z.B.'s grandparents Shimson Sam Halperin, Sara Halperin, Murray Braun, and Esther Braun suffered severe mental anguish upon learning of the horrific murder of their grandchild and the injuries suffered by their son and son-in-law, Shmuel.  They continue to suffer loss of solatium and loss of C.Z.B.'s companionship and society to this day.

273.    Hamas publicly praised the attack and referred to the attacker as a "martyr" and "hero."

274.    Importantly, the car ramming and the murder were referred to as an attack - not an accident - by Hamas and by other organizations that praised the terrorist in the death notices they published for him, in their speeches and in other statements. Hamas recognized Abd al-Rahman al-Shaludi as one of its operatives.

275.    After the attack, Israeli investigators discovered that the terrorist had previously taken part in other violent activities and had been arrested and sentenced before. Abd al-Rahman Al-Shaludi's terrorist past was well known to the security and intelligence services.

276.    Hamas issued a death notice for the terrorist recognizing him as one of their members, which read: "The Islamic Resistance Movement mourns the death of its son, the martyr, the hero Abd al-Rahman Idris al-Shaludi.

277.    During the course of his funeral, mourners carried Hamas-affiliated flags, and the terrorist's body, which had been wrapped in white shrouds before the burial, was now wrapped in a green Islamic shroud for the funeral. This was a symbol of Abd al-Rahman al-Shaludi's affiliation with the Hamas movement.

278.    After his death, the family's house was decorated with green flags bearing Quranic verses, which are considered Hamas banners.

279.    This gruesome Hamas terrorist attack utilizing a vehicle which was driven at high speeds into a crowd of innocent pedestrians was later copied by other terrorist groups in attacks perpetrated worldwide including in Europe, the United States and Asia.

## VII.    THE JANUARY 27, 2016 STABBING OF MENACHEM MENDEL RIVKIN

280.    Husband and wife Menachem Mendel Rivkin ("Menachem") and Bracha Rivkin ("Bracha") were U.S. citizens living in Israel.

281.    On January 27, 2016, at approximately 10:00 p.m., Ubada Aziz Mustafa Abu Ras, a young Palestinian resident of a village near Givat Ze'ev, just north of Jerusalem, left his home armed with a knife hidden under his clothing. He had decided to carry out a terrorist attack against Israelis. Before embarking on the operation, Ubada Abu Ras posted a message on Facebook reading: "I ask Allah to grant me the Shahada (death of martyrdom)."

282.    The terrorist left his village heading to a nearby Israeli military checkpoint (known as Al-Jib Crossing), planning to stab a soldier. When he noticed that the soldiers at the checkpoint were inside the guard post which made it more difficult for him to attack them, he changed his plan. Instead he proceeded to a gas station in Givat Ze'ev in order to find an Israeli to kill.

283.    At approximately 11:00 p.m., Ubada Abu Ras approached a restaurant situated in the gas station area and noticed Menachem and Bracha (who was in her sixth month of pregnancy) exiting their car. The terrorist swiftly trailed the couple, drew his knife and savagely stabbed Menachem in the upper left side of his back. Bracha watched in horror as the terrorist attempted to murder her husband.

284.    Ubada Abu Ras pulled the knife out of Menachem's body and attempted to flee the scene.

285.    Before he could escape, however, others present at the attack overpowered the terrorist and neutralized him until the security forces arrived.

286.    The grievously injured Menachem was evacuated by a medical team to a hospital for treatment where he underwent emergency surgery.

287.    Prior to the attack, Ubada Abu Ras had posted numerous times on Facebook expressing his admiration for Palestinians perpetrating terror attacks against Israelis, including stabbing attacks.

288.    His father, Aziz Mustafa Abd al-Qader Abu Ras, had a long history of arrests by Israeli security forces for terrorist activities and was a known senior Hamas leader. The father was one of the earliest founding members of Hamas who had been arrested and deported by Israel in 1992 to South Lebanon pursuant to their involvement in illegal activities, terrorist incitement and violent attacks against Israelis.

289.    On the day of the attack, January 27, 2016, a photo was posted on the Twitter account of the Hamas-affiliated PALDF web forum, depicting Ubada Abu Ras holding the green flag of Hamas, with the caption "The executor of the heroic stabbing operation." On the banner it is written that the terrorist is the son of Aziz Abu Ras.

290.    Additionally, on that day, Ubada Abu Ras posted a photo online, of a man wrapped in a keffiyeh (a traditional Arab scarf usually worn around the head), holding a knife in his hand, and an inscription in praise of stabbing attacks. The same post also appeared on the Twitter account of the Hamas-affiliated PALDF web forum.

291.    On internet websites identified with Hamas, the attempted murder perpetrated by Ubada Abu Ras was characterized as "a heroic stabbing operation," which took place in "the settlement Givat Ze'ev." Other Palestinian websites posting about the incident explicitly pointed out Ubada Abu Ras's family credentials of being the son of senior Hamas member Aziz Abu Ras. One of the Hamas affiliated websites boasted of the stabbing and noted that the sons of Hamas leaders do not exclude themselves from taking part in terrorist operations that endangers their lives.

292.    After being stabbed, Menachem was rushed to the hospital in excruciating pain with life-threatening injuries. He was immediately admitted to the intensive care unit.

293.    Menachem remained in intensive care for five days, and was hospitalized for a total of eight days. Due to his serious injuries he was unable to move without pain for several months. Menachem continues to suffer mental anguish as a result of the stabbing attack.

294.    Plaintiff Bracha Rivkin, who witnessed the attack and its aftermath, suffered severe psychological and emotional injuries as a result of the barbaric stabbing of her husband. As a result of the trauma, she no longer feels comfortable traveling outside her home. Bracha is anxious and uncomfortable when she recalls the attack, as she frequently does. She had many nightmares from

the shocking experience and believes that her husband and herself came close to being murdered. Her psychological distress and mental anguish continue until today.

295.    Plaintiffs S.S.R., M.M.R., R.M.R., S.Z.R., and S.R., the minor children of Menachem Mendel and Bracha Rivkin also suffered severe psychological and emotional injuries as a result of the attack in which their parents were assaulted and their father was severely physically injured.  They have grown very fearful for their parents' safety and remain anxious whenever the attack or terrorism in general is discussed.  These emotional conditions and mental anguish continue to plague them until today.

## VIII.    THE DECEMBER 14, 2016 CAR RAMMING ATTACK

296.    On December 14, 2015, at approximately 3:00 p.m., a 21-year-old resident of the neighborhood of Beit Hanina in Jerusalem, Abd al-Muhsin Shaher Hasouna, deliberately drove his car into fourteen people who were waiting at a bus station near the main western entrance to the city of Jerusalem, near the Bridge of Strings. The station was crowded with passengers during the beginning of the rush hour.

297.    As he neared the crowd, Abd Hasouna accelerated and plowed into the waiting passengers. The car struck fourteen individuals including a baby in a carriage who was severely injured.

298.    It had been Abd Hasouna's plan that once his car was stopped, he would exit the vehicle and kill additional people with an axe that he had brought along. However, before he could leave the car, the terrorist was shot by an armed passerby. He was found dead with his hand extended toward the green-painted axe.

299.    Before the attack Abd Hasouna had hinted to his mother of his intention to carry out a suicide attack and the day before stated his desire to attain paradise.

300.    On the day of the attack he visited the mosque where he prayed and where he distributed candies to celebrate his intended attack. The day the terrorist chose for the attack, December 14th was the 28th anniversary of the founding of the Hamas terrorist organization.

301.    Following the attack, a Hamas-affiliated online forum (PALDF) reported the car-ramming with details but did not claim responsibility. A day later, the terrorist organization published a poster glorifying and praising the terrorist's deed of heroism and declaring Abd Hasouna, a "son of the Hamas movement", which is to say a Hamas operative.

302.    The Hamas radio station, Voice of Al-Aqsa, noted in a poster published on its website on December 16, 2015, the link between the terrorist's Hamas affiliation and the date of the terror attack (the anniversary of the founding of Hamas). In this poster, Abd Hasouna is termed shahid al-Intilaqa, Arabic for "Martyr of the day of founding". This poster shows a picture of the terrorist with a Palestinian flag and a green Hamas flag above him. The same site also refers to the Shahid Hasouna as "one of the sons of the Islamic resistance movement Hamas, whose heroic operation, carried out on the 28th anniversary of the founding of the resistance movement, has ensured the continuation of the tradition of resistance, and of actions that the movement has adopted since its founding."

### a.    Injuries Suffered by Plaintiffs Yoav Golan and Rotem Shoshana Golan

303.    Yoav and Rotem Golan were a married couple and living in Israel.

304.    On December 14, 2015, Yoav and Rotem were among the passengers waiting at the bus station, and both were struck by Abd Hasouna's vehicle and powerfully thrown to the ground. Shocked and fearing for their lives they managed to get on their feet and run to safety. The entire area of the ramming attack descended into chaos as panicked passengers fled while police

and emergency responders arrived on the scene, navigated the hysterical crowd and tried to provide aid to the injured victims.

305.    Both Yoav and Rotem were seriously injured in the attack. They were evacuated from the scene and rushed to the hospital in Jerusalem for treatment. Yoav sustained serious physical wounds from the ramming attack, including to his leg and shoulder. Due to his injuries Yoav was wheelchair bound for a period of time.

306.    Rotem also sustained physical injuries, including lacerations to her knees and a hamstring injury.

307.    As a result of the bus top terrorist attack, Yoav and Rotem received a long period of psychological treatment because of the physical, emotional and psychological harm.  They believed that they came very close to being killed by the terrorists' car as many others have in other ramming attacks.  They continue to suffer mental anguish as a result of the attack.

308.    Yoav's mother, Plaintiff Yehudit Golan; his grandparents, Plaintiffs Cici Jacobson and Eddy Jacobson; and his brother, Plaintiff Matan Golan have all suffered mental anguish and serious psychological and emotional harm as a result of learning of the attack and the injuries Yoav and Rotem suffered.

### b.  Injuries Suffered by Noam Michael Shamba

309.    Noam Michael Shamba ("Noam") was a married U.S. citizen living in Jerusalem. On the afternoon of December 14, 2015, he was attending classes at Bar-Ilan University.

310.    At approximately 3:00 p.m. he was returning from school to his home on a moped.

311.    As he entered Jerusalem near the Bridge of Strings, he suddenly found that a car had rammed into passengers at a bus stop just ahead of him.

312.    As a result of the attack, the entire area around Noam became engulfed in chaos and he was caught in the midst of victims screaming in agony. He watched as police officers and security personnel came running to the scene with weapons drawn, followed by ambulances and first responders attempting to care for the wounded right before his eyes.

313.    Noam was caught in the throng of panicked bus passengers attempting to flee the area on foot and blocking traffic, running and shouting. Additionally, a fire hydrant that was hit during the attack flooded the street with a strong spray of water adding to the frenzy right before Noam's eyes.

314.    Noam was shocked by the scene in which he suddenly found himself and was extremely frightened that he was in the midst of a terror attack. He saw there were many victims, and became extremely anxious and felt scared for his own safety, fearing a secondary attack, and not knowing what could happen next.

315.    As Noam left the scene of the attack, he felt petrified and stunned.

316.    Several hours later, Noam began to feel sharp pains in his chest that did not subside and grew increasingly severe. He was transported by ambulance to the hospital and was diagnosed as having a massive heart attack and received emergency cardiac care.

317.    Prior to his encounter with the terrorist car-ramming attack Noam was a healthy 32-year-old with no prior medical history or problems. He was active and loved to play sports. Overnight he became a young man with a serious heart condition. His medical condition continues to persist until today. Noam's life is no longer the same and he must constantly fear that he cannot exert himself and that another heart attack could happened to him. Moreover, his relationship with his wife, Plaintiff Yana Shamba, and his children, H.S., T.M.S., O.S., M.S., N.E.S. and N.S., has changed. Noam is now much more cautious about his activities and is always in the back of his

mind he must worry about his health. Neither Noam nor his wife ever believed that he would have medical problems such as this so early in his life.

318.   Noam's doctors attribute his sudden heart attack to the fear he experienced in the terror attack.  In addition to the physical disability caused by his heart attack, Noam continues to suffer from mental anguish because of the attack.

319.   Plaintiff Yana Shamba suffered, and continues to suffer, mental anguish and serious psychological and emotional harm as a result of learning of Noam's experiences in the attack, witnessing his subsequent heart attack, and his continuing physical and emotional suffering.

320.   Plaintiffs H.S., T.M.S., O.S., M.S., N.E.S. and N.S. suffered, and continue to suffer, mental anguish and serious psychological and emotional harm as a result of Noam's physical and emotional injuries.

## IX.   THE DECEMBER 23, 2016 STABBING ATTACK

321.   On December 23, 2016, at approximately 6:00pm, Raphael ("Rafi") Lisker, a 50-year-old U.S. citizen and his wife, Shoshana, were walking back to their home in the town of Efrat (located south of Jerusalem and Bethlehem) on Friday evening after attending Sabbath services at a local synagogue.

322.   As the couple strolled, a Palestinian terrorist, Ayman Muhammad Ali Fughara, who had breached the security fence surrounding the community, snuck up behind them on the main avenue, King David Street. The terrorist, who was 25 at the time of the attack, was a resident of the nearby Palestinian village of Jurat a-Shama, He had walked about 40 minutes from his home to arrive in Efrat and carry out an attack.

323.   Seeing the Liskers walking, the terrorist brandished a knife and lunged at Rafi with the weapon. After the initial stabbing Rafi in his neck, the terrorist continued powerfully lacerating him multiple times in the upper body.

324.    Ayman Fughara had sought to kill as many Jewish victims as he could. The terrorist's intent was to stab Rafi in such a way as to initially rupture his lungs completely, thus ensuring that he would be killed near instantly and not put up a struggle. He hoped to then continue with his bloody massacre of as many victims as he could get to until finally being caught or killed himself. There was a group of teenagers that were walking in the area nearby, and the terrorist intended to attack them next after killing Rafi.

325.    Fortunately, however, although badly wounded from the knifing, Rafi mustered the strength to defend himself and ensure that the terrorist would not approach any other civilian. He pushed the attacker away and assumed a boxer's position with his hands in fists. He started yelling loudly until he scared off the still-armed Ayman Fughara who ran away, escaping beyond the town's borders.

326.    During the stabbing attack, the shocked Shoshana began to scream hysterically and ran to the nearest home on the street in order to bring help, alert the security forces and call for medical assistance.

327.    After fighting off the terrorist, Rafi was badly bleeding and collapsed to the ground. He had sustained four stab wounds to his spine, the first on the side of the neck followed by the terrorist's three swift and deep plunges to Rafi's upper back.

328.    Rafi was in extreme pain and was bleeding through his clothes. He was very afraid that he would lose consciousness and bleed out on the ground. Security forces and emergency medical responders quickly arrived and evacuated him to Shaarei Tzdek Medical Center in Jerusalem to receive treatment for his stab wounds.

329.     Rafi and Shoshana suffered both severe physical and psychological pain from the brutal stabbing attack. They both understood how close to death they had come and how fortunate they had been.

330.     Long after Rafi's physical injuries began to heal, the couple still were traumatized by the terrorist assault. Over and over again, Rafi and Shoshana replay the scenes of stabbing in their heads. Rafi was unable to sleep properly in the months that followed and when he was able to slumber, he frequently had nightmares. These thoughts and memories leave the couple frightened, depressed and anxious. To this very day, neither Rafi nor Shoshana have ever fully recovered mentally or emotionally, and they continue to suffer mental anguish.

331.     The couple's four children Jonathan Issac Lisker, Avital Kerem Lisker, Tamar Penina Lisker and D.Z.L., who were aged 12-22 years old at the time of the attack, were horrified to learn about the terrorist stabbing and how their parents were almost murdered. They became very nervous and worried about their father's injuries. They repeatedly felt they had to inquire about his health and safety. In addition, the fact that the terrorist attack had happened so close to their home filled them with fear and anxiety that the attacker could return with his knife. The stabbing was right near their house and they pass by the spot often reminding themselves of it constantly, multiple times a day. At night the children are afraid that a terrorist could enter the residence and harm the family again.  They continue to suffer mental anguish as a result of the attack on their parents.

332.     The terrorist, Ayman Fughara was eventually captured by the Israeli security forces two and half years later, in March 2019.  Media reports at the time of the arrest identified the attack as a Hamas operation.

333.     The ISA identified the terrorist as a member of the Hamas terrorist organization.

## X.   THE TERRORIST MURDER OF 13 YEAR OLD H.Y.A.

334.    On June 30 2016, 13-year-old H.Y.A., a U.S. citizen, was asleep in her bedroom in the community of Kiryat Arba near Hebron. H.Y.A. had decided to sleep in late, following a dance performance she had participated in the evening before. The young student had just graduated 8th grade.

335.    At 8:45am, a 17-year-old Palestinian terrorist, Mohammad Nasser Tra'ayra, climbed over the north-side fence of Kiryat Arba. He walked 150 meters through trees and vines that belonged to the Ariel family until he reached their home. The terrorist was a high school dropout who had set out that morning from his village, Banii Naim, with a bag that contained a large knife. His intention was to murder Jews and become a martyr.

336.    At 8:53 a.m., Mohammed Tra'ayra broke into H.Y.A.'s house through a window. Her parents were not in the home at the time. Finding the house quiet, the intruder searched room by room trying to discover if anyone was in the residence.

337.    When the terrorist discovered the sleeping 13-year-old in her bedroom, he stood over her in her bed, removed his knife and stabbed the child multiple times all over her body.

338.    Members of the volunteer neighborhood security team responded after receiving an alert on their cell phones that the electronic security system on the perimeter of the community had been breached. They entered the Ariels' home looking for a possible intruder.

339.    The team was quickly drawn to H.Y.A.'s bedroom. Upon entering the room, they discovered the grisly scene and the terrorist with his knife. Mohammed Tra'ayra lunged at the civilian guards with his knife and injured one of them. The guard managed to shoot and wound the terrorist.

340.    H.Y.A.'s father, Rabbi Amichai Ariel, was on his way to the house to wake his daughter when he heard of the attack. He entered his home, surveyed the chaos and then fired two shots at the terrorist. One of the shots hit the attacker, the other hit one of the guards who permanently lost sight in one eye as a result.

341.    The terrorist was killed in the house.

342.    Critically wounded, and bleeding from the multiple stab wounds H.Y.A. was transported to Shaare Zedek Medical Center in Jerusalem. Despite emergency efforts to save her life, the 13-year-old died of her stab wounds shortly after.

343.    H.Y.A. was the youngest victim in the wave of brutal terrorist stabbing attacks that were perpetrated in Israel between 2015 and 2016.

344.    The attack on H.Y.A. was carried out by the terrorist following a public call from the Hamas terrorist organization for Palestinians to stab Jews to death.

345.    After the attack Israeli security forces discovered that Mohammad Tra'ayra had posted Hamas materials on his Facebook page and had boasted on his page of his wishes to die as an Islamic martyr. He wrote he wanted to avenge his cousin who rammed a car into an Israeli military vehicle in March 2016, injuring three Israeli soldiers.

346.    In the days after his death, the terrorist's mother praised her son's murder of H.Y.A. and called him a defender of Jerusalem and the al-Aqsa mosque. She called upon other Palestinians to follow in his path.

347.    The terrorist's family is paid a monthly stipend from a Palestinian Authority Martyrs Fund which provides grants to the families of terrorists from Hamas, the Palestinian Islamic Jihad and the PLO.

348.    As a result of the horrific stabbing murder of their 13-year-old daughter and sister, the Ariel family suffered devastating pain and emotional despair. All of the family remains in a state of shock over the cold blooded and brutal killing of a defenseless child in her sleep. Her siblings S.R.A. and K.A. were thrown into a state of depression, fear and loss that does not heal. The talented and lively H.Y.A. was always at the center of this close-knit family.

349.    H.Y.A.'s parents, Plaintiffs Amichai Ariel and Rina Ariel, remain inconsolable and feel a deep sense of anguish and a dark void in their lives that does not dissipate. They have suffered, and continue to suffer, emotional anguish, loss of solatium, and loss of H.Y.A.'s companionship and society.  Their suffering today is as grievous and bitter as it was in the days following the murder. H.Y.A.'s image and her memory are constantly with them and accompany every activity they engage in. On holidays, family occasions, her birthday and the anniversary of her murder they feel particularly broken.

350.    In a social media posting that went viral, on the second anniversary of her daughter's death, Rina Ariel wrote: "On this morning exactly 2 years ago, our H.Y.A. was murdered. Murdered at the hands of an evil one. Just 13.5 years old. An innocent girl who wanted to live, to dance and to dream."

351.    "Since then, the pain has gotten deeper and the loss even more unbearable. And from this depth, I call on each and every individual. Look at your children. At your families. Hug them close. Love and be thankful for what you have. Even when it isn't perfect. Even when it's complicated."

352.    Rina continued: "Let us try to end today with the feeling that we have made progress and advanced even one small thing in this matter. And it will be in memory of H.Y.A."

353.    H.Y.A.'s siblings S.R.A. and K.A. have suffered and continue to suffer emotional

anguish, loss of solatium and loss of H.Y.A.'s companionship and society. The Ariel family continues to suffer over their devastating loss until today.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS
**AIDING AND ABETTING FOREIGN TERRORIST**
**ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d)**

354. Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

355. Plaintiffs assert this cause of action under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

356. Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

357. Hamas and PIJ were both foreign terrorist organizations ("FTOs") at the time they committed, planned, and authorized the terrorist attacks that killed and injured Plaintiffs.

358. Those terrorist attacks were acts of international terrorism, as defined by 18 U.S.C. § 2331. The attacks: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had they been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that Hamas and PIJ raised money internationally, intended to impact the citizens and governments of Israel and the United States, and operated internationally and sought asylum in multiple countries in the Middle East.

359.   Defendants Masraf Al Rayan bank, Qatar National Bank and Qatar Charity knowingly provided substantial assistance to those acts of international terrorism.

360.   As Plaintiffs allege in detail above, Defendants Masraf Al Rayan, Qatar National Bank, and Qatar Charity provided substantial assistance to Hamas and PIJ by, among other conduct: (a) transferring significant sums of money to the FTOs, their operatives and their front organizations; (b) maintaining bank accounts for the benefit of those organizations, their front organizations, and their senior operatives; (c) providing Hamas and PIJ with access to U.S. dollars and the U.S. banking system; (d) providing seeming legitimacy to the FTOs' efforts to raise funds to finance their operations and to compensate terrorists and their family members following terrorist attacks; and (e) enabling the FTOs to convert funds nominally intended to support humanitarian causes into the resources necessary to commit terrorist attacks.

361.   Defendants' services and support provided encouragement to would-be terrorists and incentivized their future attacks.

362.   At the time Defendants provided that substantial assistance to Hamas and PIJ, Defendants knew that: (a) the two FTOs were so designated; (b) the two FTOs and their operatives engaged in terrorism, including the attacks alleged herein; and (c) the financial assistance that Defendants were providing to those FTOs was essential to their ability to carry out terrorist attacks, including the attacks that injured Plaintiffs.

363.   Defendants also intended that their substantial assistance would facilitate the ability of Hamas and PIJ to carry out their terrorist attacks against Plaintiffs and other civilians.  As a result, Defendants recognized that they played an integral role in the FTOs' terrorist activities.

364.   The substantial assistance that Defendants provided to Hamas and PIJ was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable

result of that substantial assistance.

365.    As a direct and proximate result of the substantial, knowing assistance that Defendants provided to Hamas and PIJ, Plaintiffs have suffered significant physical, psychological and emotional injuries.

366.    Defendants knowingly aided and abetted Hamas within the meaning of 18 U.S.C. § 2333(d) and within the legal framework of *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *See* Justice Against Sponsors of Terrorism Act ("JASTA"), § 2b.

367.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### (Conspiracy Liability)

368.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

369.    Plaintiffs assert this cause of action under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

370.    Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

371.    Defendants Masraf Al Rayan bank, Qatar National Bank, and Qatar Charity conspired with each other, Hamas, the government of Qatar and others to bring about acts of

international terrorism against Americans in Israel.

372.     Defendant Qatar Charity joined the conspiracy by agreeing, among other things, expressly or tacitly to raise funds for Hamas and PIJ, both organizations designated as foreign terrorist organizations by the United States, Israel and other nations, and to distribute those funds on Hamas' and PIJ's behalf.  By engaging in that conduct, Qatar Charity furthered the goals of the conspiracy.

373.     Defendant Masraf Al Rayan bank joined the conspiracy by agreeing, among other things, expressly or tacitly to:  (a) allow Qatar Charity to use accounts at Masraf Al Rayan bank to funnel money to and fund Hamas, (b) allow other Islamic groups linked to Hamas, including Interpal, to maintain accounts at the bank used to funnel money to Hamas, and (c) give Qatar Charity, Hamas, and PIJ access to U.S. dollars through the U.S. financial system through Masraf Al Rayan's correspondent banking relationships in the U.S.   By engaging in that conduct Masraf Al Rayan bank furthered the goals of the conspiracy.

374.     Defendant Qatar National Bank joined the conspiracy by agreeing, among other things, expressly or tacitly to:  (a) to provide banking services to Hamas leadership headquartered in Doha, (b) to provide banking services to its co-conspirator Qatar Charity, and (c) by employing and providing banking services to the chair of the U.S.-designation SDGT Union of Good, a fundraising front for Hamas.

375.     Defendants Masraf Al Rayan's and Qatar National Bank's association with Qatar Charity and the Qatar government, including the Qatari royal family, connected the two banks to the conspiracy.

376.     Defendant Masraf Al Rayan bank knew by allowing a notorious designated financer of terrorism like Qatar Charity to maintain accounts at the bank and to disregard suspicious

transactions involving those accounts it was joining the conspiracy.

377.    Defendant Qatar National Bank knew that by providing services to notorious Hamas terrorists who were released in a prisoner exchange from their prison sentences in Israel to the safe haven of Qatar, where they continue to run Hamas, it was joining the conspiracy.

378.    Defendants Masraf Al Rayan bank and Qatar National Bank knew that the government of Qatar and the Qatari royal family, who had leadership positions at both banks, openly supported Hamas both by financing its operations and providing a safe haven to Hamas' leadership.

379.    Defendants Masraf Al Rayan bank and Qatar National Bank knew that by allowing Qatar Charity to use accounts at the banks to funnel money to Hamas and PIJ they were joining a conspiracy that had as an essential goal the commission of acts of international terrorism, including the kidnapping and murder of Americans in Israel.

380.    As a direct and proximate result of the Defendants' conspiracy and the steps they knowingly took in furtherance thereof, Plaintiffs have suffered significant physical, psychological and emotional injuries.

381.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### PROVIDING MATERIAL SUPPORT TO TERRORISTS
### IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333(a)

382.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

383.   Plaintiffs assert this claim for Defendants Masraf Al Rayan bank, Qatar National Bank, and Qatar Charity's violations of 18 U.S.C. §§ 2333(a) and 2339A.

384.   Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

385.   As Plaintiffs allege in detail above, the financial assistance that Defendants provided to Hamas and PIJ played an integral role in the ability of those FTOs to carry out terrorist attacks, including the attacks that killed and injured Plaintiffs.

386.   That financial assistance provided material support to the efforts of Hamas and PIJ to engage in acts of international terrorism, including the attacks that killed and injured Plaintiffs.

387.   As a result, Defendants committed acts of international terrorism, as defined by 18 U.S.C. § 2331.

388.   Specifically, the substantial financial assistance that Masraf Al Rayan bank, Qatar National Bank, and Qatar Charity provided to Hamas and PIJ constituted acts of international terrorism because that financial assistance: (a) directly endangered human life; (b) violated federal and state laws regarding, among other crimes, money laundering and terror financing; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those governments; and (d) occurred primarily outside the United States and transcended national boundaries in that Defendants operated internationally in providing financial assistance to Hamas and PIJ.

389.   Masraf Al Rayan bank, Qatar National Bank, and Qatar Charity provided their material support to Hamas and PIJ knowing or intending that the FTOs would utilize the financial

assistance that Defendants provided in furtherance of their terrorist activities, including the attacks that killed and injured Plaintiffs.

390.    Hamas and PIJ did rely upon the financial assistance and material support provided by Defendants in carrying out the FTOs' terrorist activities.

391.    Hamas and PIJ engaged in acts of physical violence outside of the United States with the intent to kill or to cause serious bodily injuries to Plaintiffs, nationals of the United States. The FTOs engaged in that illicit conduct pursuant to a joint plan and conspiracy with Defendants and others.

392.    The FTOs' acts of physical violence did cause Plaintiffs death and serious bodily injuries.

393.    The material support and substantial assistance that Arab Bank provided to Hamas and PIJ was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to Hamas and PIJ.

394.    As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to Hamas and PIJ, Plaintiffs have suffered significant physical, psychological and emotional injuries.

395.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## FOURTH CLAIM FOR RELIEF AGAINST ALL DEFENDANTS

### PROVIDING MATERIAL SUPPORT TO
### FOREIGN TERRORIST ORGANIZATIONS
### IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

396.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

397.   Plaintiffs assert this claim for Defendant Masraf Al Rayan bank, Qatar National Bank and Qatar Charity's violation of 18 U.S.C. §§ 2333(a) and 2339B(a)(1).

398.   Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

399.   At the time of the attacks that injured Plaintiffs, Hamas and PIJ were FTOs.

400.   At that time, Defendants knew that Hamas and PIJ were FTOs, that those organizations engaged in terrorist activity, and that they engaged in terrorism.

401.   As Plaintiffs allege in detail above, Defendants provided material support to Hamas and PIJ.

402.   That material support was integral to the ability of Hamas and PIJ to carry out their terrorist attacks, including the attacks that injured Plaintiffs.

403.   As Plaintiffs allege in detail above, the material support that Defendants provided to Hamas and PIJ constituted acts of international terrorism, as defined in 28 U.S.C. § 2331(1).

404.   The material support that Defendants provided to Hamas and PIJ was a substantial and foreseeable factor in causing Plaintiffs' injuries.

405.   Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to Hamas and PIJ.

406.     As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to Hamas and PIJ, Plaintiffs have suffered significant physical, psychological and emotional injuries.

407.     Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against Defendants and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial, and pre-judgment interest thereon;

(c)     Enter judgment against Defendants and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a), and pre-judgment interest thereon;

(d)     Enter judgment against Defendants and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a), and pre-judgment interest thereon; and

(e)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated: June 10, 2020                    FLEISCHMAN BONNER & ROCCO LLP

                                        By:  /s/ James P. Bonner
                                        James P. Bonner (jbonner@fbrllp.com)
                                        Patrick L. Rocco (procco@fbrllp.com)
                                        Susan M. Davies (sdavies@fbrllp.com)
                                        81 Main Street, Suite 515
                                        White Plains  N.Y.  10601
                                        Telephone:  908-516-2066

**PERLES LAW FIRM PC**
Steven R. Perles[*]
Joshua K. Perles[*]
1050 Connecticut Ave. NW, Suite 500
Washington  D.C.  20036
Telephone:  202-955-9055

**THE BERKMAN LAW OFFICE, LLC**
Robert J. Tolchin (rtolchin@berkmanlaw.com)
111 Livingston Street, Suite 1928
Brooklyn  N.Y.  11201
Telephone:  718-855-3627

*Attorneys for Plaintiffs*

## OF COUNSEL

**NITSANA DARSHAN-LEITNER & CO.**
11 Havatikim Street
Petach Tikva, Israel 49389
+972-(0)52-383-7020
nitsanaleitner@gmail.com

*Israeli Counsel for Plaintiffs*

---

[*]    Motions for *pro hac vice* admission to be filed