# FLEISCHMAN BONNER & ROCCO LLP
## ATTORNEYS AT LAW

81 Main Street • Suite 515 • White Plains • New York • 10601
Tel: 908-337-1426 • Fax: 908-516-2049 • Web: WWW.FBRLLP.COM

Email: PRocco@fbrllp.com

January 24, 2022

**BY ECF**

The Honorable Brian M. Cogan
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *Force, et al. v. Qatar Charity, et al.*, 1:20-cv-02578-BMC

Dear Judge Cogan:

We write on behalf of Plaintiffs in the above-captioned case to respond to the January 18, 2022 pre-motion letters submitted by defendants Masraf Al Rayan ("Masraf"), Qatar National Bank ("QNB") and Qatar Charity. Plaintiffs are the surviving family members of U.S. citizens who were murdered or gravely injured in terrorist attacks in Israel sponsored by two notorious terrorist organizations, Hamas and the Palestinian Islamic Jihad ("PIJ"), both designated by the United States as Foreign Terrorist Organizations ("FTOs").

Defendants' letters demonstrate that all three participants in the conspiracy Plaintifffs outline seek to make virtually identical arguments for dismissal. Under those circumstances their request for a total of 105 pages to brief those arguments is excessive and should be denied.[1]

**The Relevant Facts**

Defendants principally rely on inapposite cases where financial institutions and their customers played only a remote, speculative role in terrorism. In contrast, each of the Defendants knowingly and directly participated in a conspiracy to commit terrorism spearheaded by the Qatari government, which controls each of them (¶¶ 4-5, 155[2]). Over the last decade, Qatar has openly provided substantial funding and support to Hamas, a U.S.-designated FTO, including providing safe haven to fugitive members of Hamas's senior leadership. ¶¶ 2-5, 88-89, 96-97, 118-127. Indeed, from 2012 through 2018, Qatar officially provided Hamas with more than $1.1 billion, making Qatar Hamas's largest single funder. ¶ 127.

---

[1] Having also sought similar page-extensions in the other two substantially similar cases pending against them in this Court, Defendants plan to file a total of 315 pages to make the very same arguments. *See* Defendants' premotion letters to the Court in *Henkin v. Qatar Charity,* No. 1:21-cv-05716-AMD-VMS (ECF 48-50); *Przewozman v. Qatar Charity,* No. 1:20-cv-06088-NGG-RLM (ECF 42).

[2] References herein to "¶ __" and "¶¶ __ - __" refer to specific paragraphs of Plaintiffs' Complaint (ECF 1).

**FLEISCHMAN BONNER & ROCCO LLP**
ATTORNEYS AT LAW

January 24, 2022
Page 2

      Defendant Qatar Charity, the customer of the bank Defendants Masraf and QNB, is itself a long-standing and notorious funder of international terrorism. The countries that have officially recognized Qatar Charity as a terrorist organization include: the United States, which designated Qatar Charity as "a priority III terrorism support entity;" Saudi Arabia, Bahrain, Egypt and UAE, which identified Qatar Charity as "a financial supporter of terrorism;" and Israel, which banned Qatar Charity for its support of terrorism and designated it as a member of the Union of Good, an organization that the United States declared a Specially Designated Global Terrorist ("SDGT") in 2008. ¶¶ 5, 79-81. Qatar Charity's terrorist beneficiaries include not only Hamas and PIJ, but a long and notorious list of terrorists hostile to the United States, including Osama Bin Laden and the Al-Qaida network. ¶¶ 66-85. As just one of many examples, 2003 testimony before the U.S. House of Representatives highlighted Qatar Charity's "active financing of Al-Qaida and other designated international terror groups." ¶ 71. Given the extensive and notorious nature of Qatar Charity's longstanding support for terrorist organizations (¶¶ 90, 146), no financial institution could have remained unaware of that illicit conduct.

      But the Defendant banks did not merely ignore Qatar Charity's leading role in advancing the Qatari government's conspiracy to fund FTOs. To further its goal of supporting FTOs like Hamas and PIJ, Qatar coopted Defendant banks to join the conspiracy to funnel millions of coveted U.S. dollars (the chosen currency of Middle East terrorist networks) through the U.S. financial system to those FTOs under the false guise of "charitable donations." ¶¶ 2-5, 128-135.

      Each Defendant played an integral role in that conspiracy. Masraf processed the many payments ultimately bound for terrorists through its correspondent bank in New York. ¶¶ 7, 132-135. The Defendants repeatedly used that New York correspondent account to process "donations that Qatar Charity had solicited in Qatar and around the world" and funnel U.S. dollars to Hamas and PIJ. ¶¶ 5, 7, 13, 130-132, 152-153. The access to the U.S. financial system that Defendants provided allowed Hamas and PIJ to obtain the U.S. dollars needed to sustain their terrorist activities. ¶ 6.

      QNB also furthered the goals of the conspiracy by maintaining at least six bank accounts that Qatar Charity used to fund terrorism. In addition, QNB maintained accounts for Hamas's senior leadership, including terrorists convicted for murdering innocent civilians. ¶¶ 8, 157-176.

**This Court has Specific Personal Jurisdiction Over Each Defendant in the Conspiracy**

      This Court has personal jurisdiction over all of the Defendant Co-Conspirators based on their purposeful use of a correspondent bank in New York to funnel substantial U.S. dollars to Hamas and PIJ, both U.S.-designated FTOs. *See Official Comm. of Unsecured Creditors of Arcapita Bank, B.S.C. v. Bahr. Islamic Bank*, 549 B.R. 56, 67-68 (S.D.N.Y. Mar. 30, 2016) ("[T]he use of a correspondent bank account, even if the defendant has no other contacts with New York, satisfies the first prong of New York's long-arm statute so long as the use was purposeful and not coincidental or adventitious."). "[A] foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States." *Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 339 (2012) ("*Licci III*"); *accord Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 43 (E.D.N.Y. 2019) (Cogan, J.).

QNB's claim that Plaintiffs have alleged "no facts regarding the volume, frequency or deliberate nature of such funds transfers by QNB through New York" ignores myriad allegations of the Complaint demonstrating Defendant Co-Conspirators' pattern and practice of repeatedly using a New York correspondent account to "funnel[] millions of dollars of donations through the U.S. financial system to obtain U.S. dollars" for distribution to Hamas and PIJ.  ¶ 5; *see also* ¶ 7 ("Qatar Charity solicited donations in Qatar and around the world. . . .  [Masraf] then transferred those funds denominated in U.S. dollars through a correspondent bank in New York."), ¶ 13 (QNB and Masraf "purposefully and knowingly effectuated U.S. dollar-denominated fund transfers on behalf of Qatar Charity through banks in New York . . . for the ultimate benefit of Hamas and PIJ"), ¶¶ 130-131 (describing the transfer of $28 million in just six months), ¶ 132 (setting forth the conspiracy's operating procedures for using a New York correspondent bank to process Qatar Charity's donations),  ¶¶ 152-153 (noting Masraf's use of a New York correspondent account to process "large volumes of U.S. dollars for distribution to terrorists").

Importantly, "defendant's use of the correspondent bank account need not be at the 'very root' of the plaintiff's claim."  *Arcapita Bank*, 549 B.R. at 68 (citing *Licci III*, 20 N.Y.3d at 339-41).  "Rather, as long as the use of the correspondent bank account is not 'completely unmoored' from one of the elements of the plaintiff's cause of action," the Court may exercise personal jurisdiction.  *Id.* (quoting *Licci III*, 20 N.Y. 3d at 340).  Here, the connection to this forum is far more substantial than required by the controlling *Licci* decisions, as use of the New York correspondent account was essential to Defendants' conspiracy because Hamas and PIJ required U.S. dollars to fund their widespread terrorism. ¶¶ 147-156.

Qatar Charity's claim that the use of a correspondent bank account in New York cannot be the basis for exerting specific jurisdiction over Qatar Charity—a non-bank defendant—ignores the Complaint's conspiracy allegations.  *See Allianz Global Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 408 (S.D.N.Y. 2020) ("Specific jurisdiction may . . . exist where a defendant's connection to the forum state arises from participation in a conspiracy connected to the forum state by a co-conspirator's acts in furtherance of the conspiracy.") (citing *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86-87 (2d Cir. 2018)).

In any event, because Plaintiffs have alleged a good faith basis for exerting personal jurisdiction over all three Defendants, the Court should not decide Defendants' motions to dismiss for lack of personal jurisdiction until Plaintiffs are allowed jurisdictional discovery.  *See Singer v. Bank of Palestine*, 2021 U.S. Dist. LEXIS 177860, at *61 (E.D.N.Y. Apr. 30, 2021) (permitting jurisdictional discovery where plaintiff alleged that defendant "used correspondent bank accounts in New York to issue large volumes of payments in U.S. dollars to organizations affiliated with Hamas during the relevant period"); *Vasquez v. H.K. & Shanghai Banking Corp.*, 2019 U.S. Dist. LEXIS 90716 (S.D.N.Y. May 29. 2019), at *34 (allowing jurisdictional discovery where defendant bank depicted its correspondent banking as "entirely passive").  Plaintiffs have sought to engage Defendants regarding that discovery since shortly after Plaintiffs served their Complaint, but Defendants have asserted that discovery is "premature" and have refused to conduct the Rule 26(f) conference in which the parties are obligated to participate "as soon as practicable" and which, absent court order, must precede the taking of discovery.  Defendants have offered no explanation concerning why scheduling the Rule 26(f) conference has been "impracticable" because no such excuse exists.

January 24, 2022
Page 4

### Service of Process on All Defendants Was Adequate Pursuant to Rule 4(f)(C)(ii)

Qatar Charity and Masraf misstate Rule 4(f)(C)(ii)—service by mail need not be "permitted" by Qatari law.  Plaintiffs' service is sufficient because delivery by Federal Express is not "prohibited" by Qatari law.  Rule 4(f)(C).  In fact, Article 11 of the Qatari Civil and Commercial Procedures Law (Law No. 13 of 1990) explicitly authorizes delivery of a summons "by registered mail or any other appropriate means."[3]  In any event, Defendants' arguments about the sufficiency of service will be mooted when the letters rogatory issued by this Court on September 17, 2020 [ECF 18] (and in the case of Qatar Charity, amended on December 7, 2021 [ECF 38] to reflect Qatar Charity's change of address) are finally executed by the appropriate authority in Qatar.

Contrary to Qatar Charity's assertion, Plaintiffs have not "abandoned" that effort.  The U.S. Embassy in Doha transmitted the letters rogatory for QNB and Masraf to the Qatari Ministry of Foreign Affairs on December 20, 2021.  Plaintiffs transmitted the amended letters rogatory for Qatar Charity to the U.S. Department of State on the same date.  Under normal circumstances, "[e]xecution of letters rogatory may take a year or more."[4]  In this case the process will take even more time because, as a result of the COVID-19 pandemic, the U.S. Department of State's Office of International Judicial Assistance ceased transmitting letters rogatory, including the letters rogatory issued by this Court, for more than a year during the 2020-2021 period.  Plaintiffs understand that moratorium has now ended.

Plaintiffs also suggested that, due to the inevitability that service by means of the letters rogatory would be completed, Defendants' counsel should agree to accept service on behalf of their clients.  Like Plaintiffs' request to schedule the Rule 26(f) conference, Defendants have ignored the request to consider that sensible approach to the service of process issue complicated by the State Department's COVID-19 moratorium.

### Plaintiffs Have Stated Valid Claims Under the ATA, As Revised By JASTA

Plaintiffs have adequately pled secondary liability claims against all Defendants under the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). Congress made clear that "[t]he purpose of [JASTA] is to provide civil litigants with the ***broadest possible basis***, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, ***directly or indirectly***, to foreign organizations or persons that engage in terrorist activities against the United States."  JASTA § 2(b) (emphasis added); *see also* Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S., 495 F. Supp. 3d 144, 154 (E.D.N.Y. 2020) (Cogan, J.).  By knowingly providing financial services to further the fundraising efforts of the FTOs Hamas and PIJ, the Defendants engaged in precisely the type of conduct that Congress intended JASTA to address. They conspired to further the interests of FTOs and aided and abetted the

---

[3]  *See* https://almeezan.qa/LawArticles.aspx?LawTreeSectionID=8075&lawId=2492&language=en (last visited January 21, 2022).

[4]  *See* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html (last visited January 21, 2022).

FTOs' pursuit of international terrorism.  *See* 18 U.S.C. § 2333(d); *Estate of Henkin,* 495 F. Supp. 3d at 151 (denying bank's motion to dismiss where the complaint alleged that the bank maintained "multiple bank accounts for a notorious Hamas operative, Hamas' most prominent fundraiser in Turkey, and a key Hamas institution in Gaza," and that the bank "understood that it was providing vital financial services to the terrorist organization responsible" for the plaintiffs' deaths).

Defendants are not "relieved "of [aiding-and-abetting] liability . . . simply because the terrorist organization intentionally raised funds through an intermediary, an alter ego, or a mere front to engage in violence."  *Id.* at 158; *see also, e.g., Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (JASTA "simply says the defendant must have given 'substantial assistance,'" to an act of international terrorism, not substantial assistance to the principal engaging in an act of international terrorism – *i.e.*, for aiding and abetting liability to attach under JASTA, a defendant's substantial assistance may be "indirect").  Defendants' arguments that their conduct is too remote ignores that they "may be liable under the ATA for aiding and abetting the organization behind the attacks, not only the 'triggerman' or suicide bomber."  *Miller*, 372 F. Supp. 3d at 48; *see also id.* at 46 ("Allegations that a defendant provided money to terrorist organizations, or transferred money that was given to terrorist organizations, strengthens the inference that plaintiff's injuries were proximately caused by a defendant's conduct under the ATA.").

Defendants' claims that they lacked the requisite scienter to provide substantial assistance are belied by Plaintiffs' allegations, which leave no doubt that all Defendants acted knowingly and in concert to carry out Qatar's open sponsorship of the FTOs Hamas and PIJ. [5]  Defendants' clear knowledge that they were facilitating the funding of terrorist organizations far exceeds the "general awareness" that JASTA requires.  As the Second Circuit held in *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018), JASTA's requirement of general awareness does not require "the specific intent demanded for criminal aiding and abetting culpability" or that defendant "knew of specific attacks at issue when it provided financial services for Hamas." Rather, a plaintiff must only show a defendant's "general[] aware[ness] of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Id.; accord, e.g., Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 267 (E.D.N.Y. 2019) (finding Bank Saderat liable for aiding and abetting Hezbollah based on a funding scheme involving Iran, its controlled banks, and Hezbollah because Bank Saderat "was more than generally aware that it was playing a significant role" in financing terrorism and it "knowingly and substantially assisted" that illicit conduct).[6]

---

[5] Here, the Qatari government's domination of both Masraf and QNB, and its open support for Hamas, dispel any doubt that Defendant banks were knowingly complicit in financing the Hamas and PIJ terrorist organizations.  Even if, contrary to the well-pled allegations of the Complaint, they had been more distant third-party financial institutions, their antiterrorism policies and procedures would have certainly alerted them to the fact that such an open and notorious financer of terrorism as Qatar Charity was unlawfully financing and supporting Hamas and PIJ. *See, e.g.*, ¶¶ 141-146.

[6] QNB's claim that Plaintiffs' alternative conspiracy allegations are deficient is equally flawed.  QNB relies on a single district court case holding that Defendants must conspire directly with the

January 24, 2022
Page 6

  Moreover, courts may only rarely adjudicate fact-intensive scienter issues as matter of law at the motion to dismiss stage. Indeed, the Second Circuit has instructed that courts should be "'lenient in allowing scienter issues to withstand [even] summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'" *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F. 3d 677, 693 (2d Cir. 2009) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)); *accord, e.g., Linde*, 882 F. 3d at 330 (finding itself "obliged to vacate and remand for a jury to decide that question [of scienter]" and noting that "traditionally a jury resolves questions about a tortfeasor's state of mind") (citations omitted).

  Defendants also offer no valid basis for dismissing Plaintiffs' direct claims under the ATA. Rather, they rely on district court cases that conflict with binding Second Circuit precedent to argue that, to establish a direct claim under the ATA, Plaintiffs must allege that Defendants themselves engaged in "violent or dangerous acts" beyond providing financial services and financing to a terrorist organization. Contrary to Defendants' arguments, Plaintiffs can establish a primary liability claim by alleging that Defendants provided financial services to Qatar Charity, a notorious fundraiser for FTOs, with the requisite knowledge that those funds were destined for the FTOs' coffers. *See Miller*, 372 F. Supp. 3d at 44-45 (providing financial services to members and associates of terrorist organizations may constitute an act of "international terrorism" under the ATA because that illicit conduct may be "dangerous to human life").

  Defendants present the oft-rejected claim that they are entitled to dismissal because they provided "only" "routine banking services." This meritless argument "does not require extended discussion." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 858 (2d Cir. 2021) (rejecting defendant bank's "routine banking services" defense because the complaint alleged that the bank violated banking regulations, disregarded its internal policies, and subsidized suicide bombers and their families both retrospectively and prospectively). *Linde* held that while routine banking services provided to an organization affiliated with a terrorist organization does not *necessarily* establish causation under the ATA's primary liability provisions, only a jury may normally decide whether the banking services provided by a defendant were "routine." *Linde*, 882 F.3d at 327. In any event, the services the bank Defendants provided here were anything but routine. Rather, the Defendant banks provided financial services to Qatar Charity—a notorious, U.S.-designated supporter of terrorism—as well as to notorious Hamas operatives, as part of a Qatari state-sponsored conspiracy to fund FTO terrorism, as Qatar has done openly for the last decade.

---

entity that committed the acts of terrorism—in this case FTOs Hamas and PIJ. A fair reading of the Complaint, however, demonstrates that all Defendants conspired directly with each other, Qatar and the FTOs to support the terrorism of Hamas and PIJ that killed and injured Plaintiffs. *See, e.g., Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 238-240 (2d Cir. 1999) (affirming district court's finding of conspiracy to defraud and imputing co-conspirators' misrepresentations although there was no direct evidence tying the defendant to the conspiracy, just a reasonable inference supported by circumstantial evidence); *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) ("Indeed, it is not necessary that the conspirators know the identities of all the other conspirators in order for a single conspiracy to be found, . . . especially where the activity of a single person was central to the involvement of all.").

January 24, 2022
Page 7

  Lastly, Masraf mistakenly relies on *Crosby v. Twitter, Inc.*, 921 F. 3d 617 (6th Cir. 2019) to argue that Plaintiffs have not plausibly alleged that an FTO committed, planned or authorized the attacks on Plaintiffs.  The allegations in *Crosby*, however, bear no resemblance to Plaintiffs' unequivocal allegations here that Hamas or PIJ committed each of the attacks that injured Plaintiffs and killed or injured their loved ones.  *Compare Crosby*, 921 F.3d at 626 (dismissing complaint that "contain[ed] no allegations that ISIS was involved with the Pulse Night Club shooting" and merely asserted that the actual perpetrator consumed ISIS-related content online) *with e.g.*, ¶¶ 247, 258-261 ("two Hamas operatives" perpetrated the murderous terrorist attack on Richard Lakin; Hamas praised the attack and identified at least one of the perpetrators as a Hamas operative).  Thus, Plaintiffs' allegations that Hamas and PIJ were responsible for the attacks in question are more than adequate to survive a motion to dismiss.

**Plaintiffs Have Standing to Assert Their Claims**

  Masraf wrongly claims that 16 of the more than 100 Plaintiffs here lack standing either because they: (1) are not U.S. nationals; or (2) are "not immediate family members or 'truly. . . the functional equivalent of an immediate family member' of the victim of an alleged terrorist attack."  This Court has already rejected Masraf's first argument.  *See Estate of Henkin*, 495 F. Supp. 3d at 152–53 (Cogan, J.) ("'18 U.S.C. § 2333(a) contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States.'") (citation omitted).  As to the second point, Masraf concedes that more distant relatives that are the "functional equivalent of an immediate family member" may assert claims.  Thus, at best, Masraf has raised a factual issue that cannot be resolved on a motion to dismiss.

  Accordingly, Plaintiffs will oppose Defendants' motions to dismiss in their entirety.  Plaintiffs respectfully request that the Court establish a briefing schedule that provides for Plaintiffs to file their memorandum of law in opposition after the completion of expedited jurisdictional discovery.  In addition, given the entirely overlapping nature of Defendants' arguments, Plaintiffs request that the Court require Defendants to adhere to the Court's 25-page limit for briefs, a goal Defendants can easily achieve by engaging in the coordinated conduct that has marked their defense efforts to date.

           Respectfully submitted,

           /s/ Patrick L. Rocco

           Patrick L. Rocco

cc:  All counsel of record (via ECF)