UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STUART FORCE individually and as personal representative of the ESTATE OF TAYLOR FORCE, *et al*., | 1:20-cv-02578 (BMC) |
| Plaintiffs, | |
| - against - | |
| QATAR CHARITY, *et al*., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANT MASRAF AL RAYAN'S MOTION TO DISMISS THE COMPLAINT</u>**

PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
Tel.:    (212) 858-1000
Fax:    (212) 858-1500

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................1

STATEMENT OF FACTS .........................................................................2

    A.     Overview of Plaintiffs and the Terrorist Attacks Between 2014 and 2016 ........2

    B.     MAR Is a Foreign Bank With No U.S. Branches or Offices ..............................4

    C.     MAR's Alleged Customer Is Not a Designated Terrorist Organization .............5

    D.     Plaintiffs' Allegations of Public Information Are Not Sufficient "Red Flags" for Knowledge ...................................................................................6

        1.     Alleged Reports Prior to 2008 ................................................6

        2.     Alleged Reports Between 2008 and 2016 .................................7

        3.     Alleged Reports After 2016 ...................................................7

    E.     Conclusory Allegations about the Government of Qatar .................................7

ARGUMENT ..........................................................................................8

I.     PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE SECONDARY LIABILITY UNDER JASTA, REQUIRING DISMISSAL UNDER RULE 12(b)(6) .......8

    A.     Plaintiffs Fail to Meet the Standards for Aiding and Abetting Liability ...........9

        1.     No Allegations Establish MAR's "General Awareness" of Illegal Acts ...........................................................................9

            a.     Pre-2008 Allegations Do Not Provide MAR with Knowledge ..................................................................13

            b.     Information Unavailable Until After the Attacks Cannot Impute Knowledge Upon MAR ...................................15

            c.     Allegations of Control by Qatar Are a Red Herring ...................15

        2.     Plaintiffs Have Failed to Allege that MAR "Knowingly and Substantially" Assisted in the Principal Violation ...................17

    B.     Plaintiffs Fail to Allege that MAR Knowingly Entered into an Agreement to Support Conspiracy Liability Under 18 U.S.C. § 2333(d) ...........19

    C.     Plaintiffs Fail to Plausibly Allege that an FTO "Committed, Planned or Authorized" Nine of the Ten Acts of International Terrorism Causing Their Injuries .......................................................................20

II.     PLAINTIFFS FAIL TO STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA BECAUSE MAR'S BANKING SERVICES ARE NOT ACTS OF INTERNATIONAL TERRORISM PROXIMATELY CAUSING PLAINTIFFS' INJURIES, REQUIRING DISMISSAL UNDER RULE 12(b)(6) ..................22

A. MAR's Alleged Commercial Banking Activity Is Not an Act of International Terrorism Involving Violence or Intending to Intimidate or Coerce ...................................................................................................23

B. Plaintiffs Fail to Plausibly Allege Any Facts Which Support an Inference that MAR's Financial Services Were the Proximate Cause of Plaintiffs' Injuries ................................................................................................25

C. Plaintiffs Fail to Plausibly Allege Facts Sufficient to Assert that MAR Had the Requisite *Mens Rea* for Primary Liability under the ATA ...........................28

III. SIXTEEN PLAINTIFFS LACK STATUTORY STANDING FOR ATA OR JASTA ...............................................................................................................29

A. Four Plaintiffs Are Not U.S. Nationals .................................................................29

B. Thirteen Plaintiffs Do Not Allege a Sufficiently Close Familial Relationship ...........................................................................................................31

IV. THE COURT LACKS PERSONAL JURISDICTION OVER MAR, REQUIRING DISMISSAL UNDER RULE 12(b)(2) ..........................................................................32

A. The Court Lacks Personal Jurisdiction Over MAR Under New York's Long-Arm Statute .................................................................................................33

B. Plaintiffs Fail to Satisfy Constitutional Requirements of Minimum Contacts and Reasonableness ...............................................................................38

C. Jurisdictional Discovery Is Not Warranted .........................................................40

V. DISMISSAL FOR IMPROPER SERVICE UNDER RULE 12(b)(5) IS PROPER FOR FAILURE TO COMPLY WITH THE FEDERAL RULES OR QATARI LAW ...............................................................................................................................42

CONCLUSION .....................................................................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Alexander v. Porter*,
No. 13-cv-6834 (SLT) (JO), 2014 WL 7391683 (E.D.N.Y. Dec. 29, 2014)..........................41

*Ansbacher, et. al. v. Qatar Charity, et.al.*,
Jerusalem District Court, CC 21387-06-21, November 10, 2021............................................39

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................................25, 34

*Averbach v. Cairo Amman Bank*,
No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020),
*report and recommendation adopted sub nom. Averbach ex rel. Averbach v.
Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y.
Mar. 9, 2020).....................................................................................................................17, 35

*Averbach ex rel. Averbach v. Cairo Amman Bank*,
No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).........................17, 30

*Bartlett v. Société Générale de Banque Au Liban SAL*,
No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ........... *passim*

*Berdeaux v. OneCoin Ltd.*,
No. 19-cv-4074 (VEC), 2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021).....................27, 34, 35

*Boyer Works USA, LLC v. Rubik's Brand Ltd. et. al.*,
No. 21-cv-7468 (AKH), 2022 WL 355398 (S.D.N.Y. Feb. 7, 2022) ....................................41

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
No. 18-cv-25337 (KMM), 2020 WL 7481302 (S.D. Fla. May 20, 2020) ........................30, 31

*In re Chiquita Brands Int'l, Inc.*,
284 F. Supp. 3d 1284 (S.D. Fla. Jan. 3, 2018).......................................................................28

*Clean Coal Techs., Inc. v. Leidos, Inc.*,
377 F. Supp. 3d 303 (S.D.N.Y. 2019)...................................................................................32

*Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*,
No. 14-cv-5216 (DLC), 2015 WL 4164763 (S.D.N.Y. July 10, 2015) .................................34

*Colon v. Twitter, Inc.*,
14 F.4th 1213 (11th Cir. 2021) ..............................................................................................22

*Comer v. Cisneros*,
　37 F.3d 775 (2d Cir. 1994) .................................................................................30

*Copeland v. Twitter, Inc.*,
　352 F. Supp. 3d 965 (N.D. Cal. 2018) ................................................................21

*Crosby v. Twitter, Inc.*,
　921 F.3d 617 (6th Cir. 2019) ..............................................................................21

*EM Ltd. v. Banco Central De La República Argentina*,
　800 F.3d 78 (2d Cir. 2015) .................................................................................16

*Freeman v. HSBC Holdings PLC* (*"Freeman I"*)
　413 F. Supp. 3d 67 (E.D.N.Y. 2019) ........................................................22, 23, 24

*Gonzalez v. Google LLC*,
　2 F.4th 871 (9th Cir. 2021) ................................................................................21

*Halberstam v. Welch*,
　705 F.2d 472 (D.C. Cir. 1983) ........................................................................9, 17

*Harris v. Mills*,
　572 F.3d 66 (2d Cir. 2009) ...................................................................................2

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
　495 F. Supp. 3d 144 (E.D.N.Y. 2020) ........................................................ *passim*

*Honickman v. BLOM Bank SAL*,
　6 F.4th 487 (2d Cir. 2021) ......................................................................... *passim*

*Int'l Shoe Co. v. Wash*,
　326 U.S. 310 (1945) ...........................................................................................38

*Jazini v. Nissan Motor Co., Ltd.*,
　148 F.3d 181 (2d Cir. 1998) ...............................................................................33

*Jerusalem NY Enters. LLC v. Huber Erectors & Hoisting, LLC*,
　No. 21-cv-376 (MKB), 2021 WL 5827934 (E.D.N.Y. Dec. 8, 2021) ...................40

*Kaplan v. Jazeera*,
　No. 10-cv-5298, 2011 WL 2314783 (S.D.N.Y. June 7, 2011) ............................25

*Kaplan v. Lebanese Canadian Bank, SAL*,
　405 F. Supp. 3d 525 (S.D.N.Y. 2019) ..........................................................20, 24

*Kaplan v. Lebanese Canadian Bank, SAL*,
　999 F.3d 842 (2d Cir. 2021) ...................................................................... *passim*

*Khan v. Khan*,
    360 F. App'x 202 (2d Cir. 2010) ........................................................................42

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*,
    673 F.3d 50 (2d Cir. 2012).................................................................................23

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*,
    732 F.3d 161 (2d Cir. 2013)..................................................................... *passim*

*Linde v. Arab Bank, PLC ("Linde I")*,
    882 F.3d 314 (2d Cir. 2018).................................................................... *passim*

*Mednik v. Specialized Loan Servicing, LLC*,
    No. 20-cv-427 (MKB), 2021 WL 707285 (E.D.N.Y. Feb. 23, 2021) ....................42

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) .....................................................12, 24, 38

*Nabulsi v. Nahyan*,
    No. H-06-2683, 2008 WL 1924235 (S.D. Tex. Apr. 29, 2008)...............................42

*In re NYSE Specialists Secs. Litig.*,
    503 F.3d 89 (2d Cir. 2007)....................................................................................2

*O'Sullivan v. Deutsche Bank AG*,
    No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar.
    28, 2019) ...............................................................................14, 19, 20, 26

*Ofisi v. BNP Paribas, S.A.*,
    278 F. Supp. 3d 84 (D.D.C. 2017), *order vacated in part on other grounds
    and reconsideration denied*, 285 F. Supp. 3d 240 (D.D.C. 2018)....................28, 29

*Rosenberg v. Lashkar-e-Taiba*,
    No. 10-cv-5381 (DLI) (CLP), 2016 WL 11756917 (E.D.N.Y. July 5, 2016),
    *report and recommendation adopted as modified*, No. 10-cv-5381 (DLI) (CLP),
    2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017)......................................................30

*Rosenberg v. Lashkar-e-Taiba*,
    No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017) ...............30, 43

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)..........................................................................25, 26, 28

*Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) .........................................................................................35

*Schansman v. Sberbank of Russia PJSC*,
    No. 19-cv-2985 (ALC), 2021 WL 4482172 (S.D.N.Y. Sept. 30, 2021)...................24

*Siegel v. HSBC N. Am. Holdings, Inc.*,
 933 F.3d 217 (2d Cir. 2019)..............................................................................18, 19

*Smith ex rel. Smith v. Islamic Emirate of Afg.*,
 262 F. Supp. 2d 217 (S.D.N.Y. 2003), *amended on other grounds,* No.
 01-cv-10132 (HB), 2003 WL 23324214 (S.D.N.Y. May 19, 2003)................................31, 32

*Spetner v. Palestine Inv. Bank*,
 495 F. Supp. 3d 96 (E.D.N.Y. 2020) ..........................................................32, 33, 35

*Strauss v. Crédit Lyonnais, S.A.*,
 175 F. Supp. 3d 3 (E.D.N.Y. 2016) ..........................................................36, 37, 38

*Tamam v. Fransabank Sal*,
 677 F. Supp. 2d 720 (S.D.N.Y. 2010).......................................................... *passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
 714 F.3d 118 (2d Cir. 2013)..............................................................................26, 28

*In re Terrorist Attacks on Sept. 11, 2001*,
 No. 03-MDL-1570 (GBD) (SN), 2017 WL 9533073 (S.D.N.Y. Aug. 8, 2017)
 *report and recommendation adopted*, 2017 WL 5591873 (S.D.N.Y. Nov. 17,
 2017) ...........................................................................................................................32

*In re Terrorist Attacks on Sept. 11, 2001*,
 298 F. Supp. 3d 631 (S.D.N.Y. 2018)...........................................................................16

*Waldman v. Palestine Liberation Org.*,
 835 F.3d 317 (2d Cir. 2016).........................................................................33, 39

*Weiss v. Nat'l Westminster Bank PLC*,
 453 F. Supp. 2d 609 (E.D.N.Y. 2006) .........................................................27, 31

*Weiss v. Nat'l Westminster Bank PLC*,
 768 F.3d 202 (2d Cir. 2014)...........................................................................................24

*Weiss v. Nat'l Westminster Bank PLC*,
 176 F. Supp. 3d 264 (E.D.N.Y. 2016) ........................................................................37

*Weiss v. Nat'l Westminster Bank PLC*,
 381 F. Supp. 3d 223 (E.D.N.Y. 2019) ........................................................................25

*Zapata v. HSBC Holdings PLC*,
 414 F. Supp. 3d 342 (E.D.N.Y. 2019) ............................................24, 25, 26, 27

## Constitution

United States Constitution
    Fourteenth Amendment ...................................................................................................38

## Statutes and Codes

United States Code
    18 U.S.C. § 2331(1) ..................................................................................................23, 25
    18 U.S.C. § 2331(1)(B) ....................................................................................................25
    18 U.S.C. § 2333(a) .....................................................................................1, 22, 23, 30
    18 U.S.C. § 2333(d) .........................................................................................................19
    18 U.S.C. § 2333(d)(2) ...........................................................................................1, 8, 9, 21
    18 U.S.C. § 2339A ...............................................................................................23, 28, 29
    18 U.S.C. § 2339B ...........................................................................................................28
    18 U.S.C. § 2339B(a)(1) ..................................................................................................23
    28 U.S.C. § 1604 ...............................................................................................................8

New York Civil Practice Law and Rules
    Section 302(a)(1) ...........................................................................................32, 33, 35, 37
    Section 302(a)(2) ..............................................................................................................32

Qatari Civil & Commercial Procedures Law
    Article 10 (Law No. 13 of 1990, as amended by Law No. 7 of 1995) ....................................43
    Article 11 (Law No. 13 of 1990) .......................................................................................43

## Rules and Regulations

Federal Rules of Civil Procedure
    Rule 4(f).............................................................................................................................42
    Rule 4(f)(1) .......................................................................................................................42
    Rule 4(f)(2)(C)(ii) .............................................................................................................42
    Rule 4(h)(2)........................................................................................................................42
    Rule 11 ...............................................................................................................................33
    Rule 12(b)(2)................................................................................................................32, 41
    Rule 12(b)(5).....................................................................................................................42
    Rule 12(b)(6)..................................................................................................................8, 22

## Other Authorities

*Antiterrorism Act of 1990:  Hearing on S. 2465 Before the Subcomm. on Courts*
    *& Admin. Practice of the Comm. on the Judiciary of the United States*
    *Senate*, 101st Cong. 46 (1990) (statements of Sen. Strom Thurmond and
    Lloyd Green, counselor, U.S. Department of Justice) .............................................................30

Antiterrorism Act of 1990, S. 2465, 101st Cong. § 2(a) (1990)....................................................30

U.S. Department of Defense, *'Major Non-NATO Ally' Designation Will Enhance
U.S., Qatar Relationship*, Jan. 31, 2022,
https://www.defense.gov/News/News-Stories/Article/Article/2917336/major-non-
nato-ally-designation-will-enhance-us-qatar-relationship/ ....................................................41

## PRELIMINARY STATEMENT

Plaintiffs – twelve of whom were physically injured in Israel by terrorists between June 2014 and December 2016 – ask the Court to impose liability against a foreign bank, Masraf Al Rayan ("MAR"), under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), *et seq.*, and, as amended, under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), *et seq.* Plaintiffs' theory is that MAR conspired with one customer, Qatar Charity, and another bank, Qatar National Bank Q.P.S.C., (all collectively, "Defendants") to finance Hamas and the Palestinian Islamic Jihad ("PIJ"). Plaintiffs' allegations, however, amount to MAR being an inadvertent link in the alleged chain of financial transactions. Plaintiffs assert that MAR, a foreign financial institution with no presence in the United States, provided ordinary financial services to one customer in Doha – Qatar Charity – who, in turn, allegedly used MAR to transfer its funds from Doha to correspondent banks in New York to transfer U.S. dollars to Qatar Charity's local branches in Palestine, who in turn allegedly transferred an unspecified "substantial portion" of funds to Hamas, PIJ, and unnamed "Hamas-affiliated organizations" and "PIJ-affiliated charities," and who, in turn, allegedly funded the individual terrorists who attacked Plaintiffs.

The attacks which physically injured the Plaintiffs are indisputably tragic. MAR condemns the attacks and all acts of terrorism. MAR, however, is not legally responsible for those attacks. The allegations in the Complaint against MAR are conclusory and vague, and they cannot escape at least two other fundamental legal deficiencies:

*First*, Plaintiffs' chain of causation, as illustrated above, is strained, tenuous, and rife with speculation. The allegations fail to support ATA or JASTA liability, or personal jurisdiction.

*Second*, even if the Court looks past causation, Plaintiffs cannot establish that MAR knew or should have known that Qatar Charity was so "integral" or "closely intertwined" with Hamas

and PIJ such that MAR should have known that by providing correspondent banking services to Qatar Charity, it was providing assistance to Hamas and PIJ and thus, the individual attacks should have been foreseeable to MAR.  Indeed, Plaintiffs *cannot* plead that Qatar Charity is a Specially Designated Global Terrorist ("SDGT,"), a Foreign Terrorist Organization ("FTO"), or an otherwise U.S.-sanctioned entity – the equivalent of a "red flag."  Instead, Plaintiffs ask the Court to piece together a patchwork of insufficient clippings to compel the conclusion that MAR was aware that its ordinary banking activity was sponsoring terrorism.  Plaintiffs rely on strained and disparate sources of information, such as references to Qatar Charity (under a prior name) in congressional reports and unrelated U.S. litigation from 2002 and 2003; a classified internal intelligence communication from 2008 that was only declassified after the transactions at issue; and pronouncements from Israel in 2008.  These data points hardly amount to the kind of "ubiquitous" information of terrorism support necessary to impute liability upon MAR for the attacks in 2014, 2015, and 2016.  Nor can Plaintiffs plausibly rely on public information occurring *after* the attacks to provide the requisite knowledge *before* the attacks.  Accordingly, Plaintiffs' Complaint warrants dismissal.

## **STATEMENT OF FACTS**[1]

### A.    **Overview of Plaintiffs and the Terrorist Attacks Between 2014 and 2016**

Seventy-three individual Plaintiffs seek damages from MAR for ten individual terrorist attacks that occurred in Israel between June 2014 and December 2016.  (Compl. ¶¶ 14-65).  Twelve of these Plaintiffs were physically injured, although one was not a direct victim of an attack; he suffered a heart attack hours after he witnessed the aftermath of a car ramming into passengers at

---

[1]  For purposes of this motion, the facts as alleged in the Complaint are assumed true.  *See In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007).  However, "that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks and citation omitted).

a bus stop ahead of him. (*Id.* ¶¶ 309-20).  These twelve Plaintiffs are alleged to be U.S. citizens, a prerequisite to standing under the ATA and JASTA, except that Plaintiff Glick renounced his U.S. citizenship before filing this lawsuit.  (*Id.* ¶ 37).  The remaining Plaintiffs are relatives of the twelve physically injured Plaintiffs who seek damages against MAR for emotional distress due to the physical injury suffered by their relative, although four are Israeli citizens bringing individual claims for their own injuries even though the statute applies only to U.S. nationals, and at least thirteen are distant relatives such as grandparents, grandchildren and/or great-grandchildren not alleged to have a sufficiently close relationship to their physically injured relative.  (*Id.* ¶¶ 14-65; 182-353).

The Plaintiffs who were physically injured are alleged to have been harmed by individual terrorists who, Plaintiffs allege, are affiliated with Hamas or PIJ (*e.g.*, *id.* ¶ 332), were motivated by the cause of Hamas or PIJ (*e.g, id.* ¶ 344-45), or otherwise were allegedly praised by Hamas or PIJ for their conduct (*e.g., id.* ¶ 216).  For example, one attack was carried out by an individual "following a public call" from Hamas.  (*Id.* ¶ 344).  Another individual is alleged to have "decided to carry out a terrorist attack" and to have "posted numerous times on Facebook expressing his admiration for Palestinians perpetuating terror attacks," but is not alleged to have coordinated the attack or received financing from anyone else, let alone Hamas or PIJ.  (*Id.* ¶¶ 281, 287, 291). Another attacker was praised after the fact by Hamas as a "son of the Hamas movement," with no other allegation connecting the attack to Hamas, yet Plaintiffs state without basis that he was "a Hamas operative."  (*Id.* ¶ 301).  Similarly, Plaintiffs state in a conclusory fashion that another individual terrorist was identified by Hamas as "one of its operatives," but aside from praising him after the attack, Plaintiffs plead no facts to indicate Hamas (or PIJ) was involved in the attack's coordination, planning, or financing.  (*Id.* ¶¶ 265, 273-74).  Plaintiffs also allege that Hamas

"demonstrably took responsibility" for one of the attacks but do not allege that Hamas financed or coordinated the attack. (*Id.* ¶¶ 201, 205, 207). Likewise, another attack was praised by Hamas, but there are no allegations that Hamas directed or funded the attack. (*Id.* ¶¶ 247, 252-53, 255-56, 258, 260-61). Another one of the attacks was carried out by a PIJ operative "acting on behalf of PIJ," and PIJ "claimed responsibility" for the attack, but Plaintiffs include no allegations that PIJ financed or coordinated the attack. (*Id.* ¶¶ 236, 240, 242-43).

Crucially, Plaintiffs do not allege that MAR was aware of the attacks, provided funding to the terrorists for those attacks, or that it was involved in the attacks. Nor does the Complaint allege any agreement between MAR and Hamas or PIJ to engage in these attacks. Further, Plaintiffs do not plausibly plead that Hamas or PIJ planned the relevant attacks in advance, let alone MAR's customer, Qatar Charity, and certainly not MAR itself.

**B.    MAR Is a Foreign Bank With No U.S. Branches or Offices**

Plaintiffs do not direct their claims at the individual terrorists or Hamas or PIJ, but instead at MAR, which is a foreign bank publicly held and headquartered in Doha, Qatar and regulated by the Qatar Central Bank. (*Id.* ¶¶ 86, 148). MAR has no U.S. branch or office. (*Id.*). As a financial institution, MAR engages in banking, financing, and investing activities for all of its customers. (*Id.* ¶ 87). Having no nexus to the United States, Plaintiffs focus on a single, ordinary financial activity – allegedly engaging in U.S. dollar transactions with correspondent banks in New York. (*Id.* ¶¶ 132(c), 147-54). With respect to the maintenance or use of correspondent accounts, there are no specific time frames identified in the Complaint – only "throughout the time relevant to Plaintiffs' claims." (*Id.* ¶ 90).

The only reference to specific transactions is that "from March 1, 2015 until September 7, 2015 alone, *Defendants* conspired to transfer over $28 million" in donations from Qatar Charity. (*Id.* ¶ 130 (emphasis added)). Plaintiffs allege no other details, no specific allegations as to

transfers by MAR (as contrasted to *Defendants*), when MAR allegedly made these transfers, to whom the transfers were made, how often these transfers were made, the amounts of such transfers, or *that these transfers touched correspondent accounts in New York*.  (*Id.*).  Nor do Plaintiffs make any allegations as to what relevance collective transfers by *Defendants* between March and September 2015 have to Plaintiffs' injuries that predate such alleged transfers, (*e.g., id.* ¶¶ 209-34 (Plaintiff Y.N.F., kidnapped and killed by Hamas in June 2014); ¶¶ 37, 236 (Plaintiff Glick, shot in October 2014); ¶¶ 264-65 (Plaintiff C.Z.B., killed in October 2014 following a car ramming)), or took place long after the period of alleged transfers (*e.g.*, *id*. ¶¶ 183-99 (Plaintiff Force, killed by Hamas in March 2016); ¶ 321 (Plaintiff Lisker, stabbed in December 2016)).

**C.     MAR's Alleged Customer Is Not a Designated Terrorist Organization**

Plaintiffs' allegations against MAR are, in fact, directed at its customer, Qatar Charity, which is nowhere alleged to be an SDGT or an FTO.  (*See, e.g., id.* ¶¶ 2, 5, 105).  Plaintiffs argue that MAR should not have provided ordinary banking services – here, limited to correspondent banking with no allegations of cash deposit exemptions, loans, or any other financial services – to Qatar Charity, who, in turn, transferred funds to Qatar Charity branches, who, in turn, provided an unspecified amount of funding to Hamas and PIJ or to unidentified entities allegedly affiliated with Hamas and PIJ, which are SDGTs and FTOs.  (*Id.* ¶¶ 2, 5, 105, 131, 133-34).  In other words, Plaintiffs contend that MAR knew that by providing correspondent banking services to Qatar Charity, MAR was in effect providing financing to Hamas and PIJ.  While providing no specific allegations to support this alleged knowledge, Plaintiffs also recognize that Qatar Charity is a well-known charity providing humanitarian services in the Middle East, (*id*. ¶ 72), conceding that terrorist financing is often *disguised* as charitable contributions (*id.* ¶ 118), which, by definition,

implies that such a customer would have *concealed* its activities from others.[2]

**D.    Plaintiffs' Allegations of Public Information Are Not Sufficient "Red Flags" for Knowledge**

Recognizing that Qatar Charity is not an SDGT or an FTO, Plaintiffs attempt to impute knowledge upon MAR that Qatar Charity is "integral" to Hamas and PIJ through purportedly public reports that are neither alleged to have been plausibly known by MAR nor ubiquitous to impute knowledge upon MAR.

**1.    Alleged Reports Prior to 2008**

The Complaint's allegations as to the public's ability to associate Qatar Charity with Hamas and PIJ focus almost entirely on scraps of purported information from 2008 (six to eight years before the attacks that injured Plaintiffs), or earlier.

First, Plaintiffs allege that "Qatar Charitable Society," a "prior name" for Qatar Charity, (*id.* ¶ 67), was named in congressional and trial testimony in the United States in 2002 and 2003, years before MAR's founding in 2006 and a dozen years before they allege MAR transacted with Qatar Charity.  (*Id.* ¶¶ 69-72, 86).  According to the Complaint, this testimony relates entirely to a relationship between Qatar Charitable Society and a terrorist group not at issue in this case.[3]  No allegations are made that these proceedings in the U.S. were disseminated in Qatar.

Second, Plaintiffs allege that "the U.S. Interagency Intelligence Committee on Terrorism," or "IICT," an organization established specifically to coordinate and promote "the effective use of Intelligence Community resources" and prepare materials for "senior policy makers" designated

---

[2] MAR incorporates by reference Defendant Qatar Charity's Memorandum of Law in Support of Its Motion to Dismiss, which demonstrates that Qatar Charity is and was a legitimate charitable organization, well known for its humanitarian efforts.

[3] Plaintiffs also allege terrorist "support" by Qatar Charity unrelated to the attacks (or even countries) at issue in this case without providing any detail or corroboration; Plaintiffs do not plead that this alleged information was publicly available (in a conclusory fashion or otherwise).  (*Id.* ¶¶ 73-78).

Qatar Charitable Society as a "priority III terrorism entity (TSE)," but do not allege this information was public.  (*Id.* ¶ 68 & n.1).   In fact, Plaintiffs' hyperlink demonstrates that information about the IICT itself was not declassified until December 2016.  (*Id.*).

Finally, Plaintiffs allege that Qatar Charitable Society was banned by Israel in 2008 as a member of an organization called "Union of Good."  (*Id.* ¶ 79).  Union of Good was designated as an SDGT that same year, but Plaintiffs do not allege that Qatar Charity (or Qatar Charitable Society) has ever been designated as an SDGT.  (*Id.* ¶¶ 80-81).

### 2.    Alleged Reports Between 2008 and 2016

While the attacks at issue occurred between June 2014 and December 2016, Plaintiffs do not allege that there was any publicly available information disseminated between 2008 and 2016 to render it plausible that MAR believed at the time it provided financial services to Qatar Charity, it was providing financial services to Hamas and PIJ.

### 3.    Alleged Reports After 2016

Other allegations as to public knowledge of Qatar Charity's purported connections to terrorism postdate any alleged misconduct in the Complaint.  A UK Charity Commission report in 2017, or an alleged investigation of an affiliate's affiliate in 2019, or the allegation that certain Middle Eastern countries designated Qatar Charity as a financial supporter of terrorism in June 2019 cannot provide knowledge to MAR *prior* to the transactions and attacks at issue in this case.  (*Id.*  ¶¶ 82-84, 93-94).

## E.    Conclusory Allegations about the Government of Qatar

Finally, lacking any specific allegations of general awareness against MAR, Plaintiffs shift to a conclusory theory that the Government of Qatar supports Hamas and PIJ and that MAR has been "coopted" and "controlled" by Qatar and the Qatari royal family, and, therefore, MAR must support terrorism.  (*Id.* ¶¶ 2, 4, 155).  Flawed syllogism aside, neither the Government of Qatar,

nor the Qatari royal family are defendants in this action, nor could they be.  (*See id.* ¶ 1).[4]
Moreover, the only alleged facts in the Complaint that connect the Qatari government to MAR are
that "agents or instrumentalities of the Qatari government" have a minority ownership interest of,
collectively, less than 28 percent in MAR and that unnamed members of the Qatari royal family
"are or have been" members of MAR's board of directors, without specifying any specific conduct.
(*Id*. ¶¶ 88-89).  Instead, the Complaint relies on conclusory allegations of "dominance," which –
in Plaintiffs' view – means that any entity in which a member of the royal family has an interest
must therefore support terrorism.  Such political rhetoric and conclusory allegations do not support
any claims in this action.

## ARGUMENT

Plaintiffs bring four causes of action against MAR for primary and secondary liability
under the ATA as amended by JASTA; each claim is defective as a matter of law.

## I.    PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE SECONDARY LIABILITY UNDER JASTA, REQUIRING DISMISSAL UNDER RULE 12(b)(6)

Under JASTA, liability attaches in only a limited set of circumstances:

> In an action under subsection (a) for an injury arising from an act of
> international terrorism *committed, planned, or authorized* by an
> organization that *had been designated as a foreign terrorist organization*
> under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189),
> as of the date on which such act of international terrorism was committed,
> planned, or authorized, liability may be asserted as to any person *who aids
> and abets, by knowingly providing substantial assistance*, or *who conspires
> with the person who committed such an act of international terrorism*.

18 U.S.C. § 2333(d)(2) (emphasis added).  Here, Plaintiffs' first two causes of action against MAR
are for aiding and abetting an act of international terrorism and for conspiring with the principal
actor who committed the act of international terrorism.  Both claims, however, are deficient.

---

[4] Qatar is a foreign sovereign and is thus "immune from the jurisdiction of the courts of the United States and of the
States" unless a specific exception in the Foreign Sovereign Immunities Act applies.  *See* 28 U.S.C. § 1604.

A.    **Plaintiffs Fail to Meet the Standards for Aiding and Abetting Liability**

Secondary liability pursuant to Section 2333(d)(2) under an aiding and abetting theory (First Claim for Relief Against All Defendants) requires that Plaintiffs allege that (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;" and (3) "the defendant must *knowingly and substantially* assist the principal violation." *See Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)).  Plaintiffs have not met this legal standard. The Complaint only describes MAR as a bank performing ordinary banking activity for a single customer who, as even Plaintiffs acknowledge, was known for its charitable activities and is not an SDGT or an FTO.  (Compl. ¶ 72).

1.    **No Allegations Establish MAR's "General Awareness" of Illegal Acts**

As noted above, individual terrorists caused Plaintiffs' injuries, and no allegations assert that MAR aided any of these individuals.  Nor are there allegations that MAR provided banking services to Hamas or PIJ.  Rather, MAR is a distant link in the chain providing services to its customer, Qatar Charity, which thereafter used local branches to allegedly fund unnamed affiliates of Hamas and PIJ.  *See supra* §§ B–D.  As there are no allegations of directly funding the SDGT or FTO, the only basis for secondary liability against MAR is via indirect assistance, allegedly for providing financial services to Qatar Charity.

Plaintiffs, however, have not alleged facts to support MAR's "general awareness" of a role in the overall illegal activity to fund Hamas and PIJ via Qatar Charity and its local branches.  To do so, Plaintiffs "must plausibly allege that [MAR] was aware that, by assisting the principal, it is itself assuming a role in terrorist activities." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 851 (2d Cir. 2021) (internal quotation marks and citations omitted).  This element "does not

9

require proof that the defendant had a specific intent," but it does require that MAR "knowingly—and not innocently or inadvertently—gave assistance, directly or indirectly" to the FTO.  *Id.* at 863-64.  Put simply, "the relevant inquiry for the general awareness element is: did Plaintiffs plausibly allege" that Qatar Charity was "so closely intertwined with [Hamas's and PIJ's] violent terrorist activities that one can reasonably infer that [MAR] was generally aware while it was providing banking services to [Qatar Charity] that it was playing a role in unlawful activities from which [Hamas's and PIJ's] attacks were foreseeable?"  *Honickman*, 6 F.4th at 499 (internal quotation marks and citations omitted).  The answer is no.

The allegations as to general awareness in this case pale in comparison to those in prior cases in which JASTA liability was found.  In *Kaplan*, for example, the Second Circuit considered and provided guidance on the type of publicly available information that rises to the level of general awareness.  The defendant bank at issue was alleged to have aided and abetted the terrorist group Hizbollah (an SDGT and FTO); plaintiffs in that case alleged that their customers were not only "integral parts of Hizbollah" but that the defendant bank "knew this was so because Hizbollah *repeatedly publicized those relationships on Hizbollah websites and in news media that included Hizbollah's own radio and television stations*."  999 F.3d at 862 (emphasis added).  These statements were made by "senior Hizbollah officials" at "press conferences and news media interviews" and on Hizbollah's own "official websites," "official television station," and its "official radio station" during a "particular time period (*i.e.*, repeatedly in the several years leading to [the earliest date of the attacks at issue])."  *Id.* at 864 (quoting plaintiffs' complaint).  The *Kaplan* complaint also averred that the relationships between Hizbollah and the defendant bank's customers were reported in "a *dozen* published English-language articles" in addition to "the repeated multimedia statements by Hizbollah."  *Id.* at 850, 864-65 (emphasis added).  While

10

*Kaplan* holds that, in cases brought under JASTA, Plaintiffs are not required to "plead a defendant's actual state of mind," JASTA contains a "requirement" of "actual knowledge" that the defendant "know that it is providing assistance" to an FTO, so as to "avoid imposing liability on innocent, incidental participants." *Id.* at 863-64 (internal quotation marks and citations omitted). The exhaustive recitation of the alleged publication of facts necessary to find that the defendant was generally aware it was aiding and abetting an FTO in *Kaplan* is far from present in this case.

Decisions in this District in which courts allowed JASTA aiding and abetting claims to proceed also depend on similarly comprehensive complaints detailing ubiquitous public ties between the customer and the SDGT – far more comprehensive than Plaintiffs' allegations.  In *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, for example, the Turkish bank at issue was alleged to have provided banking services to three different customers, and the complaint was replete with allegations as to the public nature of the customers' ties to Hamas.  For example, the representative of one customer, IHH, was arrested "for funding terrorism and working with Hamas."  495 F. Supp. 3d 144*, 155 (E.D.N.Y. 2020) (Cogan, J.).  In addition, in another "international incident" that was widely publicized, "several armed IHH supporters, aboard an IHH-purchased ship[] violently attacked Israel commandos."  *Id.*  Another customer was not merely an intermediary but himself "a known Hamas operative."  *Id*. at 148-49.  The third customer, a university, "was well-known as a pipeline into Hamas' terrorist wing and utilized by Hamas to store caches of weapons" and was labeled as a "stronghold of Hamas in Gaza" and "a cultural symbol of Hamas" in news reports, including "by a Turkish online news site."  *Id*. at 156.  In addition, the university's board leader was "an SDGT intimately involved in the funding of Hamas, and the dean was a high-ranking Hamas minister."  *Id*.  Put simply, "there were plenty of warning flags" providing the bank with notice that it was dealing with multiple terrorist

organizations at the time the defendant bank was processing the transactions at issue. *Id*. at 151, 160.

Other cases in which courts have found that general awareness was sufficiently pleaded include cases where the customers themselves were FTOs or SDGTs. *See, e.g.*, *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448, at *9 (E.D.N.Y. Nov. 25, 2020). Or, even worse, complaints have contained allegations that indicate the defendant bank was not only generally aware of terrorist activity, but willfully assisted it. In *Miller*, for example, the defendant bank received lists identifying causes of death of payment beneficiaries. *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 39, 47 (E.D.N.Y. 2019). Similarly, the court in *Kaplan* found that the defendant bank provided "special treatment" to the customers at issue, such as dispensing with filing requirements to allow the customers to deposit hundreds of thousands of dollars a *day* without having to identify the source of funds. *Kaplan*, 999 F.3d at 850.

Here, Plaintiffs are unable to make any of these kinds of allegations; they are missing "red flags." *Estate of Henkin*, 495 F. Supp. 3d at 160 ("A single online search at any time between 2008 and October 2015 would have confirmed IHH's status as a substantiated Hamas conduit and terrorist organization."); *see also Kaplan*, 999 F.3d at 862 ("Hizbollah repeatedly publicized those relationships [between bank customers and Hizbollah] on Hizbollah websites and in news media that included Hizbollah's own radio and television stations."). The facts in this Complaint more closely resemble those in *Honickman*, in which one customer was Union of Good (the organization which Plaintiffs claim "Qatar Charitable Society" was a member), and, like Qatar Charity, all three customers at issue were involved in charitable giving. *Honickman*, 6 F.4th at 493.[5] There, the

---

[5] In *Estate of Henkin*, decided before *Honickman*, the Court credited plaintiffs' allegation that a customer at issue was

Complaint contained "limited public sources" that the court held to be insufficient to plead general awareness.  *Id.* at 502.  Faced with similarly limited public sources but determined to reverse engineer a complaint against MAR, Plaintiffs resort to a kitchen-sink approach of stray facts to infer MAR's knowledge, but all are implausible.

### a.      Pre-2008 Allegations Do Not Provide MAR with Knowledge

First, Plaintiffs cobble together irrelevant and isolated information that predates the transactions and attacks by many years.  The Complaint mentions testimony about terrorist groups not at issue in this case and "Qatar Charitable Society," not Qatar Charity, over a decade before the alleged attacks.  Further, Plaintiffs make no attempt to demonstrate how MAR should have been aware of this testimony, or even to demonstrate how testimony in the United States about the Qatar Charitable Society supporting Al-Qaeda through a 9/11-related action rendered it foreseeable that Qatar Charity purportedly supported Hamas and PIJ years later.  (*See, e.g.*, Compl. ¶¶ 69-72); *see also Honickman,* 6 F.4th at 501-02 ("The complaint lacks any allegations that at the time of the interviews in which al-Qaradawi—who chaired Union of Good—praised martyrdom and criticized the United States' designation of Hamas, it was public knowledge that al-Qaradawi chaired Union of Good.").

The Complaint also attempts to imply knowledge should be presumed because the IICT listed Qatar Charity as a "priority III terrorism support entity" in 2008, yet this information was directed to "advise and assist the Director of Central Intelligence" ("DCI") and provide "threat warnings from the DCI to alert senior policy makers of possible foreign terrorist attacks."  (Compl.

---

designated as a member of the Union of Good.  However, that allegation was coupled with allegations that the bank customer *itself* was "a substantiated Hamas conduit and terrorist organization," that such status could be easily confirmed with a "single online search," and that the customer had participated in an internationally-publicized deadly incident before the attacks at issue – allegations that Plaintiffs here have not come close to pleading.  *See Estate of Henkin*, 495 F. Supp. 3d at 160.

¶¶ 68 & n.1, 140).  There is no basis to conclude that MAR, which does not even operate in the United States, would have knowledge of the information closely held by American intelligence agencies.  *See Honickman*, 6 F.4th at 502 n.18 (allegations of general awareness based on "publicly available" but unreported information "require[] the implausible inference that the defendant was aware of those facts even before the news media.").[6]

Nor can Plaintiffs equate an SDGT or FTO designation to *Israel's* designation of "Qatar Charitable Society" in 2008 as a "funder of the terrorist organization, Hamas," especially because Plaintiffs fail to allege whether such designation was plausibly known to MAR.  (*See* Compl. ¶¶ 79, 139); *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709-LTS-GWG, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019) (finding that allegations regarding Iran's status as a state sponsor of terrorism and the purpose of U.S. sanctions against Iran were insufficient to plausibly allege aiding and abetting liability claim).  Even assuming this fact was publicly known, one designation by a foreign country (using a different name than Qatar Charity) years before the misconduct at issue is not enough to render banking activity for that customer tantamount to terrorist activity; Plaintiffs' approach to designations from other nations other than SDGTs and FTOs would stretch the contours of anti-money laundering requirements.  *Honickman,* 6 F.4th at 502 n.20 (noting "allegation that Israel designated Al-Aqsa as a terrorist organization in 1998, without specifying whether and where this was made public, is also unavailing" while dismissing complaint for allegations of banking activity between 1999 and 2001).

In sum, Plaintiffs have not alleged facts from which general awareness can be inferred; MAR could not foresee terrorist activity at the time it processed the alleged transactions at issue.

---

[6] There are no allegations that this information was publicly available to MAR prior to the transactions at issue. Indeed, the hyperlink provided by Plaintiffs in the Complaint contradicts that this information would have been public, as it was declassified on December 2, 2016.  (Compl. ¶ 68 & n.1).

*Id.* at 496-97 ("Foreseeability is thus central" to "JASTA aiding-and-abetting liability.").  Unlike in *Estate of Henkin*, where media in the home country of the defendant bank reported that "the head of [the customer's] supervisory board had been designated as a senior Hamas fundraiser by the U.S. Treasury Department" the very year before the attacks at issue and *while* the customer was transacting with the defendant bank, 495 F. Supp. 3d at 151, here, Plaintiffs do not allege facts that are meant to support an inference of general awareness prior to the attacks at issue.

### b. Information Unavailable Until After the Attacks Cannot Impute Knowledge Upon MAR

Pleading no allegations of general awareness between 2008 and 2016, Plaintiffs instead recite alleged red flags that postdate their own allegations of harm.  These flags, however, are insufficient for an inference of general awareness.  Specifically, no inferences of knowledge can be drawn from designations by foreign countries years after the banking activity or attacks at issue (Compl. ¶¶ 82-84, 93-94).  It is impossible for after-the-fact revelations to support a finding of knowledge years before.  *See Honickman*, 6 F.4th at 501 (noting that "[o]ne of the news articles on Sanabil referenced in the complaint was dated . . . more than a year after the last relevant attack," and that another allegation of press coverage "is undated").  Unlike in *Kaplan,* Plaintiffs here cannot point to contemporaneous "press conferences and news media interviews" or content from Hamas's or PIJ's own "official websites . . . television station [or] radio station."  999 F.3d at 864 (internal quotation marks and citation omitted).[7]

### c. Allegations of Control by Qatar Are a Red Herring

Finally, as a last resort, Plaintiffs try to meet their burden by pleading that the Government of Qatar's alleged support for Hamas was well known and thus, the Complaint allegedly "dispels

---

[7] For the same reason, any attempt to draw inferences from the contents of "[*i*]*nternal* Qatar Charity annual reports" is futile.  (Compl. ¶ 135 (emphasis added)).

any doubt that [MAR] was knowingly complicit in financing the Hamas terrorist organization."
(*See* Compl. ¶ 139).  Plaintiffs appear to base this conclusion on the allegation that Qatar
"dominates" MAR, an allegation predicated on the government's minority ownership of the bank,
and the vague, general allegation that an unspecified number of those in Qatar's royal family "are
or have been" members of MAR's board of directors.  (*Id*. ¶¶ 4-5, 88-89.)  These vague and
conclusory allegations, unsupported by any facts, do not meet the standard for aiding and abetting
liability; allegations about an entity's home country cannot be imputed to the entity based on the
conclusory claim that one "dominates" the other.  To follow Plaintiffs' argument to its natural
conclusion, any entity based in Qatar with a member of Qatar's royal family on its board is subject
to liability for aiding and abetting terrorism.  However, there is nothing nefarious about a bank
being affiliated with its home country, or a member of its royal family serving on its board.  *In re
Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 656-57 (S.D.N.Y. 2018) ("Plaintiffs'
allegations fail to show that the charity organizations were alter-egos of Saudi Arabia" because
such allegations were "conclusory and largely boilerplate.") (internal quotation marks and citation
omitted).[8]

Plaintiffs further undermine their allegations because they admit Qatar Charity "touted its
humanitarian work" and the alleged terrorist funding at issue was completed "under the *guise* of
[charitable] donations."  (Compl. ¶¶ 72, 128 (emphasis added)); *see also* (*id.* ¶ 118) (conceding
that terrorist financing is often "disguised as charitable contributions"); *Honickman*, 6 F.4th at 502
("That organizations like the Three Customers maintained a 'cover' in public undermines the

---

[8] Plaintiffs do not allege that MAR is an organ or alter ego of Qatar because MAR would be entitled to foreign
sovereign immunity.  *See EM Ltd. v. Banco Central De La República Argentina*, 800 F.3d 78, 93 (2d Cir. 2015)
(holding allegations did not support alter ego finding, and noting that "[m]issing from plaintiffs' allegations are any
claims that Argentina's appointment of board members then caused it to interfere in and dictate BCRA's daily business
decisions.")  Unable to allege facts to support an alter ego theory, Plaintiffs instead use the terms "dominates"
"coopted" and "controlled" yet also offer no facts to support such alleged domination, coopting, or control.

plausibility of Plaintiffs' theory that BLOM bank understood these organizations' true nature and activities from the public record at the time."). As a result, "there is a meaningful difference between the alleged functions" of Qatar Charity "and those of the customers in *Kaplan*," who "provided subsidies to the families of Hizbollah suicide bombers." *Id.* at 503 n.21; *see also Averbach v. Cairo Amman Bank*, No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860, at *13 (S.D.N.Y. Jan. 21, 2020) ("Merely provid[ing] banking services to a Hamas-affiliated charity, does not satisfy JASTA's mens rea requirement."), *report and recommendation adopted sub nom. Averbach ex rel. Averbach v. Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).[9]

### 2. Plaintiffs Have Failed to Allege that MAR "Knowingly and Substantially" Assisted in the Principal Violation

With respect to the "aiding and abetting" requirement that the defendant "knowingly and substantially assist in the principal violation"), Plaintiffs must allege that MAR "knowingly—and not innocently or inadvertently—gave assistance" to Hamas and PIJ. *Honickman*, 6 F.4th at 499-500 (quoting *Halberstam*, 705 F.2d at 477; *Kaplan*, 999 F.3d 863-64) (internal quotation marks omitted). Courts evaluate six factors that relate to "substantial assistance," all of which weigh against Plaintiffs in this action. *See Linde v. Arab Bank*, *PLC ("Linde I")*, 882 F.3d 314, 329 (2d Cir. 2018).

**(1) Nature of act encouraged.** Plaintiffs generally allege that "from March 1, 2015 until September 7, 2015 alone, *Defendants* conspired to transfer over $28 million" in donations from Qatar Charity and, separately, MAR used its correspondent banking relationships to benefit Qatar

---

[9] To establish general awareness, Plaintiffs must show not that Qatar Charity was intertwined with Hamas and PIJ, but that it was "closely intertwined with Hamas's [and PIJ's] *violent terrorist activities*." *Honickman*, 6 F.4th at 503 (emphasis added). Here, given Qatar Charity's reputation as a charitable organization, there is no basis for such a finding.

Charity.  (Compl. ¶¶ 130, 153).  But no allegations demonstrate MAR's knowledge that specific funds would be received by Hamas and PIJ or used to fund the attacks, let alone that MAR sought to encourage Hamas and PIJ to engage in terrorist attacks.  *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019) ("The plaintiffs here have not plausibly alleged that HSBC encouraged the heinous November 9 Attacks or provided any funds to [the FTO].").

**(2) Amount of assistance given by MAR.**  While Plaintiffs do "not need to allege the funds actually went to Hamas" or PIJ, they do need to plead facts "that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO." *Honickman*, 6 F.4th at 500 (internal quotation marks omitted).  The Complaint contains no such facts.  The alleged assistance here is providing ordinary banking services to one customer, Qatar Charity, a legitimate organization, and the "amount and type of aid" pled is limited to otherwise legal transactions.  *Id*.  In contrast, the defendant bank in *Kaplan* "gave the Customers special treatment, exempting them from submitting cash transaction slips" and gave them "exemptions with respect to deposits in Lebanese Currency" for "more than $2.5 million a week." *Kaplan*, 999 F.3d at 850.  Plaintiffs fail to allege that MAR provided any special treatment to Qatar Charity.

**(3)  MAR's presence or absence at the time of the tort.**  Plaintiffs do not allege that MAR or any of its representatives were present at the location of any alleged attack.

**(4)  MAR's relation to the principal.**  Plaintiffs' conclusory allegations that MAR conspired with "Defendants," "Hamas," and the "government of Qatar" aside (*see* Compl. ¶ 371), Plaintiffs fail to allege MAR had a relationship with Hamas or PIJ.  *See Siegel*, 933 F.3d at 225 ("On the fourth factor – defendant's relation to the principal – the plaintiffs do not plead any non-conclusory allegations that HSBC had any relationship with [the FTO].").  Plaintiffs ask this Court

to impose liability on MAR for allegedly conducting ordinary banking services for a customer who allegedly used local branches to provide assistance to unidentified "Hamas-affiliated organizations" and "PIJ-affiliated charities" and Hamas and PIJ, who were allegedly providing encouragement to individual actors. This link is too "attenuated" to allege that MAR had a relationship with Hamas or PIJ. *Honickman*, 6 F.4th at 501.

**(5) MAR's "state of mind."** Plaintiffs have not alleged, in non-conclusory fashion, that MAR "knowingly or intentionally supported [Hamas or PIJ]" in any manner, or that "[MAR] knowingly assumed a role" in the FTOs' terrorist activities. *See Siegel*, 933 F.3d at 225. Focusing on acts done in MAR's ordinary course of business, Plaintiffs' allegations fail to support any inference of MAR's actual knowledge in the attacks. *See supra* § I.A.1; *see also infra* § II.C.

**(6) The period of assistance.** Plaintiffs allege that "throughout the time relevant to Plaintiffs' claims" (Compl. ¶ 90), MAR has provided and continues to provide Qatar Charity with financial services, but the only concrete allegation as to a time period (*id.* ¶ 130 ("From March 1, 2015 until September 7, 2015 alone, Defendants. . . ")) still does not connect MAR to Hamas or PIJ nor does this time period allege any links to U.S. correspondent banking.

Thus, all six *Halberstam* factors support that Plaintiffs have failed to plead that MAR knowingly provided "substantial assistance" to Hamas or PIJ. *See Siegel*, 933 F.3d at 225. Plaintiffs' aiding and abetting claim should therefore be dismissed.

### B.    Plaintiffs Fail to Allege that MAR Knowingly Entered into an Agreement to Support Conspiracy Liability Under 18 U.S.C. § 2333(d)

For conspiracy liability under JASTA (the Second Claim for Relief Against All Defendants), Plaintiffs must allege: (1) an agreement between two or more persons; (2) to participate in an unlawful act; (3) an injury caused by an unlawful overt act performed by a party to the agreement; (4) which overt act was in furtherance of the common scheme. *See O'Sullivan*,

2019 WL 1409446, at *9.  Unlike for aiding and abetting liability, for which JASTA "does not say that for . . . liability to be imposed a defendant must have given substantial assistance to the principal," for conspiracy liability, MAR must "be shown to have conspired *with* the principal." *Kaplan*, 999 F.3d at 855 (quotations omitted, emphasis added).

Accordingly, "fatal to Plaintiffs' claim for conspiracy liability is their failure to sufficiently allege any unlawful agreement between" MAR and Hamas or PIJ (or any of the individual terrorists).  *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 534 (S.D.N.Y. 2019). Despite Plaintiffs' allegations that MAR should have known that Qatar Charity's banking activities were for "the ultimate benefit of" Hamas and PIJ (*see, e.g.*, Compl. ¶ 13), *nowhere* do Plaintiffs allege in a non-conclusory fashion that MAR entered into any agreement with PIJ or Hamas.  *See O'Sullivan*, 2019 WL 1409446, at *9 ("[E]ven accepting that Defendants knew generally about the purpose of U.S. sanctions, Plaintiffs' allegations do not demonstrate that Defendants entered into any agreements with the FTOs that committed the attacks at issue.").

Moreover, MAR's "alleged provision of material support to [Qatar Charity] is so far removed from the acts of terrorism that injured Plaintiffs that the Court cannot infer that Defendants shared the common goal of committing an act of international terrorism." *Id.*  Plaintiffs offer no specific allegations to enable this Court to infer that MAR had a common goal and agreement to engage in the acts of terrorism that resulted in Plaintiffs' injuries.

**C.    Plaintiffs Fail to Plausibly Allege that an FTO "Committed, Planned or Authorized" Nine of the Ten Acts of International Terrorism Causing Their Injuries**

Plaintiffs have failed to allege facts sufficient for aiding and abetting liability or conspiracy liability under JASTA.  Further demonstrating the defect of this Complaint is Plaintiffs' failure to plead the threshold requirement for aiding and abetting or conspiracy liability: Plaintiffs' injuries must be caused by an act of international terrorism that was "committed, planned, or authorized"

by "an organization that had been designated as [an FTO]."  18 U.S.C. § 2333(d)(2).  Allegations

of terrorists who were allegedly *inspired* or *praised* afterwards by an FTO, but were not planned

attacks by an FTO, are not sufficient.  *See Gonzalez v. Google LLC*, 2 F.4th 871, 911 (9th Cir.

2021) ("It is undisputed that Farook and Malik planned and carried out the mass killing, but the

Clayborn Plaintiffs' allegations suggest only that ISIS approved of the shooting *after* learning it

had occurred, not that it authorized the attack beforehand."); *Copeland v. Twitter, Inc.*, 352 F.

Supp. 3d 965, 975 (N.D. Cal. 2018) ("Absent evidence that ISIS itself planned or carried out the

attack, facts that ISIS sought to 'generally radicalize' individuals and promoted terrorist[] attacks

similar to the one [the individual attacker] carried out are insufficient."); *Crosby v. Twitter, Inc.*,

921 F.3d 617, 626 (6th Cir. 2019) (holding allegation that terrorist "Mateen saw [ISIS internet]

content at some point before the shooting, and Mateen injured Plaintiffs" is "insufficient" to

"allege that ISIS 'committed, planned, or authorized'" the shooting).

Plaintiffs' claims fail because Hamas or PIJ only praised the attacks afterward; Plaintiffs

do not plead that an FTO "committed, planned, or authorized" the attacks because they fail to

allege that Hamas or PIJ funded, coordinated, or directed them.  (Compl. ¶ 357).  While Hamas

and PIJ are FTOs, Plaintiffs' allegations relating to the principal perpetrators of all but one[10] of the

acts of international terrorism at issue were *not* Hamas or PIJ, but rather individuals who appeared

to act alone, targeting a specific Plaintiff and not part of an elaborate attack coordinated, organized,

or funded by Hamas or PIJ.  (*See, e.g., id.* ¶ 344 (alleging that "[t]he attack on H.Y.A. was carried

---

[10] Only one attack – in June 2014 against Y.N.F. – is alleged to have been funded by Hamas.  (Compl. ¶¶ 209, 223).
As noted above, however, there are no facts alleged from which MAR would have had knowledge that correspondent
banking activity for Qatar Charity would have resulted in MAR being able to foresee that funds would end up with
Hamas in 2014. As a result, even if Plaintiffs sufficiently allege that Hamas committed, planned, or authorized,
the attack, they still cannot plead proximate causation as required by the ATA, s*ee infra* § II.B, or substantial assistance
as required by JASTA, *see supra* § I.A.2, and still cannot plead general awareness for any attack as required by
JASTA, *see supra* § I.A.1.

out by the terrorist *following a public call* from the Hamas terrorist organization for Palestinians to stab Jews to death") (emphasis added); *id.* ¶ 291 (regarding Plaintiff Rivkin, alleging that "on internet websites identified with Hamas, the attempted murder perpetrated by Ubada Abu Ras was characterized as 'a heroic stabbing operation'") (emphasis added); *see also Colon v. Twitter, Inc.*, 14 F.4th 1213, 1222 (11th Cir. 2021) ("[T]here is nothing in the complaint to suggest that ISIS was aware of Mr. Mateen or knew beforehand about his planned attack . . . . [T]he plaintiffs never once claim that Mr. Mateen was in contact with ISIS prior to the shooting, or that ISIS was involved in committing, planning or authorizing the attack, or that ISIS knew about the attack beforehand.")). Plaintiffs conspicuously decline to plead that funding from Hamas or PIJ had any connection to their injuries, or that Hamas or PIJ specifically committed, planned, or authorized the attack *prior* to the attack taking place. (*See, e.g.*, Compl. ¶ 281 (alleging terrorist "decided to carry out a terrorist attack against Israelis" and "posted a message on Facebook" asking "Allah to grant me the Shahada (death of martyrdom)"); *see also supra* § A; *infra* § II). As a result, Plaintiffs' claims must be dismissed.

## II. PLAINTIFFS FAIL TO STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA BECAUSE MAR'S BANKING SERVICES ARE NOT ACTS OF INTERNATIONAL TERRORISM PROXIMATELY CAUSING PLAINTIFFS' INJURIES, REQUIRING DISMISSAL UNDER RULE 12(b)(6)

As noted above, MAR is not secondarily liable for the attacks that injured Plaintiffs. For similar reasons, Plaintiffs' claims as to primary liability (the Third and Fourth Claims for Relief Against All Defendants) fail as well.

Under the ATA as codified at 18 U.S.C. § 2333(a), "principal perpetrators of acts of international terrorism" are not liable unless plaintiffs plausibly allege (1) an injury to a U.S. national, (2) an act of international terrorism, and (3) causation. *Freeman v. HSBC Holdings PLC*, (*"Freeman I"*) 413 F. Supp. 3d 67, 82 (E.D.N.Y. 2019) (internal quotation marks and citations

omitted); *Linde I*, 882 F.3d at 326, 332; *Bartlett*, 2020 WL 7089448, at *7.

Here, Plaintiffs allege that MAR has primary liability under the ATA, as a principal perpetrator, for allegedly providing material support to terrorists (in violation of 18 U.S.C. § 2339A) (Third Cause of Action) and to an FTO (in violation of 18 U.S.C. § 2339B(a)(1)) (Fourth Cause of Action).  MAR's conduct, however, does not equate to engaging in acts of international terrorism that proximately caused Plaintiffs' injuries.  Section 2339A additionally requires Plaintiffs to plead that MAR acted with a heightened *mens rea*, which Plaintiffs have failed to do.  Thus, Plaintiffs' Third and Fourth Claims of Relief should be dismissed.

### A.   MAR's Alleged Commercial Banking Activity Is Not an Act of International Terrorism Involving Violence or Intending to Intimidate or Coerce

To constitute an act of international terrorism under the ATA, the act at issue must:  (1) involve violence or endanger human life; (2) violate federal or state criminal law if committed in the United States; (3) appear to be intended to intimidate or "coerce a civilian population" or to "influence the policy [or the conduct] of a government by intimidation[,]" "coercion[,]" "mass destruction, assassination, or kidnapping"; and (4) occur primarily outside the United States or transcend national boundaries.  *See* 18 U.S.C. § 2331(1) (defining an act of international terrorism); *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*, 673 F.3d 50, 68 (2d Cir. 2012).  Here, Plaintiffs have based their claims of primary liability on the assertion that MAR provided banking services to Qatar Charity, but these allegations fail to satisfy the preliminary threshold for primary liability: that MAR *itself* committed an "act of international terrorism" as defined by statute.  *See Freeman I*, 413 F. Supp. 3d at 82 ("Plaintiffs must plausibly allege that Defendants' actions were, *themselves*, acts of international terrorism in order to give rise to primary liability under § 2333(a).") (emphasis added).

Plaintiffs cannot allege MAR committed an act of international terrorism, as they only

allege MAR "used its correspondent banking relationships in New York to process U.S. dollar transactions for Qatar Charity." (Compl. ¶ 153). Providing financial services – even to FTO affiliates – is not an act inherently "violent or dangerous to human life." *See Bartlett*, 2020 WL 7089448, at *7-8 (dismissing ATA claim). Unlike in *Miller*, where the bank had committed acts of international terrorism by administering an insurance scheme for terrorist martyrs through automated services, and the bank was advertised as the site of the scheme, there are no allegations here that MAR did anything other than process transactions for one customer. *See Miller*, 372 F. Supp. 3d at 45.[11] Indeed, Plaintiffs acknowledge that Qatar Charity engages in legitimate activities; providing bank services to it is not an act of international terrorism. *See* (Compl. ¶ 172); *Freeman I*, 413 F. Supp. 3d at 90; *Bartlett*, 2020 WL 7089448, at *7 (citations omitted).

In addition, Plaintiffs fail to allege that MAR's activities objectively appear to have the requisite intent to coerce or intimidate. Plaintiffs have not alleged that actions undertaken by MAR meet this standard, especially because MAR dealt with only Qatar Charity, an alleged intermediary with no clear ties to terrorism. *See Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 358 (E.D.N.Y. 2019); *Kaplan*, 405 F. Supp. 3d at 532 ("Plaintiffs must plausibly allege that Defendant's *own* actions . . . appeared to be intended to intimidate or coerce a civilian population or to influence or affect a government.") (citing *Linde I*, 882 F.3d at 326)); *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) ("The requirement to 'appear to be intended . . .' does not depend on the actor's beliefs, but imposes on the actor an objective standard.") (ellipsis in original); *Freeman I*, 413 F. Supp. 3d at 92 & n.31 (holding that Plaintiffs

---

[11] Other decisions in the Second Circuit likewise indicate that providing financial services does not constitute an act of terrorism unless the plaintiff can sufficiently allege that the funds the bank processed were identified as destined for the terrorist group and the bank knew of such designation. *See Schansman v. Sberbank of Russia PJSC*, No. 19-cv-2985 (ALC), 2021 WL 4482172, at *6 (S.D.N.Y. Sept. 30, 2021). In *Schansman*, the funds at issue "were confirmed by . . . the leader of the [terrorist group], and additional funds were raised by [an individual] who publicly boasted about raising millions for the [terrorist group]." *Id.* Here, Plaintiffs have made no such allegations.

did not allege intent to intimidate where "defendants are [not] alleged to have conspired directly with an FTO or front organization," but instead, "[c]rucially," there were "intervening actors" between the bank and the terrorist activity).[12]  Plaintiffs also cannot allege MAR had the requisite intent by imputing Qatar's alleged support of Hamas to MAR by alleging close ties between MAR and the Qatari government.  (Compl. ¶ 119); *see, e.g.*, *Kaplan v. Jazeera*, No. 10-cv-5298, 2011 WL 2314783, at *5-6 (S.D.N.Y. June 7, 2011) (dismissing plaintiffs' ATA claims where plaintiffs merely asserted, in conclusory fashion, that defendant-news network had an official "anti-American and anti-Israel organizational policy") (citation omitted).  Such a recitation of legal elements and conclusory allegations without any supporting basis simply "will not do," and turns the objective standard for intent to intimidate into a subjective one.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Accordingly, Plaintiffs have failed to meet the threshold requirements for primary liability under Section 2331(1)(B) of the ATA.

### B.     Plaintiffs Fail to Plausibly Allege Any Facts Which Support an Inference that MAR's Financial Services Were the Proximate Cause of Plaintiffs' Injuries

Plaintiffs further fail to allege that MAR's correspondent banking transactions proximately caused Plaintiffs' injuries, as required for primary liability under the ATA.  *See Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013).  Specifically, Plaintiffs must allege "a sufficiently direct relationship between the conduct in question and the injuries for which recovery is sought."  *Zapata*, 414 F. Supp. at 356.  Plaintiffs allege that MAR provided banking services to Qatar Charity, whose local branches thereafter allegedly transferred funds to Hamas, PIJ, or their unnamed "affiliated organizations" or "affiliated charities," who thereafter funded the individuals

---

[12] Even the provision of financial services to a known terrorist organization – which Plaintiffs do not allege here – would require plaintiffs to allege that a defendant's conduct "manifest[s] the apparent intent required" under Section 2331(1).  *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 235 (E.D.N.Y. 2019) (quoting *Linde I*, 882 F.3d at 326) (internal quotation marks omitted).

who engaged in wrongful acts.  (Compl. ¶¶ 5, 90, 132, 134).  The Complaint lacks a "direct link

between [MAR's] conduct . . . and [Plaintiffs'] injuries."  *See Zapata*, 414 F. Supp. 3d at 356.

Plaintiffs fail to allege proximate causation because MAR did not participate in the attacks, and

MAR did not provide the money to the perpetrators of the attack either directly or indirectly.  *See*

*Rothstein*, 708 F.3d at 97 (finding no proximate causation where "[t]he Complaint does not allege

that [bank] was a participant in the terrorist attacks that injured plaintiffs.  It does not allege that

[bank] provided money to [the terrorist organizations].  It does not allege that U.S. currency [the

bank] transferred to [its customer] was given to [the terrorist organizations].  And it does not allege

that if [the bank] had not transferred U.S. currency to [its customer], [that its customer,] with its

billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured.");

*see also O'Sullivan*, 2019 WL 1409446, at *5 ("[T]he Complaint does not allege that Defendants

participated in the attacks or provided money or goods directly to [the FTOs] or any other direct

perpetrator of a relevant attack.").

 Here, Plaintiffs allege that MAR was "knowingly complicit in financing the Hamas

terrorist organization" because Qatar Charity was allegedly a member of the Union of Good,

(Compl. ¶ 139), and that "Qatar Charity and Hamas could not have obtained those U.S. dollars

without" MAR.  (Compl. ¶¶ 80, 153).  Plaintiffs offer no specific allegations to support these

conclusions.  Indeed, these conclusory allegations "do not meet *Twombly*'s plausibility standard

with respect to the need for a proximate causal relationship between the cash transferred by [the

bank defendant] to [its customer] and the terrorist attacks . . . that injured plaintiffs."  *Rothstein*,

708 F.3d at 97; *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013)

(holding that the allegation that "[t]he September 11th Attack was a direct, intended and

foreseeable product of [defendant's] participation in al Qaida's jihadist campaign" must be

rejected for failure to meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship) (citation omitted).[13]

In addition, Plaintiffs do not allege that the unspecified funds MAR allegedly transferred to Qatar Charity's local branches were necessary for the attacks. *See Zapata*, 414 F. Supp. 3d at 358 (dismissing claims for failure to plead proximate cause because banking activity as to laundered money, which bank customers "independently accumulate[,] is an act of a fundamentally different sort from giving terrorist organizations money that they do not already have"). Plaintiffs acknowledge repeatedly that Hamas is well-funded without MAR. (*See* Compl. ¶¶ 125-27 ("In October 2012, Qatar pledged $400 million to Hamas. . . . $250 million had been paid from the central bank of Qatar directly to Hamas's leader, Khaled Meshal . . . . Between 2012 and 2018, Qatar officially provided Hamas with over $1.1 billion.")).

Finally, Plaintiffs fail to allege a temporal connection between MAR's conduct and injury, and the Complaint includes three attacks (*i.e.*, Fraenkel, Braun, and Glick) that occurred in 2014. Plaintiffs allege that the transactions occurred *after* these three attacks, which means that the transactions cannot be their proximate cause. *See Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 632 n.19 (E.D.N.Y. 2006) (explaining that a transfer "cannot be the proximate cause of any of plaintiffs' injuries because it occurred after all the attacks on plaintiffs").[14]

---

[13] Moreover, Plaintiffs further assert MAR's knowledge by lumping MAR with other defendants, which is legally improper. *See* Compl. ¶ 389 (all *Defendants* "provided their material support. . . knowing or intending that the FTOs would utilize the financial assistance . . ."); *id* ¶¶ 394, 406 ("*Defendants* knowingly provided [material support] to Hamas and PIJ") (emphasis added); *id*. ¶¶ 393, 404 ("The material support that *Defendants* provided to Hamas and PIJ was a substantial and foreseeable factor in causing Plaintiffs' injuries.") (emphasis added); *see also Berdeaux v. OneCoin Ltd.*, No. 19-cv-4074 (VEC), 2021 WL 4267693, at *7 (S.D.N.Y. Sept. 20, 2021) (dismissing complaint and denying request for jurisdictional discovery where "Plaintiffs' complaint is riddled with instances of improper group pleading, in which they refer to actions taken by 'the Scott Group Defendants,' without distinguishing in the least among the four Defendants whom Plaintiffs[] have lashed together in their complaint.").

[14] The remaining seven attacks took place from October 2015 through December 2016. Although three of those attacks are close in time to the alleged transfers (*i.e.*, Lakin, Borochov, Golan, and Shamba), Plaintiffs still fail to plead anything more than an attenuated link between the transfers MAR allegedly processed and the attacks, because

**C.      Plaintiffs Fail to Plausibly Allege Facts Sufficient to Assert that MAR Had the Requisite *Mens Rea* for Primary Liability under the ATA**

Plaintiffs' Third Cause of Action – alleging material support to terrorists (in violation of 18 U.S.C. § 2339A) – should be dismissed for failure to plausibly allege the knowledge and intent required.  This failure is especially stark where Plaintiffs have failed to plead even the lesser knowledge requirement for secondary liability, as discussed *supra* § I.A.1.

Section 2339A makes it illegal to "provide[] material support or resources or conceal[] or disguise[] the nature, location, source or ownership of material support or resources, *knowing and intending* that they are to be used in preparation for, or in carrying out, a violation of" federal laws, including terrorism.  18 U.S.C. § 2339A (emphasis added).  Accordingly, under Section 2339A, "an ATA plaintiff must prove that the defendant acted with the specific knowledge or intent that its support would be used in preparation for, or in carrying out, one of the enumerated terrorism-related crimes."  *In re Chiquita*, 284 F. Supp. 3d at 1309.  "Section 2339A [thus] requires proof of a heightened *mens rea*" in comparison to Section 2339B.  *Id.* (noting that "the mental state under § 2339A extends both to the support itself, *and* to the underlying purposes for which the support is given") (internal quotation marks and citations omitted))[15]; *see also Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 101 (D.D.C. 2017) (dismissing plaintiffs' ATA claims where "the complaint does not contain any detailed factual allegations that [bank] knew about [its customer's] supposed connections to [terrorist organization]," and the complaint contains "no facts showing that [bank]

---

MAR is far removed from the terrorist activity.  *See In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1313 (S.D. Fla. Jan. 3, 2018) ("[T]he greater the time between the payments and the attack, the more attenuated the foreseeability of the attack, and the weaker the likelihood that the support played a significant role in facilitating the attacks."); *see also In re Terrorist Attacks*, 714 F.3d at 124; *Rothstein*, 708 F.3d at 97.

[15] In contrast, Section 2339B "requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities."  *Linde I*, 882 F.3d at 330.  Plaintiffs cannot plausibly assert knowledge under either § 2339A (Providing Material Support to Terrorists, Third Claim for Relief) or § 2339B (Providing Material Support to FTOs, Fourth Claim for Relief).

knew what [another customer] was doing with the funds [bank] processed"), *order vacated in part on other grounds and reconsideration denied*, 285 F. Supp. 3d 240 (D.D.C. 2018).

Plaintiffs only allege that MAR processed funds for Qatar Charity, a charitable organization, not a terrorist group. *See Ofsi*, 278 F. Supp. 3d at 102 (holding that allegations did not satisfy § 2339A where allegations asserted that defendant "[p]rocess[ed] funds for Sudan or Sudanese commercial banks, [which] is not the same as processing funds for a terrorist organization or a terrorist front"). *Id.* Nor do Plaintiffs allege the temporal connection required for *mens rea*, because Plaintiffs have not alleged sufficient, non-conclusory facts to establish that MAR knew, before the attacks, that Qatar Charity was so connected to Hamas, PIJ, or their affiliates such that providing financial services to it was essentially the same thing as providing those services to Hamas, PIJ, or their affiliates. *See id.* at 101 (dismissing ATA claims because plaintiffs failed to allege *mens rea* where plaintiffs failed to allege bank knew its customer was acting as an agent of terrorist group prior to attack). Thus, Plaintiffs have not met their burden of pleading MAR's knowledge of Qatar Charity's alleged connection to terror.

## III. SIXTEEN PLAINTIFFS LACK STATUTORY STANDING FOR ATA OR JASTA

There are seventy-three Plaintiffs claiming recoveries under ATA and JASTA for twelve physical injuries from ten separate events, but at least sixteen of these Plaintiffs lack statutory standing[16] as non-U.S. citizens or for failure to allege sufficiently close familial relationships to allege an injury for solatium damages.[17]

### A. Four Plaintiffs Are Not U.S. Nationals

"Any national of the United States injured in his or her person, property, or business by

---

[16] "The Supreme Court has clarified that what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff has a cause of action under the statute." *Estate of Henkin*, 495 F. Supp. 3d at 152 n.7 (internal quotation marks and citations omitted).

[17] Plaintiff Rita Avni falls into both categories.

reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States."  18 U.S.C. § 2333(a).  In other words, any U.S. national "injured in *his or her* person, property, or business" may bring a claim under the ATA, *or*, in the event that the U.S. national has died, "his or her estate, survivors, or heirs" may bring a claim for that U.S. national.[18]

Thus, while foreign nationals may bring claims on behalf of U.S. nationals, under the ATA, *only* claims for injuries suffered by a U.S. national are actionable.  *See Averbach*, 2020 WL 1130733, at *2 (adopting Report and Recommendation in which the magistrate held that the ATA precludes claims by foreign nationals, who are survivors or heirs of U.S. nationals killed in terrorist attacks, for their personal injuries).  The ATA "is clear that only claims brought on behalf of individuals who are United States nationals may proceed."  *Rosenberg v. Lashkar-e-Taiba*, No. 10-cv-5381 (DLI) (CLP), 2016 WL 11756917, at *19 (E.D.N.Y. July 5, 2016), *report and recommendation adopted as modified*, No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017).[19]  Here, Plaintiff Yehudah Glick was a U.S. citizen at the time he was injured, but he renounced his U.S. citizenship before filing suit.  (Compl. ¶ 37).  Standing under the ATA and the Constitution is determined as of the time that the suit is brought.  *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994); *see Caballero v. Fuerzas Armadas Revolucionarias de*

---

[18] As initially drafted, the ATA only allowed claims to be brought "by a national of the United States injured in his person, property, or business," and did not include "his or her estate, survivors, or heirs."  *See* Antiterrorism Act of 1990, S. 2465, 101st Cong. § 2(a) (1990).  Congress added the additional language due to a suggestion by the Department of Justice, which clarified that the revision only made "certain the ability of family members to file a lawsuit on behalf of a slain or injured relative" so as to "make clear that which is already implied."  *Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Courts & Admin. Practice of the Comm. on the Judiciary of the United States Senate*, 101st Cong. 46 (1990) (statements of Sen. Strom Thurmond and Lloyd Green, counselor, U.S. Department of Justice).  In other words, the ATA includes the language "his or her estate, survivors, or heirs" almost out of an abundance of caution, so that no reader would make the mistake of believing that if a U.S. national dies in a terrorist attack, their claim dies with them.  There is no basis to suggest that Congress intended the ATA to provide a cause of action for injuries incurred by foreign nationals.

[19] *But see Estate of Henkin*, 495 F. Supp. 3d at 152-53.

*Colombia*, No. 18-cv-25337-KMM, 2020 WL 7481302, at \*6 (S.D. Fla. May 20, 2020) (explaining that plaintiff did not have standing under the ATA for underlying acts of terrorism, which occurred in 1999, until he became a U.S. citizen after 2012).  Similarly, Plaintiffs Amichai Ariel, Abraham Ron Fraenkel, and Rita Avni also assert personal claims, but each is a citizen of Israel and are not alleged to be U.S. nationals.  (*See* Compl. ¶¶ 18, 29, 43).[20]  Thus, these claims by these Plaintiffs should be dismissed.

### B. Thirteen Plaintiffs Do Not Allege a Sufficiently Close Familial Relationship

Spouses and relatives in "direct lineal relationships" with a U.S. national are permitted to sue under the ATA. *Estate of Henkin*, 495 F. Supp. 3d at 152 (internal quotation marks and citations omitted); *see also Weiss*, 453 F. Supp. 2d at 620 ("[I]t is sufficient for plaintiffs to allege a familial relationship, such as that of child, parent, spouse, or sibling of a U.S. national.") (citation omitted).  However, for other more distant relations of U.S. nationals who are physically injured, while the Complaint pleads emotional damages due to the physical injuries sustained by some of the Plaintiffs, it fails to sufficiently plead any facts demonstrating that Plaintiffs Rita Avni (daughter-in-law), Shachar Boteach, Y.L., R.A., V.A. (grandchildren), E.A. (step-grandchild), and D.A.B. (great-grandchild), Plaintiffs Shimson Sam Halperin, Sara Halperin, Murray Braun, and Esther Braun (grandparents), and Plaintiffs Cici Jacobson and Eddy Jacobson (grandparents and grandparents-in-law) had the kind of "extremely" close familial relationship with the victim that courts have found when taking the "rare" step of awarding solatium damages to non-immediate family members.  *See Smith ex rel. Smith v. Islamic Emirate of Afg.*, 262 F. Supp. 2d 217, 236–37

---

[20] To the extent that foreign nationals bring claims only on behalf of American citizens or on behalf of estates of American citizens who have died (and not on their own behalf), MAR does not seek dismissal of their claims on the basis of standing.  For example, minors R.A., V.A., and E.A. bring claims (through a guardian) on behalf of decedent Richard Lakin's estate, but do not have standing to bring claims for their *own* injuries as foreign nationals.  (Compl. ¶¶ 43, 45-47).

(S.D.N.Y. 2003) (holding that step-siblings who shared a bedroom with decedent for approximately four years and "admired . . . and looked up to him" were not entitled to solatium damages because they "did not grow up with" decedent), *amended on other grounds*, No. 01-cv-10132 (HB), 2003 WL 23324214 (S.D.N.Y. May 19, 2003); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570 (GBD) (SN), 2017 WL 9533073, at *3 (S.D.N.Y. Aug. 8, 2017) (describing as "rare" the award of solatium damages to relatives outside the victim's immediate household where such plaintiff was "truly . . . the functional equivalent of an immediate family member"), *report and recommendation adopted*, 2017 WL 5591873 (S.D.N.Y. Nov. 17, 2017). Thus, the claims by distant relatives of Richard Lakin, C.Z.B., and Yoav Golan should be dismissed.[21]

## IV.   THE COURT LACKS PERSONAL JURISDICTION OVER MAR, REQUIRING DISMISSAL UNDER RULE 12(b)(2)

Even if Plaintiffs stated an ATA or JASTA claim, they fail to plead *prima facie* personal jurisdiction. Although the Complaint states that MAR is subject to jurisdiction under New York's long-arm statute due to its correspondent banking activity (Compl. ¶ 12),[22] Plaintiffs have not alleged facts upon which it would be appropriate for this Court to exercise jurisdiction over MAR, a foreign bank with no presence in the United States.

Plaintiffs must present a *prima facie* case that (1) the New York long-arm statute and (2) U.S. constitutional requirements have been satisfied. *See Spetner v. Palestine Inv. Bank*, 495 F.

---

[21] While this issue is ultimately "a factual issue" (ECF No. 54 at 7), Plaintiffs who are distant relatives seeking solatium damages have not made any *prima facie* allegations that they are the functional equivalent of immediate family members, such as, for example, that they have lived with a physically injured plaintiff for years.

[22] Under New York's Long-Arm statute, a court may exercise personal jurisdiction over "any non-domiciliary . . . who in person or through an agent . . . *transacts any business within the state* . . . ." N.Y. C.P.L.R. § 302(a)(1) (emphasis added). Plaintiffs contend that correspondent banking is transacting business in New York under Section 302(a)(1). Plaintiffs do not allege jurisdiction under Section 302(a)(2), nor could they, because they do not allege the "physical commission of the tortious act in New York." *Clean Coal Techs., Inc. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 314 (S.D.N.Y. 2019) (citation omitted).

Supp. 3d 96, 108 (E.D.N.Y. 2020).  A *prima facie* case of jurisdiction has not been established unless a plaintiff pleads "in good faith, *see* Fed. R. Civ. P. 11, legally sufficient allegations of jurisdiction."  *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998) (citations omitted).  While courts accept jurisdictional allegations as true for purposes of a motion to dismiss, they need not accept conclusory allegations.  *See Spetner*, 495 F. Supp. 3d at 112 (rejecting "Plaintiffs' key contentions" that were "styled as factual allegations but mostly amount to legal conclusions," including allegations that defendant bank "purposefully and knowingly directed its agents to use correspondent bank accounts in New York") (internal quotation marks and citations omitted).

Here, Plaintiffs fail to establish a *prima facie* case of jurisdiction; they have not established either "a statutory basis for personal jurisdiction" or that "the exercise of personal jurisdiction" comports "with constitutional due process principles."  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (quotations omitted).  As with the Complaint's failure to plead JASTA or ATA liability, its allegations as to MAR's activities are far too attenuated to plead any connection between MAR and New York, or to plead that MAR's correspondent banking activity gave rise to the attacks that injured Plaintiffs.

## A.   The Court Lacks Personal Jurisdiction Over MAR Under New York's Long-Arm Statute

Under Section 302(a)(1), New York courts employ a two-pronged test to determine whether correspondent banking amounts to "transacting business": Plaintiffs must demonstrate that the foreign bank's maintenance and use of the correspondent account is "purposeful" and also that a "nexus" exists between the plaintiffs' claims and the foreign banks' alleged use of the account.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, ("Licci IV")*, 732 F.3d 161, 168-69 (2d Cir. 2013).  Here, Plaintiffs do not sufficiently allege either.

First, Plaintiffs have not alleged that MAR purposefully availed itself of the New York forum through correspondent banking because they fail to plead MAR's "frequen[t] and deliberate . . . use of its correspondent account." *See Id.* at 168 (citations omitted). Plaintiffs' generalized allegation that "[a]t all times relevant to Plaintiffs' claims, [MAR] maintained a direct or indirect correspondent banking relationship with at least one New York bank which cleared U.S. dollar transactions for [MAR] and its customers" (Compl. ¶ 151) is insufficient. Plaintiffs appear to be speculating as to the nature of the alleged correspondent activity, and their claims are devoid of any specificity. Critically, Plaintiffs allege that MAR "transferred . . . funds denominated in U.S. dollars through a bank in New York" (*id.* ¶¶ 132(c), 147-54), but other than a generalized allegation, there is nothing else specifically alleged as to MAR. The only reference to a more detailed allegation – that "from March 1, 2015 until September 7, 2015 alone, *Defendants* conspired to transfer over $28 million" in donations from Qatar Charity (*id.* ¶ 130) – does not cure the generalized allegations because the allegation is not about MAR, and cannot be credited.[23] *See Berdeaux*, 2021 WL 4267693 at *10-11 ("Stripping away the wholly conclusory allegations and impermissible group pleading, the specific, factual allegations. . . [are not] anywhere close to sufficient to show that Scott transacted business in New York."). Such sparse "allegations do not constitute a *prima facie* showing" that MAR's "use of the correspondent account was purposeful because Plaintiffs allege[] only one connection between this case and New York," not "an established course of dealing." *Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No. 14-cv-5216 (DLC), 2015 WL 4164763 at *4 (S.D.N.Y. July 10, 2015) (dismissing complaint for lack of personal

---

[23] Plaintiffs also aver without any elaboration that "[f]rom at least 2011 through 2015, Hamas and PIJ knowingly, willfully, and unlawfully combined, conspired, confederated and agreed with Defendants to commit numerous acts of international terrorism." (Compl. ¶ 111). With no facts to support this allegation, it cannot be credited, because it is "a threadbare recital[] of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663.

jurisdiction).  If deemed sufficient, the Complaint's jurisdictional allegations as to MAR could be used to assert jurisdiction against virtually any foreign financial institution given the ubiquity of correspondent banking today; instead, the "use of the correspondent account" must be "repeated" and used "as an instrument to achieve the wrong complained of in this suit."  *Licci IV*, 732 F.3d at 173; *see also Berdeaux*, 2021 WL 4267693 at *12 ("[T]he mere use of a correspondent account does not subject [the defendant] to jurisdiction under Section 302(a)(1).") (citation omitted).

Unlike the cases in this Circuit that have identified purposeful availment through "volitional activity," Plaintiffs' allegations here, even in their most favorable light, do not amount to purposeful availment:  Plaintiffs do not allege that that MAR chose to use the alleged New York account; that MAR affirmatively acted on instructions from Qatar Charity to use its alleged New York correspondent account to make the alleged transfers; that MAR repeatedly credited funds that Qatar Charity allegedly transferred in MAR's alleged correspondent account; or that MAR deliberately routed transfers through its New York correspondent account.  *See Averbach*, 2020 WL 486860, at *7 (finding purposeful availment where complaint alleged the bank used money transferred into its correspondent accounts to then credit money to its customers at least twenty-three times, which was volitional activity constituting purposeful use, and explaining that "affirmatively act[ing] on" a customer's deposit constitutes purposeful availment); *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 327-29 (2016) (finding purposeful availment where complaint alleged that defendants *chose* to use their New York account, *credited* the funds transferred to the account, and such crediting was "an *essential* step in the money-laundering scheme" that gave rise to plaintiffs' claims) (emphasis added); *see also Spetner*, 495 F. Supp. 3d at 110-12 (dismissing for lack of jurisdiction where complaint failed to allege that bank "chose the providers of [its correspondent bank's own] correspondent accounts in New York or exercised any say over which

of the two accounts were used for specific transactions"). Thus, Plaintiffs' generalized allegations of correspondent banking do not meet a *prima facie* case of purposeful availment of New York.

Second, Plaintiffs fail to allege that MAR's correspondent banking activity gave rise to Plaintiffs' injuries. Plaintiffs' claims do not "arise from" the business activity unless the Complaint demonstrates "an articulable nexus, or a substantial relationship, between transactions occurring within the state and the cause of action sued upon." *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 726 (S.D.N.Y. 2010) (internal quotation marks and citations omitted).[24] Instead, Plaintiffs plead that MAR's alleged role was several steps removed from the activity that injured Plaintiffs, while failing to plead sufficient facts to allege the requisite knowledge. Even if the Complaint's generalized allegation that "Defendants" transferred over $28 million in Qatar Charity donations could be credited, conspicuously absent from the Complaint is any allegation that those transfers of $28 million ever touched New York. (Compl. ¶ 130).

As part of the nexus inquiry, Plaintiffs "must show that Defendant knew or was deliberately indifferent to the fact that [the bank customer] was financially supporting terrorist organizations." *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 21 (E.D.N.Y. 2016) (internal quotation marks and citation omitted); *see also Bartlett*, 2020 WL 7089448, at *6 (holding that because plaintiffs had alleged, *inter alia*, that defendant bank "moved millions of dollars through its correspondent bank accounts" knowing it was doing so for Hezbollah's business affairs component, and that Hezbollah was "singularly" dedicated to terrorism, plaintiffs had sufficiently alleged nexus). As

---

[24] In *Tamam*, the court identified as relevant to jurisdiction one allegation that specified "Defendants processed funds and cleared U.S. dollars for [an SDGT's] direct benefit through the United States in this District." *Tamam*, 677 F. Supp. 2d at 727 (internal quotation marks citation omitted). This allegation is distinguishable from the instant case because Plaintiffs do not allege that MAR cleared U.S. dollar transactions for the direct benefit of an SDGT. At most, Plaintiffs allege that MAR cleared transactions for Qatar Charity (*see* Compl. ¶ 132), which is not an SDGT and which, as explained above, *supra* § I.A.1, was not publicly recognized as connected to or an integral part of Hamas or PIJ such that MAR could have foreseen that connection.

discussed *supra* § I.A.1, Plaintiffs have failed to allege that MAR could have inferred that providing banking services to Qatar Charity was essentially the same as funding Hamas, PIJ, or their affiliates.  Here, Plaintiffs fail to plead that their injuries arose from MAR's correspondent banking activity.[25]

Instead, the most Plaintiffs allege is that MAR was multiple steps removed from the terrorist activity that injured Plaintiffs: the unspecified funds went *first* from MAR's New York correspondent account to Qatar Charity's local branches in Palestine or Ramallah, *and then* from those local branches to Hamas, PIJ, and their unnamed affiliates, including other charities. (Compl. ¶¶ 132-34).[26]  At no point do Plaintiffs allege that MAR transferred any funds to Hamas or PIJ.  *Compare Tamam*, 677 F. Supp. 2d at 729 (concluding that, "[a]lthough . . . at some point Defendants obtained U.S. dollars from correspondent accounts in New York, 'a defendant may not be subject to personal jurisdiction under CPLR § 302(a)(1) simply because its contact with New York was a link in a chain of events giving rise to the cause of action,'" and holding that plaintiffs in that case had not sufficiently alleged personal jurisdiction) (citations omitted) *with Bartlett*, 2020 WL 7089448, at *6 (finding nexus where bank moved millions of dollars for

---

[25] Courts tend to find a nexus where plaintiffs allege both that the dates of the transfers and injuries overlapped *and* that defendant had contemporaneous knowledge of the tie between its clients and terrorist activity.  *See Strauss*, 175 F. Supp. 3d at 20-23 & n.9 (finding a nexus established when most transfers overlapped with the attacks and plaintiffs alleged defendant knew that the funds it transferred were being used to support a terrorist organization); *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 280 (E.D.N.Y. 2016) (emphasizing that finding of nexus was due to both overlap of dates of transfer with attacks that caused plaintiffs' injuries and that defendant allegedly knew the transfers were supporting a terrorist organization).  Here, as discussed above, Plaintiffs allege neither temporal overlap nor contemporaneous knowledge.

[26] Compounding the attenuation of Plaintiffs' claims, Plaintiffs do not allege that the individual terrorists who carried out nine of the ten attacks here used funds from Hamas or PIJ.  (*See* Compl. ¶¶ 201, 205, 207, 236, 240, 242-43, 247, 252-53, 255-56, 258, 260-61, 265, 273-74, 281, 287, 291, 301, 344).  Thus, for nine of the ten attacks, the most that Plaintiffs allege is that the funds passed from MAR, *then* to Qatar Charity's local branches, *and then* on to Hamas, PIJ, or entities affiliated with Hamas or PIJ, but they fail to allege that the individual terrorists who committed the attacks that injured Plaintiffs used those funds to do so.  The nexus between MAR's alleged correspondent banking activity and Plaintiffs' injuries therefore fails.  As to the one attack that Plaintiffs say Hamas allegedly funded (*see id.* ¶ 223), as with the remaining attacks, Plaintiffs have failed to plead either general awareness or substantial assistance, and it predates the alleged misconduct at issue.

37

Hezbollah's business affairs component).

As a result, Plaintiffs' allegations purportedly connecting MAR to the forum are far too attenuated. Although a single transaction may be sufficient, it must be "relevant" to the claims at issue. *See Miller*, 372 F. Supp. 3d at 42; *see also Licci IV*, 732 F.3d at 171-72 & n.7 ("[U]se of a forum's banking system . . . may expose the user to suits seeking redress in that forum when that use is an integral part of the wrongful conduct.") (citation omitted). If the transaction at issue took place "at a time far removed from the attacks that caused Plaintiffs' injuries," for example, then the nexus is "too attenuated." *See Strauss*, 175 F. Supp. 3d at 20. Here, there are no allegations as to any specific transfer involved in correspondent banking or any specific time frame associated with the attacks at issue. Indeed, the only alleged time frame for any alleged transfers is a six-month window from March 1, 2015 to September 7, 2015, which does not even include allegations as to *MAR* or that correspondent banking was used in connection with those transfers. (Compl. ¶ 130). Moreover, that window is not in temporal proximity to the attacks at issue. *See supra* §§ B, D.

**B.**    **Plaintiffs Fail to Satisfy Constitutional Requirements of Minimum Contacts and Reasonableness**

Even if Plaintiffs were able to satisfy the requirements of New York's long-arm statute, Plaintiffs must also show that MAR has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice" under the Due Process Clause of the Fourteenth Amendment. *Int'l Shoe Co. v. Wash*, 326 U.S. 310, 316 (1945) (internal quotation marks and citations omitted). This inquiry is analyzed under two prongs: (1) minimum contacts, "where the defendant purposefully availed itself of the privilege of doing business in the forum," and (2) reasonableness. *Licci IV*, 732 F.3d at 170, 173 (internal quotation marks and citations omitted). For similar reasons set forth in Section IV.A.,

*supra*, Plaintiffs cannot meet this standard.

*First*, Plaintiffs have not established that MAR has minimum contacts with the forum because, as discussed *supra* § IV.A., they have not alleged that MAR selected and repeatedly used New York's banking system for accomplishing the alleged wrongs. *See Licci IV*, 732 F.3d at 171 ("[W]e by no means suggest that a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support . . . personal jurisdiction over the account-holder in connection with any controversy.").

*Second*, exercising jurisdiction over MAR would be unreasonable. The "reasonableness" inquiry considers the burden of exercising jurisdiction on the defendant, "the interests of the forum state in adjudicating the case," and "the plaintiff's interest in obtaining convenient and effective relief." *Id.* at 170 (internal quotation marks and citations omitted). Here, MAR is headquartered in Qatar (Compl. ¶ 86); most of the Plaintiffs reside in Israel (*id.* ¶¶ 17-19, 28, 30-37, 39-45, 48-65); and the injuries and deaths for which compensation is sought occurred in Israel, *id.* ¶¶ 184-85, 200-01, 209-13, 236, 247-50, 264-65, 281-83, 296-97, 304-08, 311-16, 321-23, 334-37); *see also Licci IV*, 732 F.3d at 174. Thus, "as heinous as" the attacks at issue were, they "were not sufficiently connected to the United States to provide specific personal jurisdiction in the United States." *Waldman*, 835 F.3d at 337.

Indeed, exercising jurisdiction here would offend traditional notions of fair play and substantial justice; 132 other alleged victims have brought a lawsuit arising out of the same alleged events against MAR and nine other defendants in Israel. *Ansbacher, et. al. v. Qatar Charity, et.al.*, Jerusalem District Court, CC 21387-06-21, November 10, 2021. Plaintiffs, many of whom are either Israeli citizens or Israeli residents, would not be denied an opportunity to obtain relief, as they can bring suit in a forum outside the United States – further demonstrating that an American

court is not the appropriate forum to hear these issues.

## C.   Jurisdictional Discovery Is Not Warranted

Jurisdictional discovery is not warranted where – as here – Plaintiffs have failed to make a *prima facie* showing of jurisdiction.  *Tamam*, 677 F. Supp. 2d at 733 (citation omitted).  Because Plaintiffs' allegations as to MAR's alleged distant link in financial transactions and generalized allegations of correspondent banking are so deficient, jurisdictional discovery would essentially amount to a fishing expedition.   "[A] court is not obligated to subject a foreign corporation to discovery where the allegations of jurisdictional facts . . . fail to state a basis for the exercise of jurisdiction or where a plaintiff's proposed discovery, if granted, would not uncover facts sufficient to sustain jurisdiction."  *Jerusalem NY Enters. LLC v. Huber Erectors & Hoisting, LLC*, No. 21-cv-376 (MKB), 2021 WL 5827934, at *7 (E.D.N.Y. Dec. 8, 2021) (dismissing claim for lack of personal jurisdiction and denying request for jurisdictional discovery) (internal quotation marks and citations omitted) (ellipsis in original).   Accordingly, Plaintiffs' request for jurisdictional discovery should be denied.

In *Tamam*, the court held that jurisdictional discovery "would be futile" because the plaintiffs had "already set forth the role New York correspondent accounts played in this case – they exchanged foreign currency for U.S. dollars on behalf of Lebanese banks," which, "[c]onsidering the very nature of correspondent accounts," was "the only role they could play." *Tamam*, 677 F. Supp. 2d at 733.  Here, too, jurisdictional discovery would be futile.  Plaintiffs' allegations are too attenuated, and even if they are fully credited – all Plaintiffs have alleged are conclusory allegations of "maintaining" "indirect" or "direct" correspondent banking, *see supra* § IV.A., and discovery would not cure this deficiency because they have not pled enough to establish knowledge, a component of the nexus inquiry.  In short, Plaintiffs have not made a "sufficient start toward establishing jurisdiction"; the Complaint instead "contain[s] the kind of conclusory non-

40

fact-specific jurisdictional allegations the Second Circuit found did not require jurisdictional discovery." *Alexander v. Porter*, No. 13-cv-6834 (SLT) (JO), 2014 WL 7391683, at *6 (E.D.N.Y. Dec. 29, 2014) (internal quotations omitted) (dismissing case for lack of personal jurisdiction and denying request for jurisdictional discovery).

Moreover, Plaintiffs have asserted that their allegations depend upon a finding that the Qatari government "spearheaded" a conspiracy "to commit terrorism" and that the "Qatari government" controls each Defendant.  (ECF No. 54 at 1) (explaining that cases cited by Defendants involving "financial institutions and their customers" are "inapposite" because of Plaintiffs' allegations about the Qatari government).  These allegations are not only conclusory and implausible, but unsupported by any alleged facts.  Plaintiffs improperly impute the alleged acts of the Qatari government on to MAR, alleging that because instrumentalities of the Government of Qatar have a minority stake in MAR's ownership, and Qatar allegedly supports Hamas, MAR must also support Hamas.  (*See, e.g.*, Compl. ¶¶ 2-4, 6, 119-28); *see also supra* §§ E, II.A.  Plaintiffs' conclusory theory of conspiracy would require the Court to allow Plaintiffs to serve burdensome discovery on a foreign entity about its relationship with a foreign sovereign when Plaintiffs have failed to meet *every* threshold requisite for JASTA, ATA, and personal jurisdiction.  Moreover, despite Plaintiffs' allegations, Qatar is not designated by the United States as an SDGT or an FTO; instead, the United States designated Qatar a "major non-NATO ally," which is a "powerful symbol of the close relationship the United States shares" with Qatar.[27]  In sum, jurisdictional discovery "need not be granted to permit a fishing expedition for jurisdictional

---

[27]  *See*  https://www.defense.gov/News/News-Stories/Article/Article/2917336/major-non-nato-ally-designation-will-enhance-us-qatar-relationship/.  The designation was announced on January 31, 2022.  That same day, the two nations' leaders discussed shared interests including "countering terrorism."  *Id*; *see also Boyer Works USA, LLC v. Rubik's Brand Ltd. et. al.*, No. 21-cv-7468 (AKH), 2022 WL 355398, at *6 (S.D.N.Y. Feb. 7, 2022) ("On a Rule 12(b)(2) motion, the court may look beyond the four corners of the complaint and consider materials outside of the pleadings . . . .").

facts." *Mednik v. Specialized Loan Servicing, LLC*, No. 20-cv-427 (MKB), 2021 WL 707285, at *8 (E.D.N.Y. Feb. 23, 2021) (internal quotation marks and citations omitted). Because of the Complaint's paltry allegations as to both the merits of their claims and as to personal jurisdiction, Plaintiffs have failed to justify subjecting MAR to jurisdictional discovery.

## V.   DISMISSAL FOR IMPROPER SERVICE UNDER RULE 12(b)(5) IS PROPER FOR FAILURE TO COMPLY WITH THE FEDERAL RULES OR QATARI LAW

Plaintiffs bear "the burden of establishing that service was sufficient." *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010) (citation omitted). Here, Plaintiffs' alleged service upon MAR – a foreign defendant with no branch or office in the U.S. (Compl. ¶ 148) – via Federal Express to a Qatari address and by delivery to a person whom Plaintiffs have not demonstrated is authorized to accept service on behalf of MAR is not proper service.

Service of MAR, a foreign corporation, is permitted "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." Fed. R. Civ. P. 4(h)(2). With respect to subsection 4(f)(1), Plaintiffs acknowledge that Qatar "is not a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, or any other service treaty" and recognize that "for a judgment entered against Defendants in this action to be enforceable in Qatar against Defendants' assets located there, service *must* be effected in Qatar pursuant to letters rogatory." (*See* ECF No. 16 at 2-3).

However, Plaintiffs now attempt service via Federal Express, purportedly in compliance with Rule 4(f)(2)(C)(ii), (*see* ECF No. 24 at 1). Here, Plaintiffs have not established that service by private courier (*i.e.*, Federal Express) is not "prohibited by [Qatar's] law." *See Nabulsi v. Nahyan*, No. H-06-2683, 2008 WL 1924235, at *4 (S.D. Tex. Apr. 29, 2008) ("Plaintiffs' silence on the issue does not allow the court to assume that service by mail is not prohibited by U.A.E. law.").

Plaintiffs cite to Article 11 of the Qatari Civil & Commercial Procedures Law (Law No. 13 of 1990), in stating that Qatari law explicitly authorizes delivery of a summons "by registered mail or any other appropriate means."  (ECF No. 54 at 4) (citation omitted).  However, Article 11 governs the service of an individual person.  Article 10 governs service upon a corporation and only permits personal service upon "the chairperson or manager or one of the joint partners or their legal representatives or whoever acts on their behalf."  Article 10 of the Qatari Civil & Commercial Procedures Law (Law No. 13 of 1990, as amended by Law No. 7 of 1995).[28]  Plaintiffs fail to demonstrate their attempt at service is not prohibited by this provision of Qatari law.  *See Rosenberg*, 2017 WL 11647006, at *4 (dismissing with prejudice plaintiffs' ATA claims, and adopting Report & Recommendation in part, including a finding of improper service where plaintiffs failed to explain what position the person signing the Federal Express delivery "held in the organization or why he was 'authorized to accept service on behalf of'" defendants) (citation omitted).  Accordingly, the Complaint must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant MAR respectfully requests that the Court dismiss Plaintiffs' Complaint in its entirety, with prejudice.

Dated: February 14, 2022
    New York, New York                 PILLSBURY WINTHROP SHAW PITTMAN LLP

                                      By: */s/ Carolina A. Fornos*
                                           Carolina A. Fornos
                                         Pillsbury Winthrop Shaw Pittman LLP
                                         31 West 52nd Street
                                         New York, NY 10019-6131
                                         Tel.:   (212) 858-1000
                                         Fax:   (212) 858-1500

                                         Aryeh L. Kaplan (*pro hac vice*)
                                         Markenzy Lapointe (*pro hac vice*)

---

[28] *See* https://almeezan.qa/LawArticles.aspx?LawTreeSectionID=8075&lawId=2492&language=en); *see also* (ECF No. 54 at 7 (citing same)).

43

Pillsbury Winthrop Shaw Pittman LLP
600 Brickell Avenue, Suite 3100
Miami, FL 33131
Tel.:    (786) 913-4900
Fax:     (786) 913-4901
*Counsel for Defendant Masraf Al Rayan*