**United States Government Accountability Office**



## Report to Congressional Committees

**March 2021**

# WEST BANK AND GAZA AID

# Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks



A Century of Non-Partisan Fact-Based Work

# GAO@100 Highlights

Highlights of GAO-21-332, a report to congressional committees

**March 2021**

## WEST BANK AND GAZA AID

### Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks

## Why GAO Did This Study

Since 1993, the U.S. government has provided more than $6.3 billion in bilateral assistance to Palestinians in the West Bank and Gaza. According to USAID and State, because of a combination of policy and legal actions, ESF funding ceased as of January 2019. USAID is primarily responsible for administering ESF assistance to the West Bank and Gaza and ensuring compliance with its antiterrorism policies and procedures.

Appropriations acts for fiscal years 2015–2019 include provisions for GAO to review the uses of ESF funds for the West Bank and Gaza program. GAO was also asked to review how ceasing this assistance affected USAID's staffing resources. This report examines the (1) status of USAID's ESF assistance to the program for fiscal years 2015–2019, as of September 30, 2020; (2) steps USAID took for ongoing projects and staffing levels when ESF assistance ceased; and (3) extent to which USAID complied with its antiterrorism policies and procedures for fiscal years 2015–2019. GAO reviewed laws and agency policies, procedures, documents, and data, and assessed a generalizable sample of 245 subawards for compliance with USAID's antiterrorism policies and procedures.

## What GAO Recommends

GAO recommends that, should funding resume, USAID (1) verify prime awardees have procedures to ensure compliance with requirements before making subawards and (2) conduct post-award compliance reviews in time to make corrections before the awards end. USAID agreed with the recommendations.

View GAO-21-332. For more information, contact Latesha Love at (202) 512-4409 or lovel@gao.gov.

## What GAO Found

The U.S. government has provided assistance to Palestinians in the West Bank and Gaza to promote Middle East peace since 1993, in part through programs administered by the U.S. Agency for International Development (USAID) and funded by the Economic Support Fund (ESF). This funding ceased as of January 31, 2019. By September 30, 2020, USAID had expended most of the ESF funds that were allocated for the West Bank and Gaza program in fiscal years 2015–2019. Specifically, USAID expended $487.3 million of the $540.4 million in fiscal year 2015 and 2016 ESF assistance for the program. The Trump administration reprogrammed the $230.1 million allocated for fiscal year 2017 to other programs and did not allocate funds for fiscal years 2018 and 2019. In December 2018, the Palestinian Authority stated that it would not accept assistance after January 31, 2019, because of its concerns about the Anti-Terrorism Clarification Act of 2018. The act included provisions that could make recipients of ESF assistance subject to U.S. lawsuits, according to officials from the Department of State (State) and USAID. In January 2021, the Biden administration announced its intent to resume U.S. assistance to programs for the West Bank and Gaza.

USAID took several steps concerning ongoing projects and staffing levels at its West Bank and Gaza mission after assistance for the program ceased as of January 31, 2019. USAID ended 27 ongoing projects. USAID also stopped refilling authorized positions at its West Bank and Gaza mission, notified Congress of a planned reduction in force in May 2019, and placed about 50 staff on temporary assignment to other efforts. According to USAID, after receiving the notification, congressional committees requested that USAID place a hold on the planned reduction in force pending continued deliberations. While USAID has not terminated staff, the mission's staff decreased 39 percent from December 2017 to September 2020 because of post departures, transfers, and resignations.

USAID's antiterrorism policy and procedures for the West Bank and Gaza program outline three requirements for ESF recipients: vetting for many non-U.S. recipients of assistance, antiterrorism certifications for recipients of grants or cooperative agreements, and mandatory provisions intended to prevent financial support to terrorism in all prime awards and subawards. GAO found that, for fiscal years 2015–2019, USAID fully complied with all three requirements when awarding prime awards, but did not consistently ensure that subawards were in compliance. In addition, GAO's analysis of a generalizable sample of subawards and USAID's compliance reviews showed gaps in compliance for the vetting and mandatory provisions requirements at the subaward level. For example, GAO's analysis of USAID's compliance reviews found that 13 of the 86 reports had one or more instances of a prime awardee not incorporating the mandatory provisions, covering 420 subawards. USAID provided pre-award training to prime awardees on antiterrorism requirements for subawards, but did not verify that awardees had procedures to comply with the requirements. Further, USAID's post-award compliance reviews occurred, at times, after the subawards expired, which was too late to take corrective actions. Should ESF funding resume, verifying that prime awardees have such procedures and conducting post-award compliance reviews in time for corrections would better position USAID to reduce the risk of providing assistance to entities or individuals associated with terrorism.

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 5 |
| | USAID Expended Most of the ESF Funds Available for the West Bank and Gaza Program in FYs 2015–2019, Primarily for Project Assistance | 14 |
| | USAID Ceased Work on Projects and Took Steps to Address Mission Staffing Levels When ESF Assistance for the West Bank and Gaza Program Ceased as of January 31, 2019 | 20 |
| | USAID Complied with Its Antiterrorism Policies and Procedures for Prime Awards but Did Not Consistently Ensure Subawards Were in Compliance during FYs 2015–2019 | 28 |
| | Conclusions | 37 |
| | Recommendations for Executive Action | 38 |
| | Agency Comments and Our Evaluation | 39 |
| Appendix I | Objectives, Scope, and Methodology | 40 |
| Appendix II | USAID West Bank and Gaza Mission's Vetting Process for Awards | 46 |
| Appendix III | Economic Support Fund Obligations and Expenditures for Project Assistance and Payments to Palestinian Authority Creditors for Fiscal Years 2015–2016 | 50 |
| Appendix IV | Projects in the West Bank and Gaza That USAID Ended When Economic Support Funds Ceased | 51 |
| Appendix V | Comments from USAID | 58 |
| Appendix VI | GAO Contact and Staff Acknowledgments | 61 |

Related GAO Products                                                      62

Tables

Table 1: Requests and Allocations of Economic Support Funds
(ESF) for USAID's West Bank and Gaza Program for FYs
2015–2019, as of September 30, 2020                          15

Table 2: USAID Allocations, Obligations, and Expenditures of
Economic Support Funds for Palestinians in the West
Bank and Gaza, FYs 2015–2016, as of September 30,
2020                                                        16

Table 3: USAID West Bank and Gaza Mission Staffing Changes,
October 2017–September 2020                                  23

Table 4: Prime Awardees' Compliance and Noncompliance with
Mission Order 21 Vetting Requirements for Subawards
Funded during Fiscal Years 2015–2019                         30

Table 5: Compliance and Noncompliance with Mission Order 21
Vetting Requirements for Subawards Funded during
Fiscal Years 2015–2019                                       31

Table 6: Prime Award Noncompliance with Mission Order 21
Vetting Requirements for the West Bank and Gaza
Program Identified by USAID's Compliance Review
Reports, Fiscal Years 2015–2019                              32

Table 7: USAID West Bank and Gaza Mission's ESF Obligations
and Expenditures for Project Assistance and Payments to
Creditors, FYs 2015 and 2016, as of September 30, 2020       50

Table 8: USAID Governance and Civic Engagement Projects in
the West Bank and Gaza That USAID Reported Ended
Prematurely Because of the Cessation of Economic
Support Funds, as of January 31, 2019                        51

Table 9: USAID Economic Growth and Infrastructure Projects in
the West Bank and Gaza That USAID Reported Ended
Prematurely Because of the Cessation of Economic
Support Funds, as of January 31, 2019                        53

Table 10: USAID Investing in the Next Generation Projects in the
West Bank and Gaza That USAID Reported Ended
Prematurely Because of the Cessation of Economic
Support Funds, as of January 31, 2019                        55

Table 11: USAID Program Support Projects in the West Bank and
Gaza That USAID Reported Ended Prematurely Because
of the Cessation of Economic Support Funds, as of
January 31, 2019                                             57

Figures

Figure 1: Map of the West Bank and Gaza and Surrounding
          Countries                                               5
Figure 2: Key Events Affecting Economic Support Fund
          Assistance for USAID's West Bank and Gaza Program,
          2018–2020                                               7
Figure 3: USAID Economic Support Fund Obligations and
          Expenditures for the West Bank and Gaza Program,
          Fiscal Years 2015–2016 Combined, as of September 30,
          2020                                                    18
Figure 4: USAID West Bank and Gaza Mission Organization and
          Staff Positions Filled by Employment Position Type, as of
          October 2017 and September 2020                         25
Figure 5: USAID's Vetting Process for Awards for the West Bank
          and Gaza, as of January 31, 2019                        47

## Abbreviations

| | |
|---|---|
| ADS | Automated Directives System |
| ATCA | Anti-Terrorism Clarification Act of 2018 |
| C/AOR | Contracting/Agreement Officer's Representative |
| CN | congressional notification |
| ESF | Economic Support Fund |
| FAR | Federal Acquisition Regulation |
| FSN | Foreign Service National |
| FY | fiscal year |
| OCO | Overseas Contingency Operations |
| PA | Palestinian Authority |
| PLO | Palestine Liberation Organization |
| PSU | Program Support Unit |
| PVS | Partner Vetting System |
| RIF | reduction in force |
| SEC/CT | Office of Security's Counterterrorism Branch |
| State | Department of State |
| TFA | Taylor Force Act |
| USAID | U.S. Agency for International Development |
| USDH | U.S. Direct Hire |
| USPSC | U.S. Personal Services Contractor |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**441 G St. N.W.
Washington, DC 20548**

March 29, 2021

The Honorable Christopher Coons
Chairman
The Honorable Lindsey Graham
Ranking Member
Subcommittee on State, Foreign Operations, and Related Programs
Committee on Appropriations
United States Senate

The Honorable Barbara Lee
Chairwoman
The Honorable Hal Rogers
Ranking Member
Subcommittee on State, Foreign Operations, and Related Programs
Committee on Appropriations
House of Representatives

Since the signing of the Oslo Accords in 1993, the U.S. government has
provided over $6.3 billion in bilateral assistance to Palestinians in the
West Bank and Gaza, primarily using funds appropriated through the
Economic Support Fund (ESF).[1] According to the Department of State
(State), the U.S. government has viewed economic and humanitarian
assistance provided to the Palestinians as promoting the economic and
political foreign policy interests of the United States by supporting Middle
East peace negotiations and financing economic stabilization programs.

The U.S. Agency for International Development (USAID), with overall
foreign policy guidance from State, has primary responsibility for
administering ESF assistance for Palestinians in the West Bank and
Gaza. USAID has provided project assistance and debt relief payments to
Palestinian creditors. For example, USAID's assistance projects and
activities in the West Bank and Gaza are bound by federal laws,
executive orders, and policies to ensure that the assistance does not
provide support to entities or individuals associated with terrorism.

---

[1]In 1993, the government of Israel and the Palestine Liberation Organization signed the
Oslo Peace Accords, which called for the withdrawal of Israeli forces from parts of the
West Bank and Gaza and affirmed the Palestinian right to self-government within those
areas. According to State, the U.S. bilateral assistance provided since then includes funds
appropriated through ESF; International Narcotics Control and Law Enforcement;
Nonproliferation, Antiterrorism, Demining, and Related Programs; and Overseas
Contingency Operations accounts.

Because of a combination of complex political and legal actions, as of January 31, 2019, the Trump administration suspended all bilateral aid to the Palestinians, including ESF funding for the West Bank and Gaza program, according to State and USAID. During our review, the future of the program and staffing of USAID's West Bank and Gaza mission remained uncertain, according to USAID and State officials. However, on December 20, 2019, Congress directed $75 million in bilateral ESF assistance for Palestinians in the West Bank and Gaza for fiscal year (FY) 2020, subject to certain conditions.[2] In addition, at a United Nations meeting on January 26, 2021, the U.S. Ambassador to the United Nations announced the Biden administration's intent to resume U.S. assistance for programs that support economic development and humanitarian aid for Palestinians in the West Bank and Gaza. According to State, President Biden and the Secretary of State have made clear their intent to restart assistance.

The annual consolidated appropriations acts for FYs 2015–2019 included provisions for GAO to review the treatment, handling, and uses of funds provided through the ESF account for the West Bank and Gaza, including the extent to which the funded projects and activities comply with certain antiterrorism and other requirements.[3] In addition, you asked us to review how ceasing ESF assistance for the West Bank and Gaza program affected USAID's management of its staffing resources. This report examines the (1) status of USAID's ESF assistance to the West Bank and

---

[2]Among other statutory conditions, the Joint Explanatory Statement accompanying the Further Consolidated Appropriations Act, 2020, 165 Cong. Rec. H11430 (Dec. 17, 2019), provided that these funds shall be made available if the Anti-Terrorism Clarification Act of 2018 is amended to allow for their obligation. The ATCA was amended in part by the Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, Div. J, Title IX, §903(c)(1) (Dec. 20, 2019). These funds have an initial period of availability for obligation of 2 fiscal years. Funds obligated during this period remain available for deobligation and reobligation for an additional 4 years from the date when the availability of such funds would otherwise have expired. After this period, the funds are no longer available for new obligations, but remain available for expenditure and valid adjustments for an additional 5 fiscal years.

[3]Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 7039(e) (Dec. 16, 2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 7039(e) (Dec. 18, 2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 7039(e) (May 5, 2017); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 7039(e) (Mar. 23, 2018); and Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 7039(e) (Feb.15, 2019). Appropriations acts for FYs 2012, 2013, and 2014 included similar provisions. We have reported on provisions in these mandates in the past. A list of related GAO products is included at the end of this report.

Gaza program for FYs 2015–2019, as of September 30, 2020;[4] (2) steps USAID took concerning ongoing projects and USAID mission staffing levels when ESF assistance for the West Bank and Gaza program ceased as of January 31, 2019; and (3) extent to which USAID complied with its policies and procedures to ensure that ESF program assistance provided to the West Bank and Gaza program did not provide support to entities or individuals associated with terrorism during FYs 2015-2019.

To determine the status of USAID's ESF assistance to the West Bank and Gaza program for FYs 2015–2019, we reviewed FYs 2015–2019 appropriations legislation, budget justification and State allocation documents, congressional notifications, and State and USAID financial data as of September 30, 2020. In addition, we reviewed information regarding USAID's financial system and determined that the data provided from the system were sufficiently reliable for the purposes of our reporting objectives. We also interviewed State and USAID officials and reviewed their written responses to our questions along with the relevant laws and available documentation on the key events affecting ESF assistance, including the cessation of funding.

To determine the steps USAID took concerning ongoing projects and mission staffing levels when ESF assistance ceased as of January 31, 2019, we reviewed USAID data and corroborating project documentation on these projects,[5] including descriptions, project award start dates and original end dates, total estimated costs, and obligated amounts. We also reviewed data and documentation provided by USAID on authorized staffing levels and the status of each staff member from October 2017 through September 2020, including dates and reasons for departures, transfers, and resignations. In addition, we reviewed a congressional notification describing a planned reduction in force and data provided by the USAID mission on temporary assignments of staff to other efforts. We also interviewed USAID West Bank and Gaza mission officials and reviewed their written responses to our questions on the steps taken.

To determine the extent to which USAID complied with its policies and procedures to ensure that ESF program assistance provided to the West

---

[4]According to USAID West Bank and Gaza mission officials, financial data were available on a quarterly basis. Data as of September 30, 2020, were the most recently available data during our review.

[5]For the purposes of this report, we use the term "projects" to include what USAID sometimes interchangeably refers to as "programs," "projects," "initiatives," and "activities" within the ESF-funded West Bank and Gaza program.

Bank and Gaza did not provide support to entities or individuals associated with terrorism, we reviewed USAID's antiterrorism policies and procedures and examined relevant USAID records related to assistance programs. To determine whether program assistance complied with vetting, antiterrorism, and mandatory provision requirements, we examined all 55 prime awards—which include contracts, grants, and cooperative agreements—that USAID awarded to its implementing partners with FYs 2015–2016 ESF funding, before funding ceased.[6] We assessed the extent to which USAID granted these awards in compliance with its antiterrorism policies and procedures. Using data provided by USAID, we also examined a random generalizable sample of 245 subawards funded during FYs 2015–2019, which included contracts and grants, and assessed the extent to which USAID prime awardees granted these awards in compliance with USAID's vetting and antiterrorism certification requirements. In addition, we asked USAID to provide all compliance review reports and audit reports completed during FYs 2015–2019. We reviewed and analyzed all 86 compliance review reports and all 215 financial audits that USAID provided for instances of noncompliance with USAID's antiterrorism policies and procedures for subawardees. USAID issued the compliance review reports between March 2015 and April 2019 and the audit reports between June 2016 and November 2019. See appendix I for more information on our scope and methodology.

We conducted this performance audit from December 2018 to March 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[6]For the purposes of this report, we use the term "prime awardee" to refer to organizations and individuals that directly receive USAID funding to implement contracts, grants, or cooperative agreements, and "subawardee" to refer to organizations and individuals that receive subcontracts or subgrants from prime awardees for work on U.S. assistance projects.

# Background

## The West Bank and Gaza and USAID's Role in Providing Assistance

The West Bank and Gaza cover about 2,400 square miles and have a combined population of an estimated 4.8 million, as of July 2020. Figure 1 shows the location of the West Bank and Gaza relative to surrounding countries.

**Figure 1: Map of the West Bank and Gaza and Surrounding Countries**



Source: GAO. | GAO-21-332

Roughly 60 percent of the West Bank is under Israeli civil and military control. The Palestinian Authority (PA) controls the remaining 40 percent, mainly the major Palestinian population centers and the areas immediately surrounding them. Hamas has de facto control over Gaza. Since Hamas's takeover of Gaza in June 2007, USAID has adjusted U.S.

assistance to Gaza to take into account the factional and geographical split between Fatah and Hamas to comply with U.S. policy and U.S. law.[7]

According to USAID, since 1994, when USAID officially opened its West Bank and Gaza mission in Tel Aviv, Israel, USAID programs have assisted 4 million Palestinians living in the West Bank and Gaza. The mission manages the ESF-funded West Bank and Gaza program, for which funding has ceased, as well as a smaller ongoing Conflict Management and Mitigation program with the U.S. embassy in Israel.[8]

Because of a combination of complex political and legal actions, the future of the West Bank and Gaza's program and staffing of USAID's West Bank and Gaza mission remains uncertain, according to State and USAID. Figure 2 provides a timeline of key events affecting ESF assistance for USAID's West Bank and Gaza program from 2018 through 2020.

---

[7]Hamas has been designated a Foreign Terrorist Organization, a Specially Designated Terrorist, and a Specially Designated Global Terrorist by the U.S. government. Provisions in annual appropriations acts have prohibited funding for assistance to Hamas, any entity controlled by Hamas, or any power-sharing government of which Hamas is a member or that results from an agreement with Hamas and over which Hamas exercises undue influence. See Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 7040(f) (Dec. 16, 2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 7040(f) (Dec. 18, 2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 7040(f) (May 5, 2017); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 7040(f) (Mar. 23, 2018); and Consolidated Appropriations Act, 2019, Pub. L. No.116-6, § 7040(f) (Feb. 15, 2019).

[8]USAID's West Bank and Gaza mission in Tel Aviv, Israel, jointly manages the Conflict Management and Mitigation program with the U.S. embassy in Israel. The mission and embassy jointly invest in and manage Conflict Management and Mitigation grants. These grants support Jewish and Arab citizens of Israel working on issues of common concern. The program is part of a worldwide effort to bring together individuals of different backgrounds in people-to-people reconciliation activities, according to USAID.

**Figure 2: Key Events Affecting Economic Support Fund Assistance for USAID's West Bank and Gaza Program, 2018–2020**

**2018**

**January 2018** – The President directs a review of U.S. assistance to the Palestinians to ensure that funds are spent in accordance with U.S. national interests and are providing value to U.S. taxpayers.

**March 23, 2018** – The Taylor Force Act (TFA) (Title X of Div. S, Pub. L. No. 115-141) is enacted, adding a certification requirement for Economic Support Funds (ESF) that directly benefit the Palestinian Authority (PA). The certification requirement relates to steps by the PA and Palestine Liberation Organization (PLO) to end certain acts of violence against Israeli citizens and U.S. citizens and terminate certain payments for acts of terrorism against Israeli citizens and U.S. citizens, among other things.

**August 24, 2018** – The administration concludes an 8-month review and announces its decision to reprogram all fiscal year 2017 ESF assistance planned for the West Bank and Gaza to other priorities. USAID continues to use previously obligated fiscal year 2015 and 2016 appropriated funds to support ongoing projects and activities.

**October 3, 2018** – The Anti-Terrorism Clarification Act of 2018 (ATCA) (Pub. L. No. 115-253) is enacted, providing that, as of February 1, 2019, defendants in civil actions under 18 U.S.C. 2333 based on acts of international terrorism consent to the jurisdiction of U.S. courts upon acceptance of assistance specified in the Act, including ESF, among other things.

**December 26, 2018** – The Prime Minister of the Palestinian Authority notifies the U.S. government that it will no longer accept assistance specified in the ATCA after January 31, 2019, which includes USAID activities implemented with ESF assistance.

**2019**

**January 31, 2019** – USAID ends programmatic implementation of all assistance in the West Bank and Gaza, stops implementing the remaining fiscal year 2015 and 2016 ESF assistance to the West Bank and Gaza, and begins to close out associated programs and projects.

**April 29, 2019** – The Department of State (State), in response to TFA certification and reporting requirements, sends a report to congressional committees stating that for the period May 3, 2018–November 2, 2018, it was unable to certify that the PA, the PLO, and any successor or affiliated organizations had met the certification requirements in the TFA. The report stated that no additional amount of ESF was withheld under the TFA. Through September 2020, State continued to submit reports in which it came to the same conclusion.

**December 20, 2019** – The Promoting Security and Justice for Victims of Terrorism Act of 2019 (Title IX, § 903 of Div. J, Pub. L. No. 116-94) is enacted, replacing the provision in the ATCA that used acceptance of U.S. assistance as a trigger for personal jurisdiction in U.S. courts for civil suits based on acts of international terrorism, including such potential suits against the PA/PLO.

**December 20, 2019** – The Joint Explanatory Statement accompanying the Further Consolidated Appropriations Act, 2020 (Pub. L. No. 116-94) directed $75 million in ESF assistance for the West Bank and Gaza and called for such funds to be made available if the ATCA "is amended to allow for their obligation."

**2020**

**January 2020** – The administration releases *Peace to Prosperity: A Vision to Improve the Lives of the Palestinian and Israeli People*. The peace plan includes an economic plan that is to be implemented with the support of capital raised through an international effort. Palestinian leaders reject the peace plan, including the economic plan.

Source: GAO analysis of Department of State (State), U.S. Agency for International Development (USAID), and United Nations documents and information; and U.S. law.  |  GAO-21-332

**USAID's Antiterrorism Policies and Procedures Include Vetting, Antiterrorism Certifications, and Mandatory Provisions**

In response to federal laws and executive orders prohibiting assistance to entities or individuals associated with terrorism, USAID's West Bank and Gaza mission adopted in March 2006 a key administrative policy document known as Mission Order 21.[9] The purpose of Mission Order 21, last amended in 2007, is to describe policies and procedures to ensure that the mission's program assistance does not inadvertently provide support to entities or individuals associated with terrorism. Such procedures include (1) vetting, (2) obtaining antiterrorism certifications, and (3) including specific mandatory provisions in award documents.[10] Subsequently, USAID has issued various notices to inform or remind prime awardees of their obligations as well as USAID procedures. One such notice from 2010 provides that prime awardees are required to ensure that applicable vetting approval is obtained before a subaward is made, and mandatory provisions are included in subaward documents, as applicable.[11] USAID is responsible for ensuring that Mission Order 21 procedures are followed with regard to both prime awards and subawards for the West Bank Gaza mission assistance program. All awards for the West Bank and Gaza program are required to have a reference to Mission Order 21, according to USAID.

---

[9]Such laws and executive orders include, in part, Executive Order 13224, which blocks property of individuals and entities designated as committing or posing a significant risk of committing terrorist acts, and provisions in appropriations laws that prohibit funding terrorists and require procedures to be established to ensure that assistance is not provided to or through any individual or entity associated with terrorism. See Exec. Order No. 13224, 66 Fed. Reg. 49079, Sep. 23, 2001, codified as amended at 50 U.S.C. § 1701 note; Foreign Operations, Export Financing, and Related Programs Appropriations Act, 2006, Pub. L. No. 109-102, § 559 (Nov. 14, 2005). USAID's West Bank and Gaza mission stated that it has conducted antiterrorism vetting since 2003 in response to statutory requirements.

[10]In 2017, USAID issued but decided not to implement an addendum to Mission Order 21 that would have expanded vetting requirements to include U.S.-based organizations and certain key individuals of U.S. organizations' field offices in the West Bank and Gaza, Israel, or the city of Jerusalem. According to USAID documents, in September 2017, USAID issued the addendum after the government of Israel charged a Gaza field office employee of a past U.S.-based prime awardee with diverting donor funding to Hamas's military wing. USAID concluded that vetting of the prime awardee's field-based key individuals might have revealed sufficient risk to warrant action by the mission. However, in November 2017, USAID delayed implementation of the addendum until the necessary staff in Washington, D.C. was in place to manage the increase in vetting requests that may have resulted from implementation.

[11]USAID, West Bank Gaza Mission Notice, "Reminder of Compliance Policies and Procedures," 2010-WBG-10, June 9, 2010. For the purposes of this report, the term "Mission Order 21" includes clarifying guidance in USAID notices, when applicable.

**Vetting**

Mission Order 21 requires that certain individuals and non-U.S. organizations undergo vetting. The vetting requirements apply to certain contractors and subcontractors, recipients of grants and cooperative agreements, trainees and students, and recipients of cash or in-kind assistance, with some exceptions. The vetting involves USAID's vetting center checking the names of individuals and organizations and other identifying information against databases and other sources to determine if they have any alleged links to terrorism. USAID clears non-U.S. organizations by vetting their key individuals regardless of nationality, including U.S. citizens.[12] According to USAID, the vetting process provides reasonable assurance that program assistance is "not provided to or through any individual, private or government entity, or educational institution that is believed to advocate, plan, sponsor, engage in, or has engaged in, terrorist activity." See the following text box for more information on vetting requirements and appendix II for a description of the USAID West Bank and Gaza mission's vetting process.

---

[12]Mission Order 21 states that "key individuals" means: principal officers of the organization's governing body (e.g., chairman, vice chairman, treasurer, or secretary of the board of directors or board of trustees); (2) the principal officer and deputy principal officer of the organization (e.g., executive director, deputy director; president, vice president); (3) the program manager or chief of party for the USAID-financed program; and (4) any other person with significant responsibilities for administration of USAID-financed activities or resources.

GAO-21-332  West Bank and Gaza Aid

> **Mission Order 21 Vetting Requirements**
>
> Mission Order 21 requires USAID's West Bank and Gaza mission to vet the following:
>
> - All non-U.S. prime awardee and subawardee organizations or individuals proposed for a contract or subcontract above $25,000, except personal services contracts to be awarded by USAID and awards involving vendors of goods or services acquired by USAID contractors and grantees in the ordinary course of business for their own use, unless the total amount of rent under such an agreement exceeds $25,000. The $25,000 threshold is cumulative for multiple awards to the same organization or individual within a rolling 12-month period. If an amendment would increase the amount of an award or subaward above $25,000, vetting would be required no matter how many months have passed since the original award.
> - All non-U.S. prime awardee and subawardee organizations or individuals (other than public international organizations) proposed to receive cash or in-kind assistance under a cooperative agreement, grant, or subgrant, regardless of the dollar amount.
> - All non-U.S. individuals who receive USAID-financed training, study tours, or invitational travel in the United States or third countries, regardless of the duration; or who receive training in the West Bank and Gaza lasting more than 5 consecutive workdays.
> - All entities or specifically identified persons who directly receive other forms of cash or in-kind assistance, with the following exceptions (these thresholds apply to assistance per occasion):
>   - individuals who receive jobs under employment generation activities,
>   - individuals who receive cash or in-kind assistance of $1,000 or less (other than loans),
>   - organizations that receive cash or in-kind assistance of $2,500 or less (other than loans),
>   - households that receive micro-enterprise loans or cash or in-kind assistance of $5,000 or less, and
>   - vendors of goods or services acquired by USAID contractors and grantees in the ordinary course of business for their own use.
>
> Non-U.S. organizations are cleared by vetting their key individuals regardless of nationality, including U.S. citizens. In addition, Mission Order 21 also provides that even if vetting would not otherwise be required under these rules, vetting will be conducted whenever there is reason to believe that the beneficiary of assistance or the vendor of goods or services commits, attempts to commit, advocates, facilitates, or participates in terrorist acts, or has done so in the past. Vetting does not apply to third-tier subawardees, public international organizations, or individuals under the age of 16.
>
> Source: GAO analysis of U.S. Agency for International Development (USAID) documents. | GAO-21-332

Note: According to USAID, the mission also has the right to require vetting at all levels below subawards and of individual recipients of training and other assistance regardless of award level.

Mission Order 21 provides specific details on how USAID will carry out vetting procedures and the information that implementing partners need

to provide to the mission to conduct the vetting process.[13] If USAID approves a prime awardee or subawardee after vetting, the approval generally remains valid for that particular award for 3 years. However, new vetting is required for (1) any change in the awardee's key individuals; (2) new awards or extensions of existing awards if more than 12 months have passed since the awardee's last approval through vetting; and (3) multiple awards to the same organization or individual within a rolling 12-month period that totaled over $25,000, or an amendment to an existing award or subaward that would increase the value above $25,000.

**Antiterrorism Certification**

Mission Order 21 requires that all U.S. and non-U.S. organizations sign an antiterrorism certification before being awarded a grant or cooperative agreement by USAID to attest that the organization does not provide material support or resources for terrorism.[14] The antiterrorism certification is generally an attachment to the award documentation that certifies, in part, that the "recipient did not provide…and will take all reasonable steps to ensure that it does not and will not knowingly provide material support or resources to any individual or entity that commits, attempts to commit, advocates, facilitates, or participates in terrorist acts." USAID's Office of Contracts Management is responsible for obtaining antiterrorism certifications before making awards to applicable prime awardees. Prime awardees are responsible for obtaining them prior to making subawards to applicable subawardees, in accordance with Mission Order 21, and providing a copy to the Office of Contracts Management.

**Mandatory Provisions**

Mission Order 21 requires that all solicitations, as well as all prime awards and subawards for contracts, grants, and cooperative agreements, contain two mandatory provisions (which are included as clauses in award documents): a provision prohibiting support for terrorism, and a provision restricting funding to facilities that recognize or honor an

---

[13]Before a prime awardee makes a subaward, it must submit to USAID data needed to vet the proposed recipient of the subaward.

[14]According to USAID, this requirement is consistent with USAID policy worldwide. Unlike for vetting and mandatory provisions, Mission Order 21 requires antiterrorism certifications only for grants and cooperative agreements. It does not require the antiterrorism certification for contractors and subcontractors, individuals, public international organizations, or host governments. The USAID West Bank and Gaza mission also requires the antiterrorism certification for subawardees in the cases of second-tier recipients of cash assistance and from grants under contracts.

individual or entity that commits or has committed terrorism.[15] The antiterrorism clause states that USAID reserves the right to terminate the contract or agreement if USAID determines that the contractor or recipient is involved in or advocates terrorist activity, or has failed to comply with any requirements of this antiterrorism provision. The facility-naming clause provides that, in addition to any other remedies that may be available to USAID in cases of noncompliance, USAID can disallow any or all costs incurred by the contractor or recipient with respect to the facility and, if necessary, issue a bill for collection for the amount owed. According to Mission Order 21, the prime awardee is required to promptly provide to USAID's Contracting/Agreement Officer a copy of the pages from each subaward that contain these provisions.

## USAID Has Compliance Review and Financial Audit Processes to Monitor Compliance with Mission Order 21

### USAID's Compliance Review Process

In 2008, the USAID mission established a post-award compliance review function under the Office of Contracts Management to assess implementing partners' compliance with the requirements of the antiterrorism procedures contained in Mission Order 21 when making subawards. In 2009, we reported that USAID had enhanced its Mission Order 21 oversight efforts by hiring a compliance specialist and implementing a new compliance review process that provides additional assurance over contract and grant management.[16] According to officials from USAID's West Bank and Gaza mission, in September 2017, the mission appointed two audit firms competitively selected and approved by

[15]These two mandatory provisions inform awardees of their legal duty to (1) "prohibit transactions with, and the provisions of resources and support to, individuals and organizations associated with terrorism" (antiterrorism clause) and (2) restrict "assistance for any school, community center, or other facility named after any person or group of persons that has advocated, sponsored, or committed acts of terrorism" (facility naming clause).

[16]In addition to the compliance review process, the USAID West Bank and Gaza mission conducts oversight of its own compliance with Mission Order 21 as part of financial audits it conducts under the direction of its Regional Inspector General. These financial audits are conducted on every USAID-funded prime awardee and on subawardees having a cumulative cost of $300,000 or higher per fiscal year. In addition to financial audits, USAID's Regional Inspector General also conducts performance audits of programs and contracts under its purview. A performance audit may or may not include assessing Mission Order 21 compliance in its scope of work.

the USAID Office of Inspector General to help provide compliance reviews. According to the mission, this was necessary because of the depth of existing vetting for compliance reviews, the increased number of mission activities in Gaza during FY 2017, and the inability of mission staff to access Gaza because of security concerns.

The compliance specialist and audit firms assessed and identified any weaknesses in implementing partners' subaward compliance in four categories: (1) the proper vetting of subawardees and beneficiaries, (2) the timely incorporation of the antiterrorism certificate, (3) the timely incorporation of applicable mandatory provisions, and (4) monthly subaward reporting. To conduct these compliance reviews, the compliance specialist and audit firms assessed policies, procedures, and program activities associated with an awardee, interviewed relevant implementing partners' staff, conducted periodic site visits, and inspected subaward documentation.

The reports from these reviews also include a general observations section documenting noncritical, compliance-related issues identified during the review process. These observations fall into three categories: subaward reporting; internal control over compliance with Mission Order 21; and the cross-referencing of incorporated special mandatory provisions. This section includes recommendations on how prime awardees can improve their policies and procedures to strengthen their compliance environment and avoid compliance-related issues in the future. According to USAID officials, when the mission becomes aware that subawardees are not in full compliance with Mission Order 21, it takes actions to mitigate the problem. They said that the mission coordinates reviews and audits not only to identify deficiencies, but also to identify and incorporate improvements through training sessions.

**USAID's Financial Audit Process**

USAID also oversees compliance with Mission Order 21 through financial audits performed by external audit firms and approved by USAID's Regional Inspector General.[17] The Regional Inspector General submits an audit memorandum that summarizes any findings and recommendations identified in the audits for agency tracking and action. This memorandum must either clearly identify monetary and procedural

---

[17]Section 7039(d)(1) of the annual appropriations acts requires USAID to ensure that federal or non-federal audits of all contractors and grantees, and significant subcontractors and sub-grantees, under the West Bank and Gaza program, are conducted at least on an annual basis.

recommendations or state that there are no recommendations.[18] According to USAID policy, if an audit report makes certain recommendations for improvement or questions whether costs are allowable under the award, the responsible USAID officials must make relevant management decisions within 6 months of the report's date.[19] For example, they must decide whether they agree with certain recommendations or whether to disallow questioned costs. The mission must make a reasonable effort to complete corrective action on a recommendation within 1 year after reaching the management decision.[20]

## USAID Expended Most of the ESF Funds Available for the West Bank and Gaza Program in FYs 2015–2019, Primarily for Project Assistance

As of September 2020, USAID had expended $487.3 million of the $540.4 million in ESF funds made available for new obligations in FYs 2015 and 2016 for the West Bank and Gaza program, according to USAID data. In addition, the administration had reprogrammed $230.1 million it had allocated for FY 2017 to other programs and did not allocate funds for FYs 2018 and 2019, according to State and USAID.[21] USAID had obligated and expended most of its FYs 2015 and 2016 funds for project assistance and a lesser amount for payments to PA creditors, according to USAID data.

### The Administration Allocated About $540 Million in ESF Funds for FYs 2015–2016 and Expended Most of Those Funds

As of September 2020, the administration had made available allocations of $540.4 million in ESF funds for the West Bank and Gaza program from the FYs 2015–2016 ESF appropriations, the FY 2016 ESF-Overseas Contingency Operations (OCO) account, and prior year OCO accounts. The administration had ceased making allocations for FYs 2017–2019, as of September 30, 2020 (see table 1).

---

[18]U.S. Agency for International Development, *Automated Directives System* (ADS) 591.3.10.

[19]ADS 595.3.1.1.

[20]On September 10, 2020, USAID partially revised its policy to state that USAID must complete final action on each management decision within 12 months after the date of the Inspector General's final audit report. The revised policy also states that all actions that USAID has detailed in its management decision must be completed before final action can be considered to have taken place.

[21]The initial allocation of $155.9 million in fiscal year 2017 ESF funds was subsequently increased to $230.1 million from other ESF and ESF-Overseas Contingency Operations accounts before the administration reprogrammed the funds, according to State and USAID.

**Table 1: Requests and Allocations of Economic Support Funds (ESF) for USAID's West Bank and Gaza Program for FYs 2015–2019, as of September 30, 2020**

Dollars in thousands

| Fiscal year | President's budget request | Initial allocations from ESF appropriation[a] | Total allocations[b] |
|---|---|---|---|
| 2015 | 370,000 | 290,334 | 290,329[c] |
| 2016 | 370,000 | 112,605 | 250,097[d] |
| 2017 | 327,576 | 155,934 | 0[e] |
| 2018 | 215,000 | TBD[f] | 0 |
| 2019 | 215,000 | 0 | 0 |
| **Total** | **n/a** | **558,873** | **540,426** |

Legend: FY = fiscal year; TBD = to be determined; n/a = not applicable

Source: GAO analysis of Department of State (State) and U.S. Agency for International Development (USAID) data. | GAO-21-332

[a]Initial allocations for each fiscal year are provided in a report known as the Section 653(a) report. Section 653(a) of the Foreign Assistance Act of 1961 mandates the President to notify Congress of each foreign country and international organization intended to receive any portion of funds appropriated to carry out any provision of the Foreign Assistance Act of 1961 or the Arms Export Control Act. These "Section 653(a)" reports are to be submitted to Congress no later than 30 days after the enactment of any law appropriating such funds.

[b]Total allocations include funds appropriated for assistance to the West Bank and Gaza program in each fiscal year as well as prior-year funds available for new obligations and reductions because of reprogramming, transfers, or deobligation. Funds appropriated to the Economic Support Fund generally have an initial period of availability for obligation of 2 fiscal years. Funds obligated during this period remain available for deobligation and reobligation for an additional 4 years from the date when the availability of such funds would otherwise have expired. After this period, the funds are no longer available for new obligations, but remain available for expenditure and valid adjustments for an additional 5 fiscal years.

[c]The total allocation shown for FY 2015 reflects a reduction of $5,208 made after the Palestinian Authority refused continued assistance because of the passage of the Anti-Terrorism and Clarification Act of 2018, Pub. L. No. 115-253 (Oct. 3, 2018), according to USAID.

[d]The total allocation includes a reduction of $4,105,727 that was made after the Palestinian Authority refused continued assistance because of the passage of the Anti-Terrorism and Clarification Act of 2018, Pub. L. No. 115-253 (Oct. 3, 2018), according to USAID.

[e]The total allocation shown for FY 2017 reflects that on August 24, 2018, after the conclusion of an 8-month study during which new ESF funding was suspended, the administration announced its decision to reprogram all FY 2017 funds, according to State.

[f]State notified Congress through the Section 653(a) report to Congress for FY 2018 that the amount of the allocation was to be determined. According to State and USAID officials, the administration subsequently made no allocation because the Palestinian Authority refused continued assistance because of the passage of the Anti-Terrorism and Clarification Act of 2018, Pub. L. No. 115-253 (Oct. 3, 2018).

As of September 30, 2020, USAID's West Bank and Gaza mission had obligated about $539.4 million (99.8 percent) and expended about $487.3 million (90.2 percent) of the approximately $540.4 million in ESF funds allocated for the West Bank and Gaza in FYs 2015 and 2016. This left USAID with an obligated balance of about $52.1 million that remains available for expenditure by the mission for 5 years after its period of availability for new obligations (see table 2).[22]

**Table 2: USAID Allocations, Obligations, and Expenditures of Economic Support Funds for Palestinians in the West Bank and Gaza, FYs 2015–2016, as of September 30, 2020**

Dollars in thousands

| Fiscal year | Total allocations[a] (A) | Total obligations (B) | Subsequent years deobligations (A – B) | Obligated balance (B – C) | Expenditures (C) |
|---|---|---|---|---|---|
| 2015 | 290,329[b] | 290,228 | 101 | 13,103 | 277,125 |
| 2016 | 250,097[c] | 249,199 | 898 | 38,976 | 210,223 |
| 2015–2016 | **540,426[b, c]** | **539,427** | **999** | **52,079** | **487,348** |

Legend: FY = fiscal year

Source: GAO analysis of U.S. Agency for International Development (USAID) data. | GAO-21-332

Note: Funds appropriated to the Economic Support Fund (ESF) generally have an initial period of availability for obligation of 2 fiscal years. Funds obligated during this period remain available for deobligation and reobligation for an additional 4 years from the date when the availability of such funds would otherwise have expired. After this period, the funds are no longer available for new obligations, but remain available for expenditure and valid adjustments for an additional 5 fiscal years.

[a]Total allocations shown include amounts of appropriated ESF and ESF-Overseas Contingency Operations (OCO) funds for the year of appropriation as well as transfers of prior-year ESF-OCO funds available for new obligations, according to USAID.

[b]Allocations shown for FY 2015 reflect a reduction of $5,208 made after the Palestinian Authority refused continued assistance because of the passage of the Anti-Terrorism and Clarification Act of 2018, Pub. L. No. 115-253 (Oct. 3, 2018), according to USAID.

[c]Allocations shown for FY 2016 show a reduction of $6,797 that was reprogrammed that same year and a reduction of $4,105,727 that was made after the Palestinian Authority refused continued assistance because of the passage of the Anti-Terrorism and Clarification Act of 2018, according to USAID.

[22]According to State and USAID, allocations of ESF assistance for the West Bank and Gaza program were reduced in response to provisions in the annual appropriations acts for FYs 2015 and 2016. These provisions required the Secretary of State to reduce the amount of ESF assistance for the PA by an amount that the Secretary determined to be equivalent to the amount that the PA expended as payment for acts of terrorism by individuals imprisoned after being fairly tried and convicted of acts of terrorism and by individuals who died committing acts of terrorism during the previous calendar year. Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 7041(i)(3) (Dec. 16, 2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 7041(j)(3) (Dec. 18, 2015).

According to the USAID mission, because the PA refused assistance after January 31, 2019, the mission has not been able to expend funds since that date, other than for costs related to the termination of the projects and activities. However, the mission expects to disburse an additional $3.7 million of the obligated balance for its operational costs if funding resumes, according to USAID.

## Most of the ESF Funds Allocated in FYs 2015–2016 Went toward Project Assistance and a Lesser Amount to PA Creditors

According to USAID documents, ESF project assistance accounted for approximately $394 million of the total obligations and $342 million of the total expenditures, while direct payments to PA creditors accounted for $145 million of obligations and expenditures. USAID's total obligations and expenditures for project assistance in the West Bank and Gaza program for FYs 2015 and 2016 supported projects for three development objectives—Governance and Civic Engagement, Economic Growth and Infrastructure, and Investing in the Next Generation. Program support sustained all three development objectives, according to USAID.[23] (See fig. 3.)

---

[23]We reported on the largest projects in a prior report. See GAO, *Foreign Assistance: U.S. Assistance for the West Bank and Gaza, Fiscal Years 2015 and 2016*, GAO-18-612 (Washington, D.C.: Aug. 8, 2018).



**Figure 3: USAID Economic Support Fund Obligations and Expenditures for the West Bank and Gaza Program, Fiscal Years 2015–2016 Combined, as of September 30, 2020**

Source: GAO analysis of U.S. Agency for International Development (USAID) data. | GAO-21-332

According to USAID documents, total project assistance for the West Bank and Gaza program accounted for 73.1 percent of obligations and 70.2 percent of expenditures of USAID's FYs 2015–2016 ESF funds as of September 30, 2020. Specifically:

- Projects supporting the Governance and Civic Engagement objective accounted for 5.7 percent of obligations and 6.4 percent of

expenditures of USAID's FYs 2015–2016 project assistance, according to USAID. Projects addressing this objective included those related to civil society, good governance, and rule of law.

- Projects supporting the Economic Growth and Infrastructure objective accounted for 57.9 percent of obligations and 54.2 percent of expenditures of USAID's FYs 2015–2016 project assistance, according to USAID. Projects addressing this objective included those related to health (including water), infrastructure, private sector competitiveness, and stabilization operations and security sector reform.

- Projects supporting the Investing in the Next Generation objective accounted for 26.6 percent of obligations and 29.5 percent of expenditures of USAID's FYs 2015–2016 project assistance. Projects addressing this objective included those related to education, health, social and economic social services, and protection of vulnerable populations.

- Projects and activities included in Program Support accounted for 9.8 percent of obligations and 9.9 percent of expenditures of USAID's FYs 2015–2016 project assistance. Program support includes general management support such as assessments, monitoring, and program evaluation.

Under debt relief grant agreements with the PA, USAID made direct payments of ESF assistance to PA creditors totaling $145 million, consisting of $75 million from FY 2015 funds and $70 million from FY 2016 funds. Debt relief accounted for about 26.9 percent of obligations and 29.8 percent of expenditures of USAID's FYs 2015–2016 ESF funds as of September 30, 2020. USAID paid about $40 million from FY 2015 funds and $45 million from FY 2016 funds to two oil companies to cover debts for petroleum purchases. In addition, USAID paid about $35 million from FY 2015 funds and $25 million from FY 2016 funds to the Bank of Palestine, to pay off a PA line of credit that was used to cover PA medical referrals to six hospitals in the East Jerusalem Hospital network. See appendix III for a detailed breakdown of the amount of ESF obligations and expenditures for both project assistance and payments to creditors for FYs 2015–2016.

## USAID Ceased Work on Projects and Took Steps to Address Mission Staffing Levels When ESF Assistance for the West Bank and Gaza Program Ceased as of January 31, 2019

Because ESF assistance for the West Bank and Gaza program had ceased as of January 31, 2019, USAID ended work on all 27 ongoing projects and took various steps to address the West Bank and Gaza mission's staffing levels. USAID stopped refilling the mission's authorized positions, proposed a reduction in force (RIF) that was placed under a congressional hold, and placed some staff on temporary assignment to other efforts, according to USAID documents and officials.

### USAID Ceased Work on 27 Projects

The USAID mission halted implementation for all 27 ongoing projects in the West Bank and Gaza before their originally planned end dates when funding ceased, according to USAID. The projects halted supported all three development objectives—Governance and Civic Engagement, Economic Growth and Infrastructure, and Investing in the Next Generation—and provided program support, according to USAID documents.[24] USAID stopped work on two projects because of a lack of funding resulting from the administration's reprogramming of the FY 2017 allocation, and on 25 projects because of the PA's refusal of further assistance beyond January 31, 2019, according to USAID.[25]

- **Governance and Civic Engagement.** USAID ended five ongoing projects addressing the Governance and Civic Engagement development objective as of January 31, 2019, before their original end dates, according to USAID. For example, the project with the largest total estimated cost under this development objective, "Communities Thrive," had an award start date of September 30, 2016, and an original end date of September 25, 2021. According to USAID, the total estimated cost was $47,238,571 and the obligated amount was $11,200,000. The purpose of this project was to improve

---

[24]See appendix IV for a complete list of the projects that, according to USAID, ended because of the cessation of funding, including brief descriptions, award start dates, award original end dates, total estimated costs, and total obligated amounts as of January 31, 2019.

[25]At the time of our review, USAID had not yet completed closing contracts and, according to USAID, could not make contract closure costs available.

municipal fiscal sustainability, accountability, and service delivery by assisting targeted local governance units in planning, capacity development, and local economic development, among other efforts.

- **Economic Growth and Infrastructure.** USAID ended nine ongoing projects addressing the Economic Growth and Infrastructure development objective as of January 31, 2019, before their original end dates, according to USAID. For example, the project with the largest total estimated cost under this development objective, "Palestinian Community Infrastructure Development," had an award start date of March 6, 2013, and an original end date of December 31, 2019. According to USAID, the total estimated cost was $100 million and the obligated amount was $78.45 million. The purpose of this project was to increase Palestinians' access to water and sanitation, as well as to implement other small and medium-scale community infrastructure projects to address basic infrastructure needs in rural and vulnerable Palestinian communities.

- **Investing in the Next Generation.** USAID ended two projects addressing the Investing in the Next Generation development objective because of a lack of funding when the administration redirected FY 2017 funds, and ended eight ongoing projects as of January 31, 2019, before their original end dates, according to USAID. For example, the project with the largest total estimated cost under this development objective, "Education for the Future Activity," had an award start date of September 15, 2017, and an original end date of September 14, 2022. According to USAID, the total estimated cost was $24.5 million and the obligated amount was $4.2 million. The purpose of this project was to expand the "Leadership and Teacher Development" activity to 400 additional schools and to continue the focus on teacher and principal professional development, introduction of information technology in education, and reforming education supervision, among other efforts.

- **Program Support.** USAID ended three program support projects as of January 31, 2019, before their original end dates, according to USAID. For example, the project with the largest total estimated cost, "Evaluations and Assessments," had an award start date of August 4, 2017, and an original end date of August 3, 2022. According to USAID, the total estimated cost was $9.4 million and the obligated amount was for $1.4 million. Program support services were intended to enable the USAID mission to fulfill its evaluation, reporting, performance monitoring, and information-sharing obligations as mandated in USAID's directives and guidance.

According to USAID, prematurely ending work on the ESF-funded projects in the West Bank and Gaza will not result in any unexpected additional costs, except in the case of two construction projects. For almost all assistance projects, USAID had negotiated the award budgets at the time of the award to include all start-up, implementation, and closeout costs. Therefore, there was no regulatory basis to reopen negotiations or to require partners to provide further details. However, according to USAID, the two construction projects—the Yatta Distribution Network Rehabilitation and Exception Project and the Jericho Collection System Expansion-Phase 1B—did require a negotiation of the final cost because they were ended under a construction termination for convenience.[26] Once the termination notice was issued, according to USAID, those contractors had 12 months in which to submit their negotiated settlement plan, which is pending approval from USAID's termination settlement board. Meanwhile, the USAID mission transferred the two construction projects to the Palestinian Water Authority. Because the construction activities were not completed, the transfer of the above projects included both the site works and materials "as is," according to USAID.

## USAID Took Various Steps to Address Mission Staffing Levels

In response to the uncertainty over the continuation of the West Bank and Gaza program, USAID stopped refilling the mission's authorized positions, proposed a RIF that was placed under a congressional hold, and placed some staff on temporary assignment to other efforts, according to USAID. The USAID mission manages the West Bank and Gaza program and a smaller Conflict Management and Mitigation program for Arabs and Jews in Israel. According to USAID, the mission historically managed an annual bilateral budget ranging from $200 million to $500 million, but with the cessation of ESF funding for the Palestinians, its budget decreased to approximately $5 million to $7 million per year. As a result, the existing staffing levels of approximately 31 staff located in

---

[26]According to USAID, within these two Economic Growth and Infrastructure projects' termination settlement proposals, settlement expenses will be part of the negotiation in line with Federal Acquisition Regulation (FAR) Part 49. The Yatta Distribution Network Rehabilitation and Exception Project aimed to provide a reliable, safe, and affordable water supply to Yatta City and surrounding areas through the construction of three new reservoirs, 21 km of new main supply and distribution pipelines, as well as 40 km of new distribution network pipelines. The Jericho Collection System Expansion-Phase 1B project aimed to expand the existing wastewater collection system to reduce the use of on-site wastewater disposal systems (cesspits) and to increase the quantity of treated wastewater available for reuse in agricultural lands.

Jerusalem and approximately 100 staff in Tel Aviv was neither needed nor justified, according to USAID.

**USAID Stopped Refilling Authorized Mission Positions, Resulting in a 39 Percent Decrease in Staffing Levels**

Between October 2017 and December 2017, before the President directed a review of assistance to the Palestinians, the mission had an authorized staffing footprint of 149, with 131 staff on board. Between December 2017 and September 30, 2020, the mission's onboard staffing level at the post declined from 131 to 80—about 39 percent—because of post departures, transfers, and resignations (see table 3).

**Table 3: USAID West Bank and Gaza Mission Staffing Changes, October 2017–September 2020**

| Employment position type[a] | October 2017 Authorized | October 2017–December 2017 On board / at post | January 2018–September 30, 2020 | | | September 30, 2020 On board / at post |
|---|---|---|---|---|---|---|
| | | | Departed post[b] | Transferred[c] | Resigned[d] | |
| Foreign Service National | 120 | 107 | 0 | 20 | 10 | 77 |
| U.S. Personal Services Contractor-Local | 2 | 2 | 0 | 0 | 1 | 1 |
| U.S. Personal Services Contractor-Local (Employed Family Member) | 3 | 3 | 3 | 0 | 0 | 0 |
| U.S. Direct Hire | 24 | 19[e] | 17 | 0 | 0 | 2 |
| **Total** | **149** | **131** | **20** | **20** | **11** | **80** |

Source: GAO analysis of U.S. Agency for International Development (USAID) data. | GAO-21-332

Note: According to USAID documents, some authorized positions remained vacant for years before October 2017.

[a]Personnel working for USAID include Direct Hire Foreign Service or General Schedule employees, Personal Services Contractors, and Foreign Service Nationals, according to USAID. U.S. Personal Service Contractors at the USAID West Bank and Gaza mission included locally employed family members, among others.

[b]"Departed Post" applies to U.S. Direct Hire Foreign Service Officers who departed post to be assigned to another USAID Operation Unit or repatriated to the United States for retirement.

[c]"Transferred" applies to those Foreign Service National staff who transferred to work at other U.S. government agencies at post. While they resigned from the USAID mission, they remained within the U.S. government's local compensation plan system and retained relevant benefits.

[d]"Resigned" applies to those Foreign Service National staff who resigned from USAID to find outside employment, thus leaving the U.S. government.

[e]One additional U.S. Direct Hire arrived at post, filling a vacancy on June 30, 2018, and departed post in September 2019.

All but two of the mission's U.S. Direct Hire (USDH) Foreign Service Officers, on board as of December 2017, had departed post as of

September 30, 2020. USAID shortened some Foreign Service Officers' tour lengths and suspended any plans for recruitment or replacement of existing positions for USDH staff, according to USAID.[27] Although there are unanticipated costs related to transferring Foreign Service Officers to their future assignments sooner than planned, similar costs would have been incurred upon completion of the full tour, according to USAID.

Figure 4 provides a breakdown of USAID's staffing changes by office, including the offices responsible for USAID's three development objectives—Governance and Civic Engagement, Economic Growth and Infrastructure, and Investing in the Next Generation—and employment position type.

[27]Since December 2017, USAID has only refilled one USDH position, in June 2018, and that staff member departed in September 2019, according to USAID data.

**Figure 4: USAID West Bank and Gaza Mission Organization and Staff Positions Filled by Employment Position Type, as of October 2017 and September 2020**



Legend:  FSN = Foreign Service National, USDH = U.S. Direct Hire, USPSC = U.S. Personal Services Contractor.

Source: GAO analysis of U.S. Agency for International Development (USAID) data.  |  GAO-21-332

Note: One USDH employee is not included in the chart. The employee, who was in the Resident Legal Office, arrived at post in June 2018 and departed in September 2019, according to USAID data.

**USAID Notified Congress of Its Proposed RIF, but Congressional Committees Requested that the RIF Be Placed on Hold**

In a May 2019 congressional notification (CN),[28] USAID formally notified congressional committees of its intention to conduct a RIF from 91 to 15 locally employed staff, and from 22 to four USDHs posted to USAID's West Bank and Gaza mission in Israel. The proposed reduced footprint would include 19 staff positions, consisting of four U.S. Foreign Service Officer USDH positions, one locally employed U.S. PSC, and 14 locally employed FSNs. The CN stated that the "drawdown of staffing levels would provide a staffing footprint better aligned with current U.S. government foreign policy, legislative and host government restrictions, and funding levels in the West Bank and Gaza." According to the CN, implementation of USAID's proposed RIF would leave a sufficient structure in place to manage program and project closeout activities, as well as the remaining Conflict Management and Mitigation program in Israel.

Following USAID's submission of the CN to Congress, according to USAID, the Senate Foreign Relations Committee minority and the House Foreign Affairs Committee majority requested that USAID place the RIF on hold and requested follow-up briefings and information related to USAID's plans to maintain staff and expertise should funding resume. According to USAID, decisions on future funding depended on deliberations between Congress and the administration and the outcome of the administration's peace plan for Israel and Palestine. The RIF remained on hold as of September 30, 2020, according to USAID.

USAID's mission management issued notices of potential downsizing to employees at risk of potential elimination of their positions, according to USAID. Because of the hold on the CN, the mission has not terminated any staff or incurred related costs, according to USAID.

---

[28]USAID's CN #122, dated May 8, 2019, indicates that it was sent pursuant to sections 7015(a) and 7073(a)(1) of the Department of State, Foreign Operations and Related Programs Appropriations Act, 2019, Pub. L. No. 116-6, Division F (Feb. 15, 2019). Section 7015(a) provides that no funds shall be made available to (1) create new programs; (2) suspend or eliminate a program, project, or activity; (3) close, suspend, open, or reopen a mission or post; (4) create, close, reorganize, downsize, or rename bureaus, centers, or offices; or (5) contract out or privatize any functions or activities presently performed by federal employees; unless previously justified to the Committees on Appropriations or such Committees are notified 15 days in advance of such obligation. Section 7073(a)(1) requires prior congressional consultation and notification before using funds to implement a reorganization, redesign, or other comparable plan.

**USAID Retained Some Mission Staff Should ESF Assistance Resume for the West Bank and Gaza Program**

According to the CN on the proposed RIF, USAID planned to retain approximately 60 percent of its West Bank and Gaza mission staff, whose positions would be eliminated, through contracts with USAID to provide support to other USAID missions. USAID stated in the CN that these positions were to be either on-site in other missions or virtual, possibly from existing West Bank and Gaza office space, and would not be considered part of the new organizational structure. According to the CN, this arrangement would allow USAID to temporarily fill critical staffing gaps with experienced staff while preserving the West Bank and Gaza mission's ability to rapidly restore its capacity if needed. The CN further stated that USAID planned to terminate the contracts once the temporary duties were completed, if there was no change to the reduced mission staffing level. According to USAID, congressional committees and USAID had discussed the agency's plan to maintain its staff and expertise should the program's funding resume. Congressional staff expressed concern about staff terminations despite the possibility of staff finding work with other USAID missions, according to USAID.

In the absence of a RIF, as of September 30, 2020, USAID had retained some mission staff to fulfill continuing mission needs and other staff by arranging Memoranda of Understanding for temporary assignments to other USAID programs and offices with critical and immediate needs, according to USAID. USAID assigned 50 staff to temporary positions with other USAID missions and offices. As of September 30, 2020, six of the assignments had ended. Four staff members resigned, one remained with the mission, and one completed the assignment and transferred to another USAID office. As of September 30, 2020, the remaining 44 temporary assignments included support for other missions in Jordan, Iraq, Libya, Yemen, Lebanon, and Tunisia; clients of the Middle East Regional Program in Frankfurt, Germany; the Middle East Bureau/Syria; and the Middle East Bureau/Iraq, among others. Four staff had shifted from assignments at one location to another. According to USAID, the mission continues to fund employees using both its operations funding and "client mission" funding for those working under temporary assignments.

# USAID Complied with Its Antiterrorism Policies and Procedures for Prime Awards but Did Not Consistently Ensure Subawards Were in Compliance during FYs 2015–2019

USAID ensured that its prime awards were in compliance with its Mission Order 21 antiterrorism policies and procedures for program assistance for the West Bank and Gaza program, but not all subawards were in compliance. USAID is responsible for ensuring that Mission Order 21 procedures are followed with regard to prime awards and that prime awardees ensure that their subawards comply with Mission Order 21 requirements. For fiscal years 2015–2019, our analysis of USAID's prime awards for the West Bank and Gaza program shows that USAID complied with Mission Order 21 requirements for prime awards, but we found compliance concerns with these requirements for subawards. In addition, our analysis of USAID's compliance review reports and financial audits found that they had identified numerous instances of prime awardees not ensuring that subawardees and others complied with Mission Order 21 requirements at the subaward level. At times, these instances of noncompliance were found after the award ended, with no remedial action pursued by USAID, according to the audit reports and USAID.

## USAID Complied with Mission Order 21 Requirements for Prime Awards

Our analysis of all 55 prime awards for fiscal years 2015 and 2016 we reviewed found that USAID complied with the Mission Order 21 requirements for vetting, antiterrorism certifications, and mandatory provisions for all of them. Specifically:

- We found that all 16 of these prime awards that required vetting were vetted and deemed eligible prior to the signing of the award. These 16 awards required vetting under Mission Order 21 because they were with non-U.S. organizations and, if contracts, had a value of more than $25,000.[29]

- We found that all 21 prime awards that required an antiterrorism certification contained one signed in advance of the award. These 21 awards were grants or cooperative agreements with nongovernmental organizations that required a signed antiterrorism certification.[30]

- We found that USAID properly included both mandatory provisions in award documents for all 55 of the prime awards.

[29]One prime awardee was a public international organization, and another was a contractor retained for USAID's own internal use. Neither is subject to Mission Order 21 vetting requirements. The remaining 37 were with U.S.-based organizations, who are also not subject to Mission Order 21 vetting requirements.

[30]Of the remaining 34 prime awardees, 33 were contracts and therefore did not require an antiterrorism certification, while one was a public international organization that was exempt from the antiterrorism certification requirement.

## USAID Did Not Ensure that Prime Awardees Fully Complied with Mission Order 21 Requirements before Making Subawards

USAID's Mission Order 21 describes procedures that are meant to ensure that USAID's assistance program does not inadvertently provide support to entities or individuals associated with terrorism. USAID is responsible for ensuring that Mission Order 21 procedures are followed with regard to both prime awards and subawards for the West Bank Gaza program. To do so, USAID is responsible for verifying that Mission Order 21 procedures are followed with regard to prime awards and that prime awardees ensure that their subawards comply with Mission Order 21 requirements. However, our analysis of USAID subawards, as well as USAID's compliance review reports and financial audits, found numerous instances of prime awardees not complying with Mission Order 21 requirements for vetting and the inclusion of mandatory provisions in subawards. We also noted that the compliance review reports identified deficiencies in internal controls that could lead to further instances of noncompliance.

## Prime Awardees Did Not Fully Comply with Vetting Requirements

Our analysis of USAID data in our generalizable sample of 245 subawards for the West Bank and Gaza program showed that USAID did not fully ensure that prime awardees complied with Mission Order 21 requirements for vetting when making subawards. As previously mentioned, Mission Order 21 requires that contractors and subcontractors, recipients of grants and cooperative agreements, trainees and students, and recipients of cash or in-kind assistance, with some exceptions, undergo vetting. USAID's vetting center is tasked with checking the names of individuals and organizations and other identifying information against databases and other sources to determine whether they have any alleged links to terrorism. According to a 2010 USAID West Bank and Gaza program notice, prime awardees are required to ensure that applicable vetting approval is obtained before a subaward is made. We found that 20 of the 24 prime awardees (83 percent) complied with vetting requirements and four of the 24 prime awardees (17 percent) had one or more instances of late vetting of a subawardee (see table 4).

**Table 4: Prime Awardees' Compliance and Noncompliance with Mission Order 21 Vetting Requirements for Subawards Funded during Fiscal Years 2015–2019**

| | Number of prime awardees | Percentage |
|---|---|---|
| **Total compliant** | **20** | **83** |
| **Total noncompliant** | **4** | **17** |
| No vetting | 0 | 0 |
| Expired vetting | 0 | 0 |
| Late vetting | 4 | 17 |
| **Total** | **24** | **100** |

Source: GAO analysis of U.S. Agency for International Development (USAID) documents. | GAO-21-332

Note: For purposes of compliance with Mission Order 21 vetting requirements, we consider USAID and prime awardees to be compliant with Mission Order 21, including clarifying guidance in USAID notices, when vetting approval was obtained prior to the award date.

On the basis of our analysis of USAID data, of the 219 subawards (originating from the 24 distinct prime awards) in our generalizable sample required to undergo vetting, we estimate that vetting was completed prior to award in compliance with Mission Order 21 requirements about 98 percent of the time (see table 5). For five of the subawardees (about 2.3 percent), USAID completed vetting after the agreement was signed. Based on this sample, we estimate that the total number of subawards that did not comply with the vetting requirements could range from 37 to 262. Twenty-six of the subawardees did not require vetting, either because the subawardee was a U.S. entity, the award amount was under the $25,000 threshold, or the subawardee was providing a service in the ordinary course of business for the prime awardee's own use, according to USAID data.

**Table 5: Compliance and Noncompliance with Mission Order 21 Vetting Requirements for Subawards Funded during Fiscal Years 2015–2019**

| | Number of subawards in sample | Percentage | Estimated total number in population | Lower bound[a] (percentage) at 95 percent confidence interval | Upper bound[a] (percentage) at 95 percent confidence interval |
|---|---|---|---|---|---|
| **Total compliant** | **214** | **97.7** | **4894** | **4746 (94.8)** | **4971 (99.3)** |
| **Total noncompliant** | **5** | **2.3** | **114** | **37 (0.7)** | **262 (5.2)** |
| No vetting | 0 | 0.0 | 0 | 0 (0.0) | 68 (1.4) |
| Expired vetting | 0 | 0.0 | 0 | 0 (0.0) | 68 (1.4) |
| Late vetting | 5 | 2.3 | 114 | 37 (0.7) | 262 (5.2) |
| **Total required vetting** | **219** | **100** | **5008** | **4769** | **5190** |

Source: GAO analysis of U.S. Agency for International Development (USAID) documents. | GAO-21-332

Note: For purposes of compliance with Mission Order 21 vetting requirements, we consider USAID and prime awardees to be compliant with Mission Order 21, including clarifying guidance in USAID notices, when vetting approval was obtained prior to the award date or provision of assistance.

[a]The lower and upper bounds for the number and percentage of compliant and noncompliant subawards do not sum to totals because of statistical properties.

Our review of USAID's compliance review reports identified numerous other instances of noncompliance with applicable vetting requirements. As previously noted, Mission Order 21 requires that certain individuals and non-U.S. organizations undergo vetting prior to USAID making an award or providing assistance. Of the 86 compliance review reports we analyzed,[31] 32 contained one or more failures to comply with vetting requirements for subawardees, trainees, or other recipients of direct cash or in-kind assistance. Specifically, the compliance review reports found that awardees for eight prime awards had not obtained vetting approval for 1,298 trainees. Subsequently, six of these prime awardees received vetting approval for 257 trainees during the compliance review process, but one prime awardee did not obtain vetting approval for 1,041 trainees, as discussed in two reports (see table 6). According to USAID documents, this prime awardee reimbursed USAID in May 2018 for the value of the trainings—conducted between 2014 and 2017—instead of having them undergo vetting because vetting the trainees in question was no longer feasible. In addition, awardees for a total of nine prime awards offered training to a total of 422 trainees before obtaining vetting approval. Other prime awardees did not obtain vetting approval for 40 subawardees and 34 beneficiaries of direct cash or in-kind assistance prior to signing the relevant agreements. In each of these cases, the

_____

[31]USAID issued these compliance reviews during FYs 2015–2019.

compliance review reports indicated that prime awardees received vetting approval, with all subawardees and other recipients deemed eligible for assistance. Our analysis of the compliance reviews found no cases of USAID funding to parties who failed vetting, and for parties who were never vetted, our analysis found that costs were recovered.

**Table 6: Prime Award Noncompliance with Mission Order 21 Vetting Requirements for the West Bank and Gaza Program Identified by USAID's Compliance Review Reports, Fiscal Years 2015–2019**

| Category of noncompliance | | Number of noncompliant prime awards | Number of subawards, trainees, or beneficiaries represented | Number vetted based on compliance review process | Number not vetted |
|---|---|---|---|---|---|
| No vetting | No vetting of trainees | 8 | 1,298 | 257 | 1,041 |
| | No vetting for subawards | 9 | 21 | 21 | 0 |
| | No vetting for other direct cash or in-kind assistance | 1 | 1 | 1 | 0 |
| **Subtotal** | | **18** | **1,320** | **279** | **1,041** |
| Late vetting | Late vetting of trainees | 9 | 422 | n/a | n/a |
| | Late vetting for subawards | 15 | 19 | n/a | n/a |
| | Late vetting for other direct cash or in-kind assistance | 1 | 33 | n/a | n/a |
| **Subtotal** | | **25** | **474** | **n/a** | **n/a** |
| **Total** | | **43** | **1,794** | **279** | **1,041** |

Legend: n/a = not applicable

Source: GAO analysis of U.S. Agency for International Development (USAID) documents. | GAO-21-332

Note: For the purposes of this table, noncompliance indicates that the prime awardee failed to obtain vetting approval from USAID prior to providing assistance, according to USAID compliance review reports.

In addition, the compliance review reports noted that nine prime awardees did not have controls to detect and address any change in the key individuals for already vetted ongoing subawardees, if needed. The auditors also recommended that eight prime awardees prepare attendance sheets to document the names of trainees to facilitate the vetting of those who required it.

USAID's financial audits also found some cases of late vetting of subawardees and trainees. Our analysis showed that of the 203 audit reports examining compliance with Mission Order 21, nine contained one or more instances of prime awardees not complying with vetting requirements. Specifically, six subawardees were vetted after the agreements were signed and 86 trainees were vetted after training, according to the audit reports. Our analysis of USAID's financial audits

also found no cases of USAID assistance to parties who had failed vetting.

USAID's compliance review reports and financial audits found no cases of USAID providing assistance to parties who had failed vetting; however, late vetting increases the risk that USAID may inadvertently provide support to entities or individuals associated with terrorism. Mission Order 21 requirements were intended to reduce this risk.

**Prime Awardees Generally Complied with Antiterrorism Certification Requirements**

Our review of subawards for the West Bank and Gaza program showed that USAID's procedures generally ensured that prime awardees complied with Mission Order 21 antiterrorism certification requirements by ensuring that subawardees signed an antiterrorism certification before receiving an award. Mission Order 21 requires that all U.S. and non-U.S. organizations that are prime awardees of grants, cooperative agreements, or grants under contracts, must sign an antiterrorism certification before the award is made to attest that the organization does not provide material support or resources for terrorism.[32] It also requires the antiterrorism certification for subawardees in the first level of subgrantees receiving cash assistance under grants or cooperative agreements or any other instrument regardless of form. In our analysis of USAID data in our generalizable sample of 245 subawards, we found that 12 of the 245 subawards (about 4.9 percent) in our sample required antiterrorism certifications because, according to USAID documentation, they were grants of a nature that required such certification. USAID provided us with documentation showing that these 12 subawards were properly certified. According to USAID's subaward data, the remaining 233 subawards did not require an antiterrorism certification because the subawardees were individuals, subcontractors, or lower-tier recipients of in-kind assistance.

Our analysis of USAID's 86 compliance review reports found that one prime awardee had failed to obtain required antiterrorism certifications for nine subawardees. USAID officials provided us with a letter from the prime awardee that stated the prime awardee had obtained the

---

[32]Mission Order 21 does not require the antiterrorism certification for contractors and subcontractors, or individuals, public international organizations, or host governments. "Grants under Contracts" refers to a grant awarded by a USAID contractor to a nongovernmental organization or partner government entity; note, however, that only nongovernmental organizations are required to sign an antiterrorism certification.

certifications for seven of the nine subawardees and cancelled the remaining two subawards before any expenses were incurred.

**Prime Awardees Did Not Fully Comply with Mandatory Provisions Requirement**

We found that USAID did not ensure that prime awardees included mandatory provisions in their subawards that required subawardees to attest that the organization does not provide material support or resources for terrorism, as required by Mission Order 21. As previously noted, Mission Order 21 requires that all solicitations, as well as all prime awards and subawards for contracts, grants, and cooperative agreements, contain two mandatory provisions (included as clauses in award documents): a provision prohibiting support for terrorism, and a provision restricting funding to facilities that recognize or honor an individual or entity that commits or has committed terrorism.[33] Our analysis of USAID's compliance review reports found that 13 of the 86 reports contained one or more instances of a prime awardee failing to incorporate required mandatory provisions, covering 420 subawards.[34] Of the 420 subawards, 378 instances of noncompliance resulted from one prime awardee failing to include mandatory provisions in subaward documents. The compliance reviews, along with follow-up documentation from USAID, indicated that prime awardees had corrected six of the 420 subawards to include the mandatory provisions. According to USAID officials, prime awardees are required to amend applicable subaward documentation if the subawards are still ongoing and active. However, the subawards of at least five of the prime awardees in question, for a total of

---

[33]The prohibition against the support for terrorism provision, which is an attachment to Mission Order 21, states that USAID reserves the right to terminate the contract or agreement if the contractor or recipient has failed to comply with any requirements of the provision. The restriction on facility names provision, which is also an attachment to Mission Order 21, provides that USAID may disallow any or all costs incurred with respect to assistance provided for any facility that is named after any person or group of persons that has advocated, sponsored, or committed acts of terrorism. We did not assess how USAID monitors awardees' compliance with the terms of the provisions in our review.

[34]We did not conduct an analysis of the subawards for mandatory provisions because the USAID documentation was incomplete. According to USAID officials, the mission requested the subaward documentation from prime awardees in June 2020. However, USAID was unable to obtain all of the documents because (1) some prime awardees had stopped operations after funding ceased in early 2019, and (2) one prime awardee could not obtain documentation from a warehouse because of COVID-19 restrictions.

18 subawards, were no longer active by the time of the compliance review.[35]

Our analysis of USAID's financial audits showed that 14 of the 203 audit reports that examined compliance with Mission Order 21 found instances of failure to include mandatory provisions in subawards. We could not calculate the number of instances of noncompliance because some of the financial audits did not specify the number of cases of subawards where they found missing mandatory provisions. Three of the 14 audit reports noted that the prime awardee had corrected issues with missing mandatory provisions. In a number of cases, the audit reports, and the memoranda the USAID Regional Inspector General used to transmit them, were published after January 31, 2019, when all ESF assistance to the West Bank and Gaza ceased. As a result, USAID took no remedies to address these instances of noncompliance, according to USAID.

**USAID Compliance Review Reports Noted Deficiencies in Prime Awardee Internal Controls**

Of the 86 compliance review reports we reviewed, 72 contained one or more observations on prime awardee compliance-related issues identified in the review process that did not amount to material noncompliance with Mission Order 21, according to the reports. For example, the prime awardees covered in 16 of those 72 reports had no documented procedures to implement Mission Order 21 compliance activities. In addition, 53 reports found that prime awardees did not always report their subawards in a timely manner in accordance with USAID requirements, and 46 of the reports found that prime awardees had errors in their monthly subaward reports. In addition, seven compliance reviews recommended that prime awardees incorporate the mandatory provisions into their solicitations.

**USAID Compliance Review and Financial Audit Processes Had Gaps**

While USAID, as discussed above, established a robust post-award compliance review process as an internal control to identify and address noncompliance with Mission Order 21 requirements as discussed above, we identified two gaps. First, although USAID provides upfront training on Mission Order 21 requirements to prime awardees, according to USAID officials, it does not have a process for verifying that prime awardees have documented procedures for complying with Mission Order 21 before

---

[35]Neither the compliance review reports nor related follow-up documentation requested from USAID indicate how many of the other subawards, including the 378 subawards mentioned above, were corrected to include the required mandatory provisions before those subawards ended.

they make subawards or hold training sessions using ESF funds.[36] For financial management, USAID officials told us that USAID has a policy to ensure that a prospective prime awardee possesses or has the ability to obtain the necessary financial management competence to plan and carry out the assistance program and will practice mutually agreed-upon methods of accountability for funds and other assets provided by USAID.[37] This policy includes a screening of the compliance reviews and financial audits on file to identify past compliance issues with Mission Order 21 and ensure that no findings are open, according to USAID officials. However, the policy does not include a step, or process, for verifying that prime awardees have procedures in place for complying with Mission Order 21 before they make subawards. Should funding resume, establishing a process to verify that prime awardees have procedures in place to comply with Mission Order 21 requirements would better position USAID to ensure that prime awardees obtain vetting approval before making subawards and include relevant mandatory provisions prior to making subawards.

Second, USAID's post-award compliance reviews did not always occur in time to enforce the relevant remedies for prime awardees' noncompliance with Mission Order 21 requirements. As previously mentioned, at least 18 subawards were no longer active by the time of the compliance review. According to USAID documents and officials, USAID has a range of remedies available for prime awardees' noncompliance that are provided by federal regulations and USAID policy, as well as Mission Order 21 and its associated attachments.[38] According to USAID officials, remedies provided under these provisions, as well as actions taken by USAID to prevent noncompliance, include

---

[36]According to USAID officials, the mission officials provide upfront training to prime awardees on Mission Order 21 requirements and include Mission Order 21 as an attachment in all issued West Bank and Gaza program awards.

[37]According to USAID, the agency performs the following actions prior to award, in order to determine the responsibility of prime awardees. For assistance agreements, USAID performs a pre-award risk assessment, which includes a review of the potential recipient's policies and procedures, in line with ADS 303.3.9; and for contracts, USAID determines prospective contractors responsible in accordance with the standards under FAR 9.104-1.

[38]According to USAID officials, the following provide various remedies for noncompliance and are included, as appropriate, in their awards: FAR Subpart 42.8, Disallowance of Costs; FAR Subpart 49.5, Contract Termination Clauses; 2 CFR § 200.339, Remedies for Noncompliance; 2 CFR § 200.340, Termination; USAID, Standard Provisions for Non-U.S. Nongovernmental Organizations, ADS 303mab, M10, Award Termination and Suspension (December 2014).

- providing prime awardees with capacity building so that they better comply with award provisions and conditions,

- disallowing costs associated with the noncompliance,

- withholding cash payments pending correction of the deficiency,

- suspending implementation or terminating the award, and

- withholding approval of further awards.

For subawards, these remedies would be applied to the prime award or actioned by the prime awardee with respect to a subaward (such as partial termination of the award related to a particular subaward), according to USAID officials. However, we found that the remedies were not pursued when compliance issues were identified after the award closed. According to USAID officials, should any prime awardees that were found noncompliant be considered for future awards with USAID/WBG, they will be asked to demonstrate that they have proper procedures in place to ensure compliance with Mission Order 21. When compliance monitoring activities occur after awards end, the prime awardees and USAID have limited opportunities to correct any instances of noncompliance. Conducting post-award compliance reviews in time to make any corrective actions, should program funding resume, would better position USAID to reduce the risk of providing assistance to entities or individuals associated with terrorism.

## Conclusions

Prior to ceasing assistance in 2019, the U.S. government viewed bilateral assistance to Palestinians in the West Bank and Gaza as an important tool for supporting peace negotiations and financing economic stabilization in the Middle East, according to State. By September 30, 2020, USAID had expended $487.3 million of the $540.4 million in ESF assistance made available for new obligations in fiscal years 2015 and 2016 for the West Bank and Gaza program. However, the administration reprogrammed $230.1 million in fiscal year 2017 funds allocated for the West Bank and Gaza program and ceased allocations for fiscal years 2018 and 2019 because of a combination of complex policy and legal actions, according to State and USAID. As a result of these reductions in funding, the USAID West Bank and Gaza mission's programs, operations, and staffing were reduced—with all 27 ongoing projects in the area ceasing before their originally planned end dates, and staffing decreasing by 39 percent.

When funding is available for the West Bank and Gaza program, USAID is responsible for ensuring that it is not being made available to individuals or entities associated with terrorism. USAID established

policies, including a post-award compliance review, to help ensure that awardees complied with the requirements of the antiterrorism procedures contained in Mission Order 21. Further, our review found that USAID effectively implemented these requirements for prime awards. However, USAID did not have a process in place for verifying that prime awardees had procedures for complying with antiterrorism requirements prior to making subawards. Further, USAID's post-award compliance reviews sometimes did not occur until it was too late in the process for prime awardees or USAID to undertake corrective actions. As a result, various instances of subaward noncompliance with antiterrorism requirements occurred over the last 5 years. Addressing these issues remains important, as there are indications that funding to the program could resume in the future. Congress has appropriated not less than $75 million in fiscal year 2020 ESF assistance for the West Bank and Gaza program that shall be made available if certain conditions are met. Further, at a United Nations meeting on January 26, 2021, the Biden administration announced its intent to resume U.S. assistance for programs that support economic development and humanitarian aid for Palestinians in the West Bank and Gaza. Should such funding resume, establishing a process for verifying prime awardees' procedures and conducting post-award compliance reviews earlier would better position USAID to prevent the risk of providing assistance to entities or individuals associated with terrorism.

Without effective compliance procedures in place, USAID may be at risk of providing assistance to entities or individuals associated with terrorism. Since Congress has appropriated not less than $75 million in fiscal year 2020 ESF assistance for the West Bank and Gaza, that shall be made available if certain conditions are met, addressing these program limitations and related risks remains important.

## Recommendations for Executive Action

We are making the following two recommendations to USAID:

- The Administrator of USAID should establish a process for verifying that prime awardees have procedures in place to comply with Mission Order 21 requirements before allowing prime awardees to make subawards, should funding for USAID's West Bank and Gaza program resume. (Recommendation 1)

- The Administrator of USAID should conduct post-award compliance reviews of prime awardees and their subawards of ESF assistance for USAID's West Bank and Gaza program in time to identify

noncompliance and take appropriate actions before the awards end, should funding for the program resume. (Recommendation 2)

# Agency Comments and Our Evaluation

We provided a draft of this report to USAID and State for review and comment. We received comments from USAID, which we have reproduced in appendix V. In addition, USAID and State provided technical comments, which we incorporated as appropriate.

In its comments, USAID agreed with our two recommendations and described the actions it plans to take to address the recommendations should funding resume. USAID stated that the agency would develop a process, prior to award, that ensures that prime awardees have procedures in place to comply with Mission Order 21 requirements before allowing prime awardees to make subawards. USAID's West Bank and Gaza mission also committed to conducting compliance reviews of prime awardees and their subawards within the first 18 months of implementation, contingent on available resources.

We are sending copies of this report to the appropriate congressional committees, the Secretary of State, and the Acting Administrator of USAID. In addition, the report is available at no charge on the GAO website at https://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (202) 512-4409 or lovel@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix VI.

Latesha A. Love
Acting Director, International Affairs and Trade

# Appendix I: Objectives, Scope, and Methodology

This report examines the (1) status of the U.S. Agency for International Development's (USAID) Economic Support Fund (ESF) assistance to the West Bank and Gaza program for fiscal years (FY) 2015–2019, as of September 30, 2020; (2) steps USAID took concerning ongoing projects and USAID mission staffing levels when ESF assistance for the West Bank and Gaza program ceased as of January 31, 2019; and (3) extent to which USAID complied with its policies and procedures to ensure that ESF program assistance provided to the West Bank and Gaza did not provide support to entities or individuals associated with terrorism during FYs 2015–2019.

To determine the status of USAID's ESF assistance to the West Bank and Gaza for FYs 2015–2019, we reviewed FYs 2015–2019 appropriations legislation,[1] the Department of State's (State) budget justification and allocation documents, congressional notifications, and the USAID West Bank and Gaza mission's ESF FY financial data on allocations, obligations, and expenditures as of September 30, 2020.[2] We also reviewed the FYs 2015–2016 financial data for projects by development objective, program support, and payments to creditors. In addition, we reviewed information regarding USAID's financial system and determined that the data from the system were sufficiently reliable for the purposes of our reporting objective. To determine the key events affecting ESF assistance to the West Bank and Gaza program, including the cessation of funding, we reviewed key legislation, including the Taylor Force Act, the Anti-Terrorism Clarification Act of 2018, the Promoting Security and Justice for Victims of Terrorism Act of 2019, and relevant provisions in the Joint Explanatory Statement accompanying the Further

---

[1]The annual consolidated appropriations acts for FY 2015–2019 included provisions for GAO to review the treatment, handling, and uses of funds provided through the ESF account for the West Bank and Gaza, including the extent to which the funded projects and activities comply with certain antiterrorism and other requirements. Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 7039(e) (Dec. 16, 2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 7039(e) (Dec. 18, 2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 7039(e) (May 5, 2017); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 7039(e) (Mar. 23, 2018); and Consolidated Appropriations Act, 2019, Pub. L. No.116-6, § 7039(e) (Feb.15, 2019).

[2]According to USAID West Bank and Gaza mission officials, financial data was available on a quarterly basis. September 30, 2020, data was the most recently available data during our review.

Consolidated Appropriations Act of 2020.[3] We reviewed related reporting
and discussed the ramifications of these laws on ESF assistance to the
West Bank and Gaza with State and USAID officials. We also reviewed
the economic plan within the administration's peace plan, *Peace to
Prosperity: A Vision to Improve the Lives of the Palestinian and Israeli
People*; United Nations Security Council and USAID documents regarding
rejection of the plan, and the Palestinian Prime Minister of the State of
Palestine's letter to State regarding the refusal of assistance referenced
in the Anti-Terrorism Clarification Act of 2018. We conducted interviews
with, submitted questions to, and reviewed the responses of officials in
USAID's West Bank and Gaza mission, USAID's Bureau for the Middle
East, and State's Office of Foreign Assistance and Bureau of Near
Eastern Affairs.

To determine the steps USAID took concerning ongoing projects when
ESF assistance for the West Bank and Gaza ceased as of January 31,
2019, we reviewed USAID data and corroborating project documentation
on these projects, including the relevant development objective they
addressed, project descriptions, award start dates and original end dates,
total estimated costs, and total obligated amounts. We also conducted
interviews, submitted questions, and reviewed the responses of officials
in the West Bank and Gaza mission regarding the cessation of program
implementation, prematurely ended projects, and costs associated with
closing the project contracts.

To determine the steps USAID took concerning USAID mission staffing
levels when ESF assistance for the West Bank and Gaza ceased as of
January 31, 2019, we reviewed data and documentation provided by
USAID on authorized staffing levels, positions filled, and staff on board,
including office and employment type, from October 2017 through
September 30, 2020. We reviewed and compiled attrition data by position
type for the numbers of staff departing post, transferring, and resigning.
We reviewed and compiled data on the number of positions filled in
October 2017 and September 2020 by employment type and office. We
reviewed a CN and related documents describing a proposed reduction in
force and downsizing of the West Bank and Gaza mission's staffing
footprint. We reviewed data provided by the USAID mission on

---

[3]Taylor Force Act, Pub. L. No. 115-141, §§ 1001-1007 (March 23, 2018); Anti-Terrorism
Clarification Act of 2018, Pub. L. No. 115-253 (Oct. 3, 2018); Promoting Security and
Justice for Victims of Terrorism Act of 2019, Pub. L. No. 116-94, § 903 (Dec. 20, 2019);
and Joint Explanatory Statement accompanying the Further Consolidated Appropriations
Act, 2020, 165 Cong. Rec. H11434 (Dec. 17, 2019).

memoranda of understanding enabling USAID to temporarily assign staff to other USAID programs and offices with critical and immediate needs. In addition, we interviewed, submitted questions to, and reviewed the responses of USAID's West Bank and Gaza mission officials on the data and steps taken regarding staffing, the proposed reduction in force, and the temporary assignment of staff.

To assess the extent to which USAID complied with its policies and procedures to ensure that ESF program assistance provided to the West Bank and Gaza did not provide support to entities or individuals associated with terrorism, we reviewed USAID's antiterrorism policies and procedures and examined relevant USAID records related to assistance programs. Mission Order 21 is the primary document that details the procedures to comply with applicable laws and executive orders to ensure that assistance does not provide support to individuals or entities associated with terrorism. The effective date of the most recent version of Mission Order 21 is October 3, 2007, and, according to USAID officials, the order has not been updated since then.[4] We also reviewed memoranda and notices issued by the West Bank and Gaza mission that pertain to USAID's antiterrorism compliance review process and reminders about Mission Order 21 updates. We also interviewed USAID officials regarding the agency's antiterrorism policies and procedures and the steps they take to ensure compliance with those policies and procedures.

To determine whether program assistance complied with vetting, antiterrorism, and mandatory provision requirements, we examined all 55 prime awards—which include contracts, grants, and cooperative agreements—that USAID awarded to its implementing partners with FYs 2015–2016 ESF funding, before funding ceased.[5] We assessed the extent to which USAID granted these prime awards in compliance with its antiterrorism policies and procedures. We also examined a random

[4]In 2017, USAID issued but decided not to implement an addendum to Mission Order 21 that would have expanded vetting requirements to include U.S.-based organizations and certain key individuals of U.S. organizations' field offices in the West Bank and Gaza, Israel, or the city of Jerusalem.

[5]USAID identified a total of 63 prime awards issued by the mission that used funding from FYs 2015 and 2016. We excluded eight of those prime awards from our scope—three were cash transfers to the Palestinian Authority, three others were for Field Support, one was a loan guaranty program administered by the Overseas Private Investment Corporation, and one was a scholarship program administered by State. After these exclusions, 55 prime awards remained in our scope.

generalizable sample of 245 USAID subawards that were funded during
FYs 2015–2019 and assessed the extent to which USAID awardees
granted these awards in compliance with the agency's vetting and
antiterrorism certification requirements.[6] In addition, we asked USAID to
provide all compliance review reports and audit reports completed during
FYs 2015–2019. We reviewed and analyzed all 86 compliance review
reports and 215 financial audits that USAID provided for instances of
noncompliance with USAID's antiterrorism policies and procedures for
subawardees.

We focused our review on the West Bank and Gaza mission's prime
award contracts, grants, and cooperative agreements that were made
using ESF programming for FYs 2015–2016, as well as applicable
subawards made during this period. We selected this period because it
covers the West Bank and Gaza awards made since our 2016 report. The
mission provided us with copies of all 55 prime awards issued during this
period and the relevant documentation to support proof of vetting of
awardees when required, the presence of mandatory provisions, and the
presence of antiterrorism certifications when required.

To assess the extent to which West Bank and Gaza subawards complied
with vetting and antiterrorism certification requirements, we examined a
random generalizable sample of 245 subawards funded during FYs
2015–2019, which included contracts and grants, based on data provided
by USAID. We selected the sample from a universe of 5,512 subawards
that USAID data indicated were to subawardees whose cumulative award
value over the prior 12 months was $25,000 or more. This universe of
5,512 subawards covered subawards made by 25 prime awardees and is
a subset of a larger universe of 19,856 subawards funded during FYs
2015–2019 by 36 prime awardees, according to USAID data. The West
Bank and Gaza mission developed the universe by taking the 55 prime
awards we had received and reviewed and identifying the corresponding
subaward reports made by each prime award; some of the prime
awardees did not make any subawards during the period that we
examined, according to USAID. We stratified our sample using USAID
data to include 10 subawards made to U.S. organizations, 200 made to

---

[6]For the purposes of this report, we use the term "prime awardee" to refer to organizations
and individuals that directly receive USAID funding to implement contracts, grants, or
cooperative agreements, and "subawardee" to refer to organizations and individuals that
receive subcontracts or subgrants from prime awardees for work on U.S. assistance
projects.

non-U.S. organizations, and 35 for which the variable indicating whether the organization was a U.S. or non-U.S. organization was blank.[7] This stratification reflects that the universe of 5,512 subawards included 141 subawards made to U.S. organizations, 4,757 made to non-U.S. organizations, and 755 for which the variable indicating whether the organization was a U.S. or non-U.S. organization was blank.[8] Our sample of 245 subawards included contracts and grants—12 of which were awarded to U.S.-based organizations, 229 of which were awarded to non-U.S. organizations, and four of which were awarded to organizations whose addresses could not be established based on available data. We then assessed the extent to which these subawards were compliant with USAID vetting and antiterrorism certification requirements under Mission Order 21. For our sample of 245 subawards, we could not determine whether USAID's policies and procedures had ensured that subaward documents contained the mandatory provisions because we received incomplete documentation from USAID.[9]

To further examine the extent to which USAID complied with its antiterrorism policies and procedures under Mission Order 21, we reviewed and analyzed all 86 compliance review reports and all 215 financial audits provided to us by USAID in response to our request for all such reports issued in FYs 2015–2019. USAID issued the compliance review reports between March 2015 and April 2019. USAID's compliance specialists, or designated audit firms, conducted these compliance reviews on 43 prime awardees using FYs 2015–2016 ESF funding to identify instances of noncompliance with USAID's antiterrorism policies and procedures. We analyzed these compliance review reports to assess and compile all noncompliance weaknesses relating to Mission Order 21 in four categories: (1) the proper vetting of subawardees, trainees, and

---

[7]For the purposes of this report, we used addresses listed on award documentation and in data provided by USAID to determine whether the organization was a U.S. or non-U.S. organization.

[8]We took a stratified random generalizable sample of 245 subawards, from a universe of 5,512 subawards with award values over $25,000, for at least one of the three amount categories (Award Amount; Cumulative Amount; Cumulative Amount Over 12 Months) listed in USAID's subaward data files. Margins of error on all estimates from this sample are within +/- 5 percentage points at the 95 percent confidence level.

[9]We did not conduct an analysis of the subawards for mandatory provisions because the USAID documentation was incomplete. According to USAID officials, the mission requested the subaward documentation from prime awardees in June 2020. However, USAID was unable to obtain all of the documents because (1) some prime awardees had stopped operations after funding ceased in early 2019, and (2) one prime awardee could not obtain documentation from a warehouse because of COVID-19 restrictions.

other recipients of cash or in-kind assistance; (2) the timely incorporation of antiterrorism certifications, when required; (3) the timely incorporation of applicable mandatory provisions; and (4) subaward reporting. We also followed up with USAID officials regarding these identified weaknesses and the policies and procedures USAID had in place to ensure that such weaknesses were addressed. In addition, we assessed and compiled general observations regarding Mission Order 21 controls—including whether prime awardees had documented procedures for Mission Order 21 compliance, and whether prime awardees' monthly subaward reports were accurate—from compliance review reports, to the extent the reports contained such sections.

We also examined and analyzed all 215 financial audits of West Bank and Gaza awards performed by designated audit firms and provided to us by USAID. These 215 audits were produced between July 2015 and April 2020 and covered 135 prime awardees and 80 subawardees. Of these 215 audits, 203 included a review of the awardees' compliance with Mission Order 21. For the remaining 12 audits, the award was not subject to Mission Order 21, according to the audit report. We assessed and compiled the instances of noncompliance weaknesses with Mission Order 21 found in the 203 financial audits in two categories: (1) the proper vetting of subawardees, trainees, and other recipients of cash or in-kind assistance, and (2) the incorporation of mandatory provisions in subawards.[10]

We conducted this performance audit from December 2018 to March 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[10]The antiterrorism certifications were outside the scope of the financial audits.

# Appendix II: USAID West Bank and Gaza Mission's Vetting Process for Awards

This appendix provides information on the vetting process for U.S. Agency for International Development (USAID) awards that received U.S. government funding, including contracts, grants, cooperative agreements, and training, based on USAID documents and information from officials. This vetting process was in effect as of January 31, 2019, when USAID ceased funding for the West Bank and Gaza program.[1] According to USAID, the vetting process provided reasonable assurance that program assistance was "not provided to or through any individual, private or government entity, or educational institution that is believed to advocate, plan, sponsor, engage in, or has engaged in, terrorist activity."

Figure 5 provides details of the steps in the vetting process for awards as of January 31, 2019. A typical vetting process started with the prime awardee submitting through an online portal, the Partner Vetting System (PVS), a completed Partner Information Form that has the names and identifying information of the organization's key individuals, according to the USAID mission. The prime awardee had access to the online portal to submit the Partner Information Form and also collected and submitted the needed vetting data from proposed recipients of subawards. In cases where the prime awardee did not have access to the online portal, hard copy forms were sent directly to USAID's vetting team, known as the Program Support Unit, which inputted the information into the PVS.[2] The information submitted online or on hard copy was checked by vetting assistants at the USAID mission to ensure that it was complete and a valid request. The information was compiled for a vetting package that was submitted through the portal to the USAID Office of Security's Counterterrorism Branch (SEC/CT) at the Terrorist Screening Center in the United States.[3] Until August 2015, the vetting package was compiled by one member of the Program Support Unit team. In response to a vetting error identified in July 2015, the USAID mission implemented a new policy that required an additional check of vetting packages submitted to the SEC/CT. The revised process required that a separate member of the Program Support Unit team verify that packages submitted

---

[1]According to USAID officials, the mission continued vetting awardees through June 2019.

[2]The Program Support Unit was composed of a Supervisory Program Support Specialist, who was a U.S. citizen, and two Vetting Support Assistants who were under the specialist's supervision.

[3]Analysts from SEC/CT were detailed to the Federal Bureau of Investigation's Terrorist Screening Center where they had access to the U.S. government's consolidated Terrorist Watchlist, a single database of identifying information about those known or reasonably suspected of being involved in terrorist activity.

Appendix II: USAID West Bank and Gaza
Mission's Vetting Process for Awards

to the SEC/CT included all key individuals listed in the Partner Information Form, according to USAID.

**Figure 5: USAID's Vetting Process for Awards for the West Bank and Gaza, as of January 31, 2019**



| Abbr | Full |
|---|---|
| CTO | Cognizant Technical Officer |
| PSU | Program Support Unit |

Source: GAO analysis of information from the U.S. Agency for International Development (USAID).  |  GAO-21-332

[a]For grants and awards of cash or in-kind assistance, even if the USAID Office of Security's Counterterrorism Branch did not recommend an ineligible determination, second-step vetting also needed to be conducted by the Consulate General.

If the proposed award was a cash grant or in-kind assistance, following an eligible recommendation from the SEC/CT, the request was then sent to the U.S. Consulate General in Jerusalem for a second vetting step.[4] If the organization or individual vetted by the U.S. Consulate General was also deemed eligible, results were entered into PVS, and an automatic notification was sent to the Contracting/Agreement Officer's Representative (C/AOR), who notified the awardee of the results.

If the SEC/CT found derogatory information related to an organization or individual submitted for vetting, the SEC/CT analyzed the information to determine whether an ineligible recommendation was warranted. If an ineligible recommendation was warranted, the SEC/CT drafted an assessment of the derogatory information and sent it to the Supervisory Program Support Specialist, according to the USAID mission. The Consulate General followed a similar notification process if the vetting of an organization resulted in an ineligible recommendation. In either case, the Supervisory Program Support Specialist reviewed the derogatory information and consulted with key mission vetting officials who had been granted the appropriate security clearance and had a need-to-know. The C/AOR may have also been asked to provide an impact assessment to evaluate the potential consequences for the implementation of the program should a particular prospective implementing partner be found ineligible.

If the mission wanted to make an award notwithstanding an ineligible finding by the SEC/CT, the mission referred the case to the Vetting Working Group, located in the U.S. Consulate General in Jerusalem. The Vetting Working Group was a multiagency group, responsible for reconciling derogatory vetting information obtained by U.S. agencies implementing programs in the West Bank and Gaza, according to the mission. The group met on an ad-hoc basis and recommended eligibility or ineligibility based on consensus, with the final decision made by the Consul General. For cases that were not referred to the Vetting Working Group, the Deputy Mission Director had the authority to make final ineligibility decisions, according to the mission.[5] Once a final determination was made by either the Consulate General or the Deputy Mission Director, the Supervisory Program Support Specialist entered this

---

[4]According to a State document, the U.S. Consulate General in Jerusalem merged into the U.S. embassy in Jerusalem in March 2019.

[5]According to USAID, the Deputy Mission Director could not overrule a derogatory finding without going through the Vetting Working Group.

**Appendix II: USAID West Bank and Gaza
Mission's Vetting Process for Awards**

determination into PVS and an automatic notification was sent to the C/AOR. The C/AOR notified the awardee of the results.

If a program awardee was approved through the vetting process, the approval generally remained valid for that particular award for up to 3 years from the date of the award. However, new vetting was required in some circumstances. First, vetting was required if there was a change in the awardee's key individuals. Key individuals included principal officers of the organization's governing body, the principal officer and deputy principal officer of the organization, the program manager or chief of party, and any other persons with significant responsibility for administration of USAID-financed activities or resources. Second, new vetting was also required for any new awards or extensions of existing awards if more than 12 months had passed since the awardee was last approved. USAID could have rescinded vetting approval if the agency obtained information that an awardee or any of the key individuals was or had been involved in terrorist activity, according to USAID.

# Appendix III: Economic Support Fund Obligations and Expenditures for Project Assistance and Payments to Palestinian Authority Creditors for Fiscal Years 2015–2016

This appendix provides a detailed breakdown of the amount of Economic Support Fund obligations and expenditures for both project assistance and payments to creditors for fiscal years 2015–2016, as well as a breakdown for both fiscal years combined (see table 7).

**Table 7: USAID West Bank and Gaza Mission's ESF Obligations and Expenditures for Project Assistance and Payments to Creditors, FYs 2015 and 2016, as of September 30, 2020**

Dollars in thousands

| ESF project assistance and payments to creditors | Total obligations | | | Expenditures | | |
|---|---|---|---|---|---|---|
| | FY 2015 | FY 2016 | Total FYs 2015–2016 | FY 2015 | FY 2016 | Total FYs 2015–2016 |
| Governance and civic engagement projects | 10,800 | 11,800 | 22,600 | 10,800 | 11,194 | 21,994 |
| Economic growth and infrastructure projects | 137,567 | 90,764 | 228,331 | 124,870 | 60,816 | 185,686 |
| Investing in the next generation projects | 52,369 | 52,397 | 104,766 | 52,118 | 48,720 | 100,838 |
| Program support | 14,492 | 24,238 | 38,730 | 14,337 | 19,493 | 33,830 |
| **Total project assistance** | **215,228** | **179,199** | **394,427** | **202,125** | **140,223** | **342,348** |
| Payments to creditors | 75,000 | 70,000 | 145,000 | 75,000 | 70,000 | 145,000 |
| **Total ESF assistance** | **290,228** | **249,199** | **539,427** | **277,125** | **210,223** | **487,348** |

Legend: ESF = Economic Support Fund; FY = fiscal year

Source: GAO analysis of U.S. Agency for International Development (USAID) data. | GAO-21-332

# Appendix IV: Projects in the West Bank and Gaza That USAID Ended When Economic Support Funds Ceased

The U.S. Agency for International Development's (USAID) West Bank and Gaza mission halted implementation for all 27 of its ongoing projects in the West Bank and Gaza before their estimated completion dates when funding ceased, according to USAID. The projects that ended supported all three development objectives—Governance and Civic Engagement, Economic Growth and Infrastructure, and Investing in the Next Generation—and provided program support, according to USAID documents.

**Development Objective 1: Governance and Civic Engagement.** Projects falling under this objective aimed to help strengthen Palestinian government performance and to support increased citizen oversight and participation in decision-making processes. USAID ended five ongoing projects addressing the Governance and Civic Engagement development objective on January 31, 2019, before their originally planned end dates, according to USAID. (See table 8.)

**Table 8: USAID Governance and Civic Engagement Projects in the West Bank and Gaza That USAID Reported Ended Prematurely Because of the Cessation of Economic Support Funds, as of January 31, 2019**

| Projects and descriptions | Award start date | Award original end date | Total estimated cost (dollars) | Total obligated amount (dollars) |
|---|---|---|---|---|
| **Partnership for Social Accountability Program:** This project aimed to build the capacity of approximately 30 community-based organizations' members and 300 oversight committee members on social accountability and to target improvement of selected public services in each locality. | 7/1/2016 | 4/30/2019 | 600,000 | 600,000 |
| **Together We Survive:** This project aimed to advocate for improved regulations governing Palestinian women's shelters and provide upgraded psychosocial services for women and girls who were survivors of violence. Specifically, the project aimed to 1) offer greater opportunities for women and girls living under violent circumstances to access psychosocial services, 2) mobilize communities to help change attitudes and behaviors toward survivors of violence, and 3) help women develop reintegration plans to help them after they leave the shelters. | 9/18/2017 | 3/30/2020 | 500,000 | 500,000 |

| Projects and descriptions | Award start date | Award original end date | Total estimated cost (dollars) | Total obligated amount (dollars) |
|---|---|---|---|---|
| **Empowering Youth with Disabilities:** This project aimed to build the capacities of Community-Based Rehabilitation Organizations to provide improved rehabilitation services and to lead mothers' support groups. The project targeted West Bank caregivers/mothers of children with disabilities to increase their involvement in their children's rehabilitation and to help them more effectively advocate for the rights and needs of disabled children in their local communities and at the national level. | 9/20/2017 | 3/31/2020 | 437,168 | 208,560 |
| **The Open Government Data Initiative:** This project aimed to<br>• increase transparency, accountability, and citizen oversight over Palestinian public institutions and agencies regulating the economy;<br>• advocate for enhanced citizen access to data generated by public sector organizations; and<br>• collaborate with key Palestinian institutions to publish more data and studies on their websites and to launch public awareness campaigns informing the Palestinian people about the new information. | 9/25/2017 | 3/31/2020 | 499,940 | 499,940 |
| **Communities Thrive:** This project aimed to improve municipal fiscal sustainability, accountability, and service delivery. Specifically, the project aimed to assist targeted local governance units in participatory planning and assessments; capacity development; local economic development initiatives involving public, private, and nongovernmental institutions; citizen engagement; and national policy and regulatory reforms. | 9/30/3016 | 9/25/2021 | 47,238,571 | 11,200,000 |

Source: GAO analysis of U.S. Agency for International Development (USAID) data and project documents. | GAO-21-332

Note: USAID ended the listed projects and activities when the Palestinian Authority refused continued assistance because of the passage of the Anti-Terrorism Clarification Act of 2018, Pub. L. No. 115-253 (Oct. 3, 2018), according to USAID's West Bank and Gaza mission.

### Development Objective 2: Economic Growth and Infrastructure.

Projects falling under this objective aimed to boost the local economy, increase jobs, and enhance opportunities in domestic and regional markets by supporting Palestinian businesses. USAID ended nine ongoing projects addressing the Economic Growth and Infrastructure development objective on January 31, 2019, before their originally planned end dates, according to USAID. (See table 9.)

Appendix IV: Projects in the West Bank and
Gaza That USAID Ended When Economic
Support Funds Ceased

**Table 9: USAID Economic Growth and Infrastructure Projects in the West Bank and Gaza That USAID Reported Ended Prematurely Because of the Cessation of Economic Support Funds, as of January 31, 2019**

| Projects and descriptions | Award start date | Award original end date | Total estimated cost (dollars) | Total obligated amount (dollars) |
|---|---|---|---|---|
| **The Compete Project:** This project aimed to boost the local economy, provide jobs, and enable Palestinian businesses to compete globally. The project expanded its work into Gaza to assist Palestinian firms in reestablishing links with their buyers and to build their capacity to respond to emerging market needs focusing on agriculture information, communications technology, furniture, and textiles. In addition, the project aimed to explore potential opportunities in the energy sector. | 12/30/2011 | 2/28/2019 | 62,868,718 | 62,868,718 |
| **Jericho Collection System Expansion-Phase 1B:** This project aimed to expand the existing wastewater collection system to 80 percent of households in Jericho Municipality to reduce the use of on-site wastewater disposal systems (cesspits) and to increase the quantity of treated wastewater available for reuse in agricultural lands. Specifically, the project aimed to construct a new sewer network along with a lift station, milling and overlay of 4.5 kilometers of existing roads, and 3 kilometers of road rehabilitation. | 9/29/2017 | 4/28/2019 | 6,487,898 | 6,487,898 |
| **Yatta Distribution Network Rehabilitation and Exception Project:** This project aimed to provide a reliable, safe, and affordable water supply to Yatta through the construction of three new reservoirs, 21 km of new main supply and distribution pipelines, and 40 km of new distribution network pipelines. The existing water network in Yatta (located in Hebron Governorate) is more than 40 years old and suffers from high percentages of losses and inadequate water quantities to satisfy demand. | 9/19/2017 | 4/28/2019 | 17,760,510 | 17,760,510 |
| **Middle Area Desalination Plant Expansion Project:** This project aimed to provide an expansion to the existing desalination plant in the middle area of Gaza by 3,400 cubic meters per day of treated potable water. The planned work included new seawater intake beach well pumps, a desalination plant, a brine outfall, and a desalinated drinking water conveyance to an existing blending and storage reservoir for further distribution to the middle area. | 9/27/2016 | 6/30/2019 | 17,335,629 | 17,335,629 |
| **Palestinian Community Infrastructure Development:** This project aimed to increase Palestinians' access to water and sanitation, as well as to implement other small and medium-scale community infrastructure projects to address basic infrastructure needs in rural and vulnerable Palestinian communities. | 3/6/2013 | 12/31/2019 | 100,000,000 | 78,454,946 |

Appendix IV: Projects in the West Bank and
Gaza That USAID Ended When Economic
Support Funds Ceased

| Projects and descriptions | Award start date | Award original end date | Total estimated cost (dollars) | Total obligated amount (dollars) |
|---|---|---|---|---|
| **Creating a Competitive Edge of the Palestinian Micro, Small, and Medium-Sized Enterprises:** This project aimed to use the partnership of USAID, the Palestinian Trade Center, the Palestinian Federation of Industries, the Palestinian Shippers' Council, and the Bank of Palestine to work with enterprises. The partnership aimed to aid the firms with accessing new markets, financing, improving productivity, and lowering transaction costs associated with the export/import process. | 9/25/2017 | 3/31/2020 | 2,102,229 | 2,000,000 |
| **The Palestinian Renewable Energy Project:** This project aimed to support the modernization of the Palestinian energy sector, including promotion and integration of renewable energy and restructuring and rationalization of the traditional energy supply. | 9/30/2016 | 3/31/2020 | 13,452,807 | 8,000,000 |
| **Palestinian Agricultural Water Management Program:** This project aimed to have USAID work in partnership with the Near East Foundation, financial institutions, and others to boost commercial production, sustainability, quality, and profitability in key agricultural subsectors in the West Bank through the adoption of advanced drip irrigation and related agricultural methods to overcome water scarcity. | 9/28/2017 | 9/30/2020 | 3,000,000 | 3,000,000 |
| **Loan Guaranty Facility:** This project aimed to have USAID work with the Overseas Private Investment Corporation to support local bank lending to small and medium-sized enterprises operating in the West Bank and Gaza. This was to be accomplished via a loan guarantee to enhance the number and quality of loans from private banks operating in the West Bank to private small and medium-sized enterprises. | 9/25/2015 | 9/30/2027 | 8,300,000 | 2,500,000 |

Source: GAO analysis of U.S. Agency for International Development (USAID) data and projects documents. | GAO-21-332

Note: USAID ended the listed projects and activities when the Palestinian Authority refused continued assistance because of the passage of the Anti-Terrorism Clarification Act of 2018, Pub. L. No. 115-253 (Oct. 3, 2018), according to USAID's West Bank and Gaza mission.

**Development Objective 3:** Investing in the Next Generation. Projects falling under this objective aimed to improve access and delivery of essential services in health and education, and provide critical humanitarian assistance to vulnerable families. USAID ended two projects addressing the Investing in the Next Generation development objective because of a lack of funding when the administration redirected fiscal year 2017 funds, and ended eight ongoing projects on January 31, 2019, before their originally planned end dates, according to USAID. (See table 10.)

Appendix IV: Projects in the West Bank and
Gaza That USAID Ended When Economic
Support Funds Ceased

**Table 10: USAID Investing in the Next Generation Projects in the West Bank and Gaza That USAID Reported Ended Prematurely Because of the Cessation of Economic Support Funds, as of January 31, 2019**

| Projects and descriptions | Award start date | Award original end date | Total estimated cost (dollars) | Total obligated amount (dollars) |
|---|---|---|---|---|
| **The Youth Cohort Study:** This project aimed to conduct independent evaluation activities and examine evidence about the effectiveness of the USAID West Bank and Gaza mission's Partnership With Youth project. The study aimed to identify strategies to increase the impact of USAID's investments in youth going forward. | 9/23/2016 | 2/21/2019 | 1,226,551 | 1,226,551 |
| **Rotavirus Vaccine:** This project aimed to procure and support the administration and tracking of the Rotarix oral rotavirus vaccine to reduce the severity and potentially fatal impact of diarrheal disease associated with rotavirus infections. | 4/14/2016 | 4/13/2019 | 1,500,000 | 1,500,000 |
| **Anti-Microbial Stewardship Initiative:** This project aimed to support a 2-year grant signed by USAID and Augusta Victoria Hospital that aimed to achieve comprehensive antimicrobial stewardship gains for the Palestinian health system through collaborative infection prevention and control, microbiology laboratory strengthening, leadership, and rational use of pharmaceuticals in 22 hospitals in the West Bank and Jerusalem. | 9/8/2017 | 9/7/2019 | 750,000 | 750,000 |
| **Palestinian Health Capacity Project:** This project aimed to strengthen the Ministry of Health's institutions in order to improve access to quality care and manage costly health referrals. The current patient care practice of referring medical cases to hospitals outside the West Bank leads to significant debt for the Palestinian Authority, according to USAID. | 3/4/2013 | 9/29/2019 | 17,000,000 | 17,000,000 |
| **Al-Quds Bard Access to Success:** This project aimed to offer 10 scholarships for students to attend Al-Quds University and Bard Honors College for Liberal Arts and Sciences. These scholarships were expected to provide a unique opportunity for young Palestinians to participate locally in the Bard College learning experience through Al-Quds University. | 9/30/2014 | 9/29/2019 | 150,000 | 150,000 |
| **Al-Quds Bard Access to Success 2:** This project intended to offer a cohort of 10 graduates of the ACCESS program full scholarships at the Al-Quds University and Bard College for Arts and Sciences. The Access to Success 2 project targets young Palestinians who have been through the ACCESS Program, which is funded by the Department of State and implemented by AMIDEAST at Palestinian schools. The scholarships were awarded in academic year 2016/2017 and were intended to cover the 4 years of study until the 2019/2020 academic year. | 7/11/2016 | 7/10/2020 | 150,000 | 150,000 |

Appendix IV: Projects in the West Bank and
Gaza That USAID Ended When Economic
Support Funds Ceased

| Projects and descriptions | Award start date | Award original end date | Total estimated cost (dollars) | Total obligated amount (dollars) |
|---|---|---|---|---|
| **Liberal Arts Scholarship in the West Bank:** Under this project, the U.S. Consulate in Jerusalem (now Embassy Jerusalem) aimed to award a grant with the goal of offering 20 undergraduate scholarships to young Palestinians to study at a liberal arts college in the West Bank (Al-Quds University–Bard College Honors College in Abu Dis). The scholarships were to be awarded in academic years 2017/2018 and 2018/2019 and were to cover 4 years of study until the 2020/2021 and 2021/2022 academic years. | 6/15/2017 | 6/14/2022 | 300,000 | 150,000 |
| **Pre-Service Teacher Education Activity:** This project aimed to improve the quality and relevancy of pre-service teacher education programs. Over the life of the program, USAID and the International Research and Exchanges Board intended to upgrade two to three pre-service teacher education diploma programs and build the capacity of the Ministry of Education and Higher Education to review and accredit pre-service teacher education programs at higher education institutions. | 8/25/2017 | 8/24/2022 | 20,000,000 | 3,850,000 |
| **Early Grade Reading:** This project aimed to provide technical assistance to the Palestinian Ministry of Education and Higher Education to improve student reading and writing outcomes in kindergarten through second grade. Over the life of the activity, the program intended to improve kindergarten to second grade classroom instruction in Modern Standard Arabic in all 2,830 ministry-supported schools in the West Bank and to support the ministry's efforts to institutionalize Early Grade Reading policies, standards, and assessments. | 9/1/2017 | 8/31/2022 | 19,608,777 | 4,500,000 |
| **Education for the Future Activity:** This project aimed to expand the Leadership and Teacher Development activity to 400 additional schools and to continue the focus on teacher and principal professional development, and the introduction of information technology in education and educational supervision reform, among other things. | 9/15/2017 | 9/14/2022 | 24,513,769 | 4,200,000 |

Source: GAO analysis of U.S. Agency for International Development (USAID) data and project documents. | GAO-21-332

Notes: USAID ended two projects—Pre-Service Teacher Education Activity and Early Grade Reading—prematurely in fiscal year 2019, before January 31, 2019, because the administration redirected fiscal year 2017 funds for the West Bank and Gaza program. USAID ended the other eight listed projects and activities when the Palestinian Authority refused continued assistance because of the passage of the Anti-Terrorism Clarification Act of 2018, Pub. L. No. 115-253 (Oct. 3, 2018), according to USAID's West Bank and Gaza mission.

**Program Support:** Projects falling under program support aimed to provide general management support, including covering costs for needs assessments, baseline studies, targeted evaluations, special studies, or other information-gathering efforts specifically for the design, monitoring, and evaluation of U.S. government-funded programs. USAID ended three

Appendix IV: Projects in the West Bank and
Gaza That USAID Ended When Economic
Support Funds Ceased

program support projects on January 31, 2019, before their original end
dates, according to USAID. (See table 11.)

**Table 11: USAID Program Support Projects in the West Bank and Gaza That USAID Reported Ended Prematurely Because of the Cessation of Economic Support Funds, as of January 31, 2019**

| Projects and descriptions | Award start date | Award original end date | Total estimated cost (dollars) | Total obligated amount (dollars) |
|---|---|---|---|---|
| **Gaza Monitoring Services:** This project/contract aimed to acquire the services of a third-party contractor to perform regular verification, monitoring, and oversight of the USAID West Bank and Gaza mission's programming in Gaza. The contractor was intended to support the generation of rigorous, credible data on performance and results, provide a basis for verifying program implementation, and serve as a cross-check on reports prepared by the mission's implementing partners. | 6/28/2017 | 6/27/2020 | 834,768 | 427,876 |
| **Outreach and Communications:** This project/contract aimed to acquire the services of a third party contractor to work with the USAID West Bank and Gaza mission to implement its communication strategy. The strategy was intended to increase public awareness and disseminate information about USAID assistance to both Palestinian and global audiences in order to promote a better understanding, appreciation, and sustained support for USAID's foreign assistance among all stakeholders both in and outside of the West Bank and Gaza. | 8/24/2017 | 8/23/2020 | 1,173,365 | 350,000 |
| **Evaluation & Assessments:** This project/contract aimed to provide utilization-driven, comprehensive performance measurement, planning, performance monitoring, and evaluation services for the USAID West Bank and Gaza mission, and technical guidance to the mission and its implementing partners. These services were intended to enable the mission to fulfill its evaluation, reporting, performance monitoring, and information-sharing obligations as mandated in USAID's Automated Directives System and other agency guidance. | 8/4/2017 | 8/3/2022 | 9,368,099 | 1,380,843 |

Source: GAO analysis of U.S. Agency for International Development (USAID) data and project documents. | GAO-21-332

Note: USAID ended the listed projects and activities when the Palestinian Authority refused continued assistance because of the passage of the Anti-Terrorism Clarification Act of 2018, Pub. L. No. 115-253 (Oct. 3, 2018), according to USAID's West Bank and Gaza mission.

# Appendix V: Comments from USAID



Thomas Melito
Managing Director, International Affairs and Trade
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C.  20226

Re:    West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee
        Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks
        (GAO-21-332SU)

Dear Mr. Melito:

        I am pleased to provide the formal response of the U.S. Agency for International
Development (USAID) to the draft report produced by the U.S. Government Accountability
Office (GAO) titled, "*West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of
Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce
Risks*" *(GAO-21-332SU).*

        We applaud the GAO for noting that USAID has fully complied with antiterrorism policy
and procedures as applicable for awards made to prime partners during fiscal years 2015-2019.
This  includes requirements related to vetting of many non-U.S. recipients, antiterrorism
certifications for recipients of grants or cooperative agreements, and mandatory provisions for all
solicitations and awards, in order to ensure our program assistance does not inadvertently support
entities or individuals associated with terrorism. We also appreciate and agree with the two
recommendations made by the GAO in the draft report related to improving the oversight of
subawards, and are committed to taking actions that fully address these recommendations as
described in the enclosed comments, which will further extend USAID safeguards over the
investments made by U.S. taxpayers. We hope the final version of the GAO's report will
continue to reflect USAID's significant commitment to the proper stewardship of U.S. taxpayer
dollars.

        I am transmitting this letter and the enclosed comments from USAID for inclusion in the
GAO's final report.  Thank you for the opportunity to respond to the draft report, and for the
courtesies extended by your staff while conducting this engagement.  We appreciate the
opportunity to participate in the complete and thorough evaluation of our program in the West
Bank and Gaza.

                                        Sincerely,

                                        Colleen R. Allen

                                        Colleen Allen
                                        Acting Assistant Administrator
                                        Bureau for Management

Enclosure:  a/s

**Appendix V: Comments from USAID**

COMMENTS BY THE U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT ON THE DRAFT REPORT PRODUCED BY THE U.S. GOVERNMENT ACCOUNTABILITY OFFICE (GAO) TITLED, West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks (GAO-21-332SU)

The U.S. Agency for International Development (USAID) would like to thank the U.S. Government Accountability Office (GAO) for the opportunity to respond to this draft report.  We appreciate the extensive work of the GAO engagement team and the specific findings that will help USAID achieve greater effectiveness in compliance with USAID's antiterrorism policies and procedures.

This report has two recommendations for USAID as shown on page 33 of the draft report:

**Recommendation No. 1: The Administrator of USAID should establish a process for verifying that prime awardees have procedures in place to comply with Mission Order 21 requirements before allowing prime awardees to make subawards, should funding for USAID's West Bank and Gaza program resume.**

USAID Response:

USAID agrees with the GAO's recommendation.

USAID West Bank/Gaza's Mission Order 21 describes procedures that are meant to ensure that USAID's assistance program does not inadvertently provide support to entities or individuals associated with terrorism. As stated by GAO, in addition to determining responsibility of prime awardees in accordance with USAID Automated Directives System (ADS) 303.3.9 and Federal Acquisition Regulation (FAR) 9.104-1, as applicable, USAID West Bank/Gaza (USAID/WBG) has established a robust post-award training and compliance review process as an internal control to identify and address noncompliance with Mission Order 21 requirements. As a result and as evidenced by the GAO through the subject report, no cases of USAID providing assistance to parties who had failed vetting were identified.

As recommended by the GAO, USAID/WBG will establish a process, prior to award, that ensures that prime awardees have procedures in place to comply with Mission Order 21 requirements before allowing prime awardees to make subawards.

Prior to award and during the responsibility determination stage, the apparently successful applicants/offerors will be requested to submit their written policies/procedures that includes a section on compliance with USAID/WBG's Mission Order 21 requirements and attaching their mandatory template for subawards.

Accordingly, and taking the above into consideration, a documented risk assessment and responsibility determination of the prime awardee will then be made by the USAID/WBG Agreement/Contracting Officer.

**Appendix V: Comments from USAID**

**Recommendation No. 2: The Administrator of USAID should conduct post-award compliance reviews of prime awardees and their subawards of ESF assistance for the West Bank and Gaza program in time to identify noncompliance and take appropriate actions before the awards end, should funding for USAID's West Bank and Gaza program resume.**

USAID Response:

USAID agrees with the GAO's recommendation.

The compliance reviews are USAID/WBG's internal control tool which complements our robust audit program by assisting in identifying weaknesses and deficiencies in prime awardees internal controls that may lead to instances of non-compliance with Mission Order 21 requirements. As demonstrated and noted in the subject GAO report, no cases of USAID funding to parties who failed vetting were identified, and for parties who were never vetted, GAO's analysis found that costs were recovered.

USAID/WBG acknowledges that compliance reviews are a useful complement to our robust audit program, and that there is value to the partner organization when conducted in time to identify noncompliance and take appropriate actions before the awards end. Should funding for USAID's West Bank and Gaza program resume, and contingent upon available resources, USAID/WBG commits to conduct compliance reviews of prime awardees and their subawards within the first 18 months of implementation. This period of time will allow for an adequate and comprehensive review as mobilization and start of sub-award implementation will be sufficiently underway.

# Appendix VI: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Latesha Love, (202) 512-4409 or lovel@gao.gov |
| **Staff Acknowledgments** | In addition to the contact named above, Judith McCloskey (Assistant Director), Kathleen Monahan (Analyst-in-Charge), Timothy Young, Jesse Elrod, Mattias Fenton, Jose Pena III, Debbie Chung, Christopher Keblitis, Elizabeth Field, Justin Fisher, Rachel Stoiko, Roger Stoltz, and Alex Welsh made key contributions to this report. |

# Related GAO Products

*West Bank and Gaza: State Has Taken Actions to Address Potentially Problematic Textbook Content but Should Improve Its Reporting to Congress*. GAO-19-448. Washington, D.C.: June 4, 2019.

*Foreign Assistance: U.S. Assistance for the West Bank and Gaza, Fiscal Years 2015 and 2016*. GAO-18-612. Washington, D.C.: August 8, 2018.

*Foreign Aid: USAID Generally Complied with Its Antiterrorism Policies and Procedures for Program Assistance for West* Bank and Gaza. GAO-16-422. Washington, D.C.: April 18, 2016.

*Foreign Aid: U.S. Assistance for the West Bank and Gaza for Fiscal Years 2012-2014.* GAO-15-823. Washington, D.C.: September 22, 2015.

*Foreign Assistance: U.S. Programs Involving the Palestine Investment Fund.* GAO-13-537. Washington, D.C.: July 25, 2013.

*Foreign Assistance: U.S. Assistance to the West Bank and Gaza for Fiscal Years 2010 and 2011*. GAO-12-817R. Washington, D.C.: July 13, 2012.

*Foreign Assistance: U.S. Assistance to the West Bank and Gaza for Fiscal Years 2008 and 2009*. GAO-10-623R. Washington, D.C.: May 14, 2010.

*Foreign Assistance: Measures to Prevent Inadvertent Payments to Terrorists under Palestinian Aid Programs Have Been Strengthened, but Some Weaknesses Remain*. GAO-09-622. Washington, D.C.: May 19, 2009.

*Foreign Assistance: U.S. Assistance to the West Bank and Gaza for Fiscal Years 2005 and 2006*. GAO-07-443R. Washington, D.C.: March 5, 2007.

*Foreign Assistance: Recent Improvements Made, but USAID Should Do More to Help Ensure Aid Is Not Provided for Terrorist Activities in West Bank and Gaza.* GAO-06-1062R. Washington, D.C.: September 29, 2006.

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact FraudNet: Website: https://www.gao.gov/fraudnet/fraudnet.htm Automated answering system: (800) 424-5454 or (202) 512-7700 |
| Congressional Relations | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | Stephen J. Sanford, Acting Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.