**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ X

STUART FORCE individually and as personal
representative of the ESTATE OF TAYLOR FORCE,
*et al*.,

               Plaintiffs,

           -against-

QATAR CHARITY; QATAR NATIONAL BANK and
MASRAF AL RAYAN,

              Defendants.

------------------------------------------------------------------ X

Case No. 1:20-cv-2578-BMC

ORAL ARGUMENT
REQUESTED

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW
IN OPPOSITION TO MOTIONS TO DISMISS OF DEFENDANTS QATAR CHARITY,
QATAR NATIONAL BANK and MASRAF AL RAYAN**

James P. Bonner
Patrick L. Rocco
Susan M. Davies
Thomas M. Caroccia
FLEISCHMAN BONNER & ROCCO LLP
81 Main Street, Suite 515
White Plains, New York 10601

*Attorneys for Plaintiffs*

## Table of Contents

Preliminary Statement.................................................................Error! Bookmark not defined.

The Relevant Facts....................................................................Error! Bookmark not defined.

  A.  The Parties ....................................................................Error! Bookmark not defined.

    1.  Plaintiffs .............................................................Error! Bookmark not defined.

    2.  Qatar Charity and the Bank Defendants..................Error! Bookmark not defined.

  B.  The FTOs' Terrorism Campaign and Designation as Terrorist Organizations.......... **Error! Bookmark not defined.**

  C.  Qatar's Sponsorship of the FTOs......................................Error! Bookmark not defined.

  D.  Defendants' Conspiracy to Fund the FTOs' Violence.......Error! Bookmark not defined.

    1.  Qatar's Use of Qatar Charity to Fund the FTOs .....Error! Bookmark not defined.

    2.  The Bank Defendants Critical Role in the Conspiracy to Fund the FTOs ...... **Error! Bookmark not defined.**

  E.  All of the Defendants Knowingly Participated in the Conspiracy to Fund the FTO's Operations ..............Error! Bookmark not defined.

  F.  With the Help of Defendants' Material Support, the FTOs Committed the Attacks that Injured Plaintiffs and Killed Their Decedents ............. **Error! Bookmark not defined.**

Argument ....................................................................................Error! Bookmark not defined.

  I.  Plaintiffs Adequately Allege Secondary Liability Under JASTA Against All Defendants ..................................................................................Error! Bookmark not defined.

  A.  Plaintiffs State Valid Aiding and Abetting Claims Against All Defendants ............. **Error! Bookmark not defined.**

    1.  Plaintiffs Plausibly Allege that Hamas and PIJ Caused Their Injuries .......... **Error! Bookmark not defined.**

    2.  Plaintiffs Plausibly Allege Defendants' General Awareness of Their Roles as Part of an Overall Illegal or Tortious Activity................Error! Bookmark not defined.

    3.  Plaintiffs Plausibly Allege the "Substantial Assistance" Factors Misstated by Defendants...........................................................Error! Bookmark not defined.

      a.  Nature of Act Encouraged or Assisted ........Error! Bookmark not defined.

      b.  The Amount of Assistance Given by Defendant....... **Error! Bookmark not defined.**

      c.  Defendants' Relationships to the Principal .Error! Bookmark not defined.

      e.  Duration of the Assistance ..........................Error! Bookmark not defined.

B.  Plaintiffs Have Stated Valid Claims for Conspiracy Liability Against All Defendants
.......................................................................**Error! Bookmark not defined.**

   1.  Plaintiffs Have Alleged an Agreement Among Defendants, Qatar,  the Qatar Royal
Family, Hamas, and PIJ to Commit Terrorist Acts .**Error! Bookmark not defined.**

   2.  Plaintiffs Have Plausibly Alleged that Defendants and Their Co-Conspirators
Shared a Common Goal of Committing Unlawful Acts ....... **Error! Bookmark not
defined.**

II.  Plaintiffs Plausibly Allege a Primary Violation of the ATA............. **Error! Bookmark not
defined.**

A.  Defendants' Provision of Financial Services to Hamas
and PIJ Was Itself Terrorism as Defined by 18 U.S.C. § 2331 ....... **Error! Bookmark not
defined.**

B.  Defendants All Exhibited the Requisite *Mens Rea* ............**Error! Bookmark not defined.**

III.  All Plaintiffs Have Statutory Standing to Assert ATA Claims........ **Error! Bookmark not
defined.**

IV.  Defendants' Rule 12(b)(5) Motions Should Be Denied.....**Error! Bookmark not defined.**

V.  The Court May Exercise Personal Jurisdiction Over Each Defendant ....**Error! Bookmark
not defined.**

A.  The Standards Governing Rule 12(b)(2) Motions .............**Error! Bookmark not defined.**

B.  Fed. R. Civ. P. 4(k)(2) Provides a Basis for Exercising
Jurisdiction Over All Defendants......................................**Error! Bookmark not defined.**

   1.  No Due Process Obstacle Exists to Exercising Personal Jurisdiction Under Rule
4(k)(2) Over Defendants Who Use the United States' Financial System to Transmit
Funds to FTOs .........................................................**Error! Bookmark not defined.**

     a.  The Fundamental Jurisdictional Due Process Requirements .............. **Error!
Bookmark not defined.**

     b.  The Licci Decisions Dictate that Masraf's Use of Its U.S. Correspondent
Account to Funnel U.S. Dollars to Qatar Charity Satisfies the Minimum
Contacts Test ...............................................**Error! Bookmark not defined.**

     c.  Blackletter Agency Principles Dictate that Qatar Charity's Use  of Masraf's
Correspondent Bank Accounts to Funnel Money  to the Palestinian
Territories Satisfies the Minimum Contacts Requirement .................. **Error!
Bookmark not defined.**

     d.  The Overt Acts Masraf Undertook in New York to Further
Defendants'**Error! Bookmark not defined.** Conspiracy Support
Exercising Jurisdiction Over Each Defendant........... **Error! Bookmark not
defined.**

   2.  The Due Process Reasonableness Factors Further Support the Court's Ability to
Exercise Specific Jurisdiction Over Defendants .....**Error! Bookmark not defined.**

C.   CPLR § 302(a) Provides an Alternative Statutory  Basis for Personal Jurisdiction Over all Defendants ......................................................................**Error! Bookmark not defined.**

D.   If the Court Finds Plaintiffs' Jurisdictional Allegations Inconclusive,  Plaintiffs Request the Opportunity to Conduct Jurisdictional Discovery .......**Error! Bookmark not defined.**

Conclusion ..................................................................................**Error! Bookmark not defined.**

# Table of Authorities

## Cases                                                                    Page(s)

*Adams v. Unione Mediterranea di Sicurta*,
    364 F.3d 646 (5th Cir. 2004) .......................................................................... 58

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) .................................................................................... 76

*Alexander v. Porter*,
    2014 U.S. Dist. LEXIS 177841 (E.D.N.Y. Dec. 23, 2014) ............................... 83

*Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*,
    457 F. Supp. 3d 401 (S.D.N.Y. 2020) ........................................................ 72-73

*APWU v. Potter*,
    343 F.3d 619 (2d Cir. 2003) ..................................................................... 81, 82

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
    2022 U.S. App. LEXIS 6365 (2d Cir. Mar. 11, 2022) ......................... 11, 14, 15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 19, 20

*Ashton v. al Qaeda Islamic Army*,
    2018 U.S. Dist. LEXIS 158369 (S.D.N.Y. Sept. 13, 2018) ............................. 53

*Atchley v. Astrazeneca UK Ltd.*,
    2022 U.S. App. LEXIS 99 (D.C. Cir. Jan. 4, 2022) ................................... 59, 74

*Ayyash v. Bank Al-Madina*,
    2006 U.S. Dist. LEXIS 9677 (S.D.N.Y. Mar. 9, 2006) ............................. 81, 82

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    171 F.3d 779 (2d Cir. 1999) .......................................................................... 80

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    305 F.3d 120 (2d Cir. 2002) ..................................................................... 74, 75

*Bank Markazi v. Peterson*,
    136 S. Ct. 1310 (2016) .................................................................................. 74

*Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*,
    821 F.3d 297 (2d Cir. 2016) .......................................................... 66-67, 70, 71

*Banque Worms v. BankAmerica Int'l*,
    77 N.Y.2d 362 (1991) .................................................................................... 61

*Bartlett v. Société Générale De Banque Au Liban Sal*,
    2020 U.S. Dist. LEXIS 229921 (E.D.N.Y. Nov. 25, 2020) ............................. 63

*Berdeaux v. OneCoin Ltd.*,
    2021 U.S. Dist. LEXIS 178816 (S.D.N.Y. Sept. 20, 2021) .......................................... *passim*

*Berkshire Bank v. Lloyds Banking Grp. PLC*,
    2022 U.S. App. LEXIS 5095 (2d Cir. Feb. 25, 2022) ................................ 71, 72, 76, 79, 80

*Boim v. Holy Land Foundation for Relief and Development*,
    549 F.3d 685 (7th Cir. 2008) ................................................................................. 45, 46, 48

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ........................................................................................... 59, 60, 73

*Burnett v. Islamic Republic of Iran*,
    2020 U.S. Dist. LEXIS 26368 (S.D.N.Y. Feb. 14, 2020) ....................................... 53

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
    2020 U.S. Dist. LEXIS 89839 (S.D. Fla. May 20, 2020) ....................................... 52

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018) ("*Schwab I*") .................................................. 69, 71, 72

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010) ................................................................................. 60

*Cleveland v. Caplaw Enters.*,
    448 F.3d 518 (2d Cir. 2006) ................................................................................. 69

*Cmty. Fin. Grp. Inc. v. Stanbic Bank Ltd.*,
    2015 U.S. Dist. LEXIS 89904 (S.D.N.Y. July 10, 2015) ....................................... 62

*Comer v. Cisneros*,
    37 F.3d 775 (2d Cir. 1994) ................................................................................. 51

*Compañía De Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*,
    970 F.3d 1269 (10th Cir. 2020) ......................................................................... 58

*Copeland v. Twitter*,
    352 F. Supp. 3d 965 (N.D. Cal. 2018) ........................................................... 21-22

*Crosby v. Twitter, Inc.*,
    921 F. 3d 617 (6th Cir. 2019) ............................................................................. 21

*CutCo Indus. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986) ........................................................................... 69, 76

*Dale v. Banque SCS Alliance S.A.*,
    2005 U.S. Dist. LEXIS 20967 (S.D.N.Y. Sept. 22, 2005) ................................. 77

*Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*,
    7 N.Y.3d 65 (2006) ......................................................................................... 77

*Domingues v. Barton Chevrolet Cadillac*,
    2021 U.S. Dist. LEXIS 29425 (S.D.N.Y. Feb. 17, 2021) ................................. 37

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
   722 F.3d 81 (2d Cir. 2013) .................................................................................. 57

*Essex Universal Corp. v. Yates*,
   305 F.2d 572 (2d Cir. 1962) ................................................................................ 28

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
   495 F. Supp. 3d 144 (E.D.N.Y. 2020)..................................... 18-19, 51, 52, 53

*Estates of Ungar ex rel. Strachman v. Palestinian Authority*,
   304 F. Supp. 2d 232 (D.R.I. 2004) ............................................................... 51, 54

*Fed. Home Loan Mortg. Corp. v. Steinfeld*,
   1992 U.S. Dist. LEXIS 20616 (E.D.N.Y. Dec. 23, 1992) ................................. 55

*Flatow v. Islamic Republic of Iran*,
   999 F. Supp. 1 (D.D.C. 1998) ............................................................................ 74

*Fogel v. Hertz Int'l, Ltd.*,
   141 A.D.2d 375 (1st Dep't 1988) ................................................................. 68-69

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
   141 S. Ct. 1017 (2021) ................................................................................. 59, 63

*Freeman v. HSBC Holdings PLC*,
   413 F. Supp. 3d 67 (E.D.N.Y. 2019) ("*Freeman I*") ...................... 40, 41, 43, 78

*Freeman v. HSBC Holdings PLC*,
   2018 U.S. Dist. LEXIS 127289 (Jul. 27, 2018) ............................................... 41

*Gallop v. Cheney*,
   642 F.3d 364 (2d Cir. 2011) ............................................................................. 39

*Gen. Dynamics Land Sys., Inc. v. Cline*,
   540 U.S. 581 (2004) ......................................................................................... 40

*Gentry v. Kaltner*,
   2020 U.S. Dist. LEXIS 54182 (S.D.N.Y. Mar. 25, 2020) ............................... 82

*Gill v. Arab Bank, PLC*,
   893 F. Supp. 2d 474 (E.D.N.Y. 2012) .............................................................. 48

*Gonzalez v. Google LLC*,
   2 F.4th 871 (9th Cir. 2021) .............................................................................. 21

*Green v. H & R Block, Inc.*,
   735 A.2d 1039 (Md. 1999) ................................................................................ 69

*Group One Ltd. v. GTE GmbH*,
   523 F. Supp. 3d 323 (E.D.N.Y. 2021) .............................................................. 56

*Grove Press, Inc. v. Angleton*,
   649 F.2d 121 (2d Cir. 1981) ............................................................................. 69

*GSS Grp. Ltd. v. Nat'l Port Auth. of Liber.*,
    822 F.3d 598 (D.C. Cir. 2016) ................................................................. 28, 30

*Gulf Coast Dev. Grp. v. Lebror*,
    2003 U.S. Dist. LEXIS 21740 (S.D.N.Y.  Dec. 4, 2003) ................... 77

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ......................................... 19, 22, 32, 37

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ............................................................................. 36-37

*Hollins v. U.S. Tennis Ass'n*,
    469 F. Supp. 2d 67 (E.D.N.Y. 2006) ...................................................... 81

*Hypefortype Ltd. v. Universal Music Grp., Inc.*,
    2017 U.S. Dist. LEXIS 150500 (E.D.N.Y. Sept. 17, 2017) .............. 57

*Honickman v. BLOM Bank SAL*
    6 F.4th 487 (2d Cir. 2021) ............................................................. *passim*

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009) .................................................................. 23

*In re Parmalat Sec. Litig.*,
    640 F. Supp. 2d 243 (S.D.N.Y. Feb. 25, 2009) ................................... 66

*In re Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020) .................................................. 72

*In re Terrorist Attacks on Sept. 11*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ........................................... 30, 83

*In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi)*,
    714 F.3d 118 (2d Cir. 2013) ........................................................... 30, 63

*In re Terrorist Attacks on Sept. 11*,
    2017 U.S. Dist. LEXIS 128288 (S.D.N.Y. Aug. 8, 2017) .................. 53

*In re Trump Hotels Shareholder Derivative Litig.*,
    2000 U.S. Dist. LEXIS 13550 (S.D.N.Y. Sept. 21, 2000) .................. 28

*Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*,
    98 N.Y.2d 238 (2002) ........................................................................... 77

*Jain v. T & C Holding Inc.*,
    2011 U.S. Dist. LEXIS 23788 (S.D.N.Y.  Mar. 3, 2011) .................... 77

*Jerusalem NY Enters. LLC v. Huber Erectors & Hoisting, LLC*,
    2021 U.S. Dist. LEXIS 235326 (E.D.N.Y. Dec. 8, 2021) ................... 83

*John Minder & Son, Inc. v. L.D. Schreiber Co.*,
    73 F. Supp. 477 (S.D.N.Y. 1947) ........................................................ 67

*Kaplan v. Lebanese Canadian Bank, SAL,*
    405 F. Supp. 3d 525 (S.D.N.Y. 2019) ............................................................. 42

*Kaplan v. Lebanese Canadian Bank, SAL,*
    999 F.3d 842 (2d Cir. 2021) ............................................................. *passim*

*Kemper v. Deutsche Bank AG,*
    911 F.3d 383 (7th Cir. 2018) ............................................................. 46, 47

*Khodeir v. Sayyed,*
    348 F. Supp. 3d 330 (S.D.N.Y. 2018) ............................................................. 69

*Kirschner v. KPMG LLP,*
    15 N.Y.3d 446 (2010) ............................................................. 67

*Kreutter v. McFadden Oil Corp.,*
    71 N.Y.2d 460 (1988) ............................................................. 66, 67

*Lelchook v. Commerzbank AG,*
    2011 U.S. Dist. LEXIS 106305 (S.D.N.Y. Aug. 2, 2011) ............................................................. 51, 52

*Leon v. Shmukler,*
    992 F. Supp. 2d 179 (E.D.N.Y. 2014) ............................................................. 81, 82

*Licci v. Lebanese Canadian Bank, SAL,*
    673 F.3d 50 (2d Cir. 2012) ("*Licci I*") ............................................................. 57, 58, 61, 76, 77

*Licci v. Lebanese Canadian Bank,*
    20 N.Y.3d 327 (2012) ("*Licci II*") ............................................................. 61, 62, 68, 77

*Licci v. Lebanese Canadian Bank,*
    732 F.3d 161 (2d Cir. 2013) ("*Licci III*") ............................................................. *passim*

*Likewise, Suber v. VVP Servs., LLC,*
    2021 U.S. Dist. LEXIS 184529 (S.D.N.Y. Sept. 27, 2021) ............................................................. 78

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018) ............................................................. *passim*

*Linde* v. Arab Bank, PLC
    97 F. Supp. 3d 287 (E.D.N.Y. 2018) ............................................................. 46

*Maersk, Inc. v. Neewra, Inc.,*
    554 F. Supp. 2d 424 (S.D.N.Y. 2008) ............................................................. 72

*Marine Midland Bank v. Miller,*
    664 F.2d 899 (2d Cir. 1981) ............................................................. 55, 57

*McKee Elec. Co. v. Rauland-Borg Corp.,*
    20 N.Y.2d 377 (1967) ............................................................. 76

*Mednik v. Specialized Loan Servicing, LLC,*
    2021 U.S. Dist. LEXIS 34059 (E.D.N.Y. Feb. 23, 2021) ............................................................. 83

vii

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996) ............................................................... 75

*Miller v. Arab Bank*,
  372 F. Supp. 3d 33 (E.D.N.Y. 2019) ........................................... *passim*

*Moran v. Household Int'l, Inc.*,
  490 A.2d 1059 (Del. Ch. 1985) ....................................................... 28

*Mullane v. Central Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950) ........................................................................ 56

*N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*,
  266 F.3d 112 (2d Cir. 2001) ...................................................... 66, 70

*NYKCool A.B. v. Pacific Int'l Servs.*,
  2015 U.S. Dist. LEXIS 27434 (S.D.N.Y. Mar. 5, 2015) .................... 56

*Ochoa v. J.B. Martin & Sons Farms*,
  287 F.3d 1182 (9th Cir. 2002) ..................................................... 60, 73

*O'Sullivan v. Deutsche Bank AG*,
  2019 U.S. Dist. LEXIS 53134 (S.D.N.Y. Mar. 28, 2019) ............... 39, 42

*Paroline v. United States*,
  572 U.S. 434 (2014) ........................................................................ 48

*Pearson Educ. Inc. v. Doe 1*,
  2019 U.S. Dist. LEXIS 210349 (S.D.N.Y. Dec. 2, 2019) .................. 56

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*,
  530 F. Supp. 3d 301 (S.D.N.Y. 2021) ............................................ 79

*Rich v. Fox News Network LLC*,
  2020 U.S. Dist. LEXIS 170811 (S.D.N.Y. Sept. 15, 2020) .............. 78

*Rosenberg v. Lashkar-E_Taiba*,
  2017 U.S. Dist. LEXIS 52116 (E.D.N.Y. Mar. 21, 2017) ................ 54

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000) ......................................................... 8, 10

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) ................................................. 36, 48, 49

*Rudersal v. Harris*,
  2022 U.S. Dist. LEXIS 160004 (S.D.N.Y. Jan 28, 2022) ................ 72

*S. New Eng. Tel. Co. v. Global NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010) .......................................................... 57

*Sajimi v. City of New York*,
  2011 U.S. Dist. LEXIS 3912 (E.D.N.Y. Jan. 13, 2011) ............... 55-56

*Schansman v. Sberbank of Russ. PJSC*,
　2021 U.S. Dist. LEXIS 188647 (S.D.N.Y. Sept. 30, 2021) ..................................... 63

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
　2021 U.S. App. LEXIS 38618 (2d Cir. Dec. 30, 2021) ("*Schwab II*") ................................. 71, 72, 80

*Sea Trade Mar. Corp. v. Coutsodontis*,
　2012 U.S. Dist. LEXIS 119206 (S.D.N.Y. Aug. 15, 2012) .................................... 72

*Siegel v. HSBC North America Holdings, Inc.*,
　933 F.3d 217 (2d Cir. 2019) ............................................................... 30

*Singer v. Bank of Palestine*,
　2021 U.S. Dist. LEXIS 177860 (E.D.N.Y. Apr. 30, 2021) .................................... 81

*SL-x IP S.Á.R.L. v. Bank of Am. Corp.*,
　2021 U.S. Dist. LEXIS 189901 (S.D.N.Y. Sept. 30, 2021) ................................... 73

*Smith ex rel. Smith v. Islamic Emirate of Afg.*,
　262 F. Supp. 2d 217 (S.D.N.Y. 2003) ..................................................... 53

*Spetner v. Palestine Inv. Bank*,
　495 F. Supp. 3d 96 (E.D.N.Y. 2020) ...................................................... 65

*SPV OSUS, Ltd. v. UBS AG*,
　882 F.3d 333 (2d Cir. 2018) .............................................................. 63

*Strauss v. Credit Lyonnais, S.A.*,
　925 F. Supp. 2d 414 (E.D.N.Y. 2013) ..................................................... 63

*Tamam v. Fransabank SAL*,
　677 F. Supp. 2d 720 (S.D.N.Y. 2010) .............................................. 64, 68, 82

*Tescher v. Experian Info. Sols., Inc.*,
　2022 U.S. Dist. LEXIS 31759 (S.D.N.Y. Feb. 23, 2022) ..................................... 36

*Toppel v. Marriott Int'l, Inc.*,
　2006 U.S. Dist. LEXIS 60529 (S.D.N.Y. Aug. 24, 2006) .................................... 68

*Trueposition, Inc. v. Sunon, Inc.*,
　2006 U.S. Dist. LEXIS 39681 (E.D. Pa. June 14, 2006) ..................................... 55

*U.S. Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*,
　916 F.3d 143 (2d Cir. 2019) .......................................................... 58-59, 60

*Uebler v. Boss Media*,
　363 F. Supp. 2d 499 (E.D.N.Y. 2005) ..................................................... 81

*Unique Indus., Inc. v. Sui & Sons Int'l Trading Corp.*,
　2007 U.S. Dist. LEXIS 83725 (S.D.N.Y. Nov. 9, 2007) ..................................... 82

*United States v. Alessi*,
　638 F.2d 466 (2d Cir. 1980) .............................................................. 41

*United States v. El-Mezain,*
    664 F.3d 467 (5th Cir. 2011) ................................................................... 63

*United States v. Friedman,*
    854 F.2d 535 (2d Cir. 1989) ................................................................... 41

*United States v. Rooney,*
    866 F.2d 28 (2d Cir. 1989) ..................................................................... 41

*Universal Trading & Inv. Co. v. Tymoshenko,*
    2012 U.S. Dist. LEXIS 176214 (S.D.N.Y. Dec. 12, 2012) ...................... 70

*Vasquez v. H.K. & Shanghai Banking Corp.,*
    2020 U.S. Dist. LEXIS 142607 (S.D.N.Y. Aug. 10, 2020) ...................... 70

*Vega v. Hastens Beds, Inc.,*
    339 F.R.D. 210 (S.D.N.Y. 2021) ............................................................ 56

*Volkart Bros., Inc. v. M/V "Palm Trader,"*
    1989 U.S. Dist. LEXIS 3575 (S.D.N.Y. April 5, 1989) .......................... 66

*Walden v. Fiore,*
    571 U.S. 277 (2014) ............................................................................... 78

*Weiss v. National Westminster Bank PLC,*
    453 F. Supp. 2d 609 (E.D.N.Y. 2006) .................................................... 53

*Weiss v. National Westminster Bank PLC,*
    768 F.3d 202 (2d Cir. 2014) ................................................................... 28

*Weiss v. National Westminster Bank PLC,*
    176 F. Supp. 3d 264 (E.D.N.Y. 2016) ........................................ 58, 59, 63

*Weiss v. National Westminster Bank PLC,*
    278 F. Supp. 3d 636 (E.D.N.Y. Sept. 30, 2017) .................................... 41

## Statutes

Justice Against State Sponsors of Terrorism Act,
  Pub. L. No. 114222, 130 Stat. 852 (2016) ...................................................... *passim*

18 U.S.C. § 2331 ............................................................................. 3, 43, 45, 46, 47

18 U.S.C. § 2333(a) ......................................................................... 48, 54, 51, 53, 57

18 U.S.C. § 2333(d) .............................................................................. 18, 37, 41

18 U.S.C. § 2333(d)(1) .................................................................................... 41

18 U.S.C. § 2333(d)(2) ................................................................................. 3, 40

18 U.S.C. § 2339A ........................................................................................... 50

18 U.S.C. § 2339B ........................................................................................... 50

N.Y. CPLR § 302(a)(1) .......................................................................... *passim*

N.Y. CPLR § 302(a)(2) ................................................................................ 79, 80

N.Y. CPLR § 302(a)(3)(ii) ............................................................................... 64

## Rules

Fed. R. Civ. P. 4(k)(2) ........................................................... 57, 58, 72, 75, 80

Fed. R. Civ. P. 9(b) .......................................................................................... 23

Fed. R. Civ. P. 4(f)(1) ...................................................................................... 56

Fed. R. Civ. P. 4(f)(2) ................................................................................. 54, 55

Fed. R. Civ. P. 4(f)(3) ................................................................................. 55, 56

Fed. R. Civ. P. 4(l)(2)(B) ................................................................................ 54

Fed. R. Civ. P. 12(b)(2) .............................................................................. 57, 83

Fed. R. Civ. P. 12(b)(5) .............................................................................. 54, 55

## Other Authorities

*Restatement 2d of Agency (1958)* ........................................................... 68, 69

*Restatement 3d of Agency* (2006) .............................................................. 66, 69

4 Wright & Miller, *Federal Practice & Procedure* (5th ed. 2019) ........................... 60

### PRELIMINARY STATEMENT

Plaintiffs are the victims of the tragic, longstanding campaign of violence perpetrated by the militant Palestinian terrorist groups Hamas and Palestinian Islamic Jihad ("PIJ"), both of which the U.S. government has designated as Foreign Terrorist Organizations. This case involves ten of the thousands of attacks that Hamas and PIJ (the "FTOs") have launched in the past decades in pursuit of their stated objective of destroying Israel and its Jewish population.

While one would hope that the FTOs' abhorrent conduct would soon starve them of funding, quite the opposite is true. The devotees to the FTOs' radical, violent objectives include the government and Royal Family of Qatar, which controls each of the Defendants in this action—Qatar Charity, Masraf al Rayan Bank ("Masraf") and Qatar National Bank ("QNB") (collectively, "Defendants").

The Qatari government and Royal Family have long served as principal benefactors of the FTOs and have provided Hamas with billions of dollars in funding in recent years. By virtue of their controlling share ownership in Masraf and QNB (collectively, the "Bank Defendants"), Qatar and its Royal Family induced the Bank Defendants to embark on a Qatar-led conspiracy to fund the FTOs' operations through defendant Qatar Charity, which Qatar and its Royal Family also control.

The Bank Defendants agreed to participate in that conspiracy even though Qatar Charity has long served as a principal funder of the FTOs and as a member of the Union of Good, a U.S. government-designated terrorist organization that exists to raise funds for Hamas. In 2008, because of Qatar Charity's membership in the Union of the Good and support for Hamas, Israel barred Qatar Charity from operating in the Palestinian Territories. Simultaneously, Israel announcing to *all* financial institutions that providing services to Qatar Charity would produce potential criminal and civil liability, particularly to victims of terrorism.

That well-publicized designation did not deter any Defendant from participating in the Qatar-led conspiracy to fund the FTOs' operations through Qatar Charity.  Rather, with the blessing of their controlling shareholders and regulator, the Bank Defendants passed millions of dollars earmarked for the FTOs to Qatar Charity between 2011 and 2015.

The scope of Defendants' conspiracy is all the more remarkable because governments, regulators, banking industry organizations and the courts have long recognized that terrorist organizations rely heavily upon funding provided by purported "charities" that launder money for terrorist groups and their front organizations.  Banks universally employ "know-your-customer," due diligence, anti-money laundering, and counter-terrorism finance procedures to protect themselves from entanglements with terrorist organizations and their fronts.

The Bank Defendants blatantly violated those universally accepted banking norms. Because of the FTOs' infamy, nobody living or doing business in Israel or the Palestinian Territories—least of all financial institutions—could remain ignorant of the FTOs' existence and violent objectives.  Nor could the Bank Defendants fail to recognize Qatar Charity's links to terror financing, particularly given Israel's very public designation and the Bank Defendants' access to Qatar Charity's financial records.

Yet, in response to Plaintiffs' Complaint, the two Bank Defendants feign surprise that Qatar Charity maintained any link to terrorist organizations.  For its part, Qatar Charity manages to file a 36-page memorandum of law, supported by 596 pages of exhibits, without mentioning the 2017 criminal conviction of its Director in the West Bank, Judeh Jamal, for laundering funds through Masraf's New York correspondent banking account for use by the banned Qatar Charity in the Palestinian Territories.

Starting from their fictional premise of blind ignorance, Defendants unsuccessfully attempt to fashion a host of defenses to Plaintiffs' claims under the Anti-Terrorism Act ("ATA"),

18 U.S.C. § 2331 *et seq.*, including the aiding-and-abetting and conspiracy claims enacted by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114222, 130 Stat 852 (2016). But Plaintiffs' allegations negate all of those defenses at the pleading stage, where Defendants' denials of the Complaint's facts have no consequence.

First, Plaintiffs allege aiding-and-abetting and conspiracy claims under JASTA's 18 U.S.C. § 2333(d)(2). Plaintiffs identify Qatar Charity as a principal fundraiser and front for the FTOs. Pursuant to the Qatar-led conspiracy, the Bank Defendants intentionally and substantially assisted Qatar Charity's efforts to provide the FTOs with funding and other financial support. The Bank Defendants accomplished that objective by offering Qatar Charity a full array of banking services, including savings accounts, wire transfers, and giving Qatar Charity access to the U.S.-based correspondent banking accounts that permitted Qatar Charity to transact in the U.S. dollars ("USD") the FTOs use to run their operations. QNB also recruited as customers a "Who's Who" list of Hamas terrorists living in exile in Qatar, including active members of Hamas's senior leadership, all of whom use their QNB accounts to fund Hamas's operations.

Moreover, the Bank Defendants provided those financial services to Qatar Charity with knowledge of its membership in the Union of Good and funding of the FTOs' operations. Thus, Defendants' actions created the danger of precisely what occurred here—the FTOs used the funds provided to them to continue their violent operations. These facts plead aiding-and-abetting and conspiracy claims under JASTA.

For similar reasons, Plaintiffs have adequately pled their ATA primary liability claims. Defendants advance a series of misguided challenges to that conclusion that the Court has already rejected in *Miller v. Arab Bank*, and with good reason. As the Court held in *Miller,* no doctrinal basis exists for treating the funding of an organization like Qatar Charity—that serves as a front for FTOs—differently than financing the FTOs themselves. The Bank Defendants'

funding of Qatar Charity therefore created a risk of the violence that injured Plaintiffs and killed their loved ones, and thus constitutes a proximate cause of their injuries.  Defendants' conduct also both "endangered human life" and appeared to be intended "to coerce a civilian population" or influence a government's policies.  Lastly, Defendants' contentions that they lack the *mens rea* necessary to sustain the primary liability claim raises factual issues the Court cannot resolve in this context.

Defendants' other principal argument challenges the Court's ability to exercise personal jurisdiction over them.  Masraf's arguments again ignore Mr. Jamal's conviction for laundering USD through New York for the benefit of his banned employer, Qatar Charity.  The *Licci* cases dictate that those "correspondent banking" transactions suffice to establish jurisdiction over Masraf.  Since the transfers through New York were undertaken for Qatar Charity's benefit by its agent, Masraf, Qatar Charity is also subject to jurisdiction.  Lastly, in contrast to some older cases, three recent decisions from the Second Circuit have held that the in-forum actions of conspirators provide an adequate basis for exercising jurisdiction over their out-of-forum co-conspirators.  Thus, Masraf's New York correspondent banking transactions suffice to establish personal jurisdiction over all Defendants pursuant to these conspiracy principles.

THE RELEVANT FACTS

A. **The Parties**

1. **Plaintiffs**

Plaintiffs are victims of Defendants' lengthy, material and ongoing support of the violent campaign that the U.S.-designated FTOs Hamas and PIJ have undertaken to terrorize individuals who reside in and visit Israel and the Palestinian Territories.  ¶¶ 2-4, 90, 119-27, 139, 182.[1]

---

[1]  References in the format ¶ __ are to Plaintiffs' Complaint filed on June 10, 2020 [ECF 1].

Plaintiffs include the representatives of individuals killed by Hamas and PIJ, people injured directly by the FTOs' attacks, and the family members of the foregoing individuals that the ATA empowers to bring solatium claims.  ¶¶ 14-65.

### 2.  Qatar Charity and the Bank Defendants

Qatar Charity is a Qatari organization well-known for funding terrorism throughout the Middle East and North Africa.  ¶¶ 68-78.  The Qatari government and Royal Family control Qatar Charity by virtue of the positions the Royal Family occupy at Qatar Charity (including the role of Chairman).  ¶¶ 5, 85, 155.

Masraf, a publicly held company headquartered in Doha, Qatar, is one of the world's largest Islamic banks.  ¶ 86.  The Qatari government and Royal Family control Masraf through their 28% ownership of the bank's stock, board memberships and the regulatory power that the Qatari government exerts over Masraf.  ¶ 88-89.

QNB is a Qatari bank headquartered in Doha.  ¶ 95.  The Qatari government and Royal Family control QNB by virtue of their 50% ownership of the company's stock, membership on the bank's board, and the regulatory authority that they exert over QNB.  ¶¶ 96-97.

### B.  The FTOs' Terrorism Campaign and Designation as Terrorist Organizations

Hamas and PIJ are radical Islamist organizations committed to destroying Israel by violent means.  ¶¶ 105-07.  They pursue terrorism to induce Israel and U.S. to alter their policies. ¶¶ 105-07.  For decades, the FTOs' violence has posed a constant threat to people in Israel and the Palestinian Territories, including Americans.  ¶¶ 108, 113-17.  The U.S. designated Hamas and PIJ as FTOs in 1997 and has maintained that designation since then.  ¶ 115.[2]

---

[2] In October 2001, the U.S. also designated Hamas and PIJ as Specially Designated Global Terrorists (SDGT) by means of Executive Order 13224.  *See* https://www. state.gov/executive-order-13224/).  In January 1995, the U.S. designated both FTOs as Specially Designated

**C.  Qatar's Sponsorship of the FTOs**

Since at least 2006, Qatar has maintained an official state policy of supporting Hamas and PIJ.  ¶¶ 2, 120.  Over the past 15 years, the Qatari government and Royal Family have served as Hamas's largest sponsors.  ¶¶ 120-27.  Between 2012 and 2018, Qatar officially provided Hamas with over $1.1 billion in funding.  ¶ 127.

In response to Qatar's October 2012 pledge to provide $400 million to Hamas, 24 members of Congress wrote to the Qatari ambassador to the U.S., stating that Qatar's support of "Hamas, a U.S.-designated [FTO] . . .  legitimizes, and bolsters an organization committed to violence and hatred."  ¶ 125.  That criticism did not slow Qatar's support for Hamas.  For example, a "secret" 2013 memo to a Royal Family member that served as Qatar's Prime Minister and Foreign Minister revealed that Qatar's central bank had implemented his instruction to pay $250 million directly to Hamas' leader, Khaled Meshal.  ¶ 126.

Because of Qatar's unwavering support of the FTOs, the U.S. Department of the Treasury ("Treasury") has identified Qatar as an especially "permissive jurisdiction" for terrorist financing and has emphasized that Qatar "has for many years openly financed Hamas."  ¶ 122. Defendants' briefs ignore these facts, thus underscoring the impropriety of their efforts to contradict the Complaint's allegations.

Qatar's neighbors in the Middle East have also sanctioned it as a result of its terror financing.  In 2017, Saudi Arabia, Bahrain, Egypt, and the United Arab Emirates ("UAE") cut ties with Qatar due to Doha's connections with, and support of, terrorist organizations.  ¶ 123. Again, Defendants' efforts to rationalize those designations are inappropriate in this context.

Since 2012, Qatar has also promoted the FTOs' violence by providing safe haven to

---

Terrorists (SDTs) by means of Executive Order 12947, which targets terrorists who threaten to disrupt the Middle East peace process. *See* https://home.treasury.gov/news/press-releases/sm761.

convicted Hamas terrorists, including members of the organization's political leadership.  ¶ 124.
That arrangement has empowered Hamas to plan its terrorism unfettered by constraints a normal
government would impose upon that illicit conduct.[3]

## D.  Defendants' Conspiracy to Fund the FTOs' Violence

### 1.  Qatar's Use of Qatar Charity to Fund the FTOs

Hamas and PIJ require significant funding to carry out their terrorism in Israel and the
Palestinian Territories.  ¶¶ 110, 118.  As governments, regulators, banking associations, and the
courts have highlighted, the FTOs employ a financing structure heavily dependent upon
purported "charities," such as Qatar Charity.  ¶¶ 4, 72, 81, 98, 102-04, 110, 118, 137, 170.  Those
organizations raise money—often by emphasizing their charitable works—and then route a
portion of the funds to terrorist and other operational uses.  ¶¶ 104, 110.  The supposed charities
also aid the FTOs by helping to identify and recruit potential terrorists.  ¶¶ 103-04, 110.

The FTOs' violent and "charitable" wings operate seamlessly, with each working to
support terrorist operations and to achieve the illegal objectives of the terrorist group as a whole.
¶¶ 101, 110.  Thus, even when the FTOs and their "charitable" fronts undertake work for the
public benefit, every dollar they collect promotes the terrorist organizations' violence.  ¶¶ 101-
04, 110.  The charitable expenditures facilitate the fundraising efforts of the FTOs and their
fronts, and thereby generate the cash the FTOs need to acquire and maintain the weapons,
explosives, transportation and recruitment services, training, and salaries that they use to conduct
their violent operations.  ¶¶ 104, 110.  The positive public relations that the supposedly
charitable expenditures create also heighten the FTOs' standing in the Palestinian community,

---

[3] The Hamas terrorists who have benefited from the safe haven that Qatar provides include:
Khaled Mashal, the Chairman of Hamas's Politburo between 1996 and 2017; Ismail Haniyeh,
who succeeded Mashal in the Chairman's position; and Yehia Sinwar and Rawhi Mushtaha, two
founders of Hamas's military wing.  ¶¶ 124, 176.

thus helping to recruit terrorist foot soldiers.  ¶¶ 104, 110.

Consistent with that common pattern of using purportedly charitable funds to finance terrorism, the Qatari government and Royal Family exploited the control they exert over the three Defendants to induce their participation in a conspiracy to fund the FTOs' operations. ¶¶ 4-9, 87-90, 128-34, 155.  Defendants have carried out that conspiracy through coordinated activity designed to pass money to the FTOs in the guise of charitable contributions made by Qatar Charity and by providing banking services to Hamas and PIJ terrorists who fund the FTOs through those accounts.  ¶¶ 128-34.

The insurance regime that the FTOs have implemented for their operatives and their family members also promotes the FTOs' violence.  Since Plaintiffs filed their Complaint, they learned that Qatar Charity's payments to the FTOs' operatives and their family members included distributing thousands of anonymous debit cards known as "Sanabel Cards" that Qatar Charity obtained from the Bank of Palestine.  *See* Declaration of James P. Bonner executed on March 25, 2022 ("Bonner Decl.") at Ex. 1 (Complaint filed in *Henkin, et al. v. Qatar Charity, et al.*, 1:21-cv-5716-AMD-VMS (E.D.N.Y.) on October 13, 2021) at ¶¶ 149-54.[4]  The Sanabel Card scheme allowed operatives to fund their personal financial needs while they planned terrorist attacks and to make the limited expenditures the attacks required, such as securing ammunition and purchasing gasoline.  *Id.* at ¶ 151.  The Sanabel Card scheme also provided insurance for terrorists and their family members if operatives were imprisoned, injured or killed. *Id.* at ¶¶ 152-54.

---

[4]  Plaintiffs respectfully request the Court exercise its discretion to take judicial notice of the allegations in the more recently filed *Henkin* case, in which Plaintiffs' counsel represent other plaintiffs who assert identical claims against the same three Defendants. *See, e.g., Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (the court may take judicial notice of pleadings in other lawsuits).  Defendants' counsel of record in this action also represent them in the *Henkin* case.

While Qatar Charity cites a litany of irrelevant hearsay to portray itself as a benevolent actor, the U.S. government has recognized that Qatar Charity has long served as a principal sponsor of the FTOs and other terrorist organizations, including al-Qaeda.  ¶¶ 68-79.  Indeed, in March 2008, the U.S. Interagency Intelligence Committee on Terrorism ("IICT") of the U.S. National Counterterrorism Center listed Qatar Charity (then known as Qatar Charitable Society) as a "priority III terrorism support entity (TSE)" because of its "intent and willingness" to support terrorist organizations that attack the U.S. and its interests.  ¶ 68.  Moreover, Congressional testimony has revealed that Qatar Charity's "charitable mission represented little more than an excuse to provide material support to terrorists."  ¶ 72.[5]

Qatar Charity's annual reports for 2013, 2014, and 2015 demonstrate that it transferred funds to, and carried out joint projects with, multiple Hamas and PIJ fronts.  ¶ 131.  Qatar Charity's beneficiaries include the Elehssan Society, which Treasury designated "a charitable front for [PIJ]" in 2005.  ¶ 131-32.  Treasury emphasized that: (a) "in addition to its use as a financial conduit, Elehssan is used by PIJ to recruit for its operational cadre"; (b) Elehssan opened a youth center "to support PIJ activity and conduct PIJ-related recruitment and training"; and (c) like other FTO fronts, Elehssan "masquerades as a charity, while actually helping to finance [PIJ's] acts of terror against the Israeli people and other innocents."  ¶¶ 132-33.[6]

---

[5] Qatar Charity purports to challenge the provenance of these allegations, but those arguments must await trial.  In any event, contrary to Qatar Charity's characterizations, the U.S. government document that serves as the source of these allegations reveals that it originated from the U.S. Embassy in Doha and was shared with the Secretary of State, the U.S. Embassies and Missions in various countries, and Treasury.  Bonner Ex. 14.

[6] Notably, Qatar Charity does not deny its support for Elehssan.  Rather, it merely quibbles with the English translation and spelling of the Arabic name to obfuscate its open support of a terrorist front.  QC Br. at 32-33.  In fact, no doubt exists that the organization Qatar Charity funded is the one that Treasury designated "a charitable front for [PIJ]."  ¶ 136; *Treasury Designates Charity Funneling Money to Palestinian Islamic Jihad*, U.S. Dep't of the Treasury (May 4, 2005), https://www.treasury.gov/press-center/press-releases/pages/js2426.aspx.

Between March 2011 and September 2015, Qatar Charity also transferred at least $150,000 to the Hebron Islamic Charity Society, a Hamas front.  Bonner Ex. 1 at ¶¶ 128-29. Long before then, Israel had outlawed that organization because it serves as an arm of Hamas. *Id.* at ¶ 129.

Qatar Charity is also a member of the Union of Good, an umbrella organization of Hamas's largest fundraisers.  Complaint ¶¶ 5, 79-81.  In 2008, Israel banned Qatar Charity because of its role in funding the Union of Good.  ¶ 79.  Also unable to explain away these facts, Qatar Charity ignores them; its brief makes no mention of its Union of Good membership.

Just months after Israel designated Qatar Charity a Union of Good member in 2008, Treasury designated the Union of Good an SDGT for its role in "facilitating financial transfers between a web of charitable organizations …  and Hamas-controlled organizations in the West Bank and Gaza."  ¶ 81.  Treasury highlighted that the Union of Good was "created by Hamas leadership to transfer funds to the terrorist organization" and emphasized that "the primary purpose of [the Union of Good's] activity is to strengthen Hamas' political and military position in the West Bank and Gaza."  ¶¶ 80, 170.  Treasury explained that the Union of Good accomplishes those objectives by: "(i) diverting charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas."  ¶ 170.  That supposed "social welfare" includes making "martyr" payments to the families of terrorists killed or injured in the course of their crimes and making similar payments to the families of imprisoned terrorists.  ¶ 170.

Qatar's neighbors have also recognized that Qatar Charity funds terrorism.  Saudi Arabia, Bahrain, Egypt, and the UAE designated Qatar Charity a financial supporter of terrorism in June 2019.  ¶ 84.  While Defendants would also have the Court disregard these allegations (*see* Qatar

Charity Br. at 6 n.6), their efforts to spin these facts must also await trial.[7]

Qatar Charity's brief brims with purported facts—exclusively based upon hearsay sources—that purport to explain its purely "charitable" focus.  As Plaintiffs allege, however, the FTOs' "charitable" affiliates do help the needy, but even that work serves the FTOs' interests. ¶¶ 102-04, 110.  For present purposes, Qatar Charity is an FTO front and member of the Union of Good that intentionally finances the FTOs' operations.  The U.S., Israel, and Qatar Charity's neighbors have all recognized those facts.

Qatar Charity cannot justify ignoring the Complaint by referring to judicial notice principles.  "When the court takes judicial notice of documents, it must rely on such documents only for the fact that the statement was made," not as truthful statements.  *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 2022 U.S. App. LEXIS 6365, at *14-15 (2d Cir. Mar. 11, 2022).  If Qatar Charity had a real interest in disclosing relevant facts, it would share its bank records and relevant communications concerning the transactions that produced the convictions of its most senior officials in the Palestinian Territories for their participation in the terror funding conspiracy Plaintiffs allege.  *See* Bonner Ex. 1 at ¶¶ 130, 139-43.

In any event, a jury will put little stock in the willingness of the U.S. government or the U.N. to work with Qatar Charity in certain circumstances.  As Qatar Charity's brief reveals, it devotes considerable efforts to public relations and hiding its terror financing.  But Defendants all possess non-public information that shows the charity's funding of the FTOs.  Moreover, both the U.S. government and the U.N. have acknowledged that their charitable arms' vetting requires

---

[7] In 2017, the UK Charity Commission also issued a report noting Qatar Charity's connections to Hamas and the Muslim Brotherhood, another radical Islamist organization.  ¶ 82.  Rather than remedying the misconduct that the Commission highlighted, Qatar Charity attempted to divert regulators' attention by changing its UK branch's name to the Nectar Trust.  ¶ 82.

improvement and risks funding terrorist organizations.[8]  Similarly, recent U.S. government pronouncements regarding Qatar must be considered in light of the ongoing Middle East turmoil and oil market disruptions associated with Russian war sanctions.  The U.S. government is now enlisting even rogue states like Iran and Venezuela in efforts to combat rapid oil price increases.  *See* Bonner Ex. 2.  The hearsay, politically motivated statements Qatar Charity cites are also years removed from Qatar's relevant conduct.

### 2.   The Bank Defendants Critical Role in the Conspiracy to Fund the FTOs

Qatar Charity requires financial institutions' assistance to transfer to the Palestinian Territories the money the FTOs require to fund their operations.  Qatar's government and Royal Family enlisted the Bank Defendants—both of which the government and Royal Family control—to assist with serving the FTOs' financial needs.  Complaint ¶¶ 4, 6, 88, 97, 128, 155.

From March 1, 2015 until September 7, 2015 alone, Qatar Charity used Masraf's services to transfer over $28 million in donations from Qatar Charity in Doha to its two branches in the Palestinian Territories.  ¶ 130.  Qatar Charity then transferred a substantial portion of those funds to other supposed "charities" that served as fronts for the FTOs.  ¶ 131.

Contrary to Defendants' claims, the services Masraf provided to Qatar Charity in

---

[8] *See, e.g.,* https://www.devex.com/news/opinion-usaid-must-protect-the-integrity-of-its-humanitarian-aid-programs-100366 (editorial drafted by former chief of staff of USAID that acknowledges the need to improve the organization's vetting process to avoid aiding terrorism) (Bonner Ex. 4); https://www.devex.com/news/gao-report-usaid-partners-violated-antiterror-laws-in-west-bank-gaza-99552 (report concerning GAO's findings regarding violations of anti-terrorism regulations by USAID during the 2015-19 period) (Bonner Ex. 5); West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of U.S. Government Accountability Office, Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks (March 2021) (Bonner Ex. 6); https://www.jpost.com/j-spot/zionist-watchdog-un-funds-millions-to-palestinian-groups-with-terror-ties-673753 (*Jerusalem Post* article noting watchdog group's findings regarding the use of U.N. funds to finance terrorist groups) (Bonner Ex. 7); https://jij.org/news/united-nations-funds-hamas/ (same) (Bonner Ex. 8).

furtherance of Defendants' conspiracy tie this case to the U.S.  In particular, Masraf completed international money transfers involving USD for Qatar Charity that passed through a "correspondent" bank account that Masraf maintained in New York.  ¶¶ 147-53.

Correspondent banks provide accounts that other financial institutions use to transfer funds, often between different countries and currencies. ¶ 149.  Maintaining a correspondent account in the U.S. enables foreign banks to conduct transactions that require conversions between USD and a local currency, all without establishing a U.S. physical presence. ¶ 150.[9]

One would not know from Defendants' briefs that the criminal convictions of Qatar Charity's most senior officials in the West Bank confirm that Masraf used its correspondent accounts to pass USD through New York for the benefit of Qatar Charity and the FTOs.  ¶¶ 132-34.  According to the Qatar Charity officials' confessions, Qatar Charity solicited donations for the FTOs and transferred those funds to its account at Masraf in Qatar.  ¶ 132.  Masraf then transferred the funds denominated in USD through the correspondent account that Masraf maintained in New York to Qatar Charity's accounts at either the Bank of Palestine or Islamic Bank in the West Bank.  ¶ 132-33.  Masraf made those transfers although it and Qatar Charity knew that Israel had banned Qatar Charity because it funded Hamas.  ¶¶ 132, 139, 141-46.

Once Masraf transferred those funds to the West Bank accounts, Qatar Charity's local branches distributed the money to entities controlled by the FTOs, including other supposed charities.  ¶¶ 132, 134.  In turn, those transferees used the Qatar Charity transfers to fund the FTOs' operations, including terrorist attacks and the "welfare" programs that support the FTOs' operatives and promote their violence.  ¶¶ 104, 110, 134.

---

[9] With very limited exceptions not applicable here, USD wire transactions like those that Masraf conducted at Qatar Charity's direction *must* pass through a U.S.-based correspondent account. *See* Declaration of Patrick J. McArdle executed on March 25, 2022 ("McArdle Decl.") at ¶¶ 8-14.

Between 2009 and September 7, 2015 (when Israel shuttered Qatar Charity in the West Bank), Masraf used its correspondent bank accounts to move in excess of $3.5 million in USD and Euros between Qatar Charity's accounts at Masraf in Doha and the charity's accounts in the Palestinian Territories.  Bonner Ex. 1 at ¶ 130(c).   In addition to those funds, between 2011 and 2013, Qatar Charity moved $25 million from Doha to the banned Qatar Charity entity operating in the Gaza Strip.  *Id.* at ¶ 130(f).

Like Masraf, QNB played a critical role in Defendants' conspiracy.  QNB maintained at least six accounts for Qatar Charity.  ¶¶ 8, 177-78.  Qatar Charity used those funds to finance the FTOs' operations, including purported charities that the FTOs control.  ¶¶ 8, 131.  QNB also contributed directly to Qatar Charity despite the bank's knowledge of Qatar Charity's direct links to terrorism, including a November 2013 contribution of roughly $275,000 and a February 2020 contribution of roughly $550,000.  Bonner Ex. 1 at ¶¶ 225-26.

QNB also played a central role in Defendants' conspiracy by serving as the go-to bank for otherwise "unbankable" terrorists, including Hamas members convicted of murder and other terrorism offenses and individuals designated as terrorists by the U.S. and Israeli governments.  ¶¶ 157-73.  QNB performed those services for the FTO leaders at the behest of Qatar, which permitted the terrorists to operate freely in Qatar.  ¶ 6, 96-97, 161, 168, 176.

Multiple QNB account holders are convicted Hamas terrorists whom Israel released from jail in connection with a massive prisoner exchange that Hamas secured by kidnapping and then ransoming an Israeli soldier.  *See* ¶¶ 161, 168; Bonner Ex. 1 at ¶¶ 225-26.  QNB's accountholders include: Husam Badran, the former leader of Hamas' military wing in the West Bank, who was convicted for orchestrating deadly terrorist attacks; Musa Dudin, a member of Hamas' politburo and a convicted Hamas terrorist; Ahlam Aref Ahmad Tamimi, one of the FBI's most-wanted terrorists because of her role in the August 9, 2001, Hamas suicide bombing of the

14

Sbarro pizzeria in Jerusalem that killed 15 people, including two Americans; and Zaher Ali Musa Jibril, a convicted murderer and founder of Hamas's military wing whom Treasury has designated as an SDN.  *See* ¶¶ 161, 168; Bonner Ex. 1 at ¶¶ 210-17.  All of those prominent terrorists used money from their QNB accounts to fund the FTOs' operations.  Complaint ¶ 181.

QNB exhibited its support for its terrorist clientele by opening and maintaining accounts for them in violation of its own policies and international banking standards designed to prevent terror financing.  ¶ 142; Bonner Ex. 1 at ¶¶ 177, 227-315.  Indeed, QNB was so eager to curry favor with the Qatari government that it allowed these convicted terrorists to register their accounts wholesale to a single P.O. Box, rather than their own addresses.  ¶¶ 159, 166; Bonner Ex. 1 at ¶¶ 176, 215, 218.  Thus, while the terrorists' infamy alone alerted QNB to their violence and prominent Hamas positions, the non-routine shared address scheme highlights QNB's knowing participation in Defendants' conspiracy.  Bonner Ex. 1 at ¶¶ 174-177.

QNB claims that its extraordinary role as the preferred bank for convicted terrorists merely constitutes "routine banking services" and notes that its terrorist customers were released from prison (without mentioning the kidnapping and extortion that produced that result).  While those services apparently qualify as routine for QNB, they are irreconcilable with the counter terror-financing standards that govern international banking.  *See id.* at ¶¶ 227-315.

QNB also exhibited unbridled support for the FTOs and advanced Defendants' conspiracy by maintaining multiple accounts for Yousuf Abdulla Al-Qaradawi, the Union of Good's Chairman.  Complaint ¶¶ 98, 169, 172-73.  Al-Qaradawi used those accounts to fund Hamas's operations.  ¶ 181.  His radicalism has extended to issuing religious rulings inciting Muslims to join jihadist groups, to conduct attacks against U.S. forces, and to commit suicide bombings.  Bonner Ex. 1 at ¶¶ 197-98.

To capitalize on Al-Qaradawi's role as a leading social, political, and religious figure

15

within the Muslim religious community in Qatar, QNB also appointed him to the bank's Sharia Supervisory Board.  Complaint ¶¶ 98, 169.  Thus, QNB—which purports to abhor terrorism—has intentionally tied itself to a cleric who heads an organization that serves as a principal Hamas fundraiser and who not only supports terrorism, but has encouraged his many followers to commit violence.  ¶¶ 174-76; Bonner Ex. 1 at ¶¶ 197-98.

### E.  All of the Defendants Knowingly Participated in the Conspiracy to Fund the FTO's Operations

Defendants did not merely participate blindly in the conspiracy to fund the FTO's operations.  Rather, they all understood their important roles in that Qatar-led conspiracy.  ¶¶ 13, 119, 132, 141, 376-78.  Given the universally recognized international standards requiring banks to perform due diligence concerning their customers and to adopt policies to prevent terror financing, the Bank Defendants could not have remained unaware that Israel had designated Qatar Charity a terrorist organization because of its role in the Union of Good.  *See* ¶¶ 141-46; Bonner Ex. 1 at ¶¶ 227-315.  QNB also unquestionably knew of Al-Qaradawi's leadership of the Union of Good and its role in financing Hamas as well as the murderous history of the bank's FTO-affiliated customers.  *See* ¶¶ 157-81.

Thus, Defendants knew throughout the conspiracy that Qatar, Qatar Charity, and the Union of Good were funding the FTOs through Qatar Charity.  ¶¶ 119, 139, 141-146, 157-81.  In addition, they understood the critical role that they played in the efforts of Qatar and the Royal Family to finance the FTOs' violence and the FTOs' efforts to enhance their standing in the Palestinian community through purported charitable work.  ¶¶ 13, 119, 132, 141, 376-78.

The Bank Defendants' knowing participation in the conspiracy is also confirmed by their failure to cut their ties to Qatar Charity after its second expulsion from Israel and its designation as a terrorist organization by Qatar's Gulf neighbors.  Indeed, the Bank Defendants continue to

16

provide services to Qatar Charity, a known terrorist fundraiser, to this day.  ¶¶ 90, 117.

The controlling role that Qatar's Royal Family plays at each Defendant strengthens the inference that they knowingly participated in the conspiracy to fund the FTOs.  Given Qatar's autocratic government, the Bank Defendants could not perform banking services for notorious terrorists and a well-known financier of terrorism like Qatar Charity without the consent of their controlling shareholders and regulators.  ¶¶ 89-90, 96-97, 119, 122, 139.

Moreover, even before Israel shuttered Qatar Charity's operations in the Palestinian Territories in 2015, other banks operating there (including Arab Bank and Banque du Caire) had refused to provide services to Qatar Charity because of its terror funding.  *See* Bonner Ex. 1 at ¶ 145.  The Bank Defendants had far greater access to information regarding Qatar Charity's links to terrorism than those banks because of the Defendants' overlapping ownership and the extensive financial services that the Bank Defendants provided to Qatar Charity.  *See* ¶¶ 6-8, 88-90, 96-97, 130-34, 147-55, 177-80.  Thus, the ability of other banks to ascertain Qatar Charity's links to terrorism confirms that the Bank Defendants also understood Qatar Charity's role in financing the FTOs.  *See* Bonner Ex.1 at ¶¶ 144-45.

## F.  With the Help of Defendants' Material Support, the FTOs Committed the Attacks that Injured Plaintiffs and Killed Their Decedents

Defendants' conspiracy achieved its intended effect of empowering the FTOs to continue their terrorism campaign in Israel and the Palestinian Territories and to commit the attacks that severely injured Plaintiffs and killed their loved ones.  ¶¶ 9, 190, 198-99, 201-04, 213, 218-20, 231-34, 236-38, 244-45, 250, 262-63, 265, 268-72, 283, 292-95, 304-320, 323, 327-31, 337-43, 348-53.  Plaintiffs were the victims of ten attacks.  ¶¶ 183-353.  Plaintiffs unequivocally identify the FTOs as the perpetrators of that violence.  ¶¶ 209, 230, 236, 240-41, 247, 258-61, 273-74, 288, 289, 302, 332-33, 344, 347.  Moreover, the FTOs themselves acknowledged responsibility

for the attacks.  ¶¶ 193, 205, 207, 226, 242, 258, 261, 273-78, 289-91, 301-02, 332-33, 343-47.

Defendants falsely claim that certain attacks were remote from the USD transactions by which Masraf and Qatar Charity passed funds through New York to the Palestinian Territories. In fact, the confessions of Qatar Charity's officials demonstrate that the transactions (which took place from March 1, 2011 to September 7, 2015) were conducted in the same time frame as the FTOs' attacks (June 2014 through December 2016).  ¶¶ 130-134, 184, 200, 209, 236, 247, 264, 281, 296, 321, 334.

**ARGUMENT**

**I**

**PLAINTIFFS ADEQUATELY ALLEGE SECONDARY LIABILITY
UNDER JASTA AGAINST ALL DEFENDANTS**

In enacting JASTA, Congress emphasized that its purpose "is to provide civil litigants with the ***broadest possible basis***, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, ***directly or indirectly***, to foreign organizations or persons that engage in terrorist activities against the United States."  JASTA § 2(b) (emphases added); *see also, e.g., Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 154 (E.D.N.Y. 2020) (Cogan, J.).  By knowingly providing financial services to further the fundraising efforts of the FTOs, the Defendants engaged in precisely the type of conduct that Congress intended JASTA to address—they conspired to further the interests of the FTOs and aided and abetted the FTOs' acts of international terrorism.  *See* 18 U.S.C. § 2333(d); *Estate of Henkin,* 495 F. Supp. 3d at 151 (denying bank's motion to dismiss where the complaint alleged that the bank maintained "multiple bank accounts for a notorious Hamas operative, Hamas' most prominent fundraiser in Turkey, and a key Hamas institution in Gaza," and that the bank

18

"understood that it was providing vital financial services to the terrorist organization responsible" for the plaintiffs' deaths).

## A.  Plaintiffs State Valid Aiding and Abetting Claims Against All Defendants

Plaintiffs plausibly allege a JASTA claim by meeting the three elements for aiding-and-abetting liability outlined in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), the decision Congress identified as the prototype for such claims.  As summarized by the Second Circuit in *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021), those elements are:

> "(1) the party whom the defendant aids must perform a wrongful act that causes an injury" (the "aiding party who causes injury" element); "(2) the defendant must be ***generally aware*** of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" (the "general awareness" element); "(3) the defendant must ***knowingly and substantially assist*** the principal violation" (the "substantial assistance" element).

(Quoting *Halberstam*, 705 F.2d at 477) (emphases in original).[10]

Defendants' cherry-picking criticisms of Plaintiffs' allegations ignore the Second Circuit's admonition that the Court must determine "whether there is a permissible relevant inference from '***all*** of the facts alleged, taken collectively,' not whether an inference is permissible based on 'any individual allegation, scrutinized in isolation.'"  *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (emphasis in original) (citations omitted).  That permissive standard harmonizes with the rule that plaintiffs need only allege facts that, taken collectively, "state a claim to relief that is plausible on its face."  *Honickman*, 6 F.4th at 495 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) ("The plausibility standard is not

---

[10] Contrary to Qatar Charity's assertion, neither *Halberstam* nor *Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018) holds that Plaintiffs must show that "the defendant and the principal were 'one in spirit.'"  *Halberstam* merely employed that phrase in explaining that the defendant's state of mind is one of six factors courts consider in assessing "how much encouragement or assistance is substantial enough" to constitute aiding and abetting. *Halberstam,* 705 F.2d at 478, 484.  In any event, the Complaint leaves no doubt that Defendants shared Qatar's objective of funding the FTOs' operations.

akin to a probability requirement, but it asks for more than a sheer possibility that a defendant

has acted unlawfully.").  That standard precludes Defendants' efforts to ignore key allegations of

the Complaint, while attacking others in isolation.

### 1. Plaintiffs Plausibly Allege that Hamas and PIJ Caused Their Injuries

In challenging the "aiding party who causes injury" element of Plaintiffs' aiding-and-

abetting claim, Defendants ignore the Complaint's detailed allegations concerning the FTOs'

admissions of responsibility for each of the attacks:

- Taylor Force was "murdered by a Hamas operative on March 8, 2016."  ¶ 14.
  Hamas took responsibility for the attack (¶¶ 192-194) and identified the
  perpetrator as "'a son of the Hamas movement,' thus receiving recognition by
  [Hamas] as a rank-and-file operative sent to carry out the attack … on behalf of
  the organization" (¶ 195).

- Eli Borochov "was shot by a Hamas terrorist."  ¶ 20.  "Following the attack,
  the Hamas organization took responsibility for the shooting and identified the
  perpetrators as Hamas operatives."  ¶ 205.  The Israeli Security Agency also
  identified the two attackers "as members of a Hamas cell."  *Id.*

- Teenager Y.N.F. was "kidnapp[ed] and murder[ed] by Hamas terrorists."  ¶ 27.
  "[T]wo Hamas terrorists drove a stolen vehicle … looking for a Jew to kidnap
  …   [as] part of Hamas' plan at the time to kidnap Jews to use them as
  bargaining chips…."  ¶ 209.  "Senior Hamas officials praised the abduction
  and called the Hamas Kidnappers 'martyrs' and 'heroes.'"  ¶ 230.

- Plaintiff Yehudah Glick was "severely wounded in a PIJ terrorist attack" (¶ 37)
  when "an operative of [PIJ] … armed with a gun and acting on behalf of PIJ …
  fired four shots at Yehudah from close range…." (¶ 236).  The perpetrator
  "was known to the security forces in Israel as a PIJ operative," and "PIJ
  claimed responsibility for the murder attempt."  ¶¶ 240, 242.

- "[T]wo Hamas operatives" murdered Richard Lakin.  Hamas praised the attack
  and identified at least one of the perpetrators as a Hamas operative.  ¶¶ 247,
  258-261.

- The infant C.Z.B. "was killed by a Hamas terrorist."  ¶ 49.  "Hamas publicly
  praised the attack and referred to the attacker as a 'martyr' and a 'hero.'"
  ¶ 273.  "Hamas recognized [the perpetrator] as one of its operatives." ¶ 274.

- Menachem Rivkin "was stabbed by a Hamas terrorist" (¶ 51) who was the son
  of a senior Hamas leader (¶ 288).  The terrorist and his attack were celebrated
  on the Hamas-affiliated PALDF web forum, which depicted the terrorist
  "holding the green flag of Hamas with the caption 'The executioner of the
  heroic stabbing operation.'"  ¶ 289.

- The Golan and Shamba Plaintiffs "were injured when a Hamas terrorist deliberately drove a car into a crowd of people waiting at a bus station." ¶ 53. A Hamas radio station's website depicted the perpetrator with a Hamas flag and referred to him as "one of the sons of the Islamic resistance movement Hamas, whose heroic operation, carried out on the 28th anniversary of the founding of the [Hamas] resistance movement has ensured the continuation of the tradition of resistance…." ¶ 302.

- Plaintiff Rafi Lisker "was stabbed in the neck by a Hamas terrorist while walking home from Sabbath services." ¶ 58. "[M]edia reports … identified the attack as a Hamas operation (¶ 332) and "[t]he [Israeli Security Agency] identified the terrorist as a member of the Hamas terrorist organization" (¶ 333).

- 13-year-old H.Y.A. "was murdered in her sleep by a Hamas terrorist." ¶ 17. "The attack on H.Y.A. was carried out by the terrorist following a public call from … Hamas … for Palestinians to stab Jews to death." ¶ 344. "The terrorist's family is paid a monthly stipend from a Palestinian Authority Martyrs Fund which provides grants to families of terrorists from Hamas, [PIJ] and the PLO." ¶ 347.

In light of these allegations, Defendants' claims that the attacks were too rudimentary to be attributable to the FTOs (QNB Br. at 26-27, 28-29), or were unconnected acts of terrorists acting alone (QNB Br. at 17, n. 13), raise factual disputes that cannot be resolved in their favor on a motion to dismiss, and must ultimately be decided by a jury.

Defendants' legal authorities provide no support for dismissing Plaintiffs' claims. *See* Masraf Br. 20-22; QNB Br. 17, n. 13. In contrast to this case, the plaintiffs in *Crosby v. Twitter, Inc.*, 921 F. 3d 617, 626 (6th Cir. 2019), made "no allegations that ISIS was involved with the Pulse Night Club shooting." They merely asserted that the perpetrator read ISIS-related content. *Id.* Similarly, in *Gonzalez* and *Copeland*, FTO operatives neither planned nor perpetrated the attacks, which took place thousands of miles from the FTOs' locations and were committed by individuals with no demonstrable affiliation with the FTOs. *See Gonzalez v. Google LLC*, 2 F.4th 871, 911 (9th Cir. 2021) (a U.S. citizen and his wife attacked Plaintiffs in California, and "Plaintiffs' allegations suggest[ed] only that ISIS approved of the shooting *after* learning it had occurred, not that it authorized the attack beforehand."); *Copeland v. Twitter*, 352 F. Supp. 3d

965, 974-75 (N.D. Cal. 2018) (plaintiff whose family members were killed in France failed to

make "plausible allegations that *this* attack was carried out by ISIS" because allegations that a

FTO attempted to "'generally radicalize' individuals and promoted terrorists attacks similar to

the one Bouhlel carried out are insufficient") (emphasis in original).

Thus, Plaintiffs' unambiguous allegations that the FTOs were responsible for the attacks

in question are more than adequate to survive a motion to dismiss.

2.  **Plaintiffs Plausibly Allege Defendants' General Awareness
    of Their Roles as Part of an Overall Illegal or Tortious Activity**

Plaintiffs also plausibly allege that all Defendants in this Qatari-led conspiracy were

generally aware of their roles as part of overall illegal or tortious activity when they provided

material assistance to the FTOs.  In *Kaplan*, the Second Circuit clarified that "general

awareness" is "less demanding than a requirement that [plaintiffs] show awareness."  999 F.3d at

863.  The plaintiff need only allege that the defendant was generally aware "that it was playing a

role in unlawful activities from which the rocket attacks were foreseeable."  *Id.* at 860-61;

*accord, e.g., Honickman*, 6 F.4th at 496 ("The defendant need not be generally aware of its role

in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role

in an overall illegal activity from which the act that caused the plaintiff's injury was

*foreseeable*.") (emphasis in original).

Moreover, "acts that are 'neutral standing alone … must be evaluated in the context of

the enterprise they aided.'"  *Kaplan*, 999 F.3d at 865 (quoting *Halberstam*, 705 F.2d at 488).

Thus, what might constitute a "routine banking service" in another context amounts to material

assistance where those services are provided amidst a decades-long "campaign of terrorist

attacks against civilians."  *Id.*

22

Where, as here, financial institutions assist a terrorist organization through an FTO-affiliated customer, plaintiffs can satisfy the general awareness requirement by alleging: (1) the bank's awareness of its customer's "connections with [an FTO] before the relevant attacks," and (2) that the customer was sufficiently "intertwined with [the FTO's] violent terrorist activities that one can reasonably infer [the defendant] was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services to" the customer. *Honickman*, 6 F.4th at 501; *accord, e.g., Kaplan,* 999 F.3d at 860-61 999 ("The [complaint] satisfies the general awareness element because it plausibly alleges the Five Customers were so closely intertwined with Hezbollah's violent terrorist activities that one can reasonably infer that LCB was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which the rocket attacks were foreseeable."). Ultimately, "[w]hether a defendant's material support to an FTO suffices to establish general awareness is a fact-intensive inquiry." 999 F.3d at 860.

*Kaplan* emphasized that plaintiffs can rely on circumstantial evidence, including public information, at the pleading stage to allege general awareness. *Id.* at 864. Moreover, "[a] complaint is allowed to contain general allegations as to a defendant's knowledge, *see* Fed. R. Civ. P. 9(b), because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Id.*[11]

In *Kaplan*, a variety of allegations, in combination, sufficed to permit the inference that

---

[11] Courts may only rarely adjudicate fact-intensive scienter issues as matter of law at the motion to dismiss stage. Indeed, the Second Circuit has instructed that courts should be "'lenient in allowing scienter issues to withstand [even] summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'" *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (citation omitted); *accord, e.g., Linde*, 882 F.3d at 330 (court found itself "obliged to vacate and remand for a jury to decide that question [of scienter]" and noted that "traditionally a jury resolves questions about a tortfeasor's state of mind") (citations omitted).

23

the defendant bank (LCB) was generally aware of its role in a scheme to fund Hezbollah that

rendered the attacks that injured the plaintiffs foreseeable.  *See Kaplan,* 999 F.3d at 865 (in

assessing whether plaintiffs meet their pleading burden, the court must "consider all of the

complaint's allegations, rather than considering each in isolation, and … accept as true all

permissible inferences that could be drawn from the complaint as a whole").  While the Second

Circuit acknowledged that the plaintiffs had not alleged that LCB "read or was aware of" various

public information regarding the ties between Hezbollah and LCB's customers, the court

nevertheless found that those statements bolstered the inference that LCB was generally aware of

those ties.  *Id.* at 864-65; *accord, e.g., Estate of Henkin*, 495 F. Supp. 3d at 156 ("As a practical

matter—absent discovery—terrorist victims and their families understandably do not have

conclusive evidence that bank officials or compliance staff had actual knowledge of various red

flags that could have apprised them of their customer's nefarious activities.").

      In finding that the plaintiffs had pled LCB's general awareness, the Second Circuit also

emphasized a number of circumstantial facts, which are also present here, that strengthened the

required inference.  Specifically, the Second Circuit found that inference supported by

allegations: "that Hizbollah has been a terrorist organization headquartered in Lebanon since

1982, that LCB was a Lebanese bank headquartered in Lebanon, that banking regulations require

banks to know their customers, and that [the alleged Hizbollah supporters] were customers of

LCB in Lebanon since at least 2003."  *Id.* ("The plausibility of the allegations as to LCB's

knowledge of Hizbollah's terrorist activities and of the Customers' affiliation with Hizbollah is

sufficient to permit the inference that LCB was at least generally aware that through its money-

laundering banking services to the Customers, LCB was playing a role in Hizbollah's terrorist

activities.").

The Complaint sets forth all of the factors *Kaplan* found sufficient to allege LCB's general awareness, plus far more compelling support than *Kaplan* presented for making that inference.  Specifically, the Complaint alleges that:

- Qatar Charity is a member of the Union of Good, a U.S. government-designated terrorist organization that serves as Hamas's principal fundraising organization.  ¶¶ 79-80.

- Hamas and PIJ are famously committed to destroying Israel by violence and have been designated as terrorist organizations by the U.S. and Israel for decades.  ¶¶ 105, 107, 112-17.

- Qatar Charity has a long and public history of supporting international terrorism dating back to its founding in 2002.  ¶¶ 67-84.

- Qatar Charity's annual reports disclosed that Qatar Charity transferred funds to, and carried out joint projects with, various Hamas and PIJ fronts, including the Elehssan Society, which the U.S. Treasury designated as "a charitable front for the Palestinian Islamic Jihad" in 2005.  ¶¶ 135-138.

- In 2008, the U.S. Interagency Intelligence Committee on Terrorism (IICT) of the U.S. National Counterterrorism Center listed Qatar Charity (then known Qatar Charitable Society) as a "priority III terrorism support entity (TSE)."  ¶¶ 68, 140.[12]

- In 2008, Israel banned Qatar Charity in the Palestinian Territories for financing Hamas terrorism and its membership in the Union of Good, which the U.S. had designated as financier of terrorist organization in 2008.  ¶¶ 79-81, 139.  As a result, throughout the Defendants' conspiracy, Qatar Charity was operating illegally in the Palestinian Territories.  ¶ 139.

- Simultaneously with banning Qatar Charity, Israel publicly broadcast an express warning to "all world banking and financial institutions" that might deal with Qatar Charity to "prepare accordingly and act with caution in order to avoid criminal sanctions and lawsuits by victims of terrorism."  ¶ 79.

- Prior to Israel shutting down Qatar Charity's operations in the Palestinian Territories in 2015, other Middle East banks, including Arab Bank and Banque

---

[12] The Bank Defendants highlight that the U.S. designation of Qatar Charity as a TSE was not public.  Of course, however, the U.S. government (as well as Israel and Qatar's Gulf neighbors) made that designation because of Qatar Charity's terror financing, and the Bank Defendants had access to non-public information regarding Qatar Charity's transactions and an obligation to uncover any links to terror financing.  Moreover, Israel's very public designation of Qatar Charity as a member of the Union of Good eliminated any doubt regarding whether Qatar Charity funded Hamas terrorism.  ¶¶ 79-81.  That public designation distinguishes this case from *Honickman*, where the plaintiffs did not "specif[y] whether and where" Israel's designation of a terrorist entity "was made public."  6 F.4th at 502, n. 20.

du Caire, had already refused to provide services to Qatar Charity because of its terror funding.  *See* Bonner Ex. 1 at ¶ 145.

- In June 2019, Saudi Arabia, Bahrain, Egypt, and the UAE designated Qatar Charity as a financial supporter of terrorism.  ¶¶ 83-84.

- The Qatari government and the Qatari Royal Family have publicly supported Hamas terrorism for more than a decade by providing Hamas with more than $1 billion in funding and by extending safe haven to numerous notorious Hamas criminals.  ¶¶ 2-3, 119-27.

- In October 2012, the Qatari government made a public pledge of $400 million to Hamas that "evoked widespread condemnation in U.S. Congress" and protests by 24 members of Congress to the Qatari ambassador to the U.S.  ¶¶ 3, 125.

- The U.S. Treasury Under Secretary for Terrorism and Financial Intelligence issued a press release in March 2014 noting that "Qatar has become such a permissive terrorist financing environment, that several major Qatar-based fundraisers act as local representatives for larger terrorist fundraising networks" there.  ¶ 129.

- Because of Doha's connections with and support of terrorist organizations, Saudi Arabia, Bahrain, Egypt, and the UAE cut ties with Qatar on June 5, 2017.  ¶ 83.

- The Qatari government and Qatari Royal Family effectively control the Bank Defendants through the ownership of their stock, the autocratic nature of the Qatari government, and Qatar's regulatory authority.  ¶¶ 4-6, 85, 88-89, 96-97, 111, 155.

- The Qatari government and Qatari Royal Family used that influence and control to induce the Bank Defendants to join a conspiracy to fund the FTOs through Qatar Charity, another entity subject to the control of Qatar and the Royal Family.  ¶¶ 4-6, 85, 88-89, 96-97, 111, 155.

- QNB placed the notorious head of the U.S.-designated SDGT, the Union of Good, on its Sharia Supervisory Board and provided banking services to him despite his leadership role in a known terrorist organization.  ¶¶ 98, 169.

- QNB opened accounts for several convicted Hamas murderers whom Israel released from prison early in a prisoner exchange arranged to save the life of an Israeli soldier, including a terrorist on the FBI's most wanted list.  ¶¶ 161, 168; Bonner Ex. 1 at ¶¶ 172-187, 210-212.  Several of those convicted Hamas terrorists continued their leadership roles with Hamas to direct terror attacks and provided financing to Hamas through their QNB accounts.  ¶¶ 162-163, 167-168.

- International banking standards and the Bank Defendants' own policies required them to perform due diligence regarding their customers.  ¶¶ 141-46. Qatar Charity's well-documented role as a fundraising front for the FTOs'

26

terrorism could not have escaped the required analysis of its accounts with the Bank Defendants.

These allegations undeniably outline each Defendant's general awareness of its participation in "overall illegal or tortious activity."  Defendants' contrary contentions largely hinge on procedurally inappropriate factual arguments that Qatar Charity is not what Israel, Qatar's Gulf neighbors, and, most importantly for present purposes, the Complaint say it is—a front for the FTOs.  *See* pp. 9-11, *supra*.[13]

The Bank Defendants exaggerate Plaintiffs' pleading burden by arguing that, notwithstanding its notorious ties to terrorists, Qatar Charity was insufficiently "intertwined" with the FTOs for their violence to be a foreseeable result of the Bank Defendants' material assistance.  As *Honickman* found, customers "do not themselves need to be 'engaged in ... violent or terrorist acts'" to satisfy that requirement.  *Honickman*, 6 F.4th at 499 n.15 (citation omitted).

*Kaplan* illustrates this point.  There, LCB's "Five Customers" were a putative charity (the "Martyrs Foundation" or "Shahid"), two corporations, and two of their officers.  *Kaplan*, 999 F.3d at 849-50.  None of the Five Customers had a direct role in any attack.  *Id.*  Nevertheless,

---

[13] Contrary to Defendants' claims, they are not relieved "of [aiding-and-abetting] liability . . . simply because the terrorist organization intentionally raised funds through an intermediary, an alter ego, or a mere front to engage in violence."  *Estate of Henkin*, 495 F. Supp. 3d at 158; *see also, e.g., Kaplan*, 999 F.3d at 855 (JASTA "simply says the defendant must have given 'substantial assistance'" to an act of international terrorism, not substantial assistance to the principal engaging in an act of international terrorism – *i.e.*, for aiding and abetting liability to attach under JASTA, a defendant's substantial assistance may be "indirect").  Defendants' arguments that their conduct is too remote ignores that they "may be liable under the ATA for aiding and abetting the organization behind the attacks, not only the 'triggerman' or suicide bomber."  *Miller v. Arab Bank*, 372 F. Supp. 3d 33, 48 (E.D.N.Y. 2019); *see also id.* at 46 ("Allegations that a defendant provided money to terrorist organizations, or transferred money that was given to terrorist organizations, strengthens the inference that plaintiff's injuries were proximately caused by a defendant's conduct under the ATA.").

Plaintiffs demonstrated LCB's general awareness by alleging the Five Customers' connections to Hezbollah and its status as a terrorist organization. *Id*. at 864-65.[14]

The Bank Defendants advance a number of additional general awareness arguments that hinge on impermissible challenges to the veracity of Plaintiffs' allegations. Masraf claims that Qatar and the Royal Family could not have controlled Masraf because they "only" held 28% of its stock. Masraf Br. at 8, 16 n.8. As a practical matter, that percentage of stock ownership— standing alone—would suffice to establish control for pleading purposes.[15] But here, the Royal Family wields further power at Masraf by holding multiple positions on the bank's board. ¶ 88. Moreover, the autocratic Qatari government's regulatory power over the Bank Defendants augments Qatar's control over them, particularly because the U.S. Treasury identified Qatar as "an especially 'permissive' jurisdiction for terror financing." ¶ 122; *see e.g.*, *GSS Grp. Ltd. v.*

---

[14] Citing no authority, QNB erroneously claims that Plaintiffs fail to establish the purportedly required link between Qatar Charity and the FTOs' "violent terrorist activities" because Plaintiffs do not allege that funding went to the FTOs' military wings, as opposed to their humanitarian components. QNB Br. at 25. That contention ignores that JASTA proscribes providing "material support, ***directly or indirectly***, to foreign organizations…." JASTA § 2(b) (emphasis added). Plaintiffs need not allege that specific funds played a role in their attacks or that those funds were delivered to a particular segment of the FTO. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010) ("Money is fungible, and "[w]hen foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put."); *Honickman*, 6 F.4th at 499 ("substantial assistance to the actual injury-causing act—here, Hamas's attacks—is unnecessary"); *Weiss v. National Westminster Bank PLC*, 768 F.3d 202, 205 (2d Cir. 2014) (the ATA requires only that defendant supports a terrorist organization not that it aided the "terrorist activities of the terrorist organization"); *Miller*, 372 F. Supp. 3d at 48 (defendants "may be liable under the ATA for aiding and abetting the organization behind the attacks, not only the individual 'triggerman' or suicide bomber").

[15] *See e.g.*, *Essex Universal Corp. v. Yates*, 305 F.2d 572, 579 (2d Cir. 1962) (28.3% shareholder "almost certain to have share control as a practical matter"); *In re Trump Hotels Shareholder Derivative Litig.*, 2000 U.S. Dist. LEXIS 13550, at *22 (S.D.N.Y. Sept. 21, 2000) (Delaware courts have found "substantial minority interests, ranging from 20% to 40% sufficient to grant the holder working control" of a company); *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1080 (Del. Ch. 1985) (20% ownership recognized as threshold for measuring control).

*Nat'l Port Auth. of Liber*., 822 F.3d 598, 606 (D.C. Cir. 2016) ("[A] government can wield power not only as [a] shareholder but also as [a] regulator.").

QNB tries to distance itself from Hamas by claiming that the convicted terrorists who maintain QNB accounts committed their murders and other terrorist activity decades ago, as if that mattered. QNB Br. at 26. In fact, the Complaint alleges that QNB's lineup of convicted Hamas terrorist customers continued their crucial roles in planning Hamas terrorism ***while they maintained their accounts at QNB***. *See, e.g.,* ¶¶ 161-63, 167. Plaintiffs further allege that those Hamas terrorists used their QNB accounts "to finance Hamas' and PIJ's terrorist activities in Israel." ¶ 181.

QNB also feigns surprise regarding the ties of its Sharia Supervisory Board member, Yousuf Abdulla Al-Qaradawi, to the Union of Good. Given Al-Qaradawi's radical public support for terrorism (¶ 175), the unambiguous allegations that he served as Chairman of the Union of Good (¶ 98, 169, 172), and QNB's obligation to vet its policy makers (¶ 141), a jury will have to resolve this argument.

The Bank Defendants also pretend that Qatar Charity is not the same organization as Qatar Charitable Society, which Israel banned in 2008, and that Qatar Charity's pre-2008 activities have no bearing on the general awareness requirement. *See, e.g.,* Masraf Br. at 13. As the criminal convictions of Qatar Charity's senior officials show, the slight name change altered nothing regarding Qatar Charity's activities, and it remained a banned entity in the Palestinian Territories throughout the relevant period. ¶¶ 130-34, 139. The Bank Defendants' awareness of Qatar Charity's role in financing terrorism is also supported by their decision to continue providing services to Qatar Charity even after Israel shuttered its operations and Qatar's Gulf neighbors designated Qatar Charity a supporter of terrorism. *See* ¶¶ 84, 90.

29

Ultimately, Defendants' general awareness arguments rely on their vain efforts to equate this case to the inapposite *Honickman*.  For example, *Honickman* noted that the complaint alleged only that "certain leaders of Hamas were board members of the Three Customers [of the bank] but d[id] not aver that this was public knowledge during the relevant period."  *Id*. at 502.  In stark contrast, here notorious Hamas criminals *themselves* were QNB customers, and QNB not only held accounts for the leader of a U.S.-designated SDGT but placed that terrorist on the bank's Sharia Supervisory Board. ¶¶ 98, 169, 172-73.

Moreover, in *Honickman*, the bank's customer, also the Union of Good, was not designated as a terrorist organization until *after* the attacks on Plaintiffs.  6 F.4th at 501-02.  Here, Israel publicly designated Qatar Charity as a terrorist financer of Hamas in 2008, well *before* the attacks.  ¶¶ 79-81, 139.  The plaintiffs in *Honickman* also alleged that Israel designated a customer as a terrorist organization in 1998 "without specifying whether and where this was made public."  *Honickman*, 6 F.4th at 502 n.20.  In contrast, here, Plaintiffs allege that Israel's 2008 ban of Qatar Charity was publicly broadcast to "all world banking and financial institutions," who were "expressly warned" to deal with Qatar Charity at their peril.  ¶¶ 79-81.

Lastly, neither *Honickman* nor any case on which Defendants rely involved the web of factors that Plaintiffs allege to bolster the inference that Defendants were generally aware of their role in financing the FTOs' operations.[16]  In combination, these factors leave no doubt that

---

[16] *In Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), the plaintiffs alleged that defendant HSBC was liable for attacks by al-Qaeda in Iraq ("AQI") on a hotel in Jordan because HSBC engaged in financial transactions with Al Rajhi Bank ("ARB"), which, in turn, had customers who allegedly provided material support to AQI.  The *Siegel* Court noted: "To be sure, the plaintiffs did allege that HSBC provided hundreds of millions of dollars to ARB, but they did not advance any non-conclusory allegation that AQI received any of those funds or that HSBC knew or intended that AQI would receive the funds."  *Id.* 225.  While the *Siegel* plaintiffs had alleged that HSBC knew that some of "ARB's banking activities are linked to terrorists," they failed to plausibly allege that HSBC was actually used by ARB (knowingly or unwittingly) to provide *any* funds to AQI.  *Id.* at 224-25.  Here, by contrast, the Bank

30

Plaintiffs have adequately alleged the general awareness element of their aiding-and-abetting claim.

**3.  Plaintiffs Plausibly Allege the "Substantial Assistance" Factors Misstated by Defendants**

Six *Halberstam* factors determine whether Plaintiffs have adequately alleged the substantial assistance element of an aiding-and-abetting claim: "(1) the nature of the act encouraged or assisted, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Kaplan,* 999 F.3d at 852 (quoting *Linde*, 882 F.3d at 329).  As the Second Circuit has emphasized, "No factor is dispositive; the weight accorded to each is determined on a case-by-case basis." *Honickman,* 6 F.4th at 500.[17]  Here, the *Halberstam* analysis yields the unmistakable conclusion that Plaintiffs have adequately alleged the substantial assistance element of their claim.

a.  Nature of Act Encouraged or Assisted

Because Defendants cannot dispute that financial services or, in Qatar Charity's case, direct assistance provided to an FTO or its affiliates is "important to the nature of the injury-

---

Defendants' customers were either Hamas operatives themselves, or Qatar Charity, which had been publicly designated as a funder of Hamas terrorism prior to Defendants' tortious conduct. *In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi)*, 714 F.3d 118 (2d Cir. 2013) is similarly inapposite.  There, the *Al Rajhi* plaintiffs pled that the defendant bank, ARB, maintained accounts for certain charitable organizations; that the banks knew (or should have known) that the charitable organizations supported terrorism and terrorist organizations, including Al Qaeda; and that the charitable organizations transmitted material support to Al Qaeda.  But the Court held that plaintiffs had failed to make non-conclusory allegations that the accounts ARB allegedly held for those charitable organizations were ever in fact used to transmit funds to Al Qaeda.  *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 833 (S.D.N.Y. 2005), *aff'd*, 714 F.3d 118 (2d Cir. 2013).  In contrast, the Director and Staff of Qatar Charity confessed to transferring money from Qatar Charity's accounts to the FTOs' affiliates.  ¶ 134.  Qatar Charity's membership in the Union of Good also confirms Plaintiffs' allegations that Qatar Charity used its funds to finance the FTOs, as Israel determined.

[17] Plaintiffs do not allege that Defendants were present at the time of the torts at issue here.

causing act," *Honickman*, 6 F.4th at 500, the Bank Defendants attempt to sanitize their conduct under the rubric of "routine banking services." The Second Circuit has recognized, however, that "whether a defendant bank's 'financial services to [an FTO or its affiliates should or] should not be viewed as routine' is a 'question[ ] of fact for a jury to decide.'" *Kaplan,* 999 F.3d at 858 (quoting *Linde*, 882 F.3d at 327). Thus, this supposed defense cannot justify the dismissal of Plaintiffs' claims at the pleading stage.

In any event, *knowingly* financing a terrorist organization is not exempt from JASTA liability because the defendant provided the support in a purportedly "routine" manner. As in *Halberstam,* where the defendant's services "as banker, bookkeeper, recordkeeper, and secretary" were "neutral standing alone," 705 F.2d at 487, 488, the relevant issue is not the abstract nature of the assistance. Rather, courts consider whether the services assisted a tortious or illegal *enterprise* and whether violence is a foreseeable risk of that enterprise. *Id.* at 488-89.[18]

In any event, the services Defendants provided here were anything but routine. QNB provided accounts and banking services to several notorious Hamas criminals, including a terrorist on the FBI's most wanted list and the head of a U.S.-designated terrorist organization. ¶¶ 161, 168; Bonner Ex. 1 ¶¶ 172-187, 210-212. QNB also opened those accounts in a most irregular way, allowing 20 convicted Hamas criminals to use the same P.O. Box as the address for their separate accounts. Bonner Ex. 1 at ¶ 175-176, 191, 215, 218.

Both Bank Defendants also provided services to Qatar Charity despite knowing that it had compiled a long and public history of supporting international terrorism (¶¶ 67-84) and was banned from the Palestinian Territories because it had been publicly designated as a financer of

_____

[18] The *Kaplan* Court noted that *Linde* only addressed whether routine services might be insufficient to a *primary* liability claim that "the defendant *itself* committed an act of terrorism"—not to a JASTA aiding-and-abetting claim. *Kaplan*, 999 F.3d at 858 (quoting *Linde*, 882 F.3d at 327).

Hamas terrorism (¶¶ 79-81).  Nonetheless, Masraf transferred funds there to permit Qatar Charity to support the FTOs.  ¶¶ 5, 130.

These facts demonstrate that "the nature of the act encouraged or assisted" factor supports finding that each Defendant provided substantial assistance to the FTOs.

    b.  <u>The Amount of Assistance Given by Defendant</u>

The "amount of assistance" factor also favors finding that all Defendants provided the FTOs with substantial assistance because each played an important role in providing millions of dollars to Hamas and PIJ.  *See, e.g.,* ¶¶ 5, 130, 146.[19]  Moreover, Hamas terrorists used the accounts QNB maintained for them to finance the terrorist activities of Hamas and PIJ (¶ 181), and Qatar Charity used accounts at both Masraf and QNB for the same purpose (¶¶ 6-8, 13, 132-134, 152-153, 360).  The Bank Defendants' assistance assumed outsized importance because Qatar Charity serves as a key fundraising source for Hamas and PIJ (¶¶ 66-67, 135, 139), and Masraf and QNB were among the small number of banks willing to provide Qatar Charity with access to the USD that terrorist groups covet because of the dollar's status as a universally accepted currency.  ¶¶ 4, 6, 153.

Contrary to Defendants' contentions, the Complaint also leaves no doubt that these funds reached the FTOs and their operatives.  The strength of Plaintiffs' direct allegations that these funds benefited the FTOs is bolstered by their allegations concerning the Qatar-led conspiracy to fund those organizations.  *See* Point I.B.  Moreover, the Complaint outlines the ease with which Defendants could serve the FTOs' financial needs from Qatar, which the U.S. has identified as an especially "permissive jurisdiction" for terrorist financing.  ¶¶ 122, 129.

---

[19] The Complaint alleges that "Defendants, Qatar Charity, [QNB] and Masraf … bank purposefully and knowingly effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity though banks in New York . . . for the ultimate benefit of Hamas and PIJ . . . ." ¶ 13.

In combination, these facts dictate that the "amount of assistance" factor also strongly supports concluding that Plaintiffs have adequately alleged the substantial assistance element of their aiding-and-abetting claim. *Honickman*, 6 F.4th at 500 (courts credit allegations that defendants passed funds to FTOs where the "allegations … permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the" FTO).

c. Defendants' Relationships to the Principal

"[A] direct relationship between the defendant and the FTO is not required to satisfy this factor." *Id.* at 501. Nonetheless, QNB did maintain a direct relationship with Hamas by providing accounts and services to: (a) notorious convicted Hamas terrorists who used their QNB accounts to support Hamas's terrorist activities from Qatar (¶¶ 161-163, 167, 181); and (b) the head of the Union of Good, a U.S.-designated SDGT that served as a principal fundraiser for Hamas (¶¶ 169-73). Qatar Charity's membership in the Union of Good—widely publicized by Israel in 2008—also tied it directly to Hamas.

All Defendants also maintained a close connection with Hamas through their participation in the Qatar-led conspiracy to fund the FTOs and their efforts to pass funds through the Bank Defendants to Qatar Charity, a member of the Union of Good. Finally, the sanctions against Qatar Charity for terror financing and the admissions of its West Bank Director and Staff concerning the organization's use of its Masraf accounts to finance terrorism dispel any doubt that Defendants maintained substantial ties to the FTOs.[20]

---

[20] QNB provides no authority for its claim that Plaintiffs must link the Hamas criminals to which QNB provided banking services to the actual attacks on Plaintiffs and their loved ones. QNB Br. at 31. No such requirement exists. *See Kaplan,* 999 F.3d at 855 (rejecting bank defendant's argument that the complaint was insufficient because it did not allege that any of the bank's customers themselves engaged in an act of international terrorism and finding that JASTA "simply says the defendant must have given 'substantial assistance'" to a terrorist organization, not the terrorist who committed an attack); *Honickman,* 6 F.4th at 498, n. 15 (the bank's customers "do not themselves need to be 'engaged in . . . violent or terrorist acts'"); *Miller,* 372 F.

### d. Defendants' States of Mind

*Kaplan* rejected the argument that a "plaintiff must prove the defendant's intent to further terrorist activity" to establish and aiding-and-abetting claim.  999 F.3d at 858.  Instead, "a plaintiff *may* introduce evidence of intent in order to prove other elements of the aiding-and-abetting claim; but a plaintiff is not required to plead evidence, and an absence of proof of intent is not fatal to the aiding-and-abetting claim because intent is not itself a *Halberstam* element." *Id.* at 860 (citation omitted).

Nevertheless, the Complaint sets forth a detailed factual basis for inferring that all Defendants acted with intent to further the Qatar-led terror financing conspiracy.  *See* pp. 7-17; Point I.B., *infra.*  Qatar Charity knew it was a member of the Union of Good, and Israel's designation, among other factors, apprised Bank Defendants of that fact.  As a result, the state of mind factor also supports finding that Plaintiffs have adequately alleged substantial assistance.

### e. Duration of the Assistance

Plaintiffs have alleged that the Defendants' scheme to fund the FTOs extended over several years.  *See* ¶ 111 ("From at least 2011 through 2015, Hamas and PIJ knowingly, willfully, and unlawfully combined, conspired, confederated and agreed with Defendants to commit numerous acts of international terrorism . . ."); ¶ 178 (Qatar Charity's QNB accounts were opened in 2006 and 2012); ¶¶ 159, 166 (the convicted Hamas terrorists opened their accounts at QNB no later than August 2015); ¶ 173 (the leader of the Union of Good opened his QNB account in 2006).

Masraf's false claim that the "only concrete allegation as to a time period" in the Complaint is "[f]rom March 1, 2015 until September 2015" (Masraf Br. at 19) simply ignores

---

Supp. 3d at 48 (defendant "may be liable under the ATA for aiding and abetting the organization behind the attacks, not only the individual 'triggerman' or suicide bomber").

these allegations.  Again, therefore, the "period of defendant's assistance" factor favors finding that Plaintiffs have adequately alleged the substantial assistance element of their claim.

In challenging the adequacy of Plaintiffs' substantial assistance allegations, Qatar Charity erroneously claims that Plaintiffs must also show that its actions were "integral" to or played a "major part in prompting" the terrorist acts at issue.  QC Br. at 28.  The Second Circuit's recent decisions in *Kaplan* and *Honickman* contain no such requirement.  Nor does *Linde*, the case Qatar Charity purports to quote as the basis for imposing this requirement on Plaintiffs.  *See* QC Br. at 28; *see also Linde*, 882 F.3d at 329 ("What the jury did have to find was that, in providing such services, the bank was 'generally aware' that it was thereby playing ***a 'role'*** in Hamas's violent or life-endangering activities.") (emphasis added); *Miller*, 372 F. Supp. 3d at 46 (the payment need only be a "substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence" of the defendants' scheme) (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013)).

In a misguided attempt to raise factual disputes regarding Plaintiffs' allegations, Qatar Charity highlights its supposedly stellar works.  *See, e.g.,* QC Br. at 25 (asserting that Plaintiffs' allegations that Qatar Charity financed terrorism are "false and flatly belied by the public record").  Obviously, Qatar Charity cannot rely on hearsay news reports to contradict Plaintiffs' allegations at the motion to dismiss stage (or ever).  *E.g., Tescher v. Experian Info. Sols., Inc.*, 2022 U.S. Dist. LEXIS 31759, at *10 (S.D.N.Y. Feb. 23, 2022) ("The Court cannot wade into fact and credibility determinations on a motion to dismiss by considering a hearsay document that was not mentioned in, referenced in, relied upon in bringing, or actually integral to the … Complaint.").  In any event, Congress, the courts and the Executive Branch have emphasized that charitable front organizations frequently perform legitimate philanthropic work while simultaneously funding terrorism.  *See, e.g., Holder v. Humanitarian Law Project*, 561 U.S. 1,

30-31 (2010) ("Investigators have revealed how terrorist groups systematically conceal their activities behind charitable, social, and political fronts.  Indeed, some designated [FTOs] use social and political components to recruit personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations.") (internal quotations and citations omitted).[21]

At present, all that matters is that Qatar Charity's laudatory self-assessment is irreconcilable with the Complaint's *detailed*, *non-conclusory* allegations regarding Qatar Charity's membership in the Union of Good and financing of the FTOs.  *See* pp. 7-12, *supra*. Cherry-picked examples of Qatar Charity's "humanitarian efforts" cannot negate those allegations in connection with a motion to dismiss.

For all of the foregoing reasons, Plaintiffs have plausible alleged that all three Defendants aided and abetted Hamas and PIJ prior to the attacks that resulted in Plaintiffs' injuries and are therefore liable to Plaintiffs under JASTA Section 2333(d).

## B.   Plaintiffs Have Stated Valid Claims for Conspiracy Liability Against All Defendants

Plaintiffs have also adequately alleged a JASTA conspiracy claim by showing "an agreement to do an unlawful act or a lawful act in an unlawful manner; an overt act in furtherance of the agreement by someone participating in it; and injury caused by the act." *Halberstam*, 705 F.2d at 487.[22]

---

[21]  For similar reasons, the court should reject the Bank Defendants' claims that Qatar Charity's humanitarian work undermines Plaintiffs' allegations that the Bank Defendants were generally aware of Qatar Charity's terror financing.  For the reasons Plaintiffs describe above, the Bank Defendants were well aware that Qatar Charity mixed its philanthropy with a healthy dose of support for the FTOs.  *See* pp. 16-17, *supra*.

[22]  Defendants argue only that Plaintiffs have not alleged an agreement to commit an unlawful act.  Thus, they have waived arguments as to the other conspiracy elements, an overt act and causation.  *Domingues v. Barton Chevrolet Cadillac*, 2021 U.S. Dist. LEXIS 29425, at *24

a. Plaintiffs have Alleged an Agreement Among Defendants, Qatar,
the Qatar Royal Family, Hamas, and PIJ to Commit Terrorist Acts

The Complaint clearly and plausibly alleges an agreement among the government of

Qatar, the Qatari Royal Family, the FTOs, and Defendants to finance the FTOs' operations. *See,*

*e.g.,* ¶¶ 111, 137. In connection with that conspiracy, the Bank Defendants agreed to provide

financial services to Qatar Charity, which acted as a front for the FTOs.

Many of the same facts that support Plaintiffs' aiding-and-abetting claim likewise

evidence the existence of Defendants' conspiracy. Qatar and the Royal Family exerted control

over each Defendant, thus facilitating their ability to coordinate Defendants' support for the

FTOs. ¶¶ 4-8, 88, 97, 119, 128, 155. Qatar's status as Hamas's biggest benefactor and Israel's

designation of Qatar Charity as a member of the Union of Good confirm that Qatar and Qatar

Charity shared the objective of funding the FTOs. ¶¶ 127, 139.

The Israeli designation also demonstrates that Masraf and QNB shared the same

objective. ¶¶ 79, 147. Otherwise, they would not have violated universally accepted banking

standards and risked the potential civil and criminal liability that Israel very publicly highlighted

by serving the banking needs of a designated financier of terrorism for more than a decade after

that designation. ¶¶ 79, 139, 141-47. QNB's willingness to serve as a one-stop-shop for the

financial needs of murderers and a cleric who advocated suicide bombings and other forms of

violence further confirms that it shared the objectives of Defendants' conspiracy. ¶¶ 157-81.

Likewise, QNB's astonishing decision to name that cleric to a significant position at the bank

dispels all doubts regarding its willingness to embrace the purveyors of terror. ¶¶ 98, 169.

---

(S.D.N.Y. Feb. 17, 2021) (considering unraised arguments waived where defendants argued only
certain elements of a claim).

Each Defendant also played an integral role in the conspiracy, with Qatar Charity maintaining the direct link to the FTOs and the Bank Defendants providing invaluable access to services that included processing USD transactions that few, if any, banks would risk performing for a member of the Union of Good.  ¶¶ 130-34.  In the background, Qatar enabled all of that illicit behavior by—consistent with its longstanding role as the FTOs' largest funder—encouraging the behavior that the Israel and Qatar's Gulf neighbors sanctioned.  ¶¶ 3-9, 79, 139, 141-47, 83-84.

The Complaint belies Defendants' efforts to characterize the conspiracy allegations as "conclusory."  The existence of the conspiracy is confirmed by the criminal confessions by the Director and Staff of Qatar Charity's West Bank Branch, which detail how Qatar Charity and Masraf laundered USD through the U.S. to Qatar Charity's accounts in the West Bank.  ¶ 132. Other allegations are based upon statements from Israeli security agencies, publicly available U.S. Treasury designations, State Department reports, and statements by counterterrorism officials, among other sources.[23]  ¶¶ 157-181.

These detailed allegations distinguish this case from *O'Sullivan v. Deutsche Bank AG*, 2019 U.S. Dist. LEXIS 53134, at *37-38 (S.D.N.Y. Mar. 28, 2019), where the court refused to infer that the violation of Iranian sanctions by European banks sufficed to establish a conspiracy between the banks and various Iranian entities.  Unlike this case, the *O'Sullivan* plaintiffs alleged "no facts from which the Court can infer that Defendants knew that the financial services they

---

[23]  Both the content of Plaintiffs' allegations and their sources distinguish this case from *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011).  *Gallop* involved implausible claims lacking in any factual support that U.S. government officials intentionally caused the September 11 attacks to advance their political interests and conceal their misallocation of funds to the Department of Defense.  That far-fetched "conspiracy theory" finds no parallels here.

provided to various Iranian entities would be directed towards FTOs." *Id.* In contrast, no doubt exists here that Defendants recognized Qatar Charity's membership in the Union of Good and, thus, its status as a leading funder of Hamas.

Because Plaintiffs have alleged that Defendants conspired with the FTOs, Defendants' myopic reading of JASTA to require a *direct* agreement with Hamas and PIJ provides no basis for dismissing the conspiracy claim. In any event, Defendants' interpretation of JASTA's conspiracy provision limits the law to far less than its stated purpose of "provid[ing] civil litigants with the *broadest possible basis*" to sue entities "that have provided material support, *directly or indirectly*" to FTOs. JASTA § 2(b), 130 Stat. 852 (emphasis added).

Notably, no binding authority exists for the direct agreement requirement. In *Freeman v. HSBC Holdings PLC*, which QNB cites, the court acknowledged "Congress's apparent intent to provide liability for actions that indirectly assist in the commission of acts of terrorism." 413 F. Supp. 3d 67, 98 n.41 (E.D.N.Y. 2019) ("*Freeman I*"). Despite that Congressional intent, the court concluded that "the plain text of JASTA's *conspiracy* liability provision requires that a defendant conspire directly with the person or entity that committed the act of international terrorism that injured the plaintiff." *Id.* (emphasis in original).[24]

But nowhere in JASTA's conspiracy provision (18 U.S.C. § 2333(d)(2)) did Congress employ the word "directly." Because Congress's clearly expressed intent is consistent with the plain text of § 2333(d)(2), JASTA does not require a direct agreement between the defendant and the FTO for civil liability to attach to any member of the conspiracy. *See Gen. Dynamics Land*

---

[24] Masraf and Qatar Charity also cite to dicta in the Second Circuit's *Kaplan* decision (which only addressed aiding-and-abetting claims) even though the court expressed no view regarding whether JASTA required a direct conspiracy between a defendant and a principal. *Kaplan* merely noted that "JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspire[d] with' the principal . . . ." 999 F.3d at 855. The court expressed no view regarding whether only a direct agreement could satisfy that standard.

*Sys., Inc. v. Cline*, 540 U.S. 581, 589-90 (2004) (employing a statute's "findings and statements

of objectives" to provide context to its plain meaning).  Although the two parties in *Halberstam*

necessarily conspired directly, the opinion never suggests that JASTA imposes a direct

conspiracy requirement.  Indeed, even in the criminal context, parties to a conspiracy need not

"conspire directly with every other member of it or be aware of all acts committed in furtherance

of the conspiracy, *or even know every other member*."  *United States v. Rooney*, 866 F.2d 28, 32

(2d Cir. 1989) (emphasis added) (quoting *United States v. Friedman*, 854 F.2d 535, 562 (2d Cir.

1989) and *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980)).

Similarly, Qatar Charity's claim (QC Br. at 29) that Plaintiffs must allege an agreement

or direct contact between Defendants and the *individual terrorists involved in an attack* finds no

support in JASTA or case law.  *See Freeman I,* 413 F. Supp. 3d at 97 n.38 (concluding that "a

defendant may be liable under § 2333(d) even if it did not directly conspire with 'the specific

individual representative of the [FTO] who'" actually injured a plaintiff) (quoting *Freeman v.*

*HSBC Holdings PLC*, 2018 U.S. Dist. LEXIS 127289, at *17 (Jul. 27, 2018)).[25]  Qatar Charity's

reading of JASTA would defeat the entire purpose of a law aimed at FTOs, many of which

Congress expressly acknowledged "act[] through affiliated groups or entities" in order to avoid

detection and consequences.  JASTA § 2(a)(3).

---

[25]  Qatar Charity misreads *Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 648
(E.D.N.Y. Sept. 30, 2017) as supporting this assertion.  The *Weiss* court merely emphasized that
JASTA provides that the defendant must "conspire[] with the person who committed [the] act of
international terrorism," as opposed to a person who planned or authorized that act.  *Id.* at 650.
*Weiss* never suggests that the "person" the defendant conspires with must be the individual
terrorist.  Both Hamas and PIJ qualify as a "person" under the plain language of 18 U.S.C.
§ 2333(d)(1).  *See Freeman I*, 413 F. Supp. 3d at 97 ("JASTA's inclusion of societies and
associations within its definition of 'person' clearly indicates that the 'person' committing an act
of terrorism need not be the literal triggerman.").

41

    b.  Plaintiffs Have Plausibly Alleged that Defendants and Their Co-Conspirators <u>Shared a Common Goal of Committing Unlawful Acts</u>

The foregoing discussion also demonstrates that Defendants shared the common goal of funding the FTOs.  As a member of the Union of Good, Qatar Charity's primary purpose is to accomplish that objective.  ¶ 79-81.  The Bank Defendants were well aware that they were facilitating Qatar Charity's funding of the FTOs.  ¶¶ 79, 119-27.  The risks of civil and criminal liability that the Bank Defendants assumed by providing financial services to a banned entity and their continued willingness to maintain accounts for Qatar Charity leave no doubt regarding their adoption of the conspiracy's objective.  ¶¶ 79, 130-34, 177-81.  Moreover, the control that Qatar and the Royal Family exerted over each Defendant lends further strength to the inference that Defendants acted in a coordinated fashion to accomplish a shared objective.  ¶¶ 4-8, 88, 97, 119, 128, 155.  For pleading purposes, these allegations easily suffice to show Defendants' agreement to engage in unlawful conduct.

Contrary to the Bank Defendants' argument, nothing about their conduct is "'so far removed from the acts of terrorism that injured Plaintiffs that the Court cannot infer that Defendants shared the common goal of committing an act of international terrorism.'"  Masraf Br. at 20 (quoting *O'Sullivan*, 2019 U.S. Dist. LEXIS 53134, at *37); *see also* QNB Br. at 32-33 (quoting *Kaplan*, 405 F. Supp. 3d at 534).  On the contrary, the Second Circuit has recognized that, in the context of ATA claims brought against financial institutions provide banking services for charitable front organizations, "wire transfers are a part of the principal wrong at which the plaintiffs' lawsuit is directed."  *Licci v. Lebanese Canadian Bank,* 732 F.3d 161, 170 (2d Cir. 2013).

Plaintiffs' conspiracy allegations are far more detailed than the allegations considered in the district court opinion in *Kaplan*, a case that was reversed on appeal, albeit with respect to the

plaintiffs' aiding-and-abetting claim.  Given that the Second Circuit disagreed with the *Kaplan* district court's characterization of the very allegations QNB cites, the opinion is not persuasive authority for anything.  *See, e.g., Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 534 (S.D.N.Y. 2019) (finding liability based on "no factual support for their claim that … the Five Customers were affiliated with Hizbollah").

## II
### PLAINTIFFS PLAUSIBLY ALLEGE A PRIMARY VIOLATION OF THE ATA

As Defendants correctly note, under the ATA an act of international terrorism must (1) involve violence or endanger human life; (2) violate federal or state criminal law if committed in the United States; (3) appear to be intended to intimidate or "coerce a civilian population" or to "influence the policy [or the conduct] of a government by intimidation[,]" "coercion[,]" "mass destruction, assassination, or kidnapping"; and (4) occur primarily outside the United States or transcend national boundaries.  *See e.g.,* Masraf Br. at 23 (citing 18 U.S.C. § 2331(1)).  Providing financial services to a terrorist organization may satisfy the first prong of a primary violation under the ATA.  *See Miller*, 372 F. Supp. 3d at 45.  As demonstrated below, Plaintiffs have satisfied all of those requirements.

Defendants argue that Plaintiffs fail to state an ATA primary liability claim because Defendants' support for terrorist organizations and terrorists (a) is not itself terrorism and thus did not involve violence or endanger human life, and (b) did not cause Plaintiffs' harms.  *See* QC Br. at 19-28; Masraf Br. at 22-29; QNB Br. at 34-40.  Both arguments are meritless.

### A.  Defendants' Provision of Financial Services to Hamas and PIJ Was Itself Terrorism as Defined by 18 U.S.C. § 2331

Defendants mistakenly argue that 18 U.S.C. § 2331(1) provides "civil relief only against the principals perpetrating acts of international terrorism."  QNB Br. at 35 (quoting *Linde*, 882 F.3d at 319–20); QC Br. at 19 (same); Masraf Br. at 23 (citing *Freeman*, 413 F. Supp. 3d at 86).

43

This Court rejected that argument in *Miller*, 372 F. Supp. 3d at 46, which makes clear that financial services can themselves be acts of terrorism.

### 1. Defendants' Provision of Financial Services to Hamas and PIJ Endangered Human Life

The Bank Defendants provided financial services and several bank accounts to Qatar Charity, a known terrorist front that was financing Hamas and PIJ in the Palestinian Territories although Israel banned Qatar Charity in 2008 for its unlawful sponsorship of terrorism there and its membership in the Union of Good.  ¶¶ 79, 128-34.  Those services included transferring millions of USDs bound for Hamas and PIJ through the New York banking system to a jurisdiction where Qatar Charity was banned from operating precisely because of its sponsorship of Hamas terrorism.  Defendants also: provided funds for the purchase of anonymous Sanabel debit cards used to provide martyr payments to Hamas and PIJ operatives, like those who perpetrated the attacks on Plaintiffs (¶¶ 79, 128-34; Bonner Ex. 1, ¶¶ 148-54); provided financial services to notorious convicted criminal Hamas leaders who used their accounts at QNB to further Hamas's terror operations; and provided an account for the leader of the U.S. designated SDGT, the Union of Good.  ¶¶ 157-81; Bonner Ex. 1, ¶¶ 168-226.[26]  In addition, Qatar Charity

---

[26] QNB maintained accounts for at least 20 Hamas terrorists freed from Israeli prisons in exchange for the release of Hamas-held hostages (Bonner Ex. 1, ¶¶ 173-74), including: (1) Ahlam Aref Ahmad Tamimi, whom the FBI placed on its most wanted list for, *inter alia*, her role in the Sbarro Pizzeria bombing in Jerusalem that killed 15 people and injured scores (*id*. at ¶¶ 210-13); (2) Husam Badran, the Hamas Politburo Spokesperson and former leader of Hamas' military wing in the West Bank, who continues to advocate for Palestinian terrorism and to fund and direct Hamas terror cells (¶¶ 167-73; Bonner Ex. 1 at ¶¶ 178-88); (3) Musa Dudin, a member of the Hamas Politburo, who maintains Hamas' "prisoner portfolio" and determines which operatives Hamas insists Israel should release from prison in exchange for freeing civilians and IDF soldiers whom Hamas has kidnapped or for returning the remains of IDF soldiers killed by terrorists to the soldiers' families (¶¶ 164-68; Bonner Ex. 1 at ¶¶ 190-95); (4) Zaher Ali Musa Jibril, a U.S. Treasury Specially Designated National who helped found Hamas' military wing in the West Bank and who continues to run Hamas's financial operations (Bonner Ex. 1 at ¶¶ 214-17); (5) Hisham Hijaz, who has offered a $20,000 martyr payment to the family of anyone

used its accounts at Masraf and QNB to provide financial support to Hamas and PIJ terrorism in the Palestinian Territories, a fact confirmed by the criminal confessions of Qatar Charity's West Bank Director and Staff.  ¶¶ 79, 128, 132-134.[27]

In assessing the "endanger human life" prong of ATA primary liability, this Court found in *Miller* that Arab Bank's participation in a martyr payment scheme and account maintenance for Hamas operatives "was dangerous to human life under 18 U.S.C. § 2331(1)(A).  *Miller,* 372 F. Supp. 3d at 45.  The Court held that "by rewarding acts of terrorism, [Arab Bank] incentivized prospective 'martyrs' to commit acts of violence and enhanced Hamas's reputation among potential recruits" and that "Arab Bank further enhanced terrorists' ability to conduct acts of violence by routing payments and maintaining accounts for terrorists and terrorist organizations." *Id.*

Here, the Bank Defendants provided the same types of services that this Court found sufficient in *Miller* to satisfy the ATA's primary liability requirements.  *See* pp. 12-16, *supra.* Thus, *Miller* defeats Defendants' motions to dismiss.

As in *Miller*, "[u]nder these circumstances, '[g]iving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life'" under the ATA.  *Id.* (quoting *Boim v. Holy Land Foundation for Relief and Development*, 549 F.3d 685, 690 (7th Cir. 2008)).  Providing financial services like wire transfers under these

---

carrying out a suicide bombing in Israel; and (6) other terrorists collectively responsible for the killing scores of victims (*id*. at ¶¶ 218-21).

[27] Plaintiffs also allege that: Israel publicly identified Qatar Charity as part of the Union of Good, a terror finance network designated as an SDGT by the U.S. for providing martyr payments to Hamas terrorists (¶¶ 79, 81, 170, 171); and Qatar Charity's local branches in the Palestinian Territories distributed funds to Hamas, PIJ, and their affiliates, as corroborated by annual reports for 2013, 2014, and 2015 (¶¶ 134-35).

circumstances is also dangerous to human life since "financial services increase Hamas' ability to carry out attacks in the same way, and Congress made no distinction between these different forms of material support in criminalizing them." *Id.* (quoting *Linde*, 97 F. Supp. 3d at 323). Accordingly, Defendants' actions were "dangerous" within the meaning of 18 U.S.C. § 2331(1)(A).[28]

Qatar Charity and QNB cite *Kemper v. Deutsche Bank AG*, presumably as a counterpoint to *Miller* (which cites *Boim* favorably), but the distinction the Seventh Circuit drew between *Kemper* and *Boim* demonstrates that *Kemper* does not support dismissing Plaintiffs' claims. This case, like *Boim*, "dealt with direct donations to a known terrorist organization." In contrast, *Kemper* involved "business with companies and countries that have significant legitimate operations," specifically, the entire government of Iran. 911 F.3d 383, 390 (7th Cir. 2018).

This case more closely parallels *Miller* than *Kemper*. As part of their conspiracy to support Hamas and PIJ: Qatar Charity (itself a notorious front for FTOs) made direct payments to the FTOs; Masraf helped Qatar Charity, an Israel-designated sponsor of Hamas, move money into Hamas-controlled territory in which Qatar Charity was banned from operating; and QNB provided financial services directly to Hamas's criminal leadership. ¶¶ 5, 67-84, 128-40, 157-81.

### 2. Defendants Provision of Financial Services to Hamas and PIJ Was Intended to Intimidate and Coerce

As explained by this Court in *Miller*, the "intended to intimidate and coerce" prong is satisfied where, as here, a defendant knowingly provides support to a violent terrorist organization "like Hamas," or even to an organization substantially likely to engage in terrorism:

> In a persuasive opinion that the Second Circuit described at length in *Linde II*, Judge Posner explained that a defendant who provides financial support to an organization like Hamas who "knew the aims and activities of the organization" would "by augmenting Hamas's resources ... enable Hamas to kill

---

[28] *See* Bonner Ex. 1, at ¶¶ 148-154 (describing Sanabel card scheme)

> or wound, or try to kill, or conspire to kill more people in Israel." *Boim* …, 549 F.3d at 694 …. "And given such foreseeable consequences, such donations would appear to be intended to intimidate or coerce a civilian population or to affect the conduct of a government by assassination, as required by section 2331(1)" of the ATA. *Id.* (internal quotation marks and alterations omitted). Even if one does not know the organization engages in terrorism, liability is appropriate when one "is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care." *Id.* at 693.

Defendants' conduct closely parallels the actions the Court found sufficient to allege the "intended to intimidate and coerce" prong of an ATA claim in *Miller.* Plaintiffs allege that Masraf and QNB "knew that by allowing Qatar Charity to use accounts at the banks to funnel money to Hamas and PIJ they were joining a conspiracy that had as an essential goal the commission of acts of international terrorism, including the kidnapping and murder of Americans in Israel." ¶ 379. Moreover, Defendants intended that the conduct they undertook in furtherance of the conspiracy would improve Hamas' ability to carry out terrorist attacks. ¶¶ 111, 128-34, 139, 147, 153-54, 181.

Those facts again distinguish this case from *Kemper*, where the court found that Deutsche Bank intended to increase its profits by offering sanctions-busting services at "premium prices," not to "intimidate or coerce" civilians. *Kemper*, 911 F.3d at 390, 394. In contrast, as in *Miller*, Defendants demonstrated their intention to further the FTOs' violent agenda by providing "financial support to an organization like Hamas." *See Miller*, 372 F. Supp. 3d at 45. Plaintiffs' claims therefore meet the requirements of 18 U.S.C. § 2331(1)(B). Moreover, because this conduct primarily occurred outside of the United States, Defendants' conduct also meets the requirements of 18 U.S.C. § 2331(1)(C). *See id.*

### 3. Defendants Provision of Financial Services to Hamas and PIJ Caused Plaintiffs' Injuries

Masraf repackages the "but for" causation argument the Court rejected in *Miller* by arguing that Plaintiffs must show that Defendants' conduct was "necessary" for the attacks at issue to prove causation under 18 U.S.C. § 2331.  Masraf Br. at 37; *see Miller*, 372 F. Supp. 3d at 46.  While Qatar Charity and QNB acknowledge that the proper standard is proximate causation, they nonetheless appear to argue that Plaintiffs must connect specific dollars transferred as part of Defendants' conspiracy to specific attacks.  QC Br. at 26-28, QNB Br. at 38-39.  This Court also rejected that argument in *Miller*:

> [A] showing that defendant's conduct was the "'[b]ut for' cause [of plaintiff's injuries] cannot be required in the section 2333(a) context."  *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012).  Requiring a showing of but-for causation would eviscerate Section 2333(a) of the ATA because money is fungible.  *Linde*, 882 F.3d at 324.  "Even if an ATA plaintiff could show that a particular dollar was used in furtherance of a particular attack – a requirement rejected by this Court – that plaintiff still could never prove that absent the defendant's providing that dollar, a group like Hamas would not have made up the shortfall from elsewhere."  *Id*.

> In such circumstances "the requirement of proving causation is relaxed because otherwise there would be a wrong and an injury but no remedy because the court would be unable to determine which wrongdoer inflicted the injury."  *Boim*, 549 F.3d at 697.  *See also Paroline v. United States*, 572 U.S. 434, 452 (2014) ("[I]t would be anomalous to turn away a person harmed by the combined acts of many wrongdoers simply because none of those wrongdoers alone caused the harm ...").

*Miller*, 372 F. Supp. 3d at 46.

As the Court held in *Miller,* the proximate causation standard requires that Plaintiffs allege that Defendants' conduct was a "substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence."  *Id.*  "Allegations that a defendant provided money to terrorist organizations, or transferred money that was given to terrorist organizations, strengthens the inference that" Defendants'

conduct caused the plaintiffs' injuries.  *Id.* (citing *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013)).

In finding the proximate cause requirement satisfied in *Miller*, this emphasized that Arab Bank "maintained accounts for terrorist organizations, and routed payments to terrorist organizations, which further enhanced their ability to fund and commit acts of terrorism."  *Id.* As a result, the Court held that, "[i]n light of the *nature of . . . Hamas, and other entities that Arab Bank provided these services to*, it was reasonably foreseeable that Defendant's conduct would lead to plaintiff's injuries."  *Id.*

That holding compels a finding that Plaintiffs have adequately alleged proximate causation.  Like Arab Bank, Defendants provided financial services that enhanced the ability of Hamas and PIJ to carry out the types of terrorist attacks that harmed Plaintiffs.  As in *Miller*, therefore, Defendants proximately caused Plaintiffs' injuries because Defendants' conduct was a "substantial factor in the sequence of responsible causation" and Plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence" of those illicit actions.  *Id.*; *see* ¶¶ 128-34.

Masraf and Qatar Charity also argue that they could not have caused the Glick, C.Z.B., and Force attacks because they predate the $28 million in transfers that occurred between March and September 2015.  Masraf Br. at 5, QC Br. at 15.  Paragraph 130 of the Complaint states that "[f]rom March 1, 2015 until September 7, 2015 *alone*, Defendants conspired to transfer over $28 million in those donations from Qatar Charity to its two branches in PA administered territories." (emphasis added).  Of course, the term "alone" signifies that this was not an exclusive period of Hamas and PIJ funding by Defendants.  Rather, it reflects certain details that were available to Plaintiffs without the benefit of discovery, as other details remain behind the wall of bank secrecy.

Moreover, this argument ignores that Plaintiffs also allege that Defendants' terror finance conspiracy involved the transfer of millions of dollars through Masraf's New York correspondent account at least as early as 2011.  ¶¶ 111, 132.  Moreover, Qatar Charity annual reports for 2013, 2014 and 2015 reflect that it transferred funds to Hamas and PIJ in those years (¶ 135), and Israel banned Qatar Charity for funding Hamas before 2008.  ¶¶ 79, 171.  Thus, Defendants' temporal causation argument also fails.

### 4.   **Defendants All Exhibited the Requisite *Mens Rea***

Masraf argues that Plaintiffs do not "allege the temporal connection required for mens rea" under 18 U.S.C. § 2339A and 18 U.S.C. § 2339B, purportedly because they do not allege that Masraf knew of Qatar Charity's ties to the FTOs before the attacks that injured Plaintiffs. Masraf Br. at 29.  In fact, as Plaintiffs discuss in Point I.B., the Complaint alleges that Masraf knowingly participated in a Qatari-led conspiracy to support Hamas and PIJ terrorism.  The inference that Masraf acted knowingly is strengthened by, among other facts: Masraf's domination by Qatar and the Royal Family, who openly support Hamas; and Israel's 2008 public declaration barring Qatar Charity because of its terror funding and warning banking institutions to proceed accordingly.  ¶¶ 6, 79, 88-90.

Given these facts, it strains credulity to imagine how Masraf could have remained ignorant of Qatar Charity's role in financing Hamas.  Therefore, "its ignorance would be the result of deliberate indifference" and Masraf "cannot ignore blatant red flags and then use its deficient compliance program as a shield against liability."  *Miller*, 372 F. Supp. 3d at 45.

Plaintiffs' allegations also preclude the supposed *mens rea* defenses of Qatar Charity, which served as part of the Hamas' fundraising wing, and QNB, which provided financial services directly to Hamas's criminal leadership.  ¶¶ 128-34, 157-81.  Accordingly, the Court should also reject Defendants' purported *mens rea* defense.

50

## III
### ALL PLAINTIFFS HAVE STATUTORY STANDING TO ASSERT ATA CLAIMS

**A.  The Foreign National Plaintiffs Have Standing to Assert Claims for Their Injuries**

Defendants assert that Plaintiffs Amichai Ariel, Abraham Ron Fraenkel, and Rita Avni lack standing because "while foreign nationals may bring claims on behalf of U.S. nationals, under the ATA, *only* claims for injuries suffered by a U.S. national are actionable."  Masraf Br. at 30; *see also* QC Br. at 35, QNB Br. at 5 n.2.  This Court has already rejected this argument as "based on a strained interpretation" of the statute.  *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 152 (E.D.N.Y. 2020) (quoting *Lelchook v. Commerzbank AG*, 2011 U.S. Dist. LEXIS 106305, at *7 (S.D.N.Y. Aug. 2, 2011)).  "'18 U.S.C. § 2333(a) contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves by citizens of the United States.'"  495 F. Supp. 3d at 153 (quoting *Estates of Ungar ex rel. Strachman v. Palestinian Authority*, 304 F. Supp. 2d 232, 263 (D.R.I. 2004)).  As a matter of law, both Amichai Ariel and Abraham Ron Fraenkel qualify as the heirs of their murdered, U.S. national minor children.  ¶¶ 18, 27, 201, 334; *Estates of Ungar*, 304 F. Supp. 2d at 261 (an intestate decedent's parents are his legal heirs under Israeli law).  Rita Avni qualifies as her father-in-law's survivor.  *See id*. at 263-4 ("By including the term 'survivors' in the class of persons eligible to bring an action, Congress evidenced an intention that family members who are not legal heirs … may bring an action pursuant to the statute.").

Additionally, Defendants assert that Plaintiff Yehudah Glick lacks standing because he renounced his U.S. citizenship ***after*** being injured in the terrorist attack, in order to be able to serve in the Israeli Knesset.  *See* Masraf Br. at 30; QC Br. at 35; QNB Br. at 5 n.2.  Defendants offer only inapposite legal support for this standing challenge.  *See* Masraf Br. at 30 -31 (citing *Comer v. Cisneros*, 37 F.3d 775, 787 (2d Cir. 1994) (addressing Article III standing) and

51

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia,* 2020 U.S. Dist. LEXIS 89839, at *9 (S.D. Fla. May 20, 2020) (holding that "the ATA permit[s] individuals who were not U.S. nationals at the time of the injury but subsequently become U.S nationals [can] state a claim")). That a non-U.S. national can retroactively gain standing upon gaining U.S. citizenship does not show that a U.S. citizen loses standing upon renouncing his citizenship.  If anything, *Caballero* reinforces this Court's finding that the ATA should be construed "'broadly'" so as not to undermine the statute's "broad remedial purpose."  *Estate of Henkin*, 495 F. Supp. 3d at 152 (quoting *Lelchook*, 2011 U.S. Dist. LEXIS 106305, at *3).  Plaintiff Yehuda Glick's right to relief accrued at the time of his injury and Defendant has described no statutory or judicial mechanism by which that right was extinguished.

## B.  The Nine Relatives of Richard Lakin, C.Z.B., and Yoav Golan All Have Standing

Defendants assert that "Plaintiffs Rita Avni (daughter-in-law), Shachar Boteach, Y.L., R.A., V.A. (grandchildren), E.A. (step-grandchild), and D.A.B. (great-grandchild), Plaintiffs Shimson Sam Halperin, Sara Halperin, Murray Braun, and Esther Braun (grandparents), and Plaintiffs Cici Jacobson and Eddy Jacobson (grandparents and grandparents-in-law)" lack standing to bring claims in their own right because they are not a "child, parent, spouse, or sibling" of a decedent or injured Plaintiff.  Masraf Br. at 31; QC Br. at 35; QNB Br. at 5 n.2.

That assertion is factually incorrect as to Plaintiffs Murray Braun, Esther Braun, Sam Halperin, and Sara Halperin who are, respectively, the parents of Plaintiffs Shmuel Elimelech Braun and Chana Braun, who were direct victims injured in the October 22, 2014 car ramming at Ammunition Hill station in Jerusalem.  ¶¶ 264-272.  Accordingly, by Defendants' own admissions these four Plaintiffs have standing to recover as parents of two directly injured Plaintiffs.

With respect to the other nine Plaintiffs, nothing in the ATA limits the recovery of

damages to the children, parents, spouses and siblings of direct victims of terrorism.  To the contrary, the ATA provides for the award of triple damages to compensate "any national of the United States injured in his or her person … by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  The appropriate question, therefore, is whether the loss of a non-immediate family member constitutes a personal injury within the scope of the statute.  Defendants do not cite a single case that addresses this issue.  *See* Masraf Br. at 31 (citing *Estate of Henkin*, 495 F. Supp. 3d at 152 (addressing not the question of whether grandparents, grandchildren, and children-in-law have standing, but rather whether foreign national relations generally have standing) and *Weiss*, 453 F. Supp. 2d at 620 (same)).

Other cases cited by Defendants indicate that the question of the appropriate compensation for loss of solatium involves a fact-intensive inquiry unsuitable for resolution on a motion to dismiss.  *See, e.g., Smith ex rel. Smith v. Islamic Emirate of Afg.*, 262 F. Supp. 2d 217, 236 (S.D.N.Y. 2003) (finding that a grandmother qualified for solatium damages where evidence indicated "an extremely close bond" with her grandchild after reviewing affidavits of multiple witnesses); *In re Terrorist Attacks on Sept. 11, 2001*, 2017 U.S. Dist. LEXIS 128288, at *318-19 (S.D.N.Y. Aug. 8, 2017) ("[E]very plaintiff is entitled to have their damages claim fully evaluated by the Court.  As such, the Court heartily agrees … that rather than apply 'a rigid rule or formulaic analysis,' it must 'embrace a claim-by-claim, family-by-family, fact-driven analysis.'") (citations omitted).  Hence, damages have been awarded to compensate the injuries suffered by grandparents, grandchildren, stepparents, stepchildren, stepsiblings, domestic partners, and fiancés of direct victims of the September 11th terrorist attacks.  *See, e.g., Burnett v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 26368, at Exhibit A (S.D.N.Y. Feb. 14, 2020); *Ashton v. al Qaeda Islamic Army*, 2018 U.S. Dist. LEXIS 158369, at *554 (S.D.N.Y. Sept. 13, 2018).  The approach under the ATA should be no less flexible than that under the

terrorism exception to the Foreign Sovereign Immunities Act, and allow each Plaintiff to have their day in court to prove the extent of their injury.  See Estates of Ungar, 304 F. Supp. 2d at 263 ("Congress did not intend that the class of persons able to bring actions pursuant to § 2333(a) should be interpreted narrowly.").

However, should the Court conclude that the Complaint does not sufficiently allege the standing of the non-immediate family member Plaintiffs, Plaintiffs respectfully request they be given the opportunity to replead.

**IV**
**DEFENDANTS' RULE 12(B)(5) MOTIONS SHOULD BE DENIED**

**A.  Plaintiffs Have Made a *Prima Facie* Showing That Service**
     **Under Rule 4(f)(2)(C)(ii) is not Prohibited by Qatari Law**

All three Defendants challenge the sufficiency of service, notwithstanding the Court's request that they refrain from so doing (*see* Jan. 28, 2022 Pre-Motion Conference Transcript at 4:21-8:14), and Defendants' undeniable awareness that service pursuant to letters rogatory, which has been in process for over a year, ultimately will moot their challenges.  *See* Bonner Decl. at ¶¶ 10-11.  Even more frivolously, both QNB and Masraf challenge the sufficiency of Plaintiffs' ***proofs of service*** based on the *non sequitur* that Plaintiffs have failed to demonstrate that the individuals who signed for the FedEx packages containing the summons and complaint were authorized to accept personal service of process on behalf of QNB and Masraf.  *See* QNB Br. at 7; Masraf Br. at 42-43 (citing *Rosenberg v. Lashkar-E_Taiba*, 2017 U.S. Dist. LEXIS 52116, at *4 (E.D.N.Y. Mar. 21, 2017) (a case involving proofs of service on individual defendants who defaulted).  Under Rule 4(*l*)(2)(B), service outside of the United States under Rule 4(f)(2) can be proved by any "evidence satisfying the court that the summons and complaint were delivered to the addressee"—in this case, the evidence that QNB and Masraf have appeared in, and vigorously defended, this action should meet that standard.

To survive Defendants' Rule 12(b)(5) motion, in the absence of a full-blown evidentiary hearing, Plaintiffs need only make a *prima facie* showing that service by the Clerk of Court in accordance with Rule 4(f)(2)(C)(ii) is not prohibited by Qatari law, which Plaintiffs have done. *See, e.g., Fed. Home Loan Mortg. Corp. v. Steinfeld*, 1992 U.S. Dist. LEXIS 20616, at *5 (E.D.N.Y. Dec. 23, 1992) (citing *Marine Midland Bank v. Miller*, 664 F.2d 899,904 (2d Cir. 1981)).  Extensive research has revealed no decision in which a federal or state court in the United States has found that service of process by a form of mail that requires a signed receipt is prohibited by Qatari law.  *See* Bonner Decl. at ¶ 12.  The "country specific" guidance for Qatar published in the U.S. Department of State's on-line Judicial Assistance database does not indicate that service of process by mail is prohibited in Qatar (*cf., e.g.*, Switzerland and Germany).  *See* Bonner Ex. 9.  And the Qatari Civil and Commercial Procedures Law (Law No. 13 of 1990) expressly authorizes courts—albeit Qatari courts—to deliver process to any person inside **or outside of** Qatar "by registered mail or any other appropriate means."  *See* Bonner Ex. 10 at Art. 11.[29]  A similar provision in the Taiwan Code of Civil Procedure was among the evidence that convinced the U.S. District Court for the Eastern District of Pennsylvania that the law of Taiwan did not prohibit service by registered mail.  *See Trueposition, Inc. v. Sunon, Inc.*, 2006 U.S. Dist. LEXIS 39681, at *14 (E.D. Pa. June 14, 2006).

## B.   Alternatively, the Court has Discretion to Order Service Pursuant to Rule 4(f)(3)

Even if the Court finds that Plaintiffs have not made out a *prima facie* case of sufficient service, it "is not required to[] dismiss the action … [and] may grant leave to allow the [P]laintiff[s] to cure the insufficiency."  *Sajimi v. City of New York*, 2011 U.S. Dist. LEXIS

---

[29]  As in the United States, the term "registered mail" in Qatar refers to a form of "postal service which allows sender proof of mailing upon request and a signed proof of delivery upon delivery."  *See* https://qatarpost.qa//FAQs (last visited on March 21, 2022).

3912, at *9 (E.D.N.Y. Jan. 13, 2011).  Pursuant to the Court's March 2, 2022 minute order on

Plaintiffs' request for a pre-motion conference, Plaintiffs respectfully request the Court to enter

an order under Rule 4(f)(3) directing service of process on the Defendants by e-mails sent to

their respective counsel of record in this action.  *See, e.g., Vega v. Hastens Beds, Inc.*, 339 F.R.D.

210, 222 (S.D.N.Y. 2021) (granting leave to serve Swedish defendants via email sent to their

counsel of record); *NYKCool A.B. v. Pacific Int'l Servs.*, 2015 U.S. Dist. LEXIS 27434, at *8-16

(S.D.N.Y. Mar. 5, 2015) (overruling objections to Magistrate Judge's order authorizing service

on attorneys who had appeared in the action to challenge service and personal jurisdiction on

behalf of foreign defendant).

       "Service of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief."

*Group One Ltd. v. GTE GmbH*, 523 F. Supp. 3d 323, 341 (E.D.N.Y. 2021) (internal quotation

omitted).  It is "committed to the sound discretion of the district court … so long as the ordered

means of service (1) is not prohibited by international agreement; and (2) comports with

constitutional notions of due process."  *Id*. at 342 (internal quotations omitted).  "The Due

Process Clause requires that the alternative means of service be 'reasonably calculated, under all

the circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections.'"  *Id*. at 344 (quoting *Mullane v. Central Hanover Bank

& Tr. Co*., 339 U.S. 306, 31 (1950)).  "Email service has … repeatedly been found by courts to

meet the requirements of due process."  *Pearson Educ. Inc. v. Doe 1*, 2019 U.S. Dist. LEXIS

210349, at *6 (S.D.N.Y. Dec. 2, 2019).  Moreover, "it is not necessary to exhaust or demonstrate

the impossibility of service under Rule 4(f)(1)-(2) before resorting to service under Rule 4(f)(3)."

*NYKCool A.B*., 2015 U.S. Dist. LEXIS 27434, at * 9).  The Defendants will ultimately be served

via letters rogatory.  In the meantime, the Court should put to rest their pointless challenges to

the sufficiency of the service that indisputably apprised them of the pendency of this action.

## V.
### THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER EACH DEFENDANT

### A.  The Standards Governing Rule 12(b)(2) Motions

To defeat a motion to dismiss on personal jurisdiction grounds, plaintiffs need only "ma[k]e out a prima facie case of personal jurisdiction." *Hypefortype Ltd. v. Universal Music Grp., Inc.*, 2017 U.S. Dist. LEXIS 150500, at *4 (E.D.N.Y. Sept. 17, 2017) (Cogan, J.); *accord, e.g., Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) ("*Licci I*").  To accomplish that, Plaintiffs need only make "'an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant.'" *Licci I,* 673 F.3d at 59 (citation omitted).  The Court must "'constru[e] all pleadings and affidavits in the light most favorable to the plaintiff[s] and resolv[e] all doubts in the plaintiff[s'] favor.'" *Id.* (citation omitted).  That permissive standard controls in the absence of jurisdictional discovery and "'a full-blown evidentiary hearing,'" and "'notwithstanding any controverting presentation' by defendant." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (quoting *S. New Eng. Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010) and *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).

### B.  Fed. R. Civ. P. 4(k)(2) Provides a Basis for Exercising Jurisdiction Over All Defendants

Defendants' erroneous assumption that Plaintiffs must satisfy the New York long-arm statute (CPLR § 302) disregards Plaintiffs' personal jurisdiction allegations pursuant to Fed. R. Civ. P. 4(k)(2). *See* ¶ 12.  Rule 4(k)(2) provides for jurisdiction where: (a) plaintiffs assert federal claims; (b) "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction;" and (c) "exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2).  The first two elements of Rule 4(k)(2) are satisfied. Plaintiffs assert federal claims under the ATA.  *See* ¶¶ 10, 354-407; 18 U.S.C. § 2333(a), (d).

Defendants identify no other state where Plaintiffs can assert their claims.[30]  For the reasons

explained below, exercising personal jurisdiction over all Defendants based upon Masraf's use of

its correspondent bank account under either an agency theory or a conspiracy theory of personal

jurisdiction is consistent with due process.

### 1. No Due Process Obstacle Exists to Exercising Personal Jurisdiction Under Rule 4(k)(2) Over Defendants Who Use the United States' Financial System to Transmit Funds to FTOs

#### a. The Fundamental Jurisdictional Due Process Requirements

Courts frequently divide the due process analysis into two components: the "'minimum

contacts' inquiry and the 'reasonableness' inquiry." *Licci I,* 673 F.3d at 60.[31]  Other cases break

the due process test into three parts: (1) whether the defendant "'purposefully availed itself of the

privilege of conducting activities within the forum State or … purposefully directed its conduct

into the forum State;'" (2) whether "'the plaintiff's claim … arise[s] out of or relate[s] to the

defendant's forum conduct;'" and (3) whether exercising jurisdiction is "'reasonable under the

circumstances.'"  *U.S. Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*, 916 F.3d 143, 150 (2d Cir.

---

[30] *See, e.g., Compañía De Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1284 (10th Cir. 2020) (adopting "the approach endorsed by the Fifth, Seventh, Ninth, Eleventh, District of Columbia, and Federal Circuits," which requires defendants to show that they are subject to personal jurisdiction in another state to defeat jurisdiction under Rule 4(k)(2)); *Adams v. Unione Mediterranea di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004) ("We agree with the Seventh Circuit, that a piecemeal analysis of the existence *vel non* of jurisdiction in all fifty states is not necessary.  Rather, so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction.").  While contrary minority authority exists requiring plaintiffs to disclaim the ability to satisfy any state's long-arm statute to invoke Rule 4(k)(2), the more recent decisions reject that view as inefficient and contrary to the Rule 4(k)(2)'s text.  In any event, given the liberal rules governing amendments and alternative pleading, refusing to consider Rule 4(k)(2) because Plaintiffs have also alleged jurisdiction under the New York long-arm statute would needlessly promote inefficiency.

[31] In cases where Rule 4(k)(2) provides the basis for jurisdiction, the due process analysis arises under the Fifth Amendment and focuses on the defendant's contacts with the U.S. as a whole, rather than any individual state.  *See, e.g., Weiss v. Natl. Westminster Bank PLC,* 176 F. Supp. 3d 264, 285 (E.D.N.Y. 2016).

2019) (citation omitted); *accord, e.g., Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141

S. Ct. 1017, 1024-25 (2021) (specific jurisdiction exists where a defendant "take[s] 'some act by

which [it] purposefully avails itself of the privilege of conducting activities within the forum

State'" and the plaintiffs' claim "'arise[s] out of or relate[s] to the defendant's contacts' with the

forum") (citations omitted).

      The Supreme Court recently emphasized the disjunctive nature of the "arise out of or

relate to" requirement. *Ford Motor,* 141 S. Ct. at 1026.  Thus, in-forum conduct need not have a

causal relationship to the plaintiff's claim.  *Id.* ("[Defendant's] causation-only approach finds no

support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's

activities.").  In other words, Plaintiffs need not show that their "claim[s] came about because of

the [D]efendant's in-state conduct." *Id.*  Moreover, "'the forum contacts need not themselves be

unlawful.'" *Atchley v. Astrazeneca UK Ltd.*, 2022 U.S. App. LEXIS 99, at *74 (D.C. Cir. Jan. 4,

2022) (quoting *Ford Motor*, 141 S. Ct. at 1026).

      As the "minimum contacts" formulation suggests, due process does not demand extensive

connections between a defendant and the forum.  The Second Circuit has summarized the

minimum contacts inquiry as hinging on whether "'the defendant purposefully availed itself of

the privilege of doing business in the forum and could foresee being haled into court there.'"

*Licci III,* 732 F.3d at 170 (citation omitted).  Even a single, low-dollar-amount connection

between a defendant and the forum may provide the requisite minimum contacts with respect to

claims involving extensive misconduct elsewhere.  *E.g., Burger King Corp. v. Rudzewicz,* 471

U.S. 462, 475 n.18 (1985) ("So long as it creates a 'substantial connection' with the forum, even

a single act can support jurisdiction.") (citation omitted).[32]  Moreover, where—as here—

---

[32] The case law highlighting that jurisdiction may be based upon a single in-forum act
demonstrates the insignificance of Defendants' arguments that they undertook much of their

Congress has adopted a statute that implicates significant public policy issues, courts weigh that factor in analyzing due process issues. *See* 4 Wright & Miller, *Federal Practice & Procedure,* §1068.1 (5th ed. 2019) (due process permits exercising jurisdiction where "federal interest in furthering fundamental objectives or policies rises to a constitutional level, or implicates other especially weighty or uniquely federal concerns").

When the minimum contacts test is satisfied, "jurisdiction is favored," and defendants can negate that preference only by making "'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 165 (2d Cir. 2010) (quoting *Burger King,* 471 U.S. at 477). Moreover, where the reasonableness factors strongly favor exercising jurisdiction, courts demand a lesser showing with respect to the minimum contacts prong.[33] Factors relevant to the reasonableness inquiry include: (1) any burdens that proceeding in the forum will impose on defendants; (2) the forum's interests; (3) plaintiffs' interests in securing relief; (4) the judicial system's interest in promoting efficient claim resolution; and (5) other jurisdictions' interests in furthering beneficial social policies. *E.g., U.S. Bank*, 916 F.3d at 151 n.5; *Chloe,* 616 F.3d at 164-65.

---

misconduct abroad. *See, e.g., Ford Motor*, 141 S. Ct. at 1029 (Ford was subject to jurisdiction in states other than those in which it sold allegedly defective vehicles, and the fact that "the plaintiffs' claims would be just the same" without any in-forum conduct lacked jurisdictional significance); *Weiss,* 176 F. Supp. 3d at 279 (due process satisfied although "the New York Transfers represent only a subset of the total transfers Defendant made to the Charities on behalf of Interpal" because the transfers "constitute part of Defendant's alleged support of Hamas and its terrorist activities, including the attacks in which Plaintiffs were injured").

[33] *E.g., Burger King*, 471 U.S. at 477 ("These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required."); *accord, e.g., Ochoa v. J.B. Martin & Sons Farms,* 287 F.3d 1182, 1188 n.2 (9th Cir. 2002) ("Jurisdiction may be established with a lesser showing of minimum contacts 'if considerations of reasonableness dictate.'") (citation omitted).

b. The *Licci* Decisions Dictate that Masraf's Use of Its U.S. Correspondent
Account to Funnel U.S. Dollars to Qatar Charity Satisfies the Minimum Contacts Test

Plaintiffs' claims are inextricably linked to Defendants' use of the U.S. financial system

to funnel US dollars ("USD") to the FTOs.  Defendants' conspiracy required them to pass USD

to FTO fronts like Qatar Charity or to convert USD raised from various sources into other

currencies for use by those purported "charities."  ¶¶ 4, 72, 81, 98, 102-04, 110, 118, 137, 170;

*see* Point I.B.  As a practical matter, Defendants could not conduct those transactions without

passing funds through correspondent banks in the U.S., which participate in virtually all large

wire transfers of USD.[34]  Defendant Masraf used its correspondent accounts in New York for

that purpose.  ¶¶ 7, 147-54.  Hence, the *Licci* series of cases (collectively, "*Licci*") establishes

that the Court may exercise personal jurisdiction over Masraf.  *See Licci I,* 673 F.3d at 59-74;

*Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 334-41 (2012) ("*Licci II*"); *Licci III,* 732 F.3d

at 168-89.

The *Licci* plaintiffs' ATA claims related to injuries suffered in rocket attacks launched

into Israel by the Hezbollah terrorist organization.  *See, e.g., Licci II,* 20 N.Y.3d at 330.  The

*Licci* plaintiffs alleged that a Lebanese bank (LCB) materially assisted Hezbollah by processing

wire transfers through LCB's New York correspondent account to a supposed charity that was a

Hezbollah front.  *Licci III,* 732 F.3d at 165-66.  The Second Circuit concluded that the use of

LCB's New York correspondent account to conduct "dozens" of wire transfers that "totaled

several million dollars" satisfied the minimum contacts test.  *Id.* at 171.

---

[34] *See, e.g., Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991) (large-value
transfers of USD must pass through the U.S., and New York banking enterprises participate in
nearly all such transactions); Bonner Ex. 11 (Amicus Brief of Institute of International Bankers
*et al*. in *Strauss v. Credit Lyonnais*, No. 19-865 (L) (2d Cir.) at 12 ("Dollar-denominated
payments, wherever they originate and wherever their ultimate destination, generally 'clear' in
the United States, through a U.S. bank.")); McArdle Decl. at ¶¶ 6-14.

Masraf's conduct closely parallels LCB's in *Licci*.  Like LCB, Masraf maintained a correspondent account through which it passed USD for the benefit of FTOs.  ¶¶ 7, 147-54. Masraf engaged in that conduct over the course of multiple years and its transactions involved millions of USD.  ¶¶ 90, 130, 132.  Just the series of correspondent banking transactions that formed the basis for the guilty plea of the head of Qatar Charity's operation in the West Bank totaled over $28 million.  ¶¶ 130, 132.  Thus, like LCB, Masraf did not provide its New York currency exchange and wire transfer capabilities to Qatar Charity "'once or twice by mistake.'" *Licci III*, 732 F.3d at 168 (quoting *Licci II*, 20 N.Y.3d at 340).  Rather, it intentionally availed itself of the protections that New York law provides to banking institutions by engaging in repeated, sizable transactions over the course of multiple years that were integral to the Defendants' scheme to finance the FTOs.  ¶¶ 90, 130, 132-34.[35]

Those facts belie Masraf's contention that it did not "choose" to use its own correspondent account.  Masraf Br. at 35.  To the contrary, Masraf's "repeated use of [its] correspondent account—and hence New York's banking system—as an instrument to achieve the wrong complained of in this suit satisfies the minimum contacts component of the due process inquiry."  *Licci III,* 732 F.3d at 173.

The Second Circuit's conclusion in *Licci III* that LCB's "wire transfers are a part of the principal wrong at which the plaintiffs' lawsuit is directed" (732 F.3d at 170) defeats Masraf's and Qatar Charity's arguments that USD transfers through New York for the benefit of a member of the Union of Good lack a sufficient connection to Plaintiffs' claims.  Masraf Br. at

---

[35] These allegations distinguish this case from *Cmty. Fin. Grp. Inc. v. Stanbic Bank Ltd.*, 2015 U.S. Dist. LEXIS 89904, at *10-11 (S.D.N.Y. July 10, 2015), where the court found that claims lacked an adequate connection to New York because the plaintiff identified only a single wire transaction that passed through New York and the defendant, unlike Masraf, played no role in initiating that transaction.

36; QC Br. at 17.[36]  In addition, *Ford Motor* defeats Qatar Charity's contention that jurisdiction

lies only where in-forum conduct constitutes a proximate cause of plaintiffs' injuries.  *Ford*

*Motor,* 141 S. Ct. at 1026; *see* QC Br. at 17-18 (citing *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333,

344 (2d Cir. 2018)).[37]

      The Complaint also belies Defendants' contention that Plaintiffs do not allege that Qatar

Charity passed funds to the FTOs.  *See* QC Br. at 18.  Defendants conspired to accomplish

precisely that objective and conducted the transactions that passed through New York in

furtherance of their conspiracy.  *See* ¶¶ 4-9, 130-34, 147-56.  In any event, Qatar Charity did not

need to pass funds to other FTOs because Qatar Charity is itself a front for Hamas and a member

of the Union of Good—both designated FTOs.  ¶¶ 5, 79-80, 115, 139, 170.  As courts have

recognized repeatedly, passing funds to a terrorist organization's fundraisers and "charitable

fronts" is no different for purposes of the ATA than providing the funds to the terrorist

organization itself.[38]  A contrary rule would frustrate Congress' intention by empowering

---

[36] *Accord, e.g., Schansman v. Sberbank of Russ. PJSC*, 2021 U.S. Dist. LEXIS 188647, at *13 (S.D.N.Y. Sept. 30, 2021) (allegations that terrorist organization "raised millions of dollars through fundraising, some of which were transferred using [the defendant banks'] services" satisfied minimum contacts requirement); *Bartlett v. Société Générale De Banque Au Liban Sal*, 2020 U.S. Dist. LEXIS 229921, at *44 (E.D.N.Y. Nov. 25, 2020) (allegations that "Defendant MEAB Bank … moved millions of dollars through its correspondent bank accounts—'knowing that it was . . . laundering narcotics trafficking proceeds on behalf of Hezbollah's [fundraising arm]'" satisfied minimum contacts test); *Weiss*, 176 F. Supp. 3d at 286 (minimum contacts relatedness requirement satisfied "where the New York Transfers are among the allegedly unlawful financial services Defendant provided to Interpal for which Plaintiffs seek redress in this action").

[37] Qatar Charity also cites *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109 (2d Cir. 2013), but that opinion does not discuss any personal jurisdiction issues.  *See* QC Br. at 17-18.

[38] *See, e.g., Schansman*, 2021 U.S. Dist. LEXIS 188647, at *13 ("Defendants' support of the DPR through fundraisers or other intermediaries does not foreclose a finding of personal jurisdiction over Defendants as Plaintiffs allege facts to support that Defendants knew they were supporting the DPR when they completed transfers for fundraisers supporting the DPR."); *Bartlett*, 2020 U.S. Dist. LEXIS 229921, at *55 n.7 ("But courts have recognized that FTOs can operate through affiliates and front groups, and that to aid such front groups is to aid the FTO.")

terrorists' enablers to escape jurisdiction and liability through the simple step of inserting middlemen between themselves and their banks.[39]

As Plaintiffs explain in Point I.A.2., Masraf's related contention that it was unaware that it was processing payments for a Hamas front organization (Masraf Br. at 36-37) also ignores the Complaint's allegations. *See* ¶¶ 4, 6-7, 9, 90-94, 141-46. The argument—raised by both Masraf and Qatar Charity (*see* Masraf Br. at 36-38; QC Br. 15-16)—that the transactions Masraf processed are too temporally remote from the relevant attacks (which took place between March 2011 and December 2016 (¶¶ 183, 200, 209, 236, 247, 264, 281, 296, 334)) is defeated by the confession of Qatar Charity's West Bank director, Judeh Jamal, describing transactions that took place between March 2011 and September 2015. ¶¶ 130-34; Bonner Ex. 1 at ¶¶ 130, 139, 141. Even the decisions Masraf cites demonstrate that this temporal overlap is sufficient for jurisdictional purposes. *See* Masraf Br. at 37 n.25.

The emphasis each Defendant places upon the clearly inapposite *Berdeaux v. OneCoin Ltd.*, 2021 U.S. Dist. LEXIS 178816 (S.D.N.Y. Sept. 20, 2021) is misplaced on multiple levels. The *Berdeaux* plaintiffs explicitly disclaimed all bases for personal jurisdiction other than CPLR 302(a)(3)(ii), which Plaintiffs have not alleged here. *Id.* at *19-20. In addition, *Berdeaux* involved only a single wire transfer (*id.* at *24) not initiated by any of the defendants (*id.* at *24-

---

(citing *United States v. El-Mezain*, 664 F.3d 467, 489 (5th Cir. 2011) (affirming conviction under ATA for donating to non-FTO entities under the control of a designated-FTO)); *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 434-35, 442 (E.D.N.Y. 2013) (ATA liability could attach where "a reasonable jury could find that the [non-FTO charities] are operating as [designated-FTO] front groups").

[39] Masraf also mistakenly relies upon a pre-*Licci* decision, *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 726 (S.D.N.Y. 2010), for the proposition that only support that plaintiffs are able to tie directly to the purchase of bombs or bullets can support jurisdiction. *See* Masraf Br. at 37. The *Licci* decisions directly contradict that theory. *See Licci III,* 732 F.3d at 170-73 (emphasizing that wire transfers funding a terrorist front provide a sufficient basis for jurisdiction).

25)—not the multiple transfers that Defendant Masraf effectuated over the course of at least four years pursuant to the instructions of Defendant Qatar Charity.  ¶¶ 130-34.  Judge Caproni's general remarks about correspondent banking as a basis for personal jurisdiction under the CPLR—upon which Masraf and, particularly, Qatar Charity heavily rely (*see* Masraf Br. at 35; QC Br. at 11 13-14, 17)—were thus made in a totally inapposite legal and factual context. Moreover, the comment that basing personal jurisdiction on a bank customer's use of a New York correspondent account would be "'nonsensical'" (*see* QC Br. at 10, 13 (quoting *Berdeaux*, 2021 WL 4267693, at *12 n.25)) was pure *dicta* made without the benefit of evidence about the essential role New York banks play in effectuating sizable USD transfers (*see* note 34, *supra*). The court was also deprived of any briefing regarding the agency theory of jurisdiction, pursuant to which the in-forum acts of an agent (or subagent) are attributable to the principal.  *See* Point V.B.1.c., *infra.*  The weak reed of ill-informed *Berdeaux dicta* provides no basis for ignoring the controlling *Licci* decisions.

Masraf also misplace reliance upon *Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 110 (E.D.N.Y. 2020) (*see* Masraf Br. at 35-36; QC Br. at 14), in which the court began its analysis by observing that, if the defendant had "maintained and used its own correspondent bank account in New York for the relevant transactions"—as Masraf did here—"jurisdiction would lie."  In addition, the *Spetner* plaintiffs did not allege that the defendant participated in a conspiracy with the bank that actually had employed its correspondent bank to pass wires through New York—as Qatar Charity and QNB did here.  *See id.* at 113.  *Spetner* is therefore inapposite.

c.  Blackletter Agency Principles Dictate that Qatar Charity's Use
of Masraf's Correspondent Bank Accounts to Funnel Money
to the Palestinian Territories Satisfies the Minimum Contacts Requirement

Qatar Charity's jurisdictional arguments ignore its agency relationships with Masraf and

Masraf's New York correspondent bank, as well as blackletter law attributing agents' and sub-

agents' actions to principals for jurisdictional purposes to the same extent the law permits such

attribution in other contexts.  *See, e.g., Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467

(1988) (agent's actions confer CPLR § 302(a)(1) jurisdiction over out-of-state defendants when

the agent "engage[s] in purposeful activities in this State … for the benefit of and with the

knowledge and consent of" defendants that "exercised some control over" the agent); *Volkart*

*Bros., Inc. v. M/V "Palm Trader*," 1989 U.S. Dist. LEXIS 3575, at *9 (S.D.N.Y. April 5, 1989)

(following *Kreutter* and finding personal jurisdiction under CPLR § 302(a)(1) based on in-state

activities of sub-agent:  the fact that an agent "directed [a sub-agent] to transact the business does

not break the direct linkage of those activities to [the out-of-state principal]").

Under New York law, "an agency relationship 'results from a manifestation of consent by

one person to another that the other shall act on his behalf and subject to his control, and the

consent by the other to act.'"  *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112,

122 (2d Cir. 2001) (citation omitted).  "According to traditional agency principles, an agent may

appoint subagents to perform the tasks or functions the agent has agreed to perform for the

principal.  As the Restatement describes it, '[t]he relationship between a subagent and the

appointing agent and between the subagent and the appointing agent's principal are relationships

of agency.'"  *In re Parmalat Sec. Litig.*, 640 F. Supp. 2d 243, 252 (S.D.N.Y. Feb. 25, 2009)

(quoting RESTATEMENT 3D OF AGENCY § 3.15(1) (2006)).  The knowledge that an agent or sub-

agent acquires, and the conduct it undertakes while acting within the scope of its agency, are

fully attributable to the principal.  *See, e.g., Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley*

*Mortg. Capital, Inc.*, 821 F.3d 297, 318 (2d Cir. 2016) ("'a fundamental principle that has informed the law of agency and corporations for centuries' is that 'the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals'") (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010)); *John Minder & Son, Inc. v. L.D. Schreiber Co.*, 73 F. Supp. 477, 478 (S.D.N.Y. 1947) ("As a general rule, a principal is charged with constructive knowledge of any material facts which his … duly appointed subagent possessed or acquired in the course of transaction the business of the principal.").

In the personal jurisdiction context, courts apply these agency principles flexibly, and the "[p]laintiff need not establish a formal agency relationship between defendants and" the entity that acted in New York. *Kreutter*, 71 N.Y.2d at 467. Hence, the in-forum agent for jurisdictional purposes need not be the out-of-state defendants' fiduciary, but need only be an entity that "engaged in purposeful activities in [the forum] … for the benefit of and with the knowledge and consent of the [out-of-state] defendants [who] exercised some control over [it] in the matter." *Id.*

Qatar Charity's assertion that it did not direct Masraf to route USD transfers through a New York correspondent bank ignores fundamental principles of agency law. *See* QC Br. at 10, 12-13, 17 (citing *Berdeaux*, 2021 U.S. Dist. LEXIS 178816, at *26-28 and n.25—a case that does not address the law of agency). Critically, Qatar Charity instructed its agent Masraf to make certain USD transfers that—whether Qatar Charity knew it or not[40]—could only be

---

[40]  Besides being irrelevant in the current procedural context, Qatar Charity's claimed institutional ignorance of the role of U.S. banks in effectuating USD transfers is not plausible in light of the criminal confession of Judeh Jamal, which is based upon his admission that he knew Qatar Charity was passing funds through New York. ¶¶ 132-34; Bonner Ex. 1 at ¶¶ 130, 139, 141. Qatar Charity's claim is also irreconcilable with its global operations and substantial financial wherewithal. Qatar Charity reported over $500 million worth of income (in

effectuated through a U.S. correspondent bank.  *See* note 24, *supra*; ¶¶ 4-7, 132-33.[41]  On that

basis, Masraf had authority to appoint a U.S. correspondent bank to be Qatar Charity's subagent

because "the proper conduct of the principal's [*i.e.*, Qatar Charity's] business in the

contemplated matter reasonably require[d] the employment of other agents."  RESTATEMENT 2D

OF AGENCY § 79(b) (1958).[42]  In any event, Qatar Charity cannot challenge the existence of

Masraf's authority to appoint a U.S. correspondent bank as subagent, or its own agency

relationship with that correspondent bank, in the current procedural context.  *See, e.g., Toppel v.*

*Marriott Int'l, Inc.*, 2006 U.S. Dist. LEXIS 60529, at *23-24 (S.D.N.Y. Aug. 24, 2006)

("[W]here 'the circumstances raise the possibility of a principal-agent relationship but no written

authority of the agent has been proven, questions of agency and of its nature and scope are

questions of fact to be submitted to the jury.'") (quoting *Fogel v. Hertz Int'l, Ltd*., 141 A.D.2d

---

unidentified currencies) from donations and investments in 2020, operates in 58 countries, has 34 international field offices.  *See* Bonner Decl. at ¶ 16, Ex. 12 and Ex. 13 at 5.  Its "significant accounting policies" include rules for reporting in Qatari Riyals—its "functional currency"—the value of transactions, assets and liabilities denominated in other currencies.  *See* Bonner Ex. 12 at 9-10.

[41] Qatar Charity miscites *Licci II* for the proposition that Masraf could have completed Qatar Charity's USD transactions without passing funds through a U.S. correspondent account.  *See* QC Br. at 12.  In so doing Qatar Charity ignores language that clearly indicates the Court was speaking hypothetically:  "***it may be*** that LCB could have routed the dollar transactions … elsewhere."  20 N.Y.3d at 340 (emphasis added).  Elsewhere, *Licci II* noted "the widespread use of correspondent accounts … in New York to facilitate the flow of money worldwide" (*id.* at 338), which is what occurred here.  Likewise, the pre-*Licci* decision in *Tamam,* 677 F. Supp. 2d at 720, provides no basis for dismissing Plaintiffs' claims.  *Tamam* does not identify any way in which Qatar Charity could move millions of dollars from an account in Doha to a different bank in the West Bank without passing those funds through the U.S.

[42] Masraf was also authorized to appoint a correspondent bank as subagent because Masraf is "in a business in which it is customary to employ other agents for the performance of such acts."  RESTATEMENT 2D OF AGENCY § 79(b); McArdle Decl. at ¶¶ 8-14.

375, 376 (1st Dep't 1988).  The conduct of the Masraf's New York correspondent bank therefore suffices to establish jurisdiction over its principal, Qatar Charity.[43]

Qatar Charity's assertion that it did not control the behind-the-scenes mechanics of how its agent and subagent transferred USD on its behalf disregards agency law attributing the conduct of agents to their principals as long as the principals exercise "'some control'" over the agent.  *CutCo Indus.*, 806 F.2d at 366 (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)).  "[T]he control asserted [by the principal] need not 'include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective.'"  *Cleveland v. Caplaw Enters*., 448 F.3d 518, 522 (2d Cir. 2006) (quoting RESTATEMENT 2D OF AGENCY § 14 cmt. a).[44]  Qatar Charity misplaces reliance on Judge Caproni's conclusion in *Berdeaux* that a defendant's awareness that *a single wire transfer* passed through a New York correspondent account was insufficient to confer jurisdiction under CPLR § 302(a)(1) "'[a]bsent allegations that [the defendant] *directed* the funds to be deposited

_____

[43] *See, e.g., Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) ("[W]here we have found personal jurisdiction based on an agent's contacts, we have never suggested that due process requires something more than New York law.") ("*Schwab I*"); *CutCo Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (agent's actions are attributable to the principal for jurisdictional purposes where the agent "acted in the state 'for the benefit of, and with the knowledge and consent of' the non-resident principal") (citation omitted).

[44] *See also, e.g., Khodeir v. Sayyed*, 348 F. Supp. 3d 330, 345 (S.D.N.Y. 2018) (it is irrelevant to the existence of an agency relationship that the principal "claims he gave no direction to [the agent]" because "'[t]o the extent the parties have created a relationship of agency . . . the principal has a power of control even if the principal has previously agreed with the agent that the principal will not give interim instructions to the agent or will not otherwise interfere in the agent's exercise of discretion'") (quoting RESTATEMENT 3D OF AGENCY § 1.01, cmt. f)); *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1051 (Md. 1999) ("the control a principal exercises over its agent is not defined rigidly to mean control over the minutia of the agent's actions" and the "control may be very attenuated with respect to the details"); RESTATEMENT 3D OF AGENCY, § 1.01 ("[A] person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment.").

or **controlled** the route of the plaintiffs' funds [*i.e.* the single wire transfer] through the correspondent account."  QC Br. at 13-14 (quoting 2021 U.S. Dist. LEXIS 178816, at *26-27, and adding emphasis).  The *Berdeaux* defendant was not the originator of the wire transfer at issue and therefore had no role in causing it to be processed through New York enroute to Defendants' Cayman Island bank account.  *Id*. at 24.  By contrast, Qatar Charity originated multiple USD transfers that were processed through New York as a direct result of Qatar Charity's decision to engage Masraf's services, and because no other practical alternative was available.[45]

Qatar Charity also has the law backwards when it claims that its purported ignorance of the mechanics of Masraf's correspondent account negates the fact that Masraf was acting for Qatar Charity's benefit and at its direction.  An agency exists when the principal knows that the agent is acting on the principal's behalf.  *See, e.g., N.Y. Marine*, 266 F.3d at 122 (the principal must give consent for the agent to act on the principal's behalf).  Once the agency relationship exists, the agent's knowledge is attributed to the principal.  *E.g., Bank of N.Y. Mellon,* 821 F.3d at 318.  Hence, what matters is that Masraf knew that it was using its New York correspondent

---

[45] Other decisions Qatar Charity cites are inapposite for similar reasons.  For example, *Vasquez v. H.K. & Shanghai Banking Corp.*, 2020 U.S. Dist. LEXIS 142607 (S.D.N.Y. Aug. 10, 2020), did not even address due process issues or a terrorist organization with severely limited options for conducting USD transactions.  Rather, *Vasquez* found personal jurisdiction lacking under CPLR 302(a)(1) because three isolated transfers totaling $104,000, unlike the multi-year multi-million-dollar scheme Plaintiffs have alleged, did not evidence purposeful availment of the protections of New York law.  2020 U.S. Dist. LEXIS 142607, at *257-58.  In *Universal Trading & Inv. Co. v. Tymoshenko*, the court held that a bank's use of a correspondent account, without more, does not justify exercising jurisdiction over a customer because of "the lack of clear precedent on this issue and the policy rationale in favor of not extending jurisdiction."  2012 U.S. Dist. LEXIS 176214, at *11-12 (S.D.N.Y. Dec. 12, 2012).  In contrast to the policy rationale examined in *Tymoshenko*, which involved a private financial dispute, Congress has expressly emphasized the importance of providing an American forum to the victims of terrorism.  JASTA § 2(a)(6); *see* pp. 73-75, *infra*.  Moreover, *Tymoshenko* did not consider the agency principles applicable to customers' use of their banks' correspondent accounts.

account when it conducted the USD transactions.  Because those actions fell squarely within the scope of Masraf's duties as Qatar Charity's agent, New York law attributes those acts, and the knowledge associated with them, to Qatar Charity.  *E.g., id.*

     d.  The Overt Acts Masraf Undertook in New York to Further Defendants'
            Conspiracy Support Exercising Jurisdiction Over Each Defendant

Contrary to Defendants' assertions, conspiracy principles provide an adequate basis for concluding that all three Defendants' contacts with New York satisfy the minimum contacts requirement.  As the Second Circuit explained in *Berkshire Bank v. Lloyds Banking Grp. PLC*, 2022 U.S. App. LEXIS 5095, at *5-6 (2d Cir. Feb. 25, 2022), "[a] defendant can purposefully avail itself of the forum by creating the requisite minimum contacts through actions of a third party such as a co-conspirator because '[m]uch like an agent who operates on behalf of, and for the benefit of, its principal, a co-conspirator who undertakes action in furtherance of the conspiracy essentially operates on behalf of, and for the benefit of, each member of the conspiracy."  (Quoting *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 2021 U.S. App. LEXIS 38618, at *34 (2d Cir. Dec. 30, 2021) (*Schwab II*")).

*Schwab II* rejected the argument that conspiracy jurisdiction "'requires a relationship of direction, control, and supervision before a co-conspirator's forum contacts may be imputed to absent defendants for jurisdictional purposes.'"  *Id.* at *35; *accord, e.g., Berkshire Bank*, 2022 U.S. App. LEXIS 5095, at *6.  Rather, as the Second Circuit held in *Schwab I*, 883 F.3d at 87, conspiracy principles support personal jurisdiction where a plaintiff alleges "that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Accord, e.g., Schwab II,* 2021 U.S. App. LEXIS 38618, at *34-35.

As Plaintiffs demonstrate in Points I.B. and V.B.1.b., their allegations easily suffice to satisfy that pleading standard.  Even standing alone, therefore, the conspiracy principles that the Second Circuit outlined in the *Schwab* decisions and the very recent *Berkshire Bank* case dictate that the conduct of all three Defendants satisfies the due process minimum contacts test.  *See Schwab I,* 883 F.3d at 86-87; *Schwab II,* 2021 U.S. App. LEXIS 38618, at *34-41; *Berkshire Bank*, 2022 U.S. App. LEXIS 5095, at *5-12; *Rudersal v. Harris*, 2022 U.S. Dist. LEXIS 160004, at *4 (S.D.N.Y. Jan 28, 2022) ("[A]s dicta, the Court concludes that a plaintiff may plead personal jurisdiction under Rule 4(k)(2) using a theory of conspiracy jurisdiction because the Second Circuit has expressly held that conspiracy jurisdiction is consistent with Constitutional Due Process….") (citing *Schwab I*).

In contesting the adequacy of Plaintiffs' conspiracy allegations, Defendants overstate the specificity the *Schwab* decisions and *Berkshire* demand.  Courts have recognized that, "[w]hen considering whether plaintiffs have made a prima facie showing [that a conspiracy existed], 'great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading.'"  *Sea Trade Mar. Corp. v. Coutsodontis*, 2012 U.S. Dist. LEXIS 119206, at *19-20 (S.D.N.Y. Aug. 15, 2012) (quoting *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 458 (S.D.N.Y. 2008)).

Recent cases from this Circuit applying the *Schwab* decisions illustrate that Plaintiffs' allegations more than suffice to establish personal jurisdiction over all Defendants based upon conspiracy principles.  *See, e.g., In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 325 (S.D.N.Y. 2020) (foreign participants in alleged price-fixing conspiracy had sufficient minimum contacts based on plausible inference that they used non-public client order information provided by U.S.-based co-conspirators to fix global prices of platinum and palladium); *Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 412

72

(S.D.N.Y. 2020) (French participant in alleged conspiracy to manipulate foreign exchange market had sufficient minimum contacts based on inference that it knew co-conspirators were based in N.Y.); *SL-x IP S.Á.R.L. v. Bank of Am. Corp.*, 2021 U.S. Dist. LEXIS 189901, at *20 (S.D.N.Y. Sept. 30, 2021) (UK entity alleged to have engaged in a conspiracy to boycott a potential competitor had sufficient minimum contacts through its U.S.-based board member and agent who was a key player in the conspiracy).

These three decisions illustrate the permissive approach courts apply to assess the adequacy of allegations concerning conspiracies which, by their nature, are hidden.  Contrary to Qatar Charity's effort to portray itself as a benevolent actor and the Bank Defendants' claims that they merely provide "routine banking services," Plaintiffs' allegations that Defendants conspired to fund the FTOs are substantiated by—among other facts—criminal convictions, the unabashed support for Hamas provided by the Qatari government and Royal Family, and QNB's lengthy "Who's Who" list of Hamas terrorist clientele.  ¶¶ 2-3, 98, 119-27, 130-34, 157-81. Those allegations easily provide a prima facie basis for concluding that Defendants participated in the conspiracy Plaintiffs allege.  *See* Point I.B., *supra.*

## 2. The Due Process Reasonableness Factors Further Support the Court's Ability to Exercise Specific Jurisdiction Over Defendants

The second step of the due process analysis—the reasonableness inquiry—also fully supports exercising jurisdiction over Defendants.  In fact, the reasonableness factors weigh so heavily in Plaintiffs' favor that subjecting Defendants to jurisdiction would be appropriate "upon a lesser showing of minimum contact than would otherwise be required."  *Burger King*, 471 U.S. at 477; *accord, e.g., Ochoa,* 287 F.3d at 1188 n.2.

Glaringly absent from Defendants' discussion of the reasonableness factor is any mention of Congress' recent pronouncements regarding the need to subject entities that provide material

assistance to terrorists to jurisdiction in the American courts.  JASTA emphasizes that Congress

adopted the statute to provide victims of terrorism with "with the broadest possible basis,

consistent with the Constitution of the United States, to seek relief against persons, entities, and

foreign countries, wherever acting and wherever they may be found, that have provided material

support, directly or indirectly, to foreign organizations or persons that engage in terrorist

activities against the United States."  JASTA § 2(b).  Consistent with that intent, Congress also

emphasized that entities that provide material support to terrorists "necessarily direct their

conduct at the United States, and should reasonably anticipate being brought to court in the

United States to answer for such activities."  JASTA § 2(a)(6).  Those Congressional

pronouncements regarding foreign policy matters uniquely within Congress' provenance are

entitled to substantial deference and find no parallel in any decision Defendants cite.[46]

Particularly given Congress' unambiguous direction in JASTA, each due process

reasonableness factor strongly supports exercising jurisdiction over Defendants: (1) None of the

well-financed Defendants, all of which operate internationally, has articulated a cognizable

burden they will face by proceeding in the U.S., where they elected to route their wire

transfers;[47] (2) the U.S. maintains a substantial interest in preventing the use of its currency and

---

[46] *See, e.g., Atchley*, 2022 U.S. App. LEXIS 99, at \*73 (highlighting JASTA § 2(a)(6) in concluding that personal jurisdiction existed over foreign companies in an ATA action); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 22 (D.D.C. 1998) (citing *Burger King* in noting that, in the terrorism context, a lesser showing of minimum contacts may be required because "some areas were so committed to the political branches, such as foreign policy, that a statute implementing that policy could significantly lower the threshold of constitutional requirements, so long as there existed other processes to protect the defendant's interests"); *see also, e.g., Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1328-29 (2016) (emphasizing the broad discretion that Congress possesses when exercising "authority regarding foreign affairs" and the importance of providing deference to Congress in that sphere).

[47] *See, e.g., Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129-30 (2d Cir. 2002) ("[T]he conveniences of modern communication and transportation ease what would have been a serious burden a few decades ago.") (citation omitted).

banking system to pass money to FTOs and in punishing entities that surreptitiously attempt to

attain that objective; (3) Plaintiffs possess weighty interests in obtaining relief for their injuries

and justice for their deceased loved ones; (4) Defendants identify no obstacle to resolving this

action efficiently in the U.S.; and (5) the U.S. and its allies share strong interests in preventing

terror financing.  *See, e.g., Licci III*, 732 F.3d at 173-74 (jurisdiction was reasonable although

LCB maintained no New York presence because of the substantial interests that the plaintiffs

possessed in vindicating their rights and that New York had in preventing the use of its banking

system for terror financing).

Accordingly, Defendants cannot establish that any burden or other factor qualifies this

case as an "'exceptional situation' where exercise of jurisdiction is unreasonable even though

minimum contacts are present."  *Bank Brussels,* 305 F.3d at 130.  Indeed, Defendants cite only

one inapposite decision that found exercising jurisdiction unreasonable although a defendant's

contacts with a jurisdiction satisfied the minimum contacts requirement.  *See Metro. Life Ins. Co.

v. Robertson-Ceco Corp.*, 84 F.3d 560, 574 (2d Cir. 1996) (dismissing claims on reasonableness

grounds where a New York corporation brought suit in Vermont against a company

headquartered in Pennsylvania where: the claims related to defective construction materials used

on a Florida building; no party engaged in any case-related conduct in Vermont; and the plaintiff

filed suit there exclusively to benefit from a more permissive statute of limitations).

### C.  CPLR § 302(a) Provides an Alternative Statutory Basis for Personal Jurisdiction Over all Defendants

While Rule 4(k)(2) eliminates the need for Plaintiffs to make a prima facie showing that

New York's long-arm statute supports jurisdiction over Defendants, the due process standard and

CPLR § 302(a)(1)'s specific jurisdiction test closely parallel one another.  In practice, research

has uncovered no cases finding the minimum contacts requirement satisfied without also finding

jurisdiction was proper under § 302(a)(1).  Indeed, courts have noted that, in some

circumstances, the due process standard could be more restrictive than § 302(a)(1).  *See, e.g.,*

*Licci III,* 732 F.3d at 170 (noting that although "personal jurisdiction permitted under the long-

arm statute may theoretically be prohibited under due process analysis, we would expect such

cases to be rare" and that the Court could find "no such decisions in this Circuit").  The Second

Circuit has also held that, like the due process standard, "New York courts do not mandate a

showing of control or direction to establish conspiracy-based personal jurisdiction" under § 302.

*Berkshire Bank,* 2022 U.S. App. LEXIS 5095, at *11.

Courts may exercise jurisdiction under § 302(a)(1) when a defendant, "in person or

through an agent," "transacts any business within the state or contracts anywhere to supply goods

or services in the state" and the plaintiff's cause of action arises from that activity.  CPLR

§ 302(a)(1); *see also, e.g., Licci III,* 732 F.3d at 166, 169 (specific jurisdiction under CPLR

§ 302(a)(1) exists when: "(1) the defendant 'transacted business within the state; and (2) the

claim asserted … arise[s] from that business activity'").  Because the quality, not the quantity of

New York-based activity governs the transacting business test, "[a] single act within New York

will, in the proper case, satisfy the requirements of section 302(a)(1)."  *Licci I,* 673 F.3d at 62;

*accord, e.g., Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 n.4 (2016) (because § 302(a)(1) is a

"single-act" statute, "proof of one transaction in New York is sufficient to invoke jurisdiction").

A non-domiciliary "transacts business" under § 302(a)(1) when it "'purposefully avails

[itself] of the privilege of conducting activities within [New York], thus invoking the benefits

and protections of its laws …'"  *CutCo*, 806 F.2d at 365 (quoting *McKee Elec. Co. v. Rauland-

Borg Corp.*, 20 N.Y.2d 377, 382 (1967)).  Importantly, "[a] defendant need not physically enter

New York State in order to transact business, 'so long as the defendant's activities here were

76

purposeful.'" *Licci I*, 673 F.3d at 61 (quoting *Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.,* 7

N.Y.3d 65, 71 (2006)).

Section 302(a)(1)'s "arising from" or "nexus" requirement is met when "'there is an

articulable nexus, or a substantial relationship, between the claim asserted and the actions that

occurred in New York.'" *Id.* at 66.  As is true of the due process standard, the nexus inquiry "is

relatively permissive" and "causation is not required."  *Licci II,* 20 N.Y.3d at 339 (2012).  Thus,

Plaintiffs need only show that their claims are not "completely unmoored from" the relevant

transactions, and jurisdiction exists "over those claims in some way arguably connected to the

transaction[s]."  *Id.* at 339-40; *accord, e.g., Licci* III, 732 F.3d at 168-69 (§ 302(a)(1) "'does not

require that every element of the cause of action pleaded must be related to the New York

contacts; rather, where at least one element arises from the New York contacts, the relationship

between the business transaction and the claim asserted supports specific jurisdiction under the

statute.'") (quoting *Licci II*, 20 N.Y.3d at 341).

Because the due process and § 302(a)(1) tests largely duplicate each other, the same facts

that negate Defendants' supposed due process defense also defeat their contention that Plaintiffs

fail to allege a basis for jurisdiction under the New York long-arm statute.  *See Licci III,* 732

F.3d at 168-69 (exercising jurisdiction was appropriate in ATA case related to Hezbollah

bombings of civilians because the plaintiffs' claims arose out of the defendant's forum contacts

where it used a correspondent account in New York to process transactions "not 'once or twice

by mistake'" because the repeated use of the account "'indicate[d] desirability and a lack of

coincidence'") (quoting *Licci II,* 20 N.Y.3d at 340).[48]

---

[48]  *Accord, e.g., Jain v. T & C Holding Inc.*, 2011 U.S. Dist. LEXIS 23788, at *12 (S.D.N.Y.
Mar. 3, 2011) ("Plaintiffs also have asserted sufficient allegations to allow for the exercise of
long-arm jurisdiction over [a Japanese resident] as they have alleged, among other things, that
[she] maintained a New York bank account and that significant portions of the payment for the

Defendants err when they suggest that conspiracy principles are inapplicable to jurisdiction under § 302(a)(1).[49]  Significantly, QNB relies for this proposition on the inapposite *Berdeaux* case, even though the Berdeaux plaintiffs "expressly disclaimed reliance on conspiracy jurisdiction."  2021 U.S. Dist. LEXIS 178816, at *20; *see* QNB Br. at 11.  In addition to its many distinguishing qualities (*see* pp. 64-65, *supra*), *Berdeaux* never mentions *Schwab I* and pre-dates *Schwab II* and *Berkshire*.  Likewise, *Suber v. VVP Servs., LLC*, 2021 U.S. Dist. LEXIS 184529, at *17 (S.D.N.Y. Sept. 27, 2021) (cited in QC Br. at 14-15 and QNB Br. at 8, 11), also rejects rejecting conspiracy jurisdiction under CPLR § 302(a)(1) without mentioning *Schwab*.

The cases rejecting conspiracy jurisdiction under the long-arm statute or due process clause largely reasoned that *Walden v. Fiore*, 571 U.S. 277, 285 (2014) dictated that result by counseling that personal jurisdiction arises from "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  Those decisions did not survive *Schwab I, Schwab II* and *Berkshire Bank,* all of which attributed the in-forum acts of co-conspirators to each other.

---

shares 'which are the basis of this lawsuit were transferred to that account.'") (citation omitted); *Dale v. Banque SCS Alliance S.A.*, 2005 U.S. Dist. LEXIS 20967, at *12-13 (S.D.N.Y. Sept. 22, 2005) (exercising jurisdiction pursuant to § 302(a)(1) where Swiss bank utilized correspondent bank accounts located in New York to launder money a third party stole from the plaintiffs); *Gulf Coast Dev. Grp. v. Lebror*, 2003 U.S. Dist. LEXIS 21740, at *11 (S.D.N.Y.  Dec. 4, 2003) (jurisdiction proper under § 302(a)(1) where plaintiffs "alleged that [Israeli resident defendant] maintained a New York bank account and that significant portions of the funds which are the basis of this lawsuit were transferred to that account"); *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 246 (2002) (jurisdiction under § 302(a)(1) proper over Russian bank that "maintained a New York bank account for payment of the option payments and the nonoption payments" at issue in the litigation).

[49] *Rich v. Fox News Network LLC*, 2020 U.S. Dist. LEXIS 170811, at *17 (S.D.N.Y. Sept. 15, 2020) ("Moreover, personal jurisdiction over Butowsky based on Plaintiffs' conspiracy to commit IIED claim is proper under Section 302(a)(1)."); *Freeman I*, 413 F. Supp. 3d at 80 ("Accordingly, the Court finds that, at the pleading stage, Plaintiffs have met their burden to establish specific jurisdiction over Bank Saderat for claims arising from the alleged conspiracy in this action under New York CPLR § 302(a)(1).").

Even if Defendants were correct, however, the Second Circuit has now unambiguously ruled that another prong of the long-arm statute—CPLR § 302(a)(2)—provides for conspiracy jurisdiction. *Berkshire Bank*, 2022 U.S. App. LEXIS 5095, at *11.[50]  As in *Berkshire Bank,* Plaintiffs "have sufficiently alleged that certain co-conspirators acted as agents of their co-conspirators in New York and took steps in furtherance of the alleged conspiracy at the request of or on behalf of their co-conspirators." *Id.*  Here, Defendants agreed to illicitly fund the FTOs and serve the financial needs of their leaders.  ¶¶ 4-8, 119, 128-35, 147-56.  They each played important roles in that conspiracy, with Qatar Charity and QNB providing funds, Masraf laundering those funds through New York, QNB and Masraf serving Qatar Charity's every banking need, and QNB serving as a one-stop banking operation for the convicted murderers who continued to fund and lead Hamas from their sanctuary in Qatar.  ¶¶ 130-34, 157-81.  As in *Berkshire Bank*, therefore, Plaintiffs "allegations satisfy the requirements of personal jurisdiction both under principles of due process and under New York's long-arm statute." *Berkshire Bank*, 2022 U.S. App. LEXIS 5095, at *11-12.

Even if, as Defendants claim, § 302 imposes a higher burden upon Plaintiffs than the minimum contacts test, a decision QNB cites illustrates that any higher standard § 302 imposes provides Defendants with no comfort.  *See* QNB Br. at 12 (citing *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 325 n.9 (S.D.N.Y. 2021)).  In dicta, *PharmacyChecker* did distinguish jurisdiction under CPLR § 302(a)(2) from what the court characterized as *Schwab I's* "permissive" and "capacious" minimum contacts test for conspiracy

---

[50] Under § 302(a)(2), jurisdiction lies where a "non-domiciliary … in person or through an agent commits a tortious act within the state."  The torts at issue in *Berkshire Bank* included "fraud and conspiracy-based claims under New York law." *Berkshire Bank*, 2022 U.S. App. LEXIS 5095, at *2.  Here, Plaintiffs' claims are also tortious in nature.

jurisdiction.  *See id.*  The court also noted that the constitutional standard for jurisdiction does not require in-forum conduct by each defendant.  *Id.*

In light of Plaintiffs' ability to base jurisdiction upon Rule 4(k)(2), a "permissive" and "capacious" constitutional minimum contacts test hardly serves QNB's interests.  In any event, both *Berkshire Bank* and *Schwab II* held that conspiracy jurisdiction harmonizes with the rule attributing the in-forum acts of an agent to a principal who does not act in the jurisdiction. *Berkshire Bank,* 2022 U.S. App. LEXIS 5095, at *5 (quoting *Schwab II,* 2021 U.S. App. LEXIS 38618, at *34).  Thus, *Berkshire Bank* expressly rejected the rule *PharmacyChecker* discussed and that QNB advocates.  *See Berkshire Bank,* 2022 U.S. App. LEXIS 5095, at *9-12 (rejecting argument that § 302(a)(2) required more than the *Schwab I* test for conspiracy jurisdiction).

Qatar Charity does cite decisions holding that "physical presence" is required to impose jurisdiction under § 302(a)(2).  *See* QC Br. at 11.  In that regard, *Bank Brussels,* notes that the original Practice Commentary to § 302 stated that jurisdiction would not lie under § 302(a)(2) "'if a New Jersey domiciliary were to lob a bazooka shell across the Hudson River at Grant's Tomb.'"  171 F.3d at 790 (citation omitted).  But neither that illustration nor any decision Qatar Charity cites involved conduct undertaken in New York by an agent acting at the direction of a defendant (here, Masraf's correspondent bank).  The language of § 302(a)(2) requires only that an "agent" "commits a tortious act within the state."  That requirement is satisfied here even though Masraf's agent did not participate in Defendants' conspiracy because the correspondent bank acted on Masraf's behalf and pursuant to its instructions.

Thus, although Plaintiffs' ability to employ conspiracy jurisdiction to satisfy § 302(a)(1) or § 302(a)(2) is not outcome determinative here, the long-arm statute provides an alternative basis for exercising jurisdiction over all three Defendants.

**D.  If the Court Finds Plaintiffs' Jurisdictional Allegations Inconclusive,**
**Plaintiffs Request the Opportunity to Conduct Jurisdictional Discovery**

Defendants devote much of their briefs to criticizing Plaintiffs for their inability to itemize details regarding the transactions Defendants have endeavored for years to hide from scrutiny.  In his criminal plea, however, Qatar Charity's Mr. Jamal admitted that the charity conducted the types of transfers through Masraf's correspondent bank account in New York that the *Licci* courts deemed sufficient to support personal jurisdiction.

Thus, even if the Court concludes that Plaintiffs must allege more detailed facts concerning Defendants' secret financial transactions, the Court should permit Plaintiffs to conduct the discovery necessary to uncover those hidden jurisdictional facts.  As the court emphasized in *Singer v. Bank of Palestine*, 2021 U.S. Dist. LEXIS 177860 (E.D.N.Y. Apr. 30, 2021), "'[i]t is well settled under Second Circuit law that, even where plaintiff has not made a *prima facie* showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record.'"  *Id.* at *60 (quoting *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014)).  Courts authorize jurisdictional discovery "where a 'plaintiff has made a threshold showing that there is some basis for the assertion of jurisdiction.'"  *Id.* (quoting *Ayyash v. Bank Al-Madina*, 2006 U.S. Dist. LEXIS 9677, at *17 (S.D.N.Y. Mar. 9, 2006)).[51]  In weighing whether to permit discovery, courts "'should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'"  *Id.* at *61 (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).

---

[51] *Accord, e.g., Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 70-71 (E.D.N.Y. 2006) ("[D]istrict courts in this Circuit have ordered jurisdictional discovery where plaintiff made less than a *prima facie* showing but 'made a sufficient start toward establishing personal jurisdiction.'") (quoting *Uebler v. Boss Media*, 363 F. Supp. 2d 499, 506-07 (E.D.N.Y. 2005)).

In *Singer,* the court authorized discovery to permit the plaintiffs to seek additional evidence relevant to jurisdiction where the plaintiffs alleged that the defendant bank "used correspondent bank accounts in New York to issue large volumes of payments in U.S. dollars to organizations affiliated with Hamas" and that the defendant "knowingly assisted Hamas … by providing financial services and facilitating these dollar transfers." *Id.* Because Plaintiffs' Complaint here makes similar, albeit more detailed, allegations, the Court should permit Plaintiffs the opportunity to conduct discovery to the extent the Court harbors any doubts regarding the sufficiency of those allegations.[52]

Because facts concerning matters such as Qatar Charity's USD transactions and whether Qatar and its Royal Family control Defendants unquestionably bear on the jurisdiction issue, the cases Defendants cite provide no basis for denying Plaintiffs the opportunity to discover that evidence. Masraf's primary authority is a pre-*Licci* case that hinged on the now overruled proposition that passing money through a correspondent account for a terrorist organization cannot support exercising jurisdiction in a case arising from terrorist attacks. *Tamam*, 677 F. Supp. 2d at 729-30. Masraf's remaining decisions involved plaintiffs that could not, as a matter of law, establish jurisdiction under any scenario or that failed to identify any reason why

---

[52] *See also, e.g., Gentry v. Kaltner*, 2020 U.S. Dist. LEXIS 54182, at *26 (S.D.N.Y. Mar. 25, 2020) (even where "'serious questions'" exist regarding the plaintiff's ability to "allege[] sufficient facts to make out a prima facie case for personal jurisdiction," the court may permit discovery if the plaintiff "'makes a threshold showing of jurisdiction and establishes that its position is not frivolous'") (quoting *Unique Indus., Inc. v. Sui & Sons Int'l Trading Corp.*, 2007 U.S. Dist. LEXIS 83725, at *24 (S.D.N.Y. Nov. 9, 2007)); *Leon*, 992 F. Supp. 2d at 194-96 (permitting discovery where the plaintiffs' claims were "sufficient to articulate a colorable basis for personal jurisdiction, which could be established with further development of the factual record"); *Ayyash*, 2006 U.S. Dist. LEXIS 9677, at *16-21 (permitting jurisdictional discovery fell within the court's "considerable discretion" where the complaint alleged use of the U.S. banking system to perpetrate a conspiracy and to distance certain defendants from that conspiracy).

discovery would yield relevant evidence.[53]  The only case QNB adds to Masraf's citations—
*Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 765 (S.D.N.Y. 2004)—***authorized***
jurisdictional discovery where the requested evidence could conceivably provide a basis for
exercising jurisdiction.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motions to dismiss
be denied in their entirety.  In the alternative, Plaintiffs request the Court to:  (1) reserve its
decision on Defendants' Rule 12(b)(2) motions pending discovery and an evidentiary hearing on
the existence of personal jurisdiction; and/or (2) order that service of process via email sent to
Defendants' counsel of record in this action shall constitute good and sufficient service.

Dated:  March 25, 2022

**FLEISCHMAN BONNER & ROCCO LLP**

By:  /s/ James P. Bonner

James P. Bonner (jbonner@fbrllp.com)
Patrick L. Rocco (procco@fbrllp.com)
Susan M. Davies (sdavies@fbrllp.com)
Thomas M. Caroccia (tcaroccia@fbrllp.com)
81 Main Street, Suite 515
White Plains, New York  10601
Telephone:  646-337-1426

---

[53] *See Jerusalem NY Enters. LLC v. Huber Erectors & Hoisting, LLC,* 2021 U.S. Dist. LEXIS
235326, at *20-21 (E.D.N.Y. Dec. 8, 2021) (no fact the plaintiff could discover would have
supported jurisdiction where the sole proffered basis for jurisdiction was the claim that plaintiff
suffered an injury in New York, but, as a matter of law, the plaintiff was harmed in Ohio);
*Mednik v. Specialized Loan Servicing, LLC*, 2021 U.S. Dist. LEXIS 34059, at *24-25 (E.D.N.Y.
Feb. 23, 2021) (denying discovery both because evidence plaintiff sought was in her control and
the facts she proposed to discover could not provide a basis for jurisdiction); *Alexander v.
Porter*, 2014 U.S. Dist. LEXIS 177841, at *14-15 (E.D.N.Y. Dec. 23, 2014) (plaintiff failed to
identify any fact suggesting that a Georgia resident had conducted any business in New York).

**PERLES LAW FIRM PC**
Steven R. Perles (*not admitted in E.D.N.Y.*)
Joshua K. Perles (*not admitted in E.D.N.Y.*)
1050 Connecticut Ave. NW, Suite 500
Washington, D.C.  20036
Telephone:  202-955-9055

**THE BERKMAN LAW OFFICE, LLC**
Robert J. Tolchin (rtolchin@berkmanlaw.com)
111 Livingston Street, Suite 1928
Brooklyn, New York  11201
Telephone:  718-855-3627

*Attorneys for Plaintiffs*