UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

STUART FORCE individually and as personal
representative of the ESTATE OF TAYLOR
FORCE, *et al.*,

                  Plaintiffs,

    - against -

QATAR CHARITY, *et al.*,

                  Defendants.

1:20-cv-02578 (BMC)

**REPLY BRIEF IN FURTHER SUPPORT OF
DEFENDANT MASRAF AL RAYAN'S MOTION TO DISMISS THE COMPLAINT**

PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
Tel.:   (212) 858-1000
Fax:   (212) 858-1500

April 13, 2022

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ....................................................................................................... 2

I.   PLAINTIFFS HAVE NO SECONDARY LIABILITY CLAIMS UNDER JASTA
     BECAUSE THEY MISSTATE THE LAW ON CONSPIRACY AND FAIL TO
     PROPERLY PLEAD GENERAL AWARENESS FOR AIDING AND ABETTING ............ 2

     A.  Plaintiffs Have No Conspiracy Claim................................................................ 2

         1.  Plaintiffs Misstate the Law on Conspiracy ................................................ 2

         2.  Plaintiffs Fail to Properly Plead Conspiracy with Anyone ......................... 5

             a.  Plaintiffs Have Failed to Allege a Plausible Conspiracy with the State of
                 Qatar ....................................................................................................... 5

             b.  Plaintiffs Have Failed to Properly Plead an Agreement with Qatar Charity
                 and Qatar National Bank ......................................................................... 7

             c.  Plaintiffs Fail to Allege that MAR Conspired with an FTO ................... 8

             d.  Plaintiffs Impermissibly Engage in Group Pleading ............................. 9

     B.  Plaintiffs Do Not State a Claim for Aiding and Abetting Liability Under JASTA ........... 9

         1.  Plaintiffs Ignore the Second Circuit's Ruling in *Kaplan* on General Awareness ........ 9

         2.  The Complaint Fails to Plead Substantial Assistance ................................ 13

     C.  Plaintiffs Fail to Allege That FTOs "Committed, Planned or Authorized" Nine of
         the Ten Alleged Attacks for Secondary Liability ............................................. 15

II.  PLAINTIFFS DO NOT STATE A CLAIM FOR PRIMARY LIABILITY UNDER
     THE ATA ..................................................................................................... 15

III. PLAINTIFFS FAIL TO ESTABLISH A *PRIMA FACIE* CASE OF PERSONAL
     JURISDICTION ................................................................................................ 17

     A.  Plaintiffs Fail to Demonstrate MAR Has Minimum Contacts with the New York
         Forum ............................................................................................................. 17

     B.  Conspiracy Jurisdiction Is Not Applicable to Plaintiffs' Claims...................... 19

     C.  Personal Jurisdiction over MAR Would Be Inconsistent with Due Process .................. 21

     D.  No Jurisdictional Discovery Is Warranted ....................................................... 22

IV.  PLAINTIFFS' DECLARATIONS AND EXHIBITS FAIL TO CURE THEIR

i

LEGALLY DEFICIENT CLAIMS ........................................................................ 23

V.  PLAINTIFFS DO NOT ESTABLISH STANDING AS TO SEVERAL PLAINTIFFS........ 24

VI. PLAINTIFFS DID NOT PROPERLY EFFECTUATE SERVICE........................................ 26

CONCLUSION........................................................................................................................ 27

4870-4384-2842

**TABLE OF AUTHORITIES**

Page(s)

Cases

*Ansbacher, et al. v. Qatar Charity, et al.*,
Jerusalem District Court, CC 21387-06-21, November 10, 2021............................................21

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
No. 05-cv-4880 (CBA), 2007 WL 4326793 (E.D.N.Y. Dec. 7, 2007)...................................20

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*,
480 U.S. 102, 115 (1987)..........................................................................................................21

*Astor Chocolate Corp. v. Elite Gold Ltd.*,
510 F. Supp. 3d 108 (S.D.N.Y. 2020).......................................................................................20

*Atuahene v. City of Hartford*,
10 F. App'x 33 (2d Cir. 2001) ....................................................................................................9

*Averbach v. Cairo Amman Bank*,
No. 19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom. Averbach ex rel. Averbach v. Cairo Amman Bank*,
No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).........................13, 14

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
171 F.3d 779 (2d Cir. 1999)......................................................................................................19

*Bartlett v. Société Générale de Banque Au Liban SAL*,
No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ..................16

*Berdeaux v. OneCoin Ltd.*,
No. 19-cv-4074 (VEC), 2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021).................9, 14, 18, 19

*Bernhardt v. Islamic Republic of Iran*,
No. 18-cv-2739 (TJK), 2020 WL 6743066 (D.D.C. Nov. 16, 2020) .........................................3

*Cabellero v. Fuerzas Armadas Revolucionarias de Colombia*,
No. 18-cv-25337 (KMM), 2020 WL 7481302 (S.D. Fla. May 20, 2020) ...............................25

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018).........................................................................................................21

*Cmty. Fin. Grp. v. Stanbic Bank Ltd.*,
No. 14-cv-5216 (DLC), 2015 WL 4164763 (S.D.N.Y. July 10, 2015) ...................................18

*Comer v. Cisneros*,
37 F.3d 775, 787 (2d Cir. 1994).................................................................................................24

iii

*Crosby v. Twitter, Inc.*,
   921 F.3d 617 (6th Cir. 2019) ................................................................15

*In re Dental Supplies Antitrust Litig.*,
   No. 16-cv-696 (BMC) (GRB), 2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017)......................19

*Essex Universal Corp. v. Yates*,
   305 F.2d 572 (2d Cir. 1962)................................................................6

*Freeman v. HSBC Holdings PLC*,
   413 F. Supp. 3d 67 (E.D.N.Y. 2019) ...............................................3, 16

*Gater Assets Ltd. v. AO Moldovagez*,
   2 F.4th 42 (2d Cir. 2021) ................................................................6

*Gen. Dynamics Land Sys., Inc. v. Cline*,
   540 U.S. 581 (2004)................................................................4

*GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*,
   822 F.3d 598 (D.C. Cir. 2016) ................................................................6

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ...............................................4, 5, 8, 14, 16

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ...............................................11, 13, 23

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
   495 F. Supp. 3d 144 (E.D.N.Y. 2020), *appeal filed*, No. 21-513 (2d Cir.
   Sept. 8, 2021) ...............................................12, 13

*Jingrong v. Chinese Anti-Cult World All. Inc.*,
   16 F.4th 47 (2d Cir. 2021) ................................................................3

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021)................................................ *passim*

*Kirschenbaum v. Assa Corp.*,
   934 F.3d 191 (2d Cir. 2019)................................................................6

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*,
   673 F.3d 50 (2d Cir. 2012)................................................................23

*Licci v. Lebanese Canadian Bank, SAL ("Licci III")*,
   20 N.Y.3d 327 (2012) ................................................................23

*Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*,
   732 F.3d 161 (2d Cir. 2013)................................................................23

iv

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018)......................................................................7

*Miller v. Arab Bank, PLC,*
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ..................................................14, 16, 17

*Miranda v. S. Country Cent. Sch. Dist.,*
    461 F. Supp. 3d 17 (E.D.N.Y. 2020) ...................................................9

*Motus, LLC v. CarData Consultants, Inc.,*
    23 F.4th 115 (1st Cir. 2022)....................................................................20

*O'Sullivan v. Deutsche Bank AG,*
    No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019),
    *appeal filed*, No. 21-7018 (D.C. Cir. Feb. 26, 2021) .....................................3, 4, 17

*Rosenberg v. Lashkar-E-Taiba,*
    No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017). ....................26

*Rudersdal v. Harris,*
    No. 18-cv-11072 (GHW), 2022 WL 263568 (S.D.N.Y. Jan. 28, 2022)............................5, 21

*S. Cherry St., LLC v. Hennessee Grp. LLC,*
    573 F.3d 98 (2d Cir. 2009)........................................................................17

*Shi v. Le,*
    No. 21-cv-1361 (ARR) (CLP), 2022 WL 89693 (E.D.N.Y. Mar. 28, 2022)..........................19

*Singer v. Bank of Palestine,*
    No. 19-cv-006 (ENV) (RML), 2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021)......................22

*Suber v. VVP Servs., LLC,*
    No. 20-cv-08177 (AJN), 2021 WL 4429237 (S.D.N.Y. Sept. 27, 2021) .........................19

*Tamam v. Fransabank Sal,*
    677 F. Supp. 2d 720 (S.D.N.Y. 2010)............................................................23

*Trueposition, Inc. v. Sunon, Inc.,*
    No. 05-cv-3023, 2006 WL 1686635 (E.D. Pa. June 14, 2006).................................26

*U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.,*
    916 F.3d 143 (2d Cir. 2019)......................................................................21

*Vasquez v. Hong Kong & Shanghai Banking Corp.,*
    477 F. Supp. 3d 241 (S.D.N.Y. 2020).............................................................18

*Webb v. Goord,*
    340 F.3d 105 (2d Cir. 2003)........................................................................7

4870-4384-2842

## Constitutions

U.S. Constitution...........................................................................................................................20

## Statutes and Codes

United States Code

    Justice Against Sponsors of Terrorism Act, § 2(b), 130 Stat. 852............................................4

    18 U.S.C. § 2333(a) ...........................................................................................................1

    18 U.S.C. § 2333(d)(2) ...........................................................................................1, 2, 15

    28 U.S.C. § 1604 ................................................................................................................6

New York Civil Practice Law and Rules

    Section 302(a)(1) .......................................................................................................18, 19

    Section 302(a)(2) ..............................................................................................................20

    Section 302(a)(3)(ii).........................................................................................................19

Qatari Civil & Commercial Procedures Law

    Article 11 (Law No. 13 of 1990) .....................................................................................26

    Article 10 (Law No. 13 of 1990, as amended by Law No. 7 of 1995) ..................................26

## Rules and Regulations

Federal Rules of Civil Procedure

    Rule 4(k) ...........................................................................................................................21

    Rule 4(k)(2).................................................................................................................5, 20

    Rule 12(b)(6)....................................................................................................................23

4870-4384-2842

## PRELIMINARY STATEMENT

Recognizing that the numerous legal deficiencies identified by Masraf Al Rayan ("MAR") in its Memorandum in Support of Its Motion to Dismiss ("Motion" or "Mot.") are insurmountable, Plaintiffs spin a baseless conspiracy theory that reaches the highest levels of a foreign government. Plaintiffs fail to plead any facts to implicate MAR in a conspiracy with anyone, let alone the State of Qatar, to fund international terrorism, and Plaintiffs do not even *attempt* to plead facts implicating MAR in a conspiracy with any terrorist entity, as required under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), *et seq.* Similarly, irrelevant allegations about Middle Eastern politics cannot hide Plaintiffs' failure to plead publicly available facts that provide any grounds to plausibly allege general awareness, a requirement for aiding and abetting liability under JASTA. In addition, Plaintiffs' primary liability claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), *et seq.*, fail because (as courts have repeatedly explained, and Plaintiffs ignore) ordinary banking transactions—the most that Plaintiffs allege of MAR—are not acts of violence.

Plaintiffs' claims warrant complete dismissal for failure to state a claim; separately, they also fail to establish that MAR purposefully availed itself of the New York forum and that exercising personal jurisdiction would be consistent with due process. Moreover, Plaintiffs implicitly concede that several Plaintiffs lack standing, and they have yet to properly serve MAR. For these reasons, Plaintiffs' claims must be dismissed.

1

## ARGUMENT

**I.      PLAINTIFFS HAVE NO SECONDARY LIABILITY CLAIMS UNDER JASTA BECAUSE THEY MISSTATE THE LAW ON CONSPIRACY AND FAIL TO PROPERLY PLEAD GENERAL AWARENESS FOR AIDING AND ABETTING**

As the Court recognized, Plaintiffs are not permitted to plead a conspiracy simply by calling Defendants "co-conspirators" without facts to support their conclusory allegations. *See* Jan. 28 Hearing Tr. 24:16-19 (Plaintiffs "can't just put a label of conspiracy on them and say that's our argument, you're going to have show [] some basis by which a conspiracy was reached."). That is exactly what Plaintiffs have done—placed a label of conspiracy. Recognizing that their claims are deficient, they devote over twenty pages of their Omnibus Memorandum of Law in Opposition to Motions to Dismiss of Defendants Qatar Charity, Qatar National Bank and Masraf Al Rayan ("Opposition" or "Opp.") to describing a conspiracy that they have not properly pled (nor could they).

### A.      Plaintiffs Have No Conspiracy Claim

#### 1.      Plaintiffs Misstate the Law on Conspiracy

As a threshold matter, Plaintiffs misstate the law. Plaintiffs argue that because JASTA was enacted to permit litigants "to sue entities 'that have provided material support, *directly or indirectly*' to [Foreign Terrorist Organizations]," MAR's interpretation of JASTA is unduly restrictive. (Opp. at 40). However, JASTA's text is clear:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to *any person who aids and abets*, by knowingly providing substantial assistance, *or who conspires with the person* who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2) (emphasis added).

4870-4384-2842

"When interpreting a statute, we begin with the text. We must give effect to the text's plain meaning." *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021). Here, as the Second Circuit has explained, the plain meaning is clear. "[A]iding-and-abetting claim[s]" are permissible under JASTA "where the defendant's acts aided and abetted the principal even where his relevant substantial assistance was given to an intermediary." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021). However, conspiracy liability attaches under JASTA only where "a defendant" is "shown to have 'conspire[d] *with'* the principal" Foreign Terrorist Organization ("FTO"). *Id.* at 855 (emphasis added).[1] The statute specifically provides that the conspiracy must be with "the person" who in fact committed the acts of terrorism.

The Second Circuit's interpretation of JASTA's liability provision is far from "myopic," as Plaintiffs put it (Opp. at 40), and every court that has evaluated Plaintiffs' argument has rejected it. *See Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 98 n.41 (E.D.N.Y. 2019) ("[T]he plain text of JASTA's *conspiracy* liability provisions requires that a defendant conspire directly with the person or entity that committed the act of international terrorism that injured the plaintiff."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2020 WL 6743066, at *7 (D.D.C. Nov. 16, 2020) ("JASTA liability exists only where 'the secondary tortfeasor conspired with the principal tortfeasor in committing such an act of international terrorism.'") (emphasis and internal quotation marks omitted) (quoting *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019)), *appeal filed*, No. 21-7018

---

[1] Plaintiffs characterize this statement as "dicta" (Opp. at 40 n.24); however, the Second Circuit's invocation of conspiracy liability under JASTA as a point of comparison to aiding and abetting liability under JASTA was central to its analysis. *Kaplan*, 999 F.3d at 855-56. Moreover, even if the *Kaplan* panel's language at issue *were* dicta, Plaintiffs themselves cite an out-of-district case for dicta when it suits them. (Opp. at 70.) Second Circuit dicta has precedential value too.

4870-4384-2842

(D.C. Cir. Feb. 26, 2021). Plaintiffs do not cite a single authority that disagrees with these decisions, and none exists.

Plaintiffs argue that because JASTA was enacted to permit litigants "to sue entities 'that have provided material support, *directly or indirectly*' to FTOs," MAR's interpretation "limits the law to far less than its stated purpose." (Opp. at 40). However, MAR's interpretation—and that of every court to have weighed in on the issue—does not preclude any plaintiff from making an aiding and abetting claim, which is an independent basis for liability under JASTA. Plaintiffs seek to obviate any practical distinction between aiding and abetting and conspiracy liability, leading to a result where two causes of action under the same statute would be largely redundant of one another. (*Id*. at 38) (recognizing that "[m]any of the same facts that support Plaintiffs' aiding-and-abetting claim likewise evidence the existence of Defendants' conspiracy."). Affording JASTA's text its plain meaning does not limit a plaintiff's ability to seek redress for indirect support of FTOs, if properly pled.[2]

Moreover, the "Findings and Purpose" section of JASTA cited by Plaintiffs also states that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) "provides the proper legal framework" for how conspiracy liability "should function." JASTA § 2(b), 130 Stat. 852. As Plaintiffs acknowledge, "the two parties in *Halberstam* necessarily conspired directly." (Opp. at 41). The court also held that courts in most cases "must initially look to see if" the co-conspirators "are in contact with one another," and that "[m]utually supportive activity by parties *in contact with one*

---

[2] Plaintiffs cite a Supreme Court case interpreting the Age Discrimination in Employment Act for the proposition that courts should look to a statute's "findings and statements of objectives" to interpret a provision's plain meaning, (Opp. at 40-41); however, in that case, "[t]he very strength" of the lower courts' "consensus" in interpretation of the statute "was enough to rule out any serious claim of ambiguity" as to the statute's plain meaning. *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 593-94 (2004). Here, not only is the statute unambiguous, but every court that has opined on the issue disagrees with Plaintiffs' interpretation; Plaintiffs cite irrelevant *criminal* conspiracy cases instead. (Opp. at 41).

4

*another over a long period* suggests a common plan." *Halberstam*, 705 F.2d at 481 (emphasis added). Nothing in *Halberstam* contemplates liability for a co-conspirator who *never* conspired with the principal. Thus, based on the text and purpose of JASTA, Plaintiffs' conspiracy claim fails as a matter of law.[3]

### 2. Plaintiffs Fail to Properly Plead Conspiracy with Anyone

Setting aside Plaintiffs' misstatement of the law governing conspiracy liability under JASTA, Plaintiffs have failed to properly plead a plausible claim of conspiracy with anyone. Plaintiffs' claim requires that they plausibly plead "an agreement to do an unlawful act or a lawful act in an unlawful manner." (Opp. at 37). Plaintiffs' allegations have not met this burden.

#### a. Plaintiffs Have Failed to Allege a Plausible Conspiracy with the State of Qatar

Without basis, Plaintiffs aver that they have alleged "an agreement among the government of Qatar, the Qatari Royal Family, the FTOs, and Defendants." (*Id*. at 38). Plaintiffs continue to insist that Defendants' illegal conspiracy was orchestrated by the Qatari government, and that MAR's "domination by Qatar and the Royal Family" and "control" by Qatar demonstrates the plausibility of this theory. (*Id*. at 50). However, no facts have been pled to support this legal conclusion.

First, Plaintiffs insist their allegations that the government owns 28% of MAR and has some unspecified number of board seats is sufficient, *per se,* to establish control. In support of

---

[3] Plaintiffs' conspiracy theory is central to their claims because Plaintiffs recognize that they must first properly plead a plausible claim of conspiracy under JASTA *before* this Court can properly exercise personal jurisdiction over Qatar Charity and Qatar National Bank; without conspiracy, there is no jurisdiction over them. However, "[i]f a federal statute contains a specific limitation on the exercise of jurisdiction that would preclude" Plaintiffs' conspiracy theory, then jurisdiction as to all of Plaintiffs' claims is unavailable because under Rule 4(k)(2), the "exercise of jurisdiction must be consistent with U.S. law." *Rudersdal v. Harris*, No. 18-cv-11072 (GHW), 2022 WL 263568, at *11 (S.D.N.Y. Jan. 28, 2022); *see infra* § III.B. Here, JASTA contains a limitation on the availability of conspiracy liability—it requires the defendant to have conspired *with* an FTO; Plaintiffs may not use Rule 4(k)(2) to evade that limitation. And without the ability to assert conspiracy jurisdiction over all Defendants, Plaintiffs have no case.

4870-4384-2842

this assertion, they cite *Essex Universal Corp. v. Yates*, 305 F.2d 572 (2d Cir. 1962).[4] *Essex* grappled with "the question whether a contract for the sale of 28.3 per cent of the stock of a corporation is, under New York law, invalid as against public policy solely because it includes a clause giving the purchaser an option to require a majority of the existing directors to replace themselves," 305 F.2d at 573, a question completely irrelevant to Plaintiffs' arguments. Plaintiffs cite shareholder control cases to mask that their allegations do not allege that Qatar had "stock voting power" in two banks, *id*. at 579, but instead conclusorily plead that Qatar "coopted several institutions that it dominates and controls to funnel coveted U.S. dollars" to terrorist organizations in secret. (Compl. ¶ 4). Shareholder control, even majority shareholder control (which Plaintiffs do not plead Qatar has over MAR), and board seats are insufficient resources to coopt a corporation in service of an illegal terrorist conspiracy. *See Gater Assets Ltd. v. AO Moldovagez*, 2 F.4th 42, 58 (2d Cir. 2021) (Even if the "Republic [of Moldova] effectively wields the power of a majority shareholder over Moldovagez . . . such authority does not in itself establish extensive control.").[5]

Second, as pled, Plaintiffs' conspiracy theory is nonsensical. According to Plaintiff, the government of Qatar's "integral role in the conspiracy" was "encouraging [Defendants'] behavior." (Opp. at 39). It is not clear what encouragement Defendants needed, especially if they were completely dominated and "controlled" by Qatar. Plaintiffs also fail to explain why it is plausible that Qatar would go to the trouble of orchestrating a vast conspiracy involving a myriad

---

[4] Plaintiffs also cite shareholder control cases interpreting Delaware law in similarly irrelevant contexts, (Opp. at 28 n.15), and a D.C. Circuit case where the government "ordered" an instrumentality to cancel a contract—a specific allegation of government action missing from this case. *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598, 606-07 (D.C. Cir. 2016). There, plaintiff's complaint was dismissed because it lacked a plausible allegation of agency control, despite the order. *Id*. at 608.

[5] Were Plaintiffs' allegations somehow plausible, they would render MAR an organ or alter ego of Qatar. (*See* Mot. at 16 n.8); *see also Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 198 (2d Cir. 2019) ("Both Assa entities are owned and controlled by Iran. They are Iran's alter egos as a matter of law and are therefore foreign states under the [Foreign Sovereign Immunities Act]."). If the Government of Qatar "controlled" the acts of MAR, then the Court would lack subject matter jurisdiction over this action pursuant to the Foreign Sovereign Immunities Act. *See* 28 U.S.C. § 1604.

4870-4384-2842

of co-conspirators to provide "a substantial portion" of "over $28 million" to "Hamas and Hamas-affiliated organizations" and "PIJ and PIJ-affiliated charities," (Compl. ¶¶ 130-32), when Qatar was allegedly comfortable pledging publicly that it would provide Hamas with $400 million directly. (*Id.* ¶ 125).

        **b.**      **Plaintiffs Have Failed to Properly Plead an Agreement with Qatar Charity and Qatar National Bank**

To properly allege MAR conspired with Qatar Charity and Qatar National Bank ("QNB"), Plaintiffs "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement." *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (internal quotation marks and citation omitted). There are no non-conclusory allegations that MAR ever conspired with either or both of its co-defendants; Plaintiffs do not allege any conduct that evinces an agreement.

Plaintiffs allege only that MAR transferred funds for Qatar Charity. (*See, e.g.*, Compl. ¶ 132). The allegation that MAR "maintained a direct or indirect correspondent banking relationship with at least one New York bank" is not only vague, (*Id.* ¶ 151), but wholly unremarkable: the allegation that a foreign bank engaged in banking transactions with one of its customers is not a factual basis to support the existence of an illegal conspiracy. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018) (concluding that "providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to excuse the charging error here"). Indeed, every foreign bank would fall in this category.

In recognition of their lack of sufficient allegations against MAR, Plaintiffs repeatedly invoke the purported undated "criminal confessions by the Director and Staff of Qatar Charity's West Bank Branch, which detail how Qatar Charity and Masraf laundered USD through the U.S. to Qatar Charity's accounts in the West Bank." (Opp. at 39). However, Plaintiffs do not plead

7

any plausible allegations as to who confessed what, when, and under what circumstances.  (Compl. ¶ 132).

While the allegations as to an agreement between MAR and Qatar Charity hinge on routine transactions, there are no non-conclusory allegations that MAR and QNB interacted at all.  The entirely disparate allegations against MAR and QNB only demonstrate that there was *not* a meeting of the minds between the Defendants.  While the "only concrete allegation as to a time period" against MAR is from 2015, Plaintiffs point out that the allegations against QNB include allegations from 2006 and 2012.  (*Id*. at 35).  And nowhere do Plaintiffs allege that MAR and QNB were ever in contact with one another.  *See Halberstam*, 705 F.2d at 481 ("In sum, we expect that the relationship between the actors and between the actions (*e.g.*, the proximity in time and place of the acts, and the duration of the actors' joint activity) are relevant in inferring an agreement in a civil conspiracy action.").[6]

### c.    Plaintiffs Fail to Allege that MAR Conspired with an FTO

Plaintiffs also plead no facts to allege that Plaintiffs conspired with either Hamas or PIJ.  As the Motion explains, "*nowhere* do Plaintiffs allege in a non-conclusory fashion that MAR entered into any agreement with PIJ or Hamas."  (Mot. at 29).  Plaintiffs concede as much, stating that "Qatar Charity maintain[ed] the direct link to the FTOs," not either MAR or QNB.  (Opp. at 39).  As a result, Plaintiffs instead argue, incorrectly, that no such allegation is required.  *See supra* § I.A.1.

---

[6] Plaintiffs incorrectly assert that MAR has "waived arguments" as to "overt act" and "causation."  (Opp. at 37 n.22). The "overt act" requirement is coextensive with the "substantial assistance" and "international act of terrorism" prongs of JASTA and ATA liability, respectively, and MAR argues that Plaintiffs fail to plead causation as part of its arguments as to ATA liability and personal jurisdiction.  (*See* Mot. §§ I.A.2, II.A.-B).

4870-4384-2842

## d. Plaintiffs Impermissibly Engage in Group Pleading

Plaintiffs also make no attempt to adhere to *Berdeaux*'s admonition against "impermissible group pleading"; Plaintiffs' Complaint is "riddled" with allegations that lump Defendants together. *See Berdeaux v. OneCoin Ltd.*, No. 19-cv-4074 (VEC), 2021 WL 4267693, at *7, *11 (S.D.N.Y. Sept. 20, 2021); (*see* Mot. at 27 n.13). "Where a complaint lumps defendants together in each claim and provides no factual basis to distinguish their conduct, it fails to satisfy the minimum pleading standard." *Miranda v. S. Country Cent. Sch. Dist.*, 461 F. Supp. 3d 17, 31 (E.D.N.Y. 2020) (Cogan, J.) (citing *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001). Here, Plaintiffs repeatedly lump the Defendants together. (*See, e.g.*, Compl. ¶¶ 393, 394, 404, 406; *see also* ECF No. 67-1 at ¶¶ 149-150, 152). Because Plaintiffs repeatedly fail to plead "factual allegations to distinguish" MAR's purportedly unlawful conduct, the Complaint should be dismissed as to MAR. *Miranda*, 461 F. Supp. 3d at 31; *see also* Jan. 28 Hearing Tr. 24:12-15 ("[L]ooking at this complaint, it does seem to me that there's a lot of lumping together of defendants who might have behaved very differently.").

## B. Plaintiffs Do Not State a Claim for Aiding and Abetting Liability Under JASTA

Plaintiffs fail to plausibly state a claim for aiding and liability under JASTA; the Complaint fails to plead facts as to both general awareness and substantial assistance.

### 1. Plaintiffs Ignore the Second Circuit's Ruling in *Kaplan* on General Awareness

Plaintiffs relist their allegations of purported general awareness, (Opp. at 24-25), but those allegations remain deficient. For example, MAR's Motion detailed why allegations of public knowledge *after* the transactions at issue cannot be used to support a finding of general awareness, which Plaintiffs do not address. (Mot. at 15). In fact, Plaintiffs concede elsewhere, (Opp. at 30), that allegations of public knowledge postdating the attacks are irrelevant yet include multiple such

allegations on their own list. (*Id.* at 24-26). Nor do Plaintiffs explain why allegations as to *Qatar's* support of terrorism can be imputed to Defendants for purposes of general awareness. (Mot. at 15-16). Plaintiffs argue that "these factors leave no doubt" as to general awareness "[i]n combination," (Opp. at 30), citing *Kaplan*, but they cannot combine their disparate insufficient allegations into a single sufficient one simply by grouping them together. Plaintiffs assert that they plead "far more compelling support than *Kaplan*" for an inference of general awareness. (*Id.* at 25). Plaintiffs are incorrect.

Unlike Plaintiffs' allegations, the defendant in *Kaplan* "gave the customers special treatment, exempting them from submitting cash transaction slips" and gave them "exemptions with respect to deposits" for "more than $2.5 million a week." 999 F.3d at 850. Plaintiffs completely ignore these allegations, which were integral to the *Kaplan* decision. Moreover, as Plaintiffs highlight, the FTO at issue in *Kaplan* was famously headquartered in the same country as the defendant. (Opp. at 24). Plaintiffs' allegations as to general awareness in *Kaplan* included numerous *public statements* that identified the customers as "integral parts of Hizbollah" prior to the attacks at issue, "the circumstances in which the statements were made," and "the other specific media in which they were made." 999 F.3d at 864.

Worse, Plaintiffs mischaracterize the customers at issue in *Kaplan* as "a putative charity . . . two corporations, and two of their officers." (Opp. at 27). No customer in *Kaplan* is described as a charity; one customer provided funding to terrorists and their families and was described in passing (in a news article cited in the complaint) as providing "charitable funds" to *suicide bombers*, an allegation that supported a finding of general awareness. *Kaplan*, 999 F.3d at 849-51. The Second Circuit drew a contrast between "the plaintiffs' theory" in *Kaplan* that the "customers provided subsidies to the families of Hizbollah suicide bombers" and "permitted the

4870-4384-2842

laundering of money in violation of regulatory restrictions meant to hinder the ability of FTOs to carry out terrorist attacks" with the plaintiffs' theory in *Honickman* that the customers supported "Hamas's social welfare program" and "supported orphans in Palestinian refugee camps." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 503 n.21 (2d Cir. 2021) (citation omitted). It is disingenuous at best to claim Plaintiffs' allegations against MAR more closely resemble the former than the latter.

Plaintiffs similarly mischaracterize *Honickman*. There, as here, "[t]he limited public sources Plaintiffs cite pale in comparison to the detailed, numerous sources that sufficed in *Kaplan*." *Id*. at 502. Critically, the court held that the allegation that the customers at issue in *Honickman* "maintained a 'cover' in public undermines the plausibility of Plaintiffs' theory that BLOM Bank understood those organizations' true nature and activities from the public record at the time." *Id*. That holding flies in the face of Plaintiffs' assertion that "the court should reject the Bank Defendants' claims that Qatar Charity's humanitarian work undermines Plaintiffs' allegations" of general awareness. (Opp. at 37 n.21). Plaintiffs characterize MAR as "pretend[ing] that Qatar Charity is not the same organization as Qatar Charitable Society," (*id*. at 29), but it is Plaintiffs who explain the name change was to maintain a "cover" (as in *Honickman*), specifically in response to the notoriety received "under its prior name."[7] (Compl. ¶ 67).

Another fact rendering this case more akin to *Honickman* than *Kaplan* is Plaintiffs' emphasis on allegations concerning Union of Good, one of the customers at issue in *Honickman*. Plaintiffs' allegations as to general awareness amount to two alleged facts: Israel's ban of

---

[7] In further recognition of the Complaint's deficiencies, Plaintiffs assert for the first time that "Defendants all possess non-public information that show the charity's funding of the FTOs." (Opp. at 11; *see also id*. at 25 n.12). This conclusory allegation, whether in the Complaint or in the Opposition, is irrelevant; Plaintiffs must allege proper plausible facts to proceed beyond the pleading stage. Similarly, the allegation that non-defendant banks "refused to provide services to Qatar Charity" is unsupported by any alleged facts from which it can be inferred that such refusal was "because of its terror funding" as Plaintiffs now claim for the first time. (*Id*. at 17).

4870-4384-2842

members of Union of Good in 2008 (*see* Compl. ¶ 79), and purported confessions by employees of Qatar Charity at unspecified times (*id.* ¶ 132). Neither demonstrates with any plausibility that MAR was generally aware of any alleged relationship between Qatar Charity and Hamas or PIJ. As to the confessions, as pled, they do not sufficiently allege general awareness as to MAR. Purportedly, MAR "transferred" Qatar Charity funds "through a bank in New York." (Compl. ¶ 132(c)). There is nothing pled to indicate that the Qatar Charity employees confessed MAR had any awareness as to the *purpose* of these transfers, or knowledge of any purported Qatar Charity affiliation with a terrorist group. And no other aspect of this so-called confession implicates MAR, rendering the confession allegation probative of nothing. Further, given that Plaintiffs do not plead any information as to the date, speaker, substance, or context of these purported "confessions," they are not plausible as information available to MAR that would render it generally aware of Qatar Charity's alleged relationship with FTOs.

Finally, Plaintiffs cite Israel's order banning members of Union of Good with remarkable frequency, (*see, e.g.*, Opp. at 10, 25, 29, 30, 34, 44, 50); however, that order did not prevent Israel from allowing Qatar Charity to operate in the Palestinian Territories for seven more years—until 2015. (ECF No. 67-1 ¶ 139). Plaintiffs seek to equate the provision of routine financial services, to an entity listed under an alias on a press release seven years prior in another country, with material support of terrorism. To hold it is plausible that MAR was generally aware that it was participating in unlawful activities from which terrorist attacks were foreseeable on the basis of such flimsy allegations would erase any threshold for aiding and abetting liability. A finding of general awareness cannot depend on a single foreign country's policy changes; Plaintiffs must demonstrate that information as to Qatar Charity's alleged affiliation with Hamas was "ubiquitous." *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 160

4870-4384-2842

(E.D.N.Y. 2020), *appeal filed*, No. 21-513 (2d Cir. Sept. 8, 2021); *see Honickman*, 6 F.4th at 503 n.18 ("Plaintiffs argue that 'the publicly available evidence [in the complaint] was largely available before or during the relevant period or discussed facts that were previously knowable.' However, 'publicly available' evidence is not the same as public sources such as media articles. The latter, depending on their substance, plausibly suggest a defendant's knowledge which can be confirmed during discovery, whereas the former requires the implausible inference that the defendant was aware of those facts even before the news media."). Union of Good itself was a customer in *Honickman*, and even though Israel "designated" it in 2002 as "part of the Hamas organization," the Second Circuit held JASTA liability still did not attach because "Plaintiffs failed to plausibly allege BLOM Bank was aware [its] [c]ustomers were related to Hamas." *Honickman*, 6 F.4th at 493 n.6, 503. As a result, JASTA liability should not attach to MAR either.[8]

### 2. The Complaint Fails to Plead Substantial Assistance

Not only do Plaintiffs fail to allege facts from which general awareness can be inferred, they also fail to plead that MAR substantially assisted FTOs. The Complaint contains no non-conclusory allegations that MAR did anything other than execute ordinary financial transactions.

Emblematic of Plaintiffs' Opposition is its contention that "the services Defendants provided here were anything but routine." (Opp. at 32). As to MAR, Plaintiffs, however, do not assert any allegations beyond routine banking services. (*Id.*); *see Averbach v. Cairo Amman Bank*, No. 19-cv-0004-GHW-KHP, 2020 WL 486860, at *16 (S.D.N.Y. Jan. 21, 2020) (dismissing claim where "Plaintiffs have not pleaded that CAB had any type of relationship other than an arms-length business relationship with the Account Holders and have pleaded no relationship at all to Hamas

---

[8] Plaintiffs' allegations as to MAR's state of mind are insufficient as to all of its causes of action for the same reasons as the general awareness inquiry: Plaintiffs fail to make non-conclusory allegations that MAR knew of any alleged connection between Qatar Charity and terrorist organizations. (*See* Opp. at 50).

except through the Account Holders."), *report and recommendation adopted sub nom. Averbach ex rel. Averbach v. Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020). Each of the cases cited by Plaintiffs requires the defendant to have allegedly done more. In *Kaplan*, where, for example, the bank granted "special exceptions" to its customers, "Plaintiffs plainly did not allege that LCB's provision of banking services to the Customers was 'routine.'" 999 F.3d at 858. In *Halberstam*, the defendant "performed [her] services in an unusual way under unusual circumstances for a long period of time." *Halberstam*, 705 F.2d at 487; *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 48 (E.D.N.Y. 2019) (denying motion to dismiss because Plaintiffs pled Arab Bank's services were "unusual," consistent with *Halberstam*).[9]

Plaintiffs attempt the same ploy with regard to the "duration of assistance" prong of the "substantial assistance test." The Opposition characterizes MAR's claim that the "only concrete allegation as to a time period" in the Complaint is "[f]rom March 1, 2015 until September 2015" as "false," but cites no allegations as to MAR in dispute of it. (Opp. at 35). Again, Plaintiffs concede the point as to MAR. *Cf. Averbach*, 2020 WL 486860, at *17 (noting allegation that defendant maintained "accounts for Hamas-affiliated organizations from 1999-2004," but that "the fund transfers through the correspondent bank accounts took place over a much shorter period of time," as "[t]he longest duration of assistance for any one of the Account Holders was a year").[10]

---

[9] In a futile attempt to bolster the Complaint, Plaintiffs drag in allegations from another case about "Sanabel Cards" that "Qatar Charity obtained from the Bank of Palestine." (Opp. at 8; *see generally* ECF No. 67-1). Even if the Court were to take judicial notice of these allegations, Qatar Charity's alleged use of its own funds to purchase debit cards from a non-defendant unimplicated in the alleged conspiracy and distribute them to unnamed individuals does not implicate MAR at all, and Plaintiffs' labeling of it as "Defendants' Sanabel Card scheme" is improper and conclusory group pleading. (ECF No. 67-1 at ¶ 152); *see Berdeaux*, 2021 WL 4267693, at *2, *7 (dismissing complaint that was "riddled with instances of improper group pleading"); *supra* § I.A.2.d.

[10] With regard to the other prongs of the "substantial assistance test," Plaintiffs continue to reassert only their conclusory allegations (Opp. at 33-37), which fail for the reasons already identified by MAR (Mot. at 17-19).

4870-4384-2842

### C. Plaintiffs Fail to Allege That FTOs "Committed, Planned or Authorized" Nine of the Ten Alleged Attacks for Secondary Liability

JASTA does not confer liability (under either a theory of either aiding and abetting or conspiracy) unless the alleged terrorist acts at issue were "committed, planned or authorized" by an FTO. 18 U.S.C. § 2333(d)(2). Plaintiffs argue that they have pled that all of the alleged attacks were committed, planned or authorized by Hamas or PIJ because of the FTOs' "admissions of responsibility for each of the attacks." (Opp. at 20). However, the fact that "ISIS claimed responsibility" for the Pulse Night Club shooting did not compel a finding that ISIS "committed, planned, or authorized" it. *Crosby v. Twitter, Inc.*, 921 F.3d 617, 619, 626 (6th Cir. 2019) (citation omitted). And while Plaintiffs characterize their allegations (and distinguish *Crosby*) by pointing to their pleadings as "unambiguous" in asserting the alleged terrorists at issue were members of Hamas, that is all they do: Plaintiffs' characterization of individuals as "Hamas terrorists," without more than after-the-fact praise and claim of membership, is conclusory. *Cf. Crosby*, 921 F.3d at 621 (holding that allegations were insufficient where plaintiffs alleged that "[a]fter the attack, ISIS praised Mateen and announced that the Pulse Night Club shooting 'was carried out by an Islamic State fighter'"). Plaintiffs plead no facts from which it can be inferred that the individual terrorists at issue were actually acting pursuant to Hamas's control or authorization, (*see, e.g.*, Compl. ¶ 281 ("young Palestinian resident" had "decided to carry out a terrorist attack"), and thus, fail to plead that Hamas or PIJ committed, planned, or authorized the alleged attacks at issue.

## II. PLAINTIFFS DO NOT STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA

Plaintiffs' primary liability claims are similarly defective. In alleging that MAR's conduct constituted "acts of terrorism," Plaintiffs repeatedly compare their allegations to those in *Miller*, justifying its invocation of the Court's opinion in that case by asserting that "the Bank Defendants provided the same types of services that this Court found sufficient in *Miller* to satisfy the ATA's

primary liability requirements." (Opp. at 45). Plaintiffs' attempt to equate MAR's routine financial transactions with the scheme detailed in *Miller* mischaracterizes both the Complaint and *Miller*.

The allegations in *Miller* involved "a terrorist insurance scheme" in which Arab Bank was provided "with detailed lists containing the names of the martyrs, their personal information, and the date and manner of their death, which often included bullets, bombs, and assassinations." 372 F. Supp. 3d at 39. "[A]n Arab Bank employee called a terrorist to inform him that, because the terrorist was injured and hospitalized, he was eligible for $1,330" and personally met with him to give "him a check for that amount." *Id*. at 40. The plaintiffs in *Miller* pled that the scheme "incentivized terrorists to commit acts of violence to receive the benefits" and "helped Hamas gather support." *Id*. In short, "Arab Bank provided banking services 'in an unusual way under unusual circumstances.'" *Id*. at 48 (quoting *Halberstam*, 705 F.2d at 487).

In contrast, here, Plaintiffs all but concede that the allegations as to MAR concern routine financial transactions. (Opp. at 32) (lumping Defendants together to show services at issue were "anything but routine," without specifying any action taken by MAR); *see also supra* § I.A.2.d. *Miller* acknowledged that "routine financial services," even to "members and associates of terrorist organizations," do not meet the "definition of international terrorism under the ATA." 372 F. Supp. 3d at 44-45 (citation omitted). Several cases in the Second Circuit, which Plaintiffs do not even attempt to distinguish, have held that "providing wire transfer and other financial services" is "not an act which is 'violent or dangerous to human life' as contemplated by the ATA." *See, e.g.*, *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020); *Freeman*, 413 F. Supp. 3d at 91 (explaining that, "[g]iven the many legitimate activities [the customers] engage in, the mere act of providing

16

financial services to them cannot be violent or dangerous," even when "non-routine"); *O'Sullivan*, 2019 WL 1409446, at *8 ("The Complaint does not allege plausibly that the provision of banking services, which are not inherently violent or dangerous, can be considered as acts dangerous to human life . . . ."). Similarly, routine financial transactions do not evince an objective intent to intimidate citizens or influence a government. (Mot. at 24-25).

Plaintiffs' causation arguments are also unavailing. In *Miller*, the defendant bank employees actually handed money to terrorists, unlike MAR, for whom "the factual allegations delineating relationships between those services and the terrorist attacks at issue are so attenuated." *O'Sullivan*, 2019 WL 1409446, at *8. Moreover, Plaintiffs admit that facts as to causation in the Glick, C.Z.B., and Force attacks are not "available to Plaintiffs without the benefit of discovery," compelling dismissal of the corresponding Plaintiffs. (Opp. at 49); *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 114 (2d Cir. 2009) (argument that "facts" are "peculiarly within the knowledge of the defendants" compels dismissal because "inability to offer more than speculation [as to defendants'] conduct underscores, rather than cures, the deficiency in the Complaint").

## III. PLAINTIFFS FAIL TO ESTABLISH A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION

### A. Plaintiffs Fail to Demonstrate MAR Has Minimum Contacts with the New York Forum

Plaintiffs fail to allege that MAR has sufficient minimum contacts with New York. Contrary to Plaintiffs' argument that MAR "intentionally availed itself of the protections that New York law provides to banking institutions," all but one of the allegations Plaintiffs cite in support of this assertion fail to even *mention* New York. (*See* Opp. at 62 (citing Compl. ¶¶ 90, 130, 132-34)).[11] The only one that does is the same barebones allegation that MAR transferred on

---

[11] Plaintiffs offer no factual predicate for their assertion that MAR chose the New York forum, (*e.g.*, (Compl, ¶ 151), and simply state legal conclusions, (*e.g.*, *id.* ¶ 13 ("Specifically, in furtherance of their conspiracy with Defendants,

unspecified dates an unspecified amount of U.S. dollars through a bank in New York. (Compl. ¶ 132(c)). Moreover, even if the Court credits the statements that MAR offers its clients U.S. dollar services and that it uses Citibank, NA as its correspondent or agent to complete international payments using CHIPS, (ECF No. 69 ("McArdle Decl.") ¶ 19), Plaintiffs still do not connect the alleged transfer of "over $28 million" that "*Defendants* conspired to transfer," (Compl. ¶ 130) (emphasis added), to MAR's alleged New York correspondent banking activity. *See Cmty. Fin. Grp. v. Stanbic Bank Ltd.*, No. 14-cv-5216 (DLC), 2015 WL 4164763, at *4-5 (S.D.N.Y. July 10, 2015) (dismissing complaint for lack of personal jurisdiction and finding that plaintiffs alleged "only one connection between this case and New York," which was not purposeful).

Plaintiffs make much of their argument that U.S. dollar transactions must pass through a U.S. correspondent account (*see* Opp. at 13 n.9, 61 n.34), but acknowledge the limitations of this logical leap by noting that U.S. correspondent banks "participate in *virtually* all large wire transfers of USD" and that those transactions "*generally* 'clear' in the United States, through a U.S. bank," failing to plead purposeful availment. (Opp. at 61 & n.34) (emphases added); *see also Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 259 (S.D.N.Y. 2020) (dismissing complaint because "there is no evidence that [defendant] directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account").

Plaintiffs mischaracterize *Berdeaux* as "inapposite." (Opp. at 65). In *Berdeaux*, the court held that the plaintiffs' allegations were insufficient under 302(a)(1) where they alleged contact with New York in the form of a wire transfer of $30 million through a correspondent account located in New York. 2021 WL 4267693, at *10. That is precisely what Plaintiffs attempt to do here. (Compl. ¶¶ 13, 132(c), 147, 151-52). Plaintiffs attempt to distinguish *Berdeaux* by arguing

---

. . . [MAR] bank purposefully and knowingly effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity through banks in New York, including Bank of New York Mellon . . . .")).

4870-4384-2842

MAR effectuated "multiple transfers . . . over the course of at least four years," (Opp. at 65)—but the Complaint is, in fact, devoid of allegations as to more than one transfer. Moreover, Plaintiffs' assertion that *Berdeaux* is inapplicable because plaintiffs there "disclaimed" all bases for jurisdiction other than CPLR 302(a)(3)(ii), (Opp. at 64-65), is not accurate; the court explained that it was deciding the issue under CPLR 302(a)(1) as well. *Berdeaux*, 2021 WL 4267693, at \*8-9 ("[T]o avoid resting its decision on Plaintiffs' abandonment, the Court's analysis extends beyond Section 302(a)(3)(ii).").

## B. Conspiracy Jurisdiction Is Not Applicable to Plaintiffs' Claims

Plaintiffs allege jurisdiction under New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), over MAR based on MAR's alleged correspondent banking activity. (Compl. ¶¶ 12, 151-53). As noted above, and in the Motion, (*see* Mot. § IV), Plaintiffs' allegations are insufficient to allege personal jurisdiction over MAR using New York's long-arm statute. However, even if they were not, Plaintiffs have a problem: They must also allege jurisdiction over Qatar Charity and QNB under New York's long-arm statute, but courts have held that § 302(a)(1) is inapplicable to a conspiracy theory of jurisdiction. *See, e.g.*, *Suber v. VVP Servs., LLC*, No. 20-cv-08177 (AJN), 2021 WL 4429237, at \*6 (S.D.N.Y. Sept. 27, 2021) ("[T]he conspiracy theory of jurisdiction is not available under section 302(a)(1) . . . ."); *see also In re Dental Supplies Antitrust Litig.*, No. 16-cv-696 (BMC) (GRB), 2017 WL 4217115, at \*7 (E.D.N.Y. Sept. 20, 2017) (Cogan, J.) ("[T]here is no doctrinal support for 'conspiracy jurisdiction[]'" under New York's long-arm statute).[12] As a result, Plaintiffs have shifted arguments, now prioritizing their jurisdictional

---

[12] Despite Plaintiffs' best efforts, (Opp. at 79-80), jurisdiction under C.P.L.R. § 302(a)(2) is unavailable altogether because, as Plaintiffs acknowledge, (*id*. at 80), the Second Circuit has held that "a defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999); *see also Shi v. Le*, No. 21-cv-1361 (ARR) (CLP), 2022 WL 89693, at \*2 n.2 (E.D.N.Y. Mar. 28, 2022) (applying *Bank Brussels*). Plaintiffs plead no such physical presence, and their assertion that § 302(a)(2)'s requirements are "satisfied here even though Masraf's agent did not participate in

argument under Rule 4(k)(2) of the Federal Rules of Civil Procedure. (*Compare* ECF No. 60 at 2 ("In the alternative, Plaintiffs will demonstrate a *prima facie* case of personal jurisdiction . . . pursuant to Fed. R. Civ. P. 4(k)(2) . . . .") *with* Opp. at 80 (describing the New York long-arm statute as the "alternative basis for exercising jurisdiction"). However, Plaintiffs' Rule 4(k)(2) argument fares no better.

As a threshold matter, Rule 4(k)(2) is inapplicable because Plaintiffs fail to show that Defendants are not subject to jurisdiction in any U.S. state and that exercising jurisdiction would be consistent with the U.S. Constitution and laws. Plaintiffs represent that they cite "more recent decisions" to argue that Plaintiffs do not need to certify that no states have jurisdiction over any of the Defendants in order to assert their claims, (Opp. at 58), but they cite no authority from within the Second Circuit. *Cf. Aqua Shield, Inc. v. Inter Pool Cover Team*, No. 05-cv-4880 (CBA), 2007 WL 4326793, at *8 (E.D.N.Y. Dec. 7, 2007) (internal quotation marks and citation omitted) ("[T]he plaintiff must certify that, based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state."); *Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 125 (S.D.N.Y. 2020) (collecting cases) ("In this Circuit, to meet the second requirement of Rule 4(k)(2), plaintiffs need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state.").[13] Plaintiffs also ignore the *most* recent decision on Rule 4(k)(2), which held that "certification is a necessary component of the showing that the plaintiff must make" under Rule 4(k)(2). *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 127 (1st Cir. 2022). Instead of making this certification, Plaintiffs argue the opposite: that they "have also alleged jurisdiction under the New York long-arm statute." (Opp. at 58 n.30).

---

Defendants' conspiracy" is wholly unsupported and without merit. (Opp. at 80).

[13] In addition to being out-of-Circuit, neither case cited by Plaintiffs is more recent than *Astor*. (Opp. at 58 n.30).

4870-4384-2842

Next, even if Plaintiffs made the requisite certification, Rule 4(k) "preclude[s] the use of a conspiracy theory of jurisdiction" when such a theory would be plainly inconsistent with the "federal statute," at issue. *Rudersdal*, 2022 WL 263568, at *11. Here, JASTA "contains a specific limitation" that requires the defendant at issue to have allegedly conspired "with" the FTO at issue. *Id*; *see supra* § I. As a result, a conspiracy theory of jurisdiction under Rule 4(k) is inapplicable to Plaintiffs' Complaint altogether.

Finally, Plaintiffs' claim of personal jurisdiction under a conspiracy theory fails because their Complaint is devoid of non-conclusory allegations that (1) a conspiracy existed, (2) that MAR participated in the alleged conspiracy, or (3) that any alleged co-conspirator took overt acts in furtherance of the conspiracy. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018); *supra* § I.A. To the extent Plaintiffs lump Defendants together in their jurisdictional allegations, (*see, e.g.*, Compl. ¶¶ 12-13), Plaintiffs' pleadings are impermissible and should be dismissed on that basis. *See supra* § I.A.2.d.

### C. Personal Jurisdiction over MAR Would Be Inconsistent with Due Process

Plaintiffs ignore a lawsuit in Israel filed against MAR and nine other defendants arising out of the same alleged events, which renders Israel a suitable forum. *See Ansbacher, et al. v. Qatar Charity, et al.*, Jerusalem District Court, CC 21387-06-21, November 10, 2021; (Mot. at 39). By Plaintiffs' own argument, "other jurisdictions' interests in furthering beneficial social policies" are relevant in the reasonableness inquiry. (Opp. at 60) (citing *U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*, 916 F.3d 143, 151 n.5 (2d Cir. 2019)); *see also Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 115 (1987) (internal quotation marks and citation omitted) (explaining that reasonableness inquiry involving foreign defendant required considering "the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction"

by a U.S. state, and admonishing that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field").

### D. No Jurisdictional Discovery Is Warranted

Plaintiffs are not entitled to jurisdictional discovery. Plaintiffs' reliance on *Singer v. Bank of Palestine* is misplaced because the allegations in that case were drastically different from—and far more detailed than—the ones here. For example, the *Singer* plaintiffs alleged the defendant maintained accounts for two customers, each of whom was a Specially Designated Global Terrorist ("SDGT"), as well as five customers that were "critical part[s] of Hamas's civilian infrastructure," one of which was also an SDGT. No. 19-cv-006 (ENV) (RML), 2021 WL 4205176, at *2-3 (E.D.N.Y. Apr. 30, 2021). Jurisdictional discovery was warranted because the plaintiffs had "pleaded facts which could support a colorable claim of jurisdiction." *Id.* at *7. In addition, plaintiffs came "closest to identifying a New York connection" with allegations that two of the defendant bank's customers (both SDGTs) maintained U.S. dollar-denominated accounts with the defendant bank, that one of those customers received multiple transfers from the United States through the bank's New York correspondent account, and that the other customer "appear[ed] to be under the direct control of Hamas founder Ibrahim al-Yazuri," and that it "made multiple transfers from the U.S. to [its U.S.-dollar denominated] account in Gaza." *Id.* at *6 (internal quotation marks omitted) (quoting plaintiffs' complaint).[14] In comparison, Plaintiffs have alleged nothing similar here: they have not alleged that MAR's customer was an SDGT (nor can they) that maintained a U.S. dollar-denominated account with MAR, or that it was under the control of Hamas or PIJ.

---

[14] The *Singer* plaintiffs also alleged that the defendant bank had maintained its account for that customer at least seven years after that customer was designated an SDGT. *Id.* at *2. Plaintiffs come nowhere close to alleging anything similar with respect to MAR's alleged maintenance of an account for Qatar Charity.

4870-4384-2842

Contrary to Plaintiffs' assertions, the *Licci* decisions[15] did not overrule *Tamam*.[16] *Tamam* does not stand for the proposition that passing money through a correspondent account for a terrorist organization cannot support exercising jurisdiction in a case arising from terrorist attacks, (*see* Opp. at 82); instead, the allegations in *Tamam* were simply not sufficient to establish jurisdiction because the plaintiffs had not alleged an "actual transfer of money through New York" to link defendants' correspondent accounts to terrorist operations. *Tamam*, 677 F. Supp. 2d at 727.

Finally, Plaintiffs' comparison of Qatar to Iran and Venezuela is a stretch: Qatar is a non-NATO U.S. ally; Iran and Venezuela are not. (Far from it.) As Plaintiffs' own comparison demonstrates, the United States could "combat rapid oil price increases" by making entreaties to Qatar without calling it an ally of the United States. (Opp. at 12).

## IV. PLAINTIFFS' DECLARATIONS AND EXHIBITS FAIL TO CURE THEIR LEGALLY DEFICIENT CLAIMS

Plaintiffs submit two declarations and fifteen exhibits in support of their Opposition. (*See* ECF Nos. 67–67-14; 69–69-1). However, at the motion to dismiss stage, it is the pleadings that are the basis for dismissal, not the Plaintiffs' briefing. *See Honickman*, 6 F.4th at 502 n.19 (quotations omitted) (declining to take into account plaintiffs' factual assertions made in briefing and at oral argument, which were not made in the complaint itself, because a "Rule 12(b)(6) motion tests the adequacy of the complaint . . . not the briefs"). In sum, these submissions cannot cure the Complaint's deficiencies. Moreover, even if the Court considers the McArdle Declaration, which

---

[15] *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*, 673 F.3d 50 (2d Cir. 2012); *Licci v. Lebanese Canadian Bank, SAL ("Licci III")*, 20 N.Y.3d 327 (2012); *Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*, 732 F.3d 161 (2d Cir. 2013).

[16] The only point of law in *Tamam* that *Licci III* clarified was the nexus requirement, which requires "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former," *Licci III*, 20 N.Y.3d at 339, as opposed to *Tamam*'s requirement that the transaction be "at the very root" of the claims, *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 728-29 (S.D.N.Y. 2010) (internal quotation marks and citation omitted). Regardless, Plaintiffs fail to meet the pleading standard articulated in *Licci III*; that is, they fail to allege "a relatedness between the transaction and the legal claim." 20 N.Y.3d at 339.

4870-4384-2842

Plaintiffs offer in an attempt to repair their insufficient jurisdictional allegations, it is wholly speculative because it makes inferences out of whole cloth and not based on properly pled allegations in the Complaint. (*See, e.g.*, McArdle Decl. ¶ 18 ("With Masraf Al Rayan Bank initiating the U.S. dollar-denominated transfers for Qatar Charity as discussed in the Complaints, these funds were *almost certainly* settled and cleared in the U.S. (New York) . . . .") (emphasis added);[17] *id.* ¶ 19 ("[I]t is *logical* that Masraf Al Rayan also understood that the U.S. dollar transfers conducted on behalf of its clients would pass through the U.S. as a matter of process.") (emphasis added)). Regardless, the McArdle Declaration stands for nothing more than the fact that MAR offers U.S.-dollar denominated services and has a U.S. correspondent bank. (*See id.*). As explained *supra* § III.A., simply alleging that MAR has a U.S. correspondent bank is insufficient to establish personal jurisdiction over MAR. (*See also* Mot. at § IV.A.-B).

## V. PLAINTIFFS DO NOT ESTABLISH STANDING AS TO SEVERAL PLAINTIFFS

The Complaint also fails to plead standing for several Plaintiffs. *First*, four Plaintiffs lack statutory standing as non-U.S. citizens. As to Plaintiffs Amichai Ariel, Abraham Ron Fraenkel, and Rita Avni, Plaintiffs do not dispute their foreign national status at all relevant times. Instead, Plaintiffs assert those Plaintiffs have standing, otherwise, the statute's "broad remedial purpose" would be undermined. (Opp. at 52) (quotations omitted). Plaintiffs, however, ignore the record of congressional intent regarding foreign plaintiff standing specifically. (Mot. at 30 n.18).[18] As to Plaintiff Yehuda Glick, Plaintiffs are incorrect that Defendants' legal support for this standing challenge is inapposite. (Opp. at 51). *Comer v. Cisneros* holds that standing under the Constitution is "assessed as of the time the lawsuit is brought." 37 F.3d 775, 787 (2d Cir. 1994) (citations

---

[17] This statement is also not correct. The Complaint does not allege that MAR initiated the alleged transfers.

[18] As MAR stated in its Motion, to the extent that foreign nationals bring claims only on behalf of American citizens or on behalf of estates of American citizens who have died (and not on their own behalf), MAR does not seek dismissal of their claims on the basis of standing. (*See* Mot. at 31 n.20).

4870-4384-2842

omitted).  *Cabellero v. Fuerzas Armadas Revolucionarias de Colombia* is applicable because it reasons that "the language of the [ATA] . . . explicitly require[s] that the claimant . . . *is currently a U.S. national.*"  No. 18-cv-25337 (KMM), 2020 WL 7481302, at *2 (S.D. Fla. May 20, 2020) (emphasis added).  Additionally, Plaintiffs' argument that Defendant has described no statutory or judicial mechanism by which a foreign citizen's rights were extinguished is entirely unavailing; renunciation of citizenship *is* the mechanism.  (Opp. at 51–52).  If an individual renounces his or her citizenship, that individual thereby renounces the rights that such citizenship affords.  The non-U.S. citizens' claims brought on their own behalf should be dismissed.

*Second*, thirteen Plaintiffs lack statutory standing as they have failed to allege sufficiently close familiar relationships to allege an injury for solatium damages.[19]  Plaintiffs argue, without support, that the "appropriate question . . . is whether the loss of a non-immediate family member constitutes a personal injury within the scope of the statute."  (Opp. at 53).  Plaintiffs are incorrect; under Plaintiffs' logic, there is no principle limiting who can recover for solatium damages (under any cause of action) so long as they claim "a personal injury."  Rather, the focus of the inquiry is on whether the non-immediate family member claiming solatium damages had an "extremely close" familial relationship and bond with the decedent.  (Mot. at 31-32).  Plaintiffs further argue that the "question of the appropriate compensation for loss of solatium involves a fact-intensive inquiry unsuitable for resolution on a motion to dismiss," (Opp. at 53), but before any fact-intensive inquiry, Plaintiffs must plead *facts*.  The Plaintiffs at issue have failed to make any *prima facie* allegations that they are the functional equivalent of immediate family members, as Plaintiffs

---

[19] Plaintiffs now allege that the grandparents of C.Z.B. have standing as the parents of Plaintiffs Shmuel Elimelech Braun and Chana Braun.  (*Id.* at 52).  However, C.Z.B.'s grandparents plead injury for the "loss of solatium and loss of C.Z.B.'s companionship."  (Compl. ¶ 272; *see also id.* ¶ 50).  MAR moves to dismiss claims for those injuries for which non-immediate family members lack standing.

seem to acknowledge when they request an opportunity to replead.  (Opp. at 54).[20]  As a result, the non-immediate family members should be dismissed.

## VI.     PLAINTIFFS DID NOT PROPERLY EFFECTUATE SERVICE

Plaintiffs have failed to establish that service by private courier is not prohibited by Qatari law, ignoring the Qatari law's plain meaning.  Plaintiffs, again, cite to Article 11 of the Qatari Civil & Commercial Procedures Law (Law No. 13 of 1990), in stating that Qatari law authorizes courts to deliver process "by registered mail."  (Opp. at 55) (citing Bonner Decl. ¶ 14 & Ex. 10 at Art. 11); (*see also* ECF No. 54 at 4) (quotations omitted).  Plaintiffs ignore that Article 11 governs the service of an individual and that Article 10 governs service upon a corporation.[21]

Instead, Plaintiffs rely on a declaration by counsel to attempt to show the absence of any prohibition of service of process by mail under Qatari law.  (Opp. at 55) (citing Bonner Decl. ¶¶ 12–14 & Ex. 9–10).  In *Trueposition, Inc. v. Sunon, Inc.*, No. 05-cv-3023, 2006 WL 1686635, at *3–6 (E.D. Pa. June 14, 2006), upon which Plaintiffs rely even though it is not binding authority, the court relied on a declaration by a foreign lawyer that service by registered mail is a method of service regularly made in the foreign country under that country's laws, State Department guidance that service of process in the foreign country can be effected by international registered mail, and other cases in which courts found that the foreign country's law did not prohibit service of process by registered mail—none of which have been submitted by Plaintiffs here.[22]

---

[20] Plaintiffs neglect to mention they have had such an opportunity for almost two years.  (*See* ECF No. 1).

[21] *See* Article 10 (Law No. 13 of 1990, as amended by Law No. 7 of 1995).  Plaintiffs also decline to cite any authority to distinguish *Rosenberg v. Lashkar-E-Taiba*, No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017).  (Opp. at 54).

[22] Plaintiffs' argument that MAR's service argument is "frivolous" because MAR has "appeared in, and vigorously defended, this action" fails to engage with the relevant law and would incentivize defendants to avoid appearing in lawsuits filed against them.  (Opp. at 54).  Moreover, counsel for MAR has expressly reserved its rights and filed limited notices of appearances expressly highlighting this issue.  (*See* ECF Nos. 27, 35-36).

4870-4384-2842

Finally, Plaintiffs provide no compelling reason for this Court to order alternative service while Defendants wait for service of process through letters rogatory. (Opp. at 54–56).[23] Plaintiffs continue to concede that the proper method of service is through letters rogatory, and that has not yet occurred. (Opp. at 54, 56); (Bonner Decl. ¶¶ 10–11).

## **CONCLUSION**

For the foregoing reasons, Defendant MAR respectfully renews its request that the Court dismiss Plaintiffs' Complaint in its entirety, with prejudice.

Dated: April 13, 2022
New York, New York

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: */s/ Carolina A. Fornos*
Carolina A. Fornos
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019-6131
Tel.: (212) 858-1000
Fax: (212) 858-1500

Aryeh L. Kaplan (*pro hac vice*)
Markenzy Lapointe (*pro hac vice*)
Pillsbury Winthrop Shaw Pittman LLP
600 Brickell Avenue, Suite 3100
Miami, FL 33131
Tel.: (786) 913-4900
Fax: (786) 913-4901
*Counsel for Defendant Masraf Al Rayan*

---

[23] MAR incorporates the arguments and accompanying case law from QNB's February 22, 2022 letter to this Court. (*See* ECF No. 61 at 3-4).

4870-4384-2842