## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

STUART FORCE individually and as personal
representative of the ESTATE OF TAYLOR
FORCE, *et al.*,

    *Plaintiffs*,

       v.

QATAR CHARITY, QATAR NATIONAL BANK
and MASRAF AL RAYAN,

    *Defendants*.

Case No. 20-cv-2578 (BMC)

Oral Argument Requested

## QATAR NATIONAL BANK'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ............................................................................................ 2

I.     PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED AS TO QNB FOR LACK OF PERSONAL JURISDICTION ................................................. 2

     A.     Plaintiffs Fail to Make a Prima Facie Showing of Proper Service ........................ 3

     B.     Plaintiffs Fail to Demonstrate Any Statutory Basis for Personal Jurisdiction over QNB. ................................................................. 4

          1.     Plaintiffs' Conspiracy Theory of Jurisdiction Is Not Cognizable Under C.P.L.R. 302(a)(1). ........................................................... 4

          2.     Plaintiffs' Apparent Invocation of C.P.L.R. 302(a)(2) Is Unfounded. ................................................................. 6

          3.     QNB Is Not Subject to Personal Jurisdiction Under Federal Rule of Civil Procedure 4(k)(2). ...................................................... 7

     C.     Principles of Due Process Compel Dismissal. ........................................ 8

     D.     Jurisdictional Discovery as to QNB Is Inappropriate. ........................... 11

II.     PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR AIDING AND ABETTING ............... 12

     A.     Plaintiffs Fail to Plausibly Allege General Awareness. ......................... 13

     B.     Plaintiffs Fail to Plausibly Allege Knowing and Substantial Assistance. ............ 19

III.     PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR CONSPIRACY ................................. 22

IV.     PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS PRIMARILY LIABLE UNDER 18 U.S.C. § 2333(A) ................................................. 24

CONCLUSION .......................................................................... 28

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                **Page(s)**

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
    No. 05-cv-4880 (CBA), 2007 WL 4326793 (E.D.N.Y. Dec. 7, 2007) ......................................8

*Astor Chocolate Corp. v. Elite Gold Ltd.*,
    510 F. Supp. 3d 108 (S.D.N.Y. 2020).........................................................................................8

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    171 F.3d 779 (2d Cir. 1999)......................................................................................................7

*Berkshire Bank v. Lloyds Banking Grp. PLC*,
    No. 20-1987-cv, 2022 WL 569819 (2d Cir. Feb. 25, 2022) .................................................5, 6

*Black v. Vitello*,
    841 F. App'x 334 (2d Cir. 2021) ..............................................................................................4

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) ...............................................................................24, 25, 26, 27

*Carlström v. Livförsäkring*,
    No. 19-cv-11569 (DLC), 2020 WL 7342753 (S.D.N.Y. Dec. 14, 2020) ...............................10

*Chirag v. MT Marida Marguerite Schiffahrts*,
    604 F. App'x 16 (2d Cir. 2015) ................................................................................................9

*Chufen Chen v. Dunkin' Brands, Inc.*,
    954 F.3d 492 (2d Cir. 2020).......................................................................................................5

*Clean Coal Techs., Inc. v. Leidos, Inc.*,
    377 F. Supp. 3d 303 (S.D.N.Y. 2019).......................................................................................7

*Daventree Ltd. v. Republic of Azer.*,
    349 F. Supp. 2d 736 (S.D.N.Y. 2004)................................................................................11, 12

*In re Dental Supplies Antitrust Litig.*,
    No. 16-cv-696 (BMC) (GRB), 2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017)........................7

*Freeman v. HSBC Holdings PLC*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019) ................................................................................22, 23

*Halberstam v. Welsh*,
    705 F.2d 472 (D.C. Cir. 1983) .........................................................................................17, 20

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)...........................................................................................................16, 17

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ............................................................... *passim*

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021) ............................................................ *passim*

*Kemper v. Deutsche Bank AG*,
   911 F.3d 383 (7th Cir. 2018) ................................................. 24, 26, 27

*Lebron v. Sanders*,
   557 F.3d 76 (2d Cir. 2009) (per curiam) .......................................... 5

*Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*,
   10 F. Supp. 2d 334 (S.D.N.Y. 1998) .................................................. 6

*Licci v. Lebanese Canadian Bank (Licci I)*,
   673 F.3d 50 (2d Cir. 2012) ................................................................. 9

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018) ............................................. 17, 24, 25, 27

*Marcus v. Lominy*,
   No. 18-cv-1857 (NSR), 2022 WL 493688 (S.D.N.Y. Feb. 17, 2022) ...................... 5

*Mednik v. Specialized Loan Servicing, LLC*,
   No. 20-cv-427 (MKB), 2021 WL 707285 (E.D.N.Y. Feb. 23, 2021) ...................... 11

*Miller v. Arab Bank, PLC*,
   372 F. Supp. 3d 33 (E.D.N.Y. 2019) ........................................... 24, 25

*O'Sullivan v. Deutsche Bank AG*,
   No. 17-cv-8709 (LTS) (GWG), 2018 WL 1989585 (S.D.N.Y. Apr. 26, 2018) ........... 23

*O'Sullivan v. Deutsche Bank AG*,
   No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar 28, 2019) ........... 24

*Owens v. BNP Paribas, S.A.*,
   897 F.3d 266 (D.C. Cir. 2018) .................................................... 19, 27

*In re Platinum & Palladium Antitrust Litig.*,
   449 F. Supp. 3d 290 (S.D.N.Y. 2020) ................................................ 10

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013) ................................................................ 27

*Rudersdal v. Harris*,
   No. 18-cv-11072 (GHW), 2022 WL 263568 (S.D.N.Y. Jan. 28, 2022) ................... 9

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* (*Schwab II*),
 22 F.4th 103 (2d Cir. 2021) ..................................................................................9

*Siegel v. HSBC N. Am. Holdings, Inc.*,
 933 F.3d 217 (2d Cir. 2019).................................................................................21

*Smartmatic United States Corp. v. Fox Corp.*,
 No. 151136/2021, 2022 WL 685407 (N.Y. Sup. Ct. Mar. 8, 2022) .....................4, 6

*In re Terrorist Attacks on Sept. 11, 2001*,
 349 F. Supp. 2d 765 (S.D.N.Y. 2005).....................................................................6

*Thorne v. Square, Inc.*,
 No. 20-cv-5119 (NGG) (TAM), 2022 WL 542383 (E.D.N.Y. Feb. 23, 2022) ......................13

*Uddoh v. United Healthcare*,
 254 F. Supp. 3d 424 (E.D.N.Y. 2017) ....................................................................2

*Walden v. Fiore*,
 571 U.S. 277 (2014)............................................................................................8, 9

*Waldman v. Palestine Liberation Org.*,
 835 F.3d 317 (2d Cir. 2016).................................................................................3

**Statutes**

18 U.S.C. § 2333 ...................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 4 ...................................................................................... *passim*

N.Y. C.P.L.R. 302............................................................................................1, 4, 7, 9

Defendant Qatar National Bank Q.P.S.C. ("QNB") respectfully submits this reply memorandum of law (the "Reply") in support of its motion to dismiss Plaintiffs' complaint (the "Complaint").

## PRELIMINARY STATEMENT

Plaintiffs' opposition brief (the "Opposition") is based on a flawed understanding of the relevant law that would, if adopted, subject almost any multinational bank to potential civil liability claims by victims of terrorist acts, even when those acts are not connected—in even the most remote manner—to the bank or its activities. Without allegations that tie QNB's own provision of banking services foreseeably to the acts of terrorism that injured Plaintiffs, and in a way that demonstrates some meaningfully relevant contact with the United States and this forum, Plaintiffs cannot establish a basis even for the exercise of personal jurisdiction over QNB, much less the imposition of liability on it.

With respect to personal jurisdiction, Plaintiffs' reliance on a conspiracy theory of personal jurisdiction—their only basis for asserting personal jurisdiction over QNB—is mistaken, because the relevant state and federal courts have explicitly and repeatedly rejected that theory as unavailable under the relevant prong of the New York long-arm statute. Plaintiffs' invocation of Fed. R. Civ. P. 4(k)(2) in the alternative fairs no better, as they make no effort to satisfy that provision. Plaintiffs' attempt to resurrect their substantive claims also fails. In regard to JASTA aiding and abetting, Plaintiffs change course in their opposition, switching their headline allegation in support of "general awareness" from one involving the U.S. IICT, which was never published, to Israel's supposed 2008 "designation" of Qatar Charity, which is, on careful inspection, just as deficient. In direct contravention of Second Circuit law, Plaintiffs rely on an argument about the fungibility of money (and financial services) that they believe relieves them of the obligation under the general awareness inquiry even to allege that QNB's customers were closely intertwined with

1

terrorist activities. That is not the law. Indeed, the Second Circuit explicitly rejected Plaintiffs' theory in *Honickman* in this same context. The Opposition makes little effort to save Plaintiffs' JASTA conspiracy and ATA primary liability claims, which are plainly deficient.

Plaintiffs continue to advance their arguments in the same impermissible group pleading style that plagues the Complaint, often using the vague catch-all "Defendants" when it is crystal clear that the Complaint's specific allegations do not involve QNB. This includes all the allegations involving specific transfers of funds, as well as the newly added assertion regarding Sanabel cards (which Plaintiffs improperly incorporate from a complaint in another case).[1] In similar fashion, Plaintiffs fail in many places to respond to QNB's arguments, opting instead to address only those made by QNB's co-defendants. This is for good reason. While the Complaint is deficient against all Defendants, the allegations against QNB are almost non-existent. Rather than rehash the arguments in QNB's thorough motion to dismiss, this Reply focuses on the serious errors of law and misleading arguments that undergird Plaintiffs' Opposition, which does nothing to salvage the insufficient allegations of the Complaint.[2]

## ARGUMENT

## I.    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED AS TO QNB FOR LACK OF PERSONAL JURISDICTION.

Both in their Complaint and Opposition, Plaintiffs fail to meet any of the three requirements to show a *prima facie* case for personal jurisdiction over QNB, because (1) Plaintiffs' method of service was improper, (2) Plaintiffs fail to plausibly allege a statutory basis for personal jurisdiction over QNB, and (3) Plaintiffs fail to make the requisite showing that exercising personal jurisdiction

---

[1] Plaintiffs throughout their Opposition attempt to add new allegations, including alleging now *twenty* total individual accountholders as opposed to the original *three* (Badran, Dudin, and al-Qaradawi). *See* Opp. at 44 n.26. This is plainly improper, though it does not in any event cure the legal deficiencies of Plaintiffs' claims. *See Uddoh v. United Healthcare*, 254 F. Supp. 3d 424, 429 (E.D.N.Y. 2017) (Cogan, J.) ("A plaintiff . . . is not permitted to interpose new factual allegations . . . in opposing a motion to dismiss.").

[2] QNB also incorporates MAR's reply arguments regarding lack of standing. *See* MAR Reply at Section V.

over QNB would be constitutionally permissible. *See Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (quoting *Licci v. Lebanese Canadian Bank (Licci I)*, 673 F.3d 50, 59-60 (2d Cir. 2012)).

### A. Plaintiffs Fail to Make a Prima Facie Showing of Proper Service.

Plaintiffs fail to address, let alone rebut, QNB's argument that Article 2 of the same Qatari law cited in Plaintiffs' pre-motion letter and Opposition clearly states that "*[e]very* summons or execution *shall* be served through the police or any other authority appointed by the President of the Supreme Judicial Council," with the only carveout being for a Qatari court to effect service by registered mail, which plainly suggests that Plaintiffs' method of service by private courier is *prohibited* by Qatari law. *See* QNB Br. at 7 n.3 (quoting Qatar Civil and Commercial Procedure Law (Law No. 13 of 1990), https://www.almeezan.qa/LawArticles.aspx?LawTreeSectionID=8075&lawId=2492&language=en (emphases added)). The case Plaintiffs rely on regarding Taiwanese law, *see* Opp. at 55 (citing *Trueposition, Inc. v. Sunon, Inc.*, No. 05-3023, 2006 WL 1686635 (E.D. Pa. June 14, 2006)), did not involve this key provision.

Perhaps realizing the deficiencies of their arguments under Fed. R. Civ. P. 4(f)(2)(c)(ii), Plaintiffs switch to requesting alternative service under Fed. R. Civ. P. 4(f)(3), which should be denied. QNB incorporates its arguments and accompanying case law from its February 22, 2022 letter to this Court. *See* ECF No. 61 at 3-4. QNB further notes that concerns of international comity are especially heightened where, as here, the Complaint makes baseless allegations of heinous misconduct against the sovereign nation of Qatar, which is immune from suit in this Court and was recently reaffirmed by the United States government as a "major non-NATO ally."[3] QNB

---

[3] C. Todd Lopez, *'Major Non-NATO Ally' Designation Will Enhance U.S., Qatar Relationship*, U.S. Dep't of Defense (Jan. 31, 2022), https://www.defense.gov/News/News-Stories/Article/Article/2917336/major-non-nato-ally-designation-will-enhance-us-qatar-relationship/.

respectfully encourages the Court to exercise its discretion to require service to be *properly* effected in this case through letters rogatory—which Plaintiffs represent are well underway. Until service has been properly effected, which has not yet occurred, this Court cannot properly assert personal jurisdiction over QNB. *See Black v. Vitello*, 841 F. App'x 334, 335 (2d Cir. 2021).

### B. Plaintiffs Fail to Demonstrate Any Statutory Basis for Personal Jurisdiction over QNB.

Plaintiffs' Opposition asserts that personal jurisdiction over QNB is permissible under New York's long-arm statute and Federal Rule of Civil Procedure 4(k)(2).[4] Plaintiffs' assertions fail on both counts.

#### 1. Plaintiffs' Conspiracy Theory of Jurisdiction Is Not Cognizable Under C.P.L.R. 302(a)(1).

Plaintiffs insist that a conspiracy theory of personal jurisdiction is available to show that QNB transacted business in New York under Section 302(a)(1) of New York's long-arm statute. *See* Opp. at 75-80. In doing so, Plaintiffs continue to ignore that numerous New York courts, as well as district courts in the Second Circuit, have rejected application of a conspiracy theory to C.P.L.R. 302(a)(1)—the only provision of New York's long-arm statute that could apply here. *See* QNB Br. at 11 (citing cases). At least one New York State Supreme Court, interpreting the very New York State law applicable here, recently re-confirmed that a conspiracy theory of personal jurisdiction is *not* applicable under Section 302(a)(1). *See Smartmatic United States Corp. v. Fox Corp.*, No. 151136/2021, 2022 WL 685407, at *26 (N.Y. Sup. Ct. Mar. 8, 2022) ("The conspiracy theory of jurisdiction is not available under *section 302(a)(1)*, which is applicable to business transactions and not torts." (emphasis added) (citing *Suber v. VVP Servs., LLC*, No. 20-cv-08177

---

[4] Plaintiffs do not address the Complaint's assertion of personal jurisdiction under Section 2333 of the ATA. Thus, Plaintiffs concede that the provision is inapplicable here.

4

(AJN), 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021))).[5] As this is a question of state law, this recent state court decision interpreting state law is especially relevant because "when interpreting state statutes[,] federal courts defer to state courts' interpretation of their own statutes." *Marcus v. Lominy*, No. 18-cv-1857 (NSR), 2022 WL 493688, at *12 (S.D.N.Y. Feb. 17, 2022) (quoting *United States v. Fernandez-Antonia*, 278 F.3d 150, 162 (2d Cir. 2002)); *see also Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 497 (2d Cir. 2020) ("When deciding a question of state law, we . . . look to the state's decisional law, as well as to its constitution and statutes." (internal quotation marks omitted)). Indeed, many federal district courts in the Second Circuit have reached the same conclusion when interpreting Section 302(a)(1) of New York's long-arm statute. *See* QNB Br. at 11 (citing cases).

Like their earlier reliance on *Schwab I*, Plaintiffs' reliance in the Opposition on *Berkshire Bank v. Lloyds Banking Grp. PLC*, No. 20-1987-cv, 2022 WL 569819 (2d Cir. Feb. 25, 2022) (summary order),[6] is also misplaced. *See* QNB Br. at 11-12 (discussing *Schwab I*). The parties' dispute in *Berkshire Bank* concerned the *third* prong of what is required to assert personal jurisdiction—the due process analysis—not the second prong, which is the statutory basis for personal jurisdiction, New York's long-arm statute. *See* 2022 WL 569819, at *2. Moreover, to the extent the court's summary order in *Berkshire Bank* even addressed New York's long-arm

---

[5] Plaintiffs suggest that under C.P.L.R. 302(a)(1), Plaintiffs need not show an agent/principal relationship between QNB and any of the Defendants such that QNB exercised control over any other Defendant in order to confer jurisdiction under the statute. *See* Opp. at 76. This suggestion is based on Plaintiffs' misinterpretation of the holding in *Berkshire Bank*. True, the court in *Berkshire Bank* held that "New York courts do not mandate a showing of control or direction to establish conspiracy-based personal jurisdiction." 2022 WL 569819, at *3. But it only held as much with respect to *C.P.L.R. 302(a)(2)*. Indeed, in their Opposition, Plaintiffs cite to case law clearly stating that, under *C.P.L.R. 302(a)(1)*, which does not allow for conspiracy-based jurisdiction, in order to attribute the actions of an agent to an out-of-state defendant, a plaintiff must show that the defendant exercised control over the agent. *See* Opp. at 66 (citing *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40 (N.Y. 1988)).
[6] The Second Circuit summary order in *Berkshire Bank* does not bind this Court as it has "no precedential effect." *Lebron v. Sanders*, 557 F.3d 76, 77 n.2 (2d Cir. 2009) (per curiam) (citing Local Rule of the Second Circuit 32).

statute, it did so with respect to C.P.L.R. 302(a)(2) and *not* 302(a)(1), which is at issue here.[7] *Id.* at *3. *See Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys., Inc.*, 10 F. Supp. 2d 334, 342 (S.D.N.Y. 1998) (explaining that, unlike § 302(a)(1), "conspiracy-based jurisdiction is more properly based on § 302(a)(2), which authorizes personal jurisdiction over a non-domiciliary who commits a tortious act within the state," and thus would capture only a conspiracy in which the wrongful conduct and harm were each committed and felt in New York). Because Plaintiffs' legal theory as to whether QNB transacted business under New York's long-arm statute fails as a matter of law, Plaintiffs have not established that QNB is subject to personal jurisdiction in this Court.[8]

Nevertheless, even were this Court to extend "conspiracy jurisdiction" to C.P.L.R. 302(a)(1), Plaintiffs' arguments would still fail. To establish conspiracy-based personal jurisdiction pursuant to New York's long-arm statute, a plaintiff must first make a *prima facie* showing of a conspiracy. *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 805 (S.D.N.Y. 2005); *see also Smartmatic*, 2022 WL 685407, at *26. Because Plaintiffs do not adequately allege a conspiracy, let alone make a *prima facie* case that one existed, Plaintiffs' argument falls short. *See infra* Section III; QNB Br. at 32-34. Nothing in Plaintiffs' Opposition cures that defect. Moreover, even applying the *Berkshire Bank* test here, Plaintiffs fail to allege that co-defendant MAR's in-forum contacts were "at the request of or for the benefit of" QNB, such that the exercise of personal jurisdiction over QNB would even comport with that test.

2.    Plaintiffs' Apparent Invocation of C.P.L.R. 302(a)(2) Is Unfounded.

Despite their assertion of personal jurisdiction over Defendants pursuant to C.P.L.R.

---

[7] In fact, all of the cases cited in the *Berkshire Bank* summary order discuss Section 302(a)(2), not 302(a)(1).

[8] QNB adopts MAR's and Qatar Charity's reply arguments that they are not subject to personal jurisdiction under New York's long-arm statute, including their arguments with respect to whether any alleged contacts have a sufficient nexus to New York under the second prong of the due process analysis. *See* MAR Reply at Section III; Qatar Charity Reply at Section I.

302(a)(1), Plaintiffs apparently now also seek to invoke C.P.L.R. 302(a)(2), *see* Opp. at 79, which allows a New York "court [to] exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . commits a tortious act within the State." As already stated in QNB's opening brief, Section 302(a)(2) is not even potentially applicable here. *See* QNB Br. at 9 n.7. Section 302(a)(2) is construed narrowly in the Second Circuit and "requires physical commission of the tortious act in New York." *Clean Coal Techs., Inc. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 314 (S.D.N.Y. 2019); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999). Plaintiffs do not allege that *any* tortious act occurred in New York and therefore cannot assert personal jurisdiction over QNB under this provision. And even if the Court were to disregard this precedent *and* extend Section 302(a)(2) to conspiracy allegations where no tortious conduct took place within New York, here there is no adequate allegation of a conspiracy at all.[9] *See infra* Section III; QNB Br. at 32-34.

3.  QNB Is Not Subject to Personal Jurisdiction Under Federal Rule of Civil Procedure 4(k)(2).

Plaintiffs' effort to invoke Fed. R. Civ. P. 4(k)(2) as an alternative basis to subject QNB to personal jurisdiction in this Court likewise fails. Jurisdiction under Rule 4(k)(2) is proper only if (1) "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction" and (2) "exercising jurisdiction is consistent with the United States constitution and laws." Fed. R. Civ. P. 4(k)(2). Plaintiffs fail to meet either prong.

*First*, Plaintiffs fail to certify (or even represent) to this Court that QNB is not subject to personal jurisdiction in *any* state, as is required in the Second Circuit to meet the first prong under Rule 4(k)(2). *See id.* Plaintiffs' suggestion that Defendants, including QNB, have the burden to

---

[9] QNB notes that this Court has previously declined to adopt a conspiracy theory of specific personal jurisdiction with respect to C.P.L.R. 302(a)(2). *See In re Dental Supplies Antitrust Litig.*, No. 16-cv-696 (BMC) (GRB), 2017 WL 4217115, at *7 (E.D.N.Y. Sept. 20, 2017).

show they *are* subject to jurisdiction in some *other* state, *see* Opp. at 58, is inaccurate and misleading. To support their proposition, Plaintiffs tellingly cite only to decisions from outside the Second Circuit, while disregarding clear precedent within the Second Circuit that mandates that a *plaintiff* carry the burden with respect to this prong. *See id.* at 58 n.30; *Aqua Shield, Inc. v. Inter Pool Cover Team*, No. 05-cv-4880 (CBA), 2007 WL 4326793, at *8 (E.D.N.Y. Dec. 7, 2007) ("[T]he plaintiff must certify that, based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state."); *Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 134 (S.D.N.Y. 2020) (collecting cases) (same). It is obvious why Plaintiffs seek to avoid this burden: they are contemporaneously advocating that QNB is subject to personal jurisdiction in *every* state in the United States where *any* alleged conspirator is subject to personal jurisdiction. Plaintiffs cannot have it both ways.

*Second*, for the reasons stated in Section I.C below, because Plaintiffs have not alleged the essential elements of a conspiracy, exercising personal jurisdiction over QNB in this case would violate due process even under the expansive principles Plaintiffs urge.

## C. Principles of Due Process Compel Dismissal.

To comport with due process, Plaintiffs must show that QNB had "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *Aqua Shield*, 2007 WL 4326793, at *3; *see also* Opp. at 58. As explained in QNB's opening brief, Plaintiffs' reliance on vague and conclusory allegations regarding a conspiracy involving the Qatari Royal Family, Hamas, PIJ, and unidentified others does not satisfy the requirements of due process. *See* QNB Br. at 12-14.

*First*, Plaintiffs continue to rest their jurisdictional allegations as to QNB solely on

principles of conspiracy, claiming that *MAR's* alleged New York contacts support the exercise of personal jurisdiction over QNB. *See* Opp. at 71-73. Even to the extent the Second Circuit has embraced a conspiracy theory of personal jurisdiction under the Due Process Clause,[10] Plaintiffs' allegations as to QNB are not sufficient to meet that standard. *See* QNB Br. at 13-14; *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* (*Schwab II*), 22 F.4th 103 (2d Cir. 2021). Plaintiffs do not assert a single, non-conclusory allegation concerning QNB's alleged participation in a conspiracy that supposedly caused Plaintiffs' injuries. In their Opposition, Plaintiffs attempt to bolster the bare allegations in the Complaint as to QNB by claiming that QNB maintains a "lengthy 'Who's Who' list of Hamas terrorist clientele," Opp. at 73, and "serv[es] as a one-stop banking operation for the convicted murderers who continued to fund and lead Hamas from their sanctuary in Qatar," *id.* at 79. Such baseless allegations should not be considered by this Court, as it is clear that Plaintiffs make these assertions in an effort to draw the legal conclusion that because QNB allegedly provides banking services to individuals with alleged ties to Hamas, QNB must be a part of some overarching conspiracy that caused Plaintiffs' alleged injuries. But courts will not draw such "argumentative inferences" in a plaintiff's favor nor will it "accept as true a legal conclusion couched as a factual allegation." *Licci I*, 673 F.3d at 59 (internal quotation marks omitted); *see also Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir.

---

[10] QNB is not aware of any case in which the Second Circuit has held that a conspiracy theory of personal jurisdiction is available under Rule 4(k)(2), and Plaintiffs give no basis for so construing the Rule. Indeed, the Supreme Court's emphasis in *Walden v. Fiore* on the need to focus on the defendant's "own affiliation with the State," rather than the "defendant's relationship with the plaintiff or third party," strongly indicates that Plaintiff's broad theory of conspiracy-based jurisdiction would violate due process. 571 U.S. at 286. Plaintiffs' reliance on *Rudersdal v. Harris*, No. 18-cv-11072 (GHW), 2022 WL 263568 (S.D.N.Y. Jan. 28, 2022), to support their contention that a conspiracy theory is applicable to Rule 4(k)(2), is misplaced. *See* Opp. at 72. The court in *Rudersdal* expressly *declined* to rule on whether Rule 4(k)(2) allows a plaintiff to plead a conspiracy theory of liability and stated that its musings that a conspiracy theory may be available under the Rule were made "in dicta," to underscore their tentativeness. *See* 2022 WL 263568, at *1. Especially where, as here, the actual allegations of conspiracy are so deficient, the Court should reject Plaintiffs' attempt to extend the doctrine in a way that would violate the fundamental principles underlying *Walden*.

2015) (summary order) (*prima facie* showing "requires non-conclusory fact-specific allegations" (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998))).

*Second*, it would be unreasonable to exercise jurisdiction over QNB in this action. Plaintiffs claim "the reasonableness factors weigh so heavily in Plaintiffs' favor," yet their analysis of each due process reasonableness factor falls far short. As an initial matter, Plaintiffs' contention that no Defendant, including QNB, "has articulated a cognizable burden" for litigating in New York, Opp. at 74, completely ignores QNB's clear explanation of the burden it would face should it be required to litigate in this forum, *see* QNB Br. at 14 n.12. Plaintiffs fail to refute any of QNB's proffered factors concerning this immense burden, which is the primary concern when assessing reasonableness. *See In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 327 (S.D.N.Y. 2020). Such factors include that QNB does not maintain an office in New York or even in the United States. As a result, all relevant books, records, and witnesses are located abroad, which presents a clear obstacle for resolving this action efficiently in the United States, including the potential for data privacy concerns prohibiting the disclosure of information to jurisdictions outside of Qatar. *See Carlström v. Livförsäkring*, No. 19-cv-11569 (DLC), 2020 WL 7342753, at *6 (S.D.N.Y. Dec. 14, 2020) (noting that the discovery required to address claims against a foreign bank, among other defendants, would be "immense and complex," as "witnesses are largely if not entirely beyond this Court's subpoena power and document discovery will require engagement with [foreign] data and privacy laws"). Plaintiffs assert that the United States has an interest "in preventing the use of its currency and banking system to pass money to FTOs and in punishing entities that surreptitiously attempt to attain that objective," Opp. at 74-75, yet the Complaint does not allege that QNB ever passed any U.S. dollars to FTOs or used a correspondent bank to pass any such currency to FTOs. While Plaintiffs certainly have an interest in obtaining relief for their

injuries, Plaintiffs have failed to plausibly allege that QNB was at all involved in any conduct that led to their injuries. Thus, it would be unreasonable to assert personal jurisdiction over QNB in this case.

### D. Jurisdictional Discovery as to QNB Is Inappropriate.

As explained in QNB's opening brief and February 22, 2022 letter to this Court, jurisdictional discovery as to QNB is unwarranted. *See* QNB Br. at 15-16; ECF No. 61 at 3. In their Opposition, Plaintiffs assert that "Defendants devote much of their briefs to criticizing Plaintiffs for their inability to *itemize* details regarding the transactions Defendants have endeavored for years to hide from scrutiny." Opp. at 81 (emphasis added). To the contrary, QNB criticizes Plaintiffs' inability to *allege* that QNB ever effectuated even a single transaction through New York. In Plaintiffs' own words, "Courts authorize jurisdictional discovery where a plaintiff has made a *threshold showing that there is some basis* for the assertion of jurisdiction." *Id.* at 81 (cleaned up) (emphasis added). Plaintiffs have not shown that there is *any* basis whatsoever to assert jurisdiction over QNB. Plaintiffs further assert that it is appropriate for this Court to "permit plaintiffs to seek *additional* evidence relevant to jurisdiction," given their allegations about use of correspondent banks in New York. *Id.* at 82. But Plaintiffs are not seeking *additional* evidence regarding any *alleged* use of a New York correspondent bank by QNB; rather, they are seeking permission to engage in a fishing expedition with hopes that they uncover *any* shred of evidence to salvage their legally deficient jurisdictional theories as to QNB. This Court should not give Plaintiffs such license. *See Mednik v. Specialized Loan Servicing, LLC*, No. 20-cv-427 (MKB), 2021 WL 707285, at *8 (E.D.N.Y. Feb. 23, 2021) ("Discovery need not be granted to permit a fishing expedition for jurisdictional facts." (internal quotation marks omitted)).[11]

---

[11] Plaintiffs assert that the court in *Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 765 (S.D.N.Y. 2004), "authorized jurisdictional discovery where the requested evidence could conceivably provide a basis for exercising

## II. PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR AIDING AND ABETTING.

Plaintiffs themselves note that the "plausibility standard," as articulated in *Twombly* and *Iqbal*, "asks for *more than the sheer possibility* that a defendant has acted unlawfully." Opp. at 19 (emphasis added) (quoting *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021)). However, a sheer possibility of wrongdoing is all that the Complaint (and Opposition) presents, leaving the Court to fill in gaping holes in Plaintiffs' allegations and legal theories, not only in regard to secondary aiding-and-abetting liability, but also in regard to their even more far-fetched claims for secondary conspiracy liability and primary liability.

Plaintiffs repeatedly attempt to equate their case to that of *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860-61 (2d Cir. 2021), a case that involved allegations far more extreme than those levied against QNB, choosing to highlight only the tamest allegations in *Kaplan*. *See* Opp. at 24. Nor is QNB raising a *factual* dispute that its banking services were "routine"; QNB simply uses that moniker as a shorthand to emphasize that the Complaint itself, when boiled down, alleges only that QNB "maintained" certain accounts, with no unusual services or transfers of funds even alleged on the part of QNB. There is no factual dispute; QNB is crediting the only non-conclusory factual allegations that the Complaint does make, as it must on a motion to dismiss.[12]

---

jurisdiction." Opp. at 83. While the court in *Daventree* permitted jurisdictional discovery, it did not do so simply because it could "conceivably" render a basis for jurisdiction. Rather, the court allowed for jurisdictional discovery based on the defendant's public representation that it engaged in transactions involving United States securities. As such, the court allowed for jurisdictional discovery regarding "the extent of defendant['s] general business contacts with the United States." *Id.* The facts are quite different here: there is no evidence (public or otherwise) that QNB transacts business in the United States, and Plaintiff has not pled as much. Plaintiffs' position is, in essence, that there is *always* a basis to subject a foreign bank to jurisdictional discovery, even when a plaintiff cannot muster *any* allegations of jurisdictional contacts specific to that particular bank. That is not the law.

[12] QNB adopts the reply arguments of MAR regarding the first element of JASTA aiding-and-abetting liability, the "aiding party who causes injury" element. *See* MAR Reply at Section I.C.

### A.   Plaintiffs Fail to Plausibly Allege General Awareness.

Plaintiffs' Opposition understandably moves away from their initial central focus on the alleged inclusion of Qatar Charity on an internal "list[]" of a U.S. intelligence committee as a "priority III terrorism support entity (TSE)," which, because the list was not published at the time, cannot possibly establish "general awareness" that Qatar Charity was engaged in terrorism-related activities.[13]  Plaintiffs now switch their headline allegation to Israel's alleged designation of Qatar Charity "as a *terrorist financier* of Hamas in 2008."  Opp. at 30 (emphasis added); *see also id.* at 16-17, 25, 29, 34, 38.  However, Plaintiffs' reliance on this allegation about an Israeli designation is similarly misplaced.  The "general awareness" prong of aiding-and-abetting liability under JASTA is not satisfied simply by alleging, with hindsight, that a defendant might have been able to find, had it known where to look, evidence that *someone* thought another party might be aiding yet another party to conduct terrorist activities.

To begin, Plaintiffs do not explain when, where, and how the Israeli designation was published, and so they shed no light on how a bank operating in Qatar would have known about it.  Plaintiffs quote only from a webpage of the Israel Ministry of Foreign Affairs, *see* Compl. ¶ 78, which appears to have gone live only in 2013, or possibly later, despite the purported 2008 date of the underlying order.[14]  Even assuming that this webpage did go live in 2013, that would mean

---

[13] Plaintiffs again fail to explain how an internal intelligence document allegedly used to "advise and assist the Director of Central Intelligence" would constitute public knowledge for QNB.  *See* Compl. ¶¶ 68 & n.1, 140.

[14] Israel Ministry of Foreign Affairs, *Defense Minister Signs Order Banning Hamas-Affiliated Charitable Organizations*, Wayback Machine (June 14, 2013), https://web.archive.org/web/20130614210048/ https://www.mfa.gov.il/mfa/pressroom/2008/pages/defense%20minister%20signs%20order%20banning%20hamas-affiliated%20charitable%20organizations%207-jul-2008.aspx (emphasis added).  Only this governmental webpage, which is the source Plaintiffs quote from, *see* Compl. ¶ 78, is in English, which is not an official language of Israel (the governmental order itself would have been in Hebrew).  Moreover, that webpage itself has intermittently been (even during the drafting of this b

only that a party who was looking for the statement and knew where to look would be able to find it, not that it rose to the level of a public source that would plausibly suggest QNB's general awareness. The Second Circuit has specifically warned that "publicly available evidence" is not the same as "public sources, such as media articles" that "depending on their substance, plausibly suggest a defendant's knowledge." *Honickman*, 6 F.4th at 502 n.18.

Even were it true that QNB had reason to be aware of the webpage quoted by Plaintiffs, that webpage is far less categorical than Plaintiffs characterize it to be. It mentions the various charitable organizations as potentially being part of Hamas's fundraising network because "it has become clear that Union-affiliated foundations are trying to raise funds not only for Hamas charitable associations in Judea, Samaria and the Gaza Strip, but for the activities of the Hamas *government* as well" (emphasis added). But it makes this statement without specifying *which* of those organizations was necessarily doing so. In any event, as Plaintiffs themselves allege, Hamas is divided into three wings, two of which are a "political organization" (*i.e.*, a governmental organization) and a "social service or humanitarian component," with only the third being a "military operational wing." Compl. ¶ 101. As the Second Circuit held in *Honickman*, such allegations tend to *undermine* a finding of "general awareness"; documents that "describe[] these organizations as using humanitarian purposes as a cover" or "[t]hat organizations like the [bank customers] maintained a 'cover' in public undermines the plausibility of Plaintiffs' theory that [the bank] understood these organizations' true nature and activities from the public record at the time." *Honickman*, 6 F.4th at 502. Thus, even the Israeli document (again assuming QNB had any reason to be familiar with it) would not provide a basis for concluding that QNB was "generally aware" that Qatar Charity was engaged in financing terrorism, as opposed to certain humanitarian efforts in which Hamas was engaged.

Finally, any consideration of the Israeli listing would need to be weighed against the U.S. government's and U.N.'s ongoing cooperation with Qatar Charity. Plaintiffs seem to charge QNB with greater knowledge than even the U.S. government had. Inclusion of an entity on a list by a foreign country by itself cannot, of course, have the same legal effect under a U.S. statute as an official U.S. designation would. That is particularly so where, as here, the U.S. itself (as well as international organizations) has signaled a dramatically different view of the entity as an important collaborator in international aid efforts. *See, e.g.*, Qatar Charity Opening Br. at Section II.A.1. Under Plaintiffs' contrary reasoning, any single country's inclusion of an entity on such a list would essentially constitute a death knell for that entity, as no other party could afford to do business with it—even if that effect were entirely contrary to U.S. foreign policy interests.

As in *Honickman*, Plaintiffs' allegations here "pale in comparison to the detailed, numerous sources that sufficed in *Kaplan*," the case on which Plaintiffs so heavily rely. *Id.* at 502. In essence, Plaintiffs hang their hat on a "publicly available" website of a foreign government that has undifferentiated allegations about a large group of entities supposedly having some affiliation with another entity, which itself is acknowledged to have engaged in certain charitable activities. Under established Second Circuit law, that is not enough to haul into a U.S. court a foreign bank that is alleged only to have provided routine banking services to its customers.

The Opposition is also flawed because it mischaracterizes the relevant legal standard for the other prong of the "general awareness" test. Plaintiffs state that they can satisfy the general awareness requirement by alleging that a bank customer was "*sufficiently* intertwined" with Hamas's and PIJ's violent terrorist activities. Opp. at 23 (emphasis added). The actual language of *Honickman* sets a higher bar: Plaintiffs must allege that the bank "[c]ustomers were *so closely* intertwined with [Hamas's and PIJ's] *violent terrorist activities* that one can reasonably infer

[QNB] was generally aware of its role in unlawful activities from which the attacks were *foreseeable* while it was providing financial services to the [bank customers]." *Honickman*, 6 F.4th at 501 (emphases added). Plaintiffs do not make a single non-conclusory allegation that QNB's customers were so closely intertwined with violent terrorist activities of Hamas or PIJ at the time QNB was providing financial services to them.

Plaintiffs mischaracterize both QNB's arguments and the law in asserting that "QNB erroneously claims that Plaintiffs fail to establish the purportedly required link between Qatar Charity and the FTOs' 'violent terrorist activities' because Plaintiffs do not allege that funding went to the FTOs' military wings, as opposed to their humanitarian components." Opp. at 28 n.14. QNB's actual argument is that Plaintiffs' own acknowledgement that Hamas was engaged in charitable activities means that mere awareness (which Plaintiffs have not adequately alleged) that Qatar Charity was reported to have been associated in some way with Hamas would not, in turn, give rise to a reasonable inference that QNB was generally aware that its routine banking services were somehow supporting terrorism. Tellingly, Plaintiffs rely for this point on cases applying a standard the Second Circuit has rejected. In support of their argument, they contend that money is fungible, citing to *Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010). *See* Opp. at 28 n.14. But the Second Circuit has already rejected any effort to carry *Holder*'s "fungibility" standard over to JASTA aiding-and-abetting liability. In *Honickman*, the Second Circuit explained:

> Plaintiffs urge us to adopt *Holder*'s "fungibility" rationale in assessing the sufficiency of their complaint. They contend that *Linde* merely recognized that the *mens rea* for aiding and abetting is "different" from criminal material support, not that it is "higher." However, *Linde* determined that the facts in *Holder*—adequate for criminal material support—fall short for the general awareness element of JASTA aiding and abetting. 882 F.3d at 329-30. *Indeed,* Linde *could not have been clearer: aiding and abetting "requires*

> *more than the provision of material support to a designated terrorist organization," 882 F.3d at 329.*

6 F.4th at 499 (emphasis added) (explicitly "reject[ing] Plaintiffs' attempt to equate the *Halberstam* foreseeability standard with the 'fungibility' theory in *Holder*"). Here, moreover, the allegations are even further removed from what the Second Circuit has required. Plaintiffs here do not even allege that QNB's purported material support was provided to any designated terrorist organization (as in *Linde*), but rather to a charity and to three individuals, none of which were themselves designated as terrorists or terrorist organizations. This point in *Honickman* is critical. Plaintiffs' central theory is that QNB's maintaining of accounts, without more, is enough to subject it to aiding-and-abetting liability (in part based on supposed fungibility), but the Second Circuit in *Honickman* expressly rejected that proposition: "*Foreseeability* is . . . central to the *Halberstam* framework, and as a result, to JASTA aiding-and-abetting liability." *Id.* at 496-97 (emphasis added).

Plaintiffs' Opposition arguments concerning the individual accountholders also fail. Plaintiffs argue that "to capitalize on Al-Qaradawi's role as a leading social, political, and religious figure within the Muslim religious community in Qatar, QNB . . . appointed him to the bank's Sharia Supervisory Board," Opp. at 15-16, and that QNB "feigns surprise regarding the ties of its Sharia Supervisory Board member, Yousuf Abdulla Al-Qaradawi, to the Union of Good," *id.* at 29. But the Complaint itself belies this oversimplified narrative. As alleged in the Complaint, a Sharia Supervisory Board deals with Sharia issues, or religious compliance. *See* Compl. ¶ 98. And the Opposition further concedes (and the Complaint alleges) al-Qaradawi's "role as a leading . . . religious figure." Opp. at 15; *see also* Compl. ¶ 174. Appointment to a religious compliance board says nothing about QNB's awareness that al-Qaradawi allegedly chaired the Union of Good or how QNB's banking services were used by Qatar Charity or any of the individual

accountholders. As in *Honickman*, the "complaint lacks any allegations that . . . it was public knowledge that al-Qaradawi chaired Union of Good." 6 F.4th at 501-02. Notably, it was in this very context that the Second Circuit gave an explicit warning about relying on various publicly available evidence as opposed to public sources such as media articles. *See id.* at 502 n.18.

Regarding Badran and Dudin, the Opposition does very little to shore up or reframe those allegations, though it mentions, "Multiple QNB account holders are convicted Hamas terrorists whom Israel released from jail in connection with a massive prisoner exchange *that Hamas secured by kidnapping and then ransoming an Israeli soldier. See* ¶¶ 161, 168; Bonner Ex. 1 at ¶¶ 225-26." Opp. at 14 (emphasis added). The emphasized text appears nowhere in the Complaint or in the cited portions of the exhibit. In any event, that allegation does not change the fact that Plaintiffs are unable to even allege any concrete, non-conclusory terrorism-related activity on the part of Badran or Dudin subsequent to their release by Israel (or during the time that they were allegedly customers of QNB).

If, as Plaintiffs contend, the individual accountholders were so closely intertwined with Hamas's and PIJ's violent terrorist activities at the time QNB allegedly provided services to them, then Plaintiffs could presumably point to some public sources that connect those accountholders to some actual terrorist activity during the decade between their release from prison and the terrorist acts alleged here, but Plaintiffs fail to identify any. To be sure, there are scores of individuals named in relation to the alleged attacks, *see* Compl. ¶¶ 182-353, but *not a single one of them* is alleged to have been a customer of QNB or even alleged to have been connected to any customer of QNB in any way. Plaintiffs do not adequately allege any facts from which one could plausibly infer that QNB's "maintaining" of bank accounts would somehow *foreseeably* lead to the hodgepodge of unsophisticated attacks in question—a central requirement for pleading JASTA

aiding-and-abetting liability.[15]  Plaintiffs' allegations fall far short of what is required under *Twombly*.  *See, e.g.*, *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276 (D.C. Cir. 2018) (allegations that banks "transmitted the funds . . . directly to al Qaeda, and that these funds . . . were necessary for al Qaeda to carry out the embassy bombings" were "conclusory allegations that do not meet *Twombly*'s plausibility standard" (internal quotation marks omitted)).  Because the Complaint fails to allege facts that give rise to a plausible inference of general awareness, it must be dismissed.

### B.      Plaintiffs Fail to Plausibly Allege Knowing and Substantial Assistance.

QNB's opening brief explained why, based on the allegations of the Complaint, *all* of the six factors that the Second Circuit weighs in considering whether a defendant substantially assisted a principal violation favor QNB in this instance.  *See* QNB Br. at 27-32.  The Opposition effectively concedes many of these factors, and its arguments as to the others are unconvincing.

With respect to the first factor, Plaintiffs misleadingly state that QNB does not "dispute that financial services . . . is 'important to the nature of the injury-causing act.'"  Opp. at 31-32 (quoting *Honickman*, 6 F.4th at 500).  To the contrary, QNB has forcefully argued here that it is inconceivable to view the alleged act by QNB of maintaining accounts (or other banking services, if they had been alleged) as being important to a series of unsophisticated attacks involving stabbings, shootings, and car rammings, which would respectively require a knife, a gun, and a car, any of which could be acquired from a family member or friend.  Plaintiffs do not rebut this point.  They provide no narrative whatsoever regarding how QNB's maintaining of bank accounts for Qatar Charity or other individual accountholders was important to carrying out the unsophisticated attacks that form the basis of Plaintiffs' Complaint.

---

[15] Plaintiffs' argument that labeling the attacks as unsophisticated "raise[s] factual disputes that cannot be resolved . . . on a motion to dismiss" is off-base, because this is a characterization made while crediting the exact factual allegations that Plaintiffs make regarding the attacks, which were a series of stabbings, shootings, and car rammings.  Opp. at 21.

Plaintiffs' reliance on *Halberstam* is misplaced; the vast gulf between the allegations and QNB here, versus the extremely close relationship that existed in *Halberstam* between the principal and the abettor, only highlights the deficiencies of the Complaint. Plaintiffs argue that Linda Hamilton's services as "as banker, bookkeeper, recordkeeper, and secretary" had also been "neutral standing alone," Opp. at 32 (quoting *Halberstam v. Welsh*, 705 F.2d 472, 487-88 (D.C. Cir. 1983)), but Plaintiffs fail to acknowledge the *Halberstam* court's critical observation that Hamilton "performed these services in an *unusual way* under *unusual circumstances* for a *long period of time*," which greatly bolstered "the court's *inference that she knew she was assisting Welch's wrongful acts*." 705 F.2d at 487 (emphases added). There are no similar irregularities in the provision of services on the part of QNB. Grasping for something, Plaintiffs' Opposition focuses on the allegation that certain individual accountholders (Badran and Dudin) used the same P.O. Box when opening their accounts. *See* Opp. at 32. But this allegation, even assuming it is true, does not even relate to the provision of actual banking services, much less support an "inference that [QNB] knew [it] was assisting [the individual accountholders'] wrongful acts"— which are neither identified nor tied in any way to the bank accounts in question—or an inference that QNB knew it was somehow assisting the wrongful acts of Hamas itself. *Halberstam*, 705 F.2d at 487. Plaintiffs' reliance on *Kaplan* again goes to show the inadequacies, by comparison, of Plaintiffs' Complaint. The Second Circuit noted that the *Kaplan* plaintiffs had alleged that the bank "granted special exceptions to its Hizbollah-related Customers, allowing them to deposit" large amounts of cash per day/week "all without disclosing the sources of the funds," which allowed them to "circumvent existing sanctions on Hizbollah as a designated FTO." *Kaplan*, 999 F.3d at 862. Nothing like that is alleged here. Plaintiffs here rely simply on the fact that the accounts were opened, essentially proposing a rule of strict liability on banks for their customers'

activities. The Second Circuit has decisively rejected that view of JASTA aiding-and-abetting liability. *See Honickman*, 6 F.4th at 502-03.

Regarding the second factor, the amount of assistance given, Plaintiffs misleadingly state that "all Defendants provided the FTOs with substantial assistance because each played an important role in providing millions of dollars to Hamas and PIJ," Opp. at 33, but this again resorts to impermissible group pleading. The Opposition fails to rebut QNB's observation that, with respect to QNB in particular, the Complaint alleges only that QNB "maintained" certain accounts, and it fails to allege *any unusual services* or even *any specific transfers of funds involving QNB*. *See* QNB Br. at 29.

Plaintiffs apparently concede that the third factor regarding QNB's presence (or lack thereof) favors QNB. *See* Opp. at 31 n.17.

Plaintiffs argue, with respect to the fourth factor, that QNB had a "direct relationship" with the principal behind the attacks, Hamas/PIJ, because QNB maintained accounts for three individuals who allegedly have ties to Hamas. Plaintiffs misrepresent QNB's argument with respect to this factor. *See id.* at 34 n.20. QNB never argued that these individual accountholders had to be the "triggerman." Rather, QNB observed that there must be at least some non-conclusory allegation explaining how these individuals are related to the "principal" actors who committed the attacks. *See* QNB Br. at 30. Maintaining individual bank accounts for certain individuals who are alleged to have positions with Hamas is a far cry from QNB having a "direct relationship" to Hamas itself, which the Complaint never alleges QNB had. Plaintiffs further fail to address QNB's argument, with respect to Qatar Charity, that QNB's relationship to the principal behind the attacks is even more removed than the relationship in *Siegel*, which the Second Circuit found to be impermissibly attenuated. *See id.*

Plaintiffs do not contest QNB's argument with respect to the fifth factor—QNB's state of mind—that Plaintiffs must at least allege facts giving rise to an inference of general awareness. For the reasons discussed above, Plaintiffs' arguments regarding general awareness are unavailing.

As for the sixth factor—the period of QNB's assistance—Plaintiffs do not even address QNB's argument that its assistance to its bank customers, no matter how long in duration, was not alleged to have been "assistance in terrorism" for *any* length of time. *See* QNB Br. at 31-32 (quoting *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019)). The factual allegations of the Complaint do not plausibly lead to that inference. This is even more so considering that any Qatar Charity funds held at QNB that might somehow have reached Hamas or PIJ would more plausibly have gone to a charitable or humanitarian purpose than to its military wing.

None of Plaintiffs' arguments are sufficient to establish any of the six factors, much less enough of them in combination, to satisfy the knowing and substantial assistance element of aiding-and-abetting liability. At the end of the day, the Complaint alleges the provision of unremarkable banking services, such as maintaining accounts, for a well-regarded international charitable organization and for a few individuals who are not alleged to have been involved—even tangentially—in any of the violence committed against Plaintiffs. That is simply not enough to establish knowing and substantial assistance. As a result, the Complaint must be dismissed.

## III. PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS SECONDARILY LIABLE UNDER 18 U.S.C. § 2333(D) FOR CONSPIRACY.

"[T]he plain text of JASTA's conspiracy liability provision requires that a defendant conspire directly with the person or entity that committed the act of international terrorism that injured the plaintiff." *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 97-98 & n.41

(E.D.N.Y. 2019).[16]  Plaintiffs concede this holding from *Freeman* and cite no case contradicting it.  *See* Opp. at 40.  Indeed, *Freeman* is fully consistent with the Second Circuit's analysis in *Kaplan*, which specifically distinguishes conspiracy liability from aiding-and-abetting liability, noting that "JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspire[d] with' the principal," but "does not say that for aiding-and-abetting liability to be imposed a defendant must have given 'substantial assistance to' the principal.'"  999 F.3d at 855. Plaintiffs point to language in *another* section of JASTA that generally discusses that liability attaches to entities "that have provided material support, directly or indirectly" and to other language from *Freeman* regarding "indirect assist[ance]."  Opp. at 40.  However, there is no inconsistency.  It is possible for the assistance a co-conspirator provides to be "indirect," but that does not eliminate the requirement that the conspiracy be a "direct" one.  And JASTA's "indirect" language makes sense in light of aiding-and-abetting liability, which the Second Circuit has made clear may be "indirect."  Because there is no allegation in the Complaint that QNB "directly conspired" with Hamas or any other "principal," Plaintiffs' conspiracy claim must be dismissed.

While Plaintiffs attempt to fill this gap with allegations concerning Qatar itself (or Qatar Charity and MAR as supposed agents/proxies of Qatar), *see* Opp. at 38, 42, those allegations cannot suffice as allegations of conspiracy between QNB itself and Hamas.  Indeed, the *O'Sullivan* case, which involved allegations regarding Iran, rejected such an effort.  *See O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2018 WL 1989585, at *7 (S.D.N.Y. Apr. 26, 2018).  There, the court explained that, even "[a]ccepting these allegations as true, they simply do not show a conspiracy or agreement between any defendant and a foreign terrorist organization as

---

[16] JASTA, in relevant part, states that "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who *conspires with the person who committed such an act of international terrorism*."  18 U.S.C. § 2333(d)(2) (emphasis added).

opposed to a conspiracy or agreement between a defendant and Iran or the Agents and Proxies sponsoring such organizations."[17]  In other words, the alleged conspiracy cannot run through another third-party or, more particularly, through a foreign government that is not itself a defendant (and could not be made a defendant) in the case.  None of Plaintiffs' arguments concerning the government of Qatar can change the basic fact that the Complaint fails to allege an agreement between QNB and Hamas/PIJ to support a conclusion that they directly conspired with each other, as would be required to assert a conspiracy claim under JASTA.

## IV.  PLAINTIFFS FAIL TO STATE A CLAIM THAT QNB IS PRIMARILY LIABLE UNDER 18 U.S.C. § 2333(A).

Plaintiffs continue to press their primary liability claims despite the clear inappropriateness of doing so under the relevant case law.  As a preliminary matter, the ATA's primary liability provision provides "civil relief only against the principals perpetrating acts of international terrorism . . . [and] provide[s] no civil action against secondary actors who, while not committing international terrorist acts themselves, facilitated such acts by others."  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 319-20 (2d Cir. 2018).  Any other reading would render "superfluous" JASTA's secondary liability provision.  *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 396 (7th Cir. 2018).

Plaintiffs rely heavily on a case that was before this Court, *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33 (E.D.N.Y. 2019), as well as on a case that *Miller* cited, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008), while also attempting to distinguish *Kemper*,

---

[17] *See also O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446, at *9 (S.D.N.Y. Mar 28, 2019) ("Plaintiffs' allegations are insufficient to state a claim for JASTA conspiracy liability because *Defendants' alleged provision of material support to Iranian entities is so far removed from the acts of terrorism that injured Plaintiffs* that the Court cannot infer that Defendants shared the common goal of committing an act of international terrorism.  Moreover . . . *Plaintiffs' allegations do not demonstrate that Defendants entered into any agreements with the FTOs that committed the attacks at issue*." (emphases added)).  Plaintiffs try to argue that QNB's conduct is not "so far removed" because "wire transfers are a part of the principal wrong at which the plaintiffs' lawsuit is directed," Opp. at 42, but QNB is not even alleged in the Complaint to have conducted any wire transfers whatsoever.

but none of those arguments saves Plaintiffs' primary liability claims.

Plaintiffs ignore that the facts alleged in *Miller* are far more extreme than and obviously distinguishable from those alleged against QNB. In *Miller*, Arab Bank was alleged to have "processed over $30,000,000 for Hamas entities from various sources, as well as processing millions of dollars through New York for Hamas leaders." 372 F. Supp. 3d at 39. Here, QNB is not alleged to have made any transfers of funds, let alone $30 million worth or any transactions passing through the United States. What's more, Arab Bank was also alleged to have "administered a terrorist insurance scheme . . . in which the Saudi Committee provided over $35 million to martyrs and their families, including individuals responsible for attacks that have injured plaintiffs in the instant cases." *Id.* The allegations surrounding this "Martyr Operation" were replete with specific facts regarding how this dangerous terrorist operation was meticulously run, including "detailed lists" sent by nefarious actors to Arab Bank and the "professional accounting system" the bank ran in connection with that operation. *Id.* at 39-40. This is a far cry from anything alleged against QNB.[18] [19]

And, *Boim*, on which *Miller* relied, has since been criticized by the Second Circuit. In *Honickman*, which post-dates *Miller*, the Second Circuit observed that *Boim* was a pre-JASTA case and stated that "any persuasive value [*Boim*] might have" as an out-of-circuit authority "is insufficient to overcome the binding effects of *Linde*." *Honickman*, 6 F.4th at 499 n.14.

---

[18] The same is true of *Boim*, which involved direct donations to Hamas, hence the language that Plaintiffs quote from that case reading, "Giving money to Hamas, like giving a loaded gun to a child . . . is an 'act dangerous to human life.'" 549 F.3d at 690. QNB is not alleged to have given any money to Hamas nor to have provided direct financial services to Hamas.

[19] In a desperate bid, Plaintiffs try to add on an allegation that "Defendants also provided funds for the purchase of anonymous Sanabel debit cards used to provide martyr payments to Hamas and PIJ operatives," but that allegation appears nowhere in the Complaint, and in the exhibit Plaintiffs attach to their Opposition, this allegation is not even advanced against QNB. Opp. at 44 (citing Bonner Ex. 1 ¶¶ 148-54 (no mention of QNB)). On a related note, in many sections of the Complaint, Plaintiffs engage in impermissible group pleading regarding behavior that QNB is not even alleged to have engaged in (when the Complaint actually attempts to add any sort of specificity into its allegations).

Unlike *Boim*, *Kemper* is a post-JASTA Seventh Circuit case, and it has many parallels to this one, notwithstanding Plaintiffs' efforts to distinguish it. As a preliminary matter, the allegations against the bank in *Kemper* were far more detailed and substantial than those against QNB. Deutsche Bank was alleged to have participated in a sanctions-avoidance practice where it processed "600 transactions valued at over $38 million [that] were illegal under one of the U.S. sanctions programs." 911 F.3d at 388. Not only are there no similar allegations against QNB, but also the same holes that the Seventh Circuit observed with respect to the *Kemper* allegations are equally true here. For example, "Kemper [did] not allege that Deutsche Bank ever serviced a terrorist group directly," but instead alleged that the bank "provided financial services to Iranian financial institutions and to other Iranian businesses such as Shipping Lines, and those Iranian entities went on to provide services to terrorist groups." *Id.* at 392 Likewise here, QNB is not alleged to have serviced Hamas or PIJ directly, outside of individuals the Plaintiffs attempts to link to Hamas in a wholly conclusory manner, without any factual allegations backing those claims. Nor did the complaint allege that the bank's customers "exist solely to perform terrorist acts," but rather had other, concededly legitimate activities. *Id.* Here too, Plaintiffs concede that Qatar Charity pursues a number of legitimate ends, mentioning its "humanitarian work" and "philanthropy," Opp. at 37 n.21, and clearly does not allege that Qatar Charity "exist[s] solely to perform terrorist acts." *See, e.g.*, Qatar Charity Opening Br. at Section II.A.1. Similarly, the complaint in *Kemper* made certain allegations, a central feature of which were the role of the government of Iran, which the Seventh Circuit observed required an even greater degree of factual specificity than a complaint might typically require:

> The central theory tying all of Kemper's allegations together is that Iran is responsible for the terrorist attack that killed her son, and that Deutsche Bank facilitated that attack by providing services to Iran and state-owned Iranian businesses. But this theory ignores that, as

> the D.C. and Second Circuits have noted, Iran is a sovereign state
> with many legitimate agencies, operations, and programs to fund.
> When one of the links on a causal chain is a sovereign state, the need
> for facts specifically connecting a defendant's actions to the ultimate
> terrorist attack is especially acute.

*Id.* (cleaned up).[20] Plaintiffs clearly have attempted to shove the government of Qatar in as the missing piece of the puzzle—somehow acting in some entirely speculative way as the invisible bridge between two otherwise unconnected commercial banks, QNB and MAR—in precisely the way that *Kemper* warns is inappropriate. Plaintiffs' allegations against QNB do not even satisfy the usual *Twombly* standard, much less the "*especially acute*" need for specificity when the complaint attempts, in essence, to tar a sovereign state with alleged involvement.

Finally, even assuming, *arguendo*, that Qatar Charity and the individual accountholders were actively associated with Hamas or PIJ during the relevant time period, the Second Circuit has already concluded in *Linde*, which postdates the out-of-circuit *Boim* case, that "providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to . . . compel a finding that as a matter of law, the services were violent or life-endangering acts that appeared intended to intimidate or coerce civilians or to influence or affect governments." *Linde*, 882 F.3d at 327. Plaintiffs fail to explain away *Linde*, which is binding, *see Honickman*, 6 F.4th at 499 n.14, in connection with the "act of international terrorism" element.

Similarly, in regard to the "proximate cause" element, Plaintiffs again mischaracterize QNB's argument as requiring that they "connect specific dollars transferred as part of Defendants'

---

[20] *See also Owens*, 897 F.3d at 275 (citing *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013)) ("*Rothstein* correctly recognized that when a defendant is more than one step removed from a terrorist act or organization, plaintiffs suing under the ATA must allege some facts demonstrating a substantial connection between the defendant and terrorism. In *Rothstein*, the presence of an independent intermediary, Iran, created a more attenuated chain of causation connecting UBS to Hezbollah and Hamas than one in which a supporter of terrorism provides funds directly to a terrorist organization.")

conspiracy to specific attacks." Opp. at 48. That is not QNB's argument. Rather, QNB focuses on the correct central inquiry: that Plaintiffs fail to plausibly allege that QNB's conduct was a "*substantial factor* in the *sequence of responsible causation*" and that Plaintiffs' "injury was *reasonably foreseeable or anticipated* as a natural consequence." *See* QNB Br. at 38-40 (quoting *Rothstein*, 708 F.3d at 91-92). Plaintiffs have no rebuttal for QNB's argument that "maintaining accounts for a charity organization with multiple ongoing charitable and philanthropic projects could hardly be said to be a substantial factor in causing, much less in a way that is reasonably foreseeable, a series of relatively unsophisticated attacks involving stabbings, shootings, and car rammings." *Id.* at 39. Nor do Plaintiffs have any effective response to QNB's argument that Plaintiffs advance no narrative whatsoever in regard to the individual accountholders that would even begin to approach a plausible inference of proximate causation. As such, Plaintiffs' primary liability claims must also be dismissed.

## CONCLUSION

For the foregoing reasons, Qatar National Bank respectfully submits that the Court should grant in full its Motion to Dismiss Plaintiffs' Complaint with prejudice.


Dated: April 13, 2022                                    Respectfully submitted,

                                                         */s/ Michael G. McGovern*
                                                         Michael G. McGovern
                                                         Douglas Hallward-Driemeier (*pro hac vice*)
                                                         **ROPES & GRAY LLP**
                                                         1211 Avenue of the Americas
                                                         New York, New York 10036-8704
                                                         Telephone: (212) 596-9000
                                                         Facsimile: (212) 596-9090
                                                         michael.mcgovern@ropesgray.com
                                                         douglas.hallward-driemeier@ropesgray.com

                                                         *Counsel for Defendant Qatar National Bank*
                                                         *(Q.P.S.C.)*

**CERTIFICATE OF SERVICE**

I, Michael McGovern, hereby certify that true and correct copies of Defendant Qatar National Bank's Reply Memorandum of Law in Support of Its Motion to Dismiss the Complaint, were filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to any nonregistered participants on April 13, 2022.

*/s/Michael G. McGovern*
Michael G. McGovern