**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STUART FORCE individually and as personal
representative of the ESTATE OF TAYLOR FORCE,
*et al*.,

                  Plaintiffs,

         v.

QATAR CHARITY, QATAR NATIONAL BANK
and MASRAF AL RAYAN,

               Defendants.

Civil Action No.  1:20-CV-02578

**DEFENDANT QATAR CHARITY'S REPLY MEMORANDUM**
**IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

**DLA PIPER LLP (US)**
John M. Hillebrecht
Kevin Walsh
Jessica Masella

1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 335-4500
Email:    John.Hillebrecht@us.dlapiper.com
             Kevin.Walsh@us.dlapiper.com
             Jessica.Masella@us.dlapiper.com

*Counsel for Defendant Qatar Charity*

**April 13, 2022**

Page

PRELIMINARY STATEMENT .................................................................................1

ARGUMENT ...........................................................................................................5

I.     PLAINTIFFS FAIL TO SHOW QATAR CHARITY IS SUBJECT TO
       PERSONAL JURISDICTION IN NEW YORK .............................................5

       A.     Qatar Charity is Not Subject to Personal Jurisdiction Under Rule 4(k)(2)............11

              i.     Rule 4(k)(2) is Inapplicable Because Plaintiffs Failed to Certify
                     that Qatar Charity is Not Subject to Personal Jurisdiction in Any
                     State's Courts of General Jurisdiction ........................................11

              ii.    Rule 4(k)(2) is Inapplicable Because Due Process Forbids
                     Exercising Jurisdiction Over Qatar Charity ................................13

                     1.     Masraf Al Rayan's Alleged Contacts in New York are
                            Insufficient to Confer Jurisdiction Under Rule 4(k)(2) ................16

                     2.     Qatar Charity is Not Subject to 4(k)(2) Jurisdiction Under
                            an Agency Theory........................................................................16

                     3.     Qatar Charity is Not Subject to 4(k)(2) Jurisdiction Under a
                            Conspiracy Theory.......................................................................19

                     4.     The Due Process Reasonableness Factors Counsel Against
                            Imposing Jurisdiction..................................................................23

       B.     Plaintiffs' "Alternative" Basis For Jurisdiction Fails Because Qatar
              Charity is Not Subject to Jurisdiction Under New York's Long-Arm
              Statute ................................................................................................24

                     1.     CPLR Section 302(a)(1) Does Not Apply ....................................24

                     2.     CPLR Section 302(a)(2) Does Not Apply ....................................29

II.    PLAINTIFFS FAIL TO STATE ANY CLAIM FOR RELIEF.........................................32

       A.     Counts III and IV Must Be Dismissed As Plaintiffs Fail to Plead a Primary
              Liability Claim.....................................................................................32

              i.     Plaintiffs Fail to Plead that Qatar Charity Committed Any Act of
                     International Terrorism .............................................................33

              ii.    Plaintiffs Fail to Plausibly Allege That Qatar Charity Proximately
                     Caused the Attacks..................................................................35

       B.     Counts I and II Must Be Dismissed For Failure to Plausibly Plead a
              Secondary Liability Claim ....................................................................37

              i.     Plaintiffs Have not Plausibly Alleged a JASTA Conspiracy Claim..........37

              ii.    Plaintiffs Have Not Plausibly Alleged a JASTA Aiding-And-
                     Abetting Claim........................................................................38

III.    PLAINTIFFS FAILED TO PROPERLY EFFECT SERVICE OF PROCESS & A
REQUEST TO SERVE BY EMAIL DOES NOT CURE THE FAILURE ......................41

IV.    CLAIMS AS TO FOREIGN PLAINTIFFS CONTINUE TO DEMONSTRATE
THE PLAINTIFFS LACK STANDING TO BRING PERSONAL INJURY
CLAIMS UNDER THE ATA............................................................................................41

V.    THIS COURT'S ORDER REGARDING JURISDICTIONAL DISCOVERY
SHOULD STAND AND ANY RECONSIDERATION SHOULD FOLLOW A
FULL BRIEFING ...........................................................................................................41

CONCLUSION.............................................................................................................................43

**Page(s)**

**Cases**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*,
   731 F.2d 112 (2d Cir. 1984)........................................................................19, 27

*AG of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*,
   268 F.3d 103 (2d Cir. 2001)..................................................................................41

*Alexander v. Porter*,
   2014 WL 7391683 (E.D.N.Y. Dec. 29, 2014) ......................................................42

*Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*,
   457 F. Supp. 3d 401 (S.D.N.Y. 2020)...................................................................21

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
   2007 WL 4326793 (E.D.N.Y. Dec. 7, 2007) ........................................................12

*Arch Trading Corp. v. Republic of Ecuador*,
   839 F.3d 193 (2d Cir. 2016)..................................................................................43

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................32

*Astor Chocolate Corp. v. Elite Gold Ltd.*,
   510 F. Supp. 3d 108 (S.D.N.Y. 2020)...................................................................12

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
   171 F.3d 779 (2d Cir. 1999)..................................................................................30

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................32

*In re Bemis Co. Sec. Litig.*,
   512 F. Supp. 3d 518 (S.D.N.Y. 2021)...................................................................19

*Berdeaux v. OneCoin Ltd.*,
   2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021)............................................. *passim*

*Berkshire Bank v. Lloyds Banking Grp.*,
   2022 WL 569819 (2d Cir. Feb. 25, 2022)........................................20, 28, 31, 32

*Bluewaters Commc'ns Holdings v. Ecclestone*,
   122 A.D.3d 426 (1st Dep't 2014) .........................................................................30

*Chambers v. Time Warner Inc.*,
    282 F.3d 147 (2d Cir. 2002)......................................................................................34

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018) (*Schwab I*) ............................................... *passim*

*Clean Coal Techs. v. Leidos, Inc.*,
    377 F. Supp. 3d 303 (S.D.N.Y. 2019)......................................................................30

*Contant v. Bank of Am. Corp.*,
    385 F. Supp. 3d 284 (S.D.N.Y. 2019)......................................................................31

*Cordice v. LIAT Airlines*,
    2015 WL 5579868 (E.D.N.Y. Sept. 22, 2015) ......................................................14

*CutCo Industries, Inc. v. Naughton*,
    806 F.2d 361 (2d Cir. 1986).......................................................................................16

*In re Dental Supplies Antitrust Litig.*,
    2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017) (BMC)..........................................22

*Denton v. Hernandez*,
    504 U.S. 25 (1992)......................................................................................................33

*DISH Network, LLC. v. Kaczmarek*,
    2021 WL 4483470 (E.D.N.Y. June 24, 2021) .........................................11, 12, 14

*E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*,
    2003 WL 22064259 (S.D.N.Y. Sept. 5, 2003).......................................................28

*In re Eur. Gov't Bonds Antitrust Litig.*,
    2022 WL 768680 (S.D.N.Y. Mar. 14, 2022) ........................................................24

*Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*,
    609 F.3d 111 (2d Cir. 2010)...............................................................................19, 27

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ...................................................................................36

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)...............................................................................................15

*Freeman v. HSBC Holdings PLC*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019) .................................................................29, 35

*Fuld v. Palestine Liberation Org.*,
    2022 WL 62088 (S.D.N.Y. Jan. 6, 2022) (appeal filed) ......................................24

*Gallop v. Cheney*,
642 F.3d 364 (2d Cir. 2011)................................................................32, 33

*George Moundreas & Co SA v. Jinhai Intelligent Mfg. Co Ltd*,
2021 WL 168930 (S.D.N.Y. Jan. 18, 2021) .....................................................14

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012) ...........................................................36

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
284 F.3d 1114 (9th Cir. 2002) ....................................................................14

*Global Network Commc'ns, Inc. v. City of New York*,
458 F.3d 150 (2d Cir. 2006).........................................................................4

*Gonzalez v. Google, Inc.*,
335 F. Supp. 3d 1156 (N.D. Cal. 2018) ..........................................................36

*Grove Press, Inc. v. Angleton*,
649 F.2d 121 (2d Cir. 1981)....................................................................16, 25

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) .................................................................39, 40

*Hau Yin To v. HSBC Holdings, PLC*,
700 F. App'x 66 (2d Cir. 2017) ...............................................................16, 35

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984)................................................................................15

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) .....................................................................39, 40

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2nd Cir. 2021)..................................................................38, 39

*Kreutter v. McFadden Oil Corp.*,
71 N.Y.2d 460 (1988) ..............................................................................16

*Langenberg v. Sofair*,
2006 WL 2628348 (S.D.N.Y. Sept. 11, 2006).....................................................42

*Lawati v. Montague Morgan Slade Ltd.*,
961 N.Y.S.2d 5 (1st Dep't 2013) ..............................................................31, 32

*Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*,
184 F.Supp.2d 277 (S.D.N.Y. 2001)...............................................................38

*Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys.*,
    10 F. Supp. 2d 334 (S.D.N.Y. 1998) ...................................................28

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) .........................................................23

*Military Public Prosecution v. Najwan Mohammed Iman Hassan Awda*
    (Feb. 8, 2017) .............................................................................8

*Miller v. Arab Bank, PLC*,
    372 F.Supp.3d 33 (E.D.N.Y. 2019) ...............................................35

*In re N. Sea Brent Crude Oil Futures Litig.*,
    2017 WL 2535731 (S.D.N.Y. Jun. 18, 2017) ...................................29

*O'Sullivan v. Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. March 28, 2019) ...............................37

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) .....................................................36

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*,
    530 F. Supp. 3d 301 (S.D.N.Y. 2021) ...........................................29

*Pincione v. D'Alfonso*,
    506 F. App'x 22 (2d Cir. 2012) ...................................................18

*In re Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020) ...............................20, 21, 22, 23

*Porina v. Marward Shipping Co., Ltd.*,
    521 F.3d 122 (2d Cir. 2008) .....................................................14, 15

*Rich v. Fox News Network LLC*,
    2020 WL 6276026 (S.D.N.Y. 2020) ...........................................28, 29

*Rudersdal v. Harris*,
    2022 WL 263568 (S.D.N.Y. Jan. 28, 2022) ...................................20, 22

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
    22 F.4th 103 (2d Cir. 2021) (*Schwab II*) .................................. *passim*

*Siegel v. HSBC North America Holdings*,
    933 F.3d 217 (2d Cir. 2019) .......................................................36, 40

*SK's Cosm. Boutique Inc. v. J.R. Silverberg Realty*,
    2020 WL 3451324 (S.D.N.Y. Jun. 24, 2020) ...................................30

*SL-X IP S.Á.R.L. v. Bank of Am. Corp.*,
2021 WL4523711 (S.D.N.Y. Sep. 30, 2021) ........................................................21

*Smartmatic United States Corp. v. Fox Corp.*,
2022 WL685407 (Sup. Ct. N.Y. Cty. Mar. 18, 2022) ......................................27, 29

*Spetner v. Palestine Inv. Bank*,
495 F. Supp. 3d 96 (E.D.N.Y. 2020) ................................................12, 18, 19, 27

*In re SSA Bonds Antitrust Litig.*,
420 F. Supp. 3d 219 (S.D.N.Y. 2019)........................................................12, 13, 15

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)...................................................................................4

*Stansell v. BGP, Inc.*,
2011 WL 1296881 (M.D. Fla. Mar. 30, 2011) ....................................................35

*Suber v. VVP Servs., LLC*,
2021 WL 4429237 (S.D.N.Y. Sept. 27, 2021).....................................................28

*Tamam v. Fransabank*,
677 F. Supp. 2d 720 (S.D.N.Y. 2010)..................................................................17

*In re Terrorist Attacks*,
714 F.3d 118 (2nd Cir. 2013).................................................................................36

*In re Terrorist Attacks on September 11, 2001*,
714 F.3d 659 (2d Cir. 2013)...................................................................................12

*Universal Trading & Inv. Co. v. Tymoshenko*,
2012 WL 6186471 (S.D.N.Y. Dec. 12, 2012) ....................................................25

*Vasquez v. Hong Kong and Shanghai Banking Corp., Ltd.*,
477 F. Supp. 3d 241 (S.D.N.Y. 2020).....................................................18, 22, 27

*Walden v. Fiore*,
571 U.S. 277 (2014).......................................................................................15, 22

*Weiss v. Nat'l Westminster Bank PLC*,
768 F.3d 202 (2d Cir. 2014).............................................................................6, 38

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980)..............................................................................................23

*Wright v. Ernst & Young LLP*,
152 F.3d 169 (2d Cir. 1998)..................................................................................19

*Zapata v. HSBC Holdings PLC*,
    414 F. Supp. 3d 342 (E.D.N.Y. 2019), *aff'd,* 825 F. App'x 55 (2d Cir. 2020).......................36

**Statutes & Other Authorities**

2d Cir. L.R. 32.1.1(a)..................................................................................................20

18 U.S.C. § 233 et seq............................................................................................6, 38

28 U.S.C. § 1603...................................................................................................38, 43

Fed. R. Civ. P. 4(k)(2)....................................................................................... *passim*

N.Y. U.C.C. § 4–A–212............................................................................................19

N.Y. C.P.L.R. 302.............................................................................................. *passim*

## PRELIMINARY STATEMENT

Plaintiffs' 83-page Omnibus Memorandum of Law ("Plaintiffs' Opposition") does nothing to cure the deficiencies of a Complaint based entirely on conclusory and wholly implausible allegations. These deficient allegations fail to state a claim under the Justice Against Sponsors of Terrorism Act ("JASTA") and the Anti-Terrorism Act ("ATA"). Nor do they constitute a *prima facie* showing that jurisdiction exists over Qatar Charity—an entity which has no contact whatsoever with this forum. Under the law previously cited to the Court, this case must be dismissed as to Qatar Charity.

Plaintiffs' Opposition devotes most of its bulk to unsubstantiated claims—many absent from the Complaint itself—that Qatar Charity is little more than a fund raiser for Foreign Terrorist Organizations designated by the United States ("FTOs"). One newly-minted argument, found nowhere in the Complaint, even alleges that Qatar Charity is *itself* a "front" for FTOs. (Opp. Mem. at 3). This claim, like many others in Plaintiffs' Opposition, is incredible on its face. Simply stated, and as documented in detail in its Motion to Dismiss, Qatar Charity has earned high praise from the United States government and leading international organizations as a reliable partner in providing humanitarian assistance to some of the world's neediest communities. (Memorandum in Support of Qatar Charity's Motion to Dismiss ("MTD Mem.") at 2–3). This renders Plaintiffs' allegations wholly implausible.

In an attempt to dissuade this Court from taking proper notice of Qatar Charity's good works and close collaboration with the United Nations and the United States government—which, as argued previously, underscores the utter implausibility of their allegations—Plaintiffs assert that the Charity improperly seeks to have the Court rely on "purported facts." (Opp. Mem. at 11). This is not so. All exhibits attached to Qatar Charity's Motion to Dismiss were either (i) explicitly incorporated by Plaintiffs themselves into the Complaint or (ii) reliable material in the public

domain that was properly submitted for the purpose of judicial notice. (MTD Mem. at 3 n.2). Importantly, the significance of the statements contained in the documents which Qatar Charity has submitted to the Court lie largely in the fact that they were made. The fact that high-ranking U.S. diplomats publicly praise Qatar Charity as "one of the best organizations in the world" (Ex. 17[1]; MTD Mem. at 25), that United States Agency for International Development ("USAID") and the U.N. speak with pride of their numerous partnerships with the Charity (*e.g.*, Ex. 1, 2, 5, 6), and that Bill Gates has traveled to Doha to personally announce his foundation's partnership with the Charity (Ex. 27) are significant for purposes of this motion not because they are true (as they certainly are), but because it is preposterous to imagine that those statements would have been made if the entities making them—most pertinently, the United States government and State Department—had information suggesting that Qatar Charity was knowingly assisting fronts for FTOs (or, as Plaintiffs now claim, was itself such a front). These statements are thus highly relevant to the calculus that this Court must undertake in assessing the plausibility of the Complaint's allegations.

The documents submitted by Qatar Charity to the Court include the Annual Reports incorporated into the Complaint by Plaintiffs. In its Opposition, Plaintiffs continue to mischaracterize those reports to the Court, as previously explained in our opening brief. (*See* MTD Mem. at 20-23). Plaintiffs also rely heavily on the "confessions of the Director and Staff of the Qatar Charity Ramallah Branch" in Israeli criminal proceedings. (Complaint ¶ 132; Opp. Mem. at 39). Plaintiffs allege that those confessions "detail how Qatar Charity and Masraf laundered USD through the U.S." (Opp. Mem. at 39). But the confessions and testimony we have been able

---

[1] References to "Ex." refer to Qatar Charity's Memorandum in Support of its Motion to Dismiss. References to Reply Ex. refer to additional exhibits attached to this brief, the majority of which are incorporated into the Complaint.

to obtain (only in the last few days) do nothing of the kind. As detailed below, the confessions and trial testimony of Fadi Manassra,[2] the Charity's staff accountant in Ramallah, completely refute Plaintiffs' allegations; crucially, that confession and testimony flatly contradicts the central allegation upon which Plaintiffs seek to base its personal jurisdiction argument, that U.S. dollars were transferred through a correspondent account in New York. To the contrary, in both Manassra's confession (handwritten and then signed by him) and trial testimony, summarized in more detail below, he describes the money flow as follows: funds at the Masraf Al Rayan bank in Doha, in euros, would be transferred to "Deutsche Bank in Germany" and then "transferred to the Bank of Palestine in Ramallah to Branch number 1213"; only once received by the Bank of Palestine would it "convert the bills from Euros to Dollars." (Reply Ex. 1, Fadi Manassra Interrogation at 3:85 and 3:87). Thus, the very confessions that Plaintiffs repeatedly urge the Court to consider as the only non-conclusory allegations in support of personal jurisdiction appear to do precisely the opposite and indeed make explicit that there is absolutely no basis for jurisdiction here.

As to judicial notice, Plaintiffs have failed to take their own counsel. They themselves now ask the Court to take judicial notice of a complaint filed by their own counsel in another litigation. (*See* Opp. Mem. at 8 n.4 (citing ECF No. 67-1)). And, far from simply seeking judicial notice of this filing—an improbable source of neutral facts—Plaintiffs have proceeded to cite that complaint, which their own lawyer drafted, throughout their Opposition for the ***truth*** of the matters asserted therein. (*See, e.g*., Opp. Mem. 8, 10, 11, 14, 17, 25, 64, 67 n.40). Rather than asking the Court to take notice the existence of that litigation, Plaintiffs have instead taken it upon themselves

---

[2] Please note that there are a number of alternative translations of Mr. Manassra's name, as well as other individuals identified in the Complaint as employees of Qatar Charity: Juda Jamal and Najwan Awda. Any references to those names are employed as they appear in the translation.

to merge the allegations pleaded in that unrelated litigation with those from the instant Complaint. That is plainly improper. In essence, Plaintiffs argue that the instant Complaint's allegations are sufficient to state a claim only when they are considered alongside those made in another litigation. Attempts to amend a Complaint in this fashion is plainly improper. By way of example, Plaintiffs cite to a number of "allegations" in support of their argument that the instant Complaint—the one the Court is considering on this motion—adequately pleads the claims asserted, yet fail to disclose that ***these allegations are not pleaded in this Complaint***.[3]

Plainly, this is not the stuff of judicial notice. A "court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (quoting *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir. 2006)). Here, Plaintiffs seek precisely what is prohibited. They cannot oppose a motion to dismiss by requesting that the Court take judicial notice of a pleading in another litigation in an attempt to bootstrap the deficient allegations of the pleadings before the Court. The Court should, therefore, reject Exhibit 1 of the Declaration of James P. Bonner, and all subsequent citations to it, for anything beyond establishing that Plaintiffs' Counsel filed an action which this Court declined to treat as "related" (a fact which would appear to be completely irrelevant to this Court's consideration of the motions before it).

---

[3] Plaintiffs' improper citations to factual allegations not pleaded in the Complaint include, but are not limited to: "Between March 2011 and September 2015, Qatar Charity also transferred at least $150,000 to the Hebron Islamic Charity Society, a Hamas front." (Opp. Mem. at 10); "Between 2009 and September 7, 2015…Masraf used its correspondent bank accounts to move in excess of $3.5 million in USD and Euros between Qatar Charity's accounts at Masraf in Doha and the charity's accounts in the Palestinian Territories. . . . In addition to those funds, between 2011 and 2013, Qatar Charity moved $25 million from Doha to the banned Qatar Charity entity operating in the Gaza Strip." (Opp. Mem. at 14); "QNB also contributed directly to Qatar Charity…including a November 2013 contribution of roughly $275,000 and a February 2020 contribution of roughly $550,000." (Opp. Mem. at 14); "Qatar Charity's claimed institutional ignorance of the role of U.S. banks in effectuating USD transfers is not plausible in light of the criminal confession of Judeh Jamal, which is based upon his admission that he knew Qatar Charity was passing funds through New York." (Opp. Mem. at 67 n.40).

Among the allegations in this unrelated action that must be disregarded include the claim that Defendants "provided funds for the purchase of anonymous Sanabel debit cards used to provide martyr payments to Hamas and PIJ operatives, like those who perpetrated the attacks." (Opp. Mem. at 44). This is an entirely new claim, alleged nowhere in the Complaint, although, remarkably, Plaintiffs purport to cite to the Complaint in their Opposition in support of this claim.[4] This allegation is, moreover, like others that figure in Plaintiffs' Opposition, based on troubling misrepresentations of Israeli judicial proceedings, as made clear through the very documents cited by Plaintiffs and discussed below.

## ARGUMENT

## I.    PLAINTIFFS FAIL TO SHOW QATAR CHARITY IS SUBJECT TO PERSONAL JURISDICTION IN NEW YORK

Plaintiffs argue that this Court can exercise jurisdiction over Qatar Charity based both on Rule 4(k)(2) and on New York's long arm statute. In support of each argument, Plaintiffs rely heavily on two allegations: (i) that Qatar Charity has long been, and remains to this day, a member of the "Union of Good," a Specially Designated Global Terrorist ("SDGT") (*see* Opp. Mem. at 1, 10, 16); and (ii) that the "confessions" of Charity staffers in Israel confirm that Masraf Al Rayan and the Charity "laundered USD through the U.S." for the benefit of Hamas. (Opp. Mem. at 13, 39). But just as the Plaintiffs mischaracterized the Charity's Annual Reports,[5] these allegations—central to their jurisdiction argument—are similarly inaccurate and misleading.

Plaintiffs assert that (i) the Union of Good is a U.S.-designated SDGT; and (ii) Qatar Charity is a "member" of the Union. Hence, according to Plaintiffs, this designation tarred the

---

[4] In addition to the Bonner Declaration, Plaintiffs also cite to paragraphs 79 and 128-134 of the Complaint—none of which make any reference to Sanabel cards. (Opp. Mem at. 57).

[5] Although Plaintiffs continue to argue that the Annual Reports "reflect that [the Charity] transferred funds to Hamas and PIJ" (Opp. Mem. at 50), those Reports—which are before the Court—say no such things. (*See* Ex. 22, 23, 24).

Charity with the same brush and placed the bank defendants on notice that the Charity was a bad actor and that, accordingly, Masraf Al Rayan's alleged 2011–2015 in-forum conduct (putatively through a correspondent bank concededly not a co-conspirator) suffices to establish jurisdiction over all defendants in New York. But, yet again, this argument rests on misleading factual assertions.

The Charity does not dispute that the Court can take judicial notice that the U.S. Treasury Department designated the Union of Good as an SDGT on November 12, 2008—not, as Plaintiffs falsely claim, an FTO.[6] But the Court should also take judicial notice of the fact that in that designation there is no mention of Qatar Charity, although there is reference to certain specific entities and individuals as well as reference to "several organizations previously designated" under an earlier Executive Order.[7] The Court should also take notice of the fact that the U.S. government has *never* designated Qatar Charity as an SDGT or FTO; to the contrary, it regularly works with the Charity and has repeatedly praised its good work. (*See* MTD Mem. at 4–7 and Exhibits cited therein).

Significantly, Qatar Charity definitively terminated any association with the Union of Good 13 years ago, in 2009, within a few months of the U.S. designation. (*See* Reply Ex. 3, Letter from Qatar Charity to Essam Youssef, Secretary General of the Union of Good (Apr. 2, 2009)).

---

[6] Notably, the Union of Good is not an FTO, it is a U.S. designated SDGT, which does not qualify as a terrorist organization for the purposes of § 2339B of the ATA. *See, e.g., Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 209 (2d Cir. 2014) ("OFAC's SDGT designation is distinct from the State Department's FTO designation. While an organization designated as an FTO by the State Department is a terrorist organization for the purposes of § 2339B, that is not true for organizations designated as SDGT by OFAC.").

[7] *See* Reply Ex. 2, Treasury Designates the Union of Good, U.S. Dep't of the Treasury (Nov. 12, 2008), https://home.treasury.gov/news/press-releases/hp1267 (press release announcing U.S. Department of the Treasury's designation of the Union of Good under Executive Order 13224).

Thus, the Charity's minimal association with the Union[8] was terminated years before the inception of the alleged conspiracy.

The same can be said as to the confessions of former Qatar Charity employees in Israel. Plaintiffs allege specifically, but without citation or any detail, that "confessions" obtained from these former employees support the conclusion that Masraf Al Rayan and the Charity laundered U.S. dollars through New York for the benefit of the FTOs. (Complaint ¶ 132; Opp. Mem. at 13, 39). Yet again, as with the Annual Reports and the Union of Good allegations, these claims are fundamentally misleading and not supported by the confessions and testimony we have been able to obtain. For example, the confession made by Fadi Manassra to the Israeli authorities bears no relationship to the Plaintiffs' claim that the confessions of the staff supported its allegation that U.S. dollars transited through New York. Manassra was the Charity's staff accountant in Ramallah, responsible for (among other things) interacting with banks and "monitoring money transfers" (Reply Ex. 4, Sept. 1, 2017 Trial Testimony at 5:11) and "recording the movements of incoming and outgoing funds." (Reply Ex. 1 at 2:30). When interrogated by Israeli authorities in 2015, this is what Manassra said about money transfer (based on a certified translation):

> The funds are at the Al-Riyyan Bank in Doha it is transferred to Deutsche Bank in Germany. From there it is transferred to the Bank of Palestine in Ramallah to Branch Number 1213. At the bank branch in Ramallah, we convert the bills from Euros to Dollars and this action is only done at the Bank of Palestine. This is the Qatar Organization's policy for all branches around the world.

(Reply Ex. 1 at 3:85–89). At his subsequent trial testimony—where he testified as "Prosecution Witness Number 3," called by the Israeli prosecutors as a cooperative witness—Manassra confirmed that the money flowed from Doha through Deutsche Bank "in Germany" and

---

[8] In reality, Qatar Charity never provided any funds to the Union of Good, never co-sponsored any events or programs, and never attended any Union events. Therefore, this lynchpin of Plaintiffs' jurisdiction argument is fatally flawed.

thence to the Bank of Palestine.  The prosecutor then asked, "This money, how is it transferred? In what currency?" to which Manassra replied, "Euros."  (Reply Ex. 4 at 5:28–29).

The Plaintiffs' representation to this Court that the referenced "confessions" "confirm that Masraf used its correspondent accounts to pass USD through New York for the benefit of Qatar Charity and the FTOs" would thus appear to be a fiction made up out of whole cloth.

Nor do the "confessions" of Qatar Charity's former employees make any mention of Hamas, as Plaintiffs suggest.  The Israeli judicial proceedings referenced by Plaintiffs reflect guilty pleas to working for an organization deemed illegal by Israeli authorities.[9]  They ***do not*** represent convictions for providing financial support to Hamas or PIJ.  In this respect, Qatar Charity was one of more than 411 entities so designated by Israel since 1967.[10]  Furthermore, it is also not unusual, and reputable human rights organizations have confirmed that it is the case here, that Israeli authorities are well aware of, and often permit, continued operations of a "designated" entity.[11]

Indeed, the confessions also rebut Plaintiffs' allegations that Qatar Charity was nothing more than the fundraising arm of murderous terrorist organizations.  As Manassra testified, as a

---

[9]  Reply Ex. 5, Case (Military Court of the West Bank) 6014/15 *Military Public Prosecution v. Najwan Mohammed Iman Hassan Awda* (Feb. 8, 2017) (Isr.) at 2 ("Defendant was convicted based upon her confession, with[in] the framework of the guilty plea agreement, that she was a member of the Qatar Charity organization, an illegal organization."); Reply Ex. 6, Case (Military Court of Appeals) 3189/15, *Juda Dib Ibrahim Jamal and Fadi Bahjat Abd el-Fateh Manassra v. Military Advocate General's Office*, (Dec. 30, 2015) (Isr.) at 1 ("The Qatar Association is an illegal association…[Juda Jamal and Fadi Manassra]…were indicted for membership in an illegal association, holding office in an illegal association, performing a service for an illegal association and bringing in enemy money."); Reply Ex. 7, Case (Military Court of Appeals) 2731/15 *Najwan Mohammed Iman Hassan Awda v. Military Prosecution*, (Oct. 13, 2015) (Isr.) at 1 ("An indictment was filed against the appellant, which includes membership and activity in an illegal association, holding an office in an illegal associating, and bringing enemy funds into the area.").

[10] Reply Ex. 8, Human Rights Watch, *Born Without Civil Rights*, HRW (Dec. 17, 2019) at 4, ("Since 1967, the Israeli Defense Ministry has banned more than 411 organizations, among them all major Palestinian political parties.")

[11] *Id.* at 38 (Despite the designation, Israel allowed Qatar Charity to deliver funding into Gaza in May 2019); *see also* MTD at 4 n. 5 (discussing Qatar Charity's partnership with the U.N. to deliver supplies which "until recently have been prevented from entering by Israeli authorities.").

prosecution witness, the Charity "is only a social association that helps society's weaker populations, among them orphans, the poor, and people with special needs." (Reply Ex. 4 at 5:2–3). Its "purposes are humanitarian only. Aid to all people regardless of religion or race." (Reply Ex. 4 at 5:41). As to the Sanabel card allegations—which Plaintiffs attempt to back-door into this case even though the Complaint contains no reference to them—Manassra characterized the program as a wholly benign effort to help thousands of orphans, describing "the conditions for registration" as simply that "the child's father died before age 10" and that proper paperwork (such as death and birth certificates) were filed. (Reply Ex. 1 at 3:62–63). Similarly at trial, although the Israel prosecutor elicited testimony regarding these cards, there was no mention of Hamas and no suggestion that the program had any purpose other than to assist "orphans who live with the mother." (Reply Ex. 4 at 7:25). More generally, under questioning by the prosecutor, Manassra testified—without contradiction or challenge—that "all the money we have transferred to charities helps orphans and people with special needs." (Reply Ex. 4 at 7:41).

In assessing the plausibility of Plaintiffs' allegations, this Court should weigh the false conclusions that they seek to draw from the Israeli judicial proceedings against Qatar Charity's standing in the world community, including in the United States, where it enjoys a strong relationship with the U.S. government.[12] This court should similarly discount Israel's 2008 designation of Qatar Charity as an "illegal" organization, upon which Plaintiffs rely heavily. (*See, e.g.*, Opp. Mem. at 10, 16, 25, 30). The designations cannot bear the weight that Plaintiffs would put upon it. As an initial matter, it is by no means clear that this designation was widely known. Manassra himself, who started working for the Charity in February 2010 and was called as a prosecution witness, testified in 2015 that he was "surprised" to learn that Qatar Charity had been

---

[12] *See, e.g.*, MTD Mem. at 24-25.

deemed an illegal association by Israel, in part because in the past the Charity was able to obtain "approval from the Israeli authorities" for certain of its activities in the West Bank. (Reply Ex. 4 at 7:56). Indeed, the very court proceedings upon which Plaintiffs rely include filings making clear that Qatar Charity operated in a completely open and above-board manner and that "the Israeli authorities [were] aware of [the Charity's] activities," including by dint of "correspondence with the Israeli Tax Authorities [and] the Israeli Ministry of the Economy." (*See* Reply Ex. 9, Notice filed in Juda Jamal et al v. The Military Prosecution at 1). Accordingly, the Charity's staff argued that, given the authorities' knowledge of their activities, the Charity had "returned to being legal." Nor does the designation of an entity in Israel as "illegal" determine whether the United States will designate it as a Foreign Terrorist Organization, which, of course, the United States has not done in the case of Qatar Charity.[13]

In sum, the "confessions" relied on heavily by Plaintiffs and incorporated into the Complaint do not support Plaintiffs' claims that Qatar Charity purposefully availed itself of New York correspondent banks to transfer U.S. dollars to Hamas and PIJ in the Palestinian Territories. Quite to the contrary, the confession of the staff member with direct responsibility for "monitoring money transfers" says exactly the opposite—stating in his confession that the money flowed (in euros ***not*** dollars) from Doha to Germany (***not*** New York) to the Bank of Palestine, where it was "convert[ed] from Euros to Dollars," something which was "***only*** done at the Bank of Palestine." (Reply Ex. 1 at 3:87-88) (emphasis added). By relying on these confessions, it would appear that Plaintiffs have been hoisted on their own petard.

Thus, as is the case with the Annual <u>Reports</u> (*see* MTD Mem. at 20–24, 32–33) and the Union of Good, on the rare occasions when Plaintiffs allege something other than vague and

---

[13] *See* Reply Ex. 10, *US Dep't of State, Foreign Terrorist Organizations* (Listing Designated FTOs).

conclusory claims devoid of factual specificity, their assertions rest largely, and demonstrably, on misrepresentations and mischaracterizations. With that background, we turn to Plaintiffs' Rule 4(k)(2) and long-arm statute arguments.

### A. Qatar Charity is Not Subject to Personal Jurisdiction Under Rule 4(k)(2)

Contrary to Plaintiffs' assertion (Opp. Mem. at 57–75), Federal Rule of Civil Procedure 4(k)(2) is not a basis for establishing personal jurisdiction over Qatar Charity. Rule 4(k)(2) "provides for jurisdiction where: (a) plaintiffs assert federal claims; (b) 'the defendant is not subject to jurisdiction in any state's courts of general jurisdiction;' and (c) 'exercising jurisdiction is consistent with the United States Constitution and laws.'" (Opp. Mem. at 57 (quoting Fed. R. Civ. P. 4(k)(2)); *see also* MTD Mem. at 18 n.10). The Complaint forecloses satisfaction of the second element, because far from pleading that Qatar Charity "is not subject to jurisdiction in any state's courts of general jurisdiction," Plaintiffs have pled precisely the opposite—alleging that Qatar Charity *is* subject to personal jurisdiction in New York. (Complaint ¶¶ 12–13). Having reviewed the Charity's moving brief, Plaintiffs now attempt to take the opposite tack, claiming that "the defendant[s] [are] not subject to jurisdiction in any state's court of general jurisdiction." (Opp. Mem. at 57). This transparent reversal of course comes with no explanation. Plaintiffs also fail to satisfy the third element of Rule 4(k)(2), requiring consistency with the United States Constitution and laws, because they "have not demonstrated that [Qatar Charity] has meaningful contacts with New York, and Plaintiffs make no specific allegations of contacts with other states or the United States generally" (as they cannot do because there are none). *DISH Network, LLC. v. Kaczmarek*, 2021 WL 4483470, at *8 (E.D.N.Y. June 24, 2021), *report and recommendation adopted in relevant part*, 2021 WL 4485870 (E.D.N.Y. Sept. 30, 2021). Qatar Charity is therefore not subject to personal jurisdiction under Rule 4(k)(2). We address these points in turn below.

### i. Rule 4(k)(2) is Inapplicable Because Plaintiffs Failed to Certify that

**Qatar Charity is Not Subject to Personal Jurisdiction in Any State's Courts of General Jurisdiction**

Plaintiffs fail to satisfy Rule 4(k)(2)'s second element as a matter of law. Despite their argument to the contrary (Opp. Mem. at 58), Plaintiffs have the burden of pleading each element of personal jurisdiction. *See Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 109 (E.D.N.Y. 2020) (plaintiffs "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant") (quoting *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)). By its very terms, Rule 4(k)(2) requires that "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction." Fed. R. Civ. P. 4(k)(2)(A). Here, Plaintiffs plead the opposite—alleging Qatar Charity is subject to personal jurisdiction in New York. (Complaint ⁋ 12; Opp. Mem. at 58 n.30).

Plaintiffs cite out-of-circuit case law for the proposition that Qatar Charity must "identify [another] state where Plaintiffs can assert their claims." (Opp. Mem. at 58). Those cases are plainly inapposite because—in the Second Circuit—"plaintiffs bear [the] burden of certifying that to their knowledge, the defendant is not subject to suit in the courts of general jurisdiction of any state." *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 240 (S.D.N.Y. 2019) (citation and quotation marks omitted); *Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 134 (S.D.N.Y. 2020) ("In this Circuit, to meet the second requirement of Rule 4(k)(2), ***plaintiffs*** need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state.") (citation omitted) (emphasis added); *Aqua Shield, Inc. v. Inter Pool Cover Team*, 2007 WL 4326793, at *8 (E.D.N.Y. Dec. 7, 2007) (same).

Here, Plaintiffs failed to make the requisite certification. In fact, they pled precisely the opposite—alleging that Qatar Charity ***is*** subject to personal jurisdiction under New York's long-arm statute. (Complaint ¶ 12). Plaintiffs have doubled down on that argument in their Opposition,

arguing that New York's "long-arm statute provides" a "basis for exercising jurisdiction over all three Defendants." (Opp. Mem. at 80). Thus, Plaintiffs cannot carry their burden under Rule 4(k)(2). *See In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d at 240 ("[b]ecause the Plaintiffs in the instant case have not certified that the [foreign defendants] are not subject to general jurisdiction in another state, they have not met all of the elements of Rule 4(k)(2)") (Ramos, J.).

### ii. Rule 4(k)(2) is Inapplicable Because Due Process Forbids Exercising Jurisdiction Over Qatar Charity

Rule 4(k)(2)'s three elements are, moreover, conjunctive, so Plaintiffs' failure to satisfy the second element precludes jurisdiction under Rule 4(k)(2). But even though Plaintiffs' failure to satisfy Rule 4(k)(2)'s second element is itself dispositive, so too is the failure to satisfy Rule 4(k)(2)'s third element: Qatar Charity lacks the minimum contacts required to satisfy due process. Plaintiffs neither allege in their Complaint nor argue in their Opposition that Qatar Charity is subject to personal jurisdiction based on its own contacts in the United States. Plaintiffs argue instead that "exercising personal jurisdiction over [Qatar Charity] based upon Masraf Al Rayan's use of its correspondent bank account under either an agency theory or a conspiracy theory of personal jurisdiction is consistent with due process." (Opp. Mem. at 58). Those arguments are frivolous and should be rejected. Indeed, Plaintiffs have totally conceded that they cannot plausibly allege that the Charity even knew about any supposed use of a New York correspondent account (Opp. Mem. at 67–68 ("whether Qatar Charity knew it or not"); *cf.* Opp. Mem. at 70–71 ("what matters is that Masraf knew that it was using its New York correspondent account")), much less that the Charity agreed to or directed such use, which is what would be required to satisfy the demands of due process. Their argument is, again, absurd.

Nor, contrary to Plaintiffs' insinuation, is Rule 4(k)(2) a "catchall" provision extending personal jurisdiction over a defendant like Qatar Charity that lacks minimum contacts in the

plaintiff's chosen forum. To the contrary, Rule 4(k)(2) merely "provides for what amounts to a federal long-arm statute in a narrow band of cases in which the United States serves as the relevant forum for a minimum contacts analysis." *DISH Network*, 2021 WL 4483470, at *8 (quoting *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co*., 284 F.3d 1114, 1126 (9th Cir. 2002)); *see also Porina v. Marward Shipping Co*., Ltd., 521 F.3d 122, 127 (2d Cir. 2008).

Congress enacted Rule(4)(k)(2) "with the intention of filling a gap in the enforcement of federal law" by authorizing "federal jurisdiction over a foreign defendant who has 'contacts with the United States sufficient to justify the application of United States law and to satisfy federal standards of forum selection,' but who otherwise has insufficient contact with the state in which the federal court sits to support that court's jurisdiction." *Cordice v. LIAT Airlines*, 2015 WL 5579868, at *5 (E.D.N.Y. Sept. 22, 2015) (quoting *Porina v. Marward Shipping Co., Ltd*., 521 F.3d 122, 126 (2d Cir. 2008)). "The Rule 4(k)(2) jurisdictional analysis mirrors that of the standard personal jurisdiction analysis, except in one critical respect: The due process analysis for Rule 4(k)(2) jurisdiction hinges on whether the non-resident has sufficient minimum contacts with the United States as a whole instead of with the specific forum state." *George Moundreas & Co SA v. Jinhai Intelligent Mfg. Co Ltd*, 2021 WL 168930, at *11 (S.D.N.Y. Jan. 18, 2021) (citing *Porina v. Marward Shipping Co*., 521 F.3d 122, 127 (2d Cir. 2008)).

These clear principles are obviously fatal to Plaintiffs' Rule 4(k)(2) argument, as Qatar Charity has neither contacts with New York in particular nor the United States as a whole. In fact, Plaintiffs do not even attempt the (futile) task of alleging sufficient contacts with the "United States as a whole." To the contrary, the ***only*** contacts alleged (as to any defendant) are chimerical "contacts" with the "specific forum state" (New York) which are not, in fact, contacts that any defendant itself had with the state. To the contrary, Plaintiffs seek to base jurisdiction here on the

contacts of an unnamed correspondent bank which is not a defendant before the Court ("a bank in New York" (Complaint at 132))—an entity of which Qatar Charity is not alleged to have had knowledge (*see* Opp. Mem. at 67–68; 70–71). How can jurisdiction based on such frail allegations possibly be reasonable?

Due process requires such reasonableness; Rule 4(k)(2) "requires (1) that the defendant have sufficient minimum contacts with the United States in general, rather than any particular state and (2) that the exercise of jurisdiction is reasonable." *In re SSA Bonds Antitrust Litig*., 420 F. Supp. 3d at 240 (quoting *Porina.*, 521 F.3d at 127). Here, Qatar Charity has not undertaken "some act by which [it] purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quotation marks and citation omitted), nor has it itself created "contacts…with the forum State," *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis in original) rather than those arising from the "unilateral activity of another party or a third person," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984). As to Qatar Charity, the Plaintiffs have effectively conceded that they cannot carry this burden. (*E.g*., Opp. Mem. at 67–68, 70–71). Indeed, a weaker case in this regard is hard to even imagine.

## 1. Masraf Al Rayan's Alleged Contacts in New York are Insufficient to Confer Jurisdiction Under Rule 4(k)(2)

For the reasons articulated by Defendant Masraf Al Rayan in its opening brief in support of its motion to dismiss (ECF Nos. 55-1), Masraf Al Rayan's contacts in New York are insufficient to confer personal jurisdiction over it. In sum, Masraf Al Rayan has no physical presence in the United States and allegations concerning its correspondent account at an unnamed New York bank cannot survive due process scrutiny. Hence, the foundational premise of the argument as against Qatar Charity crumbles.

## 2. Qatar Charity is Not Subject to 4(k)(2) Jurisdiction Under an Agency Theory

Plaintiffs' argument that Qatar Charity is subject to personal jurisdiction under an agency theory (Opp. Mem. at 66–71) also fails, because the Complaint lacks factual allegations that either Masraf Al Rayan or its third-party correspondent bank acted in an agency capacity for Qatar Charity. There may be jurisdiction over a principal "based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal,'" but that is certainly not the case here. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (*Schwab I*) (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)); *see also* (Opp. Mem. at 66 (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).

To plead agency for jurisdictional purposes, the plaintiff "must allege the actual exercise of control, based on the 'realities of the relationship.'" *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (quoting *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)). Plaintiffs do not plausibly allege that Qatar Charity had any knowledge or control over Masraf Al Rayan's alleged use of a correspondent account in New York; indeed, quite to the contrary, Plaintiffs actually ***concede that they cannot plausibly allege even mere knowledge*** of

the potential use of a correspondent account (*see* Opp. Mem. at 67–68; 70–71), much less the requisite direction and control. (*See* Complaint ¶ 7; *cf.* Opp. Mem. at 67–68 ("Qatar Charity instructed its agent Masraf to make certain USD transfers that—whether Qatar Charity knew it or not—could only be effectuated through a U.S. correspondent bank."); Opp. Mem. at 70–71 ("[W]hat matters is that Masraf knew that it was using its New York correspondent account")).[14]

Plaintiffs allege that Masraf Al Rayan transferred funds from Qatar Charity's account in Qatar to its account in the Palestinian Territories and that, in transit, the funds passed through New York. (Complaint ¶¶ 7, 132–33). Again, and crucially, Plaintiffs do not plausibly allege that Qatar Charity knew its funds would pass through New York. Instead, Plaintiffs allege that "Masraf Al Rayan" transferred Qatar Charity "funds denominated in U.S. dollars through a correspondent bank in New York," conclusorily and inaccurately asserting in their Opposition that such transfers "must have" gone through New York. But, the confession of Fadi Manassri, upon which Plaintiffs rely, makes explicit that, to the contrary, funds were routinely converted into U.S. dollars in Ramallah—"and this action is only done at the Bank of Palestine" in Ramallah. (Reply Ex. 1 at 3:87-88).

---

[14] Plaintiffs are also wrong that the alleged transfers "could only be effectuated through a U.S. correspondent bank." (Opp. Mem. at 67–68). As in *Tamam v. Fransabank*, "[u]nderlying Plaintiffs' argument is the faulty assumption that U.S. dollars can only be obtained in the United States," when, in fact, financial institutions can obtain U.S. dollars abroad from numerous, foreign correspondent banks. 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010). Plaintiffs try to evade that fact by attaching the declaration of Patrick J. McArdle ("McArdle Decl."). (*See* ECF No. 69). But Mr. McArdle concedes he lacks any personal knowledge of the transfers alleged here. He relies instead on personal experience and three complaints filed by Plaintiffs' counsel in this and two unrelated cases, without even specifying which of his opinions are derived from the pleadings in this case. (*See, e.g.*, McArdle Decl. ¶¶ 1, 15). The Court should afford no weight to Mr. McArdle's declaration, which merely recounts how foreign banks "ordinarily" handle U.S. dollar transactions (McArdle Decl. ¶ 14) and parrots the Complaint's conclusory allegations (*see, e.g.*, McArdle Decl. ¶ 18 ("With Masraf Al Rayan Bank initiating the U.S. dollar-denominated transfers for Qatar Charity as discussed in the Complaints, these funds were almost certainly settled and cleared in the U.S. (New York) by U.S. banks on behalf of Masraf Al Rayan Bank."); McArdle Decl. ¶ 16 ("The Complaints' description of these interbank transactions is consistent with the manner in which a transaction involving U.S. dollars would typically operate.")). *See* Reply Ex. 1 at 3:88 (conversion to U.S. dollars "is only done at the Bank of Palestine").

As numerous cases make crystal clear, those paltry allegations fail to establish that Masraf Al Rayan was Qatar Charity's agent for jurisdictional purposes. *See Spetner*, 495 F. Supp. 3d at 112 (defendant "may have expected, or even known for a fact, that [Arab Jordan Investment Bank] would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling"); *Berdeaux v. OneCoin Ltd.*, 2021 WL 4267693, at *12 n.25 (S.D.N.Y. Sept. 20, 2021) ("The nature of correspondent banking renders largely nonsensical any attempt to base jurisdiction against the individual Defendants on wire transfers of funds moving through a New York correspondent account" because "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York."); *Vasquez v. Hong Kong and Shanghai Banking Corp., Ltd*., 477 F. Supp. 3d 241, 259 (S.D.N.Y. 2020) ("there is no evidence that [defendant] directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account").

Plaintiffs also devote a considerable portion of their Opposition to manufacturing an unalleged theory that Masraf Al Rayan's "U.S. correspondent bank," which Plaintiffs conspicuously fail to identify, is somehow Qatar Charity's "sub-agent" for jurisdictional purposes. (Opp. Mem. at 66–71). That argument is unavailing because merely alleging that Masraf Al Rayan was Qatar Charity's agent, does not make it so. *Pincione v. D'Alfonso*, 506 F. App'x 22, 24 (2d Cir. 2012) ("allegations concerning [non-party's] agency were entirely conclusory and thus inadequate"). Instead, because Plaintiffs must plausibly allege, as they cannot, the consent, knowledge, and control required to establish an agency relationship, it is self-evident that any correspondent bank chosen by Masraf Al Rayan could not have been Qatar Charity's "sub-agent." Furthermore, even if Masraf Al Rayan was Qatar Charity's agent—which it plainly was not, even

accepting as true the allegations in the Complaint—Plaintiffs' chain of agency theory breaks irreparably at the purported link between Masraf Al Rayan and its unnamed correspondent bank, because it is well-recognized that "an intermediary bank is the legal agent of neither the originator nor the intended beneficiary." *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 121 (2d Cir. 2010) (quoting N.Y. U.C.C. § 4–A–212); *see also Spetner*, 495 F. Supp. 3d at 110 (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d 112, 122 (2d Cir. 1984)) ("[a] correspondent bank relationship, standing alone, does not create an agency relationship"); *Spetner*, 495 F. Supp. 3d at 111 ("That critical element of control is not present in the garden-variety correspondent banking relationship alleged here."). Plaintiffs would have the Court ignore this black letter law. That it cannot do.

In short, Qatar Charity has neither an agent nor a sub-agent in New York. Among other deficiencies, Plaintiffs' averments to the contrary are an impermissible effort to amend their deficient Complaint. *See In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 541 (S.D.N.Y. 2021) (quoting *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)) ("plaintiff cannot 'amend' its pleading through its opposition papers"). And their conceded inability to allege that Qatar Charity had knowledge about any correspondent banking relationship, much less direction or control, is obviously fatal here.

### 3. Qatar Charity is Not Subject to 4(k)(2) Jurisdiction Under a Conspiracy Theory

Plaintiffs cannot establish Rule 4(k)(2) conspiracy jurisdiction based on the in-forum acts of Masraf Al Rayan's unnamed correspondent bank, which Plaintiffs acknowledge is not an alleged co-conspirator. (*See* Opp. Mem. at 80 ("Masraf's [New York correspondent bank] did not participate in Defendants' conspiracy")). Plaintiffs' conspiracy theory is distinct from the agency theory discussed above, but equally deficient. Under the putative conspiracy theory of jurisdiction,

"a defendant purposefully avails itself of the laws of a forum when it or its co-conspirator undertakes an overt act in furtherance of the conspiracy in the forum." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 109–10 (2d Cir. 2021) (*Schwab II*); *see also Schwab I*, 883 F.3d at 87. Many courts have opined that this is a dubious theory at best, in plain tension with pertinent Supreme Court precedent. *See, e.g., Rudersdal v. Harris*, 2022 WL 263568, at *10 (S.D.N.Y. Jan. 28, 2022); *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 326 (S.D.N.Y. 2020). But Plaintiffs would have this Court launch this suspect theory into uncharted waters, predicating the theory here not on the in-forum acts of a co-conspirator (none of which are alleged) but on the in-forum acts of an entity concededly ***not*** alleged to be a co-conspirator (the supposed correspondent bank). This is a brazen bridge too far (even for Plaintiffs' counsel). We know of no cases applying *Schwab I's* conspiracy standard that support such a radical expansion of personal jurisdiction, and the Court should reject the baseless request to be the first. To state what is obvious from the Opposition Brief: Plaintiffs do not argue that any alleged conspirator acted in the forum in furtherance of the conspiracy. They argue only that "Masraf's New York correspondent banking transactions suffice to establish personal jurisdiction over all Defendants." (Opp. Mem. at 4). Plaintiffs' allegations are therefore insufficient to establish conspiracy jurisdiction over Qatar Charity.

The absence of in-forum acts undertaken by an alleged co-conspirator places the present case in stark contrast with the cases that Plaintiffs claim, wrongly, are analogous. (Opp. Mem. at 71–73) (citing, *e.g.*, *Berkshire Bank v. Lloyds Banking Grp. plc*, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022) (summary order)[15] (the "pleadings and other supporting evidence are replete with similar alleged communications and actions that appear to involve purported conspiracy

---

[15] The summary order in *Berkshire Bank* does not bind this Court as it has "no precedential effect." Second Circuit Local Rule 32.1.1(a).

participants located in New York who took steps there to advance the conspiracy"); *Schwab II*, 22 F.4th at 125 ("The alleged conspiracy involved the manipulation of U.S.-Dollar LIBOR with co-conspirators who were based in the United States."); *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d at 325-326 ("Thus, the TAC plausibly alleges that United-States-based co-conspirators acted in furtherance of the conspiracy to manipulate the Fix, and the Court has personal jurisdiction over" the foreign defendants.); *Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 412 (S.D.N.Y. 2020) ("The Complaint's allegations are sufficient to find conspiracy jurisdiction over [the foreign defendant] because they support the inference that [the foreign defendant's] traders knew that their coconspirators were based in, and acting out of, New York."); *SL-X IP S.Á.R.L. v. Bank of Am. Corp.*, 2021 WL4523711, *6 (S.D.N.Y. Sep. 30, 2021) (conspiracy jurisdiction established where the complaint "alleges that the Defendants conspired in part through their board positions and identifies which of the Broker Defendants' employees served on the board of EquiLend Holdings LLC (the U.S.-based entity)")).

Those cases bear no relationship whatsoever even to the conclusory allegations advanced by Plaintiffs. There are no putative "United-States-based co-conspirators" alleged here. As to Qatar Charity, the allegations are, remarkably enough, nothing more than the following:

- Qatar Charity, a Qatar entity with no alleged contacts of any kind with the United States, attempted to send funds from its own accounts in Doha to other of its own accounts in the Palestinian Territories, taking no action in the United States or directed towards the United States;

- The Qatari bank it used for this transfer, also with no physical presence of any kind in the United States, allegedly effectuated that Qatar-to-Palestine transfer through the United States, utilizing a New York correspondent bank;

- The routing decision to utilize a New York correspondent was not necessary; Qatar Charity is not alleged to have had knowledge of this decision, and hence is obviously not alleged to have exercised any control; and

- The putative correspondent bank is ***not*** alleged to be a co-conspirator and is not an agent as a matter of law (and certainly not an agent of Qatar Charity itself, which

<blockquote>concedely is not alleged to have had any knowledge of the existence of the supposed correspondent bank and not alleged to have exercised any control or direction).</blockquote>

To recite those factual allegations is to refute utterly the conspiracy jurisdiction allegations.[16]

Notably, numerous courts have questioned the constitutionality of conspiracy jurisdiction, even where the predicate is in-forum conduct by an actual co-conspirator. *See, e.g.*, *Rudersdal*, 2022 WL 263568, at *10–11 ("some district courts (including this one) and scholars may have qualms about the ability of a conspiracy theory of jurisdiction to satisfy due process"); *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d at 326 (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)) (the conspiracy jurisdiction "standard may be in tension with the Supreme Court's holding in *Walden v. Fiore* that 'the relationship between the defendant and the litigation must arise out of the contacts that the 'defendant himself' creates with the forum State"); *In re Dental Supplies Antitrust Litig.*, 2017 WL 4217115, at *7 (E.D.N.Y. Sept. 20, 2017) (BMC) ("[T]here is no doctrinal support for 'conspiracy jurisdiction.' Either jurisdiction is appropriate under existing jurisdictional principles or it is not, and a due process inquiry is always required.") (quotation marks and citation omitted).

Asserting personal jurisdiction over Qatar Charity would also violate *Schwab II*'s instruction that a "conspiracy theory [cannot] get off the ground if [the] defendant were altogether blindsided by its co-conspirator's contacts with the forum." 22 F.4th at 125. Courts considering the relationship between foreign and domestic banks "have discounted the use of a correspondent account that is essentially adventitious—*i.e.*, that was not even defendant's doing—as not reflecting a deliberate act." *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp.

---

[16] And that is without even referencing the confession of Fadi Manassra, expressly incorporated into the Complaint, which states clearly that transfers from Doha transited through Germany in Euros and were only converted to dollars in Ramallah. (Reply Ex. 1 at 3:85-88).

3d 241, 258 (S.D.N.Y. 2020) (collecting cases) (quotation marks and citation omitted).  Here, Qatar Charity, a banking customer, is even further removed than its banks from any purposeful availment of the forum.  Plaintiffs do not plausibly allege that Qatar Charity knew that Masraf Al Rayan had a correspondent account in the United States.  Nor do they plausibly allege that Qatar Charity knew that transfers between its accounts in Qatar and the Palestinian Territories might pass through the United States.  The alleged "conspiratorial contacts" are therefore not "the sort that [Qatar Charity] 'should reasonably anticipate being haled into court' in the forum as a result of them."  *Schwab II*, 22 F.4th at 125 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

### 4. The Due Process Reasonableness Factors Counsel Against Imposing Jurisdiction

Even in a case, decidedly unlike this one, where there are adequate allegations that "a defendant has purposefully directed its activities at the forum state, it may still defeat jurisdiction on due process grounds."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013).  Here, the reasonableness factors counsel against exercising jurisdiction because none of the Defendants has ***any*** presence in the United *States* and ***all*** of their alleged activity took place abroad.  This is especially so in the case of Qatar Charity.

The reasonableness inquiry primarily concerns "the burden on the defendant."  *In re Platinum*, 449 F. Supp. 3d at 327 (internal quotation marks and citation omitted).  It goes without saying that litigating this case in the Eastern District of New York would impose an enormous burden on Qatar Charity.  Qatar Charity does not have an office in New York (or the United States) and is not otherwise physically present in the forum.  None of Qatar Charity's relevant records or knowledgeable witnesses are located in New York.  Moreover, the forum lacks any compelling interest in retaining this litigation because none of the Plaintiffs are New York residents and no

alleged injury was suffered here. It would therefore be unreasonable to assert personal jurisdiction over Qatar Charity in this case.

Plaintiffs contend the "Defendants' discussion of the reasonableness factor" failed to address "Congress' recent pronouncements regarding the need to subject entities that provide material assistance to terrorists to jurisdiction in the American courts." (Opp. Mem. at 73–74). But of course it is self-evident that Congress lacks authority to deprive ATA defendants of due process protections. Judge Furman debunked similar arguments in a recent ATA decision, explaining that "Congress cannot, consistent with the Constitution, simply decree that any conduct, without regard for its connections to the United States generally or to litigation in the United States specifically, signals a party's intent to submit to the jurisdiction of a United States court." *Fuld v. Palestine Liberation Org.*, 2022 WL 62088, at *1 (S.D.N.Y. Jan. 6, 2022) (appeal filed). Plaintiffs' argument to the contrary is meritless.

### B. Plaintiffs' "Alternative" Basis For Jurisdiction Fails Because Qatar Charity is Not Subject to Jurisdiction Under New York's Long-Arm Statute

Qatar Charity is not subject to personal jurisdiction under New York's long-arm statute, N.Y. C.P.L.R. Section 302, which "is more restrictive than the Fourteenth Amendment's Due Process Clause." *In re Eur. Gov't Bonds Antitrust Litig.*, 2022 WL 768680, at *8 (S.D.N.Y. Mar. 14, 2022).

### 1. CPLR Section 302(a)(1) Does Not Apply

Qatar Charity is not subject to personal jurisdiction under Section 302(a)(1). That provision stipulates that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state." N.Y. C.P.L.R. 302(a)(1). Here, again, Plaintiffs do not allege that Qatar Charity itself conducted any business in New York and Plaintiffs' threadbare allegations regarding a purported unnamed correspondent

bank about which the Charity is not adequately alleged to have had any knowledge are insufficient to establish agency jurisdiction and are, indeed, foreclosed by black letter Second Circuit law. Nor does Section 302(a)(1) authorize conspiracy jurisdiction. (*See* MTD Mem. at 14–15).

Since Plaintiffs do not, and cannot, allege that Qatar Charity itself transacted any business in New York, they must, to satisfy Section 302(a)(1), allege that Qatar Charity conducted business in New York through an agent. As discussed above, there can be "jurisdiction over a principal based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal.'" *Schwab I*, 883 F.3d at 85 (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)).

As Judge Caproni recognized in *Berdeaux*, however, there is "no authority . . . standing for the principle that a non-domiciliary individual defendant may be subject to specific jurisdiction in New York under Section 302(a)(1) because the non-domiciliary moved money between foreign bank accounts, with the transfer passing through New York via a correspondent account." *Berdeaux*, 2021 WL 4267693, at *12.[17] That is because "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York." *Id.* at *12 n.25; *accord Universal Trading & Inv. Co. v. Tymoshenko*, 2012 WL

---

[17] Plaintiffs badly mischaracterize *Berdeaux* in a failed attempt to distinguish it. Plaintiffs contend "*Berdeaux* involved only a single wire transfer not initiated by any of the defendants." (Opp. Mem. at 64). In reality, while the court held that "Plaintiffs allege adequately only a single transaction," the *Berdeaux* complaint alleged "the Scott Group **Defendants** used shell companies and bank accounts all over the world to launder more than $400 million in criminal proceeds" and that defendant Bank of New York Mellon "enabled the 'Scott Group' to launder more than $300 million in fraud proceeds by serving as correspondent bank for **hundreds of transactions**." *Berdeaux*, 2021 WL 4267693, at *3, 11 n.21, 16 (emphasis added). Next, Plaintiffs assert *Berdeaux* is inapposite because the *Berdeaux* plaintiffs "disclaimed all bases for personal jurisdiction other than CPLR 302(a)(3)(ii), which Plaintiffs have not alleged here." (Opp. Mem. at 64). But the *Berdeaux* court made clear that it "assess[ed] . . . Defendants' amenability to jurisdiction under multiple prongs of New York's long-arm statute," *including* Sections 302(a)(1)–(2), even though "Plaintiffs . . . abandoned all bases for personal jurisdiction other than CPLR 302(a)(3)(ii)." *Berdeaux*, 2021 WL 4267693, at *8.

6186471, at *3 (S.D.N.Y. Dec. 12, 2012) ("[T]he Court's research [has not] revealed any cases in which a foreign individual holding foreign accounts has been found to be subject to jurisdiction in New York because their bank moved money through New York via a correspondent account.").

In *Berdeaux*, the plaintiff alleged "hundreds of transactions" that purportedly flowed through New York accounts, including one $30 million transaction as to which the defendant e-mailed himself a copy of the wire instructions—thus making explicit his knowledge that the funds would be processed through New York. *Berdeaux*, 2021 WL 4267693, at *3–4. That knowledge was deemed insufficient. "None of that is anywhere close to sufficient to show that [the defendant] transacted business in New York." *Id*. at *11; *cf. id*. at *12 (these allegations are "insufficient as a matter of law").

Here, Plaintiffs allege that Masraf Al Rayan transferred funds from Qatar Charity's account in Qatar to its account in the Palestinian territories, and that the funds passed through New York on the way. (Complaint ¶ 7, 132–33). Again, and crucially, Plaintiffs do not plausibly allege that Qatar Charity knew its funds passed through New York on the way from Qatar to the Palestinian territories. (*See, e.g*., Opp. Mem. at 67–68 ("Qatar Charity instructed its agent Masraf to make certain USD transfers that—**whether Qatar Charity knew it or not**—could only be effectuated through a U.S. correspondent bank.") (emphasis added); Opp. Mem. at 70–71 ("what matters is that Masraf knew that it was using its New York correspondent account")). Plaintiffs merely allege that "Masraf Al Rayan" transferred Qatar Charity "funds denominated in U.S. dollars through a correspondent bank in New York." (Complaint ¶ 7). But, as set forth in detail above, one of the confessions relied on by Plaintiffs, that of the staff accountant responsible for bank transfers, discusses not dollar-denominated transfers that cleared in the United States, but rather euro-

26

denominated transfers that cleared through a German bank and were "only" converted to dollars at the Bank of Palestine in Ramallah. (Reply Ex. 1 at 3:85-88).

Nonetheless, as multiple courts in this Circuit have held, putting aside the irreconcilable factual conflict between Plaintiffs' allegations and the documents upon which they purportedly rely, these allegations taken at face value are absolutely insufficient to establish an agency relationship for jurisdictional purposes. *See Spetner*, 495 F. Supp. 3d at 112 (defendant "may have expected, or even known for a fact, that [Arab Jordan Investment Bank] would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling"); *Berdeaux*, 2021 WL 4267693, at *12 n.25 ("Absent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York."); *Vasquez*, 477 F. Supp. 3d at 259 ("there is no evidence that [defendant] directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account"). Another nail in the coffin of Plaintiffs' agency theory is the Second Circuit law cited above that makes it quite clear that "an intermediary bank is [not] the legal agent" of a bank **customer** like Qatar Charity, *Asia Pulp and Paper*, 609 F.3d at 121. This is hardly surprising, since the governing caselaw states that a correspondent bank is not even the agent of the customer's bank itself (here, Masraf Al Rayan). *Spetner*, 495 F. Supp. 3d at 110 (citing *Aaron Ferer & Sons*, 731 F.2d at 122).

Plaintiffs' conspiracy theory is similarly unavailing. The overwhelming weight of authority holds that Section 302(a)(1) simply does not authorize conspiracy jurisdiction. *See, e.g., Smartmatic United States Corp. v. Fox Corp.*, 2022 WL685407, *26 (Sup. Ct. N.Y. Cty. Mar. 18, 2022) ("[t]he conspiracy theory of jurisdiction is not available under section 302(a)(1)");

*Berdeaux*, 2021 WL 4267693, at *10 (court could not "exercise jurisdiction over [defendant] under Section 302(a)(1) on a conspiracy theory based on the conduct of an alleged co-conspirator"); *Suber v. VVP Servs., LLC*, 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021) ("the conspiracy theory of jurisdiction is not available under section 302(a)(1)"); *E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co*., 2003 WL 22064259, at *9 (S.D.N.Y. Sept. 5, 2003) (same); *Levisohn, Lerner, Berger & Langsam v. Med. Taping Sys*., 10 F. Supp. 2d 334, 342 (S.D.N.Y. 1998) (same).

Plaintiffs argue Qatar Charity's cited authorities "did not survive *Schwab I*, *Schwab II* and *Berkshire Bank*, all of which attributed the in-forum acts of co-conspirators to each other." (Opp. Mem. at 78). Plaintiffs are wrong. Neither *Schwab I*, nor *Schwab II*, nor *Berkshire Bank* held or even implied that conspiracy jurisdiction is available ***under Section 302(a)(1)***. Not one of those cases had anything to do with that statutory basis and hence, unsurprisingly, do not stand remotely for the proposition for which Plaintiffs cite them. *See Schwab I*, 883 F.3d at 82 (the "statutory basis for personal jurisdiction [is] California state law"); *Schwab II*, 22 F.4th at 121 (omitting any reference to New York's long-arm statute and noting that "only the third [jurisdictional] requirement—compliance with due process—is contested here"); *Berkshire Bank*, 2022 WL 569819, at *3–4 (finding conspiracy jurisdiction applicable under Section 302(a)(2), which concerns torts physically committed in New York, without referencing Section 302(a)(1), which concerns business transactions).

Plaintiffs also cite two outlier opinions for the proposition that "Defendants err when they suggest that conspiracy principles are inapplicable to jurisdiction under § 302(a)(1)." (Opp. Mem. at 78). Both cases are unsupported and unpersuasive. In *Rich v. Fox News Network LLC,* a Report and Recommendation never ultimately adopted, the Magistrate Judge held that "personal jurisdiction over [defendant] based on Plaintiffs' conspiracy to commit IIED claim is proper under

Section 302(a)(1)." 2020 WL 6276026, at *6 (S.D.N.Y. Sept. 15, 2020). However, *Rich* does not cite any authority to support that proposition and cites *Schwab I* for the applicable standard. *Rich*, 2020 WL 6276026, at *6 (citing *Schwab I,* 883 F.3d at 87). That is erroneous because, as noted previously and as Judge Karas has explained, *Schwab I* "determined the personal jurisdiction of a federal court in California" and "California's long-arm statute is more capacious than New York's." *PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy,* 530 F. Supp. 3d 301, 325 n.9 (S.D.N.Y. 2021).

Plaintiffs' only other citation is similarly unavailing. In *Freeman*, the Court held that "under this long-arm statute . . . 'activities of a co-conspirator may... be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rational.'" *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 79 (E.D.N.Y. 2019) (quoting *In re N. Sea Brent Crude Oil Futures Litig.*, 2017 WL 2535731, at *9 (S.D.N.Y. Jun. 18, 2017)). But *Sea Brent*, the case quoted by *Freeman*, does not even mention Section 302(a)(1), and in fact held that New York's long-arm statute had no application to the case. 2017 WL 2535731, at *11 n.12. It is true that other provisions of New York's long-arm statute (inapplicable here, as discussed below) encompass conspiracy jurisdiction. But conspiracy jurisdiction "is not available under section 302(a)(1), which is applicable to business transactions and not torts." *Smartmatic*, 2022 WL685407, *26.

Hence, for the reasons discussed above, Qatar Charity is not subject to Section 302(a)(1) jurisdiction under a primary theory, an agency theory, or a conspiracy theory.

### 2. CPLR Section 302(a)(2) Does Not Apply

Qatar Charity is also not subject to personal jurisdiction under Section 302(a)(2). That provision stipulates that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . ***commits a tortious act within the state***." N.Y. C.P.L.R. 302(a)(2) (emphasis added). As we pointed out previously (MTD Mem. at 11), Section 302(a)(2)

"is read narrowly and requires physical commission of the tortious act in New York." *Clean Coal Techs. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 314 (S.D.N.Y. 2019); *see also Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999). Plaintiffs do not allege that any tortious conduct occurred in New York and neither Qatar Charity **nor any alleged co-conspirator** was ever physically present in the state. Thus, this potential theoretical basis for jurisdiction has nothing to do with this case. *See SK's Cosm. Boutique Inc. v. J.R. Silverberg Realty,* 2020 WL 3451324, at *4 (S.D.N.Y. Jun. 24, 2020) (no jurisdiction under Section 302(a)(2) where "the situs of the injury was" out of state). This case is instead analogous to *Bluewaters Communications Holdings*, where the plaintiffs alleged that defendants based in Mauritius and the British Virgin Islands bribed a German national with US dollars. *Bluewaters Commc'ns Holdings v. Ecclestone*, 122 A.D.3d 426, 427 (1st Dep't 2014). Plaintiffs argued that "because the payments were made in U.S. dollars, they must have gone through New York banks." *Id.* at 427. The Appellate Division held that jurisdiction was lacking because the defendants' "indirect use of the New York banking system" did not "constitute the commission of a tort within New York pursuant to N.Y. C.P.L.R. 302(a)(2)." *Id.* at 427. So too here, where Plaintiffs merely allege that Qatar Charity funds passed through New York on the way from one foreign Qatar Charity account to another. (Complaint ¶ 7).

Conspiracy jurisdiction under Section 302(a)(2) is similarly unavailing. The Second Circuit recently clarified that:

> To establish conspiracy-based personal jurisdiction pursuant to New York's long arm statute, a plaintiff must—after making a *prima facie* showing of a conspiracy—plausibly allege that: "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) **the co-conspirators acting in New York acted at the direction or under the control, or at the request of or on behalf of the out-of-state defendant**."

*Berkshire Bank*, 2022 WL 569819, at \*3 (quoting *Lawati v. Montague Morgan Slade Ltd*., 961 N.Y.S.2d 5, 7 (1st Dep't 2013)) (emphasis added). As Plaintiffs' own favorite case makes clear, the "third element can be established by, for example, a ***co-conspirator being 'aware of the torts being committed by . . . defendants in New York*.'"** *Berkshire Bank*, 2022 WL 569819, at \*3 (quoting *Lawati*, 961 N.Y.S.2d at 8) (emphasis added).

As discussed above, Plaintiffs have conceded that they cannot satisfy this third prong of *Berkshire Bank* and that the Court therefore cannot base an exercise of jurisdiction over Qatar Charity on this basis. The Complaint lacks any allegation that Qatar Charity requested Masraf Al Rayan to utilize a correspondent bank in New York. The Complaint does not plausibly allege that Qatar Charity was even ***aware of*** Masraf Al Rayan's correspondent account, and Plaintiffs have now conceded as much. (*See* Opp. Mem. at 67–68, 70–71). Plaintiffs merely allege that "Masraf Al Rayan" transferred Qatar Charity "funds denominated in U.S. dollars through a correspondent bank in New York." (Complaint ¶ 7). That is, under governing law, clearly, insufficient to plead the third prong of conspiracy jurisdiction. *See, e.g., Berdeaux*, 2021 WL 4267693, at \*15 n.28 (citation omitted) ("Plaintiffs' allegations fall woefully short, as they do not plead facts demonstrating that [the foreign defendants] had any knowledge of the New York acts of any alleged co-conspirators."); *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 295 (S.D.N.Y. 2019) ("[t]he Complaint does not specifically allege that [the foreign defendants] engaged in suit-related conduct aimed at or taking place in New York" or "connect these defendants' participation in the conspiracy to New York in some other way—for example, by alleging facts to show that they were aware of their co-conspirators' in-forum overt acts").

Plaintiffs' conspiracy theory also fails because, as noted above, the Complaint lacks any allegations at all of in-forum acts undertaken by a co-conspirator. Plaintiffs argue that the physical

presence requirement "is satisfied here even though Masraf's agent did not participate in Defendants' conspiracy because the correspondent bank acted on Masraf's behalf and pursuant to its instructions." (Opp. Mem. at 80). Plaintiffs' arguments are unavailing because Section 302(a)(2) conspiracy jurisdiction concerns the physical presence in New York of an alleged co-conspirator. *Berkshire Bank*, 2022 WL 569819, at *4 (plaintiffs "sufficiently alleged that certain co-conspirators acted as agents of their co-conspirators in New York"); *Lawati*, 102 A.D.3d at 428 (conspirator "predominantly existed in New York and committed the torts underpinning the conspiracy there"). Here, the acts (if any) undertaken in New York by Masraf Al Rayan's supposed correspondent bank—which is concededly *not* a co-conspirator—are insufficient to establish personal jurisdiction over Qatar Charity. Again, Plaintiffs have hobbled this theory through their own concessions, including that the supposed (and unnamed) correspondent bank was *not* a co-conspirator. (*See* Opp. Mem. at 80 ("Masraf's [New York correspondent bank] did not participate in Defendants' conspiracy")).

## II. PLAINTIFFS FAIL TO STATE ANY CLAIM FOR RELIEF

### A. Counts III and IV Must Be Dismissed As Plaintiffs Fail to Plead a Primary Liability Claim

To survive dismissal, Plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This requires that Plaintiffs put forth well-pleaded allegations that state a plausible claim for relief, rather than simply "tendering naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quotation marks and citation omitted).

In their Opposition, Plaintiffs double-down on their speculative and conclusory allegations in an attempt to distract from the Complaint's principal defect: it fails to connect the conduct of

any defendant to any FTO aside from the wholly unsupported, implausible allegations of a terrorist-financing conspiracy. At no point do Plaintiffs allege—because they cannot—that Qatar Charity itself or any of its employees were involved in the Attacks. Instead, Plaintiffs' theory of primary liability rests entirely on the Defendants' purported provision of financial aid to almost entirely unnamed charitable organizations alleged to be, without any specificity, "fronts" for Hamas and PIJ. Aside from wholly implausible inferences about the Charity's connection to unnamed entities, there is nothing that plausibly connects Qatar Charity's conduct to Hamas or PIJ, much less to the Attacks at issue here.

Plaintiffs, in opposing the Defendants' motions to dismiss, now assert for the first time that Qatar Charity is *itself* an FTO-affiliated front for Hamas and PIJ. (*See* Opp. Mem. at 3). A theory so plainly baseless—that the United States would choose to partner with a terrorist front and praise it as "one of the best organizations in the world"—is the sort of fantasy that the Second Circuit has held is insufficient to plead a plausible claim for relief. *See, e.g.*, *Gallop v. Cheney*, 642 F.3d 364 (2d Cir. 2011) (quoting *Denton v. Hernandez,* 504 U.S. 25, 32–33 (1992)) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic,' or 'delusional.'")).

### i. Plaintiffs Fail to Plead that Qatar Charity Committed Any Act of International Terrorism

This Court has more than adequate grounds to reject the characterization of Qatar Charity as a "front organization"—a "factually frivolous" claim that is "clearly baseless." In fact, the Plaintiffs' core allegations against Qatar Charity—that it is a notorious supporter of terrorism that has been designated as such by the United States (Complaint ¶¶ 66–85)—are demonstrably false when the public record available to the Court—including the absence of any U.S. designation—is considered. And the documents of which Qatar Charity has asked this Court to take judicial notice

are plainly susceptible of such notice. Nor are these documents hearsay, as Qatar Charity has not asked this Court to recognize them for their truth, but rather for the fact that the statements were made (by, among others, the President of the United States, the Secretary of State and other senior diplomats, ranking U.N. officials, and Bill Gates; MTD Mem. at 2-7, 21-22) *or,* in the case of Qatar Charity's Annual Reports and the Israeli "confessions" attached of former Qatar Charity employees, because these documents were explicitly incorporated into the Complaint by Plaintiffs' counsel (MTD Mem. at 20-24; Complaint ¶ 135). *See Chambers v. Time Warner Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.") (citation omitted).

Here, the Court has a wealth of material before it from which it may evaluate the implausibility of Plaintiffs' allegations—all material cited by the Plaintiffs themselves for the false proposition that Qatar Charity financed Hamas and the PIJ. Relying on the Charity's Annual Reports, for instance, Plaintiffs allege that from 2013 through 2015 Qatar Charity "carried out joint projects" with "various Hamas and PIJ fronts." (Complaint ¶ 135). But the reports say nothing of the sort. They make no mention of Hamas or PIJ. Nor is there any reference in any of the reports to violence or terrorism. What the Annual Reports instead reflect, as discussed in Qatar Charity's moving papers (*see* MTD Mem. at 20–24), is abundant reference to the Charity's good works.

At least one of the "confessions" upon which Plaintiffs rely throughout their Opposition Brief are similarly replete with evidence of the Charity's good works. Far from establishing that Qatar Charity's former employees were involved in secretive and nefarious schemes to fund Hamas, at least one confession instead reflect that, consistent with the Annual Reports and the

statements of the U.S. government, the Charity focuses on "support[ing] needy families [and] orphans," providing "Ramadan holiday meals to needy families," and "small projects like raising sheep" (Reply Ex. 1 at 2:58, 2:60, and 2:59; the Charity's purposes are "humanitarian only," including aid "to all people regardless of religion or race" (Reply Ex. 4 at 5:41). The "confessions" attached hereto make no mention of Hamas or PIJ, no mention of "front organizations," and no mention of dollar transfers through New York.

In the absence of any plausible allegations—that Qatar Charity financed FTOs, any conclusory claim Qatar Charity *itself* committed an act of "international terrorism" is absurd. *See, e.g.*, *Stansell v. BGP, Inc.*, 2011 WL 1296881, *9 (M.D. Fla. Mar. 30, 2011) (corporate defendant's payment of funds directly to a U.S.-designated FTO in connection with its oil exploration business "would not lead an objective observer to conclude Defendants intended to achieve any one of the results listed in § 2331(1)(B)"). Primary liability claims impose liability only on direct perpetrators of acts of international terrorism and require a showing that a given defendant's own actions "involve[d] violence or endanger[ed] human life" and were intended to intimidate or coerce or the requisite state of mind. *Linde*, 882 F.3d at 326, 332.

### ii. Plaintiffs Fail to Plausibly Allege That Qatar Charity Proximately Caused the Attacks

The primary liability claims similarly fail because Plaintiffs have not plausibly alleged that Qatar Charity proximately caused their injuries. Establishing proximate cause requires the plaintiff to "plausibly allege that the defendant's actions were a 'substantial factor in the sequence of responsible causation' leading to the plaintiff's injury and that the plaintiff's injuries were 'reasonably foreseeable' or 'anticipated as a natural consequence' of those actions." *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 84 (E.D.N.Y. 2019) (citing *Rothstein*, 708 F.3d at 91). (Opp. Mem. at 48 (citing *Miller v. Arab Bank, PLC*, 372 F.Supp.3d 33, 46 (E.D.N.Y. 2019))).

35

Where, as here, alleged "terror funding" is the predicate, Plaintiffs must "meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by" the defendant and "the terrorist attacks . . . that injured plaintiffs." *In re Terrorist Attacks*, 714 F.3d 118, at 124–25 (2nd Cir. 2013); *accord Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156, 1178–79 (N.D. Cal. 2018). Alleging, as Plaintiffs do, that a defendant enhanced an FTO's abilities is insufficient to state a claim. *See Fields v. Twitter, Inc.*, 881 F.3d 739, 749–50 (9th Cir. 2018); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 522 (E.D.N.Y. 2012).

Plaintiffs have failed to articulate any connection whatsoever between Qatar Charity and the Attacks other than threadbare and conclusory allegations that such a connection exists. This forecloses any possible finding of proximate cause. *See, e.g.*, *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 276 (D.C. Cir. 2018) (allegations that the funds were transmitted "directly to al Qaeda [and used] to carry out the embassy bombings" were "conclusory allegations that do not meet *Twombly*'s plausibility standard") (citing *Rothstein*, 708 F.3d at 97); *see also Siegel v. HSBC North America Holdings*, 933 F.3d 217, 225 (2d Cir. 2019); *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118 (2d Cir. 2013) (allegations that defendants provided funding to purported charity organizations known to support terrorism, which, in turn, provided funding to terrorist organizations, and that defendants knowingly and intentionally provided banking services for front charities, were insufficient to make requisite showing of proximate cause where there were no allegations that defendants participated in attacks, provided money directly to the organization that carried out attacks, or that money donated actually was transferred to the organization and aided in the attacks); *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 356–57 (E.D.N.Y. 2019), *aff'd,* 825 F. App'x 55 (2d Cir. 2020) (no direct relationship between subsidiaries of foreign investment bank's money laundering for cartels and the acts of violence perpetrated against them,

for purposes of proximate cause where victims did not allege that the cartels required laundered money to carry out specific acts of violence); *see also Rothstein*, 708 F.3d at 91–92.

## B. Counts I and II Must Be Dismissed For Failure to Plausibly Plead a Secondary Liability Claim

### i. Plaintiffs Have not Plausibly Alleged a JASTA Conspiracy Claim

As stated in Qatar Charity's Motion to Dismiss, Plaintiffs have not plausibly alleged a conspiracy claim under JASTA, as they failed to allege facts required to meet the elements of such a claim, namely: "(1) an agreement between two or more persons; (2) to participate in an [act of international terrorism]; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; [and] (4) which overt act was done pursuant to and in furtherance of the common scheme." *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446 at *9, (S.D.N.Y. March 28, 2019) (quotations and citation omitted).[18]

Plaintiffs cannot even clear the first hurdle—an agreement. In support of its claim that it has adequately pled an agreement, Plaintiffs' Opposition claims the Complaint alleges an "agreement among the government of Qatar, the Qatari Royal Family, the FTOs, and the Defendants to finance the FTOs' operations." (Opp. Mem. at 38). Putting aside that the paragraphs in the Complaint that it cites for that proposition ***do not*** actually make that claim,[19] and the fact that Qatar and the Qatari Royal Family, of course, cannot be subjects of this lawsuit as they are

---

[18] Plaintiffs claim as to "Defendants" waiver of arguments as to the elements of conspiracy (Opp. Mem. at 37 n.22) clearly does not apply to Qatar Charity, which stated in its Motion to Dismiss in plain language that a conspiracy requires the four elements, set out once again above, and that the "Complaint does not clear any of these hurdles." (MTD Mem. at 28-29).

[19] One cited paragraph, for instance, discusses a comment made by a Treasury Under Secretary regarding the Elehssan Society, Complaint ¶ 137, and the other simply states in a conclusory fashion that "Hamas and PIJ knowingly, willfully . . . conspired, confederated and agreed with Defendants to commit numerous acts of international terrorism…including acts or murder." (Complaint ¶ 111).

immune from such litigation by the Foreign Sovereign Immunities Act,[20] Plaintiffs fail to plausibly support this conclusory allegation. Such a failure is fatal.

Plaintiffs argue that they need not show a conspiracy between **all** parties. (Opp. Mem. at 41). However, this claim is entirely beside the point because they have failed to show a conspiracy between any parties—and in particular, they have failed to show a conspiracy with the alleged principals—i.e., Hamas and PIJ—which is necessary to plead a conspiracy. *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2nd Cir. 2021) ("JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspir[ed] with' the principal."). In an apparent attempt to remedy this failure, Plaintiffs spend much of their Opposition discussing the Union of Good. (Opp. Mem. at 10, 16, 25).

However, as discussed previously, *see supra* Section I, Plaintiffs' allegation that Qatar Charity was a member of the Union of Good at the time of the Attacks, and remains a member today, is demonstrably false. Moreover, it is Hamas and PIJ—not the Union of Good—who are alleged to be responsible for the Attacks. And notably, the Union of Good is an SDGT not an FTO, and therefore does not qualify as a terrorist organization for purposes of § 2339B of the ATA. *See, e.g.*, *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 209 n.7 (2d Cir. 2014) ("OFAC's SDGT designation is distinct from the State Department's FTO designation. While an organization designated as an FTO by the State Department is a terrorist organization for the purposes of § 2339B, that is not true for organizations designated as SDGT by OFAC."); *see also supra* n.6.

### ii. Plaintiffs Have Not Plausibly Alleged a JASTA Aiding-And-Abetting

---

[20] *See* 28 U.S.C. § 1603 (which defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state"); *see also, e.g.*, *Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F.Supp.2d 277 (S.D.N.Y. 2001) (dismissing action against Queen of Jordan, a head of state, at instance of Executive Branch that she is immune from suit in the United States and finding department within royal court was a foreign state under meaning of FSIA).

**Claim**

Plaintiffs have also failed to plausibly allege that Qatar Charity was "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] the assistance" or that it "knowingly and substantially assist[ed] the principal violation" as required to allege a JASTA aiding-and-abetting claim. *Linde*, 882 F.3d at 329 (quoting *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983)).

To demonstrate general awareness, Plaintiffs must show that the defendant not only **knew** of the principal's involvement in committing acts of "international terrorism," but also that the defendant and the principal were "one in spirit." *Halberstam*, 705 F.2d at 484; *Linde I*, 882 F.3d at 329 n.10. Plaintiffs have made no plausible allegations demonstrating that Qatar Charity had knowledge of Hamas and PIJ's involvement in the Attacks—much less that those organizations and Qatar Charity were "one in spirit." At best, Plaintiffs make conclusory statements about knowledge and intent. (*See, e.g.*, Complaint ¶ 363). This is simply not enough. The Second Circuit made clear in *Kaplan* that "plaintiffs are **required** to include allegations of the facts or events they claim give rise to an inference of knowledge" in order to plead knowing-substantial assistance. 999 F.3d at 864 (emphasis added). Plaintiffs have failed to do so.

In their Opposition, Plaintiffs take great care to point out various claims they have put forth regarding Hamas and PIJ's alleged public proclamations of responsibility for the Attacks. (Opp. Mem. at 20). Even assuming the FTOs publicly claimed responsibility (whether or not such a claim was indeed true) for each attack as Plaintiffs allege, *Honickman* holds that while Plaintiffs are not required to allege that Qatar Charity knew of the public sources at the pleading stage, they must nonetheless show that the Defendant "had the requisite general awareness at the [relevant] time" of its alleged actions. *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021) (citations omitted). They have not done so here.

Plaintiffs also fail to plausibly allege that Qatar Charity "knowingly and substantially assist[ed] the principal violation." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 487). Such a failure is grounds for dismissal. *Siegel*, 933 F.3d at 225. The *Halberstam* framework, of course, provides six factors for determining "how much encouragement or assistance is substantial enough." 705 F.2d at 487. Although Plaintiffs walk through the six factors in their Opposition, their allegations are largely silent as to Qatar Charity. (Opp. Mem. at 31-37).

Nevertheless, the limited claims made as to Qatar Charity are unavailing and duplicative of the nonsensical argument relied upon throughout, including that "Qatar Charity knew it was a member of the Union of Good" which, somehow, shows Defendant's state of mind. (Opp. Mem. at 35). If anything, Qatar Charity's decisive move to sever any association with the Union of Good immediately following its designation, *see supra* Section I shows Qatar Charity's clear intention not to be affiliated with that entity. Indeed, the situation is analogous to *Honickman* where the Union of Good itself was a customer of the bank defendant, and even though Israel "designated" it in 2002, *Honickman*, 6 F.4th at 493 n.6, 50, the Second Circuit held liability did not attach because "Plaintiffs failed to plausibly allege BLOM Bank was aware [its] [c]ustomers were related to Hamas." *Honickman*, 6 F.4th at 493, 502. Here, Qatar Charity took decisive action upon public information coming to light.

### III. PLAINTIFFS FAILED TO PROPERLY EFFECT SERVICE OF PROCESS & A REQUEST TO SERVE BY EMAIL DOES NOT CURE THE FAILURE

Qatar Charity adopts and incorporates by reference the arguments made in response to Plaintiffs' February 17, 2022, letter (ECF No. 60), in which it sought leave to exercise service via email. (*See* Qatar Charity's February 22, 2022 letter (ECF No. 63)). Those included, of course, that there remain concerns regarding exercise of sovereign power in the territory of another without their consent. *AG of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 111 n.6 (2d Cir. 2001).

### IV. CLAIMS AS TO FOREIGN PLAINTIFFS CONTINUE TO DEMONSTRATE THE PLAINTIFFS LACK STANDING TO BRING PERSONAL INJURY CLAIMS UNDER THE ATA

Qatar Charity adopts arguments set forth in Section V of Masraf Al Rayan's Reply regarding certain Plaintiffs lack of statutory standing under the ATA and JASTA. Specifically, four Plaintiffs lack statutory standing as non-U.S. citizens and thirteen Plaintiffs lack statutory standing because non-immediate family members are precluded from obtaining solatium damages.

### V. THIS COURT'S ORDER REGARDING JURISDICTIONAL DISCOVERY SHOULD STAND AND ANY RECONSIDERATION SHOULD FOLLOW A FULL BRIEFING

This Court has twice rejected Plaintiffs' requests for jurisdictional discovery, and the Court's prior decisions should stand. Plaintiffs first raised the issue during the Pre-Motion Conference on January 28, 2022. (Tr. at 31:23–32:9). Second, following a subsequent request for jurisdictional discovery made via letter by Plaintiffs on February 17, 2022 (ECF No. 60), this Court stated in a Docket Order issued March 3, 2022, "Jurisdictional discovery is not necessary at this time."

Plaintiffs now make yet another request for jurisdictional discovery. (*See* Opp. Mem. At 81-83). This request should be rejected for the reasons it previously has been. Those include, as articulated in Qatar Charity's letter on the subject on February 22, 2022 (ECF No. 63), arguing that jurisdictional discovery is improper where, as here, Plaintiffs have not made a "'sufficient start' toward establishing jurisdiction" and instead have alleged the kind of "'conclusory non-fact specific jurisdictional allegations' the Second Circuit" has found do not "require jurisdictional discovery." *Alexander v. Porter*, 2014 WL 7391683, at *6 (E.D.N.Y. Dec. 29, 2014) (citation omitted). Indeed, a plaintiff is not entitled to "jurisdictional discovery to enable her to bolster an inadequate pleading." *Langenberg v. Sofair*, 2006 WL 2628348, at *6 (S.D.N.Y. Sept. 11, 2006) (quotations and citation omitted).

As detailed in Qatar Charity's Motion to Dismiss and above, Plaintiffs have failed to allege any *prima facie* basis for establishing personal jurisdiction over Qatar Charity—which, as alleged in the Complaint, has no contacts in New York and never directed anyone, at any time, to take any action in New York. (ECF No. 58 at 8–18). Instead, it is merely alleging that Qatar Charity was a bank customer seeking to transfer funds from one foreign location to another through its bank, Masraf Al Rayan, without regard for the particular mechanism by which these transfers were accomplished, which is "insufficient under New York law" for establishing personal jurisdiction. *Berdeaux v. OneCoin Ltd*., 2021 WL 4267693, at *12. Where Plaintiffs rely on a plainly insufficient legal theory of jurisdiction (as Plaintiffs here plainly do, as argued above) to permit jurisdictional discovery—such a request must be dismissed.

Furthermore, even the information Plaintiffs seek through jurisdictional discovery shows the futility of such an exercise. For example, Plaintiffs state that "facts concerning matters such as…whether Qatar and its Royal Family control Defendants unquestionably bear on the

jurisdiction." (Opp. Mem. at 82). However, the Qatari government has immunity from this litigation under the Foreign Sovereign Immunities Act, and absent an articulation of a "basis for the court to first assume jurisdiction" over the sovereign—which has not been made here—courts regularly deny such jurisdictional discovery. *See Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 207 (2d Cir. 2016) (affirming district court's denial of request for jurisdictional discovery). Furthermore, if it is Plaintiffs' hope to embark on a fishing expedition to show that, as it alleges, "at all times relevant to this complaint" Qatar Charity was "directed, owned, or controlled by the Qatari royal family" (Complaint ¶ 155), such a finding would only serve to underscore FSIA protections because frequently an entity which is controlled or owned by a State is entitled to FSIA protection as well, as an "agent[] or instrumentality."[21]

For all of these reasons and more, Plaintiffs' third request for jurisdictional discovery should be rejected as they have presented no new arguments which have any bearing on this Court's prior decisions.

In the event Qatar Charity's Motion to Dismiss is not granted with prejudice, and Plaintiffs at that time file a Motion for Jurisdictional Discovery in a manner consistent with this Court's Rules, Qatar Charity will, and reserves the right to, raise all further available objections in a full briefing on the matter.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.


Dated: April 13, 2022                     Respectfully submitted,
     New York, New York

                                     **DLA PIPER LLP (US)**
                                     By:    */s/ John Hillebrecht*

---

[21] Defined as "a separate legal person, corporate or otherwise…which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership is owned by a foreign state or political subdivision thereof" which is not a US citizen or created under the laws of any third country. *See* 28 U.S.C. § 1603.

John M. Hillebrecht
Kevin Walsh
Jessica Masella


1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 335-4500
Email: John.Hillebrecht@us.dlapiper.com
　　　Kevin.Walsh@us.dlapiper.com
　　　Jessica.Masella@us.dlapiper.com

*Counsel for Defendant Qatar Charity*