**20-3849-cv**
*Spetner v. PIB*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2021

ARGUED: FEBRUARY 25, 2022
DECIDED: JUNE 16, 2023

No. 20-3849-cv

Temima Spetner, Jason Kirschenbaum, Isabelle Kirschenbaum,
individually and for the Estate of Martin Kirschenbaum, Joshua
Kirschenbaum, Shoshana Burgett, David Kirschenbaum, Danielle
Teitelbaum, Netanel Miller, Chaya Miller, Aharon Miller, Shani
Miller, Adiya Miller, Altea Steinherz, Jonathan Steinherz, Temima
Steinherz, Joseph Ginzberg, Peter Steinherz, Laurel Steinherz,
Jacqueline Chambers, individually and as the Administrator of the
Estate of Esther Bablar, Levana Cohen, individually and as the
Administrator of the Estate of Esther Bablar, Eli Cohen, Sarah
Elyakim, Joseph Cohen, Greta Geller, as the Administrator of the
Estate of Greta Geller, Ilana Dorfman, as the Administrator of the
Estate of Greta Geller, Rephael Kitsis, as the Administrator of the
Estate of Greta Geller, Tova Guttman, as the Administrator of the
Estate of Greta Geller, Gila Aluf, Shabtai Shatsky, individually and
for the Estate of Keren Shatsky, Joanne Shatsky, individually and for
the Estate of Keren Shatsky, Tzippora Shatsky Schwarz, Yosef
Shatsky, Sara Shatsky Tzimmerman, Miriam Shatsky, David
Shatsky, Hillel Trattner, Ronit Trattner, Aron Trattner, Shelley
Trattner, Hadassah Diner, Efrat Fine, Yael Hillman, Chana Friedman
Edri, Bella Friedman, Reuven Friedman, Yehiel Friedman, Zvi
Friedman, Ilan Friedman, Miriam Friedman Schreiber, Steven Braun,

Chaviva Braun, Yehuda Braun, Yoni Braun, Eliana Braun Peretz,
Oriella Braun, Matanya Braun, Ginette Thaler, individually and for
the Estate of Rachel Thaler, Leor Thaler, Michael Thaler, Zvi Thaler,
Isaac Thaler, Miriam Ben-Yishai, individually and for the Estate of
Shoshana Ben-Yishai, Yitzhak Ben-Yishai, individually and for the
Estate of Shoshana Ben-Yishai, Jacob Ben-Yishai, Israel Ben-Yishai,
Aviel Ben-Yishai, Chana Ben-Yishai, Yael Ben-Yishai, Myriam
Miller, Chana Aidel Miller Schertzman, Tova Miller, Ilana
Schertzman Cohen, Leslie Schertzman, Donald Schertzman, Daniel
Schertzman, Arielle Schertzman Fisher, Abraham Schertzman,
Yehuda Schertzman, Charles O. Morgan, Jr., for the Estate of Gloria
Kushner, Leonard Mandelkorn, Ezra Kessler, Hannah Kessler
Rosenstein, Klila Kessler, Yitzhak Zahavy, Julie Zahavy, Tzvee
Zahavy, Bernice Zahavy, Mark Sokolow, Rena Sokolow, Jamie
Sokolow Fenster, Lauren Sokolow Mandelstam, Elana Sokolow
Rosman, Alan Bauer, Yehonaton Bauer, Revital Bauer, Binyamin
Bauer, Daniel Bauer, Yehuda Bauer, Ludwig Bauer, individually and
for the Estate of Ella Bauer, Phillip Bauer, Shoshana Zelcer
Weitzman, Shmuel Waldman, Henna Novack, Morris Waldman,
Eva Waldman, Chanie Bodenstein, Shaindy Weinberger, Philip
Waldman, Abraham Waldman, Dassie Waldman Davis, Leslye
Knox, individually and for the Estate of Aharon Ellis, Jordan Ellis,
Mello Nee Ellis, individually and for the Estate of Prince Elkannann
Ben Shaleak, Ametai Carter, Reuven Carter, Shaanon Carter,
Shayrah Carter, Yoshahvyah Carter, Francine Ellis, Lynne Ellis,
Shemariyah Ellis, Tsaphrerah Ellis, Yihonadov Ellis,
*Plaintiffs-Appellants*,

Arie Miller,
*Plaintiff*,

*v.*

Palestine Investment Bank,
*Defendant-Appellee*.

————

Appeal from the United States District Court
for the Eastern District of New York.

————

Before: WALKER, MENASHI, and LEE, *Circuit Judges*.

————

Plaintiffs-Appellants are American victims, and the relatives and estates of victims, of terrorist attacks in Israel between 2001 and 2003.  Plaintiffs allege that Palestine Investment Bank (PIB) facilitated the attacks by knowingly providing financial services to the terrorist organizations that allegedly perpetrated them, in violation of the Anti-Terrorism Act, 18 U.S.C. § 2213-39D.   The district court dismissed the case on the ground that it lacked personal jurisdiction over PIB.  For the reasons that follow, we VACATE the district court's decision and REMAND for proceedings consistent with this opinion.

————

MICHAEL RADINE (Gary M. Osen, Ari Ungar, Aaron A. Schlanger, *on the brief*), Osen LLC, Hackensack, NJ, *for Plaintiffs-Appellants*.

MITCHELL R. BERGER (Gassan A. Baloul, *on the brief*), Squire Patton Boggs, New York, NY and Washington, DC, *for Defendant-Appellee*.

Gregory P. Hansel, Preti, Flaherty, Beliveau & Pachios, Chartered LLP, Portland, ME, *for amici curiae Former United States Government Officials*.

Douglass A. Mitchell, Jenner & Block LLP, Washington, DC; Mordechai Biser, Abba Cohen, Agudath Israel of America; Nathan J. Diament, Union of Orthodox Jewish Congregations of America; Jonathan L. Sherman, One Israel Fund, Ltd., *for amici curiae Agudath Israel of America, Union of Orthodox Jewish Congregations of America, and One Israel Fund, Ltd.*; Jonathan M. Rotter, Glancy Prongay & Murray LLP, Los Angeles, CA, *for amicus curiae StandWithUs*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiffs-Appellants are American victims, and the relatives and estates of victims, of terrorist attacks in Israel between 2001 and 2003. Plaintiffs allege that Palestine Investment Bank (PIB) facilitated the attacks by knowingly providing financial services to the terrorist organizations that allegedly perpetrated them, in violation of the Anti-Terrorism Act, 18 U.S.C. § 2213-39D. The district court dismissed the case on the ground that it lacked personal jurisdiction over PIB. For the reasons that follow, we VACATE the district court's decision and REMAND for proceedings consistent with this opinion.

## BACKGROUND

The following facts are taken from plaintiffs' complaint and declaration to the extent "they are uncontroverted by [PIB's]

affidavits."[1]  Plaintiffs' claims arise from thirteen attacks allegedly committed by Hamas and terrorists supported by the Arab Liberation Front (ALF) during the "Second Intifada."[2]

PIB is a commercial bank headquartered in the Palestinian Territories.  During the relevant period, PIB maintained a U.S. dollar-denominated checking account for the head of the ALF, a Palestinian proxy for Saddam Hussein's regime in Iraq.  Plaintiffs allege that Saddam Hussein's government transferred so-called incentive payments to ALF's account at PIB to support and reward terrorist activities.  Plaintiffs estimate that the Iraqi government transferred to ALF between $9.5 million and $35 million, which was ultimately disbursed to families of deceased terrorists, primarily through PIB-issued checks.

PIB also maintained an account for Hamas's U.S.-based fundraising arm, the Holy Land Foundation (HLF).  HLF wired dollars from accounts in the United States to its account with PIB in the Palestinian Territories, which was then used to finance Hamas's operations.  The United States designated Hamas as a Foreign

---

[1] *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012).

[2] The "Second Intifada" refers to "a period of intensified violence by Palestinian terrorist groups in the aftermath of failed peace negotiations between Israel and the Palestinian Authority in September 2000."  *Linde v. Arab Bank, PLC*, 882 F.3d 314, 319 (2d Cir. 2018).  Although the Second Intifada lasted until 2005, plaintiffs narrow the "relevant period" for their claims to attacks committed between September 2001 and March 2003.

Terrorist Organization in 1997 and HLF as a Specially Designated Global Terrorist in December 2001.[3]

During the relevant period, PIB had no offices, branches, or employees in New York.  A foreign bank that lacks a physical presence in the United States, such as PIB, cannot directly access U.S.-based payment systems that allow financial institutions to electronically transfer dollar-denominated funds.  But it can move funds to and from the United States by using a correspondent banking account, which is an account in a domestic bank that is held in the foreign bank's name.[4]  PIB did not hold a correspondent banking account in its *own* name with any bank in the United States.  To process dollar-denominated transfers, PIB instead used a correspondent account with the Amman-branch of Arab Jordan Investment Bank (AJIB).  AJIB, in turn, held correspondent banking accounts at three banks in New York—Citibank, Chase Manhattan, and Bank of New York Mellon.  This practice, sometimes referred to as "nested" correspondent banking, afforded PIB indirect access to New York's financial system and dollar-based transfer services.

AJIB's  New York correspondent accounts were the only means it used to process dollar-based transactions.  AJIB advertised its correspondent account relationships in trade publications such as the

---

[3] While the United States did not formally designate HLF as a Special Designated Global Terrorist until December 2001, coverage from the New York Times in 1996 detailed HLF's role as a "key fundraising operation" for Hamas, and the Israeli government declared in 1997 that HLF routinely transferred funds on behalf of Hamas.  Joint App'x 186.

[4] *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 n.3 (2d Cir. 2013) ("*Licci IV*") (analogizing a correspondent bank account to "a personal checking account used for deposits, payments and transfers of funds" (internal quotation marks omitted)).

Bankers' Almanac, which listed only the three New York accounts as having dollar-processing capabilities. Because of these public disclosures, PIB knew that the wire transfers had to route through New York. While there are alternatives to processing transactions through New York, PIB did not seek them out, nor did PIB refuse transfers from AJIB despite knowing that they would be routed through New York.

PIB used nested correspondent accounts to funnel dollar-denominated payments from Iraq's government to ALF. From an originating bank, Iraqi funds were sent to AJIB's correspondent account in New York. Once the funds reached AJIB's account, AJIB notified PIB that a transfer was made for the benefit of a PIB account holder, which, in this case, was the head of the ALF. Drawing on these cash infusions from Iraq, the head of the ALF then issued dollar-denominated incentive payment checks from his PIB account to the families of terrorists, including the word "martyr" in the memo line of some checks.

Except for checks issued to ultimate recipients who were also PIB accountholders (which were cleared internally on PIB's books), the incentive payment checks were cleared and settled in New York before reaching their ultimate recipients' accounts at other banks.[5]

PIB also repeatedly processed payments for HLF. Plaintiffs allege that PIB directed HLF to use AJIB's New York correspondent accounts when transferring funds between HLF's account in the United States and its account with PIB in the Palestinian Territories.

_____

[5] "Clearing" refers to transmitting and reconciling transactions between or among parties; "settling" is the actual transfer of funds between the sending and receiving financial institutions. Joint App'x 217–18.

Plaintiffs point to at least one transfer from August 2001, in which HLF wired funds from its account in Texas with instructions that the transfer route through AJIB's correspondent account with Chase Manhattan in New York. Because PIB did not advertise its correspondent accounts at the time, plaintiffs suggest that the only way HLF could have known to send its funds to that correspondent account in New York was if PIB had selected the specific account and instructed HLF to use it.

PIB moved to dismiss the complaint on the ground that its connections with New York were too attenuated to subject it to personal jurisdiction. The district court held oral argument on the motion but did not conduct an evidentiary hearing. It granted PIB's motion, ruling that New York's long-arm statute, Civil Practice Law and Rule (C.P.L.R.) § 302, did not authorize jurisdiction over PIB. The district court reasoned that the New York correspondent accounts at issue were not held in PIB's name and that AJIB was not PIB's agent for purposes of § 302. The district court did not reach whether jurisdiction was consistent with the Due Process Clause of the Constitution or whether, as PIB argued, plaintiffs failed to state a claim. Plaintiffs timely appealed.

## DISCUSSION

This appeal requires us to answer a single question: whether the district court has personal jurisdiction over PIB. Federal Rule of Civil Procedure 4(k)(1)(A) permits a federal court to exercise personal jurisdiction over a defendant to the extent allowed by the law of the state in which it sits. If New York's long-arm statute authorizes

jurisdiction, we then consider whether jurisdiction comports with constitutional due process principles.[6]

We review a district court's decision on the question of personal jurisdiction "for clear error on factual holdings and *de novo* on legal conclusions."[7] "[W]hether an agency relationship exists is a mixed question of law and fact."[8] Where, as here, the district court did not conduct a "full-blown evidentiary hearing," relying instead on pleadings and affidavits, the plaintiff need only make a prima facie showing that jurisdiction exists.[9]

## I.    Jurisdiction Under New York's Long-Arm Statute

C.P.L.R. § 302(a)(1) authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of "transact[ing] any business within the state," whether in person or through an agent.[10] Transacting business in this context means "purposeful activity—some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus

---

[6] *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). PIB does not challenge plaintiffs' service of process, which is also required for personal jurisdiction. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016).

[7] *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 36 (2d Cir. 2001).

[8] *Id.*

[9] *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (per curiam).

[10] C.P.L.R. § 302(a)(1) ("[A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state or contracts anywhere to supply goods or services in the state.").

invoking the benefits and protections of its laws."[11]  A defendant may be subject to personal jurisdiction even if it "never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."[12]

## A.    Transacting Business in New York

Both our court and the New York Court of Appeals have on several occasions addressed whether the use of a correspondent bank account involves transacting business and therefore can support the exercise of jurisdiction over a non-domiciliary bank.  The most notable of these precedents is the *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* line of cases.[13]  *Licci* supplies two relevant principles.  First, the existence of a correspondent account in New York, without more, does not subject a defendant foreign bank to long-arm jurisdiction.[14]  But, second, a defendant foreign bank's "repeated *use* of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'"—*can* constitute transacting business for purposes

---

[11] *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (internal quotation marks omitted).

[12] *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (internal quotation marks omitted).

[13] *See generally Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50 (2d Cir. 2012) ("*Licci II*"); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327 (2012) ("*Licci III*"); *Licci IV*, 732 F.3d 161; *see also Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316 (2016); *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391 (1976).

[14] *Licci III*, 20 N.Y.3d at 337–38; *Amigo Foods*, 39 N.Y.2d at 396.

of § 302(a)(1), even if the defendant has no other contacts with the forum.[15]

Because the touchstone for jurisdiction under New York's long-arm statute is the intent to reach the forum, jurisdiction cannot be based on conduct in the forum that is extraneous or coincidental. As the New York Court of Appeals recently clarified, "[i]t is precisely the fact that defendants chose New York, when other jurisdictions were available, that makes the New York connection 'volitional' and not 'coincidental.'"[16] We were satisfied in *Licci* that the foreign bank's recurrent transfers to a New York correspondent account indicated "a lack of coincidence" and a desire to benefit from New York's "dependable and transparent banking system."[17]

While the foreign bank in *Licci* executed the challenged transactions through a correspondent account that it had opened in New York, our decision did not cabin jurisdiction to only the *owner* of the correspondent account. This case asks us to consider whether jurisdiction can be based on a foreign bank's use of a correspondent account that it does not own. As we explain below, a foreign bank's choice to project itself into New York can be evident through the selection and repeated use of an agent's correspondent account in the forum. This result follows from two strands of well-established jurisprudence. A foreign entity can be subject to suit in New York based on the acts of its agent. And sustained use of a correspondent

---

[15] *Licci III*, 20 N.Y.3d at 339 (emphasis added); *see Al Rushaid*, 28 N.Y.3d at 325–27.

[16] *Al Rushaid*, 28 N.Y.3d at 328.

[17] *Licci IV*, 732 F.3d at 168, 171 (quoting *Licci III*, 20 N.Y.3d at 339–40).

banking account constitutes "transacting business" within the meaning of § 302(a)(1).

Plaintiffs allege that AJIB acted as PIB's agent when it repeatedly facilitated and processed funds transfers to PIB's dollar-denominated accounts.  Agency within the meaning of § 302(a) is given a "broad[]" interpretation.[18]   A plaintiff does not need to establish a "formal agency relationship" in order to attribute the actions of the agent to the principal.[19]   To exercise personal jurisdiction over a defendant based on the acts of an agent, a showing must be made that "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal."[20]

We easily find that plaintiffs successfully pled benefit as well as knowledge and consent.  As for the former, AJIB's alleged role in transferring payments through its correspondent accounts in New York redounded to PIB's benefit.   While a foreign bank can theoretically bypass the United States to clear dollars—for example, at an offshore Federal Reserve-sanctioned clearing center—these processing mechanisms presumably lack the "cost savings or other conveniences" that New York correspondent accounts offer.[21] Accepting the complaint's allegations as true (as we must at this stage), PIB did not use these alternative systems.  The account with

---

[18] *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981).

[19] *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988).

[20] *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (quoting *Grove Press, Inc.*, 649 F.2d at 122).

[21] *Licci IV*, 732 F.3d at 171; *see also Licci III*, 20 N.Y.3d at 340 (speculating that routing transactions through New York was "cheaper and easier for [the foreign bank] than other options").

AJIB enabled PIB to offer dollar-denominated banking to its customers without establishing a direct physical presence in New York or incurring the costs of clearing dollars abroad.  As for the knowledge requirement, PIB conceded at oral argument that plaintiffs plausibly allege that it had knowledge of AJIB's activities;[22] in addition, PIB repeatedly accepted incoming dollar-denominated payments from AJIB, evidencing its consent that AJIB act on its behalf in effectuating the transfer through AJIB's correspondent accounts in New York.

We disagree with the district court's conclusion that the complaint failed to plausibly allege that PIB exercised "some control" over AJIB.  To start, PIB conceded that AJIB was required to follow PIB's instructions as to the amount of funds to transfer and the beneficiary of those funds.[23]  AJIB could not choose to transfer a different amount for the benefit of a PIB customer or transfer to a beneficiary of AJIB's own choosing.  PIB acknowledged that, "[i]n the event" that a request was made by a PIB customer, PIB instructed AJIB to make certain transfers "to the U.S. bank."[24]  AJIB did not ignore or reject those instructions.  These allegations indicate that AJIB's conduct vis-à-vis the correspondent account was not "unilateral."[25]

---

[22] Hr'g Tr. 22:10–30.  To bolster their allegations of PIB's knowledge of AJIB's activities, plaintiffs also introduced evidence suggesting that the two banks were "related," including a credit report from PIB stating that PIB "has close connections with [AJIB]" and "shar[es] the same chairman." Joint App'x 223–24, 245.

[23] Hr'g Tr. 23:00–20.

[24] Joint App'x 213.

[25] *Rushaid*, 28 N.Y.3d at 326, 328.

Once PIB chose to offer dollar-denominated banking services, it necessarily exercised control by utilizing AJIB's correspondent bank accounts in New York.  Contrary to the district court's determination, the absence of allegations that PIB routinely designated *which* of AJIB's three correspondent accounts to use in New York is of no moment because PIB had already selected the *forum* and any of the three banks would do.  Section 302(a)(1) does not demand that the principal exercise complete control over every decision of the putative agent.[26]  AJIB's three correspondent accounts with New York banks during the relevant period were a matter of public knowledge.  AJIB did not advertise any alternative dollar-clearing centers that were outside of New York.  Accepting the allegations in the complaint as true, PIB did not seek out any alternative clearing centers and did not direct AJIB to avoid New York. Furthermore, the relevant transactions were not routed through any other correspondent account.  It is thus a plausible reading of the complaint that processing the payments through New York was part of PIB's design.

We also find plausible plaintiffs' allegations that PIB exercised control over the transactions by directing its customers to use certain correspondent accounts in New York.  Plaintiffs allege that, on at least one occasion, HLF transferred funds from its Texas-based account to its account at PIB with instructions on the payment form to use AJIB's correspondent account at Chase Manhattan in New York.  Because PIB did not advertise its correspondent accounts, we can reasonably infer that PIB designated one of AJIB's correspondent accounts and then instructed HLF to send its funds there, thereby controlling the flow of funds and ensuring that they would pass through New York.

---

[26] *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986).

While New York remains "the national and international center for wholesale wire transfers," alternative channels that bypass the State existed at the time that would have enabled PIB to provide dollar-denominated banking services to its clients.[27]  For example, PIB could have sought out dollar-clearing centers outside of the U.S.[28]  It also could have arranged to keep sufficient U.S. banknotes on hand for entirely physical, rather than electronic, funds transfers.  That these alternatives may have been less attractive to PIB is further support that the purpose of holding a correspondent account with AJIB was to gain convenient access to New York's financial system. The fact that PIB injected itself into the payment process leads us to conclude that its contact with New York was not random or fortuitous but sufficiently purposeful to satisfy New York's long-arm statute.

PIB makes several arguments against the exercise of personal jurisdiction on these facts.  It relies on Article 4A of the New York Uniform Commercial Code for the proposition that "[a] receiving bank is not the agent of the sender or beneficiary of the payment order it accepts, or of any other party to the funds transfer."[29]  But agency under § 302 is not bound either by the "formalities of agency law"[30] or by the UCC's framework governing a party's rights and obligations

---

[27] *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991).

[28] As an example, the Clearing House Automated Transfer System (CHATS), based in Hong Kong and active since 2000, can settle U.S. dollar-denominated transfers through The Hongkong and Shanghai Banking Corporation.  Access to the system for non-Hong Kong-based banks, however, must be approved on a case-by-case basis.  *See* https://www.hkma.gov.hk/eng/key-functions/international-financial-centre/financial-market-infrastructure/payment-systems/.

[29] N.Y. U.C.C. § 4-A-212.

[30] *CutCo Indus.*, 806 F.2d at 366.

when making electronic funds transfers.[31]  Moreover, the cases that PIB cites involved parties seeking to attach or garnish assets that were "midstream," in other words assets that were in the process of being transferred between banks.[32]  We thus understand Article 4A to qualify the court's attachment power in the context of international funds transfers, separate from the threshold question of whether the court has personal jurisdiction over the bank involved in the transfer.

PIB also asserts that *Licci* rejected jurisdiction over foreign banks using nested correspondent accounts and that finding otherwise would "undo" *Licci*.[33]  We disagree.  In *Licci*, we considered whether New York's long-arm statute provided for personal jurisdiction over a foreign bank that maintained a correspondent account with a New York bank.  The *Licci* plaintiffs alleged that defendant Lebanese Canadian Bank, SAL (LCB), a Lebanese bank with no operations in the United States, used its New York correspondent account to transfer U.S.-dollar-denominated funds to Hizballah, a terrorist organization.  After certifying the question to the New York Court of Appeals, we explained that "the use of a New York correspondent bank account, standing alone, may be considered a 'transaction of business' under the long-arm statute if the defendant's use of the correspondent account was purposeful."[34]  PIB relies instead on our observation that LCB "could have . . . processed U.S.-dollar-denominated wire transfers for [the terrorist organization's] account through correspondent accounts anywhere in

---

[31] *See Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 118 (2d Cir. 2010).

[32] *See, e.g., id.* at 121.

[33] Appellee's Br. 3.

[34] *Licci IV*, 732 F.3d at 168.

the world."[35]  In making that observation, we contrasted LCB's use of a correspondent account in New York with a foreign bank that had correspondent relationships throughout the world any of which could have been used to process transfers.  According to PIB, this statement in *Licci* demonstrates that the district court cannot exercise jurisdiction over PIB here because PIB did not itself have a correspondent account in New York but had only a correspondent account with AJIB in Jordan.[36]  We do not adopt PIB's cramped reading of *Licci*.  To the contrary, we understand the *Licci* dicta to stand for the unsurprising proposition that jurisdiction requires a choice by the defendant bank to avail itself of the benefits of the New York financial system.  Simply transacting in U.S. dollars does not make a defendant bank amenable to suit in New York.  PIB, like LCB, chose to transact business in New York—albeit one step removed, through a nesting correspondent mechanism.

## B.    Claims "Arising from" Business Transacted in New York

Plaintiffs likewise plausibly allege that their causes of action arise out of PIB's transacting business in New York.  This second element of § 302(a)(1) is satisfied "when there exists an articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon."[37]  This "relatively

---

[35] *Id*. at 171.

[36] *See* Appellee's Br. 24–25.

[37] *Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 23 (2d Cir. 2004) (internal quotation marks omitted).

permissive" inquiry requires only that "at least one element [of the claim] arises from [defendant's] New York contacts."[38]

Plaintiffs allege that PIB's use of correspondent accounts through its agent, AJIB, permitted Saddam Hussein's government to funnel dollars repeatedly to ALF to enable it to incentivize and reward terrorist activity and also permitted Texas-based HLF to send funds from the United States to Hamas to support attacks perpetrated on plaintiffs and their families. By processing payments bearing indicia of terrorism financing on behalf of ALF and knowingly providing material support to a customer linked to Hamas, a designated Foreign Terrorist Organization, PIB facilitated the attacks that are at the heart of this litigation. At this stage, we accept plaintiffs' allegations as true and find that they make out an articulable nexus between PIB's alleged conduct and their injuries.

PIB pushes back on the inference that the incentive payments were processed through New York. Because checks between account holders at Palestinian banks were settled daily on an aggregate basis rather than as individual transactions, PIB suggests that plaintiffs cannot trace any particular payment from the head of ALF to the families of terrorists. But PIB admits that any inter-bank dollar transfer to settle a debt was processed through New York. We find it plausible that, of the transfers alleged to have originated with ALF, at least some portion of them was transferred through New York. At this stage of the litigation, plaintiffs are not obligated to produce particularized proof as to each payment. They have met their burden here because they averred facts and produced copies of checks and

---

[38] *Licci III*, 20 N.Y.3d at 341.

receipt vouchers from ALF to families of terrorists.[39]  Moreover, it is not disputed that funds transferred from Iraq's government to ALF's account at PIB, from which the incentive payments were disbursed, were processed through New York.

PIB also argues that plaintiffs omit a "causal connection" between the funds transferred from HLF's Texas-based account to its account at PIB and plaintiffs' injuries from Hamas's terrorist operations.[40]  PIB's argument reflects a fundamental misunderstanding of the "arising from" requirement.  The nexus element simply ensures that the transaction is "not completely unmoored" from the claim.[41]  Plaintiffs' allegations are sufficient: by directing the transfers to AJIB's account in New York, PIB used New York's financial system to facilitate financial support for Hamas that is the basis of certain of plaintiffs' claims.

We are similarly not persuaded by PIB's alternative attempt to narrow the scope of the nexus requirement.  PIB argues that the August 2001 transfers, which plaintiffs included for illustrative purposes, lack a connection to the plaintiffs' case because they occurred a week before the start of the "relevant period."[42]  We disagree.  Plaintiffs' allegation that PIB supplied HLF with instructions on how to send dollar-based transfers to AJIB's

---

[39] Joint App'x 200–05.

[40] Appellee's Br. 47.

[41] *Licci III*, 20 N.Y.3d at 339.

[42] Plaintiffs define the "relevant period" as between September 2001 and March 2003 based on Congress's extension of a statute of limitations for Anti-Terrorism Act claims arising on or after September 11, 2001.

correspondent account in New York shortly before the attacks is sufficiently contemporaneous.

## II.   Compliance with Constitutional Due Process

Because it concluded that personal jurisdiction was not authorized by § 302(a)(1), the district court had no reason to address whether the exercise of long-arm jurisdiction would also comport with due process.   Because we conclude that there is personal jurisdiction under § 302(a)(1), we now turn to that question on appeal.[43]

Where, as here, specific jurisdiction is invoked, the Due Process Clause of the Constitution requires that the defendant have sufficient "minimum contacts" with the forum and that jurisdiction "not offend traditional notions of fair play and substantial justice."[44]   Historically, when we have found § 302(a)'s requirements satisfied based on an agent's contacts with the forum, we have not suggested that due process requires something more than New York law.[45]   Nevertheless, we must independently ensure that the constitutional requirements are satisfied.[46]

"Minimum contacts" requires finding that PIB directed its conduct at New York such that it could reasonably foresee being subject to suit here.   To be sure, there is no evidence that PIB was physically present in New York, let alone the United States, but PIB

---

[43] *MacDermid*, 702 F.3d at 729–30.

[44] *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted).

[45] *Charles Schwab*, 883 F.3d at 85; *see also Licci IV*, 732 F.3d at 168 (observing that it would be "rare" for personal jurisdiction to be permitted under § 302(a) and to nonetheless be found unconstitutional).

[46] *See Licci IV*, 732 F.3d at 170.

had repeated contact with New York through AJIB's correspondent accounts. While the contacts with the forum must be "created by the defendant itself," we also recognize that the "defendant can purposefully avail itself of a forum through the action of a third party by directing its agents . . . to take action there."[47] We find the allegations of PIB's contacts through its agent AJIB sufficient to satisfy due process for the same reason that New York's long-arm statute is satisfied.

Due process ensures that the foreign defendant is not haled into the forum based solely on the "unilateral activity" of a third party.[48] But, as we noted, PIB's use of a New York account through AJIB overcomes any claim that AJIB's acts were "unilateral." PIB chose to accept dollar-denominated transfers from Iraq and HLF through the use of a correspondent bank account. PIB's relationship with AJIB provided not only a way to clear dollar-denominated transfers on behalf of ALF and HLF, but also the exclusive means of doing so. As PIB knew, AJIB could not facilitate the transfers through alternative jurisdictions. Moreover, AJIB acted at PIB's direction: avoiding New York would have required AJIB to ignore PIB's instructions, which PIB concedes AJIB did not do.

Likewise, HLF did not route its transfers from Texas through New York at its own discretion. Accepting the complaint's allegations as true, PIB affirmatively directed HLF to send its money to a specific correspondent account in New York to which PIB had

---

[47] *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 122 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2852 (2022) (internal quotation marks, citations, and emphasis omitted).

[48] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985) (internal quotation marks omitted).

access through its own account with AJIB.  PIB thus oversaw the flow of funds moving from its customer's account in Texas to New York to the Palestinian Territories.  The New York account was not random; it was necessary to effect the transfers.

We are also satisfied that PIB's use of AJIB's correspondent account in New York was sufficiently related to plaintiffs' injuries because it was "an instrument to achieve the very wrong alleged."[49] As we explained in *Licci*: where the cause of action entails the "unlawful provision of banking services of which the wire transfers are a part[,] allegations of [the defendant bank's] repeated, intentional execution of U.S.-dollar-denominated wire transfers on behalf of [its clients]" in order to support terrorist activity are sufficient for jurisdiction.[50]  Plaintiffs sufficiently allege facts to support the conclusion that New York was integral to the wrongful conduct.

At this juncture, we are interested only in the question of personal jurisdiction and the nature of the contacts that would support such exercise.  PIB's argument that HLF was not designated a terrorist organization until several months into the relevant period is more properly raised in a Rule 12(b)(6) challenge.

A defendant who has been found to have minimum contacts can defeat jurisdiction by "present[ing] a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[51]  PIB did not argue before the district court that being haled into the New York forum would be unreasonable.  Nor does PIB so contend on appeal.  In any event, we do not find this to be the

---

[49] *Licci IV*, 732 F.3d at 171.

[50] *Id.*

[51] *Burger King*, 471 U.S. at 477.

"unusual" case where dismissal is warranted because bringing PIB into a New York court would be unreasonable.[52]  Claims brought under the Anti-Terrorism Act routinely involve international defendants.  We are cognizant of New York's interest in "monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism," which is perhaps heightened given that nested correspondent accounts could permit a bank, like PIB, to shield its identity from the New York banks or other interested parties.[53]  Moreover, we are satisfied that "the conveniences of modern communication and transportation," including email and remote video capabilities, support our finding that PIB's appearance in New York would not be fundamentally unfair.[54]

## CONCLUSION

For the foregoing reasons, we VACATE the district court's decision and REMAND for further proceedings consistent with this opinion.[55]

---

[52] *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 575 (2d Cir. 1996).

[53] *Licci IV*, 732 F.3d at 174.

[54] *Id.* (internal quotation marks omitted).

[55] Because we find jurisdiction based on an agency relationship with AJIB, we do not reach plaintiffs' alternative theory that jurisdiction is predicated on PMA being PIB's agent.

We express no opinion as to the merits of PIB's alternative argument that plaintiffs fail to state a claim under the Anti-Terrorism Act.  We leave resolution of that issue for the district court to address in the first instance.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
**CHIEF JUDGE**

Date: June 16, 2023
Docket #: 20-3849cv
Short Title: Spetner v. Palestine Investment Bank

**CATHERINE O'HAGAN WOLFE**
**CLERK OF COURT**

DC Docket #: 19-cv-5
DC Court: EDNY (BROOKLYN)
DC Judge: Komitee
DC Judge: Mann

**BILL OF COSTS INSTRUCTIONS**

The requirements for filing a bill of costs are set forth in FRAP 39. A form for filing a bill of costs is on the Court's website.

The bill of costs must:
* be filed within 14 days after the entry of judgment;
* be verified;
* be served on all adversaries;
* not include charges for postage, delivery, service, overtime and the filers edits;
* identify the number of copies which comprise the printer's unit;
* include the printer's bills, which must state the minimum charge per printer's unit for a page, a cover, foot lines by the line, and an index and table of cases by the page;
* state only the number of necessary copies inserted in enclosed form;
* state actual costs at rates not higher than those generally charged for printing services in New York, New York; excessive charges are subject to reduction;
* be filed via CM/ECF or if counsel is exempted with the original and two copies.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DEBRA ANN LIVINGSTON**
**CHIEF JUDGE**

Date: June 16, 2023
Docket #: 20-3849cv
Short Title: Spetner v. Palestine Investment Bank

**CATHERINE O'HAGAN WOLFE**
**CLERK OF COURT**

DC Docket #: 19-cv-5
DC Court: EDNY (BROOKLYN)
DC Judge: Komitee
DC Judge: Mann

## VERIFIED ITEMIZED BILL OF COSTS

Counsel for

_____

respectfully submits, pursuant to FRAP 39 (c) the within bill of costs and requests the Clerk to prepare an itemized statement of costs taxed against the

_____

and in favor of

_____

for insertion in the mandate.

Docketing Fee          _____

Costs of printing appendix (necessary copies _____ )  _____

Costs of printing brief (necessary copies _____ ____ )  _____

Costs of printing reply brief (necessary copies _____ )  _____

**(VERIFICATION HERE)**

_____
Signature