UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
STUART FORCE, individually and as a
personal representative of the ESTATE OF
TAYLOR FORCE, *et al.*,

                      Plaintiffs,

              - against -

QATAR CHARITY, QATAR NATIONAL
BANK, and MASRAF AL RAYAN,

                      Defendants.
----------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

20-cv-2578 (BMC)

**COGAN**, District Judge.

       Plaintiffs are victims, as well as estates and heirs of victims, injured and killed in ten terrorist attacks in Israel between June 2014 and December 2016. They bring this case under the Anti-Terrorism Act ("ATA") and the Justice Against Sponsors of Terrorism Act ("JASTA") against defendants Qatar Charity ("QC"), Qatar National Bank ("QNB"), and Masraf Al Rayan ("MAR"). Plaintiffs allege that defendants aided and abetted Hamas and the Palestinian Islamic Jihad ("PIJ"), foreign terrorist organizations responsible for the terrorist attacks. Plaintiffs also claim that defendants conspired to violate the ATA and the JASTA and that defendants provided material support to Hamas and PIJ. Defendants have moved to dismiss the complaint for lack of personal jurisdiction and failure to state a claim. For the reasons stated below, the case is dismissed for lack of personal jurisdiction.

## BACKGROUND

       For purposes of this motion, I accept all of plaintiffs' factual allegations as true. See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 85 (2d Cir. 2013).

**I.     The Attacks**

Defendants are "members of a terrorism financing conspiracy spearheaded by the government and Royal Family of Qatar, whose sponsorship of terrorism killed and maimed Plaintiffs in a series of heinous terrorist attacks in Israel." Defendants "provided material support and resources to Hamas and the PIJ that allowed these notorious terrorist organizations to carry out brutal terrorist attacks against Plaintiffs and/or their family members, which left Plaintiffs severely physically and/or psychologically injured."

These attacks include, in 2014, the kidnapping and murder of Y.N.F., a sixteen year old U.S. citizen who was abducted and then shot and killed in the back of a car in Israel by two Hamas terrorists; the shooting of Yehuda Glick, a U.S. citizen at the time of the attack who later renounced his citizenship, who was shot four times in the chest at close range in an assassination attempt by a PIJ operative; and the car ramming by a Hamas terrorist that murdered U.S. citizen C.Z.B., a baby who was being pushed by her mother in a stroller, and that badly injured her father, U.S. citizen Shmuel Elimelech Braun.

The attacks from 2015 include the shooting of Eli M. Borochov, a U.S. citizen who was shot and severely injured by a Hamas terrorist in Israel; the murder of Richard Lakin, a U.S. citizen who was shot in the head and stabbed in the stomach and face during a terrorist attack by two Hamas operatives who attacked passengers on a bus in Jerusalem, only ending the attack when they had used all of their bullets and "the knife broke and remained stuck inside Richard's body;" and the car ramming by a Hamas operative that injured U.S. citizens Yoav Golan and Rotem Shoshana Golan and that caused the massive heart attack of Noam Michael Shamba, a previously healthy thirty-two year old U.S. citizen.

The attacks from 2016 included in the complaint are the murder of Taylor Force, a U.S. citizen and business student on a school trip to Israel, who was stabbed by a Hamas operative

2

and died of his injuries; the stabbing of Menachem Mendel Rivkin, a U.S. citizen who was severely injured in a knife attack by a terrorist affiliated with Hamas; the stabbing of Raphael Lisker, a U.S. citizen who was attacked and stabbed four times in the spine by a member of Hamas while he was walking home after attending Sabbath services in Israel; and the murder of H.Y.A., a thirteen year old U.S. citizen who was stabbed to death in her sleep by a terrorist with ties to Hamas, following Hamas' public call for Palestinians to stab Jews to death.

## II. The Role of Defendants

QC, originally named the Qatar Charitable Society, was founded in 1992.[1] QC is "a key funding source for international terrorists," despite its purported status as a charitable organization. In support of this allegation, plaintiffs cite to a March 2008 designation of QC as a "priority III terrorism support entity (TSE)" by the U.S. Interagency Intelligence Committee on Terrorism ("IICT"), so designated due to its "'intent and willingness' to support terrorist organizations that attack the U.S. and its interests." Plaintiffs also point to testimony before Congress and a finding in a 2002 terrorism-related criminal case that Qatar Charitable Society was a major source of funding for Osama bin Laden and al-Qaeda. Plaintiffs further assert that QC has provided support to terrorist organizations including the National Islamic Front in Sudan, the Eritrean Islamic Jihad Movement, and other terrorist organizations in Chechnya, Mali, and Syria. Furthermore, QC "provided funding to and partnered with Islamic Relief Worldwide, which was banned in Israel in 2014 for providing funding to Hamas."

---

[1] Plaintiffs' complaint states that QC was founded in 2002, but public sources and information included in plaintiffs' own complaint show that QC was founded earlier. The Court takes judicial notice of the fact that QC was founded in 1992. See What We Do, Qatar Charity, https://www.qcharity.org/en/qa/home/whatwedo (last visited Dec. 10, 2024); see also Henkin v. Charity, No. 21-cv-5716, 2023 WL 2734788, at *1 n.2 (E.D.N.Y. Mar. 31, 2023); Przewozman v. Charity, No. 20-cv-6088, 2023 WL 2562537, at *2 n.2 (E.D.N.Y. Mar. 17, 2023).

QC has been banned in Israel since 2008, when it was still operating as Qatar Charitable Society, for its membership in the Union of Good, "a notorious funder of Hamas terrorism." The U.S. Treasury designated the Union of Good as a Specially Designated Global Terrorist ("SDGT") in 2008.[2]

QC "collected and funneled millions of dollars in donations through the U.S. financial system to obtain the U.S. dollars . . . needed to sustain Hamas' and PIJ's terrorist activities." QC did so by transferring money from its bank account with defendant MAR in Doha, Qatar, through MAR's correspondent bank in New York, into Palestine for distribution to Hamas and PIJ. MAR is a bank headquartered in Qatar with no branches or offices in the United States. However, MAR maintained a relationship with a correspondent bank in New York that cleared transactions conducted in U.S. currency for MAR and its customers, including QC. Specifically, from March 2015 to September 2015 alone, MAR transferred more than $28 million through MAR's correspondent bank in New York to QC's accounts at either the Bank of Palestine or the Islamic Bank in Ramallah, both located in Palestinian Authority-administered territories. QC then distributed these funds, in U.S. dollars, "to Hamas, PIJ, and their affiliates to finance acts of terrorism in Israel."

QNB, the other bank named as a defendant in this action, is not alleged to have availed itself of the U.S. financial system. Rather, QNB maintained foreign bank accounts for several parties relevant to this action: (1) QC, for which QNB maintained at least seven bank accounts; (2) Husam Badran, "a Hamas Politburo spokesperson and former leader of Hamas' military wing in the Northern West Bank;" (3) Musa Dudin, a Hamas Politburo member and "convicted Hamas

---

[2] Defendants dispute plaintiffs' characterization of QC as a funder of terrorist organizations, but on a motion to dismiss courts accept all factual, non-conclusory statements as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).

4

terror cell operative;" (4) Yousuf Abdulla Al-Qaradawi, "chair of the Union of Good;" (5) Moustafa Mamdouh Mesalm, a senior accountant for QC; and (6) Ibrahim M A Al-Kaabi, an individual who lists his address as a QC P.O. Box. QNB has also processed several payments that list the beneficiary as QC. These payments have been deposited into eleven different bank accounts at QNB.

Based on the above allegations, plaintiffs claim that MAR, QC, and QNB participated in a conspiracy "to provide the dollars and euros needed by Hamas to conduct its terrorist operations." MAR "used its correspondent banking relationships in New York to process U.S. dollar transactions for [QC], which allowed [QC] and Hamas to obtain large volumes of U.S. dollars for distribution to terrorists and their family members in the Palestinian Territories." Plaintiffs assert that QC "and Hamas could not have obtained those U.S. dollars without [MAR]'s participation in the terrorist funding scheme," and that without these U.S. dollars, "Hamas would have been unable to carry out the attacks that killed or injured Plaintiffs." Thus, plaintiffs allege, MAR's provision of financial services to QC and QC's provision of funding to Hamas form the basis of liability for aiding and abetting foreign terrorist organizations in violation of the ATA and JASTA, conspiracy to violate the ATA and JASTA, providing material support to terrorists in violation of the ATA, and providing material support to foreign terrorist organizations in violation of the ATA.

Similarly, plaintiffs allege that the accounts QNB maintained for QC and individual members of QC, Hamas, and the Union of Good "were used to finance Hamas' and PIJ's terrorist activities in Israel." Plaintiffs allege that QNB's maintenance of these accounts was "essential to provide access to the U.S. financial system to obtain the U.S. dollars needed to sustain Hamas' and PIJ's terrorist activities."

## DISCUSSION

**I.  Legal Standard**

To exercise personal jurisdiction over defendants, "[f]irst, the plaintiff's service of process upon the defendant must have been procedurally proper.  Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective.  Third, the exercise of personal jurisdiction must comport with constitutional due process principles." Waldman v. Palestine Liberation Org., 835 F.3d 317, 327 (2d Cir. 2016) (quoting Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 59-60 (2d Cir. 2012) ("Licci II")) (cleaned up).[3]  Taking the third requirement first, "[t]he constitutional analysis under the Due Process Clause consists of two separate components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." Licci II, 673 F.3d at 60 (quoting Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 164 (2d Cir. 2010)).[4]

If a defendant's conduct that allegedly establishes personal jurisdiction occurs within the forum, in this case the U.S., "[s]o long as this in-forum activity sufficiently reflects the defendant's 'purposeful availment' of the privilege of carrying on its activities [in the forum], minimum contacts are established, even if the effects of the defendant's entire course of conduct are felt elsewhere." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 173 (2d Cir. 2013) ("Licci IV") (citing Chloé, 616 F.3d at 172).  For purposeful availment, "[t]he

---

[3] Defendants previously disputed whether they had received proper service of process, but they have withdrawn these challenges and confirmed that service of process was properly effected.

[4] These constitutional inquiries derive from the Fifth Amendment's due process clause governing the exercise of federal judicial power, as opposed to the Fourteenth Amendment, which governs the exercise of state power, meaning that "the court can consider the [defendants'] contacts throughout the United States," instead of "only the contacts with the forum state." Waldman, 835 F.3d at 330.  Otherwise, "the minimum contacts and fairness analysis is the same under the Fifth Amendment and the Fourteenth Amendment in civil cases." Id. at 331.  Because plaintiffs only allege contacts between defendants and New York, analysis under either Amendment would be identical.

contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'" Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021) (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)). Additionally, "[t]he plaintiff's claims . . . must arise out of or relate to the defendant's contacts with the forum." Id. (internal quotation marks and quotation omitted). Although "a strict causal relationship between the defendant's [forum-based] activity and the litigation" is not required, there must be a "'connection' between a plaintiff's suit and a defendant's activities." Id. at 361-62 (citation omitted).

Specifically, "repeated use of [a] correspondent [bank] account – and hence New York's banking system – as an instrument to achieve the wrong complained of in [a] suit satisfies the minimum contacts component of the due process inquiry." Licci IV, 732 F.3d at 173. However, "a foreign defendant's 'mere maintenance' of a correspondent account in the United States is [not] sufficient to support the constitutional exercise of personal jurisdiction over the account-holder in connection with any controversy." Id. at 171. A plaintiff's claim "must arise out of or relate to" the defendant's use of the correspondent account. Ford, 592 U.S. at 359; see also Licci IV, 732 F.3d at 171 (use of correspondent bank account sufficiently connected to plaintiffs' claims where the account was "alleged to have been used as an instrument to achieve the very wrong alleged" – the "unlawful provision of banking services of which . . . wire transfers [through the forum state were] a part . . . in order to further Hizballah's terrorist goals"). This requirement is met if a plaintiff's complaint alleges "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former, regardless of the ultimate merits of the claim." Id. at 168-69 (quotation omitted).[5]

---

[5] This standard is articulated in the context of § 302(a)(1) of New York's long-arm statute, not the requirements of constitutional due process, but the two requirements are virtually identical. See Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 85 (2d Cir. 2018) ("Schwab I"); Licci IV, 732 F.3d at 170. Given these corresponding

7

Another way to establish minimum contacts with a forum, recognized by the Second Circuit as complying with constitutional due process,[6] is through a conspiracy theory of jurisdiction. See Berkshire Bank v. Lloyds Banking Grp. plc, No. 20-cv-1987, 2022 WL 569819, at *2 (2d Cir. Feb. 25, 2022) ("A defendant can purposefully avail itself of the forum by creating the requisite minimum contacts through actions of a . . . co-conspirator because '. . . a co-conspirator who undertakes action in furtherance of the conspiracy essentially operates on behalf of, and for the benefit of, each member of the conspiracy.'" (quoting Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC, 22 F.4th 103, 122 (2d Cir. 2021))). A conspiracy theory of jurisdiction can satisfy the minimum contacts requirement if a plaintiff alleges that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." Schwab I, 883 F.3d at 87 (citation omitted).

**II.     Application**

Plaintiffs do not plausibly allege that defendants' contacts with the U.S. are sufficiently related to plaintiffs' claims to support a finding of personal jurisdiction. Plaintiffs conclusorily allege that "[w]ithout the support provided through this conspiracy, Hamas would have been unable to carry out the attacks that killed or injured Plaintiffs," but they do not provide any link between the support allegedly provided and plaintiffs' injuries.

---

requirements, some discussion of the constitutional "arising under" requirement in this decision is based on caselaw analyzing the § 302(a)(1) "arising under" requirement.

[6] The Second Circuit has not addressed whether a conspiracy theory of jurisdiction comports with New York's long-arm statute, and several district courts have determined that a conspiracy theory of jurisdiction is not available under N.Y. CPLR § 302(a)(1) or § 302(a)(2), the two sections of the long-arm statute plaintiffs invoke. See Berdeaux v. OneCoin Ltd., 561 F. Supp. 3d 379, 400-01 (S.D.N.Y. 2021) (no conspiracy theory of jurisdiction under N.Y. CPLR § 302(a)(1) (citing E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co., No. 00-cv-8670, 2003 WL 22064259, at *9 (S.D.N.Y. Sept. 5, 2003)); In re Dental Supplies Antitrust Litig., No. 16-cv-696, 2017 WL 4217115, at *7 (E.D.N.Y. Sept. 20, 2017) (no conspiracy theory of jurisdiction under N.Y. CPLR § 302(a)(2)). These are separate analyses from whether a theory of jurisdiction comports with constitutional due process requirements.

Regarding MAR and QC, plaintiffs allege that QC "and Hamas could not have obtained . . . U.S. dollars for distribution to terrorists and their family members in the Palestinian Territories . . . without [MAR]'s participation in the funding scheme." Plaintiffs also state that QC "collected and funneled millions of dollars in donations through the U.S. financial system to obtain the U.S. dollars . . . needed to sustain Hamas' and PIJ's terrorist activities." But plaintiffs fail to provide any connection between the "U.S. dollars for distribution to terrorists and their family members in the Palestinian Territories" provided by MAR and QC and the terrorist attacks that injured and killed plaintiffs.

Plaintiffs simply do not plead any facts connecting MAR and QC's actions taken in the U.S. to plaintiffs' injuries. General, conclusory allegations that MAR and QC provided "coveted U.S. dollars . . . needed to sustain Hamas' and PIJ's terrorist activities," without more, do not suffice. See Przewozman, 2023 WL 2562537, at *13 (plaintiffs' claims did not sufficiently arise from contacts with the U.S. where plaintiffs failed "to factually allege that the Defendants 'used an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated'" (quoting Daou v. BLC Bank S.A.L., 42 F.4th 120, 132 (2d Cir. 2022)); Est. of Henkin v. Kuveyt Turk Katilim Bankasi A.S., No. 19-cv-5394, 2023 WL 4850999, at *3 (E.D.N.Y. July 28, 2023) (inadequate allegation of relationship between defendant bank's contacts with the U.S. and terrorist attacks giving rise to plaintiffs' claims where plaintiffs alleged that defendant bank "transferr[ed] funds through the United States (and New York) for the benefit of the FTO HAMAS").

The Second Circuit's decisions in Licci IV, 732 F.3d 161, and Spetner v. Palestine Inv. Bank, 70 F.4th 632 (2d Cir. 2023), illustrate the types of allegations necessary to plead a connection between a defendant's U.S. contacts and a plaintiff's injuries, in contrast to the

9

complaint presently before the Court. The Licci plaintiffs, victims of Hezbollah rocket attacks, explained in their complaint that "Hizbollah is subject to strict economic sanctions programs . . . prevent[ing] Hizbollah from conducting banking activities, including wire transfers, and thereby limit[ing] its ability to carry out terrorist attacks." Second Amended Complaint, Licci v. Am. Exp. Bank Ltd., 704 F. Supp. 2d 403 (S.D.N.Y. 2010), ECF No. 99 at 8-9. They alleged that, because of defendant bank LCB's violation of these sanctions programs, which included carrying out wire transfers for Hezbollah through the U.S. when virtually any other bank would have refused, Hezbollah was able "(a) to build and maintain its operational infrastructure for the planning and execution of the Hizbollah Rocket Attacks; (b) to pay, train, transport and shelter the terrorist operatives who carried out the Hizbollah Rocket Attacks; and (c) to carry out the Hizbollah Rocket Attacks." Id. at 9, 17.

As alleged, LCB's U.S. contacts were not completely unmoored from plaintiffs' injuries: without LCB's transfer of Hezbollah's funds through the U.S., Hezbollah would not have been able to fund the terrorist attacks that injured plaintiffs due to the U.S.'s sanctions. This theory plausibly alleges a connection between LCB's U.S. contacts and plaintiffs' injuries, unlike plaintiffs' bald assertions in the instant case that MAR's transfer of money on behalf of QC through the U.S. was necessary for Hamas and PIJ to commit the terrorist attacks that injured plaintiffs, without any explanation as to why or how.

The plaintiffs in Spetner, 70 F.4th 632, similar to Licci IV, alleged a plausible connection between the U.S. contacts of defendant bank PIB and the plaintiffs' injuries. They stated that PIB used nested correspondent banking to wire transfers through New York to ALF, "a Palestinian proxy for Saddam Hussein's regime in Iraq" which would "support and reward terrorist activities . . . through PIB-issued checks . . . to families of deceased terrorists." Spetner,

10

70 F.4th at 637-38.  With money funneled through New York, "the head of the ALF . . . issued dollar-denominated incentive payment checks from his PIB account to the families of terrorists, *including the word 'martyr' in the memo line of some checks*."  Id. at 638 (emphasis added).  That is a pretty good indication of the relatedness of the payments to the attacks.

The Second Circuit held that these facts plausibly alleged that plaintiffs' case arose out of PIB's U.S. contacts: "[b]y processing payments *bearing indicia of terrorism financing* on behalf of ALF and knowingly providing material support to a customer linked to Hamas . . . PIB *facilitated the attacks that are at the heart of this litigation*."  Id. at 643-44 (emphasis added).  The Court further explained that "where the cause of action entails the unlawful provision of banking services of which the wire transfers are a part, allegations of the defendant bank's repeated, intentional execution of U.S.-denominated wire transfers on behalf of its clients *in order to support terrorist activity* are sufficient for jurisdiction."  Id. at 645-46 (cleaned up) (emphasis added).

Here, plaintiffs allege only conclusory statements that MAR or QC executed U.S.-denominated wire transfers to support the terrorist activities that injured plaintiffs.  They do not allege any "indicia of terrorism financing," as the plaintiffs did in Spetner.  Because plaintiffs do not state any non-conclusory facts alleging a connection between MAR and QC's U.S. contacts and plaintiffs' injuries, this Court cannot assert personal jurisdiction over MAR or QC.

Plaintiffs' jurisdictional allegations regarding QNB are even weaker.  Plaintiffs do not plausibly allege that QNB took any actions in the U.S. connected to plaintiffs' injuries.  The complaint includes no facts regarding QNB's interaction with the U.S. financial system, let alone its provision of access to that system to Hamas and PIJ or an explanation of how such access related to plaintiffs' injuries.

The theory of conspiracy jurisdiction doesn't help. None of the alleged co-conspirators' or their agents' "overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." Schwab I, 883 F.3d at 87 (citation omitted). As discussed above, the transfer of funds through New York, whether alleged to be the action of MAR, QC, or the bank hosting the correspondent account, is not sufficiently connected to plaintiffs' claims to subject any of the defendants to personal jurisdiction in the U.S. Plaintiffs' failure to link *any* alleged actions in the U.S. to the harms suffered by plaintiffs still prohibits this Court's exercise of personal jurisdiction over defendants.

This Court does not reach the constitutional reasonableness inquiry or the question of whether there is a proper statutory basis for exercising personal jurisdiction over defendants because the constitutional minimum contacts requirement for exercising personal jurisdiction is not met.

### III. Jurisdictional Discovery

This Court has "broad discretion" to consider plaintiffs' request to conduct jurisdictional discovery. Lehigh Val. Indus., Inc. v. Birenbaum, 527 F.2d 87, 93 (2d Cir. 1975) (quotation and citation omitted). A district court is "well within its discretion in declining to permit discovery [when] the plaintiff ha[s] not made out a prima facie case for jurisdiction." Best Van Lines, Inc. v. Walker, 490 F.3d 239, 255 (2d Cir. 2007) (citations omitted). If a plaintiff has failed to make a *prima facie* showing of personal jurisdiction, it is still within a court's discretion to grant jurisdictional discovery if the plaintiff has pled sufficient allegations "to articulate a colorable basis for personal jurisdiction, which could be established with further development of the factual record." Leon v. Shmukler, 992 F. Supp. 2d 179, 195 (E.D.N.Y. 2014). "Courts frequently permit jurisdictional discovery where the plaintiff has made a 'sufficient start' toward establishing jurisdiction . . . but will not permit jurisdictional discovery on the basis of a

generalized request more akin to a 'fishing expedition.'" Alexander v. Porter, No. 13-cv-6834, 2014 WL 7391683, at *6 (E.D.N.Y. Dec. 29, 2014) (citations omitted).

Plaintiffs have not made a *prima facie* showing of personal jurisdiction, which requires plaintiffs to make "an averment of facts that . . . credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." Chloé, 616 F.3d at 163 (quoting Metro Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996)) (cleaned up). Because plaintiffs do not plead any facts alleging a relationship between defendants' U.S. contacts and plaintiffs' suit, as is required for personal jurisdiction, Ford, 592 U.S. 351, they do not meet this *prima facie* standard.

Nor have plaintiffs pled any facts "starting" to show that there was a relationship between defendants' U.S. contacts and plaintiffs' suit. Plaintiffs' conclusory allegation that defendants' support was necessary for Hamas and PIJ to conduct the terrorist attacks that killed and injured plaintiffs is so abstract that allowing plaintiffs to conduct jurisdictional discovery would be permitting plaintiffs to *discover* a plausible theory of personal jurisdiction over defendants, not flesh out missing facts related to a theory plaintiffs already possess. Cf. Trachtenberg v. Failedmessiah.com, 43 F. Supp. 3d 198, 205 (E.D.N.Y. 2014) (denying jurisdictional discovery where plaintiff would have needed discovery to reveal a new jurisdictional theory plaintiff had not already asserted to successfully claim personal jurisdiction over defendant). Plaintiffs may not receive jurisdictional discovery simply by alleging that defendants transferred money through the U.S., or were part of a conspiracy that engaged in such transfers. They must also allege a connection to the harm complained of in the suit.

If all that was required to receive jurisdictional discovery from a defendant was that party's transfer of money through the U.S., with no factual allegations relating the transfer(s) to a

plaintiff's injuries, almost anyone conducting financial transactions in U.S. dollars could automatically be subjected to discovery in a federal court. That basis for jurisdictional discovery is not proper. It would permit plaintiffs to conduct discovery without even asserting "specific, non-conclusory facts" demonstrating a connection between a defendant's U.S. contacts and the plaintiffs' suit, <u>Henkin</u>, 2023 WL 2734788 at *11 (internal quotation marks and quotation omitted), omitting a constitutional requirement for personal jurisdiction. <u>Ford</u>, 592 U.S. 351.

In cases in which courts have granted jurisdictional discovery, plaintiffs have pled non-conclusory facts connecting the defendants' U.S. contacts with the plaintiffs' injuries. See, e.g., <u>In re Magnetic Audiotape Antitrust Litig.</u>, 334 F.3d 204, 208 (2d Cir. 2003) (jurisdictional discovery appropriate in a case alleging that corporation conspired to fix prices in the U.S. and plaintiffs pointed to "minutes from a meeting showing that an executive of [defendant] was present at a meeting . . . in which price-fixing activities took place").

Jurisdictional discovery has even been granted as to two of the defendants in this case, MAR and QC, where the plaintiffs pled facts stating how defendants' actions allegedly enabled Hamas to commit the terrorist attacks that injured plaintiffs. In <u>Henkin</u>, 2023 WL 2734788, plaintiffs alleged in their complaint that MAR transferred money for QC through New York to the Bank of Palestine, which allowed QC to purchase "thousands of anonymous debit cards . . . from the Bank of Palestine." Complaint, <u>Henkin</u>, 2023 WL 2734788, ECF No. 1 at 28. "Pursuant to the Defendants' conspiracy, those anonymous debit cards were then distributed in the Palestinian Territories to thousands of recipients" and Hamas' "operatives utilized the debit cards to fund their personal financial needs while they planned terrorist attacks. Hamas-affiliated terrorists also used the [debit] cards to make the limited expenditures that their crude attacks required, such as securing ammunition and purchasing gasoline and other supplies." <u>Id.</u>

14

Although the plaintiffs needed to provide more information about MAR and QC's transfers through the U.S. to make out a *prima facie* showing of personal jurisdiction, the plaintiffs pled "facts which could support a colorable claim of jurisdiction" such that jurisdictional discovery was appropriate. Henkin, 2023 WL 2734788 at *11-12. Plaintiffs have pled no such facts here.

It may or may not be that, if this Court granted jurisdictional discovery, plaintiffs could find a connection between defendants' actions in the U.S. and plaintiffs' injuries that would satisfy the constitutional requirement that plaintiffs' claims arise out of defendants' U.S. contacts. However, plaintiffs cannot bring a case on the possibility that discovery will reveal that they are entitled to bring such a case in this Court. The information plaintiffs seek may be in the sole possession of defendants or third parties, but that does not change the fact that plaintiffs are not entitled to discovery if they cannot plead facts making "a 'sufficient start' toward establishing jurisdiction." Alexander, 2014 WL 7391683, at *6 (citation omitted).

This difficulty is inherent in plaintiffs' decision to sue foreign entities for their actions committed overseas in a U.S. court. "The rules governing establishment of jurisdiction over . . . foreign corporation[s] are clear and settled, and it would be inappropriate . . . to deviate from them or to create an exception to them" because of plaintiffs' inability to comply with these rules. Jazini v. Nissan Motor Co., 148 F.3d 181, 186 (2d Cir. 1998) (declining to grant jurisdictional discovery because, otherwise, a plaintiff could make "conclusory non-fact-specific jurisdictional allegations and thus obtain extensive discovery" over almost any multinational foreign corporation). Plaintiffs have offered the Court no basis to believe that jurisdictional discovery would result in a finding that there is a constitutional basis for jurisdiction.

## CONCLUSION

Defendants' motions to dismiss for lack of personal jurisdiction are granted.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
January 6, 2025